# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| JASON LEE HOLLOWAY,<br>AIS #230296, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. |
| | ) | 3:07-CV-690-MHT |
| | ) | |
| RALPH HOOKS, Warden; the | ) | |
| ATTORNEY GENERAL FOR | ) | |
| THE STATE OF ALABAMA, | ) | |
| | ) | |
| Respondents. | ) | |

## ANSWER OF RESPONDENTS

Come the Respondents, by and through the Attorney General of the State of

Alabama, and in response to this Honorable Court's Order to Show Cause why

writ of habeas corpus should not be granted state as follows:

1. Jason Holloway attacks his convictions for two counts of capital murder,

and his resulting sentence of life in prison without the possibility of parole,

rendered in Chambers County, Alabama. Holloway's victims were Rodney and

Angela Brown. Holloway was convicted of one count of capital murder for the

intentional murders of Rodney and Angela Brown pursuant to one scheme or

course of conduct, in violation of Alabama Code Section 13A-5-40(a)(10). He was

convicted of a second count of capital murder of Angela Brown during the course of committing a burglary, in violation of <u>Alabama Code</u> Section 13A-5-40(a)(4). As understood by Respondents, Holloway alleges the following grounds in support of his petition for writ of habeas corpus:

1. His convictions for both counts of capital murder violate the prohibition against double jeopardy because they are factually inconsistent with each other as well as with a third verdict returned by the trial jury that was later set aside (Petition, pp. 8-9);

2. The trial court lacked subject matter jurisdiction because the indictment counts charging capital murder during the course of a burglary did not state what underlying offense Holloway intended to commit by unlawfully entering a residence; Holloway further contends that the trial judge committed error by amending the indictment in his oral instructions (Petition, pp. 9-10);

3. He was denied his right of allocution (Petition, p. 10);

4. Trial counsel was constitutionally ineffective for failing to move to dismiss the indictments, for failing to object to the trial court not correctly charging the jury on the statutory elements of capital murder, and for failing to object to the judge amending the indictment orally (Petition, p. 10); and,

5. Appellate counsel was constitutionally ineffective for not raising allegations of trial counsel's alleged ineffectiveness on direct appeal.  (Petition, p. 10)

In arguing his claims, Holloway contends the Alabama appellate courts erroneously rejected his claims by applying case law that was issued after his trial.

2. Respondents admit that Holloway is in state custody based on these convictions. Respondents deny that Holloway is in custody in violation of the laws or the Constitution of the United States. Respondents aver that Holloway's convictions and sentence of life in prison without parole are valid and constitutional.

3. Respondents specifically deny each and every material allegation of the petition and demand strict proof thereof.

4. Respondents aver that Holloway's petition fails to sufficiently allege grounds cognizable under 28 U.S.C. § 2254 that would entitle him to relief by writ of habeas corpus. Holloway's contentions should be denied and dismissed with prejudice.

## PROCEDURAL HISTORY

### Trial and Direct Appeal

5. On August 23, 2000, the Chambers County (Alabama) Grand Jury returned a three-count indictment against Holloway. (Exhibit A, Clerk's Record excerpt p. 68) Count I charged Holloway with the intentional capital murders of Rodney and Angela Brown pursuant to one scheme or course of conduct, in violation of Alabama Code Section 13A-5-40(a)(10). Count II charged Holloway with the capital murder of Rodney Brown during the course of a burglary, in

3

violation of <u>Alabama Code</u> Section 13A-5-40(a)(4).  Count III charged Holloway

with the capital murder of Angela Brown during the course of a burglary, in

violation of <u>Alabama Code</u> Section 13A-5-40(a)(4).  Holloway was arraigned on

September 14, 2000 and pleaded not guilty and not guilty by reason of mental

disease or defect.  Trial on the charges against Holloway commenced before a jury

on June 3, 2003, Circuit Judge Ray D. Martin presiding.  Following the

presentation of evidence and the court's oral charge, the jury returned verdicts

finding Holloway guilty of capital murder of Rodney and Angela Brown on Count

I of the indictment; guilty of the lesser included offense of intentional murder of

Rodney Brown on Count II of the indictment; and, guilty of the capital murder of

Angela Brown during the course of a burglary on Count III of the indictment.

(Exhibit A, Clerk's Record excerpt, pp. 497-499)  The court then conducted the

sentencing phase of the capital trial, at the conclusion of which the jury returned a

verdict recommending punishment by life in prison without parole by a vote of

four for death and eight for life without parole.  (See Exhibit A, Clerk's Record

excerpt, p. 500)

      6.  After weighing the aggravating and mitigating circumstances presented in

Holloway's case, and with consideration of the jury's recommended punishment,

the court sentenced Holloway to life in prison without parole for the capital murder

convictions contained in Counts I and III of the indictment.  The court sentenced

Holloway to life imprisonment for the conviction of intentional murder contained in Count II of the indictment. (Exhibit A, Court Reporter's transcript, pp. 1766-1769)

7. Holloway appealed his conviction to the Alabama Court of Criminal Appeals in case number CR-02-2115. Holloway argued two allegations of error on appeal, the first being a claim of insufficient evidence to submit Counts II and III to the jury because there was not sufficient evidence to show the required element of burglary that Holloway had knowingly and unlawfully entered or remained unlawfully in the Browns' residence. The second claim was that the trial court had erroneously allowed evidence of a collateral act committed by Holloway some years before. (Exhibit B, pp. 15-31) The State responded that evidence had been presented of a struggle that sufficiently established a jury question of whether Holloway's privilege of being in the Browns' home had been revoked and he had therefore unlawfully remained in the home. The State further noted that, as to the murder of Angela Brown, Holloway had shot Rodney and Angela Brown and had left the Browns' home while Angela was still alive. He returned shortly thereafter to make sure she was dead and found she was not. He then stabbed her, smothered her with a pillow, and struck her with a baseball bat and thereby completed the capital murder. His second entry into the Browns' home was clearly unauthorized and unlawful. The State further argued the trial court properly exercised its

discretion in allowing the collateral act evidence. (Exhibit C, pp. 15-17, 20-24, 31-35)

8. The Alabama Court of Criminal Appeals affirmed Holloway's convictions and sentence by memorandum opinion on August 13, 2004. (Exhibit D) The court noted that Holloway did not challenge his conviction under Count I for the intentional murder of two persons. (Exhibit D, p. 1) The court further found, addressing Holloway's challenge to the sufficiency of the evidence supporting the capital burglary-murder of Angela Brown, that the evidence showed that Holloway "left the Browns' home after shooting Angela twice and leaving her to die on the sofa. Evidence was presented that when he left, [Angela] was breathing. [Holloway] went to his home, watched television and then decided to return to the Browns' home to make sure Angela was dead. He then struck her with a baseball bat and stabbed her to ensure that she was dead. Because the State presented evidence that [Holloway's] second entry was an unlawful entry that supported the capital murder charge, there was sufficient evidence presented to the jury which, if believed, would justify the verdict of guilty." (Exhibit D, pp. 2-3) The Court of Criminal Appeals further found that the trial court had properly exercised its discretion in allowing evidence of the earlier act by Holloway. (Exhibit D, p. 3)

9. Holloway took no further action on appeal, and Certificate of Judgment issued in case CR-02-2115 on September 1, 2004. (Exhibit E)

## Post-Conviction Proceedings

10. On April 12, 2004, while his direct appeal was still pending with the Alabama Court of Criminal Appeals, Holloway filed a post-conviction Rule 32 petition. (Exhibit F, pp. 1-15) Holloway alleged several purported jurisdictional claims, including an assertion that his conviction for the capital murder of Angela Brown during the course of a burglary should be set aside because it was inconsistent with the jury verdict acquitting him of capital burglary-murder of Rodney Brown by finding him only guilty of intentional murder. He also alleged that the indictment failed to specify what crime he intended to commit as part of the burglary charge, and that the trial court failed to properly instruct the jury on the elements of the offenses charged. (Exhibit F, pp. 8-10) Holloway also raised several allegations of ineffective assistance of counsel. (Exhibit F. pp. 11-14) On December 20, 2004, Holloway filed an amendment to his petition alleging he had not been allowed an opportunity to make a statement at sentencing. (Exhibit F, pp. 35-36)

On October 13, 2005, the trial court denied Holloway's petition. (Exhibit F, p. 44) Holloway appealed to the Alabama Court of Criminal Appeals in case

number CR-05-0185.  Holloway filed his brief on appeal on November 7, 2005.

(Exhibit G)  The State filed its brief on December 8, 2005.  (Exhibit H)

11.  The Alabama Court of Criminal Appeals issued a published opinion on

September 29, 2006.  (Exhibit I)  The court found Holloway's allegation that the

trial court lacked jurisdiction because of an alleged defect in the indictment was

without merit.  The court further found that Holloway's claim of a lack of

allocution at sentencing was not a jurisdictional claim.  Accordingly, the court

found that Holloway failed to show that he was entitled to relief under Alabama

post-conviction law based on these claims.  (Exhibit I, pp. 4-5)

The court next turned to Holloway's claims of ineffective assistance of trial

counsel for failing to move to dismiss the indictments, for failing to object to the

trial court's jury instruction, and for failing to object to the alleged oral amendment

of the indictment by the court's instructions.  The court concluded that Holloway's

assertions were "without merit because [Holloway] is unable to show that he was

prejudiced by his counsel's performance."  (Exhibit I, p. 6)  The court noted that,

even had counsel objected to the indictment, Alabama law provided that the court

could amend the indictment in its oral charge, as was done in Holloway's case.

(Exhibit I, pp. 6-7, citing Carruth v. State, 927 So. 2d 866, 878-879 (Ala. Crim.

App. 2005), and Rule 13.5(a), Alabama Rules of Criminal Procedure)  The

Alabama Court of Criminal Appeals further noted that, considering the trial court's

8

jury instructions "as a whole, and not in isolation," as the reviewing court was required to do, that though "not the model of clarity, the instructions did inform the jury that to constitute a capital offense the two murders must have arisen out of the same scheme or conduct. Thus, Holloway's claim is without merit." (Exhibit I, pp. 8-10) Further, because the trial court was authorized to amend the indictment in its instructions, there was no basis for trial counsel to enter any objection. Concluding its review of Holloway's claims, the Alabama Court of Criminal Appeals found that, because trial counsel could not be held ineffective, appellate counsel could not be held ineffective for not raising allegations concerning trial counsel. (Exhibit I, p. 10)

12. The Alabama Court of Criminal Appeals, on its own motion, found a violation of double jeopardy principles under Alabama law. The court held that Holloway's conviction under Count II for the intentional murder of Rodney Brown was a lesser included offense of the capital murder of two or more persons for which Holloway was convicted under Count I. Accordingly, the Court of Criminal Appeals remanded the case for the trial court to set aside Holloway's conviction for intentional murder. The Court of Criminal Appeals concluded that both capital murder convictions rendered against Holloway were valid. (Exhibit I, pp. 11-14)

13. The Court of Criminal Appeals subsequently remanded the case because the trial court's first order did not sufficiently comply with the appellate court's

directive. On March 9, 2007, on second return to remand, the Alabama Court of

Criminal Appeals affirmed the denial of Holloway's Rule 32 petition. (Exhibit J)

Holloway subsequently filed a petition for writ of certiorari in the Alabama

Supreme Court. (Exhibit K) The Alabama Supreme Court denied Holloway's

petition on May 11, 2007, and the Alabama Court of Criminal Appeals issued

Certificate of Judgment that same day. (Exhibits L and M)

## STATUTE OF LIMITATION

14. This is Holloway's first petition for writ of habeas corpus filed under 28

U.S.C. § 2254. Holloway's petition was timely filed within the statute of

limitation of 28 U.S.C. § 2244(d) to invoke the jurisdiction of this Court. Section

2244(d) provides for a one-year period of limitation for filing a petition for writ of

habeas corpus that begins when the conviction becomes final on direct appeal. The

one-year period is tolled during the pendency of a properly filed state post-

conviction proceeding. Holloway filed his state post-conviction petition before his

conviction became final on direct appeal. His post-conviction petition became

final when Certificate of Judgment was issued on May 11, 2007. (Exhibit M)

Holloway executed his petition on July 27, 2007, and it was filed by the Clerk of

this Court on July 30, 2007. (Petition, pp. 1, 15) Accordingly, Holloway's petition

was timely filed within the statute of limitation and is appropriately before this Court for resolution.

## EXHAUSTION

15.  Holloway's claims in this petition were presented by Holloway in his state post-conviction petition and were raised in his petition for writ of certiorari to the Alabama Supreme Court, the Alabama court of last resort.  Holloway has effectively exhausted his claims and they are ripe for determination by this Court.

## MEMORANDUM BRIEF

16.  Before addressing the claims raised by Holloway, Respondents first note the general standards that apply to the allegations of Holloway's petition. Respondents aver that, in considering Holloway's allegations under the appropriate standards, he has failed to show he is entitled to the relief he now seeks from this Court.

## SCOPE OF REVIEW

17.  Relief by writ of habeas on a claim that was adjudicated by the state courts is only appropriate when the petitioner shows the state adjudication "(1)

11

resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established federal law, as determined by the Supreme Court of the

United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court

proceeding." 28 U.S.C. § 2254(d); see Williams v. Taylor, 529 U.S. 362, 404-405

(2000); Bell v. Cone, 535 U.S. 685, 694 (2002).  Respondents aver that there is no

showing that the state courts' adjudications of Holloway's claims were improper.


## CLAIMS


18.  Holloway first contends that his convictions violate the constitutional

prohibition against double jeopardy.  As understood by Respondents, Holloway

contends that his conviction for the capital murder during the course of a burglary

of Angela Brown should be set aside because the jury acquitted him of the same

burglary by finding him guilty of the lesser included offense of intentional murder

of Rodney Brown.  In the alternative, he argues that if the capital burglary-murder

of Angela Brown is valid, his conviction for the murder of both Rodney and

Angela Brown as part of one act or one scheme or course of conduct should be set

aside.  The underlying basis of Holloway's contentions is the Alabama Court of

Criminal Appeals' rejection of his sufficiency argument on direct appeal in case

number CR-02-2115.  (Exhibit D)  The Court of Criminal Appeals agreed with the

trial court's finding that evidence established that Holloway left the home after

shooting Angela twice and leaving her to die, but returned to find her still alive.

He then hit her with a baseball bat and stabbed her. The Alabama Court of

Criminal Appeals noted that Holloway's second return was certainly an unlawful

entry that supported a finding of burglary.

19. Again, Holloway contends that this evidence negates any finding that

both Rodney and Angela Brown were killed as part of one scheme or course of

conduct that is required for a capital murder conviction as defined at Alabama

Code Section 13A-5-40(a)(10). Respondents aver that the fallacy of Holloway's

argument is his position that the burglary must also be the scheme or course of

conduct. To the contrary, the one scheme could simply be Holloway determining

to kill Angela and Rodney Brown, and doing so by first shooting them. Then,

when he returned to be sure Angela was dead, and finding she was not, Holloway

completed the single scheme by completing his murder of Angela Brown. The one

scheme does not have to be the burglary. The jury not finding the murder of

Rodney Brown was committed as part of a burglary, although finding Angela

Brown was murdered during the course of a burglary, is not legally inconsistent

with separately finding that Holloway killed the Browns as part of a single scheme.

The single scheme does not have to be so temporally related that it negates some

time delay during which Holloway's victim did not immediately die, requiring him

to return and finish the scheme. Holloway's double jeopardy claim has no legal basis and should be rejected.

20. Holloway next contends that he was deprived of his right to speak at sentencing. The Alabama Court of Criminal Appeals noted that this was not a jurisdictional defect that entitled Holloway to relief under Alabama post-conviction law. (See Exhibit I, pp. 4-5)

21. The Alabama Court of Criminal Appeals also rejected Holloway's claim that the indictment charging capital murder during the course of a burglary was insufficient because it did not specify the underlying crime he intended to commit as part of the burglary. The Alabama Court of Criminal Appeals rejected his claim, noting that it was not a jurisdictional defect and further finding that any such problems with the indictment were cured by the instructions given by the trial court. (See Exhibit I, pp. 4, 6)

22. The Alabama Court of Criminal Appeals rejected Holloway's claims of ineffective assistance of counsel by applying the appropriate standards enunciated by the United States Supreme Court in Strickland Washington, 466 U.S. 668 (1984). (See Exhibit I, pp. 5-6) The Alabama Court of Criminal Appeals specifically rejected the three allegations raised against trial counsel in this petition. Holloway contends that trial counsel should have moved to dismiss the indictment counts because they did not specifically charge him with capital

14

murder, that trial counsel should have objected to the court amending the

indictment counts by jury instructions, and that trial counsel should have objected

to the trial court's jury instruction on capital murder. The Alabama Court of

Criminal Appeals noted that, because any alleged deficiency in the indictment

could be corrected by the trial court's jury instructions, and the trial court had done

so in Holloway's case, there was no basis for trial counsel to object. The Alabama

Court of Criminal Appeals specifically noted that, under Alabama law, the trial

court is allowed to make such amendments where there are deficiencies such as

that alleged by Holloway. (See Exhibit I, pp. 6-7, citing Carruth v. State, 927 So.

2d 866, 878-879 (Ala. Crim. App. 2005), and Rule 13.5(a), Alabama Rules of

Criminal Procedure.)

23. Holloway contends the Alabama Court of Criminal Appeals erroneously

relied on the Carruth decision because it was issued after his trial. While this is

factually correct, it does not provide a basis for habeas corpus relief. The authority

cited in Carruth existed before Holloway's trial. See Hampton v. State, 815 So. 2d

571, 573 (Ala. Crim. App. 2001); Ash v. State, 843 So. 2d 213, 216-217 (Ala.

2002), overruled on other grounds, Ex parte Seymour, 946 So. 2d 536, 537-538

(Ala. 2006).

24. The Alabama Court of Criminal Appeals also rejected Holloway's claim

that trial counsel was constitutionally ineffective for not objecting to the trial

court's jury instruction on the elements of capital murder of two or more persons

pursuant to one scheme.  The Alabama Court of Criminal Appeals noted that the

trial court's jury instructions were appropriately reviewed "as a whole, and not in

isolation." (Exhibit I, p. 8)  The Court of Criminal Appeals then set out the

instructions given by the court and concluded that even though the court's

instructions were "not the model of clarity, the instructions did inform the jury that

to constitute a capital offense the two murders must have arisen out of the same

scheme or conduct.  Thus, Holloway's claim is without merit." (Exhibit I, pp. 8-

10)

25.  Finding that Holloway's allegations of ineffective assistance of trial

counsel were meritless, the Alabama Court of Criminal Appeals concluded that "it

logically follows that appellate counsel did not err by not raising these issues on

appeal.  Thus, Holloway's claim (sic) of ineffective assistance of appellate counsel

are likewise without merit.  Therefore, Holloway is not entitled to relief as to his

claims of ineffective assistance of counsel." (Exhibit I, pp. 10-11)

26.  The findings of the Alabama courts on the claims presented by

Holloway were neither contrary to previous Supreme Court decisions or

unreasonable applications of established federal law, nor were they decisions based

on unreasonable determinations of the facts in the light of the evidence.  The

Alabama courts' findings are supported by the record of prior litigation.  Holloway

has failed to meet his burden of showing he is entitled to relief by writ of habeas corpus. His claims were properly rejected in his post-conviction proceedings, and he has made no showing that the state courts' rejection of his claims was error. Respondents aver that Holloway's petition should be denied and dismissed with prejudice.

# EXHIBITS[1]

Exhibit A      Excerpt from record on direct appeal of Holloway's
               conviction to the Alabama Court of Criminal Appeals,
               CR-02-2115[2];

Exhibit B      Holloway's brief on direct appeal in CR-02-2115;

Exhibit C      State's brief in CR-02-2115;

Exhibit D      Memorandum Opinion of the Alabama Court of Criminal
               Appeals in CR-02-2115;

Exhibit E      Certificate of Judgment in CR-02-2115;

Exhibit F      Record on appeal of the denial of Holloway's Rule 32
               petition, CR-05-0185;

---

[1] The exhibits filed by Respondents, particularly Exhibit A, are lengthy. It appears
from Holloway's petition and from previous litigation that he has copies of the
exhibits. Accordingly, Respondents will not serve a copy of the exhibits on
Holloway. If Holloway does not have copies of any of the listed exhibits,
Respondents will provide them if directed by the Court.

[2] Because Holloway was tried on three counts of capital murder, the record on
direct appeal is lengthy. It totals over 2300 pages bound in twelve volumes. Much
of the Clerk's Record addresses pre-trial matters not relevant to the issues now
raised by Holloway. Further, extensive jury selection was conducted and recorded
that has no relevance to the issues now before this Court. Accordingly,
Respondents have only provided an excerpt from the record on appeal.
Specifically, from the Clerk's Record the excerpt contains pages 68 and 497-500,
the indictment and the jury's verdicts. From the Court Reporter's transcript, the
excerpt begins at page 774 and continues through 1770, which is the actual
evidentiary portion of trial. Should this Court desire the remainder of the transcript
for further purposes, Respondents will provide it if requested.

Exhibit G    Holloway's brief in CR-05-0185;

Exhibit H    State's brief in CR-05-0185;

Exhibit I    Alabama Court of Criminal Appeals' opinion in CR-05-0185;

Exhibit J    Alabama Court of Criminal Appeals' memorandum opinion on second return to remand;

Exhibit K    Holloway's petition for writ of certiorari filed with the Alabama Supreme Court;

Exhibit L    Alabama Supreme Court's denial of Holloway's petition;

Exhibit M    Certificate of Judgment in CR-05-0185.

**CONCLUSION**

Based on the foregoing, Respondents aver that Holloway has failed to meet his burden of showing he is entitled to relief by writ of habeas corpus. The allegations in his petition were properly rejected by the Alabama courts as they lack sufficient legal or factual merit to set aside his two convictions for capital murder. The Alabama courts properly considered and rejected Holloway's claims, and there is no basis under the law or facts to set aside these findings. Consideration of Holloway's petition by application of the appropriate standard of review shows Holloway's petition should be denied and dismissed with prejudice.

Respectfully submitted,

Troy King (KIN047)
*Attorney General*
By:


/s/ Andy S Poole
Andy S. Poole (POO011)
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>10th</u> day of September, 2007, I electronically filed the foregoing Answer (including exhibits) on the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the foregoing (excluding exhibits) to the following non-CM/ECF participants:   Jason Lee Holloway, AIS #230296, St. Clair Correctional Facility, 1000 St. Clair Road, Springville, Alabama  35146.

/s/Andy S. Poole
Andy S. Poole (POO011)
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone:  (334)  242-7300
Fax:  (334)  242-2848
E-Mail:  apoole@ago.state.al.us

ADDRESS OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division78311/
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300
316756/111636-001

21

Court of Criminal Appeals No. __CR-02-2115__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM
# CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2000-166
### Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From: __STATE CONVICTION__

Sentence Imposed: _____ __LIFE WITHOUT PAROLE__

Defendant Indigent: _X_ YES  _ NO

## JASON LEE HOLLOWAY

NAME OF APPELLANT

__CHARLES GILLENWATERS, & JOSEPH FIQUETTE__    __256-234-5018__

APPELLANT'S ATTORNEY                    (TELEPHONE NO.)

## POST OFFICE BOX 2129

ADDRESS

**ALEXANDER CITY**      **ALABAMA**      **35011**

CITY                STATE            ZIP CODE

### v.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

INDICTMENT

# THE STATE OF ALABAMA, CHAMBERS COUNTY

0068

## CIRCUIT COURT, FALL TERM, 2000

1.    The Grand Jury of Said County charges that before the finding of this Indictment, Jason Holloway, alias, whose name is otherwise unknown to the Grand Jury, by one act or pursuant to one scheme or course of conduct, did intentionally cause the death of Rodney Brown, by shooting him with a pistol, a further description of which is otherwise unknown to the Grand Jury, and did intentionally cause the death of Angela Brown, by shooting, stabbing, or striking her with a deadly weapon or dangerous instrument, to-wit: a pistol, knife or knife-like object, or bat or stick-like object, further descriptions of which are otherwise unknown to the Grand Jury, in violation of Section 13A-5-40(a)(10) of the Code of Alabama, against the peace and dignity of the State of Alabama.

2.    The Grand Jury of Said County further charges that before the finding of this Indictment, Jason Holloway, alias, whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of Rodney Brown by shooting him with a pistol, a further description of which is otherwise unknown to the Grand Jury and Jason Holloway caused said death during the time that Jason Holloway knowingly and unlawfully entered or remained, or attempted to enter or remain, unlawfully in a dwelling of Rodney or Angela Brown, with the intent to commit a crime therein, and while effecting entry or while in said dwelling or in immediate flight therefrom, Jason Holloway did cause physical injury to Rodney Brown who was not a participant by shooting him with, to-wit: a pistol, a further description of which is otherwise unknown to the Grand Jury, in violation of Section 13A-5-40(a)(4), of the Code of Alabama, against the peace and dignity of the State of Alabama.

3.    The Grand Jury of Said County further charges that before the finding of this Indictment, Jason Holloway, alias, whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of Angela Brown by  shooting, stabbing, or striking her with a deadly weapon or dangerous instrument, to-wit: a pistol, knife or knife-like object, or bat or stick-like object,  further descriptions of which are otherwise unknown to the Grand Jury and Jason Holloway caused said death during the time that Jason Holloway knowingly and unlawfully entered or remained, or attempted to enter or remain, unlawfully in a dwelling of Rodney or Angela Brown, with the intent to commit a crime therein, and while effecting entry or while in said dwelling or in immediate flight therefrom, Jason Holloway did cause physical injury to Angela Brown who was not a participant by shooting, stabbing, or striking her with, to-wit: a pistol or knife or knife-like object, or bat or stick-like object, further descriptions of which are otherwise unknown to the Grand Jury, in violation of Section 13A-5-40(a)(4), of the Code of Alabama, against the peace and dignity of the State of Alabama.

*Ren L. Clark*

District Attorney of the Fifth Judicial Circuit

## Court of Criminal Appeals No.   CR

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
FROM
# CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2000-166
### Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From:   STATE CONVICTION
Sentence Imposed:        LIFE WITHOUT PAROLE

Defendant Indigent: _X_ YES   _ NO

## JASON LEE HOLLOWAY
                                                        NAME OF APPELLANT
## CHARLES GILLENWATERS, & JOSEPH FIQUETTE        256-234-5018
APPELLANT'S ATTORNEY                        (TELEPHONE NO.)

## POST OFFICE BOX 2129
ADDRESS
## ALEXANDER CITY          ALABAMA            35011
CITY                STATE          ZIP CODE

### v.

## STATE OF ALABAMA
                                                        NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA )
)
VS. ) CASE NO. CC-00-166
)
JASON HOLLOWAY )

### VERDICT FORM
### COUNT I (MURDER OF TWO OR MORE PERSONS)

1. We, the Jury, find the Defendant, Jason Holloway, guilty of capital murder as charged in Count I of the Indictment.

*Nicholas Benson*
Foreperson

2. We, the Jury, find the Defendant, Jason Holloway, guilty of the offense of murder, a lesser included offense of capital murder as contained in Count I of the Indictment, as pertains to the death of Angela Brown; and further find the defendant, Jason Holloway, guilty of manslaughter, a lesser included offense of capital murder as contained in Count I of the Indictment, as pertains to the death of Rodney Brown.

_____
Foreperson

3. We, the Jury, find the Defendant, Jason Holloway, guilty of murder, a lesser included offense of capital murder as contained in Count I of the Indictment, as to the death of Angela Brown; and we find the Defendant, Jason Holloway, not guilty as to the death of Rodney Brown.

_____
Foreperson

4. We, the Jury, find the Defendant, Jason Holloway, not guilty.

_____
Foreperson

*Nicholas Benson*
Printed name of foreperson

0498

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| VS. | ) | CASE NO. CC-00-166 |
| | ) | |
| JASON HOLLOWAY | ) | |

**VERDICT FORM**
**COUNT II (MURDER OF RODNEY BROWN DURING**
**BURGLARY FIRST DEGREE)**

1. We, the Jury, find the Defendant, Jason Holloway, guilty of capital murder as charged in Count II of the Indictment.

_____
Foreperson

2. We, the Jury, find the Defendant, Jason Holloway, guilty of the offense of murder, a lesser included offense of capital murder as charged in Count II of the Indictment.

*Nicholas Benson*
_____
Foreperson

3. We, the Jury, find the Defendant, Jason Holloway, guilty of the offense of manslaughter, a lesser included offense of capital murder as charged in Count II of the Indictment.

_____
Foreperson

4. We, the Jury, find the Defendant, Jason Holloway, not guilty.

_____
Foreperson

*Nicholas Benson*
_____
Printed name of foreperson

0499

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA              )
                              )
VS.                           )          CASE NO. CC-00-166
                              )
JASON HOLLOWAY                )

## VERDICT FORM
## COUNT III (MURDER OF ANGELA BROWN DURING
## BURGLARY FIRST DEGREE)

1. We, the Jury, find the Defendant, Jason Holloway, guilty of capital murder as charged in Count III of the Indictment.

_Nicholas Benson_
Foreperson

2. We, the Jury, find the Defendant, Jason Holloway, guilty of the offense of murder, a lesser included offense of capital murder as charged in Count III of the Indictment.

_____
Foreperson

3. We, the Jury, find the Defendant, Jason Holloway, not guilty.

_____
Foreperson

_Nicholas Benson_
Printed name of foreperson

0590

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA                    )
                                    )
VS.                                 )        CASE NO. CC-00-166
                                    )
JASON HOLLOWAY                      )

## VERDICT FORMS

We, the jury, recommend that the defendant, Jason Holloway, be punished by death.  The vote is as follows:

_____Death              _____Life without parole


_____
Foreperson


We, the jury, recommend that the defendant, Jason Holloway, be punished by life imprisonment without parole.  The vote is as follows:

\_\_\_\_4\_\_\_\_Death              \_\_\_\_8\_\_\_\_Life without parole


*Nicholas L. Benson*
Foreperson



Nicholas L. Benson
printed name of foreperson

Court of Criminal Appeals No.___CR_____

## APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM
## CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2000-166
### Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From:___STATE CONVICTION
Sentence Imposed:_____LIFE WITHOUT PAROLE

Defendant Indigent: _X_ YES   _ NO

## JASON LEE HOLLOWAY

NAME OF APPELLANT

CHARLES GILLENWATERS, & JOSEPH FIQUETTE     256-234-5018
APPELLANT'S ATTORNEY                          (TELEPHONE NO.)

POST OFFICE BOX 2129
ADDRESS

ALEXANDER CITY          ALABAMA          35011
CITY                    STATE            ZIP CODE

### v.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
CHAMBERS COUNTY

STATE OF ALABAMA,                     *
                                      *      CRIMINAL NO.
versus                                *      CC-2000-0000166
                                      *      LaFayette, Alabama
                                      *      6 June, 2003
JASON HOLLOWAY,                       *
        Defendant.                    *      CRIMINAL APPEALS NO.
                                      *      CR-02-2115
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF TRIAL BEFORE

THE HONORABLE RAY D. MARTIN,

CIRCUIT JUDGE, AND A JURY.

A P P E A R A N C E S
FOR THE STATE OF ALABAMA:   REA S. CLARK, DISTRICT ATTORNEY
                            FIFTH JUDICIAL CIRCUIT
                            CHAMBERS COUNTY COURTHOUSE
                            COUNTY OFFICE BUILDING
                            LAFAYETTE, ALABAMA 36862

                            BY: REA S. CLARK, DA
                                BILL LISENBY, CHIEF ADA
                                KENNETH GIBBS, ADA


FOR THE DEFENDANT:          BLANCHARD & ASSOCIATES, LLC
                            ATTORNEYS AT LAW
                            505 SOUTH PERRY STREET
                            MONTGOMERY, AL 36104

                            BY: WILLIAM R. BLANCHARD, ESQUIRE
                                         and
                            KEITH & HAMM, PC
                            ATTORNEYS AT LAW
                            235 SOUTH McDONOUGH STREET
                            MONTGOMERY, AL 36104

                            BY: RICHARD K. KEITH, ESQUIRE


                            FRANCES L. ROARK, CSR
                            OFFICIAL COURT REPORTER
                            Fr3L126

## GUILT PHASE

PROCEEDINGS: In Open Court.

(JURY NOT PRESENT)

(WHEREUPON, A SIDE BAR COMMENCES.)

THE COURT: Counsel approach. Are we ready? Yesterday afternoon late Mr. Blanchard and Mr. Keith presented a motion.

MR. BLANCHARD: A Motion for Jury Instruction Prior to the Presentation of Evidence.

THE COURT: Now that motion as such was denied. However, the Court will give the following instruction.

This is a capital murder case. As you know, at this time we are beginning what is referred to as the guilt or innocence phase of the trial. In this proceeding you are to determine the defendant's guilt or innocence as pertains to the capital murder charges in the three counts of the indicment and any lesser-included offenses which may apply to those counts. You are to consider only these issues and you are not to consider any aspect of punishment or penalty should there be a guilty verdict as to either capital charges or lesser-included offenses, it would be improper to do otherwise.

Anything you want to put on?

MR. BLANCHARD: No, Judge, I believe that if you give that charge as read, I would be satisfied with that.

1          THE COURT:  That's what we're going to do.

2      Now, at this time, I'm going to have Mr. Story call up

3   the 16.  I'm going to swear in the bailiff, swear in the

4   jury, and tell the jurors not to discuss anything amongst

5   themselves, send them out for just a few minutes while I

6   dismiss the panel, and then when I call them back in, I take

7   it you want the rule invoked.

8          MR. KEITH:  The Rule?  Yes, sir.

9          MR. BLANCHARD:  Yes, sir.  I think our family

10  members are exempted from the Rule.

11         THE COURT:  That's noted.  Everyones knows who we

12  are talking about when I do invoke the Rule.  Then I'm going

13  through preliminary instructions about the conduct they are

14  to follow.  The only thing I am going to the tell them is

15  that after I give them instructions again on conduct, is the

16  general outline which will be opening statements by State and

17  Defense.  Then the State will be given an opportunity to

18  present their case.  We'll take a brief recess and address

19  any matters of law that must be addressed by me.  The Defense

20  will be given an opportunity to present theirs.  Then I'll

21  take a brief recess and address any matters of law that must

22  be dealt with by me.  Following that time, there's a

23  possibility of rebuttal by the State, but that will simply --

24  we'll have to wait until that time.  After that the attorneys

25  will again be given an opportunity to speak to you in their

```
 1   closing arguments, et cetera.  After that I'll charge you on

 2   the law and send you back.  That's it.  The next thing is

 3   going to be state your case to the jury.  Are we clear?

 4             MR. BLANCHARD:  Yes.

 5             MR. LISENBY:  We would like to put Dr. Krolikowski

 6   out of order, first.  Dr. Sam Baechtel, the FBI DNA expert is

 7   also here, and he is also going to be flying back to

 8   Virginia.  So, we are going to put him on right after

 9   Dr. Krolikowski.  Get them both out of the way and send them

10   back to their home states.

11             MR. BLANCHARD:  There is one thing I want to ask

12   about -- pose a question to the prosecution.  I have noticed

13   there's been a victims' services officer at your table

14   throughout some of the voir dire.  Do you intend to have that

15   person, or another victims' services officer at the table?

16             MR. LISENBY:  We have not had them at the table.  I

17   really don't know who that person is to tell you the truth.

18   The only people that we intend to have at the table with us

19   will be Jerome Cofield and Bertha representing the victims.

20   And, what we may actually do is just let them -- they are

21   sitting on the front row right now out behind us.  We may

22   just let them sit there.  I really don't know who that other

23   person is.  Do you, Kenny?

24             MR. GIBBS: She's Marian Sheehan (phonetics).  She's

25             MR. KEITH:  The blond lady is Marian Sheehan.
```

1          MR. GIBBS:  Who else are you talking about?  Diane

2    is our employee.

3          MR. KEITH: She's yours and the other is with

4    Marian.

5          MR. LISENBY:  Diane is going to be in and out, but

6    she's not going to be sitting at the table.

7          MR. KEITH:  We just didn't want them up at the

8    table.

9          THE COURT:  There's  no problem.

10          MR. BLANCHARD:  Kenny, one second, I have something

11    for you, Judge, and to give -- I received by FAX night before

12    last that report of Dr. Dixon and it will pertain to the

13    penalty phase issues.  And, there is something in there I

14    probably want to discuss with you, we can do that later.

15          Judge, here is, we talked about the Motion in Limine

16    on the conviction, the federal conviction, and you were

17    wondering about the definition of dishonesty or false

18    statement.  There is a section in McElroys which addresses it

19    and we think it will clear -- I brought my book.  I'm glad

20    for the Court to have a look at it at a convenient time.  I

21    will have it available otherwise.

22          THE COURT:  I think I granted the Motion in Limine

23    yesterday.

24          MR. LISENBY: I think you actually reserved ruling.

25          MR. KEITH:  You wanted some case law.

1            THE COURT:  I think what I actually said was, it

2    would be my intention to grant it, because the way I read the

3    law.  Almost on dishonesty it involves two parties -- not

4    necessarily two parties -- but a bilateral type of offense.

5    And, in this, you've got unilateral.

6            MR. BLANCHARD:   Unilateral.  If you want to look

7    at some case law, I'll be glad for you to look at that.

8            MR. LISENBY:  I would just say, I would like to

9    reserve the opportunity that if that comes back up before we

10   ask any questions, we can bring it back up.

11           THE COURT:  That's the thing, and we've talked

12   about this before, in any Motion in Limine, I will revisit.

13   Quite frankly, I have a number of motions in the record

14   already that I have said I would reserve until the time that

15   it became at issue.

16           MR. BLANCHARD:  He said we have abandoned the moral

17   turpitude test and now it is the dishonesty or false

18   statement and it goes on to tell what that is, what involves

19   -- you know, gives some examples of crimes that involve it

20   and crimes that don't.

21           THE COURT:  All right.  I have got the notation.

22   Thank you, sir.

23   (WHEREUPON, A SIDE BAR CONCLUDES.)

24   (VENIRE PANEL PRESENT)

25           THE COURT:  Ladies and Gentlemen, good morning.

1          THE JURY:  Good morning.

2          THE COURT:  In case you are wondering, we utilized

3    the old courthouse for the purpose of jury selection simply

4    because of the matter of space.  You will notice over there

5    the courtroom is large, we had down the hall the small

6    courtroom, and for the number of jurors we began with, it was

7    simply the best area that we had to do what we had to do over

8    the past three days.  Well, all of that is past, and we are

9    up to the point of beginning the trial of this case.

10         Mr. Story, at this time will call the names of the

11   jurors who will serve on this jury.

12         THE CLERK:  Yes, Your Honor.  As I call your name,

13   come forward and have a seat in the jury box, please.

14         Rosella Avery, Lisa Cox, Nicholas Benson, Karen Blanks,

15   Rita Bledsoe, Christy Brown, Joyce Carwell, Howard Crawley,

16   Ann Curry, Linda Huguley, Carla Jackson, Terri Morgan, Mary

17   Owens-Lyerly, David Philpott, Barbara Powell, Terry Vines.

18         THE COURT:  Ladies and Gentlemen, here on the trial

19   jury, if each of you would stand and raise your right hands,

20   please.

21   (WHEREUPON, THE JURY WAS SWORN).

22         THE COURT:  Ms. Schaffer.

23   (WHEREUPON, THE BAILIFF WAS SWORN).

24         THE COURT:  Ladies and Gentlemen, I am going to

25   give you one brief instruction at this time and I'm going to

1   send you back to the jury room with the bailiff in just a few

2   minutes.  During this time, do not discuss any aspect of this

3   case or anything else amongst yourselves.  You may discuss

4   the weather or other topics like that; otherwise, do not

5   discuss anything.  I've got to go through the process of

6   discharging the balance of the jurors.  As soon as that is

7   done, then I will bring you back in here and I will give you

8   preliminary instructions that you will have to follow

9   throughout the course of this trial.  I will also give you an

10  outline of what you can expect as far as the steps in the

11  procedure that we will be following in this trial.

12      So, for now, I'll ask you to step back to the jury room

13  and call you back in a few minutes.

14  (WHEREUPON, THERE WAS AN OFF-THE-RECORD SIDE BAR).

15          THE COURT: I am excluding the case agent from the

16  Rule.

17          MR BLANCHARD:  That's fine.  Maybe for the record

18  we should state that neither side exercised any Batson

19  Challenge to this jury panel.

20          THE COURT:   Thank you.

21      For the record, neither the State nor Defense made any

22  sort of Batson Motion relative to this jury, to the trial

23  jury as seated, and with that are you ready?

24      Folks, the front row is going to have to be left open.

25  You are going to have to move back from the front row.

1          MR. LISENBY:  I was also going to say, could we

2   have those two chairs for the other jurors on each side?  The

3   reason for that is we are just going to do our opening

4   statements.

5          THE COURT:  We put them there just for ....

6          MR. LISENBY:  Just for this purpose.

7          THE COURT:  Bring them in.

8   (JURY PRESENT)

9          THE COURT:  Ladies and Gentlemen of the Jury, there

10  are certain instructions that I have got to give you at this

11  time that will follow you and you will follow them throughout

12  the course of this trial.

13      Now, I told you on the first day of the term that this

14  jury won't be sequestered.  That is, you will be able to go

15  home at night.  You will be able to go home over this

16  weekend, but there are certain rules that you must follow to

17  the letter for me to be able to allow you to do that.

18      First, do not talk to anyone about this case or anything

19  that might relate to this case.  I understand that during

20  recesses, that during breaks, overnight breaks, and weekend

21  breaks, you will have people question you.  You will have

22  family, friends, relatives, and acquaintances question you

23  about what you're doing and what's going on in the

24  courthouse.  You must tell them that you are under an

25  absolute court order not to discuss this case at all.  Should

1   anyone, for whatever reason, persist in asking you about this

2   case, then it would be your duty to let me know through

3   either our bailiff, or Mr. Story, or any of his deputy

4   clerks, and we will take immediate measures to remedy that

5   situation.

6        Do not try to learn anything about this case.  The only

7   thing that you can know about this case will come to you from

8   this witness stand in the form of sworn testimony and other

9   items of evidence that may be admitted for your

10  consideration.

11       Avoid all contact with family members both of the

12  victims' families and of the defendant's families.

13       Do not talk to law enforcement officials or to any

14  person who may be a witness in this case.

15       And, Ladies and Gentlemen, you do not know who the

16  witnesses may or may not be.  So, the safest rule as I said

17  is to simply isolate yourself.

18       Avoid news media.  That includes any form of news

19  media.  We are in an electronic age that has media

20  capabilities that we have never had before:  Internet.  All

21  these different sorts of things.  All of it you must avoid.

22  Newspaper, radio, television -- any form of news media, you

23  must avoid.  You must turn away from it.  You must not listen

24  to it, watch it, or read it.  Should any member of the media

25  contact you, you must tell them that you are under court

1   order not to discuss this case in any aspect.

2       After this case is over and after you have been

3   discharged, it is your personal choice as to whether or not

4   you want to discuss this case.

5       Now this is one that I have already said several

6   times, but I want to reiterate.  Do not discuss this case

7   even amongst yourselves.  There will come the proper time for

8   you to discuss this case.  But, that will be after all

9   evidence has been presented and after I have charged you on

10  the law.  You must basically take the evidence, all evidence,

11  you will be the judges of the evidence, but you will judge

12  the evidence in light of the law as I charge you.  You must

13  follow the law, I think I have already been over that, but

14  you must apply the law as it exists and not as you think it

15  is or as you think it ought to be.

16      The bailiffs in this case, or the bailiff in this case,

17  cannot discuss any aspect of the case with you.  Just as you

18  cannot discuss with anyone.  You cannot ask the bailiff any

19  question about this case.

20      One of the last instructions I'm going to give you, and

21  this is one that is somewhat difficult to follow, but you've

22  got to do it.  During the pendency of this trial you

23  basically have to isolate and insulate yourself from any

24  contact of any sort that might tend to have an affect on your

25  ability to be a fair and impartial juror in this case.  An

1    example would be, when you are coming and going, there may be

2    people discussing the case in the hallways, foyers,

3    stairwells, or wherever.  You must isolate yourself from even

4    that sort of situation.

5         Now, I'm going to tell you very briefly the procedure

6    and the steps that we will be following in this case.  First

7    of all, I want you to understand, and I have told you before,

8    this is a capital murder case.  At this time, we're beginning

9    what is referred to as guilt or innocence phase of trial.  In

10   this proceeding you are to determine the defendant's guilt or

11   innocence as pertains to the capital murder charges in the

12   three counts of the indictment and any lesser-included

13   offenses which may apply to those counts.  You are to

14   consider only these issues and you are not to consider any

15   aspect of punishment or penalty should there be guilty

16   verdicts as to either capital charges or lesser-included

17   offenses.  It would be improper to do otherwise.

18        The first order of business this morning will be that

19   the attorneys will make their opening statements to you.

20   Following that the State will be given an opportunity to

21   present their case.  I will take a recess and take up any

22   legal matters or motions that I must take up and consider as

23   judge.  Then the Defense will be given an opportunity to

24   present their case.  After that time, I will again take a

25   recess and send you out while I discuss any legal matters

1    that I must decide with the attorneys.  After that time

2    there's a possibility that the State would have a rebuttal to

3    certain evidence presented, but we'll simply have to wait

4    until the proper time to determine whether or not that would

5    be the case.  After that time, the attorneys will address you

6    in closing arguments.  Following closing arguments, I will

7    charge you on the law.  Then I will send you out to the jury

8    room to reach -- deliberate and reach your verdicts.

9         Now, all of these things that I have just gone over are

10   just a very brief sketch.  I will be filling you in much more

11   in detail of what we will be doing at each different one and

12   the impact of each step that we go through.

13        Now, first, I want you to understand that in determining

14   what the true facts are in this case, you are limited to

15   evidence that is presented from the witness stand as opposed

16   to matters that are stated by the attorneys and the lawyers

17   during the course of trial.  What the attorneys say, both for

18   State and Defense, and anything they have stated thus far and

19   what they may say during the trial, is not evidence.  What

20   they argue to you at various points in the trial is not

21   evidence.  They have a right, duty, and obligation at the

22   appropriate times in the trial to comment on the evidence and

23   to ask you to draw reasonable inferences from the evidence as

24   they argue their respective positions to you.  What they say

25   is not evidence and you should put what they say in the

\*\*\* Frances L. Roark \*\*\*

1   proper category in your thinking, and it should not be in the

2   evidence category, just as the indictment in the case is not

3   evidence and should not be in the evidence category.

4       Now, a couple of other things before the attorneys state

5   their cases to you. Don't be concerned with the fact that I

6   may, during the course of trial, draw the attorneys up here

7   to talk to me in private. I have certain legal matters that

8   I must decide all through the course of this trial. So,

9   don't concern yourself with what's going on up here.

10      State ready?

11          MR. LISENBY:   State's ready, Your Honor.

12          THE COURT:   You may proceed.

13          MR. LISENBY:   Thank you, Your Honor. May it

14   please the Court.

15          THE COURT:   Mr. Lisenby.

16                  **OPENING STATEMENT BY STATE**

17          MR. LISENBY:   Mr. Blanchard, Mr. Keith, Members of

18   the Jury, good morning.

19          THE JURY:   Good morning.

20          MR. LISENBY:   I had gone this far, why not, if you

21   are going to go a mile, you might as well run a mile. That's

22   what the defendant Jason Holloway told police investigators

23   during his interview on January 21st of 2000, concerning the

24   events of January the 12th, 2000, At 1010 County Road 249 in

25   the Welch Community here in Chambers County.

```
 1          On January the 12th, which was a Wednesday, the two
 2   people that lived in the trailer on County Road 249, Rodney
 3   and Angela Brown were going to run some errands with Angela's
 4   brother Jerome Cofield, who you met earlier and who is seated
 5   over here with the State.  Angela ....
 6               THE COURT:  Mr. Lisenby, I'm so sorry to interrupt
 7   you.  I did not invoke the Rule.
 8               MR. LISENBY:  All right.  We have excused ....
 9               THE COURT:   I want to make certain, and I am so
10   sorry, and I apologize, the Rule of Sequestration has
11   previously be invoked.  That means that anyone who is a
12   witness, or potential witness in this case, must wait outside
13   during the course of the trial and be called in at the
14   appropriate time by the attorneys who is calling you.  With
15   that being on the record and with my apologies, proceed.
16               MR. LISENBY:   Thank you.
17          As I was saying, on January 12th of 2000, Rodney and
18   Angela Brown -- Angela goes by the name of Ann to friends and
19   family -- were going to run some errands with her brother,
20   Jerome Cofield, who was going to come and pick them up.
21          That morning Mr. Cofield around 11:30 or so, arrived
22   at the area of where they lived in a trailer.  Right across
23   the road is where the defendant, Jason Holloway, lived, and
24   as Mr. Cofield arrived in that area, he saw the defendant,
25   Jason Holloway, at a mailbox out near his house,
```

1  Mr. Holloway's house. And, at that time, the defendant did

2  not wave nor speak to Mr. Cofield, although he had always

3  done so in the past when he had seen Jerome, because he knew

4  him.

5      Mr. Cofield went on up to the trailer, blew his

6  horn to get someone's attention inside, waited a short time

7  and no one came out, so he left and went on about his

8  business, because he had other things to be doing also.

9      Around 3 o'clock or so that afternoon, January the 12th,

10 Ann's two daughters, Tashia, who was age 13 at the time, and

11 Terri, who was age 11 at the time, got home from school.

12 They had left that morning around 6:30 or so to go to school,

13 and both Angela and Rodney were alive at that time.

14     When the girls arrived back at the house, the door was

15 locked. They unlocked the door, went into the trailer and

16 immediately saw Angela, their mother, laying on the couch,

17 blood across her head and Rodney laying face down in the

18 trailer. When they ran out screaming going to people that

19 they knew in the neighborhood for help, one of the first

20 people they came in contact with was the defendant,

21 Mr. Holloway. He actually went back up to the Browns'

22 trailer, looked into the trailer, returned back to his house,

23 and was one of the people that called 911.

24     When the sheriff's office got the call, of course,

25 deputies began to respond and the investigation began on that

1    day.  During the course of this investigation autopsies were

2    performed on Rodney and Angela Brown.  And, during the course

3    of the autopsy, it was determined that Rodney had two gunshot

4    wounds.  One to his chest and one to the back of his head.

5    Angela also had two gunshot wounds.  One to her chest and one

6    to the top of her head.  She also had a graze wound on her

7    chest right above the chest wound itself.  But, in addition

8    to the gunshot wounds, Angela also had multiple stab wounds.

9    She had one to her stomach and five to the area around her

10   neck.  And, in addition to that, she also had injuries to the

11   forehead.  I believe the doctor will call blunt-force trauma

12   injuries to her head.  And further, during the course of the

13   investigation, it was determined that Angela had semen in her

14   vagina.

15        As the investigation progressed, the Department of

16   Forensic Sciences also performed ballistic examinations or

17   examination of bullets that were recovered from both Rodney

18   and Angela.  Each of them had two bullets.  Those were

19   recovered and it was determined by the examiners that those

20   bullets which were of a .38 or .357 caliber type, could have

21   come from a Colt pistol.  The investigators also learned

22   during the course of this investigation that Jason Holloway's

23   foster mother, Marie Collier, who you met the other day

24   during some of the voir dire, again they lived, basically,

25   right across the road from where Rodney and Ann lived.  Marie

 1  Collier also had a pistol and Investigator Jeff Blackstone,

 2  who is seated over here with the State, went out to

 3  Ms. Collier's house and retrieved the pistol.  It turned out

 4  to be a Colt .38 caliber revolver.  When Mr. Holloway was

 5  interviewed with this information about the pistol and the

 6  gunshots and the injuries to Angela, he gave a four page

 7  statement to the police detailing what he had done,

 8  describing to them how he had gone to the trailer and had

 9  shot both Rodney and Ann, how he had then left the trailer

10  and returned back a very short time later with a knife, and

11  that knife I believe you will also hear was later recovered

12  at his residence also.  He returned with a knife.  When he

13  returned, according to his statement, he found Ann still

14  gasping for air.  She was still alive at that time.  So, he

15  took a ball bat and he struck her across the head.  He took

16  the pillow and tried to smother her with that.  He took the

17  knife and he stabbed her multiple times.  And, then when he

18  said she was dead, he then had sexual intercourse with her.

19  And, he described it by saying, "I had gone this far, why

20  not, if you are going to go a mile, you might as well run a

21  mile," in describing why he had sexual intercourse with

22  Angela.

23       As Judge Martin told you at the beginning, Jason

24  Holloway is charged in a three-count indictment all charging

25  capital murder offenses.  The first one being a murder of two

1   or more people.  The second one being the murder of Rodney

2   Brown during the course of a burglary of their trailer.  The

3   third being the murder of Angela during the course of a

4   burglary of their trailer.  At the close of all of the

5   evidence, the State will request that you return verdicts of

6   guilty as charged in counts of capital murder against the

7   defendant, Jason Holloway.

8        Thank you.

9             THE COURT:  Mr. Keith.

10                  OPENING STATEMENT BY DEFENSE

11            MR. KEITH:  Thank you, Your Honor.  May it please

12   the Court, Ladies and Gentlemen of the Jury, counsel for the

13   State, Mr. Lisenby and Mr. Gibbs.

14             THE COURT:  Mr. Keith.

15            MR. KEITH:  Y'all are probably aware by now, every

16   murder case and every capital murder case, there is nothing

17   pretty about it.  They are all ugly.  There are gruesome

18   photographs.  People get killed in capital cases in every one

19   of them.  There's blood.  Bad things happening to good

20   people.  And, they are all bad.  And, y'all have heard some

21   of the worst of it already.  Mr. Lisenby has explained some

22   of it to you.

23        There's a dispute -- if there wasn't a dispute about

24   what actually happened, we wouldn't be here today.  If

25   everything the State said was true, we wouldn't be here.

1    I want to go ahead and very briefly thank you for being

2  here.  Thank you for being attentive.  Thank you right now

3  ahead of time for your role as juror.  Soon you will have the

4  opportunity to exercise your role and exercise your oath that

5  you swore to uphold, and you are going to do that when this

6  case is over with, and go back in that little jury room in

7  there.  When you exercise it, to give it a fair and impartial

8  analysis of the facts, apply those facts to the law, and of

9  particular importance, you won't be swayed by prejudice,

10 bias, you won't convict or acquit for the wrong reasons, and

11 you won't let your sympathy for the families between the

12 Browns and the Holloways get in the way.

13    Rodney and Angela Browns' family were all good people.

14 Every one of them.  Children -- their children.  The Holloway

15 family.  They are all good people.  There's no animosity

16 between the two families.  They are all here.  The Browns

17 support their loved ones.  The Holloway family is here to

18 support Jason.

19    We are not denying he did a bad thing, a terrible thing.

20 We are not hiding from it.  Mr. Lisenby has explained to you

21 that Jason Holloway made a statement on January 21st of the

22 year 2000.  He has read to you some portions of that

23 statement.  In that statement there's one bottom line to

24 everything Jason said in his statement.  It is basically true

25 just about everything he said in that statement.  I don't

1    mean just about everything.  It is about a four-page

2    statement.  We are not here to hide the truth.  We are here

3    to help you understand what the truth is and put it in

4    context.  The fact that Jason may have had sexual intercourse

5    with Angela Brown upon her death, doesn't mean he is guilty

6    of anything.  It might be a horrible thing that he did, but

7    that doesn't mean he is guilty of capital murder of Angela or

8    Rodney.  It doesn't mean that.

9        The State is going to have you believe through

10   their witnesses that everything Jason Holloway said was true

11   in that four-page statement, but they are not going to want

12   you to believe the entire truth, because it doesn't fit with

13   their prosecution and what they want you to believe.  Jason

14   has explained, and you are going to hear the witnesses and

15   hear about it, Jason explained in his statement why he went

16   over there and why he did what did he.  He went and got a

17   baseball bat that was by the TV.  It is not Jason Holloway.

18   It was Rodney Brown.  "He, Rodney Brown, went to swing it and

19   I pulled the gun from my jacket pocket and shot."  Jason

20   Holloway will get up and you may well hear from him, and you

21   may not, but the statement is going to come into evidence and

22   you may well hear Jason explain it.  He shot Rodney Brown in

23   self-defense.  That is why we're here.  We don't claim he

24   shot Angela in self-defense.  We are not going to try to fool

25   you.  We are not going to try to mislead you that there was

1  real good cause for him shooting Angela, because there

2  wasn't. It wasn't a capital murder when he caused Angela's

3  death. It may well have been a murder or some type of

4  homicide or manslaughter, but it wasn't a capital offense,

5  and we don't hide from that. Jason holds his head up and

6  admits that. He has done so and did about three-and-a-half

7  years ago. But, the one consistent fact, and the evidence

8  bears it out for that, he shot Rodney in self-defense.

9  That's why we're here today. That's why he is not guilty of

10  the capital murder charge in count one of killing two or more

11  people. That's why Jason is not guilty in count two of the

12  indictment of capital murder burglary of Rodney Brown. Why?

13  Because it was self-defense and because it was self-defense

14  on Rodney Brown, he can't be found guilty of capital murder

15  of Rodney or capital murder of two or more people.

16      This indictment Judge has read to you, and that is why

17  we are here, there's no presumption of guilt. This piece of

18  paper, indictment, there was a grand jury that heard some

19  evidence and heard deaths were caused by Jason and charged

20  with capital offenses, and that's why we're here. There's no

21  inference of guilt, none whatsoever, that he is guilty of any

22  capital offense or any offense.

23      Again, we are here to put all this in context and to try

24  to explain to you what the truth is. And you must remember,

25  I'm not going to get into it a whole lot, Jason is presumed

1    innocent.  He's presumed innocent of capital murder.  We are

2    not saying he's innocent of everything that happened on

3    January 12.  The State has that burden of proof to prove that

4    it was a capital murder.  There's difference between capital

5    murder, regular murder, and manslaughter.  One thing they all

6    have in common is that the person caused someone's death.

7    Then there are legal reasons why it can be capital, why it

8    would be regular murder, intentional, reckless murder, or

9    even manslaughter, heat of passion, kind of lose control,

10   freak out, do bad things to people.  You decide what the

11   facts are based on that testimony.

12       January 12 Jason went to the Browns' mobile home a

13   hundred yards away from his residence over here in the Welch

14   Community.  There had been a history of animosity between

15   Rodney Brown and Jason.  I am going to apologize to you right

16   now.  We are not here to bad mouth Rodney Brown for the wrong

17   reasons, but, unfortunately, because the truth must come out,

18   we must explain to you what was going on in Rodney Brown's

19   life that directly impacted upon Jason Holloway.  We are not

20   here to bad mouth or to suggest Angela Brown was a bad person

21   in any way, but we are going to do it here for Rodney Brown,

22   not because we are trying to be mean to the victim's family,

23   but because that's what the truth is.

24       You'll hear some witnesses come to court and you may see

25   some records that will help explain to you why it is Jason

1   went to the house to begin with.  What the evidence will be

2   that will enable you to find that there was self-defense is

3   simply this.  And, again, I apologize to the victim's family

4   for this.  Rodney Brown had a history of violence, had

5   history of threatening women, --

6           MR. LISENBY:  Your Honor, I object to that.

7           MR. KEITH:  -- had a history of beating his wife.

8           MR. LISENBY:  Your Honor, I object to that.

9           THE COURT:  Y'all approach.

10  (WHEREUPON, A SIDE BAR COMMENCES.)

11          MR. LISENBY:  What he's talking about -- what he's

12  started talking about is what Rodney said to Jason.  He can

13  probably get into that, but what Rodney's character was with

14  regard to someone else has nothing to do with this case --

15  not admissible in any proceeding that I am aware of.

16          MR. KEITH:  Judge, it is going to go to the entire

17  defense theory.  Rodney Brown raped Jason's next door

18  neighbor.  Rodney Brown threatened to rape Jason's

19  girlfriend.  Jason had witnessed personally Rodney beating

20  his wife, threatening women in general, and that's why the

21  animosity and that's why he went over there to confront

22  Rodney Brown about Rodney's threat to rape his girlfriend.

23  It's all relevant.  This is the whole defense theory.

24          MR. LISENBY:  It is not relevant to this case

25  whatsoever.

1   (WHEREUPON, A SIDE BAR CONCLUDES.)

2           THE COURT:  Ladies and Gentlemen, I ask that you

3   step back to the jury room for just a few minutes.

4   (JURY OUT)

5           THE COURT:  Now go ahead.  You were saying?

6           MR. KEITH:  Do you want me to go through it again?

7           THE COURT:   No.  We were on the record up to the

8   point that I sent the jury out.  You were at the point of

9   saying that it goes to the entire theory of defense.

10          MR. KEITH:   Jason Holloway is going to explain,

11  and we are going to have witnesses and documentation of

12  medical records, that the reason -- it is the whole defense

13  theory justifies and explains the self-defense and the

14  reasons self-defense is because Jason's fear and his

15  awareness, that personal knowledge, of Rodney Brown's

16  reputation for raping women.  We've got a witness, Sandra

17  Patterson, who is actually a State witness, who has come

18  forward, she's been subpoenaed, she's going to admit to that.

19  There are medical records to back it up that it happened.

20  Jason had been present when Rodney Brown beat his wife, when

21  he threatened women in general.  Rodney Brown threatened to

22  rape Jason's girlfriend, which is why Jason went over there

23  to confront Rodney about his threat.  All -- Rodney Brown's

24  reputation and propensity for violence, threatening to rape

25  women, having raped women, prove that it actually happened.

1   That is why Jason went over there. That was the whole basis

2   for confrontation. That's why Rodney reacted when he

3   confronted him with that in front of his wife. That's the

4   entire defense theory.

5          MR. BLANCHARD: Not only that, but also why he

6   carried a gun. Jason is a very small person and Rodney was

7   very large, and he knew Rodney to have a propensity for

8   violence. And, when he went over there to confront him, he

9   carried a gun. I'm sure the State will say carrying the gun

10  was some sort of evidence of motive. We need to be able to

11  prove otherwise.

12         THE COURT: I think it is in.

13         MR. LISENBY: I am sorry.

14         MR. KEITH: It's our whole case.

15         THE COURT: I think it is in.

16         MR. LISENBY: I don't think they can show the

17  connection as required for that, because it doesn't have

18  anything to do with self-defense.

19         THE COURT: I can't cut them off here. I mean, I

20  think if I prohibit them and he may say that we intend to

21  prove this, and he's not able to prove anything of this sort.

22         MR. LISENBY: I guess what I am concerned about is,

23  right, exactly, what I am concerned is, is that in the

24  opening statement part, I don't think they are going to be

25  able to connect this up with regard to the elements.

```
 1              THE COURT:  That's a risk any lawyer takes.  You
 2   can stand up and tell the jury anything you can prove and if
 3   you fall on your face ....
 4              MR. LISENBY:  I am going to say that taints this
 5   jury with regard to the evidence that  ....
 6              THE COURT:  No.  What I am going to do, I'm just
 7   going to reiterate that the opening statements and everything
 8   any attorney says in the course of this trial is not
 9   evidence.  I am going to do that.  I am not going to sustain
10   the objection.
11              MR. KEITH:  We are not going there for wrong
12   reasons, Judge.
13              THE COURT:  Before we go forward, as I understand
14   it, Mr. Keith is saying that this defendant went over to
15   confront Rodney Brown about a threat he made concerning --
16              MR. KEITH:  His girl friend.
17              THE COURT:   -- Jason Holloway's girlfriend.
18              MR. LISENBY:  Of course, that is not what the
19   defendant says.
20              MR. KEITH:  He certainly does, too.
21              MR. LISENBY:  Please let me finish, Mr. Keith.
22   That's not what the defendant says about the comment:  There
23   was no threat to it.  He did not say, I am going to go do
24   this, whatever this might be, to your girlfriend.  The
25   comment that's in the statement is, words to the effect, I
```

1   can get the statement, it is to the effect of, in

2   conversation of these two friends, because that's what the

3   evidence is going to be in this case, that they were friends,

4   is, "I can fuck your girlfriend better than you can." That

5   is all it is. It is not a threat of any kind. That's what

6   the defendant said. I don't think he'll be able to show a

7   connection.

8           THE COURT: I think that goes to it, Mr. Lisenby.

9   You say you don't think they are going to be able to show ...

10          MR. LISENBY: I don't think they are going to be

11  able to show a connection with regard to this whatever they

12  are alleging involving Sandra Patterson to the defendant with

13  regard to his knowledge about it or any connection or

14  anything like that. I don't think they are going to be able

15  to show any connection with regard to any allegations of

16  Rodney having beaten Angela to this defendant. And that's

17  the kind of thing they have to show. They have to show that

18  the defendant had a relationship, or kinship, or something to

19  the other person. They have to be able to show he was aware

20  of it. And, in some manner, basically, that it was

21  communicated to him in some way. I don't think they are

22  going to be able to show anything like that with regard to

23  Rodney and Angela.

24          MR. BLANCHARD: If we can show that then -- you

25  seem to be saying, if we can show that we don't have a

1    problem.

2            MR. KEITH:  If we can't, we lose.

3            MR. LISENBY:  But, based on interviews we had with

4    people, they are not going to be able to make connection

5    between these two.

6            MR. KEITH:  I'm sorry, between Jason and?

7            MR. LISENBY:  And whoever.

8            MR. KEITH:  The two are Jason and Sandra

9    Patterson?

10           MR. LISENBY:  Sandra Patterson would be one.

11   Angela Brown would be the other.  That's the two you've

12   mentioned.

13           MR. KEITH:  Sandra lived next door to Jason.

14           MR. LISENBY:  I understand that.  That's not the

15   connection I remember being listed in McElroy's.  It has to

16   be shown.  Next door neighbor is not sufficient contact.

17           MR. KEITH:  That just goes to the weight.  If it is

18   not admissible then we cannot put our case in the capital

19   murder case of the defense theory.

20           THE COURT:  Here's the bottom line.  This is

21   opening statement.  I don't know what the State is going to

22   be able to prove.  I don't know what the Defense will have as

23   evidence.  But, I just know that at this point if I sustain

24   this objection and I close the door on what the defendant has

25   proposed as his defense to a capital murder charge, ....

1          MR. LISENBY:   I'm not really asking the Court at

2   this point to do that.  All I am asking is that it not be

3   mentioned in opening statements until we get to a point where

4   they can present something to the Court as they get into

5   their defense with regards to these connections that I think

6   they have to make.

7          MR. BLANCHARD:   Opening statements are too

8   important, Judge, ....

9          MR. LISENBY:   I am not asking you to say, no, you

10  cannot get into it for ever and ever.  I'm just asking the

11  Court not to allow them to get into it -- if we had known

12  they were going to bring up something, that in my mind is

13  clearly in admissible, we would have filed a Motion in Limine

14  about that.

15         THE COURT:   Well, here we are.

16         MR. LISENBY:   Right.  I really don't want you to

17  misunderstand.  I'm not asking you to preclude them for ever

18  and ever at this point.

19         THE COURT:   I think at this point to sustain the

20  objection would be a big step toward preclusion of defense.

21  Although, what you say is not evidence now is the time if you

22  have got a defense you need to outline it to a jury.  And, if

23  you can't prove it, that's another matter.

24         MR. BLANCHARD:   I agree, Judge.  What we're talking

25  about is at the base of our defense.  It supports the

1    defense.  It is the foundation.  And, if we can't talk about

2    it, then we can't make an effective opening statement.

3              MR. LISENBY:  As I said, the point where Mr. Keith

4    was talking about some animosity between Mr. Brown and

5    Mr. Holloway, I mean clearly is nothing objectionable about

6    that.  But, it is the further connection to -- of course, I

7    am repeating myself at this point.  I will stop doing that.

8              THE COURT:  I understand.  The bottom line is the

9    State's objection, as Mr. Lisenby states, "I don't think they

10   can prove."  That's not sufficient.  I'm going to overrule

11   the objection.  I am going to again give the instruction

12   which I will do many times throughout the trial as to the

13   affect of statements of attorneys versus evidence and

14   testimony.

15        Overruled.

16   (JURY PRESENT).

17   (WHEREUPON, A SIDE BAR COMMENCES.)

18             THE COURT:  One of the jurors just asked Mr. Story

19   if he could take notes.  Is that correct, Mr. Story?

20             THE CLERK:  That's correct, Judge.

21             THE COURT:  You know we've got the standard thing,

22   yes, you can take notes but you can't use them with other

23   jurors de-da-de-da-de-da.  That's it.  Hang on I have it

24   somewhere in my black book.

25             THE COURT:  I can't find the thing, the pattern

1  charge, what I'll tell them is:  You may take notes, however,

2  you may not use those notes in an attempt to persuade another

3  juror as to what that juror's recollection is or may not be.

4  It can be for your purposes, but you can't say this is what

5  they said.  That's what you as a juror wrote down.  So, I

6  think I'll give them that.  I think it is it in my civil

7  book.

8         MR. BLANCHARD: Before you go, one other thing while

9  we're here.  As to the rule, the exclusion of witnesses,

10 there is a State witness who is subpoenaed in the courtroom.

11 I don't object.  It's my client's foster mother, Marie

12 Collier.  She's a member of the family.  I just wanted to

13 note she's here and technically she's excluded by the Rule by

14 our earlier agreement.  But she's a State's witness and we

15 don't object to her being here.

16        MR. LISENBY:  There are probably several other

17 people in here that received State subpoenas that we don't

18 intend to call.  They are in here as family members.

19        MR. BLANCHARD:  Okay.

20        THE COURT:  What else now?  Have we got anything

21 else?  I'm going to do the instruction on what the attorneys

22 say.  I am going to do the business about notes.  And, then

23 hopefully we'll go ahead.  Anything else you want?

24        MR. KEITH:  Do you want to do that after I finish

25 my opening?

1          THE COURT:    Huh?

2          MR. KEITH:    You're going to do that after I finish

3   my opening?

4          THE COURT:    No, I'm going to explain that.

5          THE CLERK:    Mr. Philpott.

6          THE COURT:    Mr. Philpott, I'm not going to refer

7   to him by name or anything, but simply say here is the rule

8   about notes.

9          MR. GIBBS:    I didn't see anybody take anything out

10  or in there with them, so are they going to be  expecting us

11  to provide pads and pens?

12         THE COURT:    No, God, no.   That's next to

13  questionnaires.

14         THE CLERK:    That's a good one to address.

15         THE COURT:    Well, I'll cover that.   I'll cover

16  that.

17  (JURY PRESENT).

18         THE COURT:    Ladies and Gentlemen, there are two

19  matters I am going to take up with you now, because I want

20  you to make -- I want to make absolutely certain that you

21  understand both.

22      First, what the attorneys say throughout the course of

23  this trial is not evidence.   In opening statements, in

24  closing arguments, at any appropriate time in the trial, the

25  attorneys have, as I said earlier, a right, duty, and

1    obligation to argue their respective cases to you.  But, it

2    is absolutely imperative that you understand what the

3    attorneys say is not evidence, not for the State and not for

4    the Defense.

5         In opening statements, the attorneys can tell you

6    what they think the evidence may be.  They can tell you what

7    they think the case will be about.  But, it is, ultimately,

8    up to you, as the jury, to decide that.  You are the sole

9    judges of the facts of this case.  You are the ones to weigh

10   all testimony and all evidence.  You are the ones to decide

11   the credibility of witnesses and the weight of the evidence.

12   In short, you are the ones to decide what the true facts are.

13   So just as I have already said, there are some things you can

14   put in the evidence category and some things you can't.  The

15   indictment in this case, which I read to you at the beginning

16   of this term, is not evidence.  What the attorneys say is not

17   evidence.  You are the judges of the facts and the facts will

18   be presented to you from the witness stand in the form of

19   sworn testimony and any other item of evidence that may be

20   admitted for your consideration.

21        Next, there has been a request in regard to the taking

22   of notes during the course of the trial.  That is

23   permissible.  But, I'm going to give you a few guidelines

24   that you must follow if any of you do choose to take notes.

25   You may use your notes as sort of a refresher for your

1    personal recollection, if you will. You can use your notes

2    to help yourself remember what certain testimony or evidence

3    may or may not have been. But, you cannot use your notes as

4    source of authority for other jurors. Each of you, as

5    jurors, has your own perception, and your own understanding,

6    your own hearing, you are all going to hear the evidence.

7    And, it is up to each individual juror at that point to be

8    listening to and deciding what the evidence is. So, the long

9    and short, yes, you may take notes; but you can't use those

10    notes as sort of authority to persuade other jurors what

11    certain testimony may or may not have been. Because each of

12    the 12 who decide this case, will have to ultimately have

13    their own recollection, their own memory, their own

14    understanding of the evidence.

15        With that, is the State satisfied as far as the

16    Instruction?

17            MR. LISENBY:  Yes, Your Honor.

18            THE COURT:   Defense?

19            MR. KEITH:  Satisfied.

20            MR. BLANCHARD:  Yes, Your Honor.

21            THE COURT:  You may proceed.

22            **CONTINUATION OF DEFENSE OPENING STATEMENT**

23            BY MR. KEITH:  As I was discussing a few minutes

24    ago, there are a lot of things about this case that Jason

25    Holloway doesn't want you to hear. They are painful. He's

1   remorseful about it.  He's devastated over it.  He didn't

2   mean for it to happen that way.  It did.  There are a lot of

3   things the State doesn't want you to hear.  There are a lot

4   of things the victims' families don't want to have you hear

5   about what was going on in the lives of Rodney and Angela

6   Brown as well as Jason Holloway.  The reason we are here is

7   it is our job to bring these things out before you and let

8   you decide what is important and what is relevant and what is

9   prejudicial and shouldn't be considered.  That's your job.

10  We are not here to tell you how to do it.  You swore the oath

11  and we are very comfortable with y'all that have been chosen

12  to sit on this jury to do that in an appropriate, fair, and

13  impartial manner.  It is not a fun job and a lot of y'all

14  were reluctant, hesitant, and stressed about doing this.  It

15  is not an easy job.  It is a very difficult job for everyone

16  in this courtroom.

17       What I told you a few minutes ago is true and is part of

18  the testimony you will hear and what the evidence will be.

19  And, the reason I'm explaining about Rodney Browns'

20  propensity for violence and reputation for violence is

21  because Jason was very much well aware of it.  His place was

22  just a hundred yards away from Rodney and Angela Brown, and

23  he knew them and was around them and knew these things.  So

24  what we're trying to explain to you is that -- why it is that

25  Jason Holloway went over to the Brown residence on January

1   11th in the year 2000 and what it was in his head.  Why he

2   carried a gun over there of all things in his pocket.  That's

3   what the evidence we're going to try to present to you during

4   the trial you'll hear from the witnesses or hear from Jason,

5   and it's Jason Holloway's defense.  It is not something he's

6   making up here to present to y'all today.  It is in a

7   statement that he made three-and-a-half years ago.  And,

8   again, the State wants you to believe everything in the

9   statement but the thing about the self-defense.  Rodney

10  coming at Jason with the bat.  He was consistent with that

11  testimony then and he's consistent with it now and you may

12  hear about it and you probably will.

13       Now, why was Jason Holloway so tormented and aggravated

14  about these threats and statements?  You can call them

15  statements.  You can call them threats.  Where Rodney Brown

16  was telling Jason he could -- however, you want to coin a

17  phrase or interpret it -- screw his girlfriend better than

18  Jason could.  That is what he was going to do.  You can

19  perceive it as a threat to rape.  It is clear what the

20  meaning was and what was said.  It is in his statement.

21  Jason over reacted to that statement.  Maybe for the right

22  reasons.  Maybe for the wrong reasons.  May not have been any

23  good reason.  Jason could have gone on his way and forgot

24  about it and not dealt with it and left Rodney alone.  But,

25  Jason Holloway lived next door to a young woman by the name

1    of Sandra Patterson that you will hear from probably next

2    week.  And Sandra Patterson was, in fact, raped by Rodney

3    Brown and Quinton Oliver.  They did it together.  Took turns.

4    Jason knew it.  Sandra knew it.  The fact it happened, and

5    you'll hear some evidence about that, some testimony.  That's

6    why when Rodney made these statements about screwing his

7    girlfriend.  Y'all excuse my language.  Jason was tormented,

8    bothered by it.  Did he appropriately react?  Well, maybe;

9    maybe not.  But he had a basis in fact and a reason for doing

10   what he did.

11        He decided that on or around January 12 that he would go

12   over there that morning whenever the Browns were there,

13   Rodney, and confront Rodney Brown.  And, he did so.  He was

14   scared of Rodney.  Because he had been there before and seen

15   Rodney's violent temper when he was drunk and on drugs, and

16   had seen him beat his wife.  He'd do these things.  That's

17   why Jason went over there with a gun in his pocket.  Jason

18   doesn't run around carrying a gun.  You've heard evidence

19   that it was his momma's gun.  It was in the house.  And, he

20   went and got it, took it, put it in his pocket, and went over

21   there to the Browns' house, confronted Rodney.  The evidence

22   will be, and it is in his statement, Rodney went and got the

23   bat and Jason was confronting Rodney in front of Angela about

24   the statement he made about this girlfriend, Felicia

25   Phillips.  Rodney, of course, didn't take kindly to it.

1   Jason wasn't standing there with the gun in his hand

2   confronting Rodney.  The gun was out of sight and in his

3   pocket.  Rodney did not react or take it kindly about these

4   statements and questions that he had for Rodney about his

5   threats.  Rodney had a bat in the house, a little small

6   aluminum bat.  It Wasn'T to play baseball with.  It was a

7   little small bat to beat people with.  Rodney went and got

8   the bat.  Came at Jason.  And Jason pulls the gun out and

9   shoots him.  That's why when we ask you and tell you and try

10  to explain to you the theory of self-defense and why he is

11  not guilty of capital murder of Rodney Brown and not guilty

12  of capital murder of two or more people.  That's why we can

13  come in here and explain that to you.  It wasn't Jason's bat.

14  He didn't bring it over.  Rodney had the bat.  Rodney tried

15  to use it on Jason when he confronted Rodney and Jason reacts

16  when Rodney is coming at him with the bat, shoots him in the

17  chest and ends up shooting him in the back of the head during

18  what happened in just the matter of a second or two.

19      You'll hear evidence about a kitchen knife being on

20  the floor right by Angela Brown and right by Rodney.

21  Immediately after Rodney was shot, right in the same couple

22  of seconds, Angela jumps up and comes toward Jason.  Not an

23  unexpected reaction I would presume.  Jason had no animosity,

24  or problem, or beef with Angela Brown, but at that point in

25  time, Jason shot Angela, shot her twice in the chest.  For

1  all practical purposes she was fatally wounded.  She was
2  still alive when he left the mobile home.  Yes, he came back.
3  Everything happened quick.  We're not trying to convince you
4  that there is going to be evidence that Jason accidentally or
5  in self-defense shot Angela Brown.  We are not here to do
6  that.  We are trying to hold our head up and tell the truth,
7  admit what happened, and basically let the facts fall where
8  they may as you interpret them.

9      Again, this is a capital murder case.  It is gruesome.
10 You are going to see some ugly photographs and all that, just
11 like in every case.  This case is not unique to have autopsy
12 pictures and those kinds of gruesome things we have
13 described.  Nothing unique about it in this case.  It happens
14 in every case.

15     Angela was shot twice and she was hit on the head with
16 the bat and she was stabbed numerous times and Jason had sex
17 with her after she was dead.

18     We have done our best to kind of give you an idea that's
19 what was going on when we were doing the panels yesterday and
20 the day before to let y'all know what was going on.  It is
21 kind of messed up and it is very bad.  It is tragic.  It's
22 just -- bad things happen.  But, he's not charged with that,
23 what he did to Angela after her death.  It is a bad fact.  It
24 is a terrible thing he did.  But, the point being, you've got
25 to look to the facts and look at the charges of capital

1    murder and not be prejudiced or over sympathetic for the

2    wrong reasons convict on the ugly aspects and some of the

3    bizarre aspects of this case.  You will weigh the evidence as

4    to whether or not he intentionally killed Rodney Brown

5    without any justification.  If you find justification to a

6    reasonable doubt to where -- well, we have the statement, we

7    have heard from Jason, he said it was self-defense because

8    Rodney came at him with the bat, regardless of whether they

9    are good or bad reasons or poor reasons for Jason being over

10   there with the gun.  He was not planning on killing anybody.

11   Yes, it happened.  And he did it to Rodney in self-defense.

12   He killed Rodney for justifiable reasons.  We are not trying

13   to fool y'all.  There's no real good reason that he killed

14   Angela other than impulse.  I call it just freaking out,

15   losing control, doing stupid things, saying stupid statements

16   about going a mile.  He was painfully truthful with the

17   police when he made that four-page statement.

18        I'm going to ask y'all to listen to the evidence and

19   the State's got the burden of proof, and they get to go first

20   and they get to go last.  We follow-up.  They have got most

21   of all the witnesses.  They are going to try and put Jason in

22   a really bad light.  I am asking y'all to put all of this in

23   context.  Don't get overly prejudiced for the wrong reasons

24   as far as some of the gory details and bad things that

25   happened to Angela, but keep it in context.  Think about what

1    Jason Holloway -- how he would explain things and how he has

2    explained things.  If you find there is some reasonable

3    doubt, a doubt for which you can put a reason, or put your

4    finger on, a reason; yes, well, yes, I can see now, they want

5    you to believe everything in the statement except the

6    self-defense part.  That's real convenient.  We're going to

7    ask you, basically, to believe the entire statement.

8    Normally we are up here trying to convince you:  It is not

9    his, he didn't say those things or didn't mean those things.

10   But, this statement would be consistent with his testimony,

11   self-defense and very poor bad, and no good explanation other

12   than losing control, someone that's grown up in, just

13   certainly had a different environment, different upbringing,

14   and a different emotional mental state where he just didn't

15   do what a normal person might could have done and he

16   explained it the best he can and told the truth about it.

17        I want to thank you for your attention and at the end of

18   this case, we're going to ask you to find Jason not guilty of

19   the capital murder Rodney Brown, because it was self-defense,

20   and if you make that finding, you must find him not guilty of

21   count one in the indictment, the capital murder of two or

22   more people.  We are going to have no real objection, and

23   can't complain about you finding Jason guilty of manslaughter

24   or murder death, be it reckless, intentional or whatever in

25   the murder of Angela Brown, but not the capital murder

1  burglary part of it.

2     Capital murder burglary evidence will be, as

3  the Judge will explain, is kind of a technical argument.

4  Jason didn't go over there to commit a burglary in that house

5  and steal anything.  He didn't steal anything.  He didn't

6  take anything out of the house that didn't belong to him.  It

7  is a technical capital murder burglary and we would suggest

8  to you that in the capital murder on Angela might well be a

9  murder.  We are asking you to find him guilty of one count

10  murder in the death of Angela Brown and not guilty of two or

11  more in count one, and not guilty of capital murder death of

12  Rodney Brown.

13     I thank y'all for your attention.

14          THE COURT:  Call your first witness.

15          MR. LISENBY:   State calls John Krolikowski.

16          JOHN KROLIKOWSKI, M.D.

17     HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

18        THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

19             TESTIFIED AS FOLLOWS:

20             DIRECT EXAMINATION

21  BY MR. LISENBY:

22  Q    Good morning.

23  A    Good morning, sir.

24  Q    Tell me your name, please.

25  A    My name is F. John Krolikowski, K-R-O-L-I-K-O-W-S-K-I.

*** Frances L. Roark ***

```
 1  Q     Where are you presently employed, Doctor?

 2  A     I am employed as the Regional Medical Examiner and

 3  Acting State Medical Examiner in Newark, New Jersey, and

 4  Trenton, New Jersey.

 5  Q     How long have you been employed in that position?

 6  A     I have been the Regional Medical Examiner both in the

 7  acting and permanent capacity for two years, and as the

 8  acting Medical Examiner since March.

 9  Q     Of this year?

10  A     Yes, sir.

11  Q     Okay.  Prior to that where were you employed, Doctor?

12  A     I was employed by the State of Alabama at Montgomery,

13  Alabama.

14  Q     What was your position there?

15  A     I was a forensic pathologist.

16  Q     Can you tell me what a forensic pathologist is, please?

17  A     Pathology is the study of disease.  So, that covers a

18  lot of things.  But, in general there are two big areas in

19  pathology.  One is called clinical pathology and the other is

20  called anatomic pathology.  In clinical pathology you get

21  your throat tests for the kids done, your blood counts, your

22  sodium, potassium, electrolytes chemistry tests, and blood

23  transfusions.  So, clinical pathology is the lab part.

24  Anatomic pathology is the biopsies of say the breast or

25  prostate where they looked at by somebody or autopsies.
```

1    Now, within the autopsy pathology part is a special area

2    that deals with medical-legal issues of deaths called

3    forensic pathology.

4    Q    And, what is that specialty area?  Can you describe

5    that for us, the forensic part of it?

6    A    As I mentioned, it has to do with medical-legal

7    determination of the cause of death and a classification or

8    manner of death.

9    Q    Can you tell us what education, training, and

10   experience you have had to qualify you for that portion?

11   A    Well, I went to college.  Then I went to medical school

12   in the Boston area at a place called Tufts.  I subsequently

13   did training in medicine at Boston City Hospital.  I had

14   rotations both as a student and as a postgraduate individual

15   at Mass General, Peter Brent Brigham Hospitals, The Malden

16   Institute of Pathology, Children's Medical Center in Boston,

17   New England Deaconess Hospital, Beth Israel Hospital all in

18   the Boston area.  I did a two year fellowship at National

19   Institutes of Health in Bethesda, Maryland.  And, I did a

20   special training in forensic at the University of

21   Massachusetts Medical Center in Worcester, Massachusetts.

22   Q    I want to direct your attention back to January of

23   2000, and ask if you were employed by the State of Alabama

24   Department of Forensic Sciences at that time?

25   A    I was.

1    Q    And, you were a medical examiner at that point?

2    A    I was a medical examiner/forensic pathologist.

3    Q    How long had you been employed with the State of

4    Alabama at that time, if you recall?

5    A    Approximately a year and a half.

6    Q    In your position there you performed autopsies; is that

7    correct?

8    A    Yes, sir.  That's correct.

9    Q    And, in general, can you tell me, and the members of

10   the jury, how you go about performing an autopsy on an

11   individual?

12   A    An autopsy is a surgical procedure.  It is a little bit

13   more extensive than the usual types of surgical procedures

14   that most of us are familiar with.  There is both an external

15   examination, which is much like you get when you go to the

16   doctor, head, eyes, ears, nose, throat, chest, abdomen, the

17   extremities.  The outside and you see what you can see.  So

18   there is the outside exam or external exam.  And, the second

19   part is an internal exam where you look at the different

20   parts of the body, examine the head and the inside of the

21   head; you exam the internal organs and the chest cavity and

22   the abdomen.  So, there is the external and then there is an

23   internal examination.

24   Q    All right, sir.  I want to direct your attention to a

25   time around January the 12th or January 13th of 2000, and ask

1   if you had occasion to receive from Lee Anderson, who is with

2   the Department of Forensic Sciences two bodies identified as

3   Rodney Brown and Angela Brown?

4   A     I did.

5   Q     Did you perform autopsies on those individuals?

6   A     I did, sir.

7   Q     Let me first direct you to the autopsy of Rodney Brown,

8   which I believe was on January the 13th, at around 11:45 a.m.

9   Can you tell me with regard to Rodney Brown any measurements

10  that you took prior to the beginning of your autopsy?

11  A     Well, Mr. Brown is a 223 pound individual who measured

12  70 inches and was well-developed and well-nourished.

13  Q     All right, sir.  And, in your external examination,

14  excuse me, that you described earlier, did notice anything

15  with regard to any injuries on Mr. Brown?

16  A     Yes, I did.  Mr. Brown had several gunshot wounds.

17  Q     Can you describe for the members of the jury where you

18  observed these gunshot wounds?

19  A     The first gunshot wound which was arbitrarily

20  designated, I'll just go in order I was in, was in the left

21  chest area.  This was an entrance site.  There was no soot

22  stippling or gun fillings, if you will, in that area.

23  Q     What did that indicate to you about that?

24  A     That the distance from the skin surface to the barrel

25  of the gun was indeterminate.

1    Q      Okay.  And, can you tell me why that would be, if you

2    did not see soot or stippling or gun powder filings as you

3    described it?

4    A      When you fire a weapon, the pin hits the bottom of the

5    bullet which ignites the primer which explodes and causes the

6    powder in the bottom of the shell to push the head of the

7    projectil, the top of the bullet, out of the gun.  It

8    acquires a spin for stability and goes forward.  But as part

9    of that process, some of the powder is burned and causes

10   smoke.  Some of the powder is unburned.  The powder that's

11   smoke, that comes out within a certain distance of the barrel

12   can land on a surface, and that surface can have smoked blue

13   hue has this unburned powder that can form little tattoos or

14   dot-like  areas called stippling.  If there's a surface

15   between the barrel and the skin surface, the weapon may be

16   close, but the intervening surface can pick up the soot and

17   smoke rather than the skin surface.

18   Q      Okay.  All right.  I'm sorry, I interrupted you.  That

19   was one wound to the left chest.

20   A      Yes, sir.

21   Q      Okay.  Was there another wound or any other wounds?

22   A      Yes, sir.  There's a wound in the back of the head

23   which had an another site associated with it over the right

24   forehead area on the right.

25   Q      Tell me what do you mean by that, "another area

1   associated with it"?

2   A      Well, there was an entrance site in the back of the

3   head and there was an exit site over -- on the right forehead

4   area.

5   Q      All right.  And, could you see any soot or stippling

6   around that particular wound?

7   A      No, I did not, sir.

8   Q      What did that indicate to you with regard to that

9   wound?

10  A      I could not determine the distance of the surface of

11  the entrance site to the gun barrel.

12  Q      Now, after you performed your external examination, did

13  you also do an internal examination?

14  A      Yes, I did, sir.

15  Q      Tell me about that, please.

16  A      Well, the pertinent findings in the internal

17  examination had to do with the previously noted gunshot

18  wounds that I mentioned.

19         Starting with the left chest wound, it went through

20  the upper lobe of the lung on the left, and -- there are two

21  lobes of the lung on the left, an upper and a lower.  And, on

22  the right there are three.  It went through the upper lobe of

23  the lung and then it went through the aorta.  The aorta is

24  the main vessel that goes from the heart and feeds the body.

25  It is the main artery.  So, it comes out of the left

1  ventricle area.  There are four chambers of the heart:  Two

2  above and two below.  So, it comes out of the left ventricle,

3  it makes an arch, sends vessels up to the head, comes back on

4  down, and has vessels that branch out to the various parts of

5  the leg and subsequently goes down into the abdomen and

6  splits out to the legs.  So, that major vessel from the heart

7  got lacerated by about one-half inch through the path, the

8  bullet's path.  So, the bullet went from the left chest,

9  through the left upper lobe of the lung, into the aorta, and

10  wound up in the tissue adjacent to the seventh rib, which is

11  about here, on the right side slightly back surface.  And,

12  there was a projectile in that area that was recovered.  So,

13  the first wound went from left to right, front to back, and

14  slightly downward.

15      The second wound ....

16  Q    I am sorry, let me ask about that one if I could.

17  When you described that as left to right, front to back,

18  slightly downward; is that -- can you describe how the body

19  would be positioned in your description of that area, please?

20  A    Well, we use what is called a standard anatomic

21  position which is somebody standing straight up, with their

22  hands extended this way.  This would be the front, side, and

23  back.  So, in the standard anatomic position, the bullet went

24  from the left chest, from the front, towards the right

25  through the aorta, and winding up slightly downward and on

1   the right side slightly to the back area at the level of the

2   seventh rib where the projectile was noted.

3   Q     Now, are you telling the members of the jury that you

4   know that's the way Mr. Brown was actually positioned at the

5   time the bullet struck him?

6   A     No, sir.  It is -- we specifically use the standard

7   anatomic position because when people are moving one to

8   another, you can't be certain as to what position a person

9   was in.  So, we use the standard anatomic position to note

10  the track of the wound site.

11  Q     You mentioned that there was a projectile recovered

12  inside Mr. Brown's body.

13  A     That's correct, sir.

14  Q     And, did you later transfer that to Scott Belton with

15  the Department of Forensic Sciences for ballistic

16  examination?

17  A     Yes, I did, sir.

18  Q     When you did so, was that projectile in the same, or

19  substantially the same condition, as when you recovered it

20  from Mr. Brown's body?

21  A     Yes, it is, sir.  Was, sir.

22  Q     Now, I am sorry, I interrupted you.  You were about to

23  talk about the second gunshot wound you noted.

24  A     Yes, sir.

25  Q     If you would, please.

*** Frances L. Roark ***

```
 1   A      The second wound was in the back of the head,
 2   approximately this area, it was an entrance site, and the
 3   wound went, it was right in the middle, and it went -- it
 4   started out in the middle, and it went slightly upward and to
 5   the right and is cut across an area called the corpus
 6   callosum.  If you've seen the two cerebral hemispheres which
 7   look like a -- they call them a bag of worms on either side
 8   of the head up here, it is the part that hooks across and
 9   connects the two.  It cut across the corpus callosum and went
10   into the right side and came out the right frontal tip.
11   Here.  So, it is going through the middle and coming out --
12   and coming out through the right frontal tip here.  So, it
13   went from the back to the front and from the midline to
14   slightly right and upward.  And, the projectile was found in
15   a stocking cap which was essentially on top of the head.
16   Q      All right.  Did you notice with regard to that
17   particular wound if there were any fractures or anything of
18   that nature present with it?
19   A      Yes, there were fractures in the front of the portion
20   of the head and there was what we call beveling of the bone
21   in the appropriate sequence.  Which means that when a bullet
22   comes through bone, where it penetrates the bone, it makes a
23   real sharp margin.  And, where it comes out, it makes like a
24   callret called beveling.  Instead of the bone being straight
25   on edge, it causes it to come out at an angle and there is
```

1   beveling to the bone on the side that the bullet comes out

2   from, because of the physics of the bone and projectile

3   losing energy.  And that was true in both posterior and

4   anterior aspects of the bullet's path.

5   Q      You mentioned that you did recover a projectile, I

6   believe, in the stocking cap.  Is what you described?

7   A      Yes, sir.

8   Q      Did you later turn that projectile over to Scott Belton

9   with the Department of Forensic Sciences for ballistic

10  examination?

11  A      Yes, I did.

12  Q      When you did so, was it in the same, or substantially

13  the same, condition as when you had retrieved it?

14  A      Yes, sir, it was.

15  Q      Now, based on your education, training, and experience

16  and the examination that you performed on Rodney Brown, were

17  you able to form an opinion as to the cause of death?

18  A      I did.

19  Q.     And, tell us what that was please?

20  A      I determined he died from multiple gunshot wounds.

21  Q      Now, you also during the time that you were there with

22  Mr. Brown and performing the autopsy collected some other

23  items for potential DNA analysis; is that correct?

24  A      Yes, sir.

25  Q      And, with regard to that, I believe, there were some

1  blood swabbings that were done off of the back of Mr. Brown?

2  A    That's correct, sir.

3  Q    And a blood flake.

4  A    I scrapped some blood flecks and swabs off the back of

5  Mr. Brown.

6  Q    Some blood was also taken from Mr. Brown for that type

7  of analysis.

8  A    Yes, sir.  Serus control material.

9  Q    Were those items also turned over to Scott Belton with

10 the Department of Forensic Sciences for analysis?

11 A    Yes, they were.

12 Q    Were those items in the same, or substantially the

13 same, condition as when you retrieved them yourself?

14 A    Yes, they were.

15 Q    All right.

16       MR. LISENBY:  Now, let me show these to defense

17 counsel, please, sir.

18 (WHEREUPON, PHOTOGRAPHS WERE MARKED AS STATE EXHIBITS 7, 8,

19 9, AND 10 FOR IDENTIFICATION.)

20 MR. LISENBY:

21 Q    Let me show you, excuse me, photographs that are

22 marked State exhibits 7, 8, 9 and 10, and tell me, if you

23 would, if you recognize those.

24 A    Yes, I do.

25 Q    Can you tell me what those photographs are of, please?

1    A    These photographs are of Mr. Brown taken at the time of

2    the autopsy examination performed by myself.

3    Q    Do each of these photographs, 7 through 10, fairly and

4    accurately depict, or show, areas of injury to Mr. Brown's

5    body as you recall it on January 13th, 2000?

6    A    They do.

7         MR. LISENBY:    We offer exhibits 7, 8, 9 and 10,

8    Your Honor.

9         THE COURT:  Admitted.

10    (WHEREUPON, PHOTOGRAPHS MARKED AS STATE EXHIBITS 7,8, 9 AND

11    10 WERE ADMITTED.)

12         MR. LISENBY:    Your Honor, may he step down to the

13    jury to show these, or how would you prefer to do that?

14         THE COURT:    Yes, that is probably the best thing.

15    MR. LISENBY:

16    Q    If you would, Doctor, and remember we both need to keep

17    our voices so she can take it down for us.   Okay?

18    A    Yes.

19         THE COURT: Ladies and Gentlemen, on the jury, at

20    any time you can't hear or see whatever is being exhibited to

21    you at this time, please, let me know, so we can make the

22    appropriate moves.

23    MR. LISENBY:

24    Q    I want to show you State's Exhibit number 8, Doctor.

25    If you would, can you show that and tell the members of the

*** Frances L. Roark ***

1  jury what that depicts, please?

2  A    Yes.

3  A    This is the entrance gunshot wound in the chest area.

4  Just to orient you a bit, this is the head area here,

5  shoulder area, this is the left areola, and this is the

6  entrance gunshot wound here in the chest.  This is the wound

7  in the upper lobe of the lung and it wound up by the side of

8  the hip.

9  Q    Remember to keep your voice up.  If you will step down,

10  and show that to ....

11  A    Again, for orientation, this is the neck, shoulder,

12  areola.  This is the entrance site here.  This the standard

13  ruling we put in with the number of the case.  Gunshot wound

14  to left chest.  Went through the left upper lobe, aorta, the

15  seventh rib, head, shoulder, left areola.

16  Q    All right, sir.  Stay right there, if you would.  This

17  is State Exhibit number 9.  If you would tell the members of

18  the jury what that shows, please?

19  A    This is the entrance site at the back of the head that

20  went through the corpus callosum and went straight upward and

21  came out right at the eyebrow area.  This is shaved so we

22  could get a better view of the collision.  Back of the head,

23  shaved, entrance site.  Shaved area.  Entrance site here.

24  Back of the head.

25  Q    Now, these two photographs 7 and 10 show something

1   similar.  Can you just take a look at both of those and show

2   to the jury what they indicate, please?

3   A     This is the decedent's stocking cap.  Now, this is

4   slightly oblique view of his facial area here.  Taken at

5   approximately this angle.  This is taken a little more

6   obliquely with the head and eyes are not obvious.  This is

7   the exit site which is somewhat S-shaped here.  This is the

8   decedent with his stocking cap.  Oblique.  This is the case

9   site from the wound to the back of the head.

10      Stocking cap.  This is the wound site.  Exit site.

11  Wound entering the back of the head.

12  Q     Thank you, sir.  You can retake your seat, please.

13      Now, Doctor, excuse me, I would like to direct your

14  attention now to the same day January 13th of 2000, and

15  around 2:40 p.m., and ask if you had the occasion to perform

16  an autopsy on Angela Brown?

17  A     I did.

18  Q     And, did you follow the same procedures that you have

19  described earlier about external examination followed by

20  internal examination?

21  A     Yes, I did.

22  Q     If you would, would you tell us the measurements of

23  Angela Brown that you took?

24  A     This was a lady who was 60.5 inches tall and weighed

25  138 pounds at the time of examination.

1    Q      And, did you observe any injuries with regard to her?

2    A      Yes, I did.

3    Q      If you would, tell us about your external examination

4    and what you observed about her.

5    A      This is a lady who had multiple diverse types of

6    injuries.  She had gunshot wound injuries.  She had stab type

7    wound injuries.  And, she had blunt-force trauma injuries.

8    Q      Let's talk about the gunshot wound injuries first.

9    Tell me what you observed about those.

10   A      The first wound was a graze wound which was on the

11   chest area.  It was approximately to the right side of the

12   right breast area and was a graze, measuring one-quarter by

13   three-quarters of an inch.  The second wound was an entrance

14   site at the level of the lower chest which penetrated the

15   chest area.  Went into the abdomen.  Went into the liver part

16   of the abdomen on the left lobe.  Caused a laceration of the

17   left lobe of the liver and pulpification or breaking up of

18   the tissue into little pieces in that area.  It subsequently

19   went to what we call the mesentery, which is like connective

20   tissue, sort of like the things tendons are made up of, and

21   holds the bowel, aligns the bowel on one edge.  It went

22   through that and went into the soft tissues next to what is

23   called L-5, a lumbar vertebra L-5 level, into the soft tissue

24   by the spine at that point where the projectile was

25   recovered.

1  Q    So, with regard to that particular injury, you are also

2  talking, now, about your internal examination, obviously, and

3  a projectile was recovered at that point?

4  A    Yes, sir.

5  Q    That projectile was it later turned over to Scott

6  Belton with the Department of Forensic Sciences for ballistic

7  examination?

8  A    Yes, it was, sir.

9  Q    When you did that, was it in the same, or substantially

10 the same, condition as when it was retrieved from the body of

11 Ms. Brown?

12 A    Yes, it was.

13 Q    All right.  Were there any other gunshot wounds that

14 you noticed?

15 A    Yes, sir, there was.  There was a gunshot wound on the

16 top of the head right at the peak of the head where there was

17 split bone and what we call a keyhole lesion.  What that is,

18 is the bullet sort of skirts the top and there's an entrance

19 and a partial exit site where the bullet sort of skims

20 across.  The bone is ovoid and the bullet trys to come in and

21 go out.  So it is an entrance -- a combined entrance and

22 partial exit site.  And a projectile was found there as well.

23 Underneath that was a contused area of brain in the midline

24 on cerebral hemispheres.

25 Q    What do you mean by contused area of the brain?

1   A       Bruised.

2   Q       A bruised area?

3   A       Yes, sir.

4   Q       Okay.  You said a projectile was also recovered there?

5   A       Yes, sir.

6   Q       And was that also turned over to Scott Belton at the

7   Department of Forensic Sciences for ballistic examination?

8   A       Yes, sir, it was.

9   Q       When you turned that projectile over to Mr. Belton, was

10  it in the same, or substantially the same, condition as when

11  you had retrieved it from Ms. Brown?

12  A       Yes, it was.

13  Q       Now, I am sorry, I forgot to ask you, with regard to

14  the gunshot wound to the chest, you described how it went and

15  what injuries were association with it, but I forgot to ask

16  in the standard anatomical position, the direction of that

17  bullet?

18  A       It went from front toward the back, from the right to

19  the left, and this is the decedent in the standard anatomical

20  position.  So, if I were the decedent, it would be standing

21  up, going from my right toward the left from the front toward

22  the back and toward the inferior area, the lower area from

23  the entrance.  So, it would go downward.  So, front to back,

24  right to left, and downward.

25  Q       And, the graze wound that you described that was also

1  in the chest, how was that, as far as going across the body?

2  A    The graze wound was going from top to bottom. There

3  are little tags that help us identify the path, the

4  direction, and it was essentially a little bit above the

5  lower wound to the chest that I just previously described.

6  Q    Would the graze wound be consistent with a bullet

7  grazing across the body and then going into that left chest

8  wound that you previously described?

9  A    It would be.

10  Q    All right. You said that you noticed other types of

11  wounds other than gunshot wounds. Can you tell me, next,

12  what you observed about Ms. Brown?

13  A    Besides the three gunshot wounds, the graze, the lower

14  chest wound, and the head wound, there were multiple sharp

15  force wounds or stab-type wounds present.

16  Q    Tell me where you observed those wounds, please?

17  A    I arbitrarily numbered these starting with the letter

18  A. There was one just above the umbilicus and there were

19  several on the left side of the neck and one on the right

20  side of the neck.

21  Q    I'm sorry, what is the umbilicus?

22  A    Belly button.

23  Q    Okay. All right. So, there was a wound -- I am sorry

24  -- right above; is that what you said?

25  A    Right above the belly button.

## Court of Criminal Appeals No. __CR_____
# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM
## CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2000-166
### Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From:___ STATE CONVICTION

Sentence Imposed: _____ LIFE WITHOUT PAROLE

Defendant Indigent: _X_ YES _ NO

## JASON LEE HOLLOWAY

NAME OF APPELLANT

**CHARLES GILLENWATERS, & JOSEPH FIQUETTE**    256-234-5018

APPELLANT'S ATTORNEY                    (TELEPHONE NO.)

## POST OFFICE BOX 2129

ADDRESS

**ALEXANDER CITY**        **ALABAMA**        35011

CITY            STATE            ZIP CODE

### v.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

1  Q      And the other wounds were to the neck?

2  A      Yes, sir.

3  Q      And, I'll ask you in a moment in regard to those about

4  an internal exam, but did you also observe externally any

5  other types of injuries other than the stab wounds and the

6  gunshot wounds?

7  A      Yes, sir.  There were some lacerations on the left

8  forehead area.

9  Q      All right.  Let me ask you about the stab wounds, if

10 you could, please, with regard to your internal examination.

11 Can you tell me about the wound to the stomach area?

12 A      Well, the wound just above the umbilicus, or belly

13 button, was one-and-one-quarter inches and it went down in

14 depth of one inch.  And, it cut into the small bowel for

15 approximately one-half inch.  That was the first stab wound.

16 These are arbitrarily designated by me.  That was called A.

17 Q      Let me interrupt on that one.  Did you notice any

18 associated bleeding with that particular wound?

19 A      Yes, there was some bleeding.

20 Q      Can you tell me about that, please?

21 A      Well, there was a total of 1200 cc of hemorrhagic blood

22 in the abdominal cavity.  Some of which was associated with

23 that and some of which was association with the previously

24 noted gunshot wound involving the liver, mesentery, and the

25 paraspinal area that I mentioned previously.

*** Frances L. Roark ***

1  Q    I am sorry, go ahead.  The other stab wounds that you

2  indicated.

3  A      The second stab wound I arbitrarily designated as B,

4  and decided to go from bottom to top.  So, there was B, C and

5  D here, E over here, and another F over here.

6        The B was one-and-a-quarter inches.  It penetrated for

7  approximately one inch into what we call soft tissue, which

8  is the muscle and fatty tissue in the neck.

9        C was a very superficial wound just through the skin.

10 It was three inches long.  That was just above B.

11       D was above that, was one-and-a-quarter inches,

12 penetrated into the soft tissue to a depth of an

13 inch-and-a-half.

14       E was more over toward the right.  It was one-and-a-half

15 inches long and penetrated for a depth of one-and-a-half

16 inches.

17       And F was back on this side and it was above,

18 essentially above the others, and it measured one inch and

19 penetrated through two inches into the soft tissues in the

20 neck, muscle, fatty fiber, and connective tissue.

21 Q    All right, sir.  Now, you also mentioned some

22 lacerations on the forehead.

23 A      Yes, sir.

24 Q    Tell me about those, please.

25 A      There were two lacerations over the left forehead area.

1   I arbitrarily designated this as G, which was the lower one,

2   and H, which was the upper one.

3       G had a somewhat Y-shaped or W-shaped configuration and

4   was two-and-a-half inches.  It had a little piece of tissue

5   between what looked like two arms above and below.  This

6   piece of horizontal tissue was intact coming in from this

7   side.  And the lesion extended down to the bone.

8       The lesion above that was about two-and-a-quarter.  That

9   was a laceration essentially in the horizontal plane, and

10  that also extended down to the bony portions below the

11  forehead area.

12  Q     All right, sir.  With regard to Angela Brown, based on

13  your education, training, and experience, and your

14  examinations that you performed, were you able to form an

15  opinion as to the cause of death?

16  A     Yes, I did.

17  Q     Tell me what that was, please.

18  A     I ruled in this case multiple gunshot wounds, sharp and

19  blunt-force trauma.

20  Q     With regard to the stab wounds themselves, would those

21  wounds be consistent with basically, for lack of a better

22  phrase, survival-type knife?

23  A     They could be.

24  Q     With regard to the lacerations on the forehead, are

25  they consistent with the use of an instrument such as a bat?

1    A    Yes, sir.

2    Q    During the course of this examination, did you also

3    prepare some items from Angela Brown that were transferred to

4    Scott Belton for potential DNA analysis?

5    A    Yes, I did, sir.

6    Q    With regard to that, did you do vaginal swabs and

7    smears?

8    A    I did.

9    Q    Rectal swabs and smears?

10   A    Yes, sir.

11   Q    Oral swabs and smears, that being the mouth area?

12   A    Yes, sir.

13   Q    Some fingernail scrapings?

14   A    Yes, sir.

15   Q    I believe a combing of the pubic hair?

16   A    Yes, sir.

17   Q    And also some blood actually from Angela Brown?

18   A    Yes, sir.

19   Q    After you had done that and transferred that to Scott

20   Belton, were those items in the same, or substantially the

21   same, condition as when you retrieved them from Angela Brown

22   yourself?

23   A    Yes, sir.

24   Q    Did you also -- excuse me.  During the course of your

25   examinations of both Rodney and Angela Brown, did do what is

1    called postmortem prints, fingerprint of the hands?

2    A     Those were performed.

3    Q     Were those also transferred for further examination?

4    A     Yes, sir.

5    Q     You mentioned the 1200 cc of blood that you associated

6    with the stab wound to the stomach area and the left chest

7    gunshot wound.

8    A     Yes, sir.

9    Q     Tell me -- can you put that in terms that I can

10   understand as to what 1200 cc of blood is?  Is that a lot or

11   a little?  How would you classify that?

12   A     Well, the average -- we always use averages.  So the

13   average is a 70 kilogram man would have about five liters,

14   but this lady is a little bit less.  And, our blood volume is

15   dependent on our size.  So, she would have somewhat less than

16   five liters.  Probably somewhere in the vicinity of

17   four-and-a-half as a total blood volume.  So, 1200 cc is

18   about 1.2 liters of the five liters of the total amount of

19   blood in the body.

20   Q     So, somewhere between one-quarter and one-fifth of the

21   total amount of blood?

22   A     That would be a fair assessment.

23   (WHEREUPON, PHOTOGRAPHS WERE MARKED AS STATE EXHIBITS 13, 14,

24   15, 16, 17, 18 AND 19 FOR IDENTIFICATION.)

25   MR. LISENBY:

*** Frances L. Roark ***

```
 1   Q     All right.  Doctor, I would like you to look at

 2   photographs, State's Exhibits 13, 14, 15, 16, 17, 18, and 19,

 3   and tell me if you recognize them, please.

 4   A     I do.

 5   Q     And, what are those exhibits, please?

 6   A     These are photographs that I had taken at the autopsy

 7   examination of Ms. Brown.

 8   Q     Do each of those photographs, 13 through 19, fairly and

 9   accurate depict, or show, areas of injury that you observed

10   on Angela Brown on January 13th of 2000?

11   A     They do.

12            MR. LISENBY:  We offer 13 through 19.

13            THE COURT:  Admitted.

14   (WHEREUPON, PHOTOGRAPHS MARKED AS STATE EXHIBITS 13 THROUGH

15   19 WERE ADMITTED.)

16            MR. LISENBY:  May the doctor step down again,

17   please?

18            THE COURT:   yes.

19   MR. LISENBY:

20   Q     All right.  Doctor, again, remember to keep your voice

21   up --

22   A     Yes.

23   Q     -- as we go down the line.

24         I am going to show you 13 and 14 first.  Can you show

25   those to the members of the jury and indicate what they
```

1  depict, please?

2  A    These are two photographs.  One is taken at a slightly

3  closer perspective than the other.  This is to give you

4  orientation.  This is a better close up of the lesion.  This

5  is the graze wound here.  This is sort of the inner portion

6  of the breast on the right side.  This is -- this midline.

7  This is the chin.  This the left breast.  This is a close up

8  view of the abrasion wound and of the chest wound where it

9  went into the liver and paraspinous.

10  Q    All right, sir.

11  A    This is a respective shot of the chin, left breast

12  portion, middle part of the left breast.

13  Q    I'm sorry, Doctor, remember to keep your voice up.

14  A    Thank you.  This is the middle portion of the right

15  breast.  This is the graze wound.  This is the entrance site

16  over the chest portion.  Again, a close up view of the graze

17  wound and the entrance site in the chest.

18      This is the chin, left breast, middle part of the right

19  breast, edge of the chest, shows the abrasion wound and this

20  shows the entrance site.

21  Q    If you would, tell the members of the jury what State's

22  Exhibit number 19 is, please.

23  A    This is the skull and what it is attempting to show is

24  the beveling and also the projectile, this white metal

25  portion here.  So this is the bullet, end of the bullet

1    present in this lesion on top of the head that I discussed.

2        White metal, the beveled entrance site, exit -- it

3    gets stuck, partially stuck here.  Shows the metal.

4        Projectile and across the bevel upward here showing

5    the projectile.

6    Q    This is Exhibit number 16.  Tell us about that, please.

7    A    This is the belly button.  It has got some scaring

8    here.  Old scar here.  This is the stab-type wound designated

9    A that I mentioned earlier.  This is the pubic area down

10   here.

11       Pubic area below the scars, umbilicus, stab wound.

12       Pubic area below the scar, belly button, stab wound.

13   Q    This is Exhibit 17.

14   A    Grouping of the wounds together to make sure everybody

15   knows what we're talking about.  I sometimes use a label

16   device, not out of disrespect for anyone, but just to make it

17   clear.  So, my report I designated this B, C, D, E, F.  These

18   are the stab wounds that I discussed earlier.  This was a

19   superficial wound right here.  C.  See C.

20   Q    When you say that is a superficial wound and it looks a

21   little bit elongated to me.  Is that more of a cut or a stab?

22   A    Technically we call them incise wounds.  An incise

23   wound means that it is longer than it is deep.  A stab wound

24   is generally deeper than it is long, if you will.  We use

25   them a little interchangeably for clarity purposes.  But in a

1    technical sense, this is an incise wound because it is longer

2    than it is deep.  But in order not -- they are both due to

3    sharp force, but they are not -- so the mechanism  isn't

4    different, it is the contention, technically, when we write a

5    report to call them incise wounds.  For pratical speaking

6    purposes, they are used interchangeably.

7    Q    I am sorry.  Go ahead.

8    A    So, these are stab wounds in the neck area.  So, we saw

9    the one in the umbilicus.  That was A.  Then I labeled these

10   B, C which is the incised or superficial wound, D, E, F.

11       Wound B, then incised wound C, D, E, F.

12   Q    All right, sir.  The last two are 15 and 18, I believe,

13   show somewhat similar areas.  If you would, describe those

14   for us, please.

15   A    This shows the oblique view from either side of the

16   head.  One is more toward the side of the head and this is

17   more toward the front of the head.  This shows the W-shaped,

18   if you will, or Y-shaped laceration.  See the bone.  It is

19   like here and this is the W laceration up here.  This is G.

20   This is H.  This laceration here with the skin in between.

21   This, the light part here, is the bone.  This is the other

22   laceration here.  This is the laceration here with the skin

23   tag, sort of W-Y, if you will.  This is the second

24   laceration.  The light portion being the skull or bone.

25   Q    Thank you, sir.  You can retake your seat, please.

1    THE COURT:  Let the record reflect that the doctor

2  is not merely repeating himself during the last testimony.

3  He has been proceeding from one end of the jury box to the

4  other so that each set of jurors can view the photographs and

5  hear his testimony simultaneously.

6    MR. LISENBY:  Thank you, Your Honor.

7  **(WHEREUPON, A PHOTOGRAPH WAS MARKED AS STATE EXHIBIT NUMBER**

8  **45 FOR IDENTIFICATION.)**

9  MR. LISENBY:

10 Q    Doctor, I want to show you what is marked as State's

11 exhibit number 45.  And, just take a look at that for just a

12 moment and tell me, if you would, with regard to what you

13 observe involving the injuries that you described as stab

14 wounds to Angela Brown, is what is depicted in State's

15 Exhibit number 45, an instrument that would be consistent

16 with that type of injury being made?

17 A    It is.

18    MR. LISENBY:  May we approach one moment?

19    THE COURT:  Yes.

20 (WHEREUPON, A SIDE BAR COMMENCES.)

21    MR. LISENBY:  Simply because Dr. Krolikowski will

22 not be back for the testimony, if we get to the penalty

23 phase, is it all right to go ahead and ask him a couple of

24 questions about what his opinion is with regard to whether or

25 not Ms. Brown was still alive at the time that the stab

1   wounds and the blunt-force trauma was made to her?  That

2   would go, obviously, to especially heinous, atrocious and

3   cruel.  I wanted to ask you before I got into it.

4           THE COURT:  Yes.  If he has such an opinion.

5   Qualify as to all of that.

6           MR. BLANCHARD:  Say again?

7           THE COURT:  Yes.  If he can qualify for that

8   opinion.

9           MR. BLANCHARD:  Yes.

10  (WHEREUPON, A SIDE BAR CONCLUDES.)

11  MR. LISENBY:

12  Q    Now, Doctor, with regard to your examination of

13  Ms.. Brown and based on your education, training, and

14  experience, were you able to form an opinion as to whether or

15  not Ms. Brown was still alive at the point in time that

16  injuries such as the stab wounds and the injuries to the

17  forehead were made?

18  A    She may have been alive.

19  Q    Okay.

20          MR. LISENBY:  Thank you, Doctor.  I believe that

21  is all I have.  Defense counsel may have some questions.

22          THE COURT:  Cross examination.

23                    **CROSS EXAMINATION**

24  BY MR. KEITH:

25  Q    Good morning, Dr. Krolikowski?

1   A       Good morning.

2   Q       You came from where?

3   A       Newark, New Jersey.

4   Q       New Jersey.

5           I'd like to ask some questions about Rodney Brown's

6   autopsy and then we'll address Angela Brown momentarily.

7           You testified Rodney Brown, 223 pounds and was 70 inches

8   tall.  That would be how many feet approximately, 70 inches?

9   A       Well, five feet is 60.  It is just under six feet.

10  Q       Just under six feet?

11  A       Two inches shy.

12  Q       Rodney was a muscular, well-developed young man?

13  A       He was a well-developed individual, sir.

14  Q       And significantly larger than someone who would be,

15  say, 5'5", four or five inches, and a 145 or so pounds?

16  A       Well, by height and weight; yes.

17  Q       Significantly larger.

18          Dr. Krolikowski, were you able to determine the time

19  of death as far as Rodney Brown?

20  A       No, sir.

21  Q       Do you know what time he died?

22  A       Beg your pardon?

23  Q       Do you know what time he died?

24  A       No, I don't know that for sure.

25  Q       Do you know how long from the time he was shot to the

1    time of his death?  Is there anyway of telling?

2    A    No, sir.

3    Q    Based on your knowledge and experience of the nature of

4    his injuries, would it have been an immediate death?

5    A    The fact that he bled into the chest cavity.  He had

6    600 mils of blood in the right chest cavity and 900 mils of

7    blood in his left chest cavity.  There would have been,

8    depending on sequence of the wounds, there could have been a

9    short period of time that he would have been alive.

10   Q    Do you think it could have been -- I said immediate --

11   a couple of seconds, a few seconds possibly?

12   A    Few seconds to a minute or so.

13   Q    You are not able to determine the order of the wounds,

14   whether -- which wound occurred first?

15   A    No, sir.  I can't.

16   Q    No way of doing it?

17   A    No, sir.

18   Q    Would there have been any way to dispute any statement

19   that he was shot in the chest first?  Would that be

20   consistent with your autopsy results?

21   A    I can't determine which wounds occurred first.

22   Q    No one knows.  Can't tell.

23   A    Can't tell, sir.

24   Q    You testified about the significance of the pathway of

25   the two bullets in Rodney Brown.  You recovered both bullets.

1   A       Yes, sir.

2   Q       And, I believe, you had some testimony about the

3   pathway of the bullet that struck Rodney Brown in the head.

4   A       Yes, sir.  It struck in the corpus callosum, then went

5   slightly upward, and came out the right frontal tip, and came

6   out with an S-shape wound on the right portion of the

7   forehead area.

8   Q       The pathway of that bullet was it not somewhat upwards

9   A       Slightly upward.

10  Q       Slightly upward.  Any significance, in your opinion, to

11  the pathway being slightly upward?

12  A       Without knowing the position of the firearm, the

13  muzzle, and the decedent, I can only give you the relative

14  track on the standard anatomic position.

15  Q       And, you would not be able to determine whether the

16  deceased was moving, or standing, or sitting, or kneeling, or

17  moving around, or anything, based on your autopsy; is that

18  true?

19  A       That's true.

20  Q       During the course of your autopsies, is it true that

21  you obtain some blood samples, urine samples, or samples like

22  that for further testing?

23  A       Well, there is no urine in Ms. Brown.  There was 35

24  mils of urine ....

25  Q       I am talking about Rodney Brown.

1    A    He had 35 mils of urine present.

2    Q    And, were any analysis done, if you know, on any

3    samples from Rodney Brown?

4    A    Toxicology was requested.

5    Q    And, what was actually sent to toxicology?

6    A    I do not have that piece of the file in front of me,

7    sir.

8    Q    Okay.  Is it a routine to test in death cases for

9    presence of drugs or alcohol?

10   A    Yes, sir.

11   Q    And, what is THC?

12   A    Tetrahydrocannabinol.  It is the shortened version of

13   what is called Delta-9 THC which is the major metabolite in

14   marijuana.

15   Q    Dr. Krolikowski, I have got -- it says certificate of

16   analysis, toxicology on the front of it.  It's got your name

17   on the top of it.  Dr. F. J. Krolikowski, are you familiar

18   with this document?

19   A    If I can refresh myself, sir, it's been a substantial

20   amount of time since I have seen that.

21          MR. KEITH:  If I may approach, Your Honor?

22          THE COURT:  Yes.

23          THE WITNESS:  Thank you, sir.  Yes, sir.  I am

24   familiar with this document.  It is the results of the

25   toxicology testing requested by me on the decedent, one

1   Mr. Rodney Brown.

2   MR. KEITH:

3   Q    What were the results of that toxicology testing?

4   A    On the blood it said ethyl alcohol negative.  No drugs

5   detected.  Vitreous humor, which is eyeball fluid, we take

6   that to analyze for various reasons.  Ethyl alcohol was

7   negative.  On the urine THC metabolites were present.

8   Q    Meaning?

9   A    Meaning that the metabolite, the Delta-9, the

10  tetrahydrocannabinol for marijuana was present in the urine.

11  Q    Any particular distinction between THC being present in

12  the urine versus being present in the blood?

13  A    Well, we generally don't test blood.  Because in order

14  to get to see if it is there, it is in such small quantities,

15  the urine concentrates things from the body, and that's why

16  we analyze it.  So, what happens is your blood gets filtered

17  in the kidneys and all the wastes products get concentrated.

18  So, for analytical purposes, it is much easier to analyze for

19  the presence of marijuana metabolites, for example, in the

20  urine as opposed to the blood.

21  Q    Would it be fair to say that Rodney Brown was under the

22  influence of marijuana at the time of his death?

23  A    I can say that he had had in the last several days

24  probably smoked marijuana, but beyond that I can't state

25  anything.

1  Q     And, between the THC in the blood or urine, are you

2  saying that because it was in the urine, it would be an

3  earlier versus a later time of ingestion of marijuana?

4  A     No, sir.  It means that once it gets into -- say it is

5  smoked.  If it is smoked, it goes into the lungs.  Then it

6  goes into the blood stream.  The blood stream then goes to

7  the kidneys and the blood is filtered and that product from

8  the marijuana goes out into the urine.  It is concentrated

9  because the kidneys pulls back some of those fluids it takes

10 out of the blood and some of the constituents in the blood.

11 So it is a filter.  It doesn't get rid of everything.  It

12 just gets rid of certain things.  So, it concentrates that

13 material in the blood, the THC, in the urine which allows us

14 to analyze to see if there's a metabolite.

15 Q     You are unable to quantify the level of THC in blood,

16 aren't you?

17 A     Well, I am not, with all due respect, sir, I'm not a

18 toxicologist so I can't say what specific level they got or

19 the time sequence as to when that level would be present.

20 Q     And, you are unable to have an opinion as to whether it

21 is chronic usage or just occasion use based on that ....

22        THE COURT:  Hold it.  Hold it.

23 (WHEREUPON, A JUROR HAD A MEDICAL EMERGENCY.)

24        THE COURT:  Ladies and Gentlemen, please go to the

25 jury room.

1    (JURY OUT.)

2          THE COURT:   Everyone in the courtroom leave.   Exit

3    the courtroom.

4    (WHEREUPON, THE COURTROOM WAS EVACUATED.)

5          THE COURT:   About 20 minutes ago Juror Blanks,

6    Karen Blanks, during the testimony, had some sort of medical

7    seizure.   Proceedings were haulted.   I immediately sent the

8    jurors, other than Ms. Blanks, to the jury room.   I had the

9    courtroom emptied and paramedics have attended to Ms. Blanks,

10   and, as I understand it, have transported her to the

11   hospital.   The other jurors at 11:30 I sent into recess until

12   12:30 instructing them with the standard instructions or

13   admonished them to follow the instructions that I have given

14   them so many times.   I told them to go on to lunch and be

15   back in the jury room at 12:30.

16        The Doctor was on the witness stand at the time and

17   cross-examination was being conducted by Mr. Keith.   At this

18   time, here in open court, only with court personnel present,

19   of course, defense counsel, the State, I've been made aware

20   that the doctor has a problem as far as his transportation

21   back to Newark.   I am asking counsel for both State and

22   Defense, and believe me, on the record I want to make it

23   absolutely certain, that I am not putting any pressure on

24   anyone in anyway, I am simply asking that we, first, we have

25   proceeded well into cross-examination, and Mr. Keith and

```
 1    Mr. Blanchard, how much remains on cross-examination?
 2              MR. KEITH:  Five, ten minutes max, Judge, not a
 3    whole lot more.
 4              THE COURT:  What would be the subject of completion
 5    of your cross-examination?
 6              MR. KEITH:  Judge, I had pretty much wrapped up my
 7    cross on Rodney Brown's autopsy.  I had a few questions on
 8    Angela Browns', probably wouldn't take five minutes.  Like I
 9    said, you want to know basically what I was going to ask him?
10              THE COURT:  Yes.
11              MR. KEITH:  I was going to ask about the nature of
12    the first wound to Angela Brown that was described as graze
13    wound.  I was going to ask about the significance of there
14    being no projectile recovered.  I was going to ask about the
15    significance of that graze wound, whether or not it would
16    indicate that she was moving in some sort of fashion when she
17    was struck by that bullet, which is why it was a graze wound.
18    I was going to ask about the -- her forensic toxicology
19    analysis.  What the significance of the .021 percent
20    blood-alcohol level was and basically the significance,
21    meaning that might be.  Possibly a little follow-up on his
22    statement where -- Dr. Krolikowski testified that she may
23    have been alive or may have been deceased at the time of the
24    bat and the knife, and that was basically it, Judge.
25              THE COURT:  Mr. Lisenby, on behalf of the State, I
```

1   am going to ask you, any of the matters cross-examination

2   that Mr. Keith just described on the record, are any of those

3   matters subject to stipulation by the State?

4           MR. LISENBY:   I was thinking probably all of it.

5   As far as her moving around, that's our contention that she

6   was moving.  The blood-alcohol level, I think we could enter

7   some kind of stipulation.

8           THE COURT:   What would prevent us from completing

9   the doctor's testimony on the record, as to what that would

10  be, and, if necessary, later in the trial use it in the form

11  of a deposition?

12          MR. BLANCHARD:   That's what I was thinking.

13          MR. KEITH:   Yes, we can come back and just read it

14  to the jury.

15          MR. BLANCHARD:   Just do it now.

16          THE COURT:   Is the defendant here?

17  (WHEREUPON, THERE WAS A BRIEF OFF-THE-RECORD.)

18          THE COURT:   Now, I'd previously put on the record

19  the matter with the juror.  Here is where we are.  At this

20  point the State and Defense have agreed and stipulated that

21  we can complete the cross-examination of the doctor.  After

22  that time, I'm going to excuse him as a witness.  His

23  testimony that's taken out of the presence of the jury, will

24  be transcribed and submitted for the jury in the form of a

25  deposition sometime subsequent to today.

1          For State, is that your stipulation?

2              MR. LISENBY:  Yes, sir.

3              THE COURT:  For defense?

4              MR. BLANCHARD:  Yes, Your Honor.

5              THE COURT:  Proceed.

6    (JURY NOT PRESENT)

7                    **CONTINUED CROSS EXAMINATION**

8    **BY MR. KEITH:**

9    Q     Dr. Krolikowski, before the break, I believe, any more

10   responses to my questions about the THC level and whether you

11   correlate that with any particular amount of ingestion or

12   date of usage of the marijuana?  Any further explanation?

13   A     No, sir.  With all due respect, anything further should

14   come from the toxicologist performing the analysis.

15   Q     Thank you, sir.

16        Dr. Krolikowski, I would like to direct your attention

17        to

18   Angela Brown's autopsy --

19   A     Yes.

20   Q     -- and ask you some questions about that briefly.

21        There was a -- the first wound you described in your

22   report --

23   A     Yes, sir.

24   Q     -- is the graze wound; is that correct?

25   A     Yes, sir.

1    Q      And, there's no way of determining how far away the

2    pistol was from Ms. Brown when she was shot; is there?

3    A      That's correct.  There's no way to determine that

4    distance.

5    Q      It wasn't close?  The wound wasn't from -- no stippling

6    indicates that it was not a close-up shot, if you will.

7    A      Well, you can't say that, sir.  If there was an

8    intervening material, say, there was a wall from which she

9    was pressed against or a piece of sheetrock, and the gun was

10   fired one side, the soot and smoke may be picked up by that

11   intervening material, even though the muzzle of the gun was

12   relatively close.  So, it could be that circumstance if there

13   was an intervening material.  So, we call those wounds

14   indeterminant:  Could be close; could be distant.  We don't

15   know.  I don't have the material to decide that.

16   Q      Dr. Krolikowski, did someone determine whether there

17   was any intervening material?

18   A      Well, by gross examination, one can do that.

19   Q      There is no projectile recovered from wound number 1,

20   the graze wound?

21   A      No, sir, there is not.

22   Q      Do you have an opinion as to how many times she was

23   actually shot?

24   A      It is possible she was shot at least twice.  There is a

25   possibility it could have been a third time and the

1   projectile was not recovered.

2   Q     And, if there was no projectile recovered from the

3   wound, number 1, I presume the projectile would have exited

4   her body or else penetrated some other area of her body.

5   A     Well, it could have penetrated the chest wound, because

6   it is in -- roughly in alignment with it.

7   Q     Would that not be consistent with the entrance and the

8   exit from the graze wound, number 1, and the chest wound I

9   think described as number 2?

10  A     I am not sure I understand the question.

11        Certainly, the bullet, the projectile, could have grazed

12  her here and then gone into the lower chest and through the

13  liver and into the paraspinal cord.

14  Q     You can't say for a fact that happened?

15  A     No, I can't.

16  Q     But, it would be consistent with two bullets causing

17  those three wounds?

18  A     That's correct.

19  Q     Are you -- the fact that wound number 1 was a graze

20  wound, would that not indicate that likely the victim was

21  moving at the time she was first wounded by a projectile?

22  A     I think that's difficult to say one way or the other.

23  Q     I guess what I'm asking is this, Dr. Krolikowski:

24  Considering the reasonably short distance from the victim and

25  the defendant, it would have been hard not to have shot the

1    victim at close range from where she would have sustained an

2    injury to her chest and not just a grazing wound from a short

3    distance.  It is hard to miss from a short distance, is what

4    I'm saying.

5    A    It is difficult to miss from a short distance and she

6    may have been moving at the time the graze wound was

7    sustained.  I can't say that for sure.

8    Q    Can you testify as to whether she was standing,

9    sitting, or ....

10    A    No, sir.  Unless you know the location of the muzzle.

11    Q    You can't determine, based on your -- you've done a lot

12    of autopsies, I know -- you can't determine whether or not

13    Angela Brown was alive or deceased at the time she sustained

14    further injuries from the bat or any type of knife; can you,

15    to a reasonable degree of medical certainty?

16    A    They occurred in the perimortem period, but I cannot go

17    beyond that.

18    Q    She could have well been deceased, may have been after

19    the gunshot wounds to her?

20    A    That is possible.

21    Q    And, would that be possible, because the gunshot wounds

22    are serious, life-threatening wounds?

23    A    Well, there's 1200 mills of blood in peritoneal cavity.

24    Clearly that amount of blood alone could cause cardiovascular

25    clots and death.  So, that wound, in and of itself, could

```
 1   cause death.

 2   Q      Gunshot wound is a very fatal wound.

 3   A      The gunshot wound to the abdomen.

 4   Q      Was a fatal wound; correct?

 5   A      Was by itself a potentially fatal wound.

 6   Q      And, her death could have been virtually immediately or

 7   within a few seconds upon bleeding?

 8   A      Well, it takes a period of time to have 1200 mills of

 9   blood collect in the abdomen.  So, I would say it would be in

10   the vicinity of minutes.

11   Q      Dr. Krolikowski, I believe there was some type of

12   toxicology report performed on Ms. Brown.  Did you obtain

13   samples and send them to the toxicologist?

14   A      I did.

15   Q      And, based on your expertise, I believe you don't

16   dispute there was a finding of .021 percent blood alcohol in

17   Ms. Brown?

18   A      With all due respect, could I review that?  I didn't

19   receive that in my package.

20           MR. KEITH: If I may approach, Your Honor?

21           THE COURT: Yes.

22           THE WITNESS:  Thank you.

23       Excuse me, there is alcohol present, it is approximately

24   0.021 percent.

25   MR. KEITH:
```

1   Q     And, can you quantify that level of alcohol based on

2   alcohol consumption?  Is there a correlation there in your

3   opinion?

4   A     Well, some alcohol could be due to decompositional

5   changes, which were minor.  In consideration of the standard

6   drink, which is about 85 proof, with standard 12 ounce beer,

7   5 ounce glass of wine, this would represent just slightly

8   over that.  They usually come in at about .017.  Because of

9   her smaller body-weight, this would be roughly the equivalent

10  of one drink, standard drink.

11  Q     And, is there a significance of the .021 blood-alcohol,

12  of the alcohol in the blood versus anywhere else, as far as

13  an indication of the recentency [sic.] of usage or

14  consumption of alcohol?

15  A     Well, the fact that vitreous humor does not have any --

16  it takes a bit of time for the equivalation between the blood

17  stream and the vitreous humor.  Absorption in the stomach is

18  on average around 20 minutes.

19  Q     Could Ms. Brown have consumed that alcohol that

20  morning?

21  A     Yes.

22  Q     Did she likely consume the alcohol that morning?

23  A     She would have had to have more than likely consumed it

24  within approximately one to one-and-a-half hours, because the

25  metabolism of alcohol basically is at the level of .020 per

```
 1   hour in the average person.

 2   Q      And, are you aware of, or were you able to determine,

 3   the time of death?

 4   A      No, sir.

 5   Q      Point 08 percent is the legal limit to be intoxicated;

 6   correct?

 7   A      In some states.

 8   Q      In the State of Alabama.

 9   A      Yes, sir.

10          MR. KEITH:  Thank you, Dr. Krolikowski.  No further

11   questions.

12          THE COURT: Anything else?

13          MR. LISENBY:  Briefly, Your Honor.

14                      REDIRECT EXAMINATION

15   BY MR. LISENBY:

16   Q      Doctor, in your discussion with regard to Angela

17   Brown --

18   A      Yes, sir.

19   Q      -- Mr. Keith asked you about the stab wounds, whether

20   they occurred before or after death:  Do you recall that

21   question?

22   A      Yes, sir, I believe I said they were in the perimortem

23   period.

24   Q      Tell me what you mean by perimortem period.

25   A      It's around the time of death.  Either somewhat before
```

```
 1   death or potentially right after death.

 2          MR. LISENBY:  I believe that's all, Your Honor.

 3   Thank you.

 4          THE COURT: Anything else from defense?

 5          MR. KEITH:  No, Your Honor.

 6          THE WITNESS:  I would like to thank the Court and

 7   the attorneys present for being so gracious.

 8          THE COURT:  Certainly.  You are excused.

 9          MR. KEITH:  Thank you for being here, Doctor.

10          MR. LISENBY:  Thank you, Doctor.  Appreciate it.

11          THE COURT:  You are excused.

12   (WHEREUPON, THE WITNESS WAS EXCUSED.)

13          THE COURT:  On the record.  Your copy of his

14   testimony marked?

15          MR. LISENBY:  The transcript -- I have got the

16   whole suppression hearing is in it.  So, I will have to get

17   it out and make a copy of just his testimony.  Is that what

18   you are talking about?

19          THE COURT:  It is not going to hurt.  What I'm

20   saying is, we can put it in the record, just the entire

21   transcript, as an exhibit, and then it is all contained there

22   everything including his testimony.

23          MR. LISENBY:  Oh, I am sorry, not to go to the

24   jury.  I apologize.

25          THE COURT:  No, no, no.  What I'm doing is saying
```

1   is if you should omit anything from the stipulation, and you

2   come back and say oops, then this is stipulated in.

3          MR. LISENBY:  Okay.

4          THE COURT:  I want you to draw that up that I'll

5   read -- I have already drawn it up.  Type it up.  I am going

6   to read that to the jury Monday.  But, at the same time, if

7   you have got this admitted, then if something should not be

8   in that, I'll allow you to amend it.

9          MR. LISENBY:  Okay.

10          THE COURT:   Okay?

11          MR. LISENBY:   Okay.  I am sorry.  I just

12   misunderstood.  I thought we were talking about something

13   before the jury.

14          THE COURT:  We can make that Court Exhibit 1.

15   Court Exhibit 1 will be the transcript of April 29th, 2003.

16   So, the transcript of that day, which, of course, has been

17   prepared, will be marked as Court Exhibit 1.  It contains in

18   particular the sworn testimony of Dr. Samuel Baechtel, and

19   that is being admitted by stipulation into the record.  This

20   will not go back to the jury, but it is part of the record.

21   The State -- previously the Court has prepared a four-part

22   stipulation that will be typewritten and read to the jury

23   Monday.  It will be charged by the Court to the jury in lieu

24   of the testimony of this witness.  However, as I have already

25   stated, Court's Exhibit 1, which is now admitted by

1  stipulation, will be there should any of the testimony of

2  that witness become relevant and it is not contained in the

3  stipulation.  Okay.

4              MR. LISENBY:  State agrees to that.

5              MR. BLANCHARD:  Yes, sir.

6              THE COURT:  Everybody agrees on the record.  Bring

7  them in.

8  **(WHEREUPON, THE TRANSCRIPT OF THE SUPRESSION HEARING OF APRIL**

9  **29, 2003, WAS MARKED AND ADMITTED AS COURT EXHIBIT 1.)**

10 (JURY PRESENT).

11             THE COURT:  Ladies and Gentlemen, I appreciate your

12 patience.  And, let me go ahead and tell you where we are at

13 this point.  Needless to say it has been an eventful

14 day.

15     As I understand it, our juror that had the medical

16 problem earlier is going to be fine and, in fact, is going to

17 be back Monday morning and will be with us.

18     I know that this is going to be a long trial and this is

19 the first day.  As a matter of fact, when she had her problem

20 it was on the first witness.  So I'm so glad for her

21 personally and her family, but also she's going to be able to

22 back with us here Monday.

23     Now, the next witness to be called would have been a

24 rather lengthy witness whose testimony might have taken an

25 extended period of time.  There has been a stipulation

1  reached between the attorneys for the State and Defense which

2  will stand in lieu of the testimony of the witness that would

3  have been called for the afternoon.  I'm going to let y'all

4  go home in just a few minutes and we'll resume with all

5  jurors Monday morning.  Hopefully, she will feel much better

6  and stronger and be able to participate fully which, of

7  course, she'll have to do.

8      At that time, Monday morning, one of the first things

9  I'm going to do is to charge you on the matter of the

10  stipulation that has been made between the attorneys for

11  State and Defense.  There are, probably, at least, four

12  different points that I'm going to charge you that will be

13  proven as a matter of fact and law.  In other words, when I

14  read these things to be, you can accept them as being

15  absolutely true, and that has been agreed to be the case by

16  both sides in this case.

17      So, with that, I'll tell you that we are going to be in

18  recess in a few minutes.  I want go over one more time with

19  you the instructions, because it will be over the weekend and

20  it will be Monday before we are back together.  You, of

21  course, cannot discuss this case with anyone.  I really can't

22  reiterate that strong enough.  Sometimes jurors feel, well,

23  if I talk a little bit about something, this, that or the

24  other; no, that's wrong.  You can have absolutely no

25  conversation whatsoever with anyone concerning this case.

```
 1           Again, do not try to learn anything about this case.

 2           Again, avoid all contact with family members, both of

 3   the victim and the defendant and all witnesses.  We have got

 4   a few special things we will be taking care of before we go

 5   today.  You cannot have contact with anyone that has anything

 6   to do with either side of this case.

 7           Avoid news media.  Ladies and Gentlemen, when you were

 8   sworn in as a jury this morning, you undertake a completely

 9   different role.  You have certain duties and obligations that

10   are now owed to everyone in this court system in all parts of

11   this.  And, the burden will be on you and your conscience to

12   judiciously avoid any contact with any sort of newspapers

13   about this case.  If it is on television, you must not look

14   at it or listen to it.  If it is on the radio, you must not

15   listen to it.  If it is in the newspaper, you cannot read it.

16   If it is on the internet, you'll have to log off.  So, all of

17   those different things you must follow.  I don't think that

18   it would happen, but a well-intentioned person might simply

19   ask you about the case.  As, I said, you have to tell them

20   you cannot discuss it.  The same would go for any member of

21   the media.  I think you well understand by this time, you

22   cannot even discuss this case amongst yourselves.

23           Any additional instructions requested by counsel for

24   State or Defense?

25               MR. BLANCHARD:   No, Your Honor, Defense is
```

 1 | satisfied.

 2 |          MR. LISENBY:    State is satisfied.

 3 |          THE COURT:    Counsel, approach for one second.

 4 | (WHEREUPON, A SIDE BAR COMMENCES.)

 5 |          THE COURT: We have the co-worker to a witness,

 6 | Ms. Bledsoe.  We have to talk to her.  She knows one of the

 7 | witnesses, of course, you know she talked about this earlier.

 8 | Were you in here?

 9 |          MR. LISENBY:    I wasn't here.

10 |          THE COURT:    Were you here, Kenny?

11 |     She is a co-worker with one of the witnesses and they

12 | are going to be on the same shift this weekend.  She wants to

13 | know if she should not go in.  We are going to take care of

14 | that in just a second.

15 | (WHEREUPON, A SIDE BAR CONCLUDES.)

16 |          THE COURT:    Ms. Bledsoe, I need to see you for

17 | just a second up here.  All the rest of you are free to go

18 | for today.  Follow the instructions.

19 |     Everyone remain in this courtroom while the jury exits.

20 | When Monday morning comes around be in the jury room at 9:00.

21 | Thank you.

22 | (JURY ADJOURNED UNTIL 9:00 A.M., 9 JUNE, 2003.)

23 |          THE COURT:    Yes, ma'am.  On the record.  For

24 | everyone else, we are now in recess until 9:00 Monday.

25 |     Ma'am, state your name for the record again.

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1              MS. BLEDSOE:  Rita Bledsoe.

2              THE COURT:  And, Ms. Bledsoe, tell me -- you

3    started relating something to me earlier in the hallway about

4    a co-worker is a witness and your work schedule for this

5    weekend.  Tell everyone about that.

6              MS. BLEDSOE:  We work at least one day on the

7    weekend.  We rotate like Saturday or Sunday.  And, I am

8    scheduled off tomorrow, but I have got to work Sunday.  And,

9    I don't know when she's scheduled to work or anything.

10             MR. GIBBS:  Can I ask, the co-worker, who are you

11   talking about?  Would that be Dorothy?

12             MS. BLEDSOE:  Dorothy Flournoy.

13             THE COURT:  Gentlemen, he'll listen to any

14   suggestions, but who is your supervisor that you can find out

15   from what the witness' work schedule is.

16             MS. BLEDSOE:  Her supervisor is Shane Dudley.

17             THE COURT:  If you can find out, I would prefer you

18   not to be at the same place, same shift that sort of thing.

19             MS. BLEDSOE:  I can talk to him.

20             COURT:  You see, basically, this would still fall

21   under the same thing:  You are still on jury duty.  You are

22   still on jury duty so they have got to pay you.  If you miss

23   because the other worker is there, that's the witness, I am

24   sorry, but that's just the law.  Is everybody satisfied?

25             MR. GIBBS:  Yes, sir.

```
 1              MR. BLANCHARD:  Yes, sir?

 2              THE COURT:  If she's working the same shift you are

 3   supposed to, you're not going in; right?

 4              MS. BLEDSOE:  Right.

 5              THE COURT:  Very good.

 6              MS. BLEDSOE:  Do we keep our badges with us and

 7   wear them Monday?

 8              THE COURT:  Yes.  I think so.  Yes, keep it with

 9   you.

10              MS. BLEDSOE:  Am I excused?

11              THE COURT:  Thank you, ma'am.  You are free to go.

12   Thank you.

13        Anything else, Gentlemen, on the record?  If not, Monday

14   morning at 9.

15   (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED UNTIL 9:00 A.M., 9

16   JUNE, 2003.)

17                              *****

18

19

20

21

22

23

24

25
```

*** Frances L. Roark ***

```
 1                        IN THE CIRCUIT COURT
             FIFTH JUDICIAL CIRCUIT OF ALABAMA
 2                        CHAMBERS COUNTY

 3   STATE OF ALABAMA,              *
                                    *      CRIMINAL NO.
 4   versus                        *      CC-2000-0000166
                                    *      LaFayette, Alabama
 5                                  *      9 June, 2003
     JASON HOLLOWAY,                *
 6        Defendant.               *      CRIMINAL APPEALS NO.
                                    *      CR-02-2115
 7   * * * * * * * * * * * * * * * * * * * * * * * * * * *

 8                   TRANSCRIPT OF TRIAL BEFORE

 9                 THE HONORABLE RAY D. MARTIN,

10                 CIRCUIT JUDGE, AND A JURY.

11   A P P E A R A N C E S
     FOR THE STATE OF ALABAMA:   REA S. CLARK, DISTRICT ATTORNEY
12                               FIFTH JUDICIAL CIRCUIT
                                 CHAMBERS COUNTY COURTHOUSE
13                               COUNTY OFFICE BUILDING
                                 LAFAYETTE, ALABAMA 36862
14
                                 BY: REA S. CLARK, DA
15                                   BILL LISENBY, CHIEF ADA
                                     KENNETH GIBBS, ADA
16

17   FOR THE DEFENDANT:          BLANCHARD & ASSOCIATES, LLC
                                 ATTORNEYS AT LAW
18                               505 SOUTH PERRY STREET
                                 MONTGOMERY, AL 36104
19
                                 BY: WILLIAM R. BLANCHARD, ESQUIRE
20                                          and
                                 KEITH & HAMM, PC
21                               ATTORNEYS AT LAW
                                 235 SOUTH McDONOUGH STREET
22                               MONTGOMERY, AL 36104

23                               BY: RICHARD K. KEITH, ESQUIRE

24
                                 FRANCES L. ROARK, CSR
25                               OFFICIAL COURT REPORTER
                                 Fr3L126
```

1  PROCEEDINGS:  In Open Court.

2  (WHEREUPON, A SIDE BAR WAS COMMENCED.)

3         THE COURT:  Your name for the record.

4         MS. POWELL:  Barbara Powell.

5         THE COURT:  Ms. Powell, if you would, relate to me

6  here on the record, what you earlier told Mr. Story.

7         MS. POWELL:  I went into work Saturday morning.

8  First shift started at 7 o'clock Valley time.  One of my

9  associates, he works for me.  I am the department manager.

10  He works for me.  He asked did I get chosen on the jury duty.

11  I said yes.  He said, you know, that's my brother-in-law.

12  And I said no.  That is all that transpired.

13         THE COURT:  What's his name?

14         MS. POWELL:  John Flournoy.

15         THE COURT:  How is he related to the defendant?

16         MS. POWELL:  He said that was his wife's brother.

17         THE COURT:  His wife's -- what?

18         MR. BLANCHARD:  I can tell you who that is.  That

19  is Dorothy Flournoy's husband.

20         MS. POWELL:  See, I didn't know her.  I was just

21  telling him because I didn't want you to think ....

22         THE COURT:  I appreciate you doing this.  You did

23  exactly what you are supposed to do.  All right.

24         MS. POWELL:  Um-hmmm.

25         THE COURT:  Did he ask any more questions?

```
 1              MS. POWELL:  No.  No, he did not.

 2              THE COURT:  Now, I know this, but I've got to have

 3   it on the record, would the fact that he approached you, and

 4   made this information known to you, would that have any

 5   affect, whatsoever, on your ability to continue service on

 6   this jury?

 7              MS. POWELL:  Not at all.

 8              THE COURT:  I know, but I have to ask you.

 9   Questions from either attorney?

10              MR. BLANCHARD:  I have no questions.

11              MR. LISENBY:  Ms. Powell, I am sorry, you said that

12   you were the --

13              MS. POWELL:  Department manager.

14              MR. LISENBY:  -- department manager, and he was one

15   of your employees?

16              MS. POWELL:  Um-hmmm.

17              MR. LISENBY:  Did you notice if he had been in the

18   courtroom any?

19              MS. POWELL:  I haven't seen him.

20              MR. LISENBY:  You hadn't seen him.

21              MS. POWELL:  I haven't seen him, and if it is his

22   wife who's here, I don't know her.

23              MR. LISENBY:  Okay.

24              MR. BLANCHARD:  For the record, his wife has been

25   here; however, I have been looking for him, because I wanted
```

1   to talk to him, and he has not been here that I know of.

2           MS. POWELL:  He has not missed any time out of

3   work.

4           THE COURT:  Good enough.  Anything else?

5           MR. LISENBY:  No, sir.  I can't think of anything

6   right now.

7           THE COURT:  Thank you, ma'am.

8       We've got that cleared up and be ready to go in

9   a minute.

10  (WHEREUPON, THERE WAS A BRIEF RECESS.)

11          THE COURT:  The State has filed a Motion in Limine.

12  This would in general request that the State prohibit defense

13  from questioning witnesses or mentioning alleged prior

14  specific acts of the victim Rodney Brown.  Go ahead, if you

15  would, Mr. Lisenby, and state on the record the grounds for

16  this motion.

17          MR. LISENBY:  Yes, sir.  Judge, after the opening

18  statement on Friday, I took some time over the weekend to do

19  some research with regard to the argument that I was making

20  to the court on Friday at the time of opening statements.

21  And, in looking at the Rules of Evidence, 404(A)(2)(a), only

22  permits testimony by character in the form of reputation or

23  opinion.  So, clearly, prior specific acts would not be

24  admissible with regard to that.  I have a copy of that if you

25  want to see it.

1    The Defense made some comment, some argument, that in

2  fact they would be attempting to admit prior specific acts

3  for some other purpose.  And, I did further research with

4  regard to that, and in the case of *Henderson versus State*,

5  583 So.2nd, 276, Court of Criminal Appeals 1990, which was a

6  capital murder case in which the defendant was sentenced to

7  death by electrocution and which was subsequently affirmed by

8  the Alabama Supreme Court at 583 So. 2nd, 305 in which in

9  their opinion they state, "We have given special

10  consideration to the issues involving," and one of the things

11  they discuss is self-defense, which is what this Motion in

12  Limine concerns, so the Alabama Supreme Court also agreed

13  with the Court of Criminal Appeals opinion on this, "The only

14  time specific acts might be admissible would be whether --

15  would be at a time after the accused has established some

16  proof that he, in fact, was acting in self-defense."  In this

17  particular case, as I read it, the trial court prohibited

18  defense counsel from even mentioning -- yes, here it is on

19  290.  "The trial court correctly instructed defense counsel

20  to exclude any reference to the victims reputation for

21  violence from his opening statement."  So, that was even

22  prevented in opening statement until there was some proof.  I

23  have a copy for the Court to read.  Until there was some

24  proof of self-defense, prior specific acts were not to be

25  mentioned even in opening statements, much less in

1    questioning by -- concerning other witnesses about those

2    events until there has been some proof offered by the

3    defendant or some proof in the case that the defendant acted

4    in self-defense.

5        In addition to that, the second part of our motion

6    indicates that before any testimony about prior specific acts

7    would be admissible at all, there are several factors that

8    the Court should evaluate, and I would -- there are four that

9    are listed in my motion which comes from McElroys, section

10   63.01, in the case of *Calhoun versus State*, 460 So. 2nd,

11   1376, Court of Criminal Appeals 1983, which stated the law

12   and the Alabama Supreme Court agreed with the law.  They

13   simply reversed on the factual basis with regard to the Court

14   of Criminal Appeals decision in four 460 So. 2nd, 1378, 1984,

15   Alabama 1984.

16       The four factors that I cite in my motion, the

17   most prominent involving the last two here, was the argument

18   that I was making, that I don't believe that the defendant

19   would be able to offer these prior specific acts at all,

20   because number 3 of these factors states:  The relationship

21   between the defendant and the victim after the defendant was

22   informed of the act of violence, if the defendant continues

23   to associate with the victim, then this would be a factor

24   against admitting the evidence of violence toward another

25   person.  I believe any offer of proof, the Defense would have

1    to indicate the fact that the defendant and victim continued

2    to remain friends and continued to hang out together, for

3    lack of a better term, well after this event that they are

4    alleging with regard to Sandra Patterson.

5        And, the fourth factor is the similarity or

6    dissimilarity of the facts of the present homicide to the

7    facts of purported act of violence.  Clearly, what the

8    Defense proffered to the Court in their argument was an

9    alleged rape involving another woman and alleged beatings of

10   the other victim in this case, Angela Brown, Rodney Brown's

11   wife, clearly would have no similarity at all to the present

12   homicide whatsoever.

13       So, I think, until there has been some proof, in

14   fact, the defendant was acting in self-defense, these acts

15   would not be admissible.  In absence of some offer of proof

16   where the Court could evaluate these factors, the prior

17   specific acts also would not be admissible.

18           MR. KEITH:  Judge, if the State requires an offer

19   of proof, the State has Jason Holloway's statement where he

20   explains it is self-defense in this statement where he claims

21   and states that Rodney Brown came after him with a baseball

22   bat and that is why he shot him.  That's State's evidence.

23   It is written down and that would be the offer of proof.  At

24   this point, the State is aware of his grounds for

25   self-defense.

 1          MR. LISENBY:  But, it is not in evidence at this

 2   point.

 3          MR. KEITH:  You are going to put it into evidence,

 4   I assume, during your case in chief; correct?

 5          MR. LISENBY:  Yes.

 6          MR. KEITH:   We can't put it in yet.

 7          MR. LISENBY:  That's correct.  But until -- the

 8   point the case makes is, until that proof is entered in

 9   evidence, it is not admissible -- the prior specific acts are

10   not admissible.

11          MR. KEITH:  Well, Judge, can we make that offer of

12   proof right now if we need to admit the statement into

13   evidence, I don't think there is any dispute about what the

14   statement says about self-defense and Rodney coming at him

15   with the bat.  We can do that now.

16          MR. LISENBY:  Well, I disagree it was self-defense,

17   but be that as it may.

18          MR. KEITH:  The State is not going to concede that

19   it was, and we understand that.

20          THE COURT:  Your offer of proof is going to be the

21   statement, which I assume you will have marked at this time?

22          MR. KEITH:  Yes, sir.  Judge, otherwise, we would

23   have to put Jason Holloway on the stand outside the presence

24   to prove he testified to that.

25          THE COURT:  Understood.

```
 1            MR. LISENBY: I think that you are missing the point

 2   with regard to the offer of proof.  The offer of proof is

 3   about the specific acts.  The element that's required in

 4   order to get into the prior specific acts is only after the

 5   accused has established some proof that he, in fact, was

 6   acting in self-defense.  That's proof in the case, not an

 7   offer of proof.  The offer of proof is the second part of our

 8   Motion in Limine, which is an offer of proof with regard to

 9   how to specific acts fit into this particular case, and to

10   allow the Court to evaluate these four factors that are

11   listed.  It is not just walking up and saying we offer that

12   he's going to plead self-defense.  There has to be some

13   evidence in the case at the time before the specific acts can

14   come in.

15            MR. KEITH:  I understand.  Judge, the other offer

16   of proof is what we had previously stated last Friday that

17   explained the defendant's state of mind and why he went over

18   there to begin with.  And, it was because of the threat of

19   rape by Rodney Brown against Sandra Patterson and because of

20   the defendant's knowledge of Rodney Brown's propensity for

21   violence and specific acts of violence.

22            THE COURT:  I'm thinking at this point I am going

23   to grant it as to Angela Brown.  I'm just thinking out loud

24   as to that.  I think that anything about Angela Brown,

25   specific acts would be out.
```

```
 1              MR. BLANCHARD:  For instance, acts of violence
 2   toward Angela Brown?
 3              THE COURT:  Right.  Isolated or specific acts of
 4   violence at this time.  Now, I've told y'all three times, I
 5   don't like Motions in Limine, whether they are Defense,
 6   State, or anybody else's.  They are subject to change.  You
 7   know, I have granted some Motions in Limine on Defense
 8   motion.  I told you that it would be subject to change.  Now,
 9   the same for the State.  I am going to grant it as to Angela
10   Brown, but it's subject to change.  I guess my big problem
11   with Motions in Limine is that to me everything depends on
12   you how the trial develops and how the evidence develops.
13   Something that is inadmissible one minute may be totally
14   admissible the next.
15              MR. BLANCHARD:  May I ask a question so I'm clear
16   on your ruling?  Your ruling goes to prior specific acts--
17              THE COURT:  Against --
18              MR. BLANCHARD:  -- with relation to Angela Brown.
19              THE COURT:   -- Angela Brown.
20              MR. BLANCHARD:  It does not prohibit any testimony
21   that may come in or any question that may be asked about the
22   reputation or character of Rodney Brown for violence,
23   propensity toward violence?
24              THE COURT:  After the proper statement is made,
25   there's a basis for, at least minimally, a self-defense
```

 1  issue.  As such, I'm not going to grant the Motion in Limine

 2  as to your question.

 3          MR. LISENBY:  Judge, if I could just ask with

 4  regard to any questions that they intend to ask any witness

 5  concerning Sandra Patterson, could we, prior to that

 6  testimony coming in, could we, at least, have a hearing

 7  outside the presence of the jury with regard to that, because

 8  as I understand it, based on some records Mr. Keith gave me,

 9  this alleged rape supposedly took place February of 1998.

10  This homicide was in January of 2000.  As I said, I think the

11  evidence is going to be pretty clear that ....

12          THE COURT:  We'll do that.  We'll do that.  Let's

13  go on and get started as far as this.

14      Off the record.

15  (WHEREUPON, THERE WAS A BRIEF RECESS.)

16  (JURY PRESENT).

17          THE COURT:   Y'all be seated.  Mr. Story, if you

18  would, go ahead with the roll call of the jury.

19          THE CLERK:  Yes, Your Honor.

20  (WHEREUPON, THE JURY ROLL WAS CALLED).

21          THE COURT:  For the record, all jurors are present,

22  all counsel are present, all parties present, and we are

23  ready to proceed.

24      Ladies and Gentlemen, last Friday afternoon there were

25  some things that transpired after I called the trial in

1  recess for the weekend.

2       First, we're glad to see you back.  Hope you are feeling

3  well.

4            MS. BLANKS:  Thank you so much.

5            THE COURT:  All right.  You'll recall

6  Dr. Krolikowski was on the witness stand.  And, the testimony

7  was at the point or actually it was during cross-examination.

8  After I called a recess and sent y'all home.  Here we

9  finished the testimony of the doctor.  Ms. Roark has

10 transcribed that over the weekend and at this point what

11 we'll be doing is basically going back through the testimony

12 of the doctor.  There will be an attorney that asks the same

13 questions that was asked here and then another attorney will

14 read the answer of the doctor to the question.  This

15 testimony is under oath.  It is totally admissible.  And, it

16 will be to -- you are to give it the same consideration that

17 you would any other testimony of this sort or that you would

18 give to any testimony, excuse me.

19      Do you all understand?  We are basically just finishing

20 the testimony that was actually presented here.

21      Counsel, who will be doing which role?

22            MR. BLANCHARD:  Your Honor, I will read the

23 responses of Dr. Krolikowski and Mr. Keith will ask the

24 Defense's questions.

25            THE COURT:  All right.  Let's get ready and we'll

1   proceed.  Now this has been marked as Court Exhibit number 2,

2   and it will be admitted as evidence into the record.

3   **(WHEREUPON, THE TRANSCRIPT OF DR. KROLIKOWSKI'S**

4   **CROSS-EXAMINATION WAS MARKED AS COURT EXHIBIT 2, AND WAS**

5   **ADMITTED.)**

6             THE COURT:  Dr. Krolikowski had a number of

7   conflicts and actually he was to be leaving on a plane Friday

8   afternoon.  So this way we accomplished both.  We got him

9   back to New Jersey and we still have his testimony here.

10       You may proceed.

11            MR. KEITH:  Thank you, Your Honor.

12   (WHEREUPON, THE CROSS-EXAMINATION OF DR. KROLIKOWSKI WAS READ

13   TO THE JURY.)

14            THE COURT:  All right.  That concludes the

15   testimony.

16       Ladies and Gentlemen, after the conclusion of the

17   doctor's testimony the next witness to be called was a

18   Dr. Sam Baechtel.  Dr. Baechtel, is a FBI DNA specialist.

19   What was his proper term or title; do you recall?

20            MR. LISENBY:  It was Dr. Baechtel, a Ph.D., I

21   believe.

22            THE COURT:  Position with the FBI?

23            MR. LISENBY:   Oh, I am sorry, DNA analyst.

24            THE COURT:  DNA analyst.  Again, in his situation,

25   Dr. Baechtel was to be on a flight back to Quantico,

1   Virginia, Friday afternoon.  The attorneys for both State and

2   Defense got together and entered what is called a Stipulation

3   of Fact.  This Stipulation of Fact is to be taken by you as a

4   proven fact.  And, I'm going to read it to you at this time

5   so listen very carefully.

6      Comes now the State of Alabama by and through the

7   District Attorney for the Fifth Judicial Circuit and the

8   defendant by and through his attorneys the Hon. William

9   Blanchard and Richard Keith, enter into the following

10   Stipulations of Fact.

11      One, DNA analysis was performed by Dr. Samuel Baechtel

12   of the FBI laboratory.

13      Two, the source of the semen from the vaginal swab taken

14   from Angela Brown is Jason Holloway.

15      Three, the source of the blood on the softball bat is

16   primarily Angela Brown with a minor source being Rodney

17   Brown.

18      Four, the swab of blood taken from the back of Rodney

19   Brown was the blood of Rodney Brown.

20      Five, no DNA material was recovered from the

21   survival-type knife.

22      Submitted this 9th day of June, 2003.  Signed by all

23   counsel of record.

24      This will be entered into evidence as Court Exhibit

25   number 3.  Court's three is hereby admitted by stipulation.

1   (WHEREUPON, A STIPULATION OF FACT WAS MARKED AS COURT EXHIBIT

2   NUMBER 3, AND WAS ADMITTED.)

3            THE COURT:  Now, with that, these facts are taken

4   to be proven.

5        Call your next witness.

6            MR. LISENBY:  State calls Jerome Cofield.

7                    WILLIAM JEROME COFIELD

8        HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

9           THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

10                    TESTIFIED AS FOLLOWS:

11                    DIRECT EXAMINATION

12  BY MR. LISENBY:

13  Q    Tell me your name, please, sir.

14  A    William Jerome Cofield.

15  Q    Mr. Cofield, if you will, remember to speak up loudly

16  so everybody on the back row can hear you.  Okay?

17  A    Okay.

18  Q    Where do you live, please, sir?

19  A    I live in LaGrange, Georgia.

20  Q    How long have you lived there?

21  A    I have been in LaGrange, now, a year and six months.

22  Q    Are you employed?

23  A    I am a minister.  I work full time at the church.

24  Q    Which church is that?

25  A    It is Miracles Ministry Church in Hogansville, Georgia.

```
 1   Q    Are you the minister there?

 2   A    Associate minister.

 3   Q    Rev. Cofield, did you know during her lifetime Angela

 4   Brown?

 5   A    Yes, I did.

 6   Q    How did you know Angela?

 7   A    She was my sister.

 8   Q    Did she have a nickname that she went by?

 9   A    We all called her Ann.

10   Q    Approximately how old was Angela?

11   A    I think she was 39 when this happened.

12   Q    Was she younger or older than you?

13   A    She was older.

14   Q    Older.  All right.  Did you know during his lifetime

15   Rodney Brown?

16   A    Yes, I did.

17   Q    How long had you known Rodney?

18   A    I knew him some in school, but I began to know him more

19   when he married my sister, started dating her and then

20   married her.

21   Q    Do you know where Rodney and Angela lived at the time

22   of their death?

23   A    Yes, I did.

24   Q    Where was that at?

25   A    1010 County Road 249 in the Welch Community in Roanoke.
```

```
 1   Q      Do you know if anyone else lived there at the time with
 2   them?
 3   A      My sister had two daughters from a previous marriage,
 4   and her two daughters lived there.
 5   Q      What are their names?
 6   A      Tashia and Terri Zachary.
 7   Q      Now, Rev. Cofield, I want to direct your attention to
 8   January the 11th of 2000, which is the date, the day before
 9   this incident, and ask if you had the occasion to see your
10   sister, Ann, somewhere that day?
11   A      That day my sister called my house.
12   Q      You spoke by telephone?
13   A      By telephone.
14   Q      Okay.
15   A      I was not home.  She left me a voice mail asking me to
16   -- if I could carry her grocery shopping and to the washer,
17   she said, tomorrow, which would be Wednesday.  I heard the
18   voice mail.  She was working that day and I stopped by her
19   job to confirm the time and everything that we would need to
20   do that day.
21   Q      Where did you actually see her at?
22   A      Traylor's Nursing Home in Roanoke, Alabama.
23   Q      And you made the arrangements for the following day; is
24   that correct?
25   A      That's correct.
```

*** Frances L. Roark ***

1  Q    What time were you supposed to arrive at the residence?

2  A    We said that I should be there at 7 o'clock Wednesday

3  morning.

4  Q    I want to direct your attention to that Wednesday,

5  January the 12th, and the day of this incident and ask if you

6  had occasion to go to the residence of Rodney and Angela

7  Brown?

8  A    I did, but didn't get there at 7.  I ended up being

9  sidetracked and some other things that came up after we made

10 the arrangements.  I ended up getting to her house around

11 11:30 that morning.

12 Q    Now, just so I know which time are we talking about

13 central time or eastern time?

14 A    We are talking central time.

15 Q    Okay.  Eleven-thirty a.m. central time is about the

16 time you got to the trailer; is that correct?

17 A    That's correct.

18 Q    Now, can you just describe for me, in general, that

19 area of where the trailer was at, as far as any other houses

20 or residences around it?

21 A    Well, the trailer was located on that property, the

22 family owned just an acre of land, and there was another

23 house on that piece of property that we owned.

24 Q    Did anyone live there?

25 A    No, no one.

*** Frances L. Roark ***

```
 1  Q     At that time?

 2  A     No one was in that house at that time.

 3  Q     What about surrounding that area, were there any other

 4  residences nearby?

 5  A     On that same street, 1010 County Road 249, it was a

 6  dirt road and across the street is the house that Jason

 7  Holloway lived in.

 8  Q     Is that a duplex residence there?

 9  A     It is.

10  Q     Do you know who else lived in that residence other than

11  Mr. Holloway.  If you don't, that's okay.

12  A     I think at that time it was Ms. Luella Patterson or

13  something like that.

14  Q     Okay.  Did you know the defendant Jason Holloway back

15  in January of 2000?

16  A     Oh, yes, yes.

17  Q     How long would you say you had known him?

18  A     We grew up together.  I can't remember.  I was 34 at

19  that time, so -- we all grew up together.  So, I have known

20  him for some time.

21  Q     Now, when you arrived at the Browns' trailer, did you

22  have the occasion to see anybody at that time?

23  A     When I finally got there, as I began to turn into my

24  sister's driveway, I saw Jason standing at the corner of

25  where his house is located beside a mailbox.  And, I went to
```

*** Frances L. Roark ***

1    my sister's driveway.

2    Q    Did Mr. Holloway do or say anything at that time?

3    A    Not at all.

4    Q    Did you find that unusual?

5    A    Yes, I did.

6    Q    Why is that?

7    A    Again, we had grew up together.  The community is very

8    small.  Everybody know everybody in the community.  Every

9    time I saw him, we always spoke.  We always talked.  My

10   sister and brother-in-law did not have a car.  If by chance

11   they'd left and someone had seen them leaving, they would

12   always say, "I saw your sister.  She went that way.  Or she

13   left with someone."  But this day, he didn't even speak.

14   Didn't even look at me that day.

15   Q    Where did you go after that?

16   A    I went -- I proceeded into the yard.  I knew I was

17   already late getting there at 11:30.  I blew my horn.  No one

18   came to the door.  I turned around in the yard and I went

19   back home.

20   Q    All right.  So, you did not get a response at all when

21   you blew the horn?

22   A    Not at all.

23   Q    You said you turned around and went back home.

24   A    I headed toward home and I went by Ms. Brown's house,

25   which is Rodney's mother's house, just to see if she had

1    heard from them, and she hadn't.  And, then I went from her

2    house straight to my house.

3    Q      Did she live somewhere close by to them?

4    A      No.  She was in Roanoke.

5    Q      Oh, I see.  You had already made it back to Roanoke.

6    A      I had made it back to Roanoke.  To get to my house, I

7    had to pass her house.  So, I said, maybe, they came over --

8    got a ride here.  I stopped by and asked if she had seen

9    them, and she hadn't, so I just went home.

10   Q      Where were you living in January 2000?

11   A      I was living at Roanoke, 1444 Main Street.

12   Q      And, you subsequently moved to LaGrange.

13   A      Yes.

14   Q      Now, when you left the yard there where the trailer

15   was, did you see the defendant, Mr. Holloway, on that

16   occasion?

17   A      When I was leaving I did not see him.

18   Q      Okay.  Now, after you returned to Roanoke, did you take

19   care of some other business there?

20   A      I did stay home.  I guess I got home around 12:30.  I

21   stayed home until about 2:30, 3 o'clock, and I went to a

22   store where I eventually started to work.  I had an interview

23   at that particular store around 3:00, 3:15.

24   Q      What was the name of that store and where was it at?

25   A      The name of the store was Showcase Electronics which is

1   in Roanoke, Alabama on Main Street.

2   Q    Sometime while you were there or at Show Case

3   Electronics did you see your wife?

4   A    I did.  My wife came through the door and said that she

5   had received a phone call from my niece, and the only thing

6   she said was something about blood being on her momma's head,

7   and she picked me up, and we went down to the trailer.

8   Q    So you returned back to Rodney and Angela Brown's

9   trailer; is that correct

10  A    Yes, I did.

11  Q    And, that was with your wife?

12  A    With my wife.

13  Q    When you got back to the trailer, tell me what you

14  observed.

15  A    When I got there, there was a group of people that had

16  started to gather in the yard.  There was a police officer

17  there on the porch.  And, when I parked my vehicle, we parked

18  our vehicle, I saw Jason Holloway.  He was coming across the

19  property and he was in front of the house that no one lived

20  in at that time.  Before I could even go to see what

21  happened, he approached me, telling me that he had been in

22  bed all day.  Before I had asked anything, he began to tell

23  me he had been in bed all day.  I hadn't asked him anything.

24  He began to tell me he had been in bed all day.  He worked

25  late.  And that he didn't know what happened.  My nieces came

1    to him.  He did not know what happened.  Even before I could

2    get -- find out what was going on.

3    Q    Did you get an opportunity to go up to the trailer?

4    A    Yes, I did.

5    Q    Tell me what happened then.

6    A    When I got to the porch.  There was a porch on the

7    trailer.  I didn't know what had happened.  And, there was a

8    police officer standing there at the door.  I think he was

9    talking to someone else.  And, I just walked right into the

10   house.

11   Q    Tell me what you observed when you walked up there.

12   A    When I stepped into the house, I saw my brother-in-law

13   laying to my left on the floor and across the room to my left

14   on the sofa was the body of my sister, Angela.

15   Q    What happened then?

16   A    I just turned around and walked out.

17   Q    Now, you indicated that you had known Mr. Holloway for

18   a number of years; is that correct?

19   A    Yes.  Yes.

20   Q    And you knew Rodney Brown for a number of years also?

21   A    Yes.

22   Q    Did you know if they had any type of association with

23   each other?

24   A    Oh, yes.

25   Q    Tell me about that.

1  A      There had been many times I had gone to visit my sister

2  and Rodney -- as a matter of fact I believe the last time I

3  was there and saw them alive, I think Jason and Rodney and

4  some more guys were sitting under the old oak tree having a

5  nice conversation.

6  Q      And, would that be something that you had seen on more

7  than one occasion?

8  A      Many times.

9  **(WHEREUPON, PHOTOGRAPHS WERE MARKED AS STATE EXHIBITS 1-3 FOR**

10  **IDENTIFICATION.)**

11  MR. LISENBY:

12  Q      Rev. Cofield, I would like you to take a look at these

13  exhibits that I have marked as State's Exhibits 1, 2, 3, and

14  tell me if you recognize them?

15  A      Yes, I do.

16  Q      What do those exhibits show, please?

17  A      One of them is a picture of the mobile home that my

18  sister and brother-in-law lived in.  One of them is a picture

19  that was taken from the yard where Jason Holloway's house is.

20  And the other one is a picture standing in the front of the

21  mobile home where my sister and brother-in-law lived taking a

22  shot of Jason Holloway's house.

23  Q      Do these photographs, one, two, three, fairly and

24  accurately depict, or show, the area that you have described

25  back in January of 2000?

```
 1   A      Yes, it does.

 2              MR. LISENBY:  We would offer exhibits 1, 2, 3, Your

 3   Honor?

 4              THE COURT:  Admitted.

 5   (WHEREUPON, PHOTOGRAPHS MARKED STATE EXHIBITS 1-3 WERE

 6   ADMITTED.)

 7   MR. LISENBY:

 8   Q      Rev. Cofield, this is State's Exhibit number 1.  I have

 9   given you a laser pointer.  Point out what you are describing

10   in that photograph, please.

11   A      Again, this is the mobile home.  This is the door that

12   my sister and brother-in-law used to exit and enter the home.

13   Q      What room did that door go into.  What kind of room?

14   A      When you stepped through this door, you were stepping

15   into the living room.  Right here is the kitchen area.

16   Q      All right.  This is the State's Exhibit number 2.  Can

17   you -- I am sorry, hold on just a second.  All right.

18   Rev. Cofield, if you could, describe what is in this

19   photograph, State's Exhibit number 2, please.

20   A      This is the mobile home where my sister and

21   brother-in-law lived.  This is the home no one lived in at

22   the time.  This property here is the property where the

23   duplex where Jason Holloway lived.

24   Q      All right.  That residence itself would be basically to

25   the left side of this photograph; is that what you are
```

1    saying?

2    A    To me it looks like they were standing at the very end.

3    Q    Okay.  I see.  All right.  And, this is State's Exhibit

4    number 3.  Can you describe what is in that photograph?

5    A    Here, in this area, would be the front of the mobile

6    home.  Again this is the house that no one lived in.  And,

7    this is the house where Jason Holloway lived at that time.

8         MR. LISENBY:  Okay.  Okay.  I believe,

9    Rev. Cofield, that's all I have.  The Defense may have some

10   questions.

11                        **CROSS EXAMINATION**

12   **BY MR. KEITH:**

13   Q    How are you doing, Mr. Cofield?

14   A    Fine.  You?

15   Q    Rev. Cofield, did you ever live in the Welch Community

16   or you were residing in Roanoke; is that right?

17   A    I did live in Welch as a little boy.  I grew up there.

18   Q    But, back in 2000, had you been residing in Roanoke at

19   that point in time?

20   A    That's right. I lived in Roanoke.

21   Q    You would have occasion where you would go over and

22   visit with Rodney and Angela?

23   A    Yes.

24   Q    And, were you friends with Jason Holloway?

25   A    I knew him as we grew up.  Yes, I was.

1    Q    And I believe Jason grew up with Angela.

2    A    Yes.

3    Q    I say Angela.  Angela met Rodney, what, a couple years

4  back, in '98, would that be about right?

5    A    Probably.  I really don't know when they met.

6    Q    Right.  So, I guess the point I am trying to make is,

7  Jason really did not grow up with Rodney at all.  He met him

8  back around the time Rodney and Angela got together.  Jason

9  knew and grew up basically with Angela.

10   A    No.  I think -- we all went to school together at Five

11  Points.  He had an opportunity to meet Rodney in school.

12   Q    Okay.  And, you've -- I take it -- when did you first

13  meet Rodney?

14   A    Back in elementary school.

15   Q    Now, do you recall making a statement to law

16  enforcement back on around January 12th of 2000?

17   A    Yes.

18   Q    Do you recall making a statement?

19   A    Um-hmmm.

20   Q    And, were you providing counseling, if you will, to

21  Rodney Brown?

22   A    Counseling?

23   Q    Yes, sir.

24   A    No.

25   Q    You didn't.  How would you describe the assistance that

*** Frances L. Roark ***

1  you were providing to Rodney Brown?

2  A    Well, ....

3          MR. LISENBY:  Your Honor, may we approach just a

4  moment?

5  (WHEREUPON, A SIDE BAR COMMENCES.)

6          MR. LISENBY:  I think Mr. Keith is trying to get

7  into an area that the Court prohibited and the Motion in

8  Limine would not be appropriate.

9          MR. KEITH:  No, I'm not going to do that.   I'm

10  going to ask him about his statements about him drinking,

11  doing drugs and how he would snap very easily and about the

12  counseling he gave him.  It is in his statement.

13          MR. LISENBY:  That would not be admissible

14  character evidence in that form.

15          MR. KEITH:  I'm going to ask him in the right form

16  as best I can.

17          MR. LISENBY:  I understand.  But, what you're

18  asking, as I understand it, you are trying to get into some

19  specific acts.

20          MR. KEITH:  Not specific acts.  A reputation for

21  the drinking, abuse of drugs, and reputation for snapping

22  easy.  I think he provided him counseling for all that.

23          MR. LISENBY:  But, I believe the appropriate way of

24  asking that question is about his reputation for drinking and

25  drugs and under 404(B)(2)(a), and I would object to that

1    reputation as not being something that would be permissible

2    with regard to the character of the victim in a homicide

3    case, the relevance and materiality of that would not be

4    appropriate character, as I have read the Rules and read

5    McElroy's.  They talk about reputation for violence and

6    reputation for blood thirstiness and things of that nature.

7              THE COURT:  As to the business about drugs and

8    alcohol, I sustain your objection; but, you have asked

9    something about his reputation for, quote, snapping?

10             MR. KEITH:  He says he snaps easily.

11             THE COURT:  That will be overruled as to that

12   aspect of the question.

13             MR. KEITH:  Stay away from drugs and alcohol?

14             THE COURT:  Right.  That's a good rule to live by.

15             MR. GIBBS:  If I may clarify one thing.  Didn't --

16   earlier today, I thought you said that stuff regarding acts

17   with respect to Angela, would be inadmissible.  Now, this

18   snapping from my understanding and reading the statements

19   deals with conduct between Rodney and --

20             MR. LISENBY:  Don't point.

21             MR. GIBBS:  -- between Rodney and Angela.  These

22   acts of violence that he's getting at deal directly with

23   contact between Rodney and Angela not between Rodney and the

24   defendant or Rodney and anybody else.

25             MR. KEITH:  It doesn't exactly say that, Judge.  It

1    didn't tie it in together.

2              THE COURT:  Overruled.  I am going to let you go in

3    to it.   Go ahead.

4    (WHEREUPON, A SIDE BAR CONCLUDES.)

5    MR. KEITH:

6    Q     You provided Rodney Brown some counseling back around

7    the time of his death; is that not correct?

8    A     I wouldn't call it counseling.  Every time I'd see

9    Rodney I'd pretty much ask questions like everybody else do

10   about the Bible and what I thought.  Things like that.  But

11   didn't call it counseling.

12   Q     Is it not true that you were having various

13   conversations, if you will, or talking with Rodney, whatever

14   you want to call it, counseling or otherwise, about his

15   reputation for his anger management problem?

16             MR. LISENBY:   Object to the form of the question.

17             THE COURT:  Overruled.

18   MR. KEITH:

19   Q     You may answer.

20   A     Could you ask me again, then?

21   Q     Yes, sir.

22   Q     Were you not aware of, and having conversations, I

23   would call it counseling if you will, with Rodney about his

24   anger management problem?

25   A     There have been times he would ask me.  Not about his

1  anger, anything like that, just what I thought in general.  I

2  think he was describing himself.  What I thought about

3  drinking, what I thought about gambling, gaming.  Everytime I

4  would go down they would be under the oak tree.  All kinds of

5  questions would come up.

6  Q     Right.  And, based on those conversations that you and

7  Rodney had, you were able to relate something about his

8  temper; is that not true?  You had knowledge about his

9  temper.

10  A     Oh, yes, I did.  Oh, yes.

11  Q     You made the statement to law enforcement about that

12  temper.  Do you recall what you stated?

13         MR. LISENBY:  Your Honor, again I would object to

14  the form of those questions.

15         THE COURT:  Sustained.

16  MR. KEITH:

17  Q     Is it not true that you told law enforcement officials

18  that ....

19         MR. GIBBS:  Objection, Your Honor.

20         MR. LISENBY:   Maybe if we approach we can explain

21  the objection.

22         THE COURT:  Okay.

23  (WHEREUPON, A SIDE BAR COMMENCES).

24         MR. LISENBY:  404(A)(2)(a) only allows reputation

25  or opinion testimony, not specifics of specific acts which is

1   what Mr. Keith keeps asking in his questions.  If he wants to

2   ask him if he was aware of his reputation, or if he had an

3   opinion about that, that would be okay.  But, to ask about

4   specifics about how I saw this or we talked about this,

5   that's the concern I have.  We're getting out of

6   404(A)(2)(a).

7           MR. BLANCHARD:  Richard asks him that kind of

8   question:  Do you have an opinion as to Rodney's character

9   and he says no.  Then Richard should be allowed to go ahead

10  an impeach him, based on this statement, which is clear.

11          THE COURT:  That will be allowed.  You have to ask

12  the predicate question first to hear his answer, but then,

13  yes, it would be allowed.

14          MR. LISENBY:  I agree with that.

15  (WHEREUPON, A SIDE BAR CONCLUDES.).

16          THE COURT:  Go ahead.

17  MR. KEITH:

18  Q    Do you have an opinion, based on your knowledge and

19  dealings with Rodney Brown about his reputation for having a

20  quick temper?

21  A    Yes.

22  Q    And, what is that reputation?

23  A    According to him, he would always say ....

24          MR. LISENBY:  I am sorry, Your Honor.  I think the

25  answer to that to be appropriate would be good or bad, the

```
 1   response.
 2              THE COURT:  Well, I'm going to let him respond.  Go
 3   ahead and ask your question again.
 4   MR. KEITH:
 5   Q    What is Rodney Brown's reputation for having a quick
 6   temper?  What do you know about it?
 7   A    According to him, he didn't know what or how to
 8   describe, you know, if it was good, again, according to the
 9   Bible?  Everytime I would talk to Rodney, when he talked to
10   me, he wanted to talk about the Bible.  So, he would ask
11   questions about himself.  What do you think if a man did this
12   or what do you think, those types of things.
13   Q    And, is it not true that, as far as your response to
14   that question, you have made the statements that he was the
15   kind of guy that would snap very easily?
16   A    The reason I said that is because he said that.  That
17   is what he would tell me at times, and I knew that he
18   probably could.
19   Q    And, he did and he had done before; correct?
20              MR. LISENBY:  Objection.
21              THE COURT:  Sustained.
22   MR. KEITH:
23   Q    Any other information that you would like to share with
24   the jury about his snapping very easily?
25   A    You call it snapping.
```

1          MR. LISENBY:  Object again.

2          THE COURT:   Sustained.  You don't have to answer

3    anything.  There's no question.

4    MR. KEITH:

5    Q    Is that your answer for his reputation for violence?

6    A    Is that my answer?

7    Q    Yes, sir.  Did he have a reputation for violence

8    against any people?

9    A    Did he have a reputation?  I know that in the marriage

10   with my sister -- now, outside of the marriage, I don't know

11   -- but the marriage with my sister, there were disagreements,

12   there were arguments in the marriage.  So I can only speak

13   for the marriage.  I knew Rodney.  But, as far as violent

14   outside of the marriage, I have no clue of that.  But they

15   did have their disagreements like everybody else does.  They

16   had arguments.

17         MR. KEITH:  Your Honor, if I may ask without

18   approaching the bench.  Does that open the door?

19         THE COURT:  Y'all approach.

20   (WHEREUPON, A SIDE BAR COMMENCES).

21         MR. LISENBY:  Your Honor, that was the reason I

22   suggested that the only answers to that were good or bad.

23   When you overruled, I did not object again, because I thought

24   you were going to allow him to answer.  I don't think Defense

25   counsel asking a question allows him to open a door that the

```
 1   Court has already closed.

 2              THE COURT:  That's going to be my ruling.  He's

 3   made his response.

 4              MR. KEITH:  I don't think it is a truthful

 5   response, Your Honor.  He denied any physical abuse.  It is

 6   clearly in his statement.

 7              THE COURT:  What's in his statement?

 8              MR. KEITH:  That Rodney abused Angela and once

 9   injured her to a degree that she needed to go to the

10   hospital.

11              MR. LISENBY:  He didn't deny that.

12              THE COURT:  I'm not going to allow you to get into

13   that at this time.  Basically the State would oppose that and

14   instruct the witness to say that the answer to the question

15   was either good or bad, and I usually hesitate to instruct a

16   witness to any answer to give to a question.  I'm going to

17   sustain the objection.

18   (WHEREUPON, A SIDE BAR CONCLUDES.)

19              THE COURT:  Go ahead with your next question.

20   MR. KEITH:

21   Q     Rev. Cofield,--

22   A     Yes.

23   Q     -- based on your experiences with Rodney, were there

24   occasions where you would be sometimes angry at him for his

25   behavior?
```

```
 1   A      Oh, yes.

 2   Q      How many times?

 3   A      Man, probably two or three times or more.  I don't

 4   know, you know because and the reason I would get angry ....

 5              MR. LISENBY:  I would object to that as being

 6   nonresponsive.

 7              THE COURT:  Sustained as nonresponsive.  Go ahead

 8   with your next question.

 9              MR. KEITH:  No further questions, Your Honor.

10              THE COURT:  Anything further from the State of this

11   witness?

12              MR. LISENBY:  No, Your Honor.

13              THE COURT:  You may step down.  Thank you sir.

14   (WHEREUPON, THE WITNESS TESTIMONY CONCLUDES.)

15              THE COURT:  Call your next witness.

16              MR. GIBBS:  The State calls Terri Zachary.

17              MR. BLANCHARD:  Your Honor, I don't know if there's

18   any problem, but we would like to have that witness subject

19   to possible recall in the Defense's case.

20              THE COURT:  Rev. Cofield, you will be subject to

21   recall.  So, you will have to remain.

22        Come up here and have a seat.  And, I want you to speak

23   loudly enough so everybody on the back row of the jury can

24   hear you and understand you.  Slide up a little bit.  Go

25   ahead.
```

*** Frances L. Roark ***

1                      TERRI ZACHARY

2        HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

3          THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

4                    TESTIFIED AS FOLLOWS:

5                    DIRECT EXAMINATION

6  BY MR. GIBBS:

7  Q    Can you tell us your name, please?

8  A    Terri.

9  Q    Okay.  You need to speak louder like you're on the

10 playground at school. Tell me your name again.

11 A    Terri Zachary.

12 Q    Your last name?

13 A    Zachary.

14 Q    Now, how old are you?

15 A    Fifteen.

16 Q    When is your birthday?

17 A    January 21.

18 Q    Okay.  What year?

19 A    Eighty-eight, 1988.

20 Q    Again, keep your voice up so everyone can hear you.

21 Okay.  Do you attend school?

22 A    Yes, sir.

23 Q    What school do you go to?

24 A    Calloway High.

25 Q    Calloway High.  Where is that located?

1   A     LaGrange.

2   Q     In LaGrange.  Where do you presently live?

3   A     In Hogansville.

4   Q     Where?

5   A     Hogansville.

6   Q     Hogansville.  Now, where is that?

7   A     I don't know.

8   Q     In Georgia or Alabama?

9   A     In Georgia.

10  Q     In Georgia.  Okay.  Who do you live there with?

11  A     My daddy and my step-mother.

12  Q     Your daddy and step-mother.  Now, where were you living

13  back in January of 2000?

14  A     In Roanoke in Welch.

15  Q     In Roanoke?

16  A     Um-hmmm.

17  Q     In what community?

18  A     In Welch.

19  Q     Welch Community.  Who were you living with?

20  A     My momma and my step-daddy.

21  Q     Now, what is your mother's name?

22  A     Angela Brown.

23  Q     So, you knew Angela Brown during her lifetime; is that

24  correct?

25  A     Yes, sir.

*** Frances L. Roark ***

```
 1   Q    That was your mother; correct?

 2   A    Yes, sir.

 3   Q    Did you know Rodney Brown during his lifetime?

 4   A    Yes, sir.

 5   Q    How did you know Rodney Brown?

 6   A    That my stepfather and he was married to my momma.

 7   Q    You need to keep your voice up so they can hear you.

 8   What was your last statement?

 9   A    He was married to my momma.

10   Q    Okay.  Did you have any idea how long they were

11   married?

12   A    No, sir.

13   Q    Short period?  Long period?

14   A    I think a long period.

15   Q    Okay.  Do you know the defendant, Jason Holloway?

16   A    Yes, sir.

17   Q    How do you know him?

18   A    He was a friend to the family.

19   Q    Okay.  Do you know where he lived in relationship to

20   y'all?

21   A    Yes, sir.

22   Q    Where did he live?

23   A    Across the street.

24   Q    Right across the street.  Do you know someone by the

25   name of Tashia Zachary?
```

```
 1   A     Yes, sir.

 2   Q     Who is Tashia?

 3   A     My sister.

 4   Q     Is she your younger sister or older sister?

 5   A     My older sister.

 6   Q     How old is she at this time?

 7   A     Seventeen.

 8   Q     She's a couple years older than you; correct?

 9   A     Two years.

10   Q     Two years.

11         Now, I want to direct your attention back to Wednesday,

12   January the 12th of 2000.  Can you recall that day for me?

13   And that was the day you and your sister came home and found

14   something really bad.  Can you remember that for me?  Can you

15   remember that day?

16   A     Yes, sir.  Yes, sir.

17   Q     Now, like I said, that was on a Wednesday in the middle

18   of the week.  So, I am asking did you and your sister go to

19   school that day?

20   A     Yes, sir.

21   Q     Now, did you two go to the same school back then?

22   A     Yes, sir.

23   Q     What school was that?

24   A     Five Points.

25   Q     And, did you all normally leave together for school in
```

```
 1   the morning?

 2   A     Yes, sir.

 3   Q     Did you ride the school bus to school?

 4   A     Yes, sir.

 5   Q     With regard to that morning, tell us what you remember

 6   happening at your home as you and Tashia left to go to

 7   school. Okay.  Let me ask it this way.

 8         We are talking about Wednesday, January 12th; correct?

 9   And I know you came home from school and saw something,

10   didn't you?  I want to go back to the beginning of that

11   morning.  You and your sister are getting ready to go to

12   school.  Tell us what was going on in your house that

13   morning.  Can you do that for me?  Tell us what was going on.

14   A     Nothing.  Wasn't nothing going on.  My momma, she, was

15   at the door when we were leaving and my step-daddy, he, was

16   still in the bed.

17   Q     Were you getting ready to go to school?

18   A     Yes, sir.

19   Q     What time did you normally leave for school?

20   A     Six-thirty.

21   Q     And, that morning you left, you and your sister, like,

22   going to the bus stop; is that correct?

23   A     Yes, sir.

24   Q     Now, where was your mother when you left?

25   A     She was locking the door when we were leaving.
```

```
 1   Q     She was locking the door?

 2   A     Yes, sir.

 3   Q     And, do you recall where Rodney was?

 4   A     He was in bed.

 5   Q     He was where?

 6   A     In the bed.

 7   Q     Was everything okay in the house when you and your

 8   sister left?

 9   A     Yes, sir.

10   Q     Do you know somebody by the name of Jerome Cofield?

11   A     Yes, sir.

12   Q     Now, who is Jerome Cofield?

13   A     My uncle.

14   Q     Do you see him in the courtroom?

15   A     Yes, sir.

16   Q     Where is he.  Right there.  Okay.  Do you know if your

17   uncle was supposed to come by your house that day?

18   A     Yes, sir.

19   Q     What do you know about that?

20   A     I just heard my momma earlier that week when she had

21   said she was going to be off and Jerome was coming by.

22   Q     Okay.  Now, you and your sister went to school;

23   correct?

24   A     Yes, sir.

25   Q     Did you come home from school that day?
```

```
 1   A     Oh, yes, sir.

 2   Q     Did you come back together?

 3   A     Yes, sir.

 4   Q     Did you ride the bus home?

 5   A     Yes, sir.

 6   Q     Do you recall what time you and your sister normally

 7   got home from school?

 8   A     Around 4 o'clock.

 9   Q     Now, tell us what happened when you and your sister

10   Tashia got home.

11   A     We got off the bus and then I got the key from her just

12   because the door was locked and I ran down the hill.

13   Q     I need you to slow down and speak clear so they can

14   hear you.  Okay?  You got the key from your sister; is that

15   what you're saying?

16   A     Yes, sir.

17   Q     And, you did what?

18   A     Ran down the hill and I was getting ready to knock -- I

19   knocked on the door and then it was locked and didn't anybody

20   come to the door.

21   Q     Nobody came to the door.  Was the door normally locked?

22   A     It was not usually locked, but sometime when it do be

23   locked, they be gone.

24   Q     I'm sorry.  It is not normally locked; is that what you

25   said, but when it is locked, they usually are not there;
```

```
 1   correct?

 2   A      Yes.

 3   Q      It was locked this day; correct?

 4   A      Yes, sir.

 5   Q      And, tell us what happened next.

 6   A      And, then I stuck the key in the door and unlocked it.

 7   That's when I found my mother laying on the couch.

 8   Q      You unlocked the door and found what?

 9   A      I found my momma laying on the couch and my step-daddy

10   on the floor.

11   Q      Did you notice anything about your mother?

12   A      Her head was busted and my stepfather was laying on the

13   floor.

14   Q      He was what?

15   A      He was laying on the floor by the couch.

16   Q      Okay.  Where was your sister Tashia when you saw this?

17   A      She was coming on down the hill when I was -- when I

18   ran out of the house.  She was just making it down the hill

19   going into the house.

20   Q      You got to the house before your sister did?

21   A      Yes, sir.

22   Q      And, you said you were running out of the house.

23   A      Yes, sir.

24   Q      And, what happened after you ran out of the house?

25   A      I ran out of the house and went on up the hill and
```

```
 1   Jason, he, met me halfway and he was asking what was going

 2   on.

 3   Q    Okay.  The defendant, Jason Holloway, met you halfway?

 4   A    When I was up there running across the street.

 5   Q    Were you running across the street, were you running in

 6   the direction of his house?

 7   A    Yes, sir.

 8   Q    And, he met you halfway.

 9   A    And asked what was going on.  He ran down there.

10   Q    He asked you what was going on?

11   A    Yes, sir.

12   Q    Tell me did he say anything else?

13   A    No.  Just asked what was going on and he ran down the

14   hill.

15   Q    Ran down the hill in what direction?

16   A    Where our house is.

17   Q    Toward your house.  Did you see him go to your house?

18   A    I don't know if he went in.

19   Q    I am sorry.

20   A    I don't know if he went in or not.

21   Q    But, he ran in the direction of your house; correct?

22   A    Yes, sir.

23   Q    Now, this is the first time you mentioned seeing the

24   defendant that day.  But, you just told us, you saw him when

25   you were running up the hill after you saw what you saw.  Was
```

1    that the first time you saw him after you and your sister got

2    off the bus?

3    A    I saw him when the bus driver was stopping at our

4    house.  I saw him -- I was standing up on the bus and I saw

5    him.

6    Q    What did you see him do?

7    A    Like he was peeping around the corner watching us get

8    off the bus.

9    Q    He was peeping around the corner of what?

10   A    Of his house.

11   Q    Of his house.  Now, where did you and your sister run

12   to?

13   A    Our cousin's house.  Our cousin's house that stay next

14   door to him.

15   Q    Okay.  That would be Luella Patterson's house?

16   A    Yes, sir.

17   Q    Did you see anyone else go into the trailer?

18   A    No, sir.

19   **(WHEREUPON, POSTER/DIAGRAM WAS MARKED AS STATE EXHIBIT 22 FOR**

20   **IDENTIFICATION.)**

21   MR. GIBBS:

22   Q    Terri, I am showing you what has been previously marked

23   for identification purposes as State's Exhibit number 22.  Do

24   you recognize this exhibit?

25   A    Yes, sir.

1   Q      What is this exhibit?

2   A      The inside of my house.

3   Q      A drawing of the inside of your house; correct?

4   A      Yes, sir.

5   Q      Does it correctly show the inside of your house?

6   A      Yes, sir.

7          MR. GIBBS:  State moves to admit Exhibit 22.

8          THE COURT:   Admitted.

9   **(WHEREUPON, A POSTER/DIAGRAM MARKED AS STATE EXHIBIT 22 WAS**

10  **ADMITTED.)**

11         MR. GIBBS:  Your Honor, may I get her to come down

12  and explain this to the members of the jury?  If you will

13  come down and follow me please.

14  MR. GIBBS:

15  Q      Can you tell us what this is a diagram of?  Just go

16  ahead and tell us, baby.

17  A      That's my stepfather, right there, and there is my

18  mother.  And that's my bedroom and my sister's bedroom and my

19  momma's bedroom.

20  Q      So, there were three bedrooms in the house?

21  A      Yes, sir.

22  Q      And whose bedroom is this?

23  A      That one were mine and that's my sister's.

24  Q      And, where was your mother and step-father's room?

25  A      Right there.

1   Q     Okay.  Now, in this diagram there are some little

2 ceramic pieces shown.  Right there.  Do you know whose

3 bedroom that was.  Where the red dot is, whose bedroom is

4 that?

5   A     Mine.

6   Q     Whose bedroom is that?

7   A     My sister's.

8   Q     This bedroom back here?

9   A     Was my mother's.

10   Q     Your mother's.  Okay.  Now, there are some little

11 ceramic pieces shown right there in the middle of the floor.

12 Now, when you left that morning, do you recall if those

13 pieces were there?

14   A     No, sir.

15   Q     Okay.  And, how did you know those pieces were not

16 there?

17   A     Because we'd cleaned up the night before.

18   Q     And, they were not there.  Okay.  Thank you.  You can

19 go back and have a seat.

20       Were there any guns in your house?

21   A     No, sir.

22   Q     Do you know if there was a bat in your house?

23   A     Yes, sir.

24   Q     And what kind of bat was in your house?

25   A     It was an iron baseball bat.

1   (WHEREUPON, A BAT WAS MARKED AS STATE EXHIBIT 27 FOR

2   IDENTIFICATION.)

3   MR. GIBBS:

4   Q      I am showing you what has been marked for

5   identification purposes as State's Exhibit number 27.  Do you

6   recognize this exhibit?

7   A      Yes, sir.

8   Q      What is this exhibit?

9   A      The baseball bat.

10   Q      Is that the baseball bat y'all had in your home?

11   A      It don't look like it.  Yes, sir.

12   Q      I am sorry, is this the bat?

13   A      I don't recognize it.

14   Q      You don't recognize it.  Okay.

15          THE COURT:  Mr. Gibbs, would you move the easel?  I

16   think the jurors are having a hard time seeing the witness.

17   MR. GIBBS:

18   Q      Do you recall talking to Investigator Blackstone?

19   A      Yes, sir.

20   Q      And, do you recall him showing you some panties?

21   A      Yes, sir.

22   Q      And did you recognize those panties?

23   A      Yes, sir.

24   Q      Whose panties were those?

25   A      Mine, my sister's, and my mother's.

```
 1   Q      Okay.

 2          Now, back in January of 2000, how old were you?

 3   A      Eleven.

 4   Q      Eleven.  And, that means your sister, Tashia, would

 5   have been twelve; is that correct?

 6   A      Thirteen.

 7   Q      Thirteen.  You were 11 and 13 years of age when you

 8   came home and found your mother and step-father in that

 9   condition; is that correct?

10   A      Yes, sir.

11          MR. GIBBS:  I have no further questions at this

12   time.

13          THE COURT:  Cross-examination.

14                    CROSS EXAMINATION

15   BY MR. KEITH:

16   Q      How are you doing, Terri?

17   A      Fine.

18   Q      Terri, those pieces of ceramic tile, Mr. Gibbs, was

19   asking you about, do you know what it was that they went to

20   that was broken on the floor?

21   A      I think that was a little horse, miniature thing,

22   little horse thing.

23   Q      Ceramic tile horse.  Was it sitting on the TV, or do

24   you know where it was sitting?

25   A      She had -- her whole table was covered with them.
```

*** Frances L. Roark ***

```
 1   Q      Like on the table by the sofa?

 2   A      The table by the couch, she had a whole lot of them.

 3   Q      Was there a bunch of different figurines or pieces of

 4   ceramic tile?

 5   A      Yes, sir.

 6   Q      And was there only one that was broken?

 7   A      I don't know.  I don't remember knowing about it being

 8   broke.

 9   Q      You have -- you say you cleaned up the house the night

10   before is why you don't remember or think it was broken that

11   morning?

12   A      I didn't know it was broke that morning because we

13   cleaned up that day and I didn't see it.

14   Q      I am sorry?

15   A      I didn't see.

16   Q      You didn't see it that morning; right.  Otherwise, you

17   don't know if Rodney broke it or your mom did --

18   A      No.

19   Q      -- after you left and went to school?

20          Have you ever seen pieces of pottery like that, or

21   figurines -- have you ever seen Rodney break them before?

22   A      No, sir.

23   Q      Have you ever seen him break anything?

24   A      No, sir.

25   Q      That bat you were -- Mr. Gibbs showed you.  I couldn't
```

```
 1  hear real well.  That was your daddy's bat?

 2  A    He had an iron bat but that doesn't look like it to me.

 3  Q    You are not sure if that one was exactly it.  He had

 4  one that you described as an aluminum bat, blue and white,

 5  little league baseball bat?  Is that right?

 6  A    Yes, sir.

 7  Q    And, where did he keep that bat?

 8  A    He had it in his bedroom.

 9  Q    What did he do with that bat?

10  A    He played baseball with it.

11  Q    How often did he play baseball?

12  A    He played it earlier, a long time ago.

13  Q    He played it a long time ago?

14  A    Yes.

15  Q    Was he playing baseball back in January of 2000?

16  A    No, sir.

17  Q    Did he use that baseball bat for protection?

18  A    No, sir.

19  Q    Why did he keep it by his bed?

20  A    That's where he had it at.

21  Q    Was it where he could always get to it real quick?

22  A    It was up under his bed.

23  Q    Under the bed.

24  A    By the dresser over there by his bed.

25  Q    Where he could reach down and get it out if he needed
```

```
 1  it?
 2  A      Not up under their bed.
 3  Q      Terri, there was a knife, a kitchen knife -- I assume
 4  you had a bunch of kitchen knives in the kitchen --
 5  A      Yes.
 6  Q      -- to cut with.  There was a kitchen knife that had a
 7  wooden handle that was about, maybe, eight to ten inches
 8  long.  Do you remember seeing any kitchen knife there on the
 9  floor or anywhere around the sofa or table when you left for
10  school?
11  A      No, sir.
12  Q      Do you know how a kitchen knife might have gotten out
13  there?  Would it have been left out for any reason, or would
14  someone have to go into the kitchen and got it out.  There
15  wasn't a knife laying there on the table or sofa, was there,
16  when you left?
17  A      No, sir.
18  Q      And, the knife, that knife would have been kept in the
19  kitchen drawer?
20  A      Yes, sir.
21  Q      Could your mother or father have broken that ceramic
22  tile horse figurine during an argument that morning?
23              MR. LISENBY:  Objection.
24              THE COURT:  Sustained.
25              MR. KEITH: Thank you, Terri.  No further questions.
```

1          THE COURT: Anything further?   You may step down.

2   Thank you, ma'am.

3   (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.).

4          THE COURT: Call your next witness.

5      Ladies and Gentlemen, I'm going to let you step back to

6   the jury room for just a few minutes.  Follow the same

7   instructions that I have given you so many times.  I'm going

8   to run through those one time this morning and then I'll just

9   refer to them during the day.

10      Do not talk to anyone about this case or anything

11  concerning this case.

12      Don't allow anyone to engage you in conversation about

13  the case.

14      Do not try to learn anything about this case.

15      Avoid contact with family members, both for the family

16  of the victims and the defendant.

17      Do not talk to law enforcement officials or any persons

18  who may be a witness in the case.

19      Avoid news media and avoid contact with members of the

20  media who might ask you questions about this case.

21      Do not discuss the case amongst yourselves and I remind

22  you that not even the bailiff can discuss this case with you

23  or answer questions about this case.

24      If you would, step to the jury room, I'll be calling you

25  back in, in just a few minutes.

```
 1   (Jury Out).

 2              THE COURT:  Let's take about a five-or-ten-minute

 3   recess.

 4    (WHEREUPON, THERE WAS A RECESS.)

 5              THE COURT: Bring the jury in.

 6   (JURY PRESENT).

 7              THE COURT:  Call your next witness.

 8              MR. GIBBS:  State calls Mike Parrish.

 9   Your Honor, we are missing one juror.

10              THE COURT:  Thank you.

11         You may take your witness.

12                   MICHAEL PARRISH

13       HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

14         THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

15                  TESTIFIED AS FOLLOWS:

16                  DIRECT EXAMINATION

17   BY MR. GIBBS:

18   Q     Tell us your name.

19   A     Mike Parrish.

20   Q     How are you employed?

21   A     Sergeant with the Chambers County Sheriff's Department.

22   Q     How long have you been with the Chambers County

23   Sheriff's Department?

24   A     Three-and-a-half years.

25   Q     As a sergeant with the department, what are your
```

```
 1   duties?

 2   A      Patrol division supervisor.

 3   Q      Do you respond to calls also?

 4   A      Yes, sir.

 5   Q      I want to direct your attention back to January the

 6   12th of 2000.  Can you recall that day for me?

 7   A      Yes, sir.

 8   Q      And I ask, were you on duty that day?

 9   A      Yes, sir.

10   Q      While on duty that day, did you have an occasion to

11   respond to a call with regard to a possible double homicide

12   at 1010 County Road 249, Roanoke, Alabama?

13   A      Yes, sir.

14   Q      And it says Roanoke, Alabama, is that address located

15   here in Chambers County?

16   A      Yes, sir.

17   Q      Did you go to that address?

18   A      Yes, sir.

19   Q      And, were you the first officer on the scene?

20   A      Yes, sir, I was.

21   Q      Was anyone in the car with you?

22   A      No, sir.

23   Q      Do you recall what time it was when you arrived at the

24   scene?

25   A      Five-eleven p.m.
```

*** Frances L. Roark ***

1  Q    Tell us what you saw and what you did when you arrived

2  at 1010 County Road 249, Roanoke, Alabama.

3  A    When I arrived, there was a large crowd of people

4  standing in the roadway pointing me to the residence at 1010

5  County Road 249.

6  Q    Did you go to the residence?

7  A    Yes, sir, I did.

8  Q    Tell us what you did and what you saw?

9  A    I entered the residence.  I observed a black male

10 laying in the floor face down.  I also observe a black female

11 on the couch with a head wound.  I checked for a pulse on

12 both subjects and found neither to have one.

13 Q    Okay.  And, I am sorry, did you see any signs of injury

14 to either one of them?

15 A    Yes, sir.  I saw a head injury to the female.

16 Q    Okay.  And, after you checked the pulses and I take it

17 you got no response.

18 A    Right.

19 Q    What did you do?

20 A    I started to exit the house.

21 Q    What happened, if anything, as you were exiting the

22 house?

23 A    As I was walking out the door, I was met at the door by

24 a black male, Quinton Oliver.

25 Q    Okay?

```
 1   A      He had a golf club in his hand and I advised him -- he

 2   was wanting to come in the house to see what happened.  I

 3   advised him that he would have to leave.  He could not enter

 4   the residence.

 5   Q      What did you do once you turned Mr. Oliver away?

 6   A      I stood at the door until I got additional units on the

 7   scene.

 8   Q      Okay.  And, who else do you recall arriving on the

 9   scene?

10   A      Sgt. Finley was the second to arrive.

11   Q      Now, tell us what happened once Sgt. Finley arrived?

12   A      Once he arrived, we secured the scene with the crime

13   scene tape around the perimeter and kept everyone out until

14   the investigators arrived.

15   Q      So, you did not allow any nonlaw enforcement or medical

16   personnel into the scene; is that correct?

17   A      No, sir.

18   Q      Did you do anything else?

19   A      We kept the scene secured.  Helped the investigators

20   take several witnesses statements.

21   Q      Did you later turn the scene and bodies of Angela and

22   Rodney Brown over to Mike Looser?

23   A      Yes, sir.

24   (WHEREUPON, A PHOTOGRAPH WAS MARKED AS STATE EXHIBIT 5 FOR

25   IDENTIFICATION.)
```

```
 1   MR. GIBBS:
 2   Q      I am showing you what has been marked for
 3   identification purposes as State's Exhibit number 5.  Do you
 4   recognize this exhibit?
 5   A      Yes, sir.
 6   Q      And, what:  Is this a photograph?  What is State's
 7   Exhibit 5?
 8   A      It is exactly the way I found the scene when I arrived.
 9   Q      It is a photograph of the scene when you arrived.
10   A      Yes.
11   Q      Does this photograph fairly and accurately show the
12   scene as you arrived that day?
13   A      Yes, sir.
14          MR. LISENBY:  State moves to admit number 5.
15          THE COURT:   Admitted.
16   (WHEREUPON, A PHOTOGRAPH MARKED AS STATE EXHIBIT 5 WAS
17   ADMITTED.)
18   MR. GIBBS:
19   Q      Now, if you would, tell us what is depicted in this
20   photograph?
21   A      The black male, face down, and the black female with
22   the head wound and a lot of blood on the couch under her
23   head.
24   Q      Okay.
25          MR. GIBBS:  Thank you very much.  I have no further
```

1    questions.

2             THE COURT:  Cross-examination.

3                    **CROSS EXAMINATION**

4    **MR. BLANCHARD:**

5    Q    Sgt. Parrish, I was unable to hear from my place on the

6    other side of the room.

7         What time did you say you arrived at the scene?

8    A    Five-eleven p.m.

9    Q    Five-eleven?

10   A    Yes, sir.

11   Q    P.M.?

12   A    Yes, sir.

13   Q    And, I didn't hear you say this either.  How did you

14   get an indication to go there?

15   A    By radio from dispatch.

16   Q    All right.  And, when did that call come in?

17   A    I am not sure of that.

18   Q    You don't know?

19   A    No, sir.

20   Q    Now, when you got there, you were alone?

21   A    Yes, sir.

22   Q    And you went to the trailer.

23   A    Yes.

24   Q    And was the door locked?

25   A    No, sir.

1    Q      All right.  Did there appear to be any signs of forced

2    entry?

3    A      No, sir, not that I saw.

4    Q      What kind of door locking mechanism did the trailer

5    have?

6    A      I really didn't notice.

7    Q      All right.  You walked into the trailer?

8    A      Yes, sir.

9    Q      What had you been told prior to going in:  That there

10   was a crime scene in there?

11   A      Yes, sir.

12   Q      All right.  Had you talked to anyone who had been into

13   the trailer?

14   A      No, sir.  Not at that point.

15   Q      Did you know whether or not there was a perpetrator

16   inside?

17   A      No, sir.

18   Q      Were you on alert for that in case it should happen?

19   A      Yes, sir, I was.

20   Q      Did you check all through the trailer to make sure no

21   one was there?

22   A      Yes, sir, I did.

23   Q      And you found no one?

24   A      Right.

25   Q      Now, you stated you saw the body of Rodney Brown face

1    down on the carpet; is that correct?

2    A      Yes, sir.

3    Q      Did you observe a kitchen knife in the vicinity of

4    Rodney Brown?

5    A      I didn't notice one; no, sir.

6    Q      It was not your job to collect evidence, was it?

7    A      No, sir.

8    Q      Your job was simply to secure the scene?

9    A      Yes, sir.

10   Q      Did you collect any evidence?

11   A      No, sir.

12   Q      The photograph you were shown, I believe it is State's

13   Exhibit number five.

14   A      Yes, sir.

15   Q      You looked at it just a minute ago.  You said that

16   accurately reflects the scene.  Actually it only reflects

17   parts of it; isn't that correct?

18   A      Well, it is what I found when I got there.

19   Q      It reflects part of what you found; isn't that right?

20   A      Yes, sir.

21   Q      Not the entire scene.

22   A      Yes, sir.

23          MR. BLANCHARD:  I think that's all.  Thank you.

24          THE COURT:  Anything futher?

25          MR. GIBBS:  Just a couple of quick questions, Your

1    Honor.

2                        REDIRECT EXAMINATION

3    BY MR. GIBBS:

4    Q    Sgt. Parrish, you stated you arrived at 5:11 p.m.

5    Isn't it correct your dispatch goes by eastern time; is that

6    correct?

7    A    Yes, sir.

8    Q    So, you would have arrived at 4:11 central time?

9    A    Right.

10            MR. GIBBS:  Nothing further.

11            THE COURT:  You may step down.  Thank you, sir.

12    (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.).

13            THE COURT:  Call your next witness.

14            MR. GIBBS:  State calls Scott Belton.

15                        SCOTT BELTON

16        HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

17            THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

18                    TESTIFIED AS FOLLOWS:

19                        DIRECT EXAMINATION

20    BY MR. GIBBS:

21    Q    Tell us your name, please.

22    A    Scott Belton.

23    Q    And, how are you employed, Mr. Belton?

24    A    Forensic investigator with the Department of Forensic

25    Sciences.

1    Q      How long have you been so employed?

2    A      Approximately four years.

3    Q      What are your duties with the Department of Forensic

4    Sciences?

5    A      As a forensic investigator, I investigate deaths,

6    sometimes responding to the scenes, sometimes collecting,

7    transporting, and releasing evidence.

8    Q      Okay.  Do you know a Dr. Krolikowski?

9    A      Yes, sir.

10   Q      And, did you work with him?

11   A      Yes.

12   Q      I am going to direct your attention to January 13th of

13   2000, and I am going to ask did you receive some times of

14   evidence pertaining to this from Dr. Krolikowski?

15   A      Yes, sir.

16   Q      Now, with regard to the victim in this case, Mr. Rodney

17   Brown, did you receive one assault kit, which contained one

18   sealed manila envelope marked blood flake from right back,

19   which contained a small flake?  One sealed manila envelope

20   swabbing off of back, which contained four swabs bearing

21   brown stains.  And, blood from Rodney Brown?

22   A      I received those items marked that way.  However, I did

23   not open them.  They were released to the scientist from me.

24   Q      They were sealed when you received them; correct?

25   A      Yes, sir.

1    Q    You simply transported them to someone else; is that

2    correct?

3    A    That's correct.

4    Q    And you turned those items over to Michael Hitchcock;

5    is that correct?

6    A    That is correct.

7    Q    And, who is Michael Hitchcock?

8    A    He is a scientist with the Alabama Department of

9    Forensic Sciences.

10   Q    And, when you turned those items over to Hitchcock were

11   they in the same, or substantially the same, condition  as

12   when you first received them from Dr. Krolikowski?

13   A    Yes.

14   Q    No, I, again, with regard to Mr. Rodney Brown, did you

15   also receive two bullets identified as coming from the body

16   of Rodney Brown?

17   A    Yes, sir.

18   Q    Did you turn those bullets over to Kathrine Richert?

19   A    Yes, sir, I did.

20   Q    And, when you turned those bullets over to Kathrine

21   Richert, were they in the same, or substantially the  same,

22   condition as when you first received them from

23   Dr. Krolikowski?

24   A    Yes, they were.

25   Q    Can you tell us who Kathrine Richert is?

1    A    She is also a scientist with the Department of the

2    Forensic Sciences, firearms division.

3    Q    Now, we have talked about items of evidence you

4    received regarding Rodney Brown.  Now, let's talk about

5    evidence from Angela Brown.  With regard to Angela Brown, did

6    you receive one sexual assault kit which contained three

7    sealed manila envelopes which contained two swabs identified

8    as vaginal swabs and two slides identified to be vaginal

9    smears?

10   A    I received a sexual assault kit and released that

11   evidence.

12   Q    And it also contained three sealed manila envelopes

13   which contained two swabs identified to be rectal swabs and

14   two slides identified to be rectal smears.  It also contained

15   three sealed manila envelopes which contained two swabs

16   identified to be oral swabs and two slides identified to be

17   oral smears.  This kit also contained nail clippings from the

18   right and left hands of Angela Brown, and hair samples.  Is

19   that correct?

20   A    I received a sexual assault kit said to contained those

21   items.  Once again I signed for a sealed kit.

22   Q    It was sealed.

23   A    Yes, sir.

24   Q    And, did you turn this assault kit over to Michael

25   Hitchcock also?

```
 1   A    Yes, I did.

 2   Q    And, when you turned this assault kit over to Michael

 3   Hitchcock was it in the same, or substantially the same,

 4   condition as when you first received it from Dr. Krolikowski?

 5   A    Yes, it was.

 6   Q    With regard to Angela Brown, did you also receive two

 7   bullets identified as coming from the body of Angela Brown?

 8   A    Yes, I did.

 9   Q    And did you turn those bullets over to Kathrine

10   Richert?

11   A    Yes, sir.

12   Q    And, when you turned those items over to Kathrine

13   Richert, were they in the same, or substantially the same,

14   condition as when you first received them?

15   A    Yes, they were.

16   Q    Did you receive blood and/or DNA cards identified as

17   being from the victims?

18   A    Yes.

19   Q    And, did you turn these DNA cards over to Katherine

20   McGeehan?

21   A    Yes, I did.

22   Q    Who is Katherine McGeehan?

23   A    She is also a scientist with the Department of Forensic

24   Sciences, blood, serology, DNA section.

25   Q    Does the term post-mortem fingerprints or palm prints
```

1    mean anything to you?

2    A     Yes, sir.

3    Q     What does post-mortem fingerprints and palm prints mean

4    to you?

5    A     For every individual that is a case at our office, we

6    do fingerprints.  We fingerprint the body and post-mortem

7    prints are taken and held or submitted.

8    Q     So those are prints that someone in the lab, usually

9    the doctor, takes of the deceased when he is doing the

10   autopsy?

11   A     Correct.

12   Q     In connection with this case, did you receive

13   post-mortem fingerprints and palm prints of Angela Brown and

14   Rodney Brown?

15   A     Yes, I did.

16   Q     Did you turn over those prints to Chuck Wright with

17   ABI?

18   A     Yes, I did.

19   Q     When you turned them over to Chuck Wright with ABI were

20   they in the same, or substantially the same, condition as

21   when you first received them?

22   A     Yes, they were.

23            MR. GIBBS:  I have no further questions, Your

24   Honor.

25            THE COURT:  Cross-examination.

1              MR. BLANCHARD:   Defense has no questions of this

2      witness, Your Honor.

3              THE COURT:   Thank you, sir.   Step down and you are

4      free to go.

5      (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

6              THE COURT:   Call your next witness.

7              MR. LISENBY:   State calls Lee Anderson.

8                          **LEE ANDERSON**

9          **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

10            **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

11                      **TESTIFIED AS FOLLOWS:**

12                      **DIRECT EXAMINATION**

13     **BY MR. LISENBY:**

14     Q     Tell me your name, please, sir.

15     A     Lee R. Anderson, Jr.

16     Q     Where are you employed?

17     A     Alabama Department of Forensic Sciences, State Medical

18     Examiner's Office in Montgomery, Alabama.

19     Q     What is your present position there?

20     A     Forensic investigator.

21     Q     How long have you been employed as a forensic

22     investigator?

23     A     Fourteen years.

24     Q     Can you describe for us your duties as forensic

25     investigator?

*** Frances L. Roark ***

1  A      Basically, I act as the eyes and ears of the State

2  Medical Examiner.  I respond to scenes, interview people,

3  photograph as necessary, take custody of the bodies, and take

4  bodies back to the medical examiner's facility and release

5  them to the medical examiner, and handle evidence, transfer

6  evidence, and things of that nature.

7  Q      I direct your attention back to January the 12th of

8  2000, and ask if you had the occasion to go to a residence at

9  1010 County Road 249 here in Chambers County?

10  A      Yes, sir, I did.

11  Q      And while there did you take possession of the bodies

12  of two people identified to you as Rodney Brown and Angela

13  Brown?

14  A      Yes, sir, I did.

15  Q      And, did you receive possession of those bodies from

16  Chief Investigator Mike Looser of the sheriff's department?

17  A      Yes, sir.

18  Q      Did you ever later turn those bodies over to the

19  medical examiner, Dr. John Krolikowski?

20  A      Yes, I did.

21  Q      When you did that, were the bodies in the same, or

22  substantially the same, condition as when you received them

23  from Chief Investigator Looser?

24  A      Yes.

25            MR. LISENBY:   Thank you, Mr. Anderson, the Defense

1    may have some questions for you.

2                MR. BLANCHARD:  No questions, Your Honor.

3                THE COURT:  Thank you, sir.  You may step down and

4    you are free to go.

5    (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

6                THE COURT:  Call your next witness.

7                MR. GIBBS:  State calls Sherwin Boswell.

8                            **SHERWIN BOSWELL**

9         **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

10           **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

11                        **TESTIFIED AS FOLLOWS:**

12                        **DIRECT EXAMINATION**

13   BY MR. GIBBS:

14   Q    Tell us your name, please?

15   A    My name is Sherwin Keith Boswell.

16   Q    And, how are you employed?

17   A    I am employed with the Department of Forensic Sciences,

18   Auburn laboratory.

19   Q    How long have you been employed with the laboratory?

20   A    I have been with the Department of Forensic Sciences

21   for 22 years.

22   Q    What are your duties, present duties, with the

23   Department of Forensic Sciences?

24   A    My duties there, I am the laboratory director.  I am

25   also the section chief of the drug chemistry section, and I

1  also assist with the processing of crime scenes and crime

2  labs.

3  Q    You still do that; correct?

4  A    That's correct.

5  Q    Now, back in January of 2000, you did that in

6  connection with this case; is that correct?

7  A    That's correct.

8  Q    Did you come to a mobile home here in Chambers County

9  located at 1010 County Road 249, Roanoke, Alabama?

10  A    Yes, I did.

11  Q    Tell us what you did and what you saw when you arrived

12  on the scene.

13  A    At the time I arrived at the scene, my being the first

14  responder from our department, my primary duty was to assess

15  the scene and try to decide where we were going to set up our

16  VCR unit on it and to what evidence or as to what may be

17  present at that particular scene.

18     Upon arriving at the scene, there was a mobile home.

19  Inside the mobile home were two deceased bodies.

20  Q    You mention a VCR unit, what is that?

21  A    That Violent Crime Response Unit.

22  Q    They are typically called to violent crimes; is that

23  correct?

24  A    That's correct.

25  Q    And you were part of that team; correct?

1    A    That's correct.

2    Q    Were other scientists and agents assigned to this

3    violent crime response unit also?

4    A    Yes, they were.

5    Q    Did they also come out and help?

6    A    Yes, they did.

7    Q    Now, you said there were two bodies inside this

8    trailer; is that correct?

9    A    That's correct.

10   Q    Now, in connection with your duties out there, did you

11   draw a diagram of inside the trailer?

12   A    Yes, I did.

13   Q    First, I am going to show you what has been marked as

14   State's Exhibit number 22.  Do you recognize this exhibit?

15   A    Yes, I do.

16   Q    And, what is exhibit 22?

17   A    Exhibit 22 is an inside diagram of the mobile home.

18   Q    And, you, yourself, drew this diagram, did you not?

19   A    Yes, I did.

20   **(WHEREUPON, A POSTER/DIAGRAM WAS MARKED AS STATE EXHIBIT 23**

21   **FOR IDENTIFICATION.)**

22   MR. GIBBS:

23   Q    And, now, I'm showing you what's been marked for

24   identification purpose as Exhibit number 23.  Do you

25   recognize this exhibit?

```
 1  A      Yes, I do.

 2  Q      What is Exhibit 23?

 3  A      Exhibit 23 is actually the room where the bodies and a

 4  lot of the evidence were present.

 5  Q      You, yourself, drew this also; is that correct?

 6  A      Yes, I did.

 7             MR. GIBBS:   State moves to admit Exhibit number 23.

 8             THE COURT:   Admitted.

 9  (WHEREUPON, A POSTER/DIAGRAM MARKED AS STATE EXHIBIT 23 WAS

10  ADMITTED.)

11  MR. GIBBS:

12  Q      And, Mr. Boswell, if you would, come down with regard

13  to Exhibit number 22, if you would, and simply tell the

14  members of the jury what you drew and what that diagram

15  depicts.

16  A      Actually my duties that night were to diagram the

17  outside.  Well, to do diagrams.

18        Here you see the inside of the trailer.  This being

19  the outer walls.  This is being the front door.  And as we

20  come through the front door, the deceased male was located in

21  this particular area.  The deceased female was located in

22  this area, lying on the side of a sofa or couch.

23        There were several items of evidence.  There was a

24  baseball bat here, which had blood stains on it.  There was a

25  magazine and several other items that had blood stains that
```

1   were collected.

2       As you come down the hallway, this was the first

3   bedroom.  We really didn't find anything in the first

4   bedroom.

5       Come down.  Here is the bedroom.  We actually did not

6   find a lot in the second bedroom.

7       Here was the bathroom.

8       And here is the master bedroom.  Also there was another

9   door, right here, that led to the outside.

10  Q    Okay.  Stay right there, please.

11      Now, with regard to Exhibit 23.  What is exhibit 23?

12  A    Exhibit 23 is actually a close up of the living room

13  area in which both deceased bodies were found.  Here you can

14  actually see the male body, as it was lying.  The front door

15  was here.  When you come in the male body was here.  The

16  female was here on the sofa.  There was a coffee table placed

17  here.  And, as you can see, there are different measurements.

18  The measurements were drawn or done at the time to try to

19  show some of the characteristics -- show where the person or

20  evidence may have been lying, because if we have to go back

21  and redo, you can easily go back and clarify the situation

22  and the place they are located.

23  Q    I'm pointing.  Can you tell me what those items depict

24  in the diagram?

25  A    Yes.  Those were small ceramic pieces which we found.

1   Because they were on the coffee table which had either been

2   moved or knocked down.

3   Q     Thank you very much, Dr. Boswell.

4            MR. BLANCHARD:  Judge, may we approach?

5   (WHEREUPON, A SIDE BAR COMMENCES.)

6            MR. BLANCHARD:  Your Honor, Defense has an

7   objection to State's Exhibit number 30, a photograph, which

8   apparently is a photograph of some blood on a magazine.  It

9   is a close up of the magazine.  If you look at it, it is a

10  periodical of some sort.  And, this particular -- it is a

11  religious periodical of some sort and there is blood on it.

12  And, I don't think the photograph itself is particularly

13  probative of anything.  There's another photograph, State's

14  Exhibit 29, in which you can also see the magazine, you just

15  can't make out the words on it.  This photograph, number 30,

16  you can make out the word on the magazine.  I think that's

17  more prejudicial than probative.

18           THE COURT:  Well, it is pretty much the way it was.

19  I am going to overrule the objection.

20           MR. BLANCHARD:  Judge, I want to make sure that

21  that objection, all my grounds are covered, all the grounds

22  and points of memoranda filed a couple years ago,

23  constitutional amendments on Four, Five, Six, Eight and

24  Fourteen, analagous provisions of the United States

25  Constitution.  And specifically --

```
1          THE COURT:  Ratified and incorporated.

2          MR. BLANCHARD:  -- specifically Rules 403, 402 and

3   403, relevancy versus the calculation the Court has to do

4   with about the prejudicial nature of the photograph.

5          THE COURT:  Y'all offering them both?

6          MR. GIBBS:  Yes, sir.

7          THE COURT:  Okay.

8          MR. BLANCHARD:  Also, they are cumulative, Your

9   Honor.  I don't see where number 30 will add anything to 29,

10  except for prejudicial impact.

11         THE COURT:  Well, it is obviously some kind of

12  periodical, publication of a religious sort, but I don't know

13  that we can infer that there would be a prejudicial affect

14  from that in and of itself.  This is actually as it -- the

15  depiction is of the deceased Angela Brown as she was found at

16  the scene; is that correct?

17         MR. LISENBY:  Yes, sir.

18         MR. BLANCHARD:  Judge, I think it improperly

19  injects material about the character of the victim into the

20  case.

21         THE COURT:  No, sir.  I don't think it injects.

22  This is actually -- the periodical, or whatever that was

23  existing at the scene, and it is there.  It is not a matter

24  of injecting any particular issue.

25         Overruled.  You've got your objection stated.
```

1    (WHEREUPON, A SIDE BAR CONCLUDES.)

2    **(WHEREUPON, PHOTOGRAPHS WERE MARKED AS STATE EXHIBITS 24, 25,**

3    **26, 28, 29, 30 AND 31 FOR IDENTIFICATION.)**

4    MR. GIBBS:

5    Q    Mr. Boswell, I am showing what have been marked for

6    identification purposes as State's Exhibit 24, 25, 26, 28,

7    29, 30, and 31.  Can you tell me what those exhibits are?

8    A    Yes, I can.

9    Q    And, first of all, those are photographs; is that

10   correct?

11   A    That's correct.

12   Q    And, photographs of what, generally?

13   A    They are generally photographs of the crime scene.

14   Q    Do those exhibits 24, 25, 26, 28, 29, 30, 31, fairly

15   and accurately depict the scene as you recall it that

16   evening?

17   A    Yes, they do.

18        MR. GIBBS:  State moves to admit Exhibits 24, 25,

19   26, 28, 29, 30 and 31.

20        MR. BLANCHARD:  With our previous objection and

21   exception noted.

22        THE COURT:  That's correct.  Admitted.

23   **(WHEREUPON, PHOTOGRAPHS MARKED AS STATE EXHIBITS 24, 25, 26,**

24   **28, 29, 30 AND 31 WERE ADMITTED.)**

25   MR. GIBBS:

1  Q    Now, I am showing you what has been marked for

2  identification purposes as State's Exhibit number 24.  Can

3  you tell us what is shown in this photograph?

4  A    Yes, I can.  This photograph shows the deceased male

5  lying slightly on his stomach.  In this particular area is a

6  baseball bat that has blood stains on it.

7  Q    Can you tell us what is just slightly showing in this

8  area?

9  A    That should be the deceased female along with a bloody

10  magazine and portion of a pillow.  This part should be one of

11  her legs.  One leg was on the floor and one leg was on the

12  couch.

13  Q    Thank you.

14     Now, I'm showing you Exhibit number 25.

15  Q    Can you tell us what that's a photograph of?

16  A    Yes, I can.  This particular photograph is showing, I

17  guess, a butcher knife which is located next to the deceased

18  male.  This being his left elbow and this being the trunk of

19  the body.  The head is in this area and the feet are in this

20  area.

21  Q    Now, going back to exhibit 24, where would the area

22  that you just talked about, showing the knife; where in this

23  photograph?

24  A    In this photograph, it will pretty much be this area

25  right in here.

1   Q     Okay.  You can slightly see his left arm right there;

2   is that correct?

3   A     That's correct.

4   Q     And, this is exhibit 26.  What is shown in this

5   exhibit?

6   A     This exhibit shows the deceased male's right elbow area

7   and is also showing the baseball bat, which was located next

8   to him.  And, you can see there is a blood stain present on

9   the baseball bat.

10  Q     Now, I am showing you exhibit 28.

11  Q     And, if you would, tell us what this is a photograph

12  of.

13  A     This particular photograph shows a view of the female

14  as she was lying on the couch.  You can see in this portion

15  here is a bloody magazine.  This thing here is a white pillow

16  which was on top of her.  As you can see, one of her legs is

17  on the floor and the other is on the couch.  Also it shows

18  the coffee table area that still has some of the ceramic

19  pieces there on it.

20  Q     What is that?

21  A     That, I believe, is a portion of the baseball bat.

22  Q     Okay.  Exhibit 29.

23  A     This photograph shows a close up of the female.  As you

24  can see, here is the bloody magazine.  Here is the pillow.

25  As you can see here, if the picture was a little clearer you

1  could see the actual wound to the side of the head.  And, as

2  you can see she is lying on the flat sofa.

3  Q     Exhibit 30?

4  A     Exhibit 30 is actually a picture of the bloody

5  magazine.  This, we felt, was like a pool of blood that had

6  clotted.  I am not sure.  I didn't do analysis on this.  This

7  was the bloody magazine that was close to the female's head.

8  Q     And 31?

9  A     This photograph actually shows a close up of the

10 female.  Also it shows more of a close up of the pillow which

11 was on top of her.

12 Q     Now with regard to those ceramic pieces shown in the

13 diagram.  Did you collect those as items of evidence?

14 A     Yes.

15 Q     Did you later turn the ceramic pieces over to Agent

16 Chuck Wright?

17 A     Yes, I did.

18 Q     When you turned those ceramic pieces over to Chuck

19 Wright, were they in the same, or substantially the same,

20 condition as when you first recovered them?

21 A     Yes, they were.

22 Q     Also, did you collect three latent lifts from the

23 scene?

24 A     Yes, we did.  Actually the latents were lifted by Craig

25 Bailey.

*** Frances L. Roark ***

1   Q     What is a latent lift, if you know?

2   A     Latent usually refers to fingerprints or patterns that

3   are found at that particular scene.  They are unknown

4   patterns.

5   Q     And, were those lifts also turned over to Agent Chuck

6   Wright?

7   A     Yes, they were.

8   Q     Now, in those photographs there was a bat shown.  Do

9   you recall that?

10  A     Yes, I do.

11  Q     I am showing what has been marked for identification

12  purposes as State's exhibit 27.  If you will, look at the

13  envelope with the markings on it or the bat itself.  Do you

14  recognize this exhibit?

15  A     Yes, I do.

16  Q     And, what is this exhibit?

17  A     This is actually the bloody baseball bat that was lying

18  to the right of the deceased male.

19  Q     How do you know this is the bat?

20  A     Well, at the time we collected it, I did place a case

21  number on the outside of the package along with the date and

22  time and with my initial on the package.  The package was

23  then sealed up.

24         MR. GIBBS:  State moves to admit number 27.

25         THE COURT:  Admitted.

*** Frances L. Roark ***

```
 1   (WHEREUPON, A BAT MARKED AS STATE EXHIBIT 27 WAS ADMITTED.)

 2   MR. GIBBS:

 3   Q    And, then there was also a pillow in some of these

 4   photographs; is that correct?

 5   A    That's correct.

 6   Q    Across the body of Angela Brown.

 7   A    That's correct.

 8   (WHEREUPON, PILLOW WAS MARKED AS STATE EXHIBIT 32 FOR

 9   IDENTIFICATION.)

10   MR. GIBBS:

11   Q    I'm showing what's been marked for identification

12   purposes as State's Exhibit number 32.  Take a look at this

13   exhibit and tell me if you recognize it.

14   A    Yes, I do.

15   Q    And, what is Exhibit number 32?

16   A    It is the pillow removed from the female body on

17   1/12/2000, 11 p.m. by myself Sherwin K. Boswell.

18   Q    It has your marks and identification on it?

19   A    That's correct.

20        MR. GIBBS:  State moves to admit Exhibit number 32.

21        THE COURT:  Admitted.

22   (WHEREUPON, A PILLOW MARKED AS STATE EXHIBITS 32  WAS

23   ADMITTED.)

24        MR. GIBBS:  May I publish these photographs to the

25   jury, Your Honor?
```

1          THE COURT:  Yes.

2   MR. GIBBS:

3   Q     Now, Mr. Boswell, was a video taken of the scene?

4   A     That's correct.

5   **(WHEREUPON, A VIDEO TAPE WAS MARKED AS STATE EXHIBITS 34 FOR**

6   **IDENTIFICATION.)**

7   MR. GIBBS:

8   Q     Okay.  And, I am showing you what has been marked for

9   identification purposes as State's Exhibit number 34.  Do you

10  recognize this?

11  A     Yes, I do.

12  Q     And, does this video tape accurately depict the scene

13  at the house on 1010 County Road 249 on January the 12th of

14  2000?

15  A     Yes, it does.

16          MR. GIBBS:  State moves to admit Exhibit number 34.

17          THE COURT:  Admitted.

18  **(WHEREUPON, A VIDEO TAPE MARKED AS STATE EXHIBITS 34 WAS**

19  **ADMITTED.)**

20          MR. GIBBS:.  At this point, we would like to play

21  the tape, Your Honor.

22          THE COURT:  All right, sir.  Go ahead.

23  (WHEREUPON, A VIDEO TAPE, STATE EXHIBIT 34, WAS PLAYED FOR

24  THE JURY.)

25          MR. GIBBS:  I have no further questions of this

```
 1    witness, Your Honor.

 2              THE COURT:  Cross-examination.

 3                      CROSS EXAMINATION

 4    BY MR. BLANCHARD:

 5    Q    Mr. Boswell, what time did you arrive on the scene?

 6    A    Excuse me.  I believe I arrived around 8:15.

 7    Q  ·  Eight-fifteen.  And, at that time there were already

 8    others there?

 9    A    That's correct.

10    Q    Do you know who had been in and out of that scene prior

11    to the time that you had arrived?

12    A    No, I do not.

13    Q    Do you know whether the scene was appropriately secured

14    at all times prior to your arrival?

15    A    That I cannot answer.

16    Q    Okay.  The pictures that we saw.  Did you take them

17    yourself?

18    A    No, I did not.

19    Q    You were able to identify what you saw in them, but you

20    did not take them?

21    A    No, I did not.

22    Q    But, you did walk through -- you walked through the

23    trailer?

24    A    That's correct.

25    Q    And, we are talking about, for lack of a better word, a
```

1   mobile home or trailer?

2   A    That's correct.

3   Q    Something that's not a particularly spacious

4   accommodation, if you will?

5   A    That's correct.

6   Q    Okay.  With reference to the room in which the bodies

7   were found, can you give any estimate of the size of that

8   room?  Did you measure it?

9   A    I believe we did.  No, we did not get measurements of

10  the exact size of the room.

11  Q    Do you have an estimate as to the size of the room?

12  A    I would probably say anywhere from 8 to maybe 12 feet

13  wide, and maybe about the same in length.

14  Q    Okay.  Well, was it rectangular or a square shape?

15  A    It was more rectangular shape.

16  Q    Let me show you what has been marked as State's Exhibit

17  23.  I will hold that up so the ladies and gentlemen can see

18  it briefly and then I'll show it to you.

19  A    That's a copy of the drawing that I made.

20  Q    You made it; is that correct?

21  A    That's correct.

22  Q    And this is a blow up?

23  A    That's correct.

24  Q    It is not exactly to scale, is it?

25  A    No, it is not.

1  Q     But it gives you a rough idea of the distances

2  involved, for instance -- if I put my pad down here -- you

3  did make some measurements; didn't you?

4  A     Yes, we did.

5  Q     For instance, here don't you show this distance as

6  being two feet, six inches.

7  A     That's correct.

8  Q     Okay.  And, the table as being 49 inches in width --

9  well length.

10 A     That's correct.

11 Q     And, 25 inches in width.

12 A     That's correct.

13 Q     All right.  And, there was another -- I can't read your

14 writing.  What is the distance from the wall here to the

15 table?

16 A     That's four feet, four inches.

17 Q     Four feet, four inches.  So if the table is 49 inches,

18 that is about four feet; correct?

19 A     That's correct.

20 Q     So, we've got about four-and-a-half feet there.  No.

21 Eight-and-a-half feet and then you have another two feet, six

22 inches to the wall.  So, that's about 11 feet all total in

23 that direction.

24 A     That's correct.

25 Q     Then it is going to be longer, it is hard to say how

1    much, because you don't have any measurements here.  Say, 11

2    feet here, maybe 20 feet here?

3  A      It's a possibility.

4  Q      Is that about right?

5  A      It's a possibility.

6  Q      All right.  All in all, Mr. Boswell, would it be fair

7    so say, if I were to draw an imaginary line from this point

8    to that back wall behind you, and from that point again to

9    that wall over there, enclosing this as a rectangular, that

10    this would be approximately the same size, maybe, a little

11    larger than that room?

12  A      It is probably close to being -- close to be being

13    about the size of that room.

14  Q      And the ceiling is much lower in a trailer; isn't it?

15  A      That's correct.

16  Q      So, you're dealing with a fairly enclosed space for

17    three people to be in.

18  A      That's correct.

19  Q      All right.  Now, I would like to ask you this:  You

20    spent some time looking around in there in that room; right?

21  A      That's correct.

22  Q      Did you notice any broken furniture?

23  A      Not that I can recall.  I know there were some broken

24    ceramic pieces.

25  Q      Did you see any chairs overturned?

1  A    I don't recall any.

2  Q    All right.  There were a lot of things hanging on the

3  walls I noticed in that video.  Looked like pictures and wall

4  hangings of various types.  Did you see where any of them had

5  been knocked off the wall or broken.

6  A    Not to my knowledge.

7  Q    Did you see any smears of blood on the wall?

8  A    There were some blood stains on the wall.

9  Q    I'm talking about smears where somebody may have bumped

10  into the wall and smeared blood on the wall.

11  A    I don't recall seeing any.

12  Q    As opposed to splatter.  You know what splatter is.

13  A    Yes.

14  Q    Did you see any blood splatter?

15  A    Yes, we did.

16  Q    Is that what you were talking about when you said you

17  saw blood stains?

18  A    Yes.

19  Q    What is blood splatter?

20  A    Blood splatter is usually when a wound is inflicted and

21  blood will travel and hit a particular object and from there

22  it will usually leave -- well, it leaves stains there on the

23  wall or on other items.

24  Q    Now, the bodies you saw.  The two victims, they were

25  not tied up; were they?

 1   A      No, they were not.

 2   Q      They did not appear to have been restrained in any way,

 3   did they?

 4   A      Not to my knowledge.

 5   Q      You did not see any -- do you know what ligature is?

 6   A      Somewhat.

 7   Q      Like somebody might use in another case an extension

 8   cord to strangle someone or a belt?

 9   A      That's correct.

10   Q      Did you see anything like that?

11   A      No, we didn't.

12   Q      As to that broken ceramic, let me ask you about that.

13   There was a coffee table in front of the sofa that we saw.

14   A      Yes, there was.

15   Q      And, that coffee table in that small space that we

16   talked about was just maybe a foot, 18 inches away from the

17   sofa; would you say that was correct?

18   A      That sounds about right.

19   Q      So, there's a small area to walk between the sofa and

20   the coffee table so somebody could go sit down on the sofa.

21   A      That's correct.

22   Q      Right?  All right.  And, on that coffee table, this

23   little kind of low coffee table, there were a number of those

24   ceramic figurines, weren't there?

25   A      Yes, there were.

*** Frances L. Roark ***

1  Q     And, what you saw on the floor appeared to be one of

2  those; correct?

3  A     There were several pieces on the floor.

4  Q     All right.  Something of a similar character as to what

5  you saw on the table, maybe, having fallen off and broken; is

6  that the way it looked to you?

7  A     That is how it appeared.

8  Q     Now, these little ceramic figurines are not hard and

9  durable; are they?

10 A     Not to my knowledge; no, they are not.

11 Q     They could have easily have been broken in falling off

12 that coffee table; isn't that correct?

13 A     I couldn't answer that, because the floor did have

14 carpet on it.  So, it depends on how delicate the ceramic

15 pieces were.

16 Q     If it fell off the table, it could have been broken by

17 somebody stepping on it; is that correct?

18 A     That's a possibility.

19 Q     You don't know who was on the scene before you got

20 there, or how that might have gotten broken; is that right?

21 A     No, I do not.

22 Q     Let me ask you this, is the fact a ceramic figurine was

23 the on floor there broken, would that be consistent with,

24 perhaps, somebody getting up off the sofa, quickly hitting

25 the coffee table and knocking the ceramic figurine on the

1  floor?

2  A    That's possible.

3  Q    That's consistent with that; right?

4  A    Yes.

5  Q    Is it also consistent with, perhaps, somebody, like,

6  Mr. Brown being shot, turning around, falling down, maybe

7  bumping the table and knocking the ceramic figurine off?  It

8  is consistent with that; isn't it?

9  A    Yes, it is.

10          MR. BLANCHARD:  I have no further questions.  Thank

11  you very much.

12          THE COURT:  Anything further from the State?

13          MR. GIBBS:  No, sir.

14          THE COURT:  You may step down.  You are excused.

15  (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

16          THE COURT:  Counsel, approach.

17  (WHEREUPON, A SIDE BAR COMMENCES  CONCLUDES.) .

18          THE COURT:   Who's your next witness?

19          MR. LISENBY:   Jason Buivids.

20          THE COURT:  How long will that be?

21          MR. LISENBY:  I think it will take -- I don't think

22  it will take more than 15 minutes.

23          MR. BLANCHARD:  I don't think we have anything.

24          THE COURT:  Go ahead with him.

25          MR. LISENBY:  He's only going to do a one- page

1   statement.  That's all he's going to do.

2              THE COURT:   Go ahead and take him and then we'll

3   break.

4   (WHEREUPON, A SIDE BAR CONCLUDES.)

5              THE COURT:Call your next witness.

6              MR. LISENBY:  State calls Jason Buivids.

7                      VICTOR JASON BUIVIDS

8         HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

9         THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

10                     TESTIFIED AS FOLLOWS:

11                     DIRECT EXAMINATION

12  BY MR. LISENBY:

13  Q    Would you tell us your name, please, sir?

14  A    My name is Victor Jason Buivids.

15  Q    Where you are employed?

16  A    Currently, I'm employed with the City of Dadeville

17  Police Department.

18  Q    What is your position there, please?

19  A    I am a patrol sergeant.

20  Q    How long have you been employed at the City of

21  Dadeville Police Department?

22  A    I have been employed with the City of Dadeville going

23  on three years now.

24  Q    Prior to that, where were you employed?

25  A    I was employed by the City of LaFayette Police

1    Department as an investigator.

2    Q    How long were you employed as an investigator with the

3    City of LaFayette?

4    A    As investigator approximately two-and-a-half years.

5    Q    Overall how much law enforcement experience do you have

6    Sgt. Buivids?

7    A    I have been in law enforcement since November of 1988,

8    with one nine month gap that was out of law enforcement.

9    Q    Sergeant, I want to direct your attention back to

10   January 12th of 2000, the date of this particular incident,

11   and ask if you were working as an investigator with the City

12   of LaFayette at that time?

13   A    Yes, sir, I was.

14   Q    Did you have the occasion to respond to an area off of

15   County Road 249 in Chambers County?

16   A    Yes, I did.

17   Q    For what purpose did you respond to that area?

18   A    Investigator Blackstone and Investigator Looser both

19   were real good about helping us out in the City of LaFayette

20   when we had major incidents, and I responded just to be able

21   to help them if they needed any assistance.

22   Q    That clearly was not in LaFayette jurisdiction, but you

23   went out to help if you could.

24   A    Yes, sir.

25   Q    When you arrived, did you have the occasion to speak

1  with either Investigator Looser or Blackstone?

2  A     Yes, sir. I spoke with Investigator Blackstone.

3  Q     At that time did he ask you to talk to someone?

4  A     Yes, sir.  He had several residents standing around his

5  vehicle, and he asked me if I could take a statement from one

6  of the residents.

7  Q     Who was that person?

8  A     Jason Lee Holloway, Sr.

9  Q     Where did you take this statement from him?

10  A     My unmarked unit was sitting in the driveway and it was

11  getting on in the afternoon.  That time of year it starts

12  getting kind of dark, so I asked Mr. Holloway, I said, if you

13  want to, well, we'll hop back in my car and I can take the

14  statement from there and that way I could use the interior

15  light.

16  Q     So, it was in your unmarked unit?

17  A     Yes, sir.

18  Q     It was still there at the location, out near the

19  location of this trailer; is that correct?

20  A     Yes, sir.

21  **(WHEREUPON, A DOCUMENT WAS MARKED AS STATE EXHIBIT NUMBER 6**

22  **FOR IDENTIFICATION.)**

23  MR. LISENBY:

24  Q     Let me show you what has been marked and says State's

25  Exhibit number 6, and ask if you can identify that, please.

1  A    Yes, sir.  This is a copy of the witness' statement

2  that I took from Jason Holloway.

3  Q    All right.  And, with regard to the original, any

4  changes, marks, or alterations on that copy other than the

5  State's Exhibit marker?

6  A    No, sir.

7  Q    You said this was a copy of the statement that you took

8  from Mr. Holloway on that occasion; is that correct?

9  A    Yes, sir.

10        MR. LISENBY:  Your Honor, we would offer State's

11  Exhibit number 6.

12        THE COURT:  Admitted.

13  **(WHEREUPON, A DOCUMENT MARKED AS STATE EXHIBIT NUMBER 6 WAS**

14  **ADMITTED.)**

15  MR. LISENBY:

16  Q    If you would, Sgt. Buivids, would you read State's

17  Exhibit number 6, please?

18  A    Yes, sir.  Top of the page, pretyped is witness

19  statement.  Then it has got statement of Jason Lee Holloway,

20  Sr.  It has got his Social Security number, his address, his

21  place of employment, age, date of birth, telephone number,

22  the place the statement was taken, the date and time, the

23  date being January 12th of 2000, the time at 1738 hours,

24  which is 5:38 p.m., statement was given to Investigator

25  Victor J. Buivids, LaFayette Police Department.  Below that

1  pretyped, this statement is of my own free will given without

2  threats, promises, or duress having been made toward me.

3  Statement reads:  I got home from work at around 6:15 a.m.

4  this morning.  I got ready for bed and went to sleep.

5  Between 11:30 a.m. and 12, I got up and went to the mailbox.

6  I saw Jerome Cofield at the Brown residence.  He was in his

7  vehicle and he blew the horn.  No one came out so he backed

8  out and left.  I went back to my house and watched TV.  About

9  4:05 p.m. the kids got off the bus and I heard screaming.

10  And, I got up, ran out, and met the kids in the yard.  All

11  the kids were screaming that momma and Rodney was dead.

12  Rodney Brown is the kids step-dad.  I ran down to the trailer

13  and went to the outside edge of the door and looked in and

14  saw Ann, parentheses, Angela Brown on the couch.  I could see

15  that her head looked busted.  I could see Rodney Brown laying

16  in front of the TV on the floor.  I ran back out and ran to

17  my house to call the police.  I dialed 911 and told them that

18  someone had been murdered and I gave them directions to the

19  scene.

20      And, I had Mr. Holloway read this statement and I put a

21  slash at the beginning and the end and had him read over it

22  to make sure it was just like he told me.  I told him if it

23  was to please initial it.  And, he initialed it at the first

24  and last.  Then I wrote on it this statement written by

25  Investigator Buivids as I told him is true  and correct and he

1    initialed again and signed it.

2  Q    All right.  I believe you signed it at the bottom also.

3  A    Yes, sir.  I signed at the bottom and put the ending

4    time which was 1800 hours.  It took me right at 22 minutes to

5    write the statement for him.

6  Q    I noticed there was a part in the statement on one of

7    the lines where there was something marked through and some

8    more initials.  Can you tell me about that?

9  A    Yes, sir.  As I was taking the statement from him, from

10   what he was saying, I wrote that all the kids were screaming

11   that momma and daddy was dead.  When he reread it, he said

12   no, he said, that's not really their daddy.  He said that's

13   -- well, when I got to that part, he was looking on, rather,

14   and he was looking on while I was writing, and when I wrote

15   daddy he said no that's not their daddy, and looked at him

16   and crossed it out and wrote Rodney, then he further

17   explained that was the step-dad.

18  Q    And he initial that change.

19  A    Yes, sir.  He initialed that change.

20  Q    And, he signed this in your presence.

21  A    Yes, sir, he did.

22        MR. LISENBY:  Sergeant, I believe that's all the

23   questions I have.  Defense counsel may have some questions.

24        MR. KEITH:  No questions, Your Honor.

25        THE COURT:  Thank you, sir.  You may step down and

```
 1   you are free to go.

 2   (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

 3        THE COURT:  Ladies and Gentlemen, at this time we

 4   are going to take a break for our noon recess.  I'll need to

 5   have you back in the jury room at 1 o'clock.  Follow all the

 6   same instructions I have given you so many times.

 7       Don't talk with anyone about this case.  Don't discuss

 8   the case with anyone, not even amongst yourselves.

 9       Do not allow anyone to try to approach you about the

10   case.

11       Don't expose yourself to any media coverage of this

12   case.

13       Avoid putting yourself in a position where you might

14   overhear or see something involving this case as pertains

15   between attorneys, witnesses, or other parties interested in

16   the case.

17       With that everyone remain in here while the jury exits.

18   Be back in the jury room before 1 and we'll start again.

19   (JURY OUT)

20        THE COURT:  All right.  In recess for one hour.

21   (WHEREUPON, THERE WAS A LUNCH RECESS)

22   (JURY PRESENT)

23        THE COURT:  Let the record reflect all jurors

24   present, all counsel present, all parties present.

25       Call your next witness.
```

1           MR. LISENBY:   State calls Mike Looser.

2           THE COURT: Speak up loudly enough so all the folks

3    on the back row of the jury can hear and understand you.

4           Go ahead.   Take your witness.

5                           MIKE LOOSER

6           HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

7             THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

8                        TESTIFIED AS FOLLOWS:

9                        DIRECT EXAMINATION

10   BY MR. LISENBY:

11   Q     Would you tell me your name, please, sir?

12   A     Mike Looser.

13   Q     Where are you employed?

14   A     Right now I'm employed with Chambers County Commission.

15   Q     What is your present position with the Chambers County

16   Commission?

17   A     I am the solid waste officer.

18   Q     How long have you been employed as the solid waste

19   officer?

20   A     Approximately six months.

21   Q     Prior to that where were you employed?

22   A     Chambers County Sheriff's Department.

23   Q     How long were you employed with the Chambers County

24   Sheriff's Department?

25   A     A little over five years.

1    Q    What was your position at the time that you left the

2    sheriff office to become the solid waste officer?

3    A    Chief investigator.

4    Q    How long had you been in that position?

5    A    Probably three, three-and-a-half years.

6    Q    How long, overall, would you say that you have been

7    involved in law enforcement?

8    A    Twenty-five years.

9    Q    Officer Looser, I want to direct your attention to

10   January the 12th of 2000, and ask if you had the occasion to

11   to go to an area on County Road 249 here in Chambers County?

12   A    Yes, sir, I did.

13   Q    For what purpose did you respond to that area?

14   A    We had a 911 call with two people dead.

15   Q    When you arrived, can you tell me who you recall being

16   at the scene with regard to law enforcement officials?

17   A    I remember Mike Parrish, Sgt. Mike Parrish.  I remember

18   Sgt. Robert Finley.  And, I believe, Deputy Arnold had got

19   there at that time.

20   Q    Mike, I am sorry, if you will, remember to keep your

21   voice up for us, please.

22   A    Yes, sir.

23   Q    Now, what were these officers doing at the time of your

24   arrival?

25   A    They were on the outside.  They had secured the crime

 1  scene.

 2  Q    Tell me what you mean by secured the crime scene?

 3  A    Taped it off to where no one could get in except myself

 4  or Investigator Blackstone, at the time, could get there.   No

 5  one else was allowed in.

 6  Q    When you arrived as the chief investigator did you then

 7  take control over the crime scene area?

 8  A    Myself and then Investigator Blackstone did.

 9  Q    During the time that you were there, were other

10  agencies contacted to come to that area to assist you?

11  A    Yes, sir.

12  Q    Who was that please?

13  A    I remember the Drug Task Force, LaFayette PD sent one

14  of their detectives up there, three ABI agents.   Shortly

15  after I got there, I called in the major crime scene unit,

16  Alabama State Troopers.

17  Q    That would be the Department of Forensic Sciences?

18  A    Yes.   That's the Department of Forensic Sciences.

19  Q    And you said three ABI officers, is that Alabama Bureau

20  of Investigation?

21  A    Yes, sir, that's correct.

22  Q    Do you recall who those officers would have been?

23  A    Yes, sir. Agent Head, Agent Thomas and Agent Wright.

24  Q    Were you present when those officers and the unit,

25  crime unit for the Department of Forensic Sciences arrived

1   also?

2   A    Yes, sir, I was.

3   Q    At that time, did you have the occasion to release the

4   bodies of Angela and Rodney Brown to Lee Anderson of the

5   Department of Forensic Sciences?

6   A    Yes, sir, I did.

7   Q    Were those bodies in the same, or substantially the

8   same, condition as when you had taken control, you and

9   Investigator Blackstone, had taken control of the scene from

10  Sgt. Parrish?

11  A    Yes, they was.  They were.

12  Q    Tell us, if you would, Officer Looser, what it was that

13  you did while you were at the scene there?

14  A    While I was at the scene, I went and interviewed

15  Quinton Oliver.

16  Q    Did you have the occasion to speak to any other people

17  that were present there?

18  A    No, sir.  Not after I interviewed Quinton.  Well, I

19  take that back.  Agent Wright and I did interview the two

20  little girls of the Browns'.

21  Q    Okay.  Would that be Tashia and Terri Zachary?

22  A    That's correct.

23  Q    Now, would it be fair to say, Officer Looser, at that

24  time, the investigation was begun by the sheriff's department

25  and the other agencies that you mentioned?

```
 1 | A     Yes, sir, it was.

 2 | Q     Did that investigation continue for a period of time?

 3 | A     Yes, sir, it did.

 4 | Q     Who assisted in that investigation?

 5 | A     Actually it ended up just being myself, Investigator

 6 | Blackstone, Agent Wright, Agent Head, and Agent Thomas.

 7 | Q     I want to direct your attention, now, Officer Looser,

 8 | to January the 21st of 2000.  And, in regard to this

 9 | particular investigation, did you have the occasion to speak

10 | to Quinton Oliver?

11 | A     Yes, sir, I did.

12 | Q     Where was that at?

13 | A     That was in investigators' office directly south of the

14 | County Jail Correction Facility.

15 | Q     Here in LaFayette?

16 | A     Yes, sir, here in LaFayette.

17 | Q     In regard to that, did Mr. Oliver provide you some

18 | information about a weapon of some kind?

19 | A     Yes.

20 |           MR. BLANCHARD:  Objection, Your Honor, hearsay.

21 |           MR. KEITH:   Objection, Your Honor.

22 |           THE COURT:   Sustained.

23 |           MR. LISENBY:  I was not asking what he said.

24 |           THE COURT:  You may go ahead with another question.

25 | MR. LISENBY:
```

1  Q    In response to the information provided, did you direct

2  someone to do something?

3  A    Yes, sir, I did.

4  Q    Who did you direct to do something?

5  A    Investigator Blackstone.

6  Q    What did you direct Investigator Blackstone to do?

7  A    To go back to where Jason Holloway lived and see if he

8  could get a consent to search for a certain weapon.

9  Q    Now, during the course of the investigation, were you,

10 in fact, provided information to look for a certain kind of

11 weapon?

12 A    Yes, sir, I was.

13 Q    From whom did that come from?

14 A    Quinton Oliver.

15 Q    I am sorry.  I didn't ask that very well.

16    Otherwise, other than Mr. Oliver, did you receive some

17 information from the Department of Forensic Sciences about a

18 weapon?

19 A    Yes, sir, I did.

20 Q    So, you had some information about what to look for; is

21 that correct?

22 A    Yes, sir.  I knew what kind.

23 Q    You indicated that you had directed Investigator

24 Blackstone to go to Jason Holloway's residence?

25 A    That's correct.

1  Q     And, this is, again, on January the 21st; is that

2  right?

3  A     Yes, sir.  That's correct to the best of my knowledge.

4  I would have to go back; but, yes, sir, I think so.

5  Q     At some point, and again I'm not asking for the

6  conversation, I'm just asking at some point after you had

7  directed Investigator Blackstone to go to that location, did

8  you and he have another conversation?

9  A     Yes, sir, we did.

10  Q     Did you later see Investigator Blackstone somewhere

11  that day here in LaFayette?

12  A     I am sorry?

13  Q     Did you later after you had had this conversation with

14  Investigator Blackstone, did you later see him somewhere

15  again here in LaFayette?

16  A     Yes, sir.

17  Q     Where was that at?

18  A     Back at the investigators' office.

19  Q     Did he have any item of evidence with him at that time?

20  A     Yes, sir, he did.

21  Q     What was that?

22  A     He had a Colt revolver.

23        MR. LISENBY:  Thank you, sir.  The Defense

24  attorneys may have some questions for you.

25        THE COURT:  Cross-examination.

1                    CROSS EXAMINATION.

2    BY MR. BLANCHARD:

3    Q    Mr. Looser.  It is Mr. Looser, now?  You were with the

4    sheriff's department.

5    A    Yes.  That's correct.

6    Q    You are not there any longer; is that correct.

7    A    I am law enforcement.  I still carry my full arrest

8    powers.

9    Q    All right.

10        You went to the scene on the night in question.

11   A    Yes, sir, I did.

12   Q    All right.  How many people were there when you

13   arrived?

14   A    To the best of my knowledge three.

15   Q    Okay.  Do you know what time you got there?

16   A    Probably would have been around a little after 4

17   o'clock.  We got the call shortly before 4.

18   Q    Okay.  All right.  Who -- just tell me who was there

19   when you got there?

20   A    I remember Sgt. Mark Parris, Sgt. Robert Finley, and

21   then Deputy Freddy Arnold.

22   Q    All right.  How long did you stay at the scene?

23   A    I stayed at the scene until approximately 3:30 or 4

24   o'clock that next morning.

25   Q    So, you were there almost 12 hours?

```
 1   A    Yes, sir.

 2   Q    During that time, did you pick up any evidence or

 3   remove any evidence from the scene?

 4   A    No, sir.  I didn't.  once we went inside, we took

 5   preliminary pictures.  We backed out and waited on the major

 6   crime unit to get there.

 7   Q    All right.  So, neither you, nor any of your men,

 8   removed any evidence?

 9   A    No, sir.

10   Q    I take it that your answer to my question is; yes, that

11   nobody removed any evidence?

12   A    Yes.  That's correct.

13           MR. BLANCHARD:  That's all.  Thank you.

14           THE COURT:  You may step down.  Thank you, sir, you

15   are excused.

16   (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED .).

17           THE COURT:  Call your next witness.

18           MR. GIBBS:  State calls Erlinda Bolt.

19   (WHEREUPON, A SIDE BAR COMMENCES.)

20           MR. GIBBS:  Judge, our next witness is

21   Ms. Erlinda Bolt and she is the one that drew blood from the

22   defendant for that DNA analysis.  My only question is,

23   Ms. Bolt works at the jail.  She came in contact with the

24   defendant at the jail and drew his blood at the jail.  If you

25   want me to lead her around to meeting him at the jail, I
```

```
 1   will.
 2            THE COURT:  What is your purpose of even calling
 3   her?
 4            MR. LISENBY:  Just to tie up our chain.  If they
 5   are not concerned about the chain, ....
 6            THE COURT:  You are talking about the DNA?
 7            MR. LISENBY:  Yes, sir.
 8            THE COURT:  It is already in.  It is
 9   uncontroverted.  It is a fact.  I have already told them
10   that.  They have to follow that.
11            MR. BLANCHARD:  If you want to call her, I would
12   ask that you kind of lead her around that.
13            MR. GIBBS:  If we are not going to object about the
14   chain, then I won't call her.
15            THE COURT:  You can put on the record, right now,
16   the showing of what the evidence would be as to the chain so
17   should there be any sort of an appeal from this, it will be
18   shown that it could have been proven.  It is stipulated as
19   is.  That way we protect the record, but at the same time it
20   is not an issue.
21            MR. GIBBS:  The State would expect Ms. Bolt's
22   testimony to be that:  First of all, she is employed and
23   works and has some duties at the jail.  She's a nurse who
24   works at the jail.  And, pursuant to a court order on April
25   the 19th of 2000, she withdrew blood from the defendant,
```

1    sealed the tubes up, and immediately handed the tube over to

2    law enforcement agents who were standing right there.  That

3    would have been Charles Wright, who was standing right there.

4    He took it into his custody immediately.  Then subsequently

5    turned it over to other medical personnel, forensic

6    personnel, for examination.  That ties up the chain.

7            THE COURT:  Okay.

8            MR. LISENBY:  This would be exhibit 39, is what we

9    have marked as the order allowing that.

10           THE COURT:  That will be admitted as well.

11   **(WHEREUPON, A DOCUMENT WAS MARKED AS STATE EXHIBIT 39 FOR**

12   **IDENTIFICATION AND WAS ADMITTED.)**

13           THE COURT:  Anything else?

14           MR. GIBBS:  State calls Jeff Blackstone.

15                      **JEFF BLACKSTONE**

16       **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

17        **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

18                   **TESTIFIED AS FOLLOWS:**

19                   **DIRECT EXAMINATION**

20   BY MR. GIBBS:

21   Q    Tell us your name, please?

22   A    Jeffery Keith Blackstone.

23   Q    And, how are you employed?

24   A    I am the chief investigator with the Chambers County

25   Sheriff's Department.

1  Q    How long have you been so employed?

2  A    As chief investigator I have been since January.   I

3  have been in investigations for about five years.

4  Q    How long have you been in law enforcement total?

5  A    Nine-and-a-half years.

6  Q    Now, as chief investigator with the sheriff's

7  department, what are your duties?

8  A    I oversee the investigators that work for us, general

9  investigation is what we usually cover.

10  Q    I'm directing your attention to January 12th of 2000.

11  Can you recall that day for me?

12  A    Yes, I can.

13  Q    Did you become involved in the investigation of the

14  deaths of Angela and Rodney Brown?

15  A    Yes.

16  Q    Tell us how you became involved.

17  A    I received a dispatch call on the radio, a possible two

18  dead bodies at 1010 County Road 249.  I arrived at that scene

19  approximately 4:29 central time.

20  Q    Now, this area, 1010 County Road 249, what is that area

21  referred to as?

22  A    The Welch community.

23  Q    And, is that Welch community here in Chambers County?

24  A    Yes, it is.

25  Q    Tell us what you saw and what you did when you arrived

1  at the scene?

2  A    When I arrived, I saw that the deputies had already

3  roped off the scene.  Deputy Parrish, Sgt. Finley, and Deputy

4  Arnold were there.  And, shortly after I got there, I

5  believe, Mike Looser came up two or three minutes later.  We

6  went in and viewed the scene.

7  Q    So, the scene was already roped off and secured when

8  you got there?

9  A    That's right.

10  Q    You say you walked through the area.  Tell us what you

11  did and what you saw.

12  A    When I walked in, I saw a black male, face down to the

13  left of me, and a black female laying on the couch face up.

14  I proceded on through the trailer to secure the scene myself.

15  And, once I got through with that, I walked out and Chief

16  Investigator Looser ....

17  Q    When you were walking through the house yourself, what

18  were you looking for?

19  A    Anybody that the deputy might have missed.  I just

20  wanted to make sure myself that I had a secure scene.

21  Q    That nobody else was in the house.

22  A    Nobody else was in the house.

23  Q    After you secured the scene to your satisfaction, what

24  did you do?

25  A    I walked out.  Chief Investigator Looser, he, notified

1    the crime lab and we waited.

2    Q    To your knowledge, did you, or anyone, move the bodies

3    or move any items of evidence?

4    A    No.

5    Q    Did you step on anything or break anything?

6    A    No, sir.

7    Q    Did y'all contact anyone else to come to the area?

8    A    Buivids actually called me and wondered if he could

9    help.  I said yes come on up and he came up.  Other than the

10   crime lab, and ABI, the coroner.

11   Q    Do you know the name Agent Chuck Wright?

12   A    Yes, I do.

13   Q    Who is Agent Chuck Wright?

14   A    He's a member of the Alabama Bureau of Investigation.

15   Q    Did he come out there to assist that evening?

16   A    Yes, he did.

17   Q    Did you do anything else that night at the scene?

18   A    I questioned several people that Deputy Arnold had

19   placed in my vehicle.  I questioned those people.  Jerome

20   Cofield and different people.

21   Q    How long did you remain at the scene?

22   A    I remained there for about four hours the first time.

23   Then I left and come back.  Then we was there until about

24   3:30 or 4 o'clock.

25   Q    Did you do anything else that night?

```
 1   A     Not that I can remember.

 2   Q     Okay.  Let's talk about the 13th.  The following day.

 3   You were actually there the morning of the 13th, were you

 4   not?

 5   A     Yes, sir.

 6   Q     Did you come back to work later on that next morning?

 7   A     Yes, I come back that next morning.

 8   Q     Did you receive any information with regard to the

 9   investigation?

10   A     We had left a deputy up there, I believe it was Mike

11   Parrish, and he had seen a vehicle come through.

12   Q     Let me ask you this.  Did you receive information with

13   regard to the weapon you were looking for?

14   A     Oh, yes, we was looking for a possible .38 Colt, .357

15   Colt, somewhere in that nature.

16   Q     Now, investigation-wise what were you doing at this

17   time point?

18   A     We are trying to find leads, interviewing people, just

19   basically -- mainly interviews at that time.

20   Q     Now, I direct your attention to January 14th of 2000,

21   did you come in contact with Tyrone Hatcher in the course of

22   your investigation?

23   A     Yes, I did.

24   Q     Who is Tyrone Hatcher?

25   A     He actually, by my determination, didn't have anything
```

1    to do with any of it.  I had some information that his car,

2    which was, I believe, a white Mustang, was seen coming

3    through the area.

4    Q    All right.

5    A    I found out that who owned the white Mustang was Tyrone

6    Hatcher, so I went to his house.

7    Q    And did you recover any evidence from Tyrone Hatcher?

8    A    Yes, sir, I did.  I recovered a .357 Magnum Colt.

9    Q    Now, was this consistent with the type of weapon that

10   you were told to look for?

11   A    Yes, sir.

12   Q    Who told you what type weapon to look for?

13   A    I believe Kathy Richert if I'm mistaken.

14   Q    Who is Ms.  Richert?

15   A    She's with the Department of Forensic Sciences .

16   Q    What type of weapon were you looking for?

17   A    .38 Colt or possibly a .357, somewhere in that nature.

18   Q    So, you received a .357 from Mr. Hatcher; correct?

19   A    Yes.  Yes, sir.

20   **(WHEREUPON, A GUN WAS MARKED AS STATE EXHIBIT 36 FOR**

21   **IDENTIFICATION.)**

22   MR. GIBBS:

23   Q    I am showing you what has been marked for

24   identification purposes as State's Exhibit number 36.  Do you

25   recognize that exhibit?

 1    A    Yes, sir.  It is my writing on this envelope.

 2    Q    And, what is exhibit 36?

 3    A    It is a .357 caliber Trooper Mark V.  Tyrone Hatcher's

 4    handgun.

 5    Q    This is the one you received from Tyrone Hatcher;

 6    correct?

 7    A    Yes.

 8              MR. GIBBS:  State moves to admit Exhibit 36.

 9              THE COURT:  Admitted.

10              MR. KEITH:  Objection, Your Honor.  Tyrone Hatcher

11    had a handgun he owned that wasn't involved in this event.

12    We object on the ground of relevancy of a handgun being

13    admitted in evidence that has nothing to do with the offense

14    charged.

15    (WHEREUPON, A SIDE BAR COMMENCES.)

16              THE COURT:  What handgun is this?

17              MR. GIBBS:  This is the gun collected from Tyrone

18    Hatcher collected two days after.

19              MR. LISENBY:  There were three weapons sized during

20    the course of this investigation.  This is one of the weapons

21    that was seized for ballistic examination.

22              THE COURT:  No ballistic exam?

23              MR. LISENBY:  There was a ballistic exam.

24              THE COURT:  And it was excluded?

25              MR. LISENBY:  This particular one was excluded as I

1   recall.  There as one excluded and there one that was listed

2   as possible.  I have forgot the exact phrase.  It is

3   included.  And, then the weapon that was seized from the

4   defendant's residence is also listed as having similar

5   microscopic characteristics.

6        The purpose of offering this is to show that there was

7   an ongoing investigation and weapons were seized.

8              THE COURT:  I'm going to let you go ahead.

9   Overruled.

10             MR. GIBBS:  With regard to Exhibit 36 was similar

11  in characteristics to this gun.

12             THE COURT:  Overruled.

13  (WHEREUPON, A SIDE BAR COMMENCES  CONCLUDES.) .

14             MR. GIBBS:  The State moves to admit number 36.

15             THE COURT:  Admitted.

16             MR. KEITH:  Same objection, Your Honor.

17  **(WHEREUPON, A GUN MARKED AS STATE EXHIBIT 36 WAS ADMITTED.)**

18  MR. GIBBS:

19  Q    Would you check and make sure this is not loaded.

20       Were any bullets collected with this gun?

21  A    Yes, sir.  Six live rounds were collected with the

22  holster.

23  Q    Are those six live rounds or the live rounds in that

24  envelope?

25  A    Yes, they are.

*** Frances L. Roark ***

```
 1   Q      What did you do with that gun that you recovered from
 2   Tyrone Hatcher?
 3   A      I turned it over to ABI Chuck Wright for laboratory
 4   examination.
 5   Q      When you turned it over to Chuck Wright was it in the
 6   same, or substantially the same, condition as when you first
 7   received it?
 8   A      Yes.
 9   Q      And, did you later receive this gun back from Agent
10   Wright?
11   A      Yes, I did.
12   Q      During the course of your investigation, did you become
13   aware of a guy named Quinton Oliver?
14   A      Yes.
15   Q      And, who was Quinton Oliver?
16   A      He was a friend of Jason Holloway and Rodney Brown.
17   Q      And, I want to direct your attention to January the
18   19th of 2000, and ask if you went to the home of Quinton
19   Oliver?
20   A      Yes, I did.
21   Q      Why did you go to the home of Quinton Oliver?
22   A      To recover a handgun.
23   Q      Tell us what happened when you got to his house.
24   A      I got to his house.  He was not there.  His mother was
25   there.  I spoke with her.
```

1  Q     What was her name?  Do you recall?

2  A     Mattie Trammell I believe.

3  Q     That's correct?

4  A     I advised her what I was there for:  I had information

5  that Quinton might have a .38 caliber gun.  And she advised

6  me that he didn't but the grandfather Roy Oliver did.

7  Q     And did you retrieve a gun from the Oliver family?

8  A     Yes, I did.  From Mr. Roy Oliver's wife.  I believe it

9  was Annette Oliver.

10 Q     What kind of gun did you recover?

11 A     .38 Colt.

12 Q     And, again was this consistent with the type of gun

13 that Kathrine Richert told y'all to look for?

14 A     Yes, it was.

15 **(WHEREUPON, A GUN WAS MARKED AS STATE EXHIBIT NUMBER**

16 **35 FOR IDENTIFICATION.)**

17 MR. GIBBS:

18 Q     Now, I am showing what has been marked for

19 identification purposes as State's Exhibits number 35.  Take

20 a look at this exhibit and tell me if you recognize it.

21 A     Yes, sir.  This is the .38 caliber revolver belonging

22 -- actually belongs to Roy Oliver.  I sealed it in this

23 envelope.

24 Q     And, would you make sure this is not loaded, please.

25 And, this is a gun you collected from whom?

```
 1  A     Roy Oliver.  Annette Oliver actually signed the gun

 2  over to me.

 3            MR. GIBBS:  State moves to admit Exhibit number 35.

 4            MR. KEITH:   Objection on the grounds of relevance,

 5  Your Honor.

 6            THE COURT:  Admitted.

 7  (WHEREUPON, A GUN MARKED AS STATE EXHIBIT NUMBER  35 WAS

 8  ADMITTED.)

 9  MR. GIBBS:

10  Q     What, if anything, did you do with this Colt .38 that

11  you received?

12  A     Once I received the gun, I immediately turned it over

13  to Agent Wright, which we submitted to the lab for analysis.

14  Q     Now, when you turned this weapon over to Agent Wright,

15  was it in the same, or substantially the same, condition as

16  when you first received it?

17  A     Yes, it was.

18  Q     I am going to direct your attention to January the 21st

19  of 2000.  I am going to ask:  Did you go to the defendant's

20  home that day?

21  A     Yes, I did.

22  Q     Why did you go there?

23  A     To recover a handgun.

24  Q     And, do you recall about what time it was that you went

25  to his residence or when you left for his residence?
```

| 1 | A | Around 2:30. |

2    Q    P.m. or a.m.?

3    A    Two-thirty p.m. central time.

4    Q    Where did the defendant live at that time?

5    A    He lived at 1011 County Road 250, which is directly

6    across from 1010 County Road 249.  The roads intersect.

7    Q    Where did he live in relationship to the victims,

8    Angela and Rodney lived?

9    A    How close did he live to them?

10   Q    Where did he live in relationship to them?

11   A    Across the road.

12   Q    Right across the road. Do you know who he was living

13   with at that time?

14   A    His foster mother.

15   Q    Her name would have been?

16   A    Marie Collier.

17   Q    Now, tell us what happened when you got to the

18   defendant's home on January the 21st of 2000.

19   A    Once I got there, I went to the door and knocked on the

20   door, and I believe it was Jason that come to the door, and

21   asked him was his mother in, and she came to the door.

22   Q    Keep your voice up, please.

23   A    I asked him where his mother was and she came to the

24   door.  And, she invited me in.  We sat down.  I told her I

25   had some information that she possibly owned a handgun.  And

1    she said that's right.  And, I asked her did she have a

2    problem with me looking at the handgun?

3    Q    What was her response?

4    A    She'd do anything she could do to help.

5    Q    Now, are you inside the house at this time?

6    A    Yes, sir, sitting down with her.

7    Q    In what particular area of the house are you sitting

8    in?

9    A    We are in the living room and I am sitting -- she is

10   facing me to my left and Jason is facing me to my right.  We

11   are all sitting in the living room.

12   Q    All three of you are sitting there including the

13   defendant.

14   A    That's right.

15   Q    Okay.  Now, Ms. Collier had agreed to let you take a

16   look at this weapon; is that right?

17   A    That's right.  I explained to her I had already

18   recovered two more and she had no problem with it.

19   Q    Did you get Ms. Collier to sign anything before you got

20   this gun?

21   A    Yes, sir, a consent to search form.

22   Q    I'm showing you what has been marked for identification

23   as purposes at State's Exhibit number 41.

24   **(WHEREUPON, A DOCUMENT WAS MARKED AS STATE EXHIBIT NUMBER  41**

25   **FOR IDENTIFICATION.)**

1   MR. GIBBS:

2   Q    Do you recognize that exhibit?

3   A    Yes, sir.  It is a copy of the Voluntary Consent to

4   Search form.

5   Q    That was signed by Ms. Collier?

6   A    Yes, sir.

7   Q    What does it give you permission to search?

8   A    It says Voluntary Consent to Search Premises for Gun.

9   Q    Okay.  And, is that your signature at the bottom?

10  A    Yes, it is.

11  Q    A long with Ms. Collier's?

12  A    Yes, it is.

13        MR. GIBBS:  State would move to admit Exhibit 41.

14        THE COURT:  Admitted.

15  **(WHEREUPON, A DOCUMENT MARKED AS STATE EXHIBIT NUMBER**

16  **41 WAS ADMITTED.)**

17  MR. GIBBS:

18  Q    What did Ms. Collier do after she told you that you

19  could look at the gun and signed the consent form?

20  A    She went to her bedroom to get the gun and I went with

21  her, and we got the gun and come back.

22  Q    Let me ask you something.  You got up and followed her

23  to her bedroom; is that correct?

24  A    Yes, sir.

25  Q    Where was the defendant and what did he do when you got

1    up and followed her?

2    A      At the time, he stayed in the living room.  But, right

3    before we got up, he kind of jumped up in anger mode and he

4    said, "I am tired of this shit," and then he sat back down.

5    Q      Then he sat back down.  You say he was angry at this

6    point?

7    A      That's right.

8    Q      Tell me what happened when you followed Ms. Collier?

9    A      We went to the bedroom and she opened the second

10   drawer, I believe to her dresser, and pulled out a gun that

11   was wrapped in a brown paper sack, and I believe that's when

12   we went back to living room.

13   Q      What did she do with this gun?

14   A      She handed it to me then.

15   Q      What type of gun was it?

16   A      .38 Colt.

17   Q      And, again, was this gun consistent with the type of

18   weapon that Kathy Richert asked you to be on the look out

19   for?

20   A      Yes, it was.

21   Q      Now what happened -- well, let me ask you this:  Was

22   the gun loaded when you got it from her?

23   A      No, it wasn't.

24   Q      Were there any bullets at all.

25   A      There wasn't any with the gun right then.  I asked her

1  about the bullets.

2  Q     What happened?

3  A     She opened the top dresser drawer and there was two.

4  Q     Okay.  So, the gun was in the second drawer.

5  A     That's right.

6  Q     And, the bullets were in the first or top drawer,

7  separate from the gun, and they were how many bullets?

8  A     Two .38 shells, live rounds.

9  (WHEREUPON, A GUN WAS MARKED AS STATE EXHIBIT NUMBER 38 FOR

10  IDENTIFICATION.)

11  MR. GIBBS:

12  Q     Investigator, I am showing what's been marked for

13  identification purposes as State's Exhibit number 38.  Do you

14  recognize this exhibit?

15  A     Yes, I do.

16  Q     Okay.  What is that exhibit?

17  A     This is the bag and the gun that I recovered from

18  Ms. Collier.

19  Q     And, that gun is unloaded; correct?

20  A     This gun is unloaded.

21  Q     And, this is the bag that it was in?

22  A     It was in that bag.

23  Q     Okay.  And, you put the gun and the bag in this big

24  envelope; correct?

25  A     I turned this gun over to Agent Wright and he would

```
 1   have put it in the envelope.

 2             MR. GIBBS:   State moves to admit exhibit 38, Your

 3   Honor.

 4             THE COURT:   Admitted.

 5   (WHEREUPON, A GUN WAS MARKED AS STATE EXHIBIT NUMBER

 6   38 WAS ADMITTED.)

 7             THE COURT:   Exhibit 38, is that the number of it?

 8             MR. GIBBS:   That's the number of this gun; yes,

 9   sir.

10   MR. GIBBS:

11   Q    Now, you have previously stated that the defendant did

12   not come into the bedroom initially with you and Ms. Collier.

13   A    No, he didn't.

14   Q    Did he come in at any time you were back there?

15   A    Not that I remember.

16   Q    Now, tell us what happened after Ms. Collier gave you

17   the bullets and the gun?

18   A    While I was sitting, talking to her in the living room,

19   going over the consent form and all of that, he got up and

20   asked his mother had she checked the mail.

21   Q    So, now I take it at some point, y'all left the bedroom

22   where the gun was.

23   A    That's right.   We come to the living room.

24   Q    Where was the defendant at the this point?

25   A    He was still sitting in the living room.
```

1    Q    He said something to his mother.  What did he say?

2    A    Had she checked the mail yet?  And, she said no.

3    Q    Tell us what happened.

4    A    He got up and went to his bedroom.  And, when he come

5    out of his bedroom, I was watching him as come out, he had

6    both hands in his jacket pockets and he went outside.

7    Q    Now, at any point in his presence had you shown him the

8    gun that you had come out of the bedroom with?

9    A    Yes, sir.

10    Q    At what point did you do that?

11    A    That was right after I come out with the gun.  I pulled

12    it out and he saw it and immediately thereafter he kind of

13    excused hisself to check the mail.

14    Q    Okay.  Now, he went -- when he got up to go check the

15    mail, as you described it, where did he first go?

16    A    He first went to his bedroom which is directly across

17    from Ms. Collier's room, which was to the left of us, left of

18    me.

19    Q    How long did he stay back there?

20    A    A short time.  A minute at the most.

21    Q    And he came out.

22    A    Yes, sir.

23    Q    What happened when he came out?

24    A    He had both of his hands in his pockets.

25    Q    Did he do anything else?

1   A       He walked straight out and went to the door and went

2   out the back door.

3   Q       How long did he stay out?  Did he ever come back

4   inside?

5   A       He come back in after about five minutes.  He was out

6   about five minutes.

7   Q       How was he acting when he came back?

8   A       He was nervous, you know.  I could tell he was nervous,

9   but other than that ....

10  Q       Did he still appear to be angry?

11  A       He didn't appear to be angry anymore.

12  Q       Did he have any mail when he came back in?

13  A       I didn't see any mail.

14  Q       What did you do next?

15  A       I finished up with Ms. Collier and left the house.

16  Q       You did what, now?

17  A       I finished talking to Ms. Collier and then I left.

18  Q       Now, in regard to this weapon here exhibit 38, did you

19  turn it over to someone?

20  A       Chuck Wright.

21  Q       And, when you turned it over to Chuck Wright, was it in

22  the same, or substantially the same, condition as when you

23  first received it?

24  A       That's correct.

25  Q       Now, did you leave his residence at this point?

```
 1   A    Yes, I did.

 2   Q    Do you remember where he was when you left the

 3   residence?

 4   A    He was still in the living room.  He come and sat in

 5   the living room when I left.

 6   Q    When you left with the gun, where were you going?

 7   A    I was coming back to LaFayette to our office.

 8   Q    What, if anything, happened while you were enroute back

 9   to LaFayette?

10   A    Chief Investigator Looser called me and asked how

11   everything was going.  I told him I had collected the gun.

12   And he said would you go back and see if Jascon will come

13   here and talk to us.

14   Q    And, did you do that?

15   A    Yes, I did.

16   Q    Tell us what you did.

17   A    I went back and knocked on the door.  Jason come to the

18   door and I asked Jason did he mind coming to LaFayette to

19   talk to us about the gun.

20   Q    And, what did he say?

21   A    He didn't mind.

22   Q    Did he say anything to his mom?

23   A    I believe he told her he'd be back after a while.

24   Something of that nature.

25   Q    So, he leaves with you --
```

```
 1   A     That's right.

 2   Q     -- headed back to the investigators' office.

 3   A     Yes, he does.

 4   Q     Now, how do you get back to the investigators' office?

 5   A     He gets in the passenger side and we drive down 431

 6   toward LaFayette in my car.

 7   Q     Where did you say the defendant was sitting in your

 8   car?

 9   A     On the passenger side seat.

10   Q     In front or back?

11   A     Front.

12   Q     Is he under arrest at this point?

13   A     No.

14   Q     Is he in handcuffs at this point?

15   A     No, he's not.

16   Q     Now, where is the investigation office that you are

17   headed to?

18   A     In LaFayette.  Here in LaFayette beside the jail.  It

19   is located in, like, double-wide trailer.

20   Q     So you were traveling in your car --

21   A     That's right.

22   Q     -- back to LaFayette?

23   A     That's right.

24   Q     How long did it take you to get back here?

25   A     Fifteen to 20 minutes.
```

*** Frances L. Roark ***

```
 1  Q     Now, tell us what's going on in that car while you are
 2  traveling back.
 3  A     We start back and Jason was having all the
 4  conversation.  I told him to wait until we get back to the
 5  office.
 6  Q     Were you asking him any questions?
 7  A     No, I wasn't.
 8  Q     He was just talking.
 9  A     That's right.
10  Q     Tell me what he was saying.
11          MR. BLANCHARD:  Your Honor, I object.  May we
12  approach?
13          THE COURT:  Yes.
14  (WHEREUPON, A SIDE BAR COMMENCES.)
15          MR. BLANCHARD:  I take it you are about to go to
16  that area we talked about earlier?  About the lie?
17          THE COURT:  Correct.
18          MR. BLANCHARD:  Judge, knowing, based on the kind
19  of question he just asked, the objectionable information
20  could come out any minute based on that question.  We are
21  talking about the lie detector situation.
22      I object based on the Fifth, Sixth, Eighth, and
23  Fourteenth Amendments of the Constitution of the United
24  States, plus all the other state and federal constitutions
25  principles outlined in our memorandum that we have all
```

1  referenced and understand what we're talking about.  I just

2  want it clear that we do object to that testimony.

3         THE COURT:  So noted.

4  (WHEREUPON, A SIDE BAR CONCLUDES.)

5  MR. GIBBS:

6  Q     Tell us what the defendant was saying in the car.

7  A     We started down the road and Jason was wanting to talk.

8  I told him to wait until the office to talk.  And, he said,

9  "Jeff, that lie detector test I told you I would take, he

10 said, if I took right now, I would blow it off the wall."

11 Q     Okay.

12 A     I said, "Okay, smoke this cigarette.  Let's get to the

13 office.  Just wait until we to get to the office and then

14 we'll talk about it."

15        He said, "You know that gun you got," I was just trying

16 not to ask him anything.  He said, "My daddy killed hisself

17 with that gun."

18        First, he asked me how long would it take me to get my

19 Ballistics test back on it.  I said it shouldn't take too

20 long.

21        Then he said, "Well, my daddy killed hisself with that

22 gun."

23 Q     Okay.  So, you gave him a cigarette to smoke?

24 A     He got a cigarette.

25 Q     Okay.  You were just trying to get back to the

*** Frances L. Roark ***

1   investigators' office quick as you can; right?

2   A    Yes, I was.

3   Q    All right.  Tell us what happened when you and the

4   defendant finally arrived here in LaFayette at the

5   investigators' office.

6   A    Once we got to LaFayette, we went inside and I pointed

7   to -- it was George Melton's office, another one of our

8   investigators, and Jason went there and sat down and then ABI

9   Chuck Wright and my -- Chuck and Mike and gave Chuck the gun

10  and Mike wanted me to go get some Cokes for everybody.  So, I

11  left to go get Cokes.

12  Q    Now, when you left to go to get Cokes, where was the

13  defendant?

14  A    He was in George Melton's office which -- he was by

15  hisself in that office.

16  Q    By himself.  Where did you have to go to get these

17  Cokes?

18  A    Up to the Spectrum which is about, I would say, 500

19  yards away from the investigators' office.

20  Q    About how long were you gone?

21  A    Ten minutes.

22  Q    And you came back with the Cokes?

23  A    Yes, I did.

24  Q    Tell us what was going on when you returned with these

25  Cokes?

1   A   When I returned the door was shut.  So I opened it.

2   And I seen Mike and Chuck.

3   Q   First of all, which door was shut?

4   A   George Melton's office.

5   Q   Was that the room you left the defendant in?

6   A   That's the room I'd left the defendant in.

7   Q   So, the door was shut at this point when you returned.

8   A   That's right.

9   Q   You were about to say what happened.

10  A   When I opened the door, Mike held his arm up, hand up,

11  I knew not to go in then.

12  Q   So, what did you do?

13  A   I backed out and went to my office.

14  Q   What do you recall happening next?

15  A   Mike come out a few minutes later and told me to go

16  back to the Collier house and he gave me a description of a

17  knife and where to find it.

18  Q   So, what did you do?

19  A   I left along with Sgt. Finley and we went back to

20  Ms. Collier's house.  We spoke to Ms. Collier.  Got a Consent

21  to Search form.  Told her what we was after.  I found the

22  knife exactly where Mike told me it was going to be under the

23  kitchen sink.

24  (WHEREUPON, A DOCUMENT WAS MARKED AS STATE EXHIBIT NUMBER 42

25  FOR IDENTIFICATION.)

1  MR. GIBBS:

2  Q    I am showing what has been marked for identification

3  purposes as State's Exhibit number 42.  Do you recognize that

4  exhibit?

5  A    Yes, I do.

6  Q    What is State's Exhibit number 42?

7  A    It is a copy of the voluntary consent to search

8  premises.

9  Q    And, that's the form that was signed by Marie Collier?

10  A    That's right.

11  Q    And, it gave you permission to search the residence?

12  A    That's right for a knife.

13        MR. GIBBS:  State moves to admit Exhibit number 42.

14        THE COURT:   Admitted.

15  **(WHEREUPON, A DOCUMENT MARKED AS STATE EXHIBIT 42 WAS**

16  **ADMITTED.)**

17  MR. GIBBS:

18  Q    Now, Investigator Blackstone, were you told where to

19  look for this knife?

20  A    Yes, I was.

21  Q    Where were you told to look?

22  A    Under the kitchen sink.

23  **(WHEREUPON, PHOTOGRAPHS WERE MARKED AS STATE EXHIBITS NUMBERS**

24  **43 AND 44 FOR IDENTIFICATION.)**

25  MR. GIBBS:

 1    Q      I am showing what's been marked for identification

 2    purposes as State's 43, 44, and 45.  Do you recognize those

 3    exhibits?

 4    A      Yes, I do.

 5    Q      And, what are State's exhibits 43, 44, and 45?

 6    A      Forty-three is a picture of the sink, bottom cabinet

 7    doors open, and the location where the knife was.

 8    Q      Collectively what are these photographs of, generally?

 9    A      The knife, the kitchen of Ms. Marie Collier.

10    Q      Do those exhibits 43, 44 and 45 fairly and accurately

11    depict the knife and area where it was recovered from?

12    A      Yes, they do.

13           MR. GIBBS:  The State moves to admit Exhibits

14    numbers 43, 44 and 45

15           THE COURT:  Admitted.

16    **(WHEREUPON, PHOTOGRAPHS MARKED AS STATE EXHIBITS 43, 44 AND**

17    **45 WERE ADMITTED.)**

18    MR. GIBBS:

19    Q      With regard to Exhibit number 43, can you show us what

20    is pictured in this photograph?

21    A      Yes.  This is the area of the kitchen sink.  The bottom

22    of the kitchen sink, and here is a bucket, right here, and

23    here is the knife.

24    Q      That's exhibit 44.  What is showing in that exhibit?

25    A      The same bucket and the knife.  The handle of the

1    knife.

2    Q    And final exhibit 45?

3    A    This is the knife that I recovered from Ms. Collier's

4    house under the sink.

5    **(WHEREUPON, A KNIFE WAS MARKED AS STATE EXHIBIT NUMBER  37 FOR**

6    **IDENTIFICATION.)**

7    MR. GIBBS:

8    Q    Investigator Blackstone, I'm showing what's been marked

9    for identification purposes as State's Exhibit 37.  Do you

10   recognize this exhibit?

11   A    It is going to be the knife that I recovered.

12   Q    Would you please open it for me.  And, what is that

13   exhibit?

14   A    This is the knife that I recovered from under the sink

15   of Ms. Collier's residence that I was sent to recover.

16            MR. GIBBS:  State moves to admit Exhibit number 37,

17   Your Honor.

18            THE COURT:  Admitted.

19   **(WHEREUPON, A KNIFE MARKED AS STATE EXHIBIT 37 WAS ADMITTED.)**

20   MR. GIBBS:

21   Q    Did you later turn that knife over to Agent Charles

22   Wright?

23   A    Yes, I did.

24   Q    Was the knife in the same, or substantially the same,

25   condition as when you first received it?

1    A    Yes, it was.

2    Q    I am going to direct your attention, now, to January

3    31st of 2000.  Can you recall that date for me?

4    A    Yes, sir.

5    Q    On that day, while in the driveway of Luella

6    Patterson's home did you discover any items of evidence in

7    connection with this case?

8    A    Yes, sir.

9    Q    Tell me what items you discovered.

10   A    Seven pairs of women's panties.

11   Q    Tell us how it is that you came to discover these seven

12   pairs of panties.

13   A    I was speaking with Ms. Patterson and Sandra Patterson

14   that day.  And, as I was leaving, I was sitting in my car.

15   Q    Let me stop you.  You were sitting in your car where?

16   A    Behind Ms. Patterson's residence.

17   Q    Ms. Patterson, where does she live in connection with

18   the defendant Jason Holloway?

19   A    She lives in basically the same house.  It's a duplex

20   house.  It is two apartments.  She lives -- facing it, she'd

21   be in the one to the right.  They'll to be the left.

22   Q    So, if you are facing this duplex, Ms. Patterson's side

23   is to the right and the defendant's side is to the left.

24   A    That's right.

25   Q    And, which side of the house, Ms. Patterson's side or

 1  the defendant's side is closest to the home of the victims,

 2  Angela and Rodney Brown?

 3  A     Ms. Patterson's side.

 4  Q     The house that is across the street on this side?

 5  A     Right.  That's correct.

 6  Q     So, now you had just -- you were -- had been talking to

 7  Ms. Patterson according to your testimony.

 8  A     That's correct.

 9  Q     Tell us what happened.

10  A     As I was leaving, I got in my car and I was sitting

11  there, and I was looking across the yard, and on past the

12  Holloways there's a fence that runs along beside the

13  property.  I could see something hanging in the trees.  And I

14  got a closer look, and I noticed it was women's panties.  So,

15  I asked Ms. Patterson did those panties belong to her or her

16  daughter?  She said no.  So I collected the panties.

17  Q     Investigator I am showing you what have been marked for

18  identification purposes as State's exhibits 46, 47, 48, and

19  49.  Do you recognize those exhibits?

20  A     Yes, I do.

21  Q     And what are State's 46, 47, 48, and 49?

22  A     They are pictures of the panties hanging in the trees.

23  Q     Do those exhibits fairly and accurately depict the

24  panties as you recall them on that day?

25  A     Yes, they do.

1          MR. GIBBS:  State moves to admit 46, 47, 48 and 49.

2          MR. BLANCHARD:  Objection, Your Honor, relevance,

3    Rule 402 and 403.  There hasn't been any connection shown to

4    this case of this evidence, and we object to grounds of

5    relevance and all other grounds enumerated in our previous

6    memoranda.

7          THE COURT:  Counsel, approach.

8    (WHEREUPON, A SIDE BAR COMMENCES.)

9          THE COURT:  All right.  Isn't this the same

10   objection that you are making as far as specific bad acts,

11   but not done, tied, or connected -- excuse me, not bad acts.

12   You are saying it is simply irrelevant and inadmissible?

13         MR. BLANCHARD:  Prejudicial.

14         THE COURT:  Prejudicial.

15         MR. GIBBS:  Your Honor, if you will recall the

16   testimony of Terri Zachary, I asked her if he showed her some

17   panties and she said they were mine, my sister's, and my

18   mother's.

19         MR. BLANCHARD:  That still does not connect it to

20   this case, Judge.

21         THE COURT:  That's what.

22         MR. LISENBY:  Let we ask it this way:  If we go --

23   I think the connection is going to come when Investigator

24   Blackstone takes a look at the diagram that's coming up.

25         THE COURT:   We're going to sustain at this time.

1   Objection sustained.

2           MR. LISENBY:    Hold on just a second, Judge.    I

3   need to finish my statement.    To make the connection, when he

4   looks at the diagram he's going to identify them because they

5   are in the same area as where the shell casings were found by

6   another officer.    And that officer, obviously, is going to

7   testify that Investigator Blackstone -- what I am wanting to

8   suggest is this.    Go ahead and allow Blackstone to identify

9   the panties.    And, then, when we get to Investigator Wright I

10  think that connection will be made.

11          THE COURT:    They just are not admitted at this

12  point.

13          MR. BLANCHARD:    Judge, I think by allowing him to

14  talk about them, show the pictures, that sort of thing the

15  harm is done.

16          THE COURT:    No, they are not going to be showing

17  anything.    He's going to ask a question about it and then

18  we're moving on.

19  (WHEREUPON, A SIDE BAR CONCLUDES.)

20          THE COURT:    Sustained.

21  **(WHEREUPON, A COLLECTION OF SEVEN PANTIES WERE MARKED AS**

22  **STATE'S EXHIBIT 4 FOR IDENTIFICATION.)**

23  MR. GIBBS:

24  Q      Investigator Blackstone, I am showing you what's been

25  marked for identification purposes as State's Exhibits number

*** Frances L. Roark ***

1   4.   Do you recognize this exhibit?

2   A   Yes, sir.  It contains seven pairs of women's panties.

3   Q   Okay.  And, are these the seven pairs of panties you

4   described previously as being in the trees?

5   A   That's right.

6   Q   Did you collect those items of panties?

7   A   Yes, I did.

8   Q   Are these items of panties that you collected?

9   A   Yes.

10   Q   And did you later turn those items of seven pairs of

11   panties over to Agent Chuck Wright?

12   A   Yes, I did.

13   Q   When you turned them over to Chuck Wright, were they in

14   the same, or substantially the same, condition as when you

15   first collected them?

16   A   Yes, they were.

17   **(WHEREUPON, A DIAGRAM WAS MARKED AS STATE EXHIBIT 50 FOR**

18   **IDENTIFICATION.)**

19   MR. GIBBS:

20   Q   Investigator Blackstone, I am showing you what has been

21   marked for identification purposes as State's Exhibit number

22   50.  Do you recognize this exhibit?

23   A   Yes, I do.

24   Q   What is it an exhibit of?

25   A   It is a diagram showing the property and the location

```
 1  of the house.

 2  Q     Whose house?

 3  A     Jason Holloway's and Luella Patterson's.

 4  A     That duplex you described; is that correct?

 5  A     That's correct.

 6  Q     Now, on here is the area where you discovered these

 7  panties shown?

 8  A     That's correct.

 9  Q     If you would, put this green sticker on the diagram

10  showing where you recovered the panties?

11  A     Yes.

12  Q     Did you later show those panties to anyone?

13  A     Yes, I did.

14  Q     Who did you show them to?

15  A     Terri and Tashia Zachary.

16  Q     Why did you show the panties to them?

17  A     I needed identification.  See if they belonged to her

18  or family members of Angela Brown?

19  Q     Were they able to identify the panties?

20        MR. BLANCHARD:  Objection, Your Honor.  Hearsay.

21        THE COURT:  Sustained.

22        MR. GIBBS: I have no further questions at this

23  point.  Defense counsel may have a few.

24        THE COURT:  Cross-examination.

25                      CROSS EXAMINATION
```

1  BY MR. BLANCHARD:

2  Q    Were you -- Investigator Blackstone, were you the

3  detective that arrested Jason Holloway when he was arrested?

4  I don't think we have gotten to that yet?

5  A    Mike Looser arrested Jason Holloway.

6  Q    Were you present when it happened?

7  A    Yes, sir.

8  Q    All right.  Did Jason do anything to resist that

9  arrest?

10  A    No, sir.

11  Q    Once he talked to Investigator Looser and told him what

12  was going on, was Jason cooperative with you?

13  A    Yes, sir.

14        MR. BLANCHARD:  I think those are all the questions

15  that I have at this time of this witness.

16        THE COURT:  You may step down.  Thank you, sir.

17  (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

18        THE COURT:  Call your next witness.

19        MR. LISENBY:  Give us just one moment.

20        THE COURT:  Certainly.

21        MR. LISENBY:  State calls in this case, Michael

22  Hitchcock.

23        THE COURT:  Speak up loudly enough so all the

24  members of the jury on the back row can hear and understand

25  you.

1       MICHAEL HITCHCOCK.

2       HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

3       THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

4       TESTIFIED AS FOLLOWS:

5       DIRECT EXAMINATION

6   BY MR. LISENBY:

7   Q    Tell me your name, please, sir.

8   A    Michael Lee Hitchcock.

9   Q    Where are you employed?

10  A    With the Alabama Department of Forensic Sciences,

11  Montgomery laboratory.

12  Q    What is your present position with the Department of

13  Forensic Sciences?

14  A    At present I am a forensic drug chemist with the

15  department.

16  Q    How long have you been employed with the Department of

17  Forensic Sciences?

18  A    Since 1994.  About nine years.

19  Q    How long have you been in the drug/chemistry area?

20  A    Since April of 2000.  Little over three years.

21  Q    Prior to that, what were your duties with the

22  Department of Forensic Sciences?

23  A    I was a forensic biologist.

24  Q    Tell me what forensic biologist is, please.

25  A    A forensic biologist is somebody that examines and

1    analyzes evidence of biological nature:  such as blood,

2    semen, or saliva.

3    Q    Can you tell us what education, training and experience

4    you have had to qualify you for that position?

5    A    Yes.  I have a bachelor's degree in biology from the

6    Citadel.  I have a Master of Science degree in chemistry from

7    the University of Alabama at Birmingham.  I received

8    extensive training in the field of forensic biology from the

9    Department of Forensic Sciences as well as the Federal Bureau

10   Investigation.  I have given several lectures in this area to

11   various colleges and universities and hospitals and things of

12   that nature.  And, I am an adjunct professor at Alabama State

13   University in Montgomery in the area of criminalistics.

14   Q    All right, sir.  When you receive items of evidence in

15   order to test for specific body fluids, I'm talking about

16   blood or semen, things of that nature; are there specific

17   tests that you perform on those items of evidence?

18   A    Yes, sir.

19   Q    Can you tell me about that, please?

20   A    In the case of semen for example, the first thing that

21   I would do is use, what I call an alternate light source, UV.

22   It is kind of a UV light that helps semen stains to kind of

23   glow in the dark to help me identify them.  Once I do that, I

24   would cut a little piece of the stain off and use a color

25   test to give me an idea if semen is present and then finally,

1  the last step, would be the actual visual confirmation of

2  spermatozoa or sperm, for short, looking at that under the

3  microscope.

4  Q     How about for blood?

5  A     For blood, blood is, obviously, visuable, unlike a

6  semen stain, so I obviously just our naked eye would be the

7  first thing.  Then I would use a different type of

8  presumptive test for blood known as TMD or

9  tetramethylenediamine is the technical name for that.  Once I

10 do that, I use a mircocrystal test to actually confirm the

11 presence of blood.

12 Q     Now with regard to this particular case, I want to

13 direct your attention to January the 14th of 2000, and ask in

14 regard to your case number 00MM00148 concerning Angela Brown,

15 do you have the occasion to receive some items of evidence

16 from Scott Belton with the Department of Forensic Sciences?

17 A     Yes, sir, I did.

18 Q     What items would that have been?

19 A     I received from Forensic Investigator Belton one sealed

20 sexual assault kit which contained various items of evidence.

21 Q     Now, with regard to the various items of evidence, did

22 you receive in that sexual assault kit an item identified to

23 you as vaginal swabs and smears from Angela Brown?

24 A     Yes, sir, I did.

25 Q     Can you tell me about the results of any tests that you

1  did on that.

2  A    Those vaginal swabs and smears were examined and

3  analyzed for the presence of semen, and they were found to be

4  positive for semen.

5  Q    Did you do something with regard to that item of

6  evidence for DNA analysis?

7  A    Yes, sir.  They were packaged and sealed and

8  transferred to the DNA section scientists in the DNA section.

9  Q    Would that have been Katerine McGeehan at that time?

10 A    Yes, sir.

11 Q    When you did that, were they in the same, or

12 substantially the same, condition as at the time you made the

13 transfer?

14 A    Yes.

15 Q    Did you also, in the sexual assualt kit, receive items

16 that were identified as rectal swabs and smears from Angela

17 Brown?

18 A    Yes, sir.

19 Q    Did you find anything there?

20 A    Those were examined for semen and those were negative

21 for semen.

22 Q    An item of evidence identified as oral swabs and smears

23 of Angela Brown, did you find anything there?

24 A    Those were examined for semen and those were negative

25 as well.

1  Q    An item of evidence identified as fingernail scrapings,

2  did you find anything there?

3  A    Those were examined and they were positive for

4  components of blood.  But, with fingernail scrapings, what

5  we're looking for is, if for example, someone scratches

6  somebody and some skin cells are embedded under those

7  fingernails, that is what we normally look for and those

8  failed to reveal those skin cells under the fingernails.

9  Q    All right.  Now, in regard to the same case on January

10 the 19th of 2000, did you have the occasion to receive some

11 items of evidence from Craig Bailey of the Department of

12 Forensic Sciences?

13 A    Yes, sir.

14 Q    With regard to one of those items, would that have been

15 a pillow, an item identified to you as a pillow?

16 A    That's correct.

17 Q    Did you perform any examinations on that item?

18 A    No, sir.

19 Q    Did you later return that item to, I believe, Agent

20 Chuck Wright with Alabama Bureau of Investigation?

21 A    Yes, sir, I did.

22 Q    With regard to the same case number, did you also

23 receive some items of evidence from Agent Charles Wright on

24 February 15th of 2000?

25 A    Yes, sir.

1    Q    In regard to that was one of the items seven pairs of

2    panties?

3    A    That's correct.

4    Q    Did you perform any examinations on those?

5    A    Yes, sir.

6    Q    What, if anything, did you find on those?

7    A    They were examined for the presence of blood and semen,

8    and they were negative for both blood and semen.

9    Q    All right, sir.  Now, I want to direct your attention

10   to your case number 00MM0147 concerning Rodney Brown, and I

11   ask if in connection with that case, on January the -- excuse

12   me, January 14th, pardon me, January 14th of 2000, did you

13   have the occasion to receive some item of evidence from Scott

14   Belton of the Department of Forensic Sciences?

15   A    Yes, sir, I did.

16   Q    What would that have been?

17   A    I received from Investigator Belton one sexual assault

18   kit which was identified to be from Rodney Brown.

19   Q    In regard to that kit, did you find there were

20   fingernail clippings or scrapings?

21   A    Yes, sir.

22   Q    Did you do any tests on that?

23   A    Yes, sir.  Those were examined as the previously nail

24   clippings and they were found to be positive for the

25   components of blood, but to look for the skin cells those

1   were negative for the skin cells as well.

2   Q    Did you also find in that kit an item identified as a

3   blood flake from the right back of Rodney Brown?

4   A    Yes, sir.

5   Q    What, if anything, did you find about that?

6   A    That was test for blood and was positive for blood.

7   Q    Did you also find an item listed a swabbings of the

8   back of Rodney Brown?

9   A    That's correct.

10  Q    Did you do any analysis on that?

11  A    That was also tested for the presence of blood and was

12  positive for blood as well.

13  Q    Did you collect any item there with regard to DNA

14  analysis?

15  A    Yes, sir.  I did collect the swab -- what was labeled

16  as swabbings of the back and that was transferred for DNA

17  analysis.

18  Q    Would that have also been to Katherine McGeehan?

19  A    Yes, sir.

20  Q    Were those items in the same, or substantially the

21  same, condition as when you performed your tests?

22  A    Yes, sir.

23  Q    In connection with this case on January 25th of 2000,

24  did you have occasion to receive an item of evidence from

25  Agent Charles Wright?

 1  A      Yes, sir.

 2  Q      And, would that have been what was described as a fixed

 3  blade survival knife?

 4  A      That's correct.

 5  Q      What, if any, analysis did you perform on that?

 6  A      The survival knife was testified for the presence of

 7  blood and was positive for components of blood on both sides

 8  of the blade of the knife.

 9  Q      Did you do anything with regard to that for DNA

10  analysis?

11  A      These possible blood stains that were just previously

12  tested were collected and transferred for DNA analysis.

13  Q      Would that also have been to Katherine McGeehan at the

14  Department of Forensic Sciences?

15  A      Yes, sir.

16  Q      Were they in the same, or substantially the same,

17  condition as when you performed your tests?

18  A      Yes, sir.

19  Q      Did you later return that knife to Agent Charles Wright

20  on February 2nd of the same year?

21  A      Yes, sir, I did.

22  Q      Was it in the same, or substantially the same,

23  condition, say, for whatever you did with regard to your

24  analysis?

25  A      Yes, sir.

1    Q    I would like to direct your attention to February 4th

2    of 2000, and ask if on that date you had the occasion to

3    receive an item of evidence from Kathrine Richert identified

4    as a softball bat.

5    A    Yes, sir.

6    Q    And what, if anything, did do you with that item?

7    A    The softball bat was examined for the presence of blood

8    and positive for blood.

9    Q    Did you do anything with regard to DNA analysis?

10    A    Some of the blood from the barrel of the bat was

11    collected and transferred for DNA analysis to Ms. McGeehan.

12    Q    Was that item in the same, or substantially the same,

13    condition as when you had done your tests?

14    A    Yes, sir.

15    Q    Did you later return that item, the softball bat to

16    Agent Charles Wright?

17    A    Yes, sir.

18    Q    And, was it in the same, or substantially the same,

19    condition except for whatever analysis you had performed?

20    A    Yes, sir.

21          MR. LISENBY:   Thank you, Mr.  Hitchcock, I believe

22    that's all I have.  Defense counsel may have some questions

23    for you.

24          THE COURT:  Cross-examination.

25                    **CROSS EXAMINATION**

1    BY MR. KEITH:

2    Q    How are you doing Mr. Hitchcock?

3    A    Fine, sir.  Thank you.

4    Q    I graduated from VMI.  That's how I know how they are

5    with the Citadel.

6        Mr.  Hitchcock, you testified about some fingernail

7    scrapings that you performed on the victims.

8    A    Yes, sir.

9    Q    And, is there any particular reason you would normally

10   take fingernail clippings?

11   A    Normally what we're looking for is some type of

12   exchange evidence.  For example, if somebody had clawed or

13   scratched somebody.  You'd be looking for the skin tissue

14   embedded under those fingernails.

15   Q    Would that indicate anything to you if found?

16   A    Well, if you found some type of skin tissue underneath

17   the nail that would indicate maybe some type of struggle or

18   clawing had taken place.

19   Q    And, you testified you found some blood.  Would that

20   have been Rodney's own blood under his fingernails?  Is that

21   basically what you know?

22   A    That's very common.  That's why we look for actual skin

23   cells.  It is common for a decedent in a homicide case to

24   have bleed under their own fingernails.

25   Q    You found no blood or tissue cells from Jason Holloway

*** Frances L. Roark ***

1  in either Rodney or Angela Brown under their fingernails?

2  A    That's right.  We found no skin cells in those

3  clippings.  That's correct.

4  Q    And, based on your earlier statement, it would be

5  reasonably safe to say that would be an indication of no

6  struggle between the parties?

7  A    Well, I can't say that.  I can say there was no clawing

8  that would embed that skin tissue under the nails.

9  Q    Clawing you would normally see during a struggle?

10 A    Correct.

11        MR. KEITH:  Thank you, sir.

12        THE COURT:  You may step down.  This witness is

13 excused.

14 (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

15        THE COURT:  Call your next witness.

16        MR. LISENBY:  Give us just a moment, Judge.

17        THE COURT:  Ladies and Gentlemen, I am going to

18 send you back to the jury room for five to ten minutes.  I'll

19 call you back in.

20 (JURY OUT)

21 (WHEREUPON, THERE WAS A BRIEF RECESS.)

22        THE COURT:  Bring them in.

23 (JURY PRESENT).

24        THE COURT:  Let the record reflect all jurors are

25 present, parties present, counsel present.

1    Ladies and gentlemen, I've got two more stipulations

2  that have been reached by the attorneys for the State and the

3  Defense.  It is very important that you understand that when

4  I say that I've got a stipulation between the attorneys, and

5  I read the stipulation to you, I want you to understand, and

6  it is very important that you understand, that that

7  stipulation stands as a fact proven.  There will not be

8  testimony, live testimony of two witnesses, two expert

9  witnesses, I believe, but there are facts that the State and

10 the Defense agree should be taken as true.  I am going to

11 read in the entirety two stipulations that will take the

12 place of the testimony of two expert witnesses.

13    Comes now the State of Alabama and the Defendant, Jason

14 Lee Holloway, by and through his attorneys the Hon. William

15 Blanchard and Richard Keith and enters into the following

16 stipulation of facts:  One, Gloria Walters, an employee with

17 the Alabama Department of Public Safety, latent print unit,

18 examined items of evidence for fingerprint analysis and is in

19 the chain of custody of items of evidence relative to the

20 said fingerprints analysis.

21    Specifically, Ms. Walters, received the following from

22 Agent Chuck Wright of the Alabama Bureau of Investigation.

23    A, one sealed bag containing a bloody bat;

24    B, one sealed cardboard box containing a wooden handle

25 butcher knife.

1    C, seven sealed paper bags each containing pieces of

2  Ceramic fragments.

3    D, one pair of sunglasses.

4    E, one bloody magazine.

5    F, one manila envelope containing three latent lifts

6  from the scene.

7    G, post-mortem finger and palm prints of Angela

8  Brown.

9    H, post-mortem finger and palm prints of Rodney Brown.

10    I, one .38 -- no, excuse me.  One Colt .38 caliber

11  police special pistol.

12    Three, Gloria Walters examined the above items of

13  evidence and her report stated that no latent prints of value

14  were found on the items of evidence.

15    Four, Gloria Walters returned all the items of

16  evidence except the three latent lifts taken from the scene

17  to Agent Charles Wright.

18    Five, pursuant to this stipulation, it will not be

19  necessary for Gloria Walters to testify as to the results of

20  her analysis or to her role in the above-listed items of

21  evidence.

22    The parties agree that the proper chain of custody

23  involving Ms. Walters receipt, maintenance, and control, and

24  subsequent delivery of the items of evidence has been

25  satisfied for purposes of this trial.

```
 1        Signed by all counsel for State and Defense.  That is
 2   Court Exhibit number 5, which is admitted in evidence and
 3   into the record.
 4   (WHEREUPON, A STIPULATION OF FACT WAS MARKED AS COURT EXHIBIT
 5   5 AND WAS ADMITTED.)
 6        THE COURT:  Now, Court exhibit 4, reads as follows:
 7        Stipulation:  Comes now the State of Alabama and
 8   the Defendant, Jason Lee Holloway, through his attorneys and
 9   enters into the following stipulation of facts.
10        One, Katherine McGeehan, a former employee with the
11   Alabama Department of Forensic Sciences is in the chain of
12   custody of items of evidence relative to DNA analysis.
13        Two, specifically, Ms. McGeehan received the following
14   from other employees of the Department of Forensic Sciences
15   or Alabama Bureau of Investigation.
16        A, vaginal swabs of Angela Brown.  That would be
17   specimens Q1 and Q2 of the FBI laboratory report.
18        B, blood standard of Angela Brown.  That would be the
19   Specimen K2 of the FBI lab report.
20        C, blood stain from knife blade.  That would be
21   Specimen Q3 of the FBI laboratory report.
22        D, blood stain from softball bat.  Specimen Q4 of the
23   FBI laboratory report.
24        E, swabbings of blood from Rodney Brown's back.  That
25   would specimens Q5 through Q8 of the FBI report.
```

1    F, blood standard from Rodney Brown.  Specimen Q1 of

2 the FBI lab report.

3    G, tube of blood from Jason Holloway.

4    Ms. McGeehan prepared a blood stain standard and that is

5 Specimen K3 of the FBI laboratory report.

6    Paragraph three.  On October 17th, 2000, Ms. McGeehan

7 shipped the above items of evidence to the Federal Bureau of

8 Investigation lab in Washington, D.C. via United Parcel

9 Service for DNA analysis pursuant to an agreement between the

10 Alabama Department of Forensic Sciences and the Federal

11 Bureau of Investigation.  The items were received by the

12 laboratory's evidence control unit on October 24, 2000.

13    Paragraph four, pursuant to this stipulation, it will

14 not be necessary for Katherine McGeehan to testify as to her

15 role in the above-listed items of evidence or specimens.  The

16 parties agree that the proper chain of custody involving

17 Ms. McGeehan's receipt, maintenance, control, and subsequent

18 delivery of the items of evidence or specimen has been

19 satisfied for purposes of this trial signed by trial counsel

20 for State and Defense.

21    Court Exhibit number 4 will be admitted into evidence

22 and is made part of the record in this case.

23    With that the attorneys may refer to the items -- excuse

24 me to the facts proven in this stipulation at any point in

25 the trial.  There will not be a necessitate for these two

1    witnesses to appear before you and to testify.

2    **(WHEREUPON, THE STIPULATION OF FACTS WAS MARKED AS COURT**

3    **EXHIBIT 4 AND WAS ADMITTED.)**

4              THE COURT:  With that you may proceed.

5              MR. GIBBS:  State calls Kathrine Richert.

6              THE COURT:  Speak loudly so all the jurors on the

7    back row can hear and understand you.

8         Take your witness.

9                          KATHRINE RICHERT

10         **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

11            **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

12                       **TESTIFIED AS FOLLOWS:**

13                       **DIRECT EXAMINATION**

14   BY MR. GIBBS:

15   Q    Tell us your name?

16   A    Kathrine Richert.

17   Q    And, how are you employed, Ms. Richert?

18   A    I'm employed with the Alabama Department of Forensic

19   Sciences, Montgomery Regional Laboratory.

20   Q    And how long have you been employed with the Department

21   of Forensic Sciences?

22   A    About seven years.

23   Q    And, what are your duties with the Department of

24   Forensic Sciences?

25   A    I am a forensic scientist specializing in firearms and

1   tool mark examination.

2   Q    Would you give us the benefit of your background,

3   training, and education that qualifies you to be a firearms

4   and tool marks examiner.

5   A    I have a bachelor's degree in science from the

6   University of Alabama at Birmingham.  I have trained

7   two-and-a-half years within the Alabama Department of

8   Forensic Sciences in the examination of firearm and tool mark

9   evidence.  I have attended two one-week courses put on by the

10  California Criminalist Institute.  I have attended seven

11  one-week training seminars put on by the Association of

12  Firearms and Tool Mark Examiners.  I have attended armour

13  courses put on by Glock, Smith and Wesson, Savage, Colt,

14  Sigma, and I have attended the FBI Firearms Instructor

15  School, and I am a certified instructor of rifles, pistols

16  and shotguns by the FBI.

17  Q    As a fire mark ....

18  A    Firearms and tools mark.

19  Q    Firearms and tools marks examiner, what are you asked

20  to do?

21  A    Basically, my job duties are that I look at fired

22  bullets and fired cartridge cases and try to relate those

23  back to a specific firearm.  We are also asked to look at the

24  clothing and try to determine a distance.

25  Q    You said you are required to look at fired bullets and

1    projectiles and relate them back to a particular firearm.

2    A     That's correct.

3    Q     What allows you to do this?

4    A     What we look -- the scientific principle we operate

5    under is that no two items are microscopically identical.    We

6    look at the -- with the fired bullet, the rifling in a

7    firearm, which marks the bullet when the bullet passes

8    through this firearm.    And, for a cartridge case, we look at

9    the microscopic marks left on that by either the breech

10   phase, the firing pin, the chamber marks, extractor and

11   ejector, and so forth.

12   Q     Is this akin to fingerprints with human people?

13   A     It is a common analogy used that every firearm has its

14   own fingerprint.

15   Q     Now, it is my understanding that as a projectile comes

16   out of a weapon, does something happen to that projectile as

17   it travels through the barrel of that weapon?

18   A     It is marked by the barrel of that weapon; yes, sir.

19   Q     These are the rifling characteristics that you talk

20   about.

21   A     That's correct.

22   Q     Now, when you look to make your comparisons, are there

23   a certain number of comparisons that you are looking for

24   before you can say that this projectile came out of this

25   weapon or what is your analysis based on?

*** Frances L. Roark ***

1  A     There is not a specific number of microscopic stride

2  that I am going for.  I am looking at the overall bullet to

3  determine if it is similar enough for me to call it a match.

4  Q     Now, in connection with this case, Ms. Richert, did you

5  receive some items of evidence from Mr. Scott Belton?

6  A     Yes, I did.

7  Q     Now, with regard to the subject Rodney Brown in this

8  case ....

9  **(WHEREUPON, PROJECTILES WERE MARKED AS STATE EXHIBITS NUMBERS**

10 **11 AND 12 FOR IDENTIFICATION.)**

11 MR. GIBBS:

12 Q     I am showing what's previously been marked for

13 identification purposes as State's Exhibits numbers 11 and

14 12.  I want to ask if you recognize these exhibits?

15 A     Yes, I do.

16 Q     What are State's Exhibits 11 and 12?

17 A     State's Exhibit number 11 is one sealed manila envelope

18 which contains a fired copper color-coded lead bullet.

19     State's Exhibit number 12 is one sealed manila envelope

20 which contains a fired lead bullet.

21 Q     And, who did you receive those objects from?

22 A     From the Forensic Investigator Scott Belton.

23 Q     Thank you.  Now, how do you know those are the ones you

24 received from Scott Belton?

25 A     They have my markings on them.

1           MR. GIBBS: State moves to admit Exhibits 11 and 12.

2           THE COURT:  Admitted.

3   **(WHEREUPON, PROJECTILES MARKED AS STATE EXHIBITS 11 AND 12**

4   **WERE ADMITTED.)**

5   MR. GIBBS:

6   Q     Now, if you would, tell us what examination you

7   conducted with regard to exhibit -- start with 11.

8   A     I receive numerous firearms in this case.  State's

9   Exhibit 11 was compared to the test-fired bullets from each

10  of those firearms.

11  Q     Now, 11 is marked Rodney Brown, projectile from chest;

12  correct?

13  A     That's correct.

14  Q     Now, you received numerous weapons in this case as you

15  said.

16  A     That's correct.

17  Q     Now, what did you compare those projectiles to, 11 and

18  12?

19  A     I compared them to test-fired bullets from the weapons

20  I received.

21  Q     When you talk about test-fired bullets, tell the ladies

22  and gentlemen of the jury how you received those test-fired

23  bullets.  In other words, how you came to have them in your

24  possession.

25      I received the firearms in th  e laboratory, checked the

1    firearms for function, made sure that they were safe to fire,

2    and then test-fired those firearms myself and collected the

3    test-fired bullets and cartridge cases for my comparison.

4    Q    Let me get this straight.  The guns came to you.

5    A    That's correct.

6    Q    You made sure the guns were working properly?

7    A    That is correct.

8    Q    And you fired bullets in those guns.

9    A    I fired bullets from those guns.

10   Q    From those guns, I am sorry.  And, you recovered those

11   bullets that you knew you fired from that gun.

12   A    That's correct.

13   Q    And, what did you do with the bullets that you

14   recovered that you knew you fired from the gun?

15   A    I recovered the test-fired bullets and cartridge cases

16   and then I have those and store those in the laboratory.

17   Q    And, did you use those bullets that you knew you had

18   fired from that gun to compare Exhibits 11 and 12 to?

19   A    That's correct.

20   Q    With regard to Exhibits number 11, identified as coming

21   from Rodney Brown, chest; what were the results of your

22   laboratory examination?

23   A    My examination revealed that this .38-.357 caliber

24   bullet revealed similar characteristics as two of the

25   firearms that I had received, but I was able to determine if

1049

## Court of Criminal Appeals No. __CR_____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM
# CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2000-166
### Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From:   __STATE CONVICTION__

Sentence Imposed: _____ __LIFE WITHOUT PAROLE__

Defendant Indigent:  _X_ YES   _ NO

## JASON LEE HOLLOWAY
<div align="right">NAME OF APPELLANT</div>

__CHARLES GILLENWATERS, & JOSEPH FIQUETTE__      __256-234-5018__
APPELLANT'S ATTORNEY                                (TELEPHONE NO.)

__POST OFFICE  BOX 2129__
ADDRESS

__ALEXANDER CITY__        __ALABAMA__              35011
CITY                     STATE          ZIP CODE

### v.

## STATE OF ALABAMA
<div align="right">NAME OF APPELLEE</div>

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

### (For Court of Criminal Appeals use only)

1   it had been fired through either barrel of those firearms.  I

2   also examined it against another Colt revolver, and I was

3   able to determine that it was not fired from that revolver.

4   Q    Ms. Richert, I am showing you what has been marked for

5   identification, Exhibit number 36.  Do you recognize State's

6   Exhibit 36?

7   A    Yes, I do.

8   Q    And, what is Exhibit number 36?

9   A    Exhibit number 36 is a Colt model trooper MK revolver,

10  caliber .357 magnum.

11  Q    That one is referred to as number three on your test

12  results; correct?

13  A    It is 03.01 on my report.

14  Q    Thank you.  Now, I show you Exhibit 35.  Do you

15  recognize that exhibit?

16  A    Yes, I do.

17  Q    What is that exhibit?

18  A    State's 35 is one Colt model official police MK3

19  revolver caliber .38 special.

20  Q    That is listed as 04.01 on your report; is that

21  correct?

22  A    That's correct.

23  Q    And, last I'm showing you Exhibit 38.

24  A    Yes, sir.

25  Q    Do you recognize that exhibit?

1  A    Yes, I do.

2  Q    And what is Exhibit 38.

3  A    State's Exhibit 38 is one Colt model police positive

4  special caliber .38 special.

5  Q    And that's Exhibit -- well, number 05.01 in your

6  report; is that correct?

7  A    That's correct.

8  Q    Now when you talk about receiving numerous guns in this

9  case, those are the guns you are referring to.

10 A    Yes, it is.

11 Q    Are those the guns you talked about test firing and

12 recovering known fired projectiles from?

13 A    Yes, I test-fired each of these firearms and recovered

14 the test-fired bullets and cartridge cases.

15 Q    Now, talking about Exhibit number 11, if I'm not

16 mistaken --

17 A    That's correct.

18 Q    -- and you told me the results of your exam; is that

19 correct?

20 A    That's correct.

21 Q    And, again what does your result reveal?

22 A    That State number 11 had similar characteristics as the

23 Colt revolver which is my 03.01 and 05.01, but I was unable

24 to determine if it was fired through either of these barrels

25 of either of these Colt revolvers, but I was able to

1  determine that it was not fired out of exhibit 04.01.

2  Q     Okay.  Now, of these three guns which one did it not

3  come out of?

4  A     State's Exhibit 35.

5  Q     But it had similar characteristics as the bullets fired

6  out of Exhibit 38 and Exhibit 36; correct?

7  A     That is correct.

8  Q     Now, when you say similar characteristics, can you tell

9  us what you mean by that?

10 A     A manufacturer of a firearm has predetermined

11 characteristics that it puts on the firearm, meaning when the

12 barrel is rifled in a Colt revolver, it is going to have six

13 lands and grooves with a left-handed twist and each of those

14 lands and grooves are going to have certain measurements.

15 This is standard throughout Colt.  And these characteristics

16 were similar as the bullet, State's Exhibit 11 and State's

17 Exhibit 12.

18 Q     Now, would you expect Colt revolvers to have similar

19 rifling characteristics?

20 A     Yes, I would.

21 Q     Now, I'm showing you what has been marked for

22 identification purposes as State's Exhibit number 12.  Do you

23 recognize that exhibit?

24 A     Yes, I do.

25 Q     What is state Exhibit number 12?

1   A       Exhibit number 12 is, again, one sealed manila envelope

2   which contains one fired lead bullet.

3   Q       And, you received that from Scott Belton; is that

4   correct?

5   A       That's correct.

6               MR. LISENBY:    State moves to admit 12.

7               THE COURT:    Admitted.

8   (EXHIBIT 12 WAS ADMITTED ON PAGE 1032.)

9   MR. GIBBS:

10  Q       What test did you perform with regard to Exhibit number

11  12?

12  A       I performed the same tests on State's Exhibit 12 as

13  State's Exhibit 11.  I compared it to each of the test-fired

14  bullets coming from the three firearms.

15  Q       Okay.  Can you open those for me, please?  Now, with

16  regard to Exhibit 12 -- how do you want me to turn it?

17  A       Flip it over.

18  Q       Is that better?

19  A       Yes, sir.  It is fine.

20  Q       What were the results of your tests?

21  A       The results on State's Exhibit 12 were the same.  I was

22  able to determine that it had similar characteristics as

23  State's Exhibit 36 and State's Exhibit 38, the test-fires

24  from each of these Colt revolvers.  I was unable to determine

25  if it was fired through the barrel of each of these

1   revolvers, but again, I was to exclude it from State's

2   Exhibit number 35.

3   Q    So, you are certain it was not fired from 35.  Is that

4   correct?

5   A    That's correct.

6   Q    But it could have been fired from either Exhibit 36 or

7   38; correct?

8   A    That's correct.

9   **(WHEREUPON, PROJECTILES WERE MARKED AS STATE EXHIBITS  20 AND**

10  **21 FOR IDENTIFICATION.)**

11  MR. GIBBS:

12  Q    Now with regard to the victim, Angela Brown, in this

13  case, did you receive some items of evidence from Scott

14  Belton?

15  A    Yes, sir, I did.

16  Q    I'm showing you what has been marked for identification

17  purposes as Exhibit numbers 20 and 21.  Take a look at those

18  exhibits, please, and what are exhibits 20 and 21?

19  A    State's Exhibit 21 is one sealed manila envelope

20  containing one fired lead bullet.  State Exhibit number 20 is

21  also a sealed manila envelope containing one fired lead

22  bullet.

23  Q    You received those from Scott Belton; is that correct?

24  A    That's correct.

25           MR. LISENBY:  State moves to admit Exhibits 20 and

```
 1  21.

 2           THE COURT:   Admitted.

 3  (WHEREUPON, PROJECTILES MARKED AS STATE EXHIBITS 20 AND 21

 4  WERE ADMITTED.)

 5  MR. GIBBS:

 6  Q     Let's talk about Exhibit number 20, which is identified

 7  as projectile from the head of Angela Brown; is that correct?

 8  A     That's correct.

 9  Q     And, did you perform similar tests as you described or

10  testified to earlier?

11  A     That's correct.  I compared this projectile to the

12  test-fired bullets from each of the firearms submitted.

13  Q     What were results of those tests?

14  A     I was also able to determine in this case that this

15  bullet had similar rifling characteristics as State's Exhibit

16  36 and State's Exhibit 38, the test-fires from each of those

17  firearms.  I was unable to determine whether it was fired

18  through the barrel of each of these firearms.  Again I was

19  able to exclude it from State's Exhibit number 35.

20  Q     And Exhibit 21, which is labeled projectile from

21  abdomen.  What were the results of your tests with regards to

22  this one?

23  A     Again, I was able to determine that this fired bullet

24  also had similar characteristics as the test-fired bullets

25  from State's Exhibit 36 and State's Exhibit 38, but was
```

```
 1   unable to determine whether it was fired through the barrel

 2   of either of these firearms.  Again, I was able to exclude it

 3   from State's Exhibit number 35.

 4   Q     Not fired from 35 could have been fired from 36

 5   and 38.

 6   A     That's correct.

 7   (WHEREUPON, SHELL CASINGS WERE MARKED AS STATE EXHIBIT

 8   NUMBERS 51 AND 52 FOR IDENTIFICATION.)

 9   MR. GIBBS:

10   Q     I am showing you what has been marked for

11   identification purposes as State's Exhibits 51 and 52.  Do

12   you recognize those exhibits?

13   A     Yes, I do.

14   Q     What are exhibits 51 and 52?

15   A     State's Exhibit 51 is one sealed manila envelope

16   containing one fired Federal brand cartridge .38 special.

17   And State's Exhibit 52 is also a sealed manila envelope

18   containing one Winchester brand cartridge case .38 special.

19   Q     Did you receive those from Agent Chuck Wright ?

20   A     Yes, I did.

21             MR. GIBBS:  State moves to admit Exhibits 51 and

22   52.

23             THE COURT:  Admitted.

24   (WHEREUPON, SHELL CASINGS MARKED AS STATE EXHIBITS 51 AND 52

25   WERE ADMITTED.)
```

*** Frances L. Roark ***

1  MR. GIBBS:

2  Q    Now, with regard to 51, the fired Remmington brand

3  cartridge case .38 caliber; correct?

4  A    .38 special.  That's right.

5  Q    Tell us how you go about analyzing a cartridge case to

6  determine whether or not it has been fired through a

7  particular weapon?

8  A    Again, I test-fired the firearm and recovered the

9  test-fired cartridge cases and then microscopically compared

10 those to the evidence.  What I'm looking for are the

11 microscopic strides that are left on this cartridge case when

12 it is fired.  Basically on the breech where the cartridge

13 case hit the breech of the firearm and the firing pin, where

14 the firing pin comes through the aperture and strikes the

15 cartridge case which ignites it.

16 Q    Can you show us on this picture what area you are

17 talking about?

18 A    Well, the whole head of the cartridge case hits the

19 breech of the firearm.  Most of the microscopic stride are

20 left on the primer because it is a softer metal and the

21 firing pin impression is right here.

22 Q    Thank you.  Now, what were the results of your testing

23 with regard to this exhibit?

24 A    I was able to determine that State's Exhibit 51 was

25 fired in the chamber of the Colt revolver described as 05.01,

1    which is State's Exhibit 38.

2    Q      So, that shell casing did come from that?

3    A      It was fired in the chamber of that firearm; that is

4    correct.

5    Q      And, exhibit 52?

6    A      State's Exhibit 52, which again was one fired

7    Winchester brand cartridge case caliber .38 special.  I was

8    able to determine that this cartridge case was also fired in

9    the chamber of State's Exhibit 38.

10   Q      Ms. Richert, in your area of expertise, do the terms

11   soot and/or stippling have any meaning to you?

12   A      Yes, they do.

13   Q      Tell us what is meant by soot or stippling.

14   A      When a firearm is discharged, the firing pin hits the

15   cartridge case.  The cartridge case is the primer that

16   ignites the powder.  The powder in the cartridge case is what

17   burns at a very rapid rate producing a gas which is going to

18   push the bullet out of the barrel as well as with an equal

19   and opposite pressure, it is going to push the cartridge case

20   up against the breech which leaves the marks on both.  This

21   powder burning at a high rate is going to produce the gas,

22   which when it comes out of muzzle, the byproducts of this

23   combustion is the soot.  Not all of the powder will be

24   consumed in the barrel and it also comes out of the muzzle

25   end of the firearm.  If a target is in close proximity of the

 1  muzzle of the firearm, depending on the caliber to the

 2  distance, this burning powder, if it is in contact with skin,

 3  will actually burn into the skin, which is commonly known as

 4  stippling.

 5  Q    So, if the muzzle of the gun is close to a person's

 6  skin, or body, or clothing for that matter, you would expect

 7  to find soot or stippling on the skin or on the clothing; is

 8  that correct?

 9  A    Well, the stippling is actually a phenomenon that only

10  happens with the skin.  You might find the gun powder

11  particles on the clothing.  The term stippling is actually

12  noted for the powder burning into the skin.

13  Q    Now, the absence of soot or stippling on a wound to the

14  body, what would that indicate to you?

15  A    Well, it could indicate a number of things.  Soot is

16  going to be deposited at a closer range.  If the muzzle is at

17  a farther distance from the body, then the soot would not be

18  there.  You wouldn't except to see the soot there, but you

19  would still see the stippling.  At a farther distance you

20  might see powder, but not see stippling unless, of course,

21  there's an intermediate target.  Meaning, that the muzzle

22  could be right up next to the skin or within a few inches,

23  but if all the powder parcels are deposited on the

24  intermediate target, then you would not expect to see it on

25  the skin.

*** Frances L. Roark ***

1   Q     So, an intermediate target would be something between

2   the muzzle of the gun and the person's skin?

3   A     That's correct.

4   Q     Would that be clothing, a wall, glass, anything of that

5   nature.

6   A     It could be anything.

7   Q     But the further the muzzle of the gun is away from that

8   object, the less likely you are to find soot or stippling; is

9   that correct?

10  A     That's correct.

11  Q     Now, with regard to those Exhibits 35, 36, and 38,

12  these weapons, did you turn those weapons back over to Agent

13  Charles Wright?

14  A     Yes, sir, I did.

15  Q     And, when you turned these items over to Agent Wright,

16  were they in the same, or substantially the same, condition

17  as when you first received them?

18  A     Yes, they were.

19  Q     Now, when you were looking at those weapons, I noticed

20  some purplish stuff on them.  Was that purplish stuff on

21  there when you got them?

22  A     Yes, they were.

23  Q     Do you have any idea what that purplish stuff is?

24  A     Yes, I do.

25  Q     Tell us please.

1    A    We just note that as fingerprint chemicals when we

2    received these that ABI has put on the firearms.

3    Q    Somebody had been looking for fingerprints on the guns;

4    correct?

5    A    That's correct.

6    Q    Did you also receive a baseball bat in connection with

7    this case?

8    A    Yes, I did.

9    Q    From Agent Wright?

10   A    Yes, I did.

11   Q    And, did you turn that bat over to Mike Hitchcock?

12   A    Yes, sir, I did.

13   Q    When you turned that bat over to Michael Hitchcock, was

14   it in the same, or substantially the same, condition as when

15   you first received it?

16   A    Yes, it was.

17        MR. GIBBS:  Ms. Richert, I have no further

18   questions for you.  Defense counsel may have a few for you,

19   though.

20        THE COURT:  Cross-examination.

21                    **CROSS EXAMINATION**

22   **BY MR. KEITH:**

23   Q    How are you, Ms. Richert?

24   A    Good.

25   Q    Are all those three guns in front of you?

1    A    Yes, sir, they are.

2    Q    Do you know which gun was used to cause the death of

3    Rodney or Angela Brown.

4    A    No, I do not.

5    Q    I'd like you to pull out, I am not sure -- I think it

6    is number 38 is the handgun I would like to direct you to.

7    While you're doing that is number 36 the .357?

8    A    Yes, sir, it is.

9    Q    And, is 38, State's Exhibit 38, is a Colt .38 handgun.

10   A    Special.

11   Q    And, could I see that.  Do you have that in your hand?

12        If I suggest to you -- whoops -- if I suggested or told

13   you that that was the gun that caused Rodney or Angela

14   Brown's death, would that be consistent with your testing?

15   A    I was not able to determine the bullets received to me

16   by each of those persons whether or not it was fired out of

17   this pistol or not.  The class characteristics and the

18   microscopic similarities were there that it could have been

19   fired out of this pistol.

20   Q    Could have been fired out of one of two guns, but you

21   can't say for sure which one?

22   A    That's correct.

23   Q    And that particular handgun in your hand, if I

24   represented to you it was taken out of the Holloway

25   residence, I would like to ask you a question about that gun.

1   Can you date that gun?  How old is it, roughly?

2   A    I have no idea.  It is definitely on the older margin.

3   Q    It is almost like an antique, is it not?

4   A    It is one of the first --the police positives were one

5   of the first revolvers that came out of Colt.  This

6   particular firearm is still made today.  So, I couldn't tell

7   you how old it is.

8   Q    Compared to those other two guns, that one in your hand

9   is no doubt an old gun.  Compared to the other two up there

10  on the table, would that be the oldest?

11  A    I can't tell you exactly when this gun was

12  manufactured, but the first police positives were definitely

13  manufactured before the other two; that is correct.

14  Q    The projectiles that were recovered and sent to.  You

15  know for a fact where the projectiles came from because they

16  were removed from the decedents.

17  A    That's correct.

18  Q    And, were there any differences, if you know, in the

19  band of any of these projectiles?

20  A    One of the projectiles that I received was copper

21  coated lead.  The brand could be anything.  They could all be

22  the same brand, though the type of bullet was different.

23  Q    And, as far as when I say projectiles and casings, I

24  guess what I am asking is:  Are all the bullets that may have

25  come out of that gun, come from the same box, if you know?

1   A      I couldn't answer that.

2   Q      No way of knowing or telling?

3   A      No, sir, because the same box may have lead brown-nose

4   bullets.  It may have copper color-coated lead.  They have

5   been reloaded.  I mean, I couldn't tell you if they came out

6   of the same box.  From the manufacturer possibly the copper

7   coated lead and the other three that were lead bullets would

8   not have originally been in the same box.  But, with reloads

9   you just never know.

10  Q      And, those bullets, the casings or the projectiles were

11  they -- would there be any reason to believe they were also

12  bullets that had been in there with that gun for a long time?

13  A      I have no indication of that; no, sir.

14  Q      Can't tell from looking at the casings or anything at

15  all, how old they might have been?

16  A      No, sir.

17  Q      And, you test-fired that gun, the gun in your hand that

18  we are talking about, State's number 38, you test-fired it?

19  A      Yes, sir, I did.

20  Q      Fully functioning normal handgun?

21  A      Yes, it was.

22  Q      Based on your -- as far as normal criminal activity, if

23  someone wants to get a gun, plan on doing a shooting, and

24  maybe go get some bullets, and have them a good gun to shoot,

25  that wouldn't be the normal kind of gun to do all of that,

```
 1   would it?  Could you say?

 2   A     I have no way of anwering that.  Any type of firearm

 3   could be used.

 4   Q     Right.  And had that one been used, it is sort of an

 5   old gun, it is functional, but -- have you seen many other

 6   guns like that of that age on the streets or being collected

 7   as evidence?

 8   A     We do get a lot of Colt revolvers in because they are

 9   well-made firearms.

10   Q     Old ones like that one that is in your hand?

11   A     We get all types.

12   Q     Have you seen one that old before?

13   A     Yes, sir, I have.

14   Q     How many?

15   A     I couldn't tell you.  Numerous.

16   Q     Would that be older that usual, I guess, from what you

17   normally see?

18   A     There's no way of telling.

19          MR. KEITH:  Thank you, Ms. Richert.

20          THE COURT:   You may step down.  Hold on.

21                    REDIRECT EXAMINATION

22   BY MR. GIBBS:

23   Q     Ms. Richert, it is not uncommon for y'all to receive

24   weapons where different cartridges, different types of

25   bullets have been fired from the same weapon; is that
```

1  correct?

2  A      That's correct.

3            MR. GIBBS:  Nothing further, Your Honor.

4            THE COURT:  Thank you, ma'am.  You're free to go.

5  This witness is excused.

6  (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

7            THE COURT:  Call your next witness.

8            MR. GIBBS:  State calls Charles Wright.

9                        **CHARLES WRIGHT**

10       **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

11         **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

12                  **TESTIFIED AS FOLLOWS:**

13                  **DIRECT EXAMINATION**

14 **BY MR. GIBBS:**

15 Q     Tell us your name, please.

16 A     Charles Wright.

17 Q     And, how are you employed?

18 A     I am employed by the department of -- the Alabama

19 Department of Public Safety.  I am assigned to the Alabama

20 Bureau of Investigation Division.

21 Q     How long have you been employed by the Alabama Bureau

22 of Investigation?

23 A     I have been in public safety 21 years.  The last six

24 with ABI.

25 Q     And, what are your duties in connection with your

1    position with ABI?

2    A    I am assigned to work criminal cases.

3    Q    Does that include murder homicide?

4    A    Yes, it does.

5    Q    In connection with your duties with ABI to investigate

6    felonies, did you become involved with the investigation of

7    the murders of Rodney and Angela Brown?

8    A    I did.

9    Q    Did you assist the local authorities in this

10   investigation?

11   A    Yes, I did.

12   Q    Tell us how you became involved.

13   A    On January 12th of 2000, I received a call from my

14   supervisor.  He had stated that they had been contacted by

15   Chambers County requesting assistance with a double homicide

16   here in Chambers County.  And, I live -- I work out of the

17   Opelika post and I traveled from my home in Auburn to the

18   scene here in Chambers County.

19   Q    Where did you go in connection with this request for

20   assistance?

21   A    I went to the -- it was the residence of ....

22   Q    Angela and Rodney Brown.

23   A    Rodney and Angela Brown.

24   Q    Okay.  And, you actually went to the scene; is that

25   correct?

1  A      That's correct.

2  Q      What did you do at the scene?

3  A      I helped process the scene, photographed, just assisted

4  with the processing of the scene, and collection of evidence,

5  and at later dates interviews.

6  Q      Did you collect some items of evidence or was evidence

7  turned over to you by Agent Blackstone in connection with

8  this case?

9  A      Yes, it was.  Evidence was turned over to me, received

10  by me from Detective Blackstone.

11  Q      And, I need you to keep your voice up for the members

12  of the jury, please.

13      Now, in connection with your investigation with this

14  case, did you receive the following items of evidence:  A

15  softball bat, a .38 caliber pistol, a .357 revolver, a knife

16  with compass, another .38 pistol, three pistols total,

17  ceramic pieces of pottery or some kind of ceramic horse?

18  A      Yes, I did.

19  Q      And, you received all these items of evidence?

20  A      Yes.

21  Q      And, were you, in going through these items of

22  evidence, did you later turn them over to members of the

23  Department of Forensic Sciences for testing?

24  A      Yes, I did.

25  Q      Did you subsequently get these items of evidence back?

1    A    I did.

2    (WHEREUPON, CERAMIC PIECES WERE MARKED AS STATE EXHIBIT 33

3    FOR IDENTIFICATION.)

4    MR. GIBBS:

5    Q    Agent Wright, I'm showing you what's been marked for

6    identification purposes as State's number 33.  Do you

7    recognize this exhibit?

8    A    Yes, I do.

9    Q    What is exhibit 33?

10   A    These are pieces of -- a bag containing other bags of

11   broken pieces of pottery.

12   Q    Open it, please.

13   Q    Now, there are numerous smaller bags in this larger

14   bag; is that correct?

15   A    Yes, there are.

16   Q    And each of the smaller bags contains what?

17   A    Just pieces of broken pottery.  Little statues that

18   were found scattered about the trailer.

19   Q    And these were collected in the trailer; is that

20   correct?

21   A    That's correct.

22   Q    Turned over to you by other agents; is that correct?

23   A    That's right.

24   Q    And, Sherwin K. Boswell; is that who turned them over

25   to you?

*** Frances L. Roark ***

1  A      Yes, it is.

2  Q      And, are those items in the same, or substantially the

3  same, condition as when you received them?

4  A      Yes.

5           MR. GIBBS:   State moves to admit Exhibit 33.

6           THE COURT:  Admitted.

7  (WHEREUPON, CERAMIC PIECES MARKED AS STATE EXHIBIT 33 WERE

8  ADMITTED.)

9  MR. GIBBS:

10 Q      Agent Wright, I am going to direct your attention to

11 February the 3rd of 2000, and ask if you had occasion to go

12 to an area just out near the defendant's residence?

13 A      Yes, I did.

14 Q      And, for what purpose did you go to this area outside

15 the defendant's home?

16 A      To look for spent shell cartridge casings.

17 Q      Agent Wright, I am showing what's been marked for

18 identification purposes as State's Exhibit number 50.  Do you

19 recognize this exhibit?

20 A      Yes, I do.

21 Q      What is Exhibit number 50?

22 A      It is a diagram depicting the defendant's residence and

23 surrounding area outside a fenced area, wooded area outside

24 the fence.

25 Q      Now, you drew this diagram; is that correct?

```
 1  A      I did.

 2  Q      Does it fairly and accurately depict the residence of

 3  the defendant and the outlining areas as you recall it?

 4  A      Yes, sir.

 5           MR. GIBBS:  State moves to admit Exhibit 50, Your

 6  Honor.

 7           THE COURT:  Admitted.

 8  (WHEREUPON, A DIAGRAM MARKED AS STATE EXHIBIT 50 WAS

 9  ADMITTED.)

10  MR. GIBBS:

11  Q      Agent Wright, if you would, come down here, please.

12  And, if you would, point out to the jury what is shown on

13  this diagram.

14  A      This is the trailer.  Representing the trailer.  The

15  lines with Xs represent a fence.  This is the driveway into

16  the -- off the roadway into the area behind the trailer.

17  And, this represents a wooded area just east of the

18  residence.

19  Q      Now, with regard to this trailer that you refer to in

20  your diagram, whose trailer is that?

21  A      That's where the defendant lived with Ms. Marie

22  Collier.

23  Q      That's really a two duplex.  That's really two houses;

24  is that correct?

25  A      Yes, it is.
```

1  Q      Now, if that's the defendant's residence, can you show

2  us where, in what direction, the home of the victims in this

3  case, Rodney and Angela Brown, would have been?

4  A      It would have been west.

5  Q      In this direction off the diagram; correct?

6  A      Correct.

7  Q      Now, what is shown over here in this area?

8  A      That's just a wooded area, trees and shrubs and

9  undergrowth.

10 Q      Now, that green tag right there.  You didn't put that

11 there, did you.

12 A      No, I didn't.

13 Q      Okay.  Now, there are some alphabets on your diagram.

14 A side from C and D, I think there is an A and a B  over

15 there; is that correct.

16 A      That's correct.

17 Q      Do those alphabets, A and B indicate anything on this

18 diagram?

19 A      The approximate area of where two spent shells casings

20 were found, .38 shell casings were found.

21 Q      You and Agent Looser recovered those shell casings; is

22 that correct?

23 A      That's right.

24 Q      And, how did you and Agent Looser know to go to that

25 area to collect those shell casings?

1  A    The defendant indicated that he had thrown some spent

2  casings in that area.

3  Q    You may sit back down.

4  **(WHEREPUPON, PHOTOGRAPHS WERE MARKED AS STATE EXHIBITS 53, 54**

5  **AND 55 FOR IDENTIFICATION.)**

6  MR. GIBBS:

7  Q    I am showing you what's been marked for identification

8  purposes as State's Exhibits 53, 54, 55.

9  A    Yes, sir.

10  Q    Do you recognize those exhibits?

11  A    I do.

12  Q    And, what are they?

13  A    It's the area or shows the shell casings where they

14  were located prior to being collected.

15  A    Okay.

16  Q    Do they fairly and accurately show where the shell

17  casings were when you first collected them?

18  A    Yes, they do.

19        MR. GIBBS:  State moves to admit Exhibits 53, 54

20  and 55.

21        THE COURT:  Admitted.

22  **(WHEREUPON, PHOTOGRAPHS MARKED AS STATE EXHIBITS 53, 54 AND**

23  **55 WERE ADMITTED.)**

24  MR. GIBBS:

25  Q    With regard to exhibit 50 there, can you show us the

1    shell casings in that photograph?  Can you see it better in

2    this photograph here?  It is showing up on the photograph

3    there.  That's the shell casing; correct?

4    A    Yes.

5    Q    Right there.  And, in exhibit 54.  Right there.  Exhibit

6    55, it's a lot easier, huh?  Where the brown envelopes are;

7    correct?  Thank you.

8    (WHEREUPON, A SIDE BAR COMMENCES.)

9         MR. GIBBS:  These have been marked as exhibits 46,

10   47, 48 and 49.  Pictures of the panties.  We visited this

11   earlier.  The girl has identified them.  The same area where

12   the shell casings where found.  The defendant's statement

13   where he says he threw the shell casings out there in that

14   area.

15        MR. BLANCHARD:  Judge, I still don't see any

16   connection to this case.  They are not reported missing from

17   the house prior to the time they showed up over there.  Jason

18   Holloway had been in jail for 10 days to two weeks before

19   anybody located these.  And, they knew -- on the day he gave

20   his statement, on the 21st, when he confessed, he said in

21   that statement that he threw the shells into that location.

22   Anybody with that information, if they wanted to put anything

23   back there, could easily have done it.  It's open and

24   accessible to the public.  It is simply not connected with

25   this case and it's just too prejudicial.

```
 1            THE COURT:  The daughter testified this morning
 2   that she did in fact identify panties that belonged to her,
 3   her sister, and her mother that were inside the house or had
 4   been at some point in time.  Through the testimony, I take
 5   it, it has now been shown that these were found in this area
 6   shown in these photographs.  And, that's the same area that
 7   the shell casings were recovered from.  And, that by the
 8   witness, excuse me, by the defendant's on statement, he threw
 9   these shell casings in a certain area.  I think all of this
10   really goes to what weight, if any, the jury would give this
11   evidence.  It is strictly circumstantial.  I think under my
12   charge on the law that I am going to give as far as
13   circumstantial evidence and all of that sort of thing that it
14   will really go to the weight of the evidence.  You know,
15   there are arguments both ways.  They say -- circumstances; of
16   course, you say that it doesn't.  He was in jail for some
17   period of time.  I know that's a problem, but I don't think
18   this goes to inadmissibility.  I think it goes to weight
19   under the Rules to be accorded the evidence.  You have got
20   your -- go ahead.
21            MR. BLANCHARD:  Judge, just let me put it on the
22   record to be sure.
23       I object under State evidence Rules 402 and 403
24   relevance -- it is not relevant and it is very prejudicial.
25   Also I object under the Fifth, Sixth, Eighth, and Fourteenth
```

1   Amendments to the Constitution of the United States, the

2   analogous provisions of the Alabama Constitution of 1901, and

3   any and all other federal and state constitutional grounds

4   listed in our earlier Memorandum of Points and Authorities.

5          THE COURT:  Overruled.  Go ahead.

6          MR. BLANCHARD:  Judge, may I have a continuing

7   objection on this.  I know put the ....

8          THE COURT:  Yes, on the entire line of questions.

9          MR. BLANCHARD:  All right.

10          THE COURT:  Go ahead.

11  (WHEREUPON, A SIDE BAR CONCLUDED.)

12          MR. GIBBS:  State moves to admit Exhibits 46, 47,

13  48 and 49.

14          THE COURT:  Admitted.

15          MR. BLANCHARD:  With our objection noted.

16          THE COURT:  Objection noted on the record and the

17  grounds thereof.

18  **(WHEREUPON, PHOTOGRAPHS MARKED AS STATE EXHIBITS 46, 47, 48**

19  **AND 49 WERE ADMITTED.)**

20  MR. GIBBS:

21  Q    Agent Wright, I'm showing what's been marked for

22  identification purposes as State's Exhibit number 4.  Do you

23  recognize this exhibit?

24  A    Yes, I do.

25  Q    And, what is State's Exhibit number 4?

1    A    It is a large bag containing seven separate sealed

2    envelopes and each one contains a pair of women's underwear.

3    Q    Did you receive those items of evidence from Agent

4    Blackstone?

5    A    I did.

6    Q    And, are they in the same, or substantially the same,

7    condition as when you received them from Agent Blackstone?

8    A    They are.

9         MR. GIBBS:    State moves to admit Exhibit 4.

10         MR. BLANCHARD:    Objection, Your Honor.    Same

11    objection.

12         THE COURT:    Overruled.    Grounds of the objection

13    noted on the record.    Admitted.

14    **(WHEREUPON, A BAG CONTAINING SEVEN PAIRS OF PANTIES MARKED AS**

15    **STATE EXHIBIT 4 WERE ADMITTED.)**

16    **(WHEREUPON, A DOCUMENT WAS MARKED AS STATE EXHIBIT 56 FOR**

17    **IDENTIFICATION.)**

18    MR. GIBBS:

19    Q    Agent Wright, in connection with your participation in

20    the investigation in this case, did you have an occasion to

21    interview the defendant, Jason Holloway?

22    A    Yes, I did.

23    Q    Particularly on January the 21st of 2000, 4:15 p.m.?

24    A    Yes, sir.

25    Q    And, where did that interview take place?

*** Frances L. Roark ***

```
 1   A      It took place at the Chambers County investigators'

 2   office.

 3   Q      And, who was present, if anyone, during this interview?

 4   A      Mike Looser.

 5   Q      And, now, prior to talking with the defendant and

 6   asking him any questions, did you advise him of his

 7   constitutional rights?

 8   A      I did.

 9   Q      How did you do that?

10   A      I read them from a form.

11   Q      I am showing what has been marked for identification

12   purposes at State's Exhibit 56.  Do you recognize that

13   exhibit?

14   A      I do.

15   Q      And, what is Exhibit 56?

16   A      It is a rights waiver form.

17   Q      And, is that a rights waiver form that was read to the

18   defendant Jason Holloway on January 21st?

19   A      Yes, it is.

20   Q      Okay.  What rights, if any, did you advise the

21   defendant of?

22   A      I advised him that he had the right to remain silent.

23   Anything you say can be used against you in court or other

24   proceedings.  You have the right to talk to a lawyer for

25   advice before we ask you any questions and have him with you
```

```
 1   during questioning.  If you cannot afford a lawyer one will
 2   be appointed without cost to you before any questioning if
 3   you wish.  If you decide to answer questions now without a
 4   lawyer present you will still have the right to stop
 5   answering at any time you wish.
 6        And then he was also read.
 7   Q    Now, there is a second part to that; right?
 8   A    Yes.
 9   Q    Now, with regard to the first part, those are the
10   rights you read to him.
11   A    That's correct.
12   Q    Did he acknowledge that he understood those rights?
13   A    He did.
14   Q    How did he acknowledge that he understood those rights?
15   A    He initialed beside each one.  One through five, he
16   initialed beside each one indicating that when asked if he
17   understood each one, he initialed by saying, yes, he did.
18   Q    Okay.  Now, there's a second portion to that form; is
19   that correct?
20   A    That's correct.
21   Q    And, that second portion is entitled, what?
22   A    Waiver of Rights.
23   Q    And, would you read what you advised him of under that
24   second portion of that form.
25   A    It says, "I have been advised of my rights and I
```

1    understand what my rights are and I am willing to make a

2    statement and answer questions.  I do not want a lawyer at

3    this time.  I understand and know what I am doing.  No

4    promises or threats have been made to me and no pressure or

5    coercion of any kind have been used against me."  And, it is

6    signed by Jason Holloway.

7    Q    And, his acknowledgment that he wished to waive those

8    rights?

9    A    Yes.

10   Q    Now, after he initialed that he understood those rights

11   and signed waiving those rights, did you conduct an interview

12   with the defendant?

13   A    Myself and Mike Looser, Deputy Mike Looser.

14   Q    And how was that interview conducted and how was that

15   statement recorded?

16   A    Deputy Looser basically did the -- what questions there

17   were -- the defendant went through a -- gave a statement and

18   then went back through it the second time where I wrote the

19   statement -- put it in writing.

20   Q    What did you write down?

21   A    I wrote -- it is not verbatim, word for word, but the

22   gist of the statement.  The defendant was allowed to read it

23   and sign it indicating that this is what he -- was his

24   statement.

25   Q    You wrote what he told you; is that correct?

*** Frances L. Roark ***

1   A      That's correct.

2   Q      You didn't make anything up?

3   A      I made nothing up.

4   Q      After you wrote it down you gave it back to him to read

5   again; is that correct?

6   A      That's correct.

7   Q      Was he allowed to make any corrections or changes that

8   he wanted to make?

9   A      Yes, sir.  He had that opportunity.

10  Q      Now, after advising the defendant of his constitutional

11  rights, but before this statement was taken, did you, or

12  anyone in your presence or hearing, threaten or coerce the

13  defendant in any way?

14  A      No.  No threats or coercion was made at any time.

15  Q      Did you, or anyone in your presence or hearing, offer

16  the defendant any hope of reward?

17  A      Nope.  No promises were made.

18  Q      Did you, or anyone in your presence or hearing, tell

19  the defendant it would be better to make a statement than not

20  to?

21  A      No, sir.

22  Q      Did he then make a statement?

23  A      He did.

24  Q      How was that statement reduced?  It was reduced to

25  writing; is that correct?

1    A      That's correct.

2    Q      Do you have that statement with you?

3    A      Yes.

4    **(WHEREUPON, A DOCUMENT WAS MARKED AS STATE EXHIBIT 57 FOR**

5    **IDENTIFICATION.)**

6    MR. GIBBS:

7    Q      I am showing you Exhibit number 57.  Do you recognize

8    Exhibit 57?

9    A      I do.

10   Q      What is Exhibit 57?

11   A      It is the interview statement of Jason Lee Holloway,

12   given on the 21st day of January.

13   Q      Would you please read us the defendant's statement that

14   was given to you on January 21st, and, please, keep your

15   voice up so the members of the jury can hear you.

16            MR. BLANCHARD:  Your Honor, Before he does, I wish

17   to state for the record an objection to the entry of this in

18   to the record and in to evidence based on the same grounds

19   raised at pretrial hearings on the admissibility of this

20   exhibit.

21            THE COURT:  So noted.  Overruled.  You may proceed.

22            THE WITNESS:  Name:  Jason Lee Holloway,

23   aliases or nicknames,Baby Food, date 1/21/2000, Friday, 4:20

24   p.m.  The defendant gave his address as 1011 County Road 250,

25   Roanoke, telephone number, black male, born 1/21/73, place of

1   birth Chambers County, Social Security Number, drivers

2   license number, State of his drivers license, his height,

3   weight, color of hair, eyes, and any scars were noted or

4   tattoos.

5       Statement is as follows:  My name is Jason Holloway and

6   I am giving this statement.

7   MR. GIBBS:

8   Q    Keep your voice up, please.

9   A    My name is Jason Holloway.  I am giving this statement

10  of my own free will.  On 1/12 of 2000 I got home around 6:15

11  a.m. from work.  I laid down and went to sleep.  I heard a

12  knock on my door around 9 a.m.  By the time I got up and to

13  the door, I saw the insurance man driving away.  I went back

14  in and laid down on the couch and the phone rang.  It was my

15  girlfriend Felicia Phillips.  We talked for a few minutes and

16  then I called Clarisa Strickland.  I then got up and walked

17  over to Rodney's house.  It was around 10 a.m.  There was no

18  answer at the door.  I went back to my house and in about an

19  hour I went back to Rodney's house.  This time I had a gun

20  with me.  I had gotten the gun from mother's room.  The

21  reason I went to Rodney's was to confront Rodney about some

22  things he had said about my girlfriend.  Rodney had said on

23  Sunday when I went to his house that he could fuck her better

24  than I could.  This time Rodney answered the door.  I went in

25  and asked him about what he had said.  He went and got a

1   baseball bat that was by the TV.  He went to swing it and I

2   pulled the gun from my jacket pocket and shot him once.  The

3   bullet hit him in the upper chest somewhere.  He went down to

4   his knees and I shot him again in the back of the head.

5   Angela had been in the room the whole time.  After I shot

6   Rodney the first time, Angela came toward me.  I shot her

7   twice and then shot him the second time.  Angela was slumped

8   on the couch gasping for air.  I then left the house.  In

9   about 30 minutes I came back.  She was still gasping for air.

10  I had left the gun at my house, but brought back a knife with

11  me.  It was a survival type with ridges on the back.  I

12  picked up the ball bat and hit her two or three times across

13  the left side of her head.  She was still alive and so I

14  stabbed her three or four times around the neck and once in

15  the stomach.  She appeared to be dead.  Before I stabbed her,

16  I went to the back bedroom and got a pillow.  I tried to

17  smother her, but it was not doing any good so I stabbed her.

18  She was dead now.  I then had sex with her.  She did not have

19  any panties on under her gown.  I did ejaculate in her.  I

20  then left and went back to my house and watched TV.  I locked

21  the door prior to leaving their house.  I watched Jerry

22  Springer and then Port Charles and All My Children and One

23  Life to Live, Sister Sister, and Different World.  About 3

24  p.m., I watched General Hospital until almost 4.  I heard the

25  school bus come by and in a few minutes I heard the kids

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1    screaming.  I went out and they said momma and Rodney are

2    dead.  I ran down looked in the trailer and then went back to

3    my house and called 911 and told them that someone had been

4    murdered.  I did this by myself and it was because of the

5    things that Rodney said about Felicia.  The reason I had sex

6    with her was because I had gone this far, why not, if you are

7    going to go a mile, you might as well run a mile.  And that's

8    the end of it.

9    MR. GIBBS:

10   Q      Did the defendant acknowledge that statement?

11   A      Yes, sir.

12   Q      How did he acknowledge that statement?

13   A      He initialed the before and after each paragraph, and

14   at the end of the statement, he signed his name.  I didn't

15   read the last page.

16   Q      There's another page; correct.

17   A      The gun that was given to the Investigator by my mother

18   is the one that I shot Rodney and Angela with.  The knife is

19   under the kitchen sink.  I cleaned the gun and knife.  The

20   four empty shell casings I threw in a field behind the shed

21   and over the fence toward the neighbor's house behind my

22   house.  And then it is signed Jason Holloway.

23   Q      Okay.  And, after that statement was written, what was

24   done with it.  After the statement was written down, what was

25   done with it?

1   A     After he signed it, I read it back and he read it and

2   went over it, indicated that it was accurate and the ....

3   Q     And, that was it?

4   A     That was it.

5           MR. GIBBS:  State moves to admit Exhibit 56 and 57.

6           THE COURT:   Admitted over objection.

7   **(WHEREUPON, DOCUMENTS MARKED AS STATE EXHIBITS 56 AND 57 WERE**

8   **ADMITTED.)**

9           THE COURT:  Anything else from this witness?

10          MR. GIBBS:  Just one second.   Nothing further from

11  this witness.

12          THE COURT:  Cross-examination.

13          MR. BLANCHARD:  Yes, sir, Your Honor.

14                    **CROSS EXAMINATION**

15  **BY MR. BLANCHARD:**

16  Q     Investigator Wright, you are with the ABI, Alabama

17  Bureau of investigation?

18  A     Yes, sir.

19  Q     All right.  Are you the case agent in this case?

20  A     I am, well, the case agent for ABI.

21  Q     All right.  And, you went to assist the local people;

22  is that right?

23  A     That's correct.

24  Q     In Chambers County?

25  A     Yes, sir.

1  Q    So, when you do that, do you operate under your rules

2  or their rules?

3  A    I follow my department's policy and procedure,

4  whatever, rules.

5  Q    All right.  Now, when you you went to the scene, I

6  think you said you helped process and photograph the scene.

7  Did you take any photographs?

8  A    Yes, sir, I did.

9  Q    And, did you collect any evidence yourself, personally?

10  A    Not at the scene; no, sir.

11  Q    Mr. Boswell, testified here earlier today.  Did he do

12  most of the evidence collecting?

13  A    Yes, sir, he did.

14  Q    All right.  You testified about some ceramic pieces.

15  And I believe you said they were scattered about the house.

16  Mr. Wright [sic.], earlier today showed us an exhibit and

17  testified that the ceramic pieces were found here.

18  A    Yes, sir.

19  Q    Is that where they were found?

20  A    Around the living room.  There were some, I believe,

21  around the coffee table and by and I think there was a piece

22  on the television.

23  Q    On the television?  Sitting up on the television?

24  A    A broken piece of it.

25  Q    A broken piece.  All right.  Like somebody had put it

1  there?

2  A    I couldn't say.  There was -- to the best of my

3  recollection there was a piece on the television.

4  Q    Okay.  But the main part of what you found or saw was

5  down here next to the coffee table?

6  A    That's correct.

7  Q    That was all that there was on the floor.

8  A    Yes, sir.

9  Q    Let me ask you about -- you testified about some

10  women's under garments, panties, found in these trees; is

11  that right?

12  A    Yes, sir.

13  Q    All right.  Were those found on February the 3rd of

14  2000?

15  A    I believe that's correct.

16  Q    Was that a yes?

17  A    Yes, sir.

18  Q    All right.  And, now, when did Jason tell you where he

19  put the shells?  On what date was that?

20  A    January 21st of 2000.

21  Q    So, as of January 21st, it was known that Jason threw

22  some shells in that area?

23  A    Yes, sir.

24  Q    All right.  You didn't go out there and look for them

25  at that time?

```
 1   A      Not on the 21st, no, sir.

 2   Q      You didn't go out there until the 3rd to look for the

 3   shells?

 4   A      That's correct.

 5   Q      The panties were found on the 2nd; isn't that right?

 6   February 2nd.

 7   A      I'm not sure of the date on that.

 8   Q      You did not find them?

 9   A      I was -- those were given to me by Deputy Blackstone.

10   Q      But, if the testimony here was earlier they were found

11   on February 2nd, you wouldn't argue with that; is that right?

12   A      No, sir.

13   Q      Do you know -- Jason Holloway was arrested after his

14   statement, was he not?

15   A      He was.

16   Q      All right.  And, as of the time when the panties were

17   found, he was still in the county jail; wasn't he?

18   A      Yes, sir, he was.

19   Q      All right.  So, between the date of his statement and

20   January 21st, and the date that the panties were found, he

21   was locked up and couldn't go to his house.

22   A      That's right.

23   Q      On the other hand, that area where the panties were

24   found, was an open area.  It was not fenced in, was it?

25   A      No, sir, it was not.
```

1   Q      So, any member of the public could have had access to

2   it?

3   A      Yes, sir.

4   Q      Let me correct myself on something.  If the panties

5   were actually found on January the 31st, would that be

6   consistent with your recollection?

7   A      Yes, sir.  Again, I'm not sure of the exact date, but

8   that would sound correct.

9   Q      In any event, it was 10 days after the January 21st,

10  the date on which Jason Holloway was arrested?

11  A      Yes, sir.

12  Q      Now, let me ask you about the statement you took.  You

13  said that the statement was recorded by you writing it down,

14  essentially.

15  A      Yes, sir.

16  Q      And, you said you did not write it down verbatim.

17  A      No, I did not.

18  Q      Agent Wright, does the ABI use tape-recording

19  equipment?

20  A      It depends on the agent.  I personally have -- do not

21  or have not used either audio or video.

22  Q      You have it available to you, don't you?

23  A      I normally keep a small tape recorder in my vehicle.

24  Q      Have you used it to take witness statements before?

25  A      I have not.

*** Frances L. Roark ***

1    Q    Do you know other law enforcement officers do?

2    A    Yes, sir.

3    Q    And, it is a rather common practice in law enforcement

4    to use audio recording equipment to take statements from

5    suspects and witnesses?

6    A    I am aware that others use it; yes, sir.

7    Q    But, you did not use it on this date?

8    A    I did not.

9    Q    Why did you not use it on this date?

10    A    It is not -- as I stated, it is not -- I have never

11    used it personally.  I have not used audio or video.  I mean,

12    there's no set rule or policy to use one or not to use one.

13    I just did not use one.

14    Q    Has the district attorney in this circuit set a rule

15    that such devices are not to be used when interrogating a

16    suspect?

17    A    At that time, I was not aware of any rule.

18    Q    So, you don't know?

19    A    I had no knowledge of any such rule at that time.

20    Q    Do you have knowledge of it now?

21    A    I have heard to some effect that the local agencies

22    have been asked not to.

23    Q    Asked not to record statements such as this?

24    A    Yes

25    Q    By tape recording?

```
 1   A     Yes.

 2   Q     Wouldn't a tape recording provide the most accurate

 3   version of what was said on that day?

 4   A     Tape recorder, it would provide an accurate statement

 5   of what occurred that day; yes.

 6   Q     In some places in this statement did you choose a word

 7   you were familiar with and wanted to use instead of a word

 8   Jason Holloway used?

 9   A     No, sir.  The words that I wrote were his words.

10   Q     Well, did he say, I did ejaculate in her?  Is that what

11   he said?

12   A     I think he was asked did he and he said I did ejaculate

13   in her.

14   Q     That was not his word?

15   A     The question to him may have been:  Did you ejaculate

16   in her and he said I did ejaculate in her.  Yes, sir.

17   Q     What about this where he says, the statement says she

18   was still gasping for air.  Is the word gasping his word or

19   your word?

20   A     That's his words.

21   Q     You are sure about that?

22   A     Yes, sir.

23   Q     You didn't record it, though?

24   A     No, sir, I did not.

25   Q     So, how can we be sure.  We can't, can we?
```

```
 1  A     Take my word for it, I guess.

 2  Q     You said you showed him the statement and let him read

 3  it; is that correct?

 4  A     That's correct.

 5  Q     Did you question him about his educational level?

 6  A     No, sir.  He had talked -- I don't remember talking to

 7  him about his education.

 8  Q     You don't know anything about his ability to read and

 9  write?

10  A     Other than he said he could.

11  Q     You didn't know that he failed the high school

12  graduation test three times and, in fact, never graduated?

13  A     No, sir.

14  Q     That he was in some special education classes, you

15  didn't know that?

16  A     No, sir.

17  Q     Did you ask him to read it out loud?

18  A     No, sir.  I didn't ask him to read it out loud; no,

19  sir.

20  Q     He just said he read it.

21  A     He said he read it and understood it.

22  Q     You did not read it to him?

23  A     No, sir.

24        MR. BLANCHARD:  I think that's all.  Thank you.

25        THE COURT:  Anything further?
```

1         MR. GIBBS:  No further questions, Your Honor.

2         THE COURT:  You may step down.  This witness is

3    released.  Thank you, sir.

4    (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

5         THE COURT:  Call your next witness.

6         MR. GIBBS:   The State rests.

7         THE COURT:   Counsel, approach.

8    (WHEREUPON, A SIDE BAR COMMENCES.).

9         THE COURT:  All right.  At this time what I intend

10   to do is send the jury home for the day and we will start in

11   the morning at 9.  I am going to tell them I have some

12   matters to take up with y'all, but follow the same

13   instructions and be back here in the morning early.

14       Anything else you want to put on the record?

15         MR. BLANCHARD:  We're going to have motions.

16         THE COURT.  We'll do that after they have gone.

17         MR. GIBBS:  Your Honor, we still have got about

18   five or six looking at evidence on the back row.

19         THE COURT:  Let's just wait a minute until they get

20   through.

21   (WHEREUPON, A SIDE BAR CONCLUDES.)

22         THE COURT:  You are to follow the same instructions

23   that I have given you several times before.  Don't talk with

24   anyone about this case.  Do not engage in conversation with

25   anyone about this case.  Do not discuss this case with

1   anyone, not even amongst yourselves. Don't try to learn

2   anything about the case. Avoid all contact with family

3   members, both of the victims and the defendant. Do not talk

4   to law enforcement officials or any persons who may be a

5   witness in this case. Avoid the news media or coverage of

6   this case.

7        Ladies and Gentlemen, with that I'm going to allow

8   you to go to the jury room and then exit. We will be in

9   recess until 9 o'clock in the morning. Be in the jury room

10  at 9 o'clock. There are some matters that I have to take up

11  with the attorneys at this time. Thank you.

12  (WHEREUPON, THE JURY WAS ADJOURNED UNTIL 9:00 A.M., 10 JUNE,

13  2003.)

14        THE COURT: All right. We will be in recess until

15  9:00 in the morning. Counsel, approach.

16        MR. BLANCHARD: Judge, this is a three-count

17  indictment. Each count charging capital murder. The first

18  count charges the murder of two or more persons pursuant to

19  one scheme or course of conduct and the next two counts each

20  one alleges a burglary murder. Count two relates to Rodney

21  and count three relates to Angela. I am going to move for

22  Judgments of Acquittal at this time as to all three counts.

23        However, I will direct my arguments only to two

24  counts two and three. All right.

25        Judge, on the burglary murder count we have a very

1   serious problem, I think.  The State, obviously, concedes

2   that the initial entry of Jason Holloway into the Brown

3   residence was lawful.  There is no evidence of forced entry

4   at all and, certainly, Jason's statement, which is the only

5   account from someone who was present on the scene, doesn't

6   support forced entry.  In fact, the only inference that could

7   be drawn is that entrance into the residence was lawful.

8       As you know, burglary requires either an unlawful entry

9   or unlawful remaining.  So, if the State is to establish

10  burglary, what they are left with is unlawful remaining.

11  This raises the specter of the case of Adrian Roderick Davis,

12  which was tried in this court, and, of course, appealed and

13  ultimately affirmed.  But, that case has some differences

14  from this case although the issue is very similar.

15      In the case of Davis, the Supreme Court said, "We

16  reiterate that the evidence of the commission of a crime

17  standing alone is inadequate to support the finding of an

18  unlawful remaining.  But, evidence of a struggle can supply

19  the necessary evidence of an unlawful remaining."  They go on

20  to say, "in homicide cases the mere fact of the victim's

21  death cannot be equated with a struggle."  For example,

22  evidence of a privileged entry followed by death from an

23  injury inflicted by surprise or stealth and causing

24  instantaneous death would not constitute circumstantial

25  evidence of an unlawful remaining."  Then they went on to

1   talk about what Davis did in this case before affirming it,

2   saying that in this case, in the Davis case, there was

3   evidence of such a struggle that would give rise to

4   circumstantial evidence of revocation of the privilege.  "In

5   this case, in the Davis case, his choice to kill by less than

6   instantaneous technique of strangulation and by his use of

7   three nonfatal stab wounds to the victim's lower back, led

8   the Court to conclude that there was evidence upon which --

9   circumstantial evidence upon which an inference that his

10  permission to remain had been revoked."  You know could

11  stand.

12      In this case, we are presented with a different set of

13  facts.  In this case, we have, instead of strangulation,

14  instead of stabbing, we have the defendant going in the --

15  according to his statement, Rodney Brown after Jason makes

16  his statement, Rodney Brown swings a baseball bat which we

17  have seen at him.  Rodney shoots him -- not Rodney.  Jason

18  shoots him.  He falls.  About the same time he's shooting

19  Angela.  She's getting up off the sofa and he shot her.  Both

20  victims incapacitated at that point.  No evidence of a

21  struggle or anything like it.  No evidence his license to be

22  in the home was ever revoked.  Very different, even,

23  circumstantial evidence.  Very different evidence from the

24  Davis case.  The Davis case was a five, four *per curiam*

25  decision.  It was five, four.  Justice Almon wrote for

1   dissenters.  What he said I think is interesting and applies

2   to this case.  He talked about the Gentry case which preceded

3   Davis.  He said, "Gentry rejected the construction of, quote,

4   remains unlawfully, unquote, that is now adopted by the

5   majority in part because that construction has the potential

6   to make almost every murder committed in doors a capital

7   murder.  And, nearly every crime that occurs in doors can be

8   bootstrapped into a burglary simply by the fact of the

9   commission of the crime.  This is contrary to the historical

10  concept of the burglary which requires that the unlawfulness

11  of the entry or later the unlawfulness of the remaining be

12  proved separately from the intent to commit or the act of

13  committing a crime inside the dwelling or building."  Another

14  paragraph or two down, he says, "as to the burglary murder

15  conviction, the majority of this Court is allowing a murder

16  conviction to be made capital by allowing the jury to draw an

17  inference of an implied revocation of a privilege to remain.

18  It is an inference of an implied revocation -- excuse me.  He

19  says, "is an inference of an implied revocation a basis on

20  which to, quote, genuinely narrow the class of persons

21  eligible for the death penalty so that capital punishment is

22  reserved for the most egregious crimes."  And he quotes

23  Gentry and Zant B. Stephens, 462 US 862.  Finally he says, "I

24  foresee great difficulty," and I think we are seeing it in

25  this case, "I foresee great difficulty in drawing the line

1   between a capital murder burglary case in which the inference

2   of an implied revocation will be supported and a noncapital

3   case of an in door murder in which that inference will not be

4   supported by the evidence." We have here the only evidence

5   -- well, there is no evidence. We have a broken figurine

6   which was on a coffee table which could have been bumped or

7   knocked off by anyone. You remember I asked Mr. -- I can't

8   think of his name -- was there any furniture overturned; no.

9   Were there any chairs over turned? Was there any furniture

10  broken? Were there any pictures knocked off the walls? Were

11  there any smears of blood? Was what you saw consistent with

12  someone getting up off the sofa, tipping the table, knocking

13  off a piece of porcelain and it breaks? Yes, it is

14  consistent with that. Nothing there consistent with any kind

15  of struggle. There is no evidence of skin cells under the

16  fingernails of either Rodney or Angela. Only it, appears,

17  their own blood, which could have got there by them touching

18  their wounds or whatever.

19       Judge, this is simply one of those cases in which the

20  proof of a struggle is insufficient to support this implied

21  revocation and if these counts stand, we could be guessing

22  Mr. Holloway into a capital conviction.

23            MR. LISENBY:   Well, Judge, I would respond in a

24  couple ways to that. Based on the defendant's own statement

25  this is not an implied or inferential case at all. According

1   to his own statement, he said, "I went in and asked him about

2   what he had said. He went and got a baseball bat that was by

3   the TV. He went to swing it and I pulled a gun from my

4   jacket pocket and shot once." I believe that is a complete

5   termination of any license or privilege to be in a residence

6   when someone starts swinging a bat at you. I believe that's

7   more than an implied comment that is a direct comment that

8   you are not where you are supposed to be. So, there is

9   clearly no problem with regard to Rodney Brown.

10      And, then, Angela Brown in the third count also.

11  Obviously, if Rodney is telling Mr. Holloway to leave at that

12  point that would apply to her as well. In addition to that,

13  of course, with regard to her, Mr. Holloway came back after

14  he had already shot two people, found her still alive, struck

15  her again, stabbed her, tried to smother her, just exactly

16  the words in Davis of evidence of struggle giving rise to the

17  inference of an unlawful remaining is supplied by Davis'

18  choice to kill by a less than instantaneous technique,

19  strangulation and by his use of three nonfatal stab wounds to

20  the victim's lower back. Clearly in this case, after he had

21  shot Angela he struck her with a ball bat, tried to smother

22  her, stabbed her with a knife. Again, by the defendant's own

23  statement, she was alive during that time that he was doing

24  all of this. In his own description in his own statement.

25      Further the Gentry decision which was overruled was

1  written by Justice Almon.  And, that case had a completely

2  different fact circumstances.  In that case the estranged

3  boyfriend of the victim had snuck into her house and was

4  staying -- was inside the house staying there awaiting her

5  return.  And, when she came in, there was no other evidence

6  other than the fact that he immediately shot her and killed

7  her.  Davis was different in regard to the use of

8  strangulation technique and the stab wounds.  This case is

9  different in that by the defendant's own statement, he

10  indicates that his license, or privilege, to remain was

11  terminated by Rodney Brown.  Further he did use a

12  noninstantaneous type death in the death of Angela.  So,

13  there's no guessing here.  This is a direct removal of the

14  license to remain.  And I would not necessarily -- I

15  apologize.  I would not necessarily agree with the statement

16  Mr. Blanchard made that -- with regard to the unlawful entry

17  either, because the fact that there were ceramic pieces all

18  around could indicate the fact that the defendant simply came

19  in with surprise and not just knocking on the door as he

20  described it in his statement.  There, obviously, was some

21  type of -- circumstantial there -- there was some struggle

22  going on for those pieces to be there.  Clearly they were not

23  there when the children left for school that morning.  And

24  they were there when the police got there.  And as the Court

25  can see in the exhibit which has already been removed out of

1   the courtroom, but there were multiple pieces.  It was not a

2   piece as I think Mr. Blanchard mentioned.  It was multiple

3   pieces of ceramics all over the floor.

4           MR. BLANCHARD:  Well, if you look at that -- the

5   photographs and the video tape, you see there are a number of

6   ceramic pieces on that coffee table.  If it had been bumped

7   or tipped in some way, those pieces, a number of them, could

8   have fallen off.  I don't think I said there was only one

9   piece.  There was, obviously, a broken ceramic thing of some

10  sort, but many pieces.

11       Judge, I don't agree with my learned collegue about the

12  revocation of the privilege at the outset.  Let's assume that

13  Mr. Holloway did enter with privilege.  I don't think there's

14  any evidence to support that he did not.  He comes in, he

15  says something to Mr. Brown.  Mr. Brown decides to engage him

16  in mutual combat, an affray.  I'm going to beat you with this

17  bat.  That's not the same as saying get out of my house.  I

18  don't want you in here.  It may be saying, I am going to

19  beat, you know, the stew out of you with this baseball bat,

20  because I want to do it and I'd like for you to remain right

21  here while I do it.  It is not saying get out of my house

22  your license to be here is terminated.  I don't think you can

23  draw an inference from that that his permission to be there

24  was somehow revoked at that time.  If he had said through

25  evidence, Get out of my house or I'm going to hit with you

1  this bat, that might be another matter.  That's not what the

2  evidence is.

3       THE COURT:  What about his subsequent reentry into

4  the trailer as regards Angela Brown.

5       MR. BLANCHARD:  Yes, sir.  I would have to say that

6  the subsequent reentry was a lawful entry into the house.  I

7  mean, he had not, as I say, it had not been revoked at that

8  time.  No one had told him to get out.

9       THE COURT:   Well, one is dead and one is dying.

10      MR. BLANCHARD:  Sure.  Let me analogize it this

11 way.  Suppose that he had been coming back into the house to

12 render aid.  That he had had a change of heart and was coming

13 back in to render first aid.  Would his entry into the home

14 have been unlawful on a trespass at that point?  I don't

15 think that it would have been.

16      THE COURT:  Well, entry to render aid and entry to

17 finish killing someone, I think might be two different

18 constructions.

19      MR. BLANCHARD:  Well, talking about the intent of

20 what is to go on when you are inside which may make it -- I

21 don't know that makes a difference, though, as to the entry.

22 It may make it burglary once you get inside, I guess, if you

23 have intent to commit a crime in there and you unlawfully

24 enter then its burglary, but your intent going in, I don't

25 think matters.

1          THE COURT:  If you come up to someone's house and

2     they invite you in and then you subsequently leave, when you

3     come back to that house, do you feel that you have the legal

4     right to enter without permission of an occupant?

5          MR. BLANCHARD:  If -- let me put it this way:  I

6     suppose that would depend on the circumstances.  If the door

7     was locked; no, I wouldn't.  If the door were not locked, I

8     might feel as if I had some authority to enter if I came

9     back.

10         THE COURT:  Although you were the one that left

11    the door unlocked and there's no occupant inside capable of

12    locking the door at that point.

13         MR. BLANCHARD:  I admit that's a closer question.

14         THE COURT:  I think so too.  I think that without a

15    doubt you have raised an issue that is contained in Gentry

16    that quite frankly I thought after Davis might be resolved

17    once and for all, but it is not.

18         Anything else from anyone?

19         MR. LISENBY:  I just want to add with regard to the

20    comment Mr. Blanchard made about the fact that someone is now

21    taking a bat to Mr. Holloway that's not a revocation of

22    license of some kind.  There's a statute that is 13A-3-25,

23    which is defense of premises.  That states a person in lawful

24    possession or control of a premises may use physical force

25    upon another person when and to the extent that he reasonably

1  believes it necessary to prevent or terminate what he

2  reasonably believes to be the commission or attempted

3  commission of a criminal trespass by the other person in or

4  upon such premises.  That's clearly what was taking place

5  here by the defendant's own statement.

6        THE COURT:  Let me briefly put in the record a few

7  observations.  First, I don't think the State has evidence of

8  an illegal entry in the first point or in the first place

9  when this defendant goes into the trailer.  When by his own

10  admission Rodney Brown fetches a baseball bat, there are

11  different inferences that could be drawn as Mr. Blanchard had

12  said.  One might be that remain right here and I intend to

13  pulverize you in the privacy of my home.  Another might

14  equally be that the welcome mat is hereby snatched from under

15  your feet and get out.  After that point Rodney Brown is

16  shot, Angela Brown is shot.  The defendant leaves.  By his

17  own admission he later reenters.  At that point Rodney Brown

18  is dead and Angela Brown is dying.  He assaults her with a

19  bat.  The same bat from the evidence that was initially

20  wielded by Rodney Brown and she is stabbed or cut with a

21  knife that this defendant has brought from his residence.  I

22  feel that in the facts of the case as to count three, there

23  is absolutely no basis for the grant of a Judgment of

24  Acquittal; and, therefore, it is denied.

25        As to count two, it may be a closer questions under the

1   Davis, but under the facts and circumstances submitted, I am

2   going to find that there was a legal revocation of any right

3   or privilege of Davis -- of this defendant to be in the

4   premises or residence under the rule set forth in Davis.

5        Did your Motion for Judgment of Acquittal address count

6   one?

7           MR. BLANCHARD:   I made a Motion for Judgment of

8   Acquittal as to count one but I chose not to argue it.

9           THE COURT:   That one is, likewise, denied.

10       Nine o'clock, gentlemen.

11  (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED UNTIL 9:00 A.M.,

12  10 JUNE, 2003.)

13                              *****

14

15

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
CHAMBERS COUNTY

STATE OF ALABAMA,                    *
                                     *        CRIMINAL NO.
versus                               *        CC-2000-0000166
                                     *        LaFayette, Alabama
                                     *        10 June, 2003
JASON HOLLOWAY,                      *
        Defendant.                   *        **CRIMINAL APPEALS NO.**
                                     *        **CR-02-2115**
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF TRIAL BEFORE

THE HONORABLE RAY D. MARTIN,

CIRCUIT JUDGE, AND A JURY.

A P P E A R A N C E S
FOR THE STATE OF ALABAMA:    REA S. CLARK, DISTRICT ATTORNEY
                             FIFTH JUDICIAL CIRCUIT
                             CHAMBERS COUNTY COURTHOUSE
                             COUNTY OFFICE BUILDING
                             LAFAYETTE, ALABAMA 36862

                             BY: REA S. CLARK, DA
                                 BILL LISENBY, CHIEF ADA
                                 KENNETH GIBBS, ADA


FOR THE DEFENDANT:           BLANCHARD & ASSOCIATES, LLC
                             ATTORNEYS AT LAW
                             505 SOUTH PERRY STREET
                             MONTGOMERY, AL 36104

                             BY: WILLIAM R. BLANCHARD, ESQUIRE
                                      and
                             KEITH & HAMM, PC
                             ATTORNEYS AT LAW
                             235 SOUTH McDONOUGH STREET
                             MONTGOMERY, AL 36104

                             BY: RICHARD K. KEITH, ESQUIRE


                             FRANCES L. ROARK, CSR
                             OFFICIAL COURT REPORTER
                             Fr3L126

PROCEEDINGS:  In Open Court.

(JURY NOT PRESENT)

MR. KEITH: Your Honor, the defendant intends to call Sandra Patterson as its first witness.  And, Sandra, among other testimony, would have testimony and medical documentation to back it up from the Randolph County Hospital, where, when she was raped by the Rodney Brown around February 19th, 1998, on or about that date, she went to the hospital for a pretty standard rape kit type examination.  We intend to elicit testimony from Ms. Patterson about Rodney's general reputation and other appropriate testimony, and basically expect her to testify that as far as Rodney's reputation for violence and propensity for violence that he, in fact, raped her in February of 1988.

**(WHEREUPON, MEDICAL RECORDS WERE MARKED AS DEFENDANT EXHIBIT 1 FOR IDENTIFICATION.)**

MR. KEITH:  We have medical records that have been identified as Defense Exhibit number 1 that we would intend to offer in evidence, at least make an offer of proof at this point, from Randolph County Hospital, certified medical record, that explains her reporting this rape at the hospital and receiving the exam.  Admittedly she does not state in this record who raped her.  Her testimony would serve that purpose.  It would be documentation and the fact that it

1   happened.

2           MR. LISENBY:  Judge, I have a case which is *Johnson*

3   *versus State,* 571 So. 2nd 375, Court of Criminal Appeals,

4   1990.  This was a homicide case in which the defendant

5   attempted to offer for the purpose of showing his state of

6   mind that his daughter had been raped and that he had been

7   informed of that prior to going and allegedly committing a

8   homicide against the victim.

9           THE COURT:  Is this against the person who

10  allegedly raped his daughter?

11          MR. LISENBY: Yes.  Yes, sir.

12          THE COURT:  Let me get this right.

13          MR. LISENBY:   The defendant --

14          THE COURT:   The defendant's daughter was --

15          MR. LISENBY:   -- was allegedly raped by the victim.

16          THE COURT:   -- by the deceased victim.

17          MR. LISENBY:   Yes, sir.

18          THE COURT:   The defendant is charged with what?

19          MR. LISENBY:  He was, best I can tell, he was

20  convicted of -- he was indicted for murder and was convicted

21  of manslaughter.

22          THE COURT:   Indicted for murder, regular murder,

23  at trial he attempts to show that --

24          MR. LISENBY:  He called -- I am sorry.  He called

25  the daughter to testify that she was raped by the deceased.

1         THE COURT:    And?

2         MR. LISENBY:    And that the defendant, Mr. Johnson,

3   was aware of that prior to his going and confronting the

4   deceased and allegedly committing the homicide.

5         THE COURT:    And did the trial court allow that

6   evidence?

7         MR. LISENBY:    The trial court did not allow that

8   evidence.  What the trial court did allow was the fact that a

9   report had been made, but not the details of the event.  I

10  have this case for you to look at, Judge.  Basically, what

11  happened is the defendant called a number of people to

12  indicate the report of the rape had been made.  When the

13  daughter got on the witness stand to discuss the details of

14  the rape, the trial court sustained an objection by the

15  prosecution, and gave a limiting instruction to the jury that

16  -- I'll just read it very quickly.  I have a copy of it, but

17  I will read it very quickly.

18        "Ladies and Gentlemen, let me explain to you that

19  this evidence is being admitted for a limited purpose.  The

20  issue before you, and upon which this testimony is being

21  admitted, is that the defendant's state of mind by virtue of

22  what he had been informed.  The evidence of an alleged rape

23  is being admitted for your consideration, not with respect to

24  whether that occurred or didn't occur.  There is going to be

25  no evidence before you whether it did or didn't.  The issue

1    being admitted in the case is for the defendant's state of

2    mind.  That is, whether he had or had not been told that it

3    had occurred.  So, that's the reason that this is being

4    admitted into evidence and I will exclude the witness' remark

5    in response to the question about whether it had occurred."

6    I will provide this case to the Court to look at.

7         So, I would say that assuming that the other factors

8    that I cited in my Motion in Limine can be met, I have not

9    gotten to that point yet, assuming that those factors could

10   be met, it appears based on Johnson that the details of the

11   rape would not be permissible to be admitted such as the

12   medical records and things of that nature, only the fact that

13   Ms. Patterson reported that a rape had occurred and that in

14   some way the defendant knew about that prior to this

15   particular incident that we are at the trial on.

16        The second prong of my objection to the admission of

17   any of this testimony is that the four factors that I cited

18   to the Court in my Motion in Limine have not been established

19   by this offer of proof.  Most specifically number three, the

20   relationship between the defendant and the victim after the

21   defendant was informed of the act of violence.  The only

22   testimony before the Court at this point is that the

23   defendant and the victim were friends who associated

24   constantly.  Jerome Cofield testified that his last occasion

25   to visit Rodney and Ann at their trailer, the defendant was,

1  in fact, out in the yard with Rodney having a good

2  conversation, I believe was his quote.  And, the fourth

3  factor, the similarity or dissimilarity of the facts of the

4  present homicide to the facts of the reported act of

5  violence, clearly that would not meet that particular prong

6  because it is a reported act of a rape of a female not of a

7  male sodomy of a male or anything of that nature.  So, I

8  would say, specifically with regard to those two factors,

9  there's not been any showing and the other two factors I am

10  not too clear on.  The first one is the distance between the

11  time of the reported act of violence and present homicide,

12  which would be February of '98, the reported act of rape, to

13  January of 2000.

14          THE COURT:  Two years.

15          MR. LISENBY:  Two years.  The second is the

16  presence or absence of friendship or kinship between the

17  reported victim of the act of violence and the defendant.

18  And, further in my interviews with Sandra Patterson, I don't

19  know what she's going to testify to here now, but in my

20  interviews with her, she indicated that she never told the

21  defendant about this event.  So, I don't think there's going

22  to be any proof that he knew of this particular event.

23          THE COURT:  All right.  Let's think about the case

24  for a second.  The case allows injection before the jury of

25  the issue of an alleged attack on a third party.  It does

```
 1   that.  What it also does is limit the amount of the detail

 2   from the complainant in the separate alleged rape case.  I'm

 3   thinking of following pretty closely the case.  I will allow

 4   the facts tha a rape was reported with Rodney Brown being

 5   named as the perpetrator.  I'll limit the details.  But also

 6   there is the element that this must be in this defendant's

 7   knowledge at the time he goes to the trailer on that morning.

 8            MR. KEITH:  Yes, and there are some distinctions in

 9   the Johnson case to where -- since it was an act of the

10   self-defense in the homicide death of the Rodney Brown that

11   is significantly different from the Johnson case where that

12   particular defendant killed the victim because of the rape of

13   his daughter, and we don't offer this piece of evidence as

14   justification for him killing Brown, because it was

15   self-defense.  It is just an explanation of his state of mind

16   as to why he took the gun over there to the residence to

17   begin with, and there are some distinctions.

18            THE COURT:  In either case, still you are

19   propounding this as theory of defense whereby this defendant

20   found himself armed in the victims' trailer.  That's got to

21   be the basis or it is clearly inadmissible.

22            MR. KEITH:  Right.

23            MR. LISENBY:  I would propose to the Court this

24   limiting instruction to give to the jury.

25            THE COURT:  Based upon that case?
```

1          MR. LISENBY:  Based upon Johnson; yes, sir.

2          THE COURT:   I think that is appropriate.  So you

3    may need to talk with your witness.  I'm not going to allow

4    details.  I'm going to allow the report and I'll allow that

5    sort of thing, but we are not going to try a rape case.

6          MR. KEITH:  No, sir.  She is going to state that

7    Rodney Brown raped her, and she reported it to the hospital,

8    and we are satisfied, basically, with that.

9          THE COURT:   I'll give a limiting instruction and

10   we'll move on.

11         MR. LISENBY:   Defendant's Exhibit 1 does not come

12   in, then?

13         MR. KEITH:  This is the report.

14         THE COURT:  It can go into the record, but not into

15   evidence.  You can admit it into the record.  I understand

16   you want to do that.  I'm not going to let it go to the jury.

17         MR. BLANCHARD:  Admitted for offer of proof

18   purposes?

19         THE COURT:  Exactly.

20         MR. KEITH:  We move to admit Defendant Exhibit

21   number 1, Randolph County Medical Center records.

22         THE COURT:  As an offer of proof.

23         MR. KEITH:  Yes, sir.  For the rape of Sandra Brown

24   that occurred on or about February 19, 1998.

25         MR. LISENBY:  Sandra Patterson.

1        MR. KEITH:  I am sorry.  Sandra Patterson.

2        THE COURT:  Admitted into evidence for that

3   purpose.

4   **(WHEREUPON, MEDICAL RECORDS MARKED AS DEFENDANT EXHIBIT 1**

5   **WERE ADMITTED AND MADE PART OF THE RECORD, BUT NOT FOR THE**

6   **JURY.)**

7        THE COURT:  Now this will be made part of the

8   record.  It will not be part of the evidence that goes back

9   to the jury.  Okay.

10  (JURY PRESENT)

11       THE COURT:  Ladies and Gentlemen, first, let me

12  state for the record that all jurors present, parties

13  present, counsel present.

14     At this point the State has rested and the Defense will

15  proceed.

16       MR. KEITH:  Thank you, Your Honor.  Defendant calls

17  Sandra Patterson.

18                    **SANDRA PATTERSON**

19        **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

20          **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

21                    **TESTIFIED AS FOLLOWS:**

22                    **DIRECT EXAMINATION**

23  BY MR. KEITH:

24  Q    State your name for the record, please, ma'am.

25  A    Sandra Patterson.

| | | |
|---|---|---|
| 1 | Q | How old are you Sandra? |
| 2 | A | Twenty-six. |
| 3 | Q | Where do you live? |
| 4 | A | I live in Welch. |
| 5 | Q | Your address there in Welch? |
| 6 | A | 1011 County Road 250. |
| 7 | Q | You will have to speak up a little bit. |
| 8 | A | 1011 County Road 250. |
| 9 | Q | That's in the Welch community? |
| 10 | A | Yes. |
| 11 | Q | You live in a duplex or single dwelling residence? |
| 12 | A | Duplex. |
| 13 | Q | Who do you live with? |
| 14 | A | My mom. |
| 15 | Q | What is her name? |
| 16 | A | Luella Patterson. |
| 17 | Q | Anybody else? |
| 18 | A | My little boy. |
| 19 | Q | Okay.  You, your mother, and your son. |
| 20 | A | Um-hmmm. |
| 21 | Q | Who lives next door to you? |
| 22 | A | Jason and his mother used to live next door to us. |
| 23 | Q | Jason Holloway -- |
| 24 | A | Um-hmmm. |
| 25 | Q | -- and his foster mother? |

1    A    Um-hmmm.

2    Q    And her name?

3    A    Marie Collier.

4    Q    Marie Collier.

5         How long have you been living -- how long have you

6    been next door neighbors, you and Jason?

7    A    About almost five years.

8    Q    Okay.  And, did you have opportunities to interact with

9    Jason?

10   A    Um-hmmm.  We talked sometimes when he'd come over.

11   Q    Jason would talk to you and talk to your momma?

12   A    Um-hmmm.

13   Q    And, would you have these opportunities on pretty much

14   a regular basis over the past five years, him being a next

15   door neighbor?

16   A    Um-hmmm.

17   Q    And, based on those interactions with Jason Holloway,

18   are you able to tell the ladies and gentlemen of the jury

19   your opinion about Jason's reputation for telling the truth?

20   A    He was pretty honest.  He never told me any lies.

21   Q    And, based on your interaction and knowledge of Jason

22   Holloway, do you have an opinion that you can tell the jury

23   about his reputation as a peaceful person?

24   A    He never started any trouble or anything.  Never

25   started anything with anybody.

1    Q     Did he have any reputation for violence?

2    A     No.

3    Q     Okay.

4    Q     Do you know Rodney and Angela Brown?

5    A     Um-hmmm.

6    Q     How long have you known -- have you known them both the

7    same period of time?

8    A     I just know them when we moved up there.

9    Q     How long have you known Angela Brown?

10   A     Like for about four years.  Like since we moved up

11   there.

12   Q     So, for about the past four years leading up to the

13   year 2000, you knew Angela Brown?

14   A     Um-hmmm.

15   Q     Were you friends with her, just neighbors, or what?

16   A     Um-hmmm.

17   Q     Did you have opportunities or occasions when you would

18   interact with her, go visit her, and do things like that?

19   A     Yes.  She came over to our house and we went over there

20   sometimes.

21   Q     How many times had you been over to her house?

22   A     I used to go over like everyday because I had to sit

23   for her mom.  She wanted me to sit with her mom while she

24   worked.

25   Q     Sandra, you are going to have to speak loud as best you

1   can.  We are not going to keep you up there very long and I

2   need you to speak really loud as best you can.

3        You are saying you would help take care of Ann -- you

4   called her Ann, Angela Brown.

5   A    Um-hmmm.

6   Q    You helped take care of her mother.

7   A    Um-hmmm.

8   Q    Was there any particular reason why you would do that?

9   A    Because Rodney would leave sometimes and she wanted

10  somebody to be there with her mom.

11  Q    Do you know where Rodney would go?

12  A    No.

13  Q    And, what do you know about Angela Brown?  Was she a

14  good person?

15  A    Yes, she was nice.

16  Q    Never caused you any problems?  You never had any

17  problems or anyone had any problems?

18  A    No.

19  Q    And, how long have you known Rodney Brown?

20  A    I just know him since we moved up there.

21  Q    For the same four years or --

22  A    Um-hmmm.

23  Q    -- four years leading up to the year 2000?

24  A    Um-hmmm.

25  Q    And, do you know any of Rodney's friends?

```
 1   A      No.

 2   Q      Did you know anyone by the name of Quinton Oliver?

 3   A      Um-hmmm.

 4   Q      Was he related or a friend of Rodney's, if you know?

 5   A      Yes, they were friends.

 6   Q      And how was it you know Quinton Oliver?

 7   A      I used to go to school with him.

 8   Q      And, would he hang around Rodney on a regular basis?

 9   A      Um-hmmm.

10   Q      Okay.  You knew Rodney back in February of 1998;

11   correct?

12   A      Um-hmmm.

13   Q      And, based on your knowledge of Rodney, have you ever

14   had any particular problems with him?

15   A      Yes, we had a few problems.

16   Q      Tell the jury about it.

17   A      Well, --

18   Q      Speak up, please.

19   A      -- one day when I went over there to, you know, like I

20   say I used to sit with his mom -- well, with Ann's mom.  She

21   wanted me to sit with her mom.

22          MR. LISENBY:   Your Honor, I would object based

23   on ....

24          THE COURT:  Sustained.

25   MR. KEITH:
```

| | | |
|---|---|---|
| 1 | Q | Do you know about Rodney's reputation for violence? |
| 2 | A | He was pretty violent. |
| 3 | Q | Towards you? |
| 4 | A | Yes. |
| 5 | Q | In what way? |
| 6 | A | He raped me. |
| 7 | Q | When did that happen? |
| 8 | A | Like in February. |
| 9 | Q | Of what year? |
| 10 | A | 2000. |
| 11 | Q | Was it 1998? |
| 12 | A | Yes. |
| 13 | Q | Okay.  Sometime in February of 1998; is that correct? |
| 14 | A | Um-hmmm. |
| 15 | Q | And, was anyone else raping you with him? |
| 16 | A | Quint. |
| 17 | Q | Who? |
| 18 | A | Quint. |
| 19 | Q | Quint otherwise known as Quinton Oliver? |
| 20 | A | Yes. |
| 21 | Q | The two of them took turns raping you in your home? |
| 22 | A | Their home. |
| 23 | Q | Oh, in Rodney and Angela Brown's home? |
| 24 | A | Yes. |
| 25 | Q | Where was Angela when this was going on? |

```
 1   A      She was at work.

 2   Q      Did you make a report to any law enforcement

 3   authorities or any hospitals, if you will, about this

 4   incident?

 5   A      Yes.

 6   Q      And, whom did you report this rape to?

 7   A      To, I guess, the LaFayette Police Department.

 8   Q      LaFayette Police Department and anybody else?

 9   A      I went to the emergency room.

10   Q      Randolph County Hospital --

11   A      Um-hmmm.

12   Q      -- on or about February 19th of 1998?

13   A      Um-hmmm.

14   Q      And, why did you go to the hospital?

15          MR. LISENBY:  I would object.

16          THE COURT:  Sustained.

17   MR. KEITH:

18   Q      Did you report to anyone else, LaFayette Police

19   Department and the hospital -- correct?

20   A      Um-hmmm.

21   Q      Are you aware, or do you have personal knowledge of any

22   other acts of violence attributed to Rodney Brown?

23          MR. LISENBY:  I would object to that.

24          THE COURT:  Sustained.

25   MR. KEITH:
```

*** Frances L. Roark ***

```
 1   Q      Any other explanation about his general reputation for

 2   violence in the community?

 3              MR. LISENBY:  Objection.

 4              MR. GIBBS:   Objection.

 5              THE COURT:  Sustained.

 6              MR. KEITH:  Thank you, Your Honor.  No further

 7   questions.

 8              THE COURT:  Cross-examination.

 9                    CROSS EXAMINATION

10   BY MR. GIBBS:

11   Q      Ms. Patterson, now, you were the next door neighbor to

12   the defendant; is that correct?

13   A      Um-hmmm.

14   Q      I need you to say yes or no?

15   A      Yes.

16   Q      And, you said that you lived next door to each other

17   about five years; is that correct?

18   A      Yes.

19   Q      Now, is that five years from, like, this is 2003 or

20   five years from when?

21   A      We moved up there in '97.

22   Q      You moved there in '97, and when you moved there in

23   '97, was Ms. Collier and the defendant already living in the

24   other side of that duplex?

25   A      Yes.
```

*** Frances L. Roark ***

```
1    Q    So, they were there before you got there.

2    A    Yes.

3    Q    Would you go over to the defendant's house much?

4    A    Went over there sometimes.

5    Q    For what purpose did you go over there?

6    A    To visit.

7    Q    Him or Ms. Patterson -- I am sorry, to visit him or his

8    mother?

9    A    To visit her.

10   Q    To visit Ms. Collier.

11   A    Um-hmmm.

12   Q    Did you and Rodney spend a lot of time together?

13   A    No.

14   Q    I am sorry.  Did you and Jason Holloway spend a lot of

15   time?

16   A    No.  We would speak to each other.

17   Q    To speak to each other.

18   A    Um-hmmm.

19   Q    Would it be safe to say, you were not close to one

20   another, then?

21   A    He never did anything to hurt me.

22   Q    I am asking were you close, really, really good

23   friends?

24   A    Well, we were friends, but ....

25   Q    But you didn't really associate with him.  You'd speak
```

```
 1   and keep going.

 2   A      Pretty much.

 3   Q      Pretty much.

 4        Now, you say that the defendant never really caused you

 5   any trouble.  Is that what you testified to earlier?

 6   A      Yes.

 7   Q      To your knowledge --

 8   A      Yes.

 9   Q      -- were you aware that on June the 22nd of 1999, the

10   defendant was convicted of theft?  Were you aware of that?

11   A      No.

12   Q      Okay.  Now, this incident of what Defense counsel has

13   referred to as a rape that occurred to you involving Quinton

14   Oliver and Rodney Brown.  I just want to clarify one thing.

15   You seemed a little uncertain about the date.  You said 2000

16   and the defendant said 1998.  Do you recall when it happened?

17   A      It was '98.

18   Q      Ninety-eight.

19        Now, isn't it true that when you spoke to Mr. Lisenby

20   and myself in Mr. Lisenby's office, you told us that you

21   never told the defendant about you being raped; is that

22   correct?

23   A      I said everybody knew about it.

24   Q      But my question is, you never told the defendant about

25   it; is that correct?
```

```
 1   A      No, I didn't.

 2          MR. GIBBS:  Thank you.  I have no further

 3   questions.

 4                    REDIRECT EXAMINATION

 5   BY MR. KEITH:

 6   Q      Sandra, you were not proud or you weren't running

 7   around bragging about the fact that Quinton and Rodney Brown

 8   raped you, were you?

 9   A      No.

10   Q      Everyone in the community knew it.

11   A      Yes.

12   Q      Your mother, what's her name?

13   A      Luella.

14   Q      Luella, she, freely shared that information with Jason

15   Holloway, did she not?

16          MR. LISENBY:  I would object.

17          THE COURT:  Sustained.

18   MR. KEITH:

19   Q      Did you mother tell anyone, best you know?

20          MR. GIBBS:   Objection.

21          THE COURT:  Sustained.  That would have to be

22   within her knowledge.

23          MR. KEITH:  Thank you.  No further questions.

24          THE COURT:   Counsel, State and Defense.

25   (WHEREUPON, A SIDE BAR COMMENCES.)
```

1           THE COURT:  Y'all want me to give this limiting

2   instruction at this time or in the final?

3           MR. LISENBY:  Yes, sir, I would like it given now

4   for sure.

5           THE COURT:  Only one time.  I'll do it now not in

6   the final.

7   (WHEREUPON, A SIDE BAR CONCLUDES.)

8           THE COURT:  Anything further from this witness for

9   either side?

10          MR. KEITH:  No, Your Honor.

11          THE COURT:  You may step down.  You are free to go.

12  (WHEREUPON, THE WITNESS TESTIMONY WAS CONCLUDED.).

13          THE COURT:  Let me explain to you that the evidence

14  that was just given before you is being admitted for a

15  limited purpose.  The issue before you, and upon which this

16  testimony is being admitted, is the defendant's state of mind

17  by virtue of what he had been informed.  The evidence is

18  being admitted for your consideration not with respect to

19  whether that occurred or that it did not occur.  There's

20  going to be no evidence before you as to whether it did or

21  didn't.  The issue being admitted in this case is the

22  defendant's state of mind; that is, whether he had or had not

23  been told that it occurred.

24      With that you may proceed and call your next witness.

25          MR. KEITH:  Thank you, Your Honor.  Defense calls

1    Jason Holloway.

2                    JASON LEE HOLLOWAY, SR.

3         HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

4            THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

5                        TESTIFIED AS FOLLOWS:

6                        DIRECT EXAMINATION

7    BY MR. KEITH:

8    Q      State your name for the record.

9    A      Jason Lee Holloway, Sr.

10   Q      And, how old are you Jason?

11   A      Thirty years old.

12   Q      Where do you live?

13   A      I stayed in the Welch community in Chambers County.

14   Welch community.

15   Q      What was your address?

16   A      1011 County Road 250, Roanoke, Alabama.

17   Q      And you heard the testimony from Sandra Patteson that

18   you were next door neighbors in a duplex-type dwelling?

19   A      Yes, sir.

20   Q      Where the houses are joined.

21   A      Yes, sir.

22   Q      And, how long had you been living there in the Welch

23   community?

24   A      I had moved back down in early, about the middle part

25   have '97, I think it was.

1  Q    And, what prompted you moving there in 1997?

2  A    Well, I had moved from Montgomery, because I was having

3  a few problems with my marriage, and so I had left.

4  Q    All right.  Do you have a  family in the Welch

5  community?

6  A    Yes, sir.

7  Q    How many brothers and sisters do you have?

8  A    I have two foster brothers and three biological

9  brothers.

10  Q    Okay.  What about your natural parents?

11  A    My mother is Rosa Jane Holloway.  She's in a nursing

12  home down here in LaFayette.

13  Q    How about your father?

14  A    My father, he is deceased.

15  Q    What happened to him?

16  A    I don't know.  He died.  I don't know he died while I

17  was away.

18  Q    Do you know any of the details involving what type of

19  death he suffered?

20  A    No, sir, I don't.

21  Q    You knew Rodney and Angela Brown.

22  A    Yes, sir.

23  Q    And, how far away was their mobile home, if you will,

24  from your residence?

25  A    About 50 yards, I guess.

1  Q    Okay.  And, how was it -- did you know them both at the

2  same time or did you know Angela longer than Rodney or what?

3  A    I knew Angela a little bit longer than I knew Rodney.

4  I knew Rodney because he went to school with my brothers.

5  And, I would pretty much go over to the house and play with

6  their sister and all, because we were all in school together.

7  Q    You have known Angela Brown -- do you call her Angela,

8  Ann, or what?

9  A    I called her Ann.

10 Q    You have known her how long?

11 A    I have been knowing her pretty much ever since -- I was

12 raised up in the Welch community.  I was 21 months old when I

13 was put in foster care.  I was raised in the community.  So,

14 when I was old enough to know of her and her brothers -- it

15 has been some years.

16 Q    Okay.  And, how far do you go back with Rodney?

17 A    I first met Rodney back in, I think it was, '94, I

18 think it was.  I was -- I had moved back down from West

19 Blockton where I had went to school at.  And, I had moved

20 back down here for the duration of my time before me and wife

21 had got together and moved to Montgomery.  So, I would say

22 '94, but I was knowing him when I was smaller not to really

23 know him until I got older.

24 Q    And how often would you have occasions to go over there

25 to their home?

1    A    Well, I had worked the night shift so I didn't really

2    get a chance to go over there like I used to.  I used to go

3    over there like every other day or either on the weekends I

4    would go over there.  Me, him, and Quinton Oliver would sit

5    around the tree and talk or whatever.

6    Q    Where were you working back in January of 2000?

7    A    I was working at Wehadkee Yarn Mills in Roanoke,

8    Alabama.

9    Q    What work did you do there.  What kind of work were you

10   doing?

11   A    I were running and drawing.  It was more or less -- I

12   was taking cotton and putting it through the machine and it

13   turn it into -- make small bales of cotton into bigger bales

14   -- to make the smaller bales and take it out to the floor for

15   the weavers or whatever.

16   Q    How long had you been doing that?

17   A    I had started, like, October of 1999.

18   Q    And, you worked the night shift?

19   A    Yes, sir.

20   Q    You heard Mr. Cofield testify that in his opinion you

21   and Rodney were real close friends; is that true?

22   A    Yes, sir.

23   Q    How long were you -- when did you become -- when did

24   you establish any friendship with Rodney Brown?

25   A    I would say when I had moved down here in, I think it

1  was '97.  Actually I will take that back.  I will say '94.

2  He used to come to the house and everything when I had moved

3  back when I got out of school.  He used to come around every

4  now and then, not so much, but I would say '94.

5  Q    This big oak tree, whatever it has been described, was

6  that kind of a hanging out place in the afternoon to get out

7  of the sun where people would talk --

8  A    Yes, sir.

9  Q    -- any significance?

10  A    Yes, sir.

11  Q    And, were you in the habit of congregating over there

12  or was anyone else in the habit of doing that?

13  A    Well, there was me, Quinton, Rodney and sometimes there

14  would be others that come around.  Her brother Patrick

15  Cofield would come around every now and then when he had the

16  chance.  And, we would all sit out and talk.

17  Q    Would the Rev. Cofield minister or counsel anyone under

18  this tree?

19  A    No, because we -- pretty much we used to drink and

20  everything.  We was drinking, so we tried to steer ourselves

21  away from that, because we respected his position as a

22  minister.

23  Q    Who is we?  When you say we used to drink.

24  A    Me, Rodney and Quinton and whoever else might have been

25  under the tree at the time.

1    Q    All right.  Do you have any personal knowledge as to

2    any type of drinking problem of Rodney Brown?

3    A    Yes, sir.

4         MR. GIBBS:  Objection.

5         THE COURT:  Sustained.

6    MR. KEITH:

7    Q    Did there ever come a time when your friendship with

8    Rodney Brown deteriorated?

9    A    Yes, sir.

10   Q    When was that?

11   A    When I was talking to this young lady by the name of

12   Felicia Phillips.  About a week before this little incident

13   happened Rodney made this little comment what he would do to

14   if Felicia or what he could do to Felicia.  And, I took it as

15   that he was saying he would rape her and everything, because

16   he had a history of rape and he was violent.

17   Q    When did you become aware of this history of rape?  You

18   are referring to Sandra Patterson; right?

19   A    Yes, sir.

20   Q    When did you learn about that?

21   A    February 18th of 1998.

22   Q    And, who did you learn that from?

23   A    That was, like, the police and her family.  Her cousins

24   and her brother and the whole family was pretty much out

25   there and so I asked around, and her mother pretty much told

1  me.

2  Q      And, her mother's name?

3  A      Luella Patterson.

4  Q      Was the LaFayette Police Department out there?

5  A      Police department and a few detectives and I think a

6  few of the sheriff's deputies.

7  Q      So, it wasn't any apparent secret at that point in

8  time.

9  A      No, sir.  Because it was like a big fiasco.  Everyone

10 in the neighborhood when something like this happens, they

11 tend to gather up.

12 Q      This comment or this statement, explain to the jury

13 what it was that made you think that the statement was any

14 kind of bad doing or evil statement, if you will.  What was

15 the statement, exactly, and what did it mean to you?

16 A      Well, the statement was that he could fuck -- I'm

17 sorry, Momma.  I ain't want to say it in front of my mother.

18 He said the F-word and it made me feel that he would rape her

19 because he had the history of doing so.  And, I had the

20 knowledge that Rodney Brown was a very violent person.  I

21 have seen him.

22         MR. LISENBY:  Your Honor, I would object as

23 nonresponsive.

24         THE COURT:  Sustained.  Move on.

25         MR. KEITH:  Go ahead?

1    MR. KEITH:

2    Q    Avoid that topic for a minute and go ahead and explain

3    this threat and what it meant to you, if you have not

4    finished.

5    A    The threat meant to me, it was a threat because me and

6    the young lady had a real close relationship.  I cared about

7    her and I felt that, you know, it was something that would

8    hurt in any man that had a woman that he was close to.  It

9    was real bad threat.

10   Q    And, you took this threat seriously.

11   A    Yes, sir.

12   Q    Did there come a point in time when you went to

13   confront or talk about this threat with Rodney Brown?

14   A    Yes, sir.  January 12th of 2000, I got up -- I got off

15   from work about 6, about 3, but I didn't get home until like

16   6-something.  And, so, I went home and laid down for a while.

17   This was bothering me so I got up and I went over to Rodney's

18   house.  And, the first time I didn't go in and everything.  I

19   left and went back and I retrieved my pistol.  So, I went

20   back.  I knocked on the door and Rodney answered and so he

21   let me in.

22   Q    Why didn't you carry your gun over there the first time

23   you went to the residence?

24   A    Because I knew Rodney had a violent history and all.

25   He had told me the things that he would do to someone.  So,

```
 1  therefore, I used my head, and not with the intent to do
 2  anything with the pistol, but I carried it with me.  And, I
 3  knocked on the door.  He answered and he let me in.  And, so,
 4  I spoke to him and spoke to Angela.  And, I asked Rodney
 5  specifically, I said, "Rodney, why would you make such a
 6  comment toward Felicia when she hadn't done anything to you?"
 7  And, he took it all out of proportion, because I said it in
 8  front of his wife.  I was not trying to disrespect anyone.  I
 9  was not trying to make anyone feel bad; but, this was hurting
10  me, and I was feeling bad.  So, he took it out of proportion
11  and he told me specifically to hold on for a minute I have
12  something for you.  He said it in a kind nice voice.  And, I
13  want to set the record straight that he went back to his
14  bedroom and got this bat.
15  Q     As opposed to going where?
16  A     I said in my statement that he had the bat by the TV,
17  but I was a  little fast when I made my statement.  So, I
18  want to set the record straight that he went to the back
19  bedroom down at the other end of the hall and got this bat.
20  I didn't take it as a threat when he left and everything,
21  because he said what he said, "I'll have something for you.
22  I'll be right back."  But when I looked up, he was charging
23  at me with this aluminum bat.  Charging like a bull in a
24  blind rage.  And, so, I didn't know what to do at the time.
25  My mind didn't know how to register.  I couldn't run because
```

*** Frances L. Roark ***

```
 1    I was too far from the door at the time.

 2    Q    What were you feeling Jason when he was coming at you

 3    with the bat?

 4    A    I was feeling afraid.  I was feeling threatened.  My

 5    life was in danger.  So I felt scared.

 6    Q    This bat, I believe, we had it out here as an exhibit

 7    yesterday.  Is that the bat you are referring to?

 8    A    Yes, sir.

 9    Q    Was there any particular purpose of that bat, if you

10    know, as far as, like, playing softball or baseball with it?

11    A    There was this comment that Rodney had made once about

12    this bat.  He said that he would use the bat on anyone that

13    he feel was threatening to him that would come to his house

14    threatening him.  So, I took that as, yes, he was -- he would

15    use the bat in other ways.

16    Q    When you went to the residence, how were you let in?

17    A    I was let in through the front door.

18    Q    By who?

19    A    Rodney Brown.

20    Q    Was there a door bell, did you knock on the door, or

21    what?

22    A    There was no door bell.  I knocked.  He came to --

23    Q    He let you in?

24    A    -- he came to the door and let me in.

25    Q    Who let you in?
```

```
 1   A      Rodney Brown.

 2   Q      And, I believe the jury saw the pistol that you had in

 3   your possession.

 4   A      Yes, sir.

 5   Q      Was it openly displayed or where was it?

 6   A      I had it inside my jacket pocket.

 7   Q      Could you see it?

 8   A      No, sir.

 9   Q      Could Rodney or Angela have seen it?

10   A      No, sir.

11   Q      Was it sticking where you could see the gun in any way?

12   A      No, sir.

13   Q      And, where did you get the pistol, Jason?

14   A      The pistol belonged to my mother, Marie Collier.  It

15   was in her bedroom.  I had no business going and getting the

16   gun in the first place.  But, I went and got the gun out of

17   her bedroom, out of her dresser drawer and put it in my

18   jacket pocket.

19   Q      Why did you feel the need to carry that gun over there

20   with you?

21   A      Because I knew Rodney's history of violence.  Rodney

22   had a violent tendency to beat up on his wife at times.  I

23   have actually seen him ....

24          MR. LISENBY:  Objection, Your Honor.

25          THE COURT:    Sustained.
```

1  MR. KEITH:

2  Q    When you got into the room, what was Angela doing?

3  A    She was sitting on the couch.  She had a magazine in

4  her hand.

5  Q    And, after you were let into the house, I believe there

6  was a diagram of it we saw, what did Rodney do?  Did he do

7  anything when you entered the home?

8  A    He let me into the house and he walked back by the sofa

9  where Angela was in the beginning.  And, so, I came only to

10 the house, because it was natural for me to come on in, when

11 I have been there many a time, numerous of times.  I felt

12 comfortable coming in.  I went over toward the window on the

13 back side of the trailer and I stood there.

14 Q    Was there any other conversation going on other than

15 the statement you made to Rodney about the threat.  Was there

16 any small talk?  Did you have -- Angela say anything?

17 A    No, sir.  He just said that -- well, actually I take

18 that back.  He actually -- he said, "How come you come down

19 here, man, with this, saying this in front of my wife?"

20 That's when he didn't really sound upset when he said it.

21 But, he did say, "I'll be right back.  I've got something for

22 you."  And, he left in a reasonable manner as we didn't have

23 any problems.

24 Q    Did he make any threats to you to get out of the house

25 or any statements at all, any requests to leave?

1  A    No, sir.  He did not tell me to leave, or Angela did

2  not tell me to leave, or anyone.  So I ....

3  Q    Did Angela have any reaction to the statement and

4  Rodney's reaction?

5  A    She looked at him real strange and everything, because

6  she knew his history as well.

7  Q    Was Angela upset at the time?

8  A    She seemed a little upset and everything, because she

9  had been through this type of stuff once before.

10         MR. LISENBY:    Your Honor, I object.

11         THE COURT:  Sustained.

12 MR. KEITH:

13 Q    Did Rodney ever sit down after you came in the house?

14 A    No, sir.

15 Q    How long were you in the house before he left to go

16 retrieve the bat?

17 A    About maybe three or four minutes.

18 Q    What was going on, if anything?  Was Rodney out of

19 sight when he left to go to the bedroom?

20 A    Yes, sir.

21 Q    Any conversation, anything further happening between

22 you and Angela?

23 A    I just asked her how was her job and all like that,

24 pretty much asking how she was doing and all.

25 Q    Did Angela ever tell you that maybe you should leave,

1   or this might be a good time to go, or anything like that?

2   A      No, sir.

3   Q      Did Angela have any idea what Rodney might be doing?

4   A      Not at the time, she didn't.

5   Q      When Rodney first came out of the bedroom, describe how

6   he was holding the bat and what he was doing with it.

7   A      He was holding the bat over his head like this and by

8   this time I had walked over to the point where I could see

9   directly down the hall and everything.  And, when I looked

10  up, I was surprised.  He was coming down the hall charging

11  with this bat raised up in the air over his head.

12  Q      Was he saying anything?

13  A      He wasn't saying anything.  He was just running with a

14  fury.

15  Q      How long a time did it take for him to get out of that

16  bedroom to get very close to you with the bat?

17  A      It didn't take but maybe five or ten minutes.  It did

18  not take that long.  I would say it didn't take that long,

19  because he went back there.  He was able to get the bat

20  apparently pretty well.  So, by the time I walked to the

21  center of the trailer, I looked up and, bam, here he comes.

22  Q      Did Angela have any reaction, if you know, when he came

23  out with the bat?

24  A      She was still sitting on the couch.  She was trying to

25  figure out what all this running and all.  I didn't say

1    anything.  She didn't say anything.  No one really said

2    anything.

3    Q    This pistol that you had, do you know what type of

4    pistol it was?

5    A    It was a .38.  All know -- I don't know the type or

6    anything.  I just know it was .38.

7    Q    It was a revolver.

8    A    Yes, sir.

9    Q    You had it in your pocket?

10   A    I had it in my right jacket pocket out of sight and was

11   no threat to anyone.

12   Q    You are right-handed.

13   A    Yes, sir.

14   Q    And that revolver, you don't to have cock it or

15   anything before you fire it, or anything; do you?

16   A    No.

17   Q    Did you ever have an opportunity to say anything to

18   Rodney when he was coming at you?

19   A    No, sir.  I was still standing there looking

20   dump-founded trying to figure out what was going on, what

21   should I do, why am I even here?  And, I was fumbling for the

22   gun.  And, I got it out in time enough to pull the trigger.

23   Q    What did you do with it when you pulled it out?

24   A    I shot.

25   Q    Did you have any other -- was there anything else --

1    could you have gotten out the front door or gotten away from

2    him?

3    A     No, sir.

4    Q     Why is that?

5    A     Because he was coming to close up on me and everything,

6    and the door was locked, and I would have fumbled trying to

7    unlock the door, and so he was going to hit me either way it

8    went.

9    Q     Wasn't any doubt in your mind he was going to strike

10   you with that bat?

11   A     None whatsoever.

12   Q     How many times did you shoot Rodney?

13   A     Twice.

14   Q     What did Angela do after you shot Rodney?

15   A     I had my back to her and I shot him the second time and

16   I heard this motion and I was already -- I was scared.

17   Paranoid.  I'd never shot anyone a day in my life.  I'd never

18   even made any threat of violence in my life.  And, so, I

19   heard this jump and all.  I turned real quick and I ended up

20   pulling the trigger twice before I even knew what I was

21   doing.

22   Q     Jason, there is a State exhibit that was found there

23   basically in between Rodney and Angela Brown that was a

24   kitchen type knife that was referred to as a butcher knife.

25   A     Yes, sir.

1    Q    Did you have the -- do you know whether Angela had

2    anything in her hands or not when she came at you?  I'm

3    sorry, when she jumped up?

4    A    What happened -- it happened so quick.  Until it was

5    like, bam, I don't know what happened.  I don't know -- I

6    don't even remember shooting her.  And, I don't know if she

7    had this knife in her hand or where this knife came from and

8    all.  I do remember seeing the knife laying on the floor.  I

9    don't know if he had it or if she had it.  I don't know.

10    Q    Did you bring that butcher knife into the house?

11    A    No, sir.

12    Q    Did anyone go and get the knife while you were in

13    there?

14    A    No, sir.

15    Q    So, it would have had to already have been there

16    somewhere.

17    A    Yes, sir.

18    Q    Do you know whether it was on the table, or TV, or

19    anywhere?

20    A    I really wasn't paying attention to the table or

21    anything around me at the time.  I did notice this little

22    glass figurine laying on the floor.  I did remember that.  I

23    don't remember anything ....

24    Q    This knife.  You saw the diagrams the State showed.

25    A    Yes, sir.

1    Q       And, basically the location of the knife near Rodney

2    and Angela Brown on the floor.

3    A       Yes, sir.

4    Q       Would you have seen that knife, or even stepped on it,

5    if it had been on the floor when you first went in the house?

6    A       Pretty much.  If it was laying there, I would have.

7    Where I was standing, it would have been a few feet away from

8    me.  But, anyone else that was that close to it would have

9    stepped on it.

10   Q       Otherwise you don't know where it came from or why it

11   was out there?

12   A       No, sir.

13   Q       Were you able to tell if the two shots to Rodney,

14   according to the medical examiner, was a rather quick death?

15   A       Yes, sir, pretty much.

16   Q       Angela Brown was still breathing somewhat --

17   A       Yes, sir.

18   Q       -- after she was shot.

19   A       She was.  She was still breathing and all.  I took

20   notice of this and I left because I was scared.  I was scared

21   and I left and went home.  I came back a few minutes later

22   because she was suffering and everything.  I thought, you

23   know, within me, I didn't want to see her suffering because

24   she was a lovely person.  Ann would never bother anyone.  She

25   was a lovely person.  What I did was stupid.  I wish I'd

 1  never done it.  I wish I'd never went there.  She was

 2  breathing and everything.  And, I went back to the house, I

 3  came back, she was still breathing and ....

 4  Q      You went back to the house with the knife; right?

 5  A      Yes, sir.

 6  Q      Why did you do that, Jason?

 7  A      Because I felt like she was, she was suffering, and I

 8  felt like it was my duty and all, I felt like I didn't want

 9  to see her suffer and everything.  She was a good person I

10  didn't want to see her like that.

11  Q      You never had any animosity with Angela Brown.

12  A      No, sir.

13  Q      In your statement you have admitted to stabbing her,

14  hitting her with the bat, and having sex with her.

15  A      Yes, sir.  When I had sex with her, I felt like I was

16  getting back at Rodney for the things he had did in his life

17  to women that he had did it to and I felt like I was getting

18  back at him which was stupid.  And I was dumb that day.  I

19  was dumb, because I have a tendency of not thinking.  My

20  brother always told me that I never think before I react,

21  which is true, and this day I did not, I didn't think before

22  I reacted.

23  Q      You remember doing it, Jason?

24  A      Yes, sir.

25  Q      Were you in control of yourself?

```
 1  A      No, sir.  I don't think I was.  I was pretty much out
 2  of my mind with the things that I did.
 3  Q      Did you take anything out of the residence?
 4  A      No, sir.
 5  Q      Did you steal anything?
 6  A      No, sir.
 7  Q      Break anything in there?
 8  A      No, sir.
 9  Q      There's a figurine, some ceramic pieces of a figurine,
10  if you will I believe you saw pictures of them.
11  A      There was some on the table and there was one on the
12  floor and all.  I didn't pay attention to it if there were
13  anymore anywhere else.
14  Q      What exactly was on the floor?
15  A      One of the figurines.  I don't know if it was broke or
16  what.  I didn't really take time out to pay attention to it.
17  I just seen it laying there.
18  Q      When did you see it laying there?
19  A      When I had came into the house.
20  Q      Was it brown in color or one of those figurines that
21  was either on the coffee table or on the TV?
22  A      One that was on the coffee table.
23  Q      Do you know whether or not it was broken?
24  A      I didn't -- like I said, I didn't really pay no
25  attention.
```

*** Frances L. Roark ***

1   Q    Do you remember it being on the floor?

2   A    Yes, sir.

3   Q    Was it anywhere in the vicinity of the butcher knife

4   that was on the floor?

5   A    No, sir.

6   Q    Was there any struggle going on between you and Rodney?

7   A    No, sir.

8   Q    Was there any struggle between you Angela?

9   A    No, sir.

10  Q    When you left, you didn't immediately volunteer to the

11  police what you had done?

12  A    No, sir, because I was scared.  I'd never done anything

13  like that before.

14  Q    You eventually made some statement to law enforcement

15  officers, I believe?

16  A    Yes, sir.

17  Q    Agent Wright.

18  A    Yes, sir.  When I made the statement, I was pretty much

19  scared, nervous, and all, because I didn't want to turn

20  myself in at the time because it was my birthday, and I

21  didn't want to turn myself in, but my conscience was

22  bothering me.  So I went on and gave the statement, but I was

23  frustrated at myself and I made some comments that I didn't

24  mean.

25  Q    You told your momma what happened, your foster mother.

1    A      Yes, sir.  I called her after I had been arrested.

2    Q      Did that help you get it off your conscience?

3    A      In some ways it did, but it still bothers me to this

4    day.

5    Q      Riding in the police car from your residence to the

6    police department down the street, it is true you told the

7    officer you couldn't pass a polygraph test.

8    A      Yes, sir.

9    Q      When you got down do the police department, you told

10   them everything that happened.

11   A      Yes, sir.  Because, like I said, I had never done

12   anything like this before and my conscience was bothering me.

13   Q      You eventually on January 21st gave a statement.

14   A      Yes, sir.

15   Q      A four-page statement or so.

16   A      Yes, sir.

17   Q      You heard it read to the jury yesterday.

18   A      Yes, sir.

19   Q      Were you truthful in your statements?

20   A      Yes, sir.

21   Q      And, apart from some very minor details, you told the

22   truth and got it off your conscience.

23   A      Yes, sir.  But I did make a stupid comment when I said,

24   if you are going to go a mile, you might as well run a mile.

25   I was stupid and angry at myself when I made that comment.

1  Q    You were truthful in your statement about self-defense?

2  A    Yes, sir.

3  Q    About Rodney coming at you with the bat.

4  A    Yes, sir.

5  Q    You never denied shooting Rodney Brown.

6  A    No, sir.

7  Q    You never denied what you did to Angela Brown.

8  A    No, sir.

9  Q    And, you beg for forgiveness.

10 A    Because, if I had to do it all over again, I wouldn't.

11       MR. KEITH:   Thank you, Jason.  If you will, answer

12 the State's questions.

13       MR. LISENBY:   Your Honor, may we approach just a

14 minute?

15       THE COURT:   Yes.

16 (WHEREUPON, A SIDE BAR COMMENCES.)

17       MR. LISENBY:   This may be something we need to

18 take up outside the presence of the jury.  The defendant made

19 a broad comment saying he'd never done anything like this

20 before.  And, according to records that the Defense has

21 provided to us, he has admitted to striking other foster

22 children in the home with his fist because they were annoying

23 him.  He struck a former girlfriend with his fist during an

24 argument. He attempted to break in on a 75-year-old woman by

25 cutting the screen door on her porch and coming in.   He

1    reported -- excuse me.  People that were talking to him about

2    all this, reported that he had the potential for aggressive

3    action seeking fulfillment of acutely felt affectional needs

4    and potential for discompensation.  He had a great deal of

5    hostility and aggression toward other foster children in his

6    home.  One report indicated, although his profile was one of

7    a friendly, social person there are other indications in his

8    responses of distrust and distance in relations with other

9    people.  These two tendencies taken together suggest that he

10   is not completely at ease in a social role.  Jason is wearing

11   a mask over very poorly controlled hostile impulses.

12        The fact that this particular defendant in testimony

13   unsolicited by the State said that he had never done anything

14   like this before opens the door for me to ask him all of

15   those particular questions about his prior tendencies.

16             MR. BLANCHARD:  He hadn't done anything like a

17   double murder.  When he said I've never done anything like

18   this before, he put the emphasis on this.

19             MR. LISENBY:  That was not the context of the

20   question.

21             MR. BLANCHARD:  Sure it was.

22             THE COURT:  Did you say something about theft?

23             MR. LISENBY:  Yes, sir.  He's been convicted of

24   theft of property.

25             MR. KEITH:  I don't think that applies.

1      MR. LISENBY:  That would be for conviction --

2  impeachable for conviction purposes.

3      THE COURT:  Let me think about that separately.

4      MR. LISENBY:  I have a case on that, that theft is

5  a case of dishonesty.

6      THE COURT:  Impeachable.  Right now we're talking

7  about what he's opening the door for.

8      MR. LISENBY:  That's right.

9      THE COURT:  Theft is not any part of the door he

10 has opened.  What's next?

11     MR. LISENBY:  What's next?  This information that I

12 just read to you about his prior aggressive actions against

13 people.

14     THE COURT:  What's the business about cutting the

15 screen?

16     MR. LISENBY:  It was in a report provided to us by

17 Defense counsel.  It appears to be a Department of Human

18 Resources report in June of 1989, in which he went to a

19 75-year-old woman's house, knocked on the door, she said she

20 didn't let anyone in after after dark, and he then cut the

21 screen door on her porch and came in, and tried to knock the

22 latch off the door to her home and tried to break in, and

23 according to this, he admitted doing those things, but

24 indicated that -- I am sorry, I am trying to find the exact

25 quote.  Worker talked to Jason about -- in the report he did

1  admit that he tried to break in Ms. Hand's home but denied he

2  had any sexual intentions toward her.  He said he wanted to

3  talk to her about lying on him.

4         MR. BLANCHARD:  Judge, this was when he was 16

5  years old.  Sixteen years old.  It is remote, number one;

6  number two, it is nothing like what happened in this case.

7  There's no weapon involved in that incident.

8         MR. LISENBY:  Cutting a screen?  He had to do it

9  with something.

10         MR. BLANCHARD:  There's no gun.  He could have done

11  it with his hands.  You know, it is nothing like anything

12  like that.

13         THE COURT:  Well, the problem that you have got

14  there is it is 14 years ago almost.

15         MR. LISENBY:  The thing about it is, Judge, again,

16  this is completely, that's why I said you may want to take

17  this out of the presence of the jury, because he said I have

18  never done anything.

19  (WHEREUPON, A SIDE BAR CONCLUDES.)

20         THE COURT:  Ladies and Gentlemen, I'm going to ask

21  that you to step back to the jury room for just a few

22  minutes.

23  (JURY OUT)

24         MR. BLANCHARD:  Judge, may I also say that the

25  juvenile authorities were made aware of what had happened in

1   that case.  They took cognizance of it.  All of that was

2   handled by the juvenile court.  If it was anything, it was a

3   juvenile offense, which would not be admissible, as any kind

4   of impeachment.  It is remote, number two.  And, number

5   three, I don't believe he opened the door to it by saying I

6   have never done anything like this when we are talking.

7          MR. LISENBY:  They carried him out again.  Judge,

8   while you are thinking about all this other stuff, let me go

9   ahead and toss in these other three things, because the

10  defendant's broad comment.  I went back and looked and my

11  notes indicate that his actual comment was words to the

12  effect:  I've never had a problem a day in my life.  We have,

13  in addition, a theft conviction.  I think it is clearly

14  admissible for impeach purposes under dishonesty.

15         THE COURT:  I am going to go ahead and rule that

16  that is admissible under impeachment.

17         MR. BLANCHARD:   The theft?  I think clearly it is.

18         MR. LISENBY:  We also have an October of '93

19  convictions of minor in possession of alcohol; April '96

20  conviction for public lewdness, and a May '95 conviction for

21  criminal surveillance.  That's the conviction that was the

22  subject of the Motion in Limine.  And, I think, again,

23  because he has made that broad comment, he has opened the

24  door to go in to not only the reports that are made in the

25  information given to us by the Defense.  That is, we got it

 1    from them.  We didn't have that prior to that.  I think it

 2    would also -- prior convictions would also be admissible to

 3    go in to also.

 4              MR. BLANCHARD:  Judge, we did give them those

 5    reports.  Those are penalty phase documents.  We intend to

 6    offer those in the penalty phase of this case if there is

 7    one, and we will tie all of that up and show how it relates

 8    to psychological opinions and that sort of thing.  As far as

 9    using them as impeachment in the guilt phase of this case, I

10    think the prosecution is way off base on that.  I don't think

11    that his comments open the door to bringing any of that in

12    first of all on that basis.  And, number two, all of it --

13    well, I'll going back and address the misdemeanor convictions

14    he talked about in just a minute.  But as far as those

15    medical records, as I said a little while ago, before we were

16    on the record, they are 14 years old.  They are juvenile.

17    And they happened when he was about 16.  Maybe 16 to 17,

18    somewhere in there.  Juvenile offenses.  The juvenile court

19    addressed all that and took care of it at the time.  And, of

20    course, juvenile offenses are not in any sense available as

21    impeachment -- convictions for impeachment.  I don't have an

22    accurate record of what was said, but the prosecutor said a

23    little while ago, he said, I've never done anything like this

24    before.  I think that is best interpreted as -- most people

25    say that and they may mean, or it could well be interpreted

```
 1    to mean, I have done some things in my life before, but I
 2    have never done anything like this, and specific reference to
 3    this crime.  And, certainly, as the record will bear out, he
 4    has never done anything like this before in his life, a
 5    double murder crime of this scope and magnitude of violence,
 6    and I think that is what he was referring to.  Certainly not
 7    referring to the fact that he had never done anything in his
 8    life.  So, I don't think it opens the door.
 9              MR. LISENBY:  Excuse me, I am sorry, I don't mean
10    to interrupt.  That is why I went back and looked at my
11    notes.  His actual comment was, "I never had a problem a day
12    in my life."
13              MR. BLANCHARD:  What's the context?  I don't have
14    the full context of that remark.
15              MR. LISENBY:  Mr. Keith was asking about Angela as
16    to where she was.  And, he said, Angela was to his back.  He
17    never had a problem a day in his life.
18              MR. BLANCHARD:  What does that mean?
19              MR. KEITH:  With her.  With Angela.
20              MR. LISENBY:  No, no, no, no.  That wasn't the
21    comment.  The comment, the comment was Angela was to my back.
22    I've never had a problem a day in my life and then I pulled
23    the trigger on her after I had shot Rodney twice.
24              MR. BLANCHARD:  Obviously, what that means is I
25    wasn't concerned about Angela.  I'd never had a problem with
```

1    her.

2              THE COURT:  That's the way I took it.

3              MR. KEITH:  I was asking him about had he had any

4    problems with Angela.

5              MR. LISENBY:  I would just ask the Court and

6    Mr. Gibbs said his notes indicate that he was making comments

7    about not having violence in his past.  I would just ask the

8    the Court to have the court reporter read that portion back,

9    because I think the context of this is clearly -- he's making

10   a blanket statement:  I have never had any trouble, period.

11             THE COURT:   Ms. Roark, see if you can locate it.

12             THE COURT REPORTER: **ANSWER: I had my back to**

13                  **her and I shot him the second time and I heard**

14                  **this motion and I was already -- I was scared**.

15                  **Paranoid.  I'd never shot anyone a day in my**

16                  **life.  I'd never even made any threat of**

17                  **violence in my life, and, so, I heard this**

18                  **jump and all.  I turned real quick and I ended**

19                  **up pulling the trigger twice before I even**

20                  **knew what I was doing.**

21             THE COURT:  Now, what are you going to attempt to

22   show?

23             MR. LISENBY:  First as I mentioned.

24             THE COURT:  Theft is in.

25             MR. LISENBY:  The theft, obviously, and these

1    events that are described in these records.

2            THE COURT:  Cutting of the screen.

3            MR. LISENBY:    Cutting of the screen, striking

4    other foster children, Striking the former girlfriend.

5            THE COURT:    Statement was I'd never had a history

6    of violence in my life.

7            MR. BLANCHARD:  Now as to the incident with the

8    woman with the screen, there's no violence involved in that

9    incident whatsoever.  As to these other things, they are

10   still juvenile events.  They are ....

11           THE COURT:  They are not in juvenile court.

12           MR. BLANCHARD:  Pardon me?

13           THE COURT:  You are not going to attempt to show

14   adjudications of juvenile court?

15           MR. BLANCHARD:    No, no,no, but they were during

16   his juvenile years and are remote.  You know, we are talking

17   about fights.  We're talking about that kids get into.  He

18   was a troubled child.  The events ....

19           THE COURT:  The cutting of the screen is closer

20   than the thing about the fights with the children.

21           MR. BLANCHARD:  But it is not violent.

22           THE COURT:  Cutting a screen on a residence?  The

23   charge here is burglary.

24           MR. BLANCHARD:  I understand.

25           THE COURT:   He says never in my life.

1          MR. BLANCHARD:  If they are saying what opens the

2   door is the statement I have never had a history of violence.

3   That simply doesn't open the door.

4          THE COURT:  Go ahead.  What next?

5          MR. LISENBY:  The other convictions they may or may

6   not fit into this description.  One is a minor in possession

7   of alcohol; the other is public lewdness and third is

8   criminal surveillance.

9          MR. BLANCHARD:  I would assert they do not fit.

10         THE COURT:  The three convictions are out.

11         THE COURT:  Now, the fight with the children is

12  out, but I'm still -- theft is in and this thing about the

13  screen.

14         MR. BLANCHARD:  Judge, I think that is awfully

15  dangerous.  It is not a violent act.  If he had assaulted the

16  woman, I might tend to agree that it could go in, but he did

17  not.

18         THE COURT:  Tell me again, Mr. Lisenby.

19         MR. LISENBY:  Why don't I read this paragraph that

20  describes.

21         THE COURT:  Read the paragraph.

22         MR. LISENBY:  Ms. Lazona Hands, age 75 was in the

23  office on this date, which is June 26th, 1989, regarding her

24  concern for Jason who reportedly tried to break into her home

25  on Saturday, June 24th, 1989, at approximately 9 p.m.

1   According to Ms. Hands Jason came to her home around 9 on

2   Saturday night and knocked on her door, told her his name and

3   asked to come in.  When she told him she doesn't let anyone

4   in her home after dark, she reported that Jason then cut her

5   screen door on her porch and came in.  He then tried to knock

6   the latch off the door to her home and tried to break in.

7   Ms. Hands reported that she gave Jason several warnings to

8   leave the home before she hurt him.  When he refused to

9   leave, she took her pistol which she has for self protection

10  and fired it.  She said she was not trying to hit Jason, just

11  wanted to scare him.  Jason then ran away from the home and

12  she had a neighbor, Mr. Walter McGuire call the sheriff's

13  department for her.

14      The statement with regard to what Jason Holloway said

15  is, this is the paragraph there.  Also worker talked with

16  Jason about the report and he did admit that he tried to

17  break into Ms. Hands' home, but denied that he had any sexual

18  intentions toward her.  He said he wanted to talk to her

19  about lying on him.  Particularly, the report that he had

20  been peeping in her window.  He denied that this had ever

21  occurred.  According to Jason he was with two friends earlier

22  that evening and had been drinking.  His friend Mr. George

23  Shear gave him two beers, Schlitz Malt Liquor Bulls, and he

24  became very drunk off of them.  He said he is not used to

25  drinking beer and he guessed he was unable to control his

1  actions.  Worker talked with Jason at length about the

2  incident and about the consequences of his behavior.  Jason

3  told the worker that he wanted to remain in Ms. Collier's

4  home and he does not want to be placed back in -- this copy

5  is cut off, but I believe the word is attention for

6  detention.

7          MR. BLANCHARD:  I've seen it before.  It is

8  attention.  I am not sure what the attention home is, but

9  that's what they call it.

10          THE COURT:  Let me see the statement, the statement

11  that he made relative to that.

12          MR. LISENBY:  That paragraph right there.

13          THE COURT:  I am going to allow in first two

14  sentences.  First let me ask you, are you going to offer this

15  on cross examination?

16          MR. LISENBY:  Yes, sir.

17          THE COURT:  Then I will allow the first two

18  sentences which reads as follows:  Worker talked with Jason

19  about the report and he did admit that he tried to break in

20  Ms. Hands' home, but denied that he had any sexual intentions

21  toward her.  He said he wanted to talk to her about lying on

22  him, L-Y-I-N-G.

23          MR. LISENBY:  Do I need to -- excuse me.

24          THE COURT:  Everything else will be excluded.  The

25  theft conviction and that portion of the report can be used

1  in cross-examination.

2       MR. BLANCHARD:  Let me state an objection now on

3  the record to the use of any portion of that report,

4  particularly the portion that you have outlined, or any other

5  portion of the report, for cross-examination.  As I

6  understand it, the theory of the State in seeking it, is that

7  Jason opened the door to it by saying that he had never had a

8  history of violence in his life.  This incident which is

9  reported is, I believe, not an incidence of violence if it

10  involves any form of force at all, it would be force toward

11  property, breaking of a latch.  I don't believe there is any

12  definition of a crime of violence which includes using force

13  to break a piece of property.  Therefore, I do not think his

14  statement, I have never had a history of violence opens the

15  door to bring in that particular act.  Which is unlike

16  anything in this particular case.  I object on the basis of

17  the Alabama Rules of Evidence, the Rules of Relevance,

18  certainly it is irrelevant to bring it in.  It is highly

19  prejudicial to bring this incident in.  Violation of Rule 402

20  and 403, plus any applicable rules regarding impeachment of a

21  witness, particularly those rules involving impeachment of a

22  witness for prior bad acts.  It doesn't fit any of the

23  categories under which one can -- under Rule 404, under which

24  rules of prior bad acts can be brought in.  So, it would be

25  violative of that provision.  In addition, it violates his

```
 1   rights to due process under the Fourteenth Amendment of the
 2   United States Constitution to the reliability, heightened
 3   reliability in the capital sentencing process under the
 4   Eighth Amendment.  Right to a fair trial under the Sixth
 5   Amendment.  Right to avoid self-incrimination under the Fifth
 6   Amendment.  And, all of the other analogous State rights and
 7   any rights referenced in our memorandum which we have all
 8   adopted earlier, which I have not specifically referenced in
 9   this objection.  I object.  I object.  I object.
10        THE COURT:  Noted.  I will also last note that the
11   tenner of this case is that this defendant, Jason Holloway,
12   went to and entered the residence of Angela and Rodney Brown
13   while armed with a pistol.  His stated intention in doing was
14   to confront Rodney Brown with things that he, Rodney Brown,
15   had said about the girlfriend of Jason Holloway.  Here in the
16   portion that is being admitted on cross-examination, this
17   defendant, Jason Holloway, attempted to enter the home of
18   another individual, that being an older woman, apparently cut
19   her screen, and stated the purpose of his actions was to
20   confront her about, quote, lying on him.  Not only does the
21   Court believe this can be admissible for purposes of
22   impeachment of his direct testimony from the stand relative
23   to acts of violence, I think this is also relevant to
24   actually showing his mental intent.
25        MR. BLANCHARD:  Judge, I would strongly disagree
```

 1    with that.  Under the Rule 404B I don't think that that sort

 2    of evidence is -- I mean, is admissible to show intent in

 3    this case.  I think 404B rules it out.

 4              THE COURT:  Absent his statement, we wouldn't even

 5    be considering it.  So, the threshold is his statement.  And,

 6    I will allow the two sentences in that report to be used.  We

 7    have got the objection on the record.

 8         Gentlemen, is there anything else?  Do you need a

 9    minute it?

10              MR. BLANCHARD:  Judge, I would like to ask for a

11    limiting instruction if this is going to come in.

12              THE COURT:  I'll give the same limiting instruction

13    I gave earlier about the testimony and that it is limited to

14    the purposes of impeachment.

15              MR. BLANCHARD:  Only to be considered for

16    credibility?

17              THE COURT:  Yes.

18              MR. LISENBY:  Do I need to -- just so I make sure

19    -- do I need to direct him to the date and person?

20              THE COURT:  Yes.  I am saying, if you meet all the

21    predicates it's admissible.  If you don't meet the

22    predicates, it is not.  And, this is cross-examination.

23    Y'all need a minute?

24              MR. BLANCHARD:  Sure.

25    (WHEREUPON, A SIDE BAR CONCLUDES.  THERE WAS A BRIEF RECESS.)

1    (JURY PRESENT)

2         THE COURT:  Counsel, approach for one second and

3    then we'll be ready to be started.

4    (WHEREUPON, A SIDE BAR COMMENCES.)

5         THE COURT:  Sorry to do this, but it's been a long

6    day.  What was the last line of questioning?  Had any

7    question been asked?

8         MR. LISENBY:  No.  They had turned it over to us.

9         THE COURT:  And then you approached.  So, we have

10   not gotten anything.  This will just be the beginning of

11   cross-examination.

12        MR. LISENBY:  Yes, sir.

13        THE COURT:  All right.  Like I said, I am sorry, I

14   wanted to make certain of that before we got into it.

15   Everything has been on the record.  Objection has been

16   entered and overruled, and as I understand the State intends

17   to offer certain things.

18        MR. BLANCHARD:  I will object again for the record

19   to just be sure when you start.

20        THE COURT:  Absolutely proceed.

21                      **CROSS EXAMINATION**

22   **BY MR. LISENBY:**

23   Q    Mr. Holloway, would you take that pointer right there

24   that is in front of you and point on this diagram where you

25   were standing when you first shot Rodney Brown?  You have

1   seen this diagram before, haven't you?  This is exhibit

2   number 22.

3   A    Yes, sir.  I am trying to see the front of the house.

4   Q    This is the front door here.  This is the living room

5   area.  This is back into the bedrooms.

6   A    Right in here.

7   Q    You were right beside the couch?

8   A    Right by the TV.

9   Q    I'm sorry.

10  A    Right by the TV.

11  Q    You were right by the TV?

12  A    Yes, sir.

13  Q    If I put this green marker, is that where you say you

14  were standing when you first shot Rodney Brown?

15  A    When I first shot him?

16  Q    Yes.  That's what I want to know.

17  A    I moved from over here to right there.

18  Q    Tell me again where you moved from.

19  A    Right over here.

20  Q    On this side of the table?

21  A    Yes, sir.  Back by the window.

22  Q    I put that green marker there.  That's where you were

23  standing initially?

24  A    Yes, sir.

25  Q    And you said you moved to over here?

| 1 | A | Right. |
|---|---|---|

2  Q    This is where Mr. Brown's body was.  This is the end of

3  the couch. This is the TV.

4  A    I was thinking it was up a little farther, not in front

5  of the TV, not directly in front of the TV, but right in

6  there.

7  Q    You were about right in here?

8  A    No.  I was right there about in front of the TV where

9  he is.  He was up a little farther.

10  Q    He was somewhere up here; is that what you are saying?

11  A    Yes, sir.

12  Q    But you were standing somewhere right about where the

13  TV was.

14  A    Yes, sir.

15  Q    All right.  This is the front door; isn't it?

16  A    Yes, sir.

17  Q    You could have gotten out that door.

18  A    Not at the time.  It was locked.

19  Q    It opens to the outside, doesn't it?

20  A    But it was locked from the inside.  He had locked it

21  back when he let me in.

22  Q    It was locked from the inside and you couldn't unlock

23  it?

24  A    Not in time enough to get out.

25  Q    Are you saying you couldn't unlock it?

1  A      I could have unlocked it, but I'm saying I couldn't

2  unlock it in time enough to keep a watch on him and unlock

3  it.

4  Q      You said that you were standing at this spot where this

5  green marker is.

6  A      I moved down to where I said I was the last point.

7  Q      The last point?

8  A      Right there.  The marker.  I had moved down there when

9  I heard him in the back.  I moved to that point and I were

10 looking directly down the hall at this point.

11 Q      The reason for that is you were looking down there to

12 see where Rodney was at; right?

13 A      I was trying to see what he had.  He said he had

14 something for me.  I was wanting to see what it was.

15 Q      You went over there because you wanted to confront him

16 about words he had said about Felicia Phillips; is that

17 correct?

18 A      Yes.

19 Q      And, you said that, in your direction examination with

20 Mr. Keith, that when these comments were made that Mr. Brown

21 simply said, I've got something for you, and left in a

22 reasonable manner.

23 A      Yes, sir.

24 Q      But you also said that Angela appeared to be upset

25 about it; is that right?

```
 1  A     Yes, at him.  She was not upset at me in any way.

 2  Q     Well, you said she appeared to be upset.

 3  A     Because of what I had told him.

 4  Q     Okay.  And, you took a position then, moving from here

 5  to here --

 6  A     Yes, sir.

 7  Q     -- and cut off any exit of the door from either of

 8  these two people; correct?

 9  A     If that is what you want to say; yes, sir.

10  Q     And, took a position where you could see down the hall

11  wherever Rodney went; right?

12  A     Yes, sir.  Yes, sir.

13  Q     Now, you testified earlier that you were real close

14  friends with Rodney.

15  A     Yes, sir.

16  Q     And, you said something about that you were basically

17  over there everyday, every other day, excuse me, until you

18  started to work at Wehadkee Yarns?

19  A     I was working night shift and I had to sleep during the

20  day.

21  Q     But, you did still continue to go over there; is that

22  correct?

23  A     When I had the opportunity to; yes.

24  Q     Right.  And, you started to work at Wehadkee Yarns in

25  October of '99.
```

1    A    Yes, sir.

2    Q    So,....

3    A    Somewhere around that area.

4    Q    Somewhere in that time; correct?

5    A    Yes.

6    Q    So, the incident involving Sandra Patterson, you said

7    you became aware of immediately because of the police being

8    out there; is that right?

9    A    Well, my mom came and picked me up from the emergency

10   room where I was working at.

11   Q    Wait a minute.  Wait a minute.  That was not my

12   question.  My question was:  You became aware of it

13   immediately because of the police being all around; correct?

14   A    Yes, sir.

15   Q    That was in February of 1998.

16   A    Yes, sir.

17   Q    So, from February of 1998, until October of 1999, you

18   were over at Rodney Brown's house about every other day.

19   A    When I had the opportunity; yes, sir.

20   Q    So, you were not scared of Rodney Brown, were you?

21   A    No, not in no sense or fashion, but I knew his

22   reputation of violence.  I wouldn't do anything to upset him,

23   no, I wouldn't, because I knew how he was.

24   Q    You weren't scared of him, were you?

25   A    In a sense; yes, sir, I was.

1  Q      You continued to visit him every other day.

2  A      He wasn't no threat to me.  He wasn't no threat to me

3  during the time I got over there.  I used to go over there

4  during the day, but I knew he would harm me if I did anything

5  to upset, but I did go over there with the intent to ask him,

6  because I was upset.  I didn't want to hurt no one.  I was

7  not intent on hurting anyone.  It was not my intention to

8  hurt anyone.

9  Q      So, you weren't scared of Rodney, were you?

10 A      Yes, sir.

11 Q      Okay.  Now, it is true, is it not, that Sandra

12 Patterson never told you about this rape.

13 A      No, sir.

14 Q      She never told you anything about any details or

15 anything of that nature?

16 A      No, sir.

17 Q      Now, this comment that you said that Rodney made about

18 Felicia Phillips, I believe your testimony was, that occurred

19 about a week before January the 12th.

20 A      Yes, sir.

21 Q      Your statement said, it occurred on Sunday before

22 January the 12th.

23 A      Well, Sunday, a week.

24 Q      Could it have been longer than Sunday.  Could it have

25 been up to seven days?

*** Frances L. Roark ***

```
 1  A     Somewhere between Sunday and the week before.  I'll put
 2  it like that.  I didn't pay too much particular attention to
 3  that part, because I was working night shift and I didn't
 4  have a chance to go see him no time between the incident and
 5  the time it was said.  So, I don't know for sure how long in
 6  between.  I said a Sunday.  I could have been confused,
 7  because once I gave my statement, like I said, I was nervous.
 8  I was frustrated at myself because I got up to this point and
 9  I didn't know what I was doing.  So, I could have said Sunday
10  and it could have been longer.  That was my fault.  Sorry.
11  Q     So, the Sunday before would have been three days before
12  January the 12th, but it could have been as long as seven
13  days before January the 12th?
14  A     It could have been.  I don't know.  Like I said, I used
15  to work at night, and when I'm working I don't pay attention
16  too much to what's going on, because when I come in everyone
17  else is mostly at work or either gone about their business.
18  Don't be too many people in the neighborhood.  Like Rodney,
19  he, usually leaves to go to his mother's house when Angela
20  goes to the work during the day.  So, I don't never get a
21  chance to see him between that time.  And, either he go
22  somewhere or either wash cars in someone's yard.  I don't
23  know for sure.  Like I said, it happened somewhere on Sunday.
24  It could have been a week on a Sunday, a week of Sundays ago.
25  I said a Sunday.  I don't know for sure.
```

```
1   Q       So, you had been thinking about this comment for at

2   least three days?

3   A       Yes, sir.

4   Q       Correct?

5   A       You could have been thinking about it as long as seven

6   days; correct?

7   A       Could have.

8   Q       But you were working the night shift that entire time,

9   were you not?

10  A       Yes, sir.

11  Q       So, on this particular occasion, you told Mr. Keith you

12  had worked the night shift prior to going over to Rodney and

13  Ann's trailer January 12th; correct?

14  A       That ....

15  Q       So, you could have gone on any day; correct?

16  A       The first time I went over there, I didn't know if he

17  was at home.  But I went back the second time, and I heard

18  movement in the trailer, so I knocked on the door, and he

19  answered the door.  I didn't ...

20  Q       You could have gone any day after you got off work;

21  correct?

22  A       But, like I said, Rodney usually goes up to his

23  mother's house.  I just happened to be up this day because

24  the insurance man knocked on the door and woke me up.  So, I

25  went over there.
```

1  Q    But, you never went over there prior to that day to

2  discuss this comment, did you?

3  A    No, sir.

4  Q    So on that day, you had been working and then you went

5  over to the house, the trailer?

6  A    Yes, sir.

7  Q    Correct?

8  A    Yes, sir.  It had been something that was on my mind to

9  do.  A lot of people make plans to do things.  I make plans

10 to do things.  And, this just happened to be something that I

11 made plans to do, but it just had -- it took longer than I

12 thought it would.  I had it in my mind to go talk to him, no

13 harm intended.

14 Q    So, you had made plans to go and talk to him; is that

15 what you are saying?

16 A    Yes, sir.  Yes, sir.

17 Q    And, you said that you went over there the first time

18 because it was bothering me.

19 A    It had been bothering me for as long as I could -- ever

20 since I heard it.

21 Q    Were you mad about it?

22 A    No, I wasn't really mad because I am not married to

23 this young lady.  I am not married to her.  I am married to

24 another woman, but ....

25 Q    Are you scared of Rodney?

1   A    Yes, I was scared of him.

2   Q    And, it was bothering you, but it didn't make you mad?

3   A    No.  Because I was -- I was liking the girl, but I was

4   not in love with her.  No.  Me and her, we was having

5   problems as well.  She was a gold digger.

6   Q    So, you said on the first occasion you went over there,

7   and I take it to mean by your comments here this morning, you

8   didn't knock on the door or attempt to go in the first time.

9   A    No.  I walked down through the yard and went back to

10  the house.

11  Q    And, I believe you said on that occasion, you used your

12  head, and that is when you retrieved the pistol; is that

13  right?

14  A    Yes, sir.

15  Q    Okay.  So, you then went back to your house or where

16  your mother lived; correct?

17  A    Yes, sir.

18  Q    You got the pistol out.

19  A    Yes, sir.

20  Q    Is that right?  Where was that pistol being kept?

21  A    It was kept in my mother's room.  In her dresser.

22  Q    And the bullets were kept separately, weren't they?

23  A    Yes, sir.

24  Q    So, you had to get the bullets from another drawer.

25  A    Some was in the next drawer; yes.

*** Frances L. Roark ***

1  Q    Then you had to load the gun.

2  A    Yes.

3  Q    And this comment is bothering you, but you are not mad

4  about it; is that correct?

5  A    No, I am not mad.

6  Q    So, you're loading this gun, but you are still not mad.

7  A    No.

8  Q    Okay.  Now, you talked to Jason Buivids on January the

9  12th.

10  A    Yes, sir.

11  Q    Correct?

12  A    Yes, sir.

13  Q    And, when you spoke to Jason Buivids, you didn't tell

14  him that Rodney charged at you with a bat, did you?

15  A    No, sir.

16  Q    You didn't even tell him you had been in the trailer

17  until after the girls got home, did you?

18  A    No, sir.

19  Q    In fact, when you left the trailer the very last time

20  on January the 12th you locked the door, didn't you?

21  A    Nope.

22  Q    You didn't?

23  A    Nope.

24  Q    You told Investigator Wright and Investigator Looser

25  you did, didn't you?

```
 1   A      I had told them that, but I didn't.

 2   Q      Was that another one of those, I believe, Mr. Keith

 3   described it as minor details that departed from what

 4   happened and your statement?

 5   A      Yes, sir.  I want to set the record straight.  I did

 6   not lock the door.

 7   Q      You still knew it was going to be Terri and Tashia that

 8   would come home and find their mother and Rodney, didn't you?

 9   A      Yes, sir.

10   Q      On the January 12th statement to Sgt. Buivids, you

11   never told him anything about confronting Rodney about a

12   comment about Felicia, did you?

13   A      No, sir.  You want to know why?  Because, ....

14   Q      No, no.  I'm just asking the questions; okay?

15   A      Yes, sir.

16   Q      You didn't mention anything to him about Rodney talking

17   about Felicia at all?

18   A      No, sir.

19   Q      Now, this comment that Rodney supposedly made about

20   Felicia, was this done under this tree that you sat around?

21   A      No, sir.

22   Q      It wasn't?  Where was it made at?

23   A      It was up around his mom's house.  We used to go up

24   there at times and play basketball.

25   Q      Is that what you are doing:  Playing baseball?
```

```
 1   A     Yes, sir.

 2   Q     All right.  So, you he and who else?

 3   A     Quinton, a couple of other guys that be around the

 4   neighborhood there.

 5   Q     Just guys hanging out; right?

 6   A     Yes, sir.

 7   Q     Just guys talking; right?

 8   A     If that is what you want to call it; yes, sir.

 9   Q     You were out there playing basketball, hanging out

10   together, the same people you'd been hanging out with all the

11   time?

12   A     I hang out with everyone.  I don't hang out with no

13   particular person.

14   Q     All right.  Now, you told us that in your statement you

15   made the comment about Rodney getting the ball bat from

16   beside the TV.

17   A     Yes, I came back and set the record straight when

18   Mr. Keith was asking me, and I said that he went to the

19   bedroom, which he did, and retrieved the baseball bat.

20   Q     The TV is in this room here that you are describing.

21   A     That's the old TV.  It doesn't work.

22   Q     But that's the TV that you made the comment about the

23   ball bat was beside the TV.

24   A     Yes, sir.  Like I said, when I made that comment, when

25   I made the statement, I was nervous.  I was just talking off
```

1   the top of my head.  Upset with myself.  My conscience was

2   bothering me.  I said just anything, because I was trying to

3   get out of there.  I was wanting to go home.

4   Q      Didn't you really say that because it just made it

5   sound better that he just had to pick up the ball bat from

6   beside the TV as opposed to going down the trailer into

7   another room?

8   A      No, sir.

9   Q      But he did; right?  He did go into another room.

10  A      He went into another room.

11  Q      You said you were standing here basically looking down

12  the hallway.  Which room did he come out of?

13  A      The back bedroom.  His bedroom.

14  Q      This bedroom here.

15  A      Yes, sir.

16  Q      So, Rodney came out of this bedroom here, down this

17  hall toward you, you said.

18  A      Yes, sir.

19  Q      And you said -- you were describing it, you said he had

20  the ball bat over his head and you were using both hands.

21  A      He was using both hands.

22  Q      Is that right?

23  A      Like I said.

24  Q      So, he did not have a knife in his hand then, did he?

25  A      No, sir.

1  Q    And, you said about that bat that Rodney once told you

2  he would use the bat on anyone that came in his house that

3  was not supposed to be there; is that right?

4  A    Yes, sir.  Me, I, didn't feel like I wasn't to be

5  there, because we supposed to be friends.

6  Q    Well, you knew when he had the bat at you, you were not

7  supposed to be there, didn't you?

8  A    No.

9  Q    You didn't?

10  A    Because, it's like this.  He invited me in the house.

11  He did not tell me to leave, so I took it that, hey, we are

12  still somewhat friends.  But, when he come at me with the

13  baseball bat, I was standing there looking dumb-founded like,

14  why is he coming at me with this bat?

15  Q    You couldn't figure it out, because all you had done

16  was confront him about some comment that he made about a girl

17  in front of his wife.  You couldn't figure out why he was

18  coming at you with a ball bat.

19  A    Like I said, he went back to the back bedroom.  He

20  didn't seem mad when he left.  He said I have something for

21  you.  I'll be right back.  And, any person would have

22  thought, hey, this young man not mad.  Hey, maybe it is just

23  something.

24  Q    Wait a minute.  You told me you were scared of him.

25  A    Yes, I was scared.

1    Q    Even though he made a comment after this, with his wife

2    being upset being in the same room when this comment was

3    made, you did not have any idea that was any conflict?

4    A    I'll put it like this ....

5    Q    Is that a yes or a no?  You didn't have any idea that

6    that was some kind of threat?

7    A    Would you please let me answer the question.

8    Q    It's a yes or no.

9         MR. BLANCHARD:    Your Honor, he's entitled to

10   answer the question that has been put to him.

11        THE COURT:  Well, you may take him on redirect.    Go

12   ahead.  Answer the question.

13   MR. LISENBY:

14   Q    Yes or no, you didn't take it as a threat?

15   A    Talking about when he went out?

16   Q    When he made the comment after you'd confronted him

17   about another girl in front of his wife, he went back making

18   a comment, "I've got something for you," you didn't take that

19   as a threat at all?

20   A    No, because he said it within a calm manner.  I was not

21   scared of Rodney any before this incident.

22   Q    You weren't scared of him?

23   A    No, I wasn't scared of him before then.   Then when he

24   come at me with this bat, I became afraid, because my life is

25   very important to me.  I love my life just like you love

1   yours.

2   Q    So, when you went and got the pistol and loaded it, you

3   were not scared of Rodney.

4   A    I put the pistol in my pocket, just putting it there

5   and everything.  I didn't want to use this pistol.  I didn't

6   take the pistol down there with the intent to use it.  I know

7   Rodney's attitude.  I know his paths.  How he acts toward his

8   wife and toward other people when he gets upset.

9   Q    Tell me, Mr. Holloway, when you walked down to Rodney

10  Brown and Angela Brown's trailer with a pistol in your

11  pocket, were you or were you not scared of Rodney Brown?

12  A    No, sir, because I did not ....

13  Q    You didn't have that -- that wasn't in your mind.

14  A    I'll put it like this.  When I went down to that

15  trailer, I was not going down there to make him upset or no

16  one else upset.  Well, he took it wrong.  That is not my

17  business.  But, man, don't take anything wrong when you come

18  to him like that, but Rodney being my friend and everything,

19  I thought maybe he could handle it better in that situation.

20  Q    But, it had been bothering you for a week, hadn't it?

21  A    Yes, sir.

22  Q    So, you had taken it wrong.

23  A    I didn't take nothing wrong.

24  Q    You didn't take it wrong?

25  A    You putting words in my mouth.

1    Q     You didn't take it wrong?

2    A     I'll tell you like this.  You can't put words in my

3    mouth, because I am like this.  I did not do anything

4    intentional.  I did not go down to that house to hurts

5    anyone, because our friendship had been for years.  Ever

6    since I moved back to the Chambers County area.  I went down

7    there because I thought our friendship was strong enough to

8    where I could confront him and he would not get upset over

9    it.  I was not upset.  The woman's not my wife.  I could care

10   less about it, but when he said this to her -- when he said

11   this about her, I wanted to confront him, because I know his

12   past and I didn't want it to lead to whatever it is he say he

13   was going to do.

14   Q     So, you could care less about Felicia.  Is that what

15   you just said?

16   A     I care about her in ways, but I could care less about

17   her in a loving way, because I did not love her.  I have a

18   wife that I love.

19   Q     This comment that he did not make to her, but made out

20   while playing basketball with some other guys kept bothering

21   you for a long period of time; right?

22   A     Right.

23   Q     All right.

24   A     But, it is like this.

25   Q     No, sir.  That's it.

1    A      You don't want to listen to me?

2    Q      Isn't it true that you said in your direct testimony

3    that I had no business getting the gun in the first place?

4    A      Yes.  Right.

5    Q      And, when Rodney -- when Rodney walked down from this

6    area here back into the back bedroom, if you had left, Rodney

7    and Ann would not be dead, would they?

8    A      No, sir.  I will put it like this.  Neither one of them

9    would have been dead if I had left.  True.  But someone was

10   coming at me with a bat.  If I had turned my back to try to

11   unlock this door, I would have been dead today.  You wouldn't

12   give a damn.

13   Q      But, you didn't even -- you weren't even concerned

14   about the fact that you just thought he was trying to get you

15   out of the house.  You said you didn't know why he had a bat

16   at you, because you were such good friends.

17   A      True.  But, it dawned on me that this guy was going to

18   hit me with this bat.

19   Q      All right.  Now, you said that when you fired the shot

20   at Rodney, you were standing in the area right here.

21   A      Yes, sir.  But he was closed in on me by then.

22   Q      Show me where Rodney was.  Take that pointer and show

23   me where Rodney was.

24   A      He was right -- somewhere between where the couch and

25   the entrance to the door.  I mean the entrance to the

1    hallway.  Right up in here.

2    Q    All right.

3    A    And, the TV from that distance to the doorway, going to

4    the hall, is not that far apart.

5    Q    That is where you say he was; is that correct?

6    A    Yes, sir.

7    Q    Somewhere in that area there. Now, your statement says

8    that when you shot him in the chest, he went to his knees.

9    A    Yes, sir.

10    Q    Is that what he did?

11    A    Yes.

12    Q    Can you explain how, if the man is walking in this

13    direction, because you are having to face him to shoot him in

14    the chest; correct?

15    A    Yes.

16    Q    Can you explain how a man who is shot here immediately

17    falls to his knees, but ends up with his body -- with his

18    head facing in this direction and his legs this direction?

19    A    Because when he got hit, he turned around.  He turned

20    around back toward the hallway and went down on his knees.  I

21    was feeling threatened still because he had enough strength

22    to get back up and pick up that bat, and he was on his way

23    back up to his feet.  So I felt threatened still.

24    Q    So you are saying that he moved -- that he moved from

25    the end of this doorway into this couch all the way to over

1   here in some manner?  I realize this isn't to scale.  I'm not

2   trying to make that point.

3   A     You are putting words in my mouth.

4   Q     I'm just trying to figure out if you shot him in

5   basically the door way there, going down a hall, he ended up

6   over here; correct?

7   A     Like I said, the TV and the hallway is not that far

8   apart, and all.  When he had fell, he had fallen like he was

9   coming this way, but he had turned around and he fell

10  backwards.  Like I said, ....

11  Q     He fell backwards?

12  A     He fell back towards the way he was facing.  When he

13  came down on his knees, he was down like on his knees facing,

14  like, toward the hallway.

15  Q     Okay.

16  A     But, he was on his way back up, and I still felt

17  threatened.  I am scared of him.  I am still scared.  So, I

18  am still holding the gun on him, because, like I said, I

19  never shot anyone dead in my life.  So, I am scared.  I

20  didn't know what to do.  I'm still holding the gun on him.

21  But when he makes a move, I pulled the trigger again and I

22  shot him in the back of the head.

23  Q     So, a good place to hit him then is in the back of the

24  head.

25  A     I wasn't trying to shoot him in the back of the head.

1   I could have hit him in the back or anywhere else.  I was not

2   trying to hit him at all.  I didn't want to shoot the guy.  I

3   didn't go in there with the intent to shoot anyone.

4   Q     Now, your statement says that after you fired the first

5   shot that hit Rodney in the chest --

6   A     Like I said, ....

7   Q     Excuse me.

8   A     Sorry.

9   Q     -- the next thing that happened is Angela came up off

10  the couch and you shot two times at her.

11  A     Yes, sir.

12  Q     But, your testimony earlier today already was that you

13  had shot Rodney twice when Angela, who is to your back now,

14  came up off the couch.

15  A     Yes, sir.

16  Q     Is that another minor detail that was just a

17  misstatement in your statement?

18  A     You are trying to put words in any mouth.  You are

19  trying to confuse me.  This is the facts right here.  When I

20  shot Rodney, I had my back to Angela on the couch.  I heard

21  her jump up and everything.  By this time Rodney was already

22  dead.  I heard her jump up.  Like I said, I was still scared.

23  I never done anything like this in my life.  I have never

24  shot anyone in my life.  When Angela jumps up, she is behind

25  my back and everything.  If someone was to your back and you

```
 1   heard it, and you was nervous and you jumped around real

 2   quick and pulled the trigger before you knew it, that's what

 3   I'd done.  I wasn't trying to kill Angela intentionally.  I

 4   wasn't trying to kill Rodney intentionally.  If that was the

 5   case, I would go out and shoot somebody everyday for what

 6   happens in life, but I'm not like that.

 7   Q    Can you see this photograph, State's Exhibit number 24?

 8   A    Yes, sir.

 9   Q    All right.  If you are standing -- this is the TV that

10   you are describing; isn't it?

11   A    Um-hmmm.

12   Q    If you are standing, basically in front of this TV;

13   right?

14   A    Right.

15   Q    Now Rodney is coming from this direction here out of

16   the hallway; correct?

17   A    Yes.

18   Q    How is your back to the couch?

19   A    Because I had turned this way now right back here.

20   Q    You had turned facing the TV?

21   A    Yes, sir.

22   Q    What were you doing taking aim on Rodney?

23   A    I wasn't taking aim on anyone.

24   Q    Okay.

25   A    I just had the gun down at my side when I got through
```

1    -- when I had shot him.

2    Q    You and Rodney, were you face to face when you shot

3    him?

4    A    He was coming at me; yes.

5    Q    So, were you, like you and I are right now, were you

6    face to face?

7    A    Yes, sir.

8    Q    All right.

9    A    But the gun was still in my pocket at this time.

10    Q    If that's the case there's no way that you could have

11    your back to this couch; is there?

12    A    When he fell, he fell facing, like I said, toward the

13    hallway.  By this time, I had turned my back to the point

14    where he had fallen right here and everything.  I had my back

15    this way.

16    Q    Were you facing the door at this point?

17    A    Was I facing the door?  No.  I was facing the hall.  I

18    was facing this window right there.

19    Q    You were facing the window?

20    A    Yes, sir.

21    Q    So, Rodney was coming down the hall, charging you with

22    the bat, you say you shot him in the chest.  He turned.  He

23    fell to his knees.  And, you turned to face the window.

24    A    I turned and faced the window, because he was still on

25    his knees.  I had got -- his back was to me then and

1    everything.  His back was to me.  And, he was, like he was

2    going to get up again, and I was nervous, and I ended up

3    shooting him in the back of the head.  By this time Angela,

4    Ann, had jumped up off the couch and everything, before I

5    knew it I jumped and turned around and shot her.

6    Q    So your testimony today is that you shot Rodney twice

7    before you shot Angela.

8    A    Yes, sir.

9    Q    But your statement says that you shot Rodney in the

10   chest, then shot Angela twice, and then turned back and shot

11   Rodney in the head.

12   A    When I made that statement, like I said, I was nervous.

13   I was confused.  I was saying something -- I made a

14   statement.  I was honest.

15   Q    You were honest?

16   A    When I made the statement, I was, like I said, it was

17   -- even Officer Blackstone told you I was nervous.  I was

18   nervous.  When I came in there my life was on the line.  I

19   was scared.  I will say anything when my life is on the line.

20   Q    You would, wouldn't you.

21   A    Which was true.  I gave them a true statement.  I

22   didn't make up anything.  I didn't make up anything.  I may

23   have got a lot of things confused, but I'm here today to set

24   the record straight what happened that particular day.  I

25   have had three years down in that jail to get my mind right,

1   to get up on the stand today and tell the truth.  And, this

2   is what I'm doing today.  I am telling you the truth.

3   Q      But, you would say anything to save your life.

4   A      Don't try to confuse me

5   Q      That's what you just said, wasn't it?

6   A      What I am saying is, I wouldn't say just anything, but

7   I am telling them the truth.  I am saying anything at the

8   time, but I am telling the truth and everything.  What I said

9   at the time, I was nervous.  I was not thinking at the time

10  to say, well, yes, he came from down the hall with the bat

11  and to hit me.  I was not thinking that.  Because, like I

12  said, nervousness -- do anything.  My nerves are bad.  I've

13  got anxiety, but I don't use that as an excuse.

14  Q      But you wanted to mention it, didn't you?

15        Let me ask you.  You said in your earlier testimony that

16  you had never had a history of violence in my life; is that

17  right?

18  A      Yes, sir.

19             MR. BLANCHARD:  Your Honor, I object on all the

20  grounds mentioned at the bench conference and ask for a

21  limiting instruction at the appropriate time.

22             THE COURT:  The objection is overruled.  However, I

23  will grant the limiting instruction at the proper time.

24  MR. LISENBY:

25  Q      Back on June the 24th of 1989, you tried to break in on

1    Ms. Lonza Hands who was age 75 at the time, didn't you?

2    A    I did not try to break in on anyone.  I went to the

3    house.  I knocked on the door.  She did not come to the door.

4    She was talking through the door.  I was drunk.  If what -- I

5    was drunk.  I was young.  I wasn't no more than about 14 or

6    15 years old.  Dumb.  I went to the house.  I had a knife.  I

7    got upset.  I cut the screen.  She told me to leave.  I left.

8    All this stuff she's saying about I came up on the porch and

9    she pulled a gun on me.  All of that is a lie.  I left when

10   she told me to leave.  I went back up toward my house.  By

11   this time, she come out of the house and she shot in the air.

12   I left.

13   Q    So, you told the social worker then that you did admit

14   I tried to break in Ms. Hands' home, but you denied you had

15   any sexual intentions toward her.  You said you wanted to

16   talk to her about lying on you.

17   A    No.

18   Q    Right?

19   A    I can't remember what it is that she had lied -- man,

20   it's been 20 some years almost.

21   Q    Confront  ....

22   A    I am the type of person, I want to get it straight.

23   When it comes to my life, I don't want no one to go out bad

24   mouthing me, talking bad about me, because that sets a bad

25   example for the whole entire neighborhood.  Everybody in the

1   neighborhood right now is thinking Jason's a bad guy.  Every

2   time something happen.  Jason did it.  When Rodney's dead,

3   oh, Jason must have had something to do with it.  When him

4   and Quinton raped Sandra.  Jason -- surprise he wasn't there.

5   I just happened to be at work that day, thank God.

6   Q     You never saw Angela Brown with a butcher knife, did

7   you?

8   A     No, sir.  I am not going to sit up here and say I did.

9   Q     And, you already told us that because Rodney had both

10  hands on the bat you knew he did not have the butcher knife.

11  A     No, sir.

12  Q     All right.  Now, ....

13              MR. BLANCHARD:  Excuse me, Your Honor, the limiting

14  instruction?  Could we do that?

15              THE COURT:  Yes.  Thank you, sir.

16       Ladies and Gentlemen, the testimony that was just

17  divulged after questions by the State has a limited purpose.

18  The purpose of that testimony, offered by the State, is for

19  potential impeachment of the testimony of this witness.  That

20  is the only purpose for which it is admitted into evidence

21  for your consideration.  It will be up to you, at the

22  appropriate time, to decide whether or not the impact of that

23  testimony is to impeach any part, whatsoever, of this

24  witness' testimony.

25              Proceed.

1                    MR. LISENBY:    Thank you, Your Honor.

2    MR. LISENBY:

3    Q     You indicated on your direct examination that after you

4    were arrested on this, you spoke to your mother, your foster

5    mother, Marie Collier.

6    A     Yes, sir.

7    Q     Now, isn't it true that you told her I killed them

8    both, and Rodney had it coming to him for a long time?

9    A     But not by me.  I'm not going to sit here and let you

10   say ....

11   Q     That's what you said, wasn't it?

12   A     Yes, I said that, but I am not going to sit up here and

13   let you blame that on me, because that is exactly what you're

14   trying to do.  I am going to explain this.  When I said ....

15   Q     No, no.

16   A     No.

17   Q     I get to ask the questions.  The question was yes and

18   no, and you answered it as yes.  Right?

19         Now, you indicated to Mr. Keith on your direct

20   examination that there was no struggle between you and Rodney

21   Brown at all.

22   A     No, sir, there wasn't.

23   Q     As best I can gather from your testimony, the fact that

24   Rodney coming down the hall with a ball bat had no indication

25   to you that he didn't want you there any more; right?

1   A       That is your indication, but he did not tell me that.

2   If he had told me that, I would have left.

3   Q       Well, did you, or did you not, think when Rodney Brown

4   was coming down the hall with a raised ball bat, charging at

5   you, according to your statement, did you still think he

6   wanted you in his trailer?

7   A       Of course not.

8   Q       Of course not.

9   A       But, he did not tell me to leave.  If he had told me to

10  leave before he went and got the ball bat, I would have left.

11  If he had told me to leave while he was charging at me with

12  the ball bat, I would have left.  But he did not make that

13  assumption [sic.] and say, Jason, you need to be trying to

14  leave before I hit you with this ball bat.  No, he did not.

15  He was charging at me like a raging bull.  And my life was

16  hanging in the balance.  I wasn't thinking at the time to

17  turn around and try to raise this gun up.  At the time, this

18  gun is still in my pocket.  I did not pull this gun until he

19  closed in on me and I was fumbling trying to get the gun out.

20  I pulled the gun out actually, finally and raised it at an

21  odd angle and shot.  I was still like this when I shot and it

22  just happened to hit him somewhere along the chest.  I am not

23  a professional gunman.  And, I did not -- like I said, I did

24  not take this gun down there to pose no threat to him or

25  Angela, but Rodney is a violent person.  Rodney has told me

1    numerous times what he would do and everything, but he didn't

2    direct it toward me.  He was saying anybody.  So, I did not

3    feel threatened not one iota at the time that me and Rodney

4    hung together.

5    Q    So, you didn't think when he was coming down the hall

6    with a ball bat, or did you think when he was coming down the

7    hall with a ball bat, that he did not want you in his

8    trailer?

9    A    He did not.

10   Q    He didn't want you there, did he?

11   A    Of course, he didn't want me there.

12   Q    That was the question that I asked.  That was all I

13   asked.

14        Now, the day that you came down and you said you just

15   decided to get this off your chest on January 21st about what

16   had happened.  After the statement isn't it true that --

17   well, during the statement isn't it true that you made that

18   comment about if you go a mile, you might as well run a mile?

19   A    Yeah, and I clarified that in my first.

20   Q    Isn't it true, that you also asked Investigator Looser

21   afterwards if you were still going to get birthday cake,

22   because that was your birthday?

23   A    Man, it was my birthday and I'm thinking, well, maybe,

24   I can go down to the jail.  I am going to get burned.  I had

25   cake at the house.

 1    Q    So, you still thought you were going to get a birthday

 2    cake; right?

 3    A    That was me just being joking.  I joke even though my

 4    life is in danger.  I got this off my chest.  I was honest.

 5    My conscience was feeling a little clearer, but it was not

 6    all the way clear.  I am bothered by this to this very day.

 7    I was trying to ease my tension by making a joke.  Saying,

 8    well, maybe I'll get some birthday cake now.  I even joked to

 9    the captain when I got down to the jail when I had seen her

10    the next day.

11    Q    Now, when you left the trailer on the first occasion,

12    you said that Angela was still breathing at the time; is that

13    correct?

14    A    Yes, sir.

15    Q    And, you knew that.

16    A    Yes, sir.

17    Q    You didn't go call the police or an ambulance?

18    A    No, because I was scared.

19    Q    Angela was a good person.

20    A    She was a very good person.  Next to my-mother, Angela

21    was an angel.

22    Q    And, so you decided you would go back; correct?

23    A    Yes, sir.

24    Q    And, I believe your comment was, it was your duty to

25    make sure that she wouldn't be suffering.

```
 1  A    I did not want her to suffer and everything.

 2  Q    Well, let me ....

 3  A    I may have said it wrong.

 4  Q    Let me ask you this, Mr. Holloway.

 5  A    Yes, sir.

 6  Q    Let me ask you this, Mr. Holloway, --

 7  A    Yes, sir.

 8  Q    -- is this the point where you were helping Angela not

 9  suffer when you struck her with the ball bat across the head;

10  is that the point?

11  A    I was scared.  I was nervous.  Like I said, I don't

12  know -- even know -- I don't know what my intentions were and

13  everything.  When I did what I did I was, like I said, I was

14  stupid and all.

15  Q    Maybe it was this point, Mr. Holloway, when you stabbed

16  her in the stomach; is that when you were helping her not

17  suffer?

18  A    I, Mr. Lisenby, I am like this, when I went back down

19  there I did not have any of that planned, no, I didn't.

20  Q    Well, you went back with a knife, didn't you?

21  A    Yes, sir.

22  Q    Because you had gone down there with a pistol the first

23  time, but you left that at home.

24  A    Yes, sir.

25  Q    Right?
```

1   A     Yes, sir.

2   Q     When you left that, you picked up a knife and brought

3   it with you.

4   A     Yes, sir.

5   Q     But, before you even used the weapon that you brought

6   with you, you had already hit her with a ball bat; hadn't you

7   that was left there.

8   A     Yes, sir.

9   Q     Right?

10  A     But at this period she was still breathing.

11  Q     Well, well, then was it this point when you stabbed her

12  multiple times and cut her neck; was that the point you were

13  making sure she was not suffering?

14  A     Like I said, she was still breathing then.

15  Q     Or when you put the pillow on top of her, is that when

16  you were helping her not suffer?

17  A     She was still breathing.  When I went back there ....

18  Q     You indicated that you were a truthful person; is that

19  right?

20  A     I'll put it like this, I have my occasions of telling

21  lies; yes, but I consider myself a truthful person.

22  Q     Back on June 22nd of 1999, you were convicted of theft

23  of property out of the City of Roanoke; weren't you?

24  A     Yes, sir.

25          MR. LISENBY:   I don't have any other questions for

1    Mr. Holloway right now.

2                    THE COURT:  Anything further from this witness?

3                    MR. KEITH:  Yes, Your Honor.

4                         REDIRECT EXAMINATION

5    BY MR. KEITH:

6    Q        Jason, the theft conviction was a misdemeanor

7    conviction in city court?

8    A        Yes, sir.

9    Q        What did you take?

10                   MR. LISENBY:  Objection, Your Honor.

11                   THE COURT:    Sustained.

12   MR. KEITH:

13   Q        Was the door locked, the residence of the Browns, and

14   if so, who locked it?

15   A        Talking about when I was inside?

16   Q        Yes, sir.

17   A        Rodney.

18   Q        When you left.

19   A        From when I left?

20   Q        No, I'm sorry, while you were inside--

21   A        Rodney.

22   Q        -- Rodney locked the door.  Was there any particular

23   reason or was that normal?

24   A        Just a custom thing he did.  He would lock the door.

25   Q        Other than your statement and inquiry to Rodney Brown

 1  about the threat he made about Felicia, were you expecting

 2  him to get a bat for any reason or do anything to you?

 3  A    I was not expecting him to get this bat whatsoever.

 4  When he went down the hall, like I said, he went down in a

 5  reasonable manner.  He was not mad.  I will put it like that.

 6  Because he said in a reasonable voice, he said, I've got

 7  something for you.  I'll be right back.  I did not feel that

 8  he was mad.  I did not take it as a threat.  I wasn't afraid

 9  at this moment.  No.  But when he come charging at me with

10  this bat; yes, I was afraid.

11  Q    Had Rodney ever assaulted you before?

12  A    No, sir.

13        MR. LISENBY:  Objection.

14  MR. KEITH:

15  Q    You learned of the rape of Sandra Patterson from whom?

16  A    Her mother.

17  Q    Luella Patterson?

18  A    Yes, sir.

19  Q    You were there when the police came out and all that.

20  A    I was not there that particular time.  Like I said, I

21  was at the emergency room.  I had got my finger caught in a

22  machine on my job and I called my mother.  She came and

23  picked me up from the emergency room and took me back to the

24  house.  And, when we was coming up the hill toward the house,

25  I seen all these people and all these police cars and such.

1   And, so, I did not ask no questions right then.  But, I went

2   on later and my her mother told me.  Rodney and Quinton had

3   raped Sandra.

4   Q     Mr. Lisenby got you to admit that basically somewhere

5   between three to seven days from this threat to the date of

6   January 12th.

7   A     Yes, sir.  Like I said, I was working.  I did not have

8   time to, you know, make -- I was -- like Rodney would go to

9   his mother's house.  I didn't know all the time when Rodney

10  was at his house or anything.  Like I said, the insurance man

11  woke me up that day.  I was asleep.  The insurance man woke

12  me up and so I was up then.  And I went down there at this

13  point not knowing if he was at home or anything.  And, I went

14  back to the house and I'm thinking, maybe I should take this

15  gun down here, not for the threat of using it, but suppose I

16  have to.  And, ....

17  Q     Had you received a phone call from Felicia Phillips

18  that morning on January 12th?

19  A     She did not call me.  I did not ....

20  Q     Did you call her or have any contact with her that

21  morning?

22  A     I called her later on that afternoon and everything

23  about 4:30, 5 o'clock, somewhere in that area, because I was

24  tired that day.  I usually call her, you know, somewhere

25  right before I come in, right after I come in from work, but

1    this particular morning, I just didn't.  Huh-huh.

2    Q    Go ahead.

3    A    I didn't call her that day.  I was tired.  I just went

4    on to bed.  I was intent on calling her later on like I did,

5    but it was like 4, 4:30, 4, somewhere in there.  I can't say

6    when I did call.

7    Q    Let me call your attention to your statement of January

8    21st.

9    A    Yes, sir.

10   Q    It says I went back ....

11        MR. LISENBY:   I would object to the leading, Your

12   Honor.

13        THE COURT:  Sustained as to leading.

14   MR. KEITH:

15   Q    Did you not make a statement to the contrary that you

16   had, in fact, had a phone call from Felicia?

17        MR. LISENBY:  Objection to the leading.

18        THE COURT:   Sustained as to leading.

19        MR. KEITH: May I approach the witness and refresh

20   him with his statement, Your Honor.

21        THE COURT:  Yes.

22   MR. KEITH:

23   Q    Jason, I want to show you what's your statement.  It is

24   not the copy admitted in evidence, but it is your January

25   21st, 2000 statement.  I want to ask you to read these couple

1   of lines and see if there's ....

2   A    I got home around 6:15 from work.  I laid down and went

3   to sleep.  I heard a knock on the door and around 9:30 by

4   that time I got up and the door -- to the door.  I saw the

5   insurance man driving away.  I went back and laid down on the

6   couch and the phone ring.  It was Felicia.  Okay.  I do

7   remember now.  We did talk that morning.  We talked and

8   everything.  But this was before I even went down to the

9   Browns' house.

10  Q    Did that phone call with Felicia trigger anything with

11  you?

12  A    No, sir.

13  Q    Mr. Lisenby wanted you to explain that you were mad

14  when you went and got the gun.  Was that the case?

15  A    I was not mad.  No.  Like I said, I liked this girl,

16  but I didn't love her.  And, I would protect anyone, any

17  female that was feeling threatened, I would try my best -- I

18  wouldn't go down with the intent to shoot or kill anyone, but

19  I would try to see why this comment was made, why her life

20  was being -- threatened her personal body and all that is

21  hers.  No one should threaten it.

22  Q    Your statement told the investigators you locked the

23  door.

24  A    I said it.  Like I said, when I made those statements,

25  I was nervous saying.  I was just actually talking and

1  everything and trying to clear my conscience.  I said a lot

2  of things, because I was confused when I made the statement.

3  Q      And you made a statement to -- and I can't pronounce

4  his name very well -- Investigator Buivids.

5  A      Buivids.

6  Q      Did he want to hear from you what had happened?

7  A      He wanted me to give him an account of what happened,

8  what I did when all this took place and everything, that

9  afternoon when the kids got home.  That was the part where he

10 took up with me from right there.  He did not ask me what

11 happened during that morning or any other time.  He was

12 particularly talking about when the children had came home,

13 what was my reaction at that time.

14 Q      And, did he provide to you any further opportunity to

15 make further explanation about anything you were wanting to

16 get off your conscience?

17 A      No, sir.  When he finished writing this down, once he

18 finished writing everything down, he asked me to read over it

19 and sign it, which I did.

20 Q      A discrepancy Mr. Lisenby pointed out, the bat was, in

21 fact, in the bedroom and not near the TV; is that right,

22 Jason?

23 A      Yes, sir.

24 Q      When you were inside the Browns' residence that

25 morning, when did you first perceive, if you did, when did

1    you first perceive your life was being threatened?

2    A    When Rodney was charging down the hall toward me with

3    the bat and all, I was not thinking clearly, I still trying

4    to figure out why he is coming at me with this bat and all.

5    By the time he got up on me, I was smart, I guess you could

6    say, I was smart enough to say, hey, you need to do something

7    about this before you get hit.  I'm not trying to be smart or

8    anything.  I am not trying to make myself look like I'm being

9    bad or anything, which I'm not.

10    Q    Apart from his physical actions with the bat, was his

11    demeanor or did he say anything to go along with the threat

12    with the bat?

13    A    He didn't say anything.  He was just charging at me.

14    Q    Did you fear for your life?

15    A    Yes, sir.  Like I said, I love my life like everyone in

16    this courtroom, I imagine, loves their life.  My life, at

17    that point in time was in danger and all.  I'm not one of

18    those type of people that go out and shoot my next door

19    neighbor before I get my newspaper.  I'm not like that.  That

20    was not the case here.  I was not trying to do either one of

21    those things.  Like I said, I went to confront Rodney and

22    everything.  Even though I had a chance to confront him while

23    we were playing basketball, but I was drinking.  I was high.

24    I smoked marijuana.  I was high that day.  And, he said the

25    comment and I wasn't, not at that particular time, you know,

1    worried about it.  But, then I come down and it had been a

2    while and I had a chance to think about it, and I wanted to

3    confront him why would he say anything like that.

4    Q    What was Rodney doing when you shot the second time?

5    A    He was on his knees with the intent to get back up.

6    Q    Was he getting up?

7    A    Yes, sir.

8    Q    Did you have time to plan and aim and decide what you

9    could do with that gun?

10   A    No, sir.

11   Q    How many seconds elapsed between the first shot and the

12   fourth shot?

13   A    A few seconds.

14   Q    Are you trying to mislead the jury or Mr. Lisenby about

15   whether you shot Rodney and then Angela or Rodney twice and

16   then Angela?

17   A    No, sir.

18   Q    You made your statement to law enforcement, the

19   statement I just showed you, your four-page statement.

20   A    Yes, sir.

21   Q    Did you have -- were you able to offer explanation

22   during your statement in addition to what was written down

23   for you?

24   A    No, sir.  Because they more or less like just wanted my

25   statement and everything, and once I did give them the

1   statement, they wrote everything down and asked me to read

2   over it and sign it.

3   Q    Mr. Lisenby asked you about some incident where you cut

4   a screen at a woman's house.  How old were you then?

5   A    I was like 14, 15.

6   Q    How old are you now?

7   A    I am 30 years.

8   Q    You weren't trying to make light of the situation you

9   were in about that birthday cake, were you?

10   A    No, sir.  No, sir.  I was like more or less trying to

11   ease the tension within the building that day, that night or

12   day, because my nerves were bad, and they were up tight, I

13   guess you would say, because they had a job to do and

14   everything.  So, I felt like just easing the tension by

15   saying that, you know, just to get a laugh, you know.

16   Q    Apart from the few discrepancies, or the minor details

17   as Mr. Lisenby would describe it, you made your statement and

18   that was a truthful statement?

19   A    Yes, sir.

20       MR. KEITH:  If I may have just a moment, Your

21   Honor.  Thank, you Jason.  Mr. Lisenby may have some

22   questions.

23       MR. LISENBY:  I have a few, Your Honor.

24       THE COURT:  Recross.

25                **RECROSS EXAMINATION**

1   BY MR. LISENBY:

2   Q    Mr. Holloway, you told Mr. Keith that when Sgt. Buivids

3   spoke to you on January the 12th, he didn't want to know

4   anything that had happened except what happened after the

5   kids arrived.

6   A    That is where he took up from.  He asked me that.

7   Q    But, you didn't tell him anything else either, did you?

8   A    No, sir.

9   Q    In fact, even before Sgt. Buivids arrived, one of the

10  first people you saw at the scene was Angela's brother Rev.

11  Cofield, was it not?

12  A    There was other people before he came.

13  Q    But, I mean he was there at the scene, too.

14  A    Yes, he was.

15  Q    And, you spoke to him upon his arrival, didn't you?

16  A    Yes, sir.

17  Q    And, you told him, I don't know what happened.  I have

18  been asleep all day; right?

19  A    Yes, sir.

20  Q    So to the reverend, to your -- the good person,

21  Angela's brother, the first thing you said about this was a

22  complete lie; wasn't it?

23  A    It was a complete lie.  I told that lie just as the

24  simple fact I didn't want to go to jail.  But, it had been

25  bothering me the whole entire time.  So when they did finally

```
 1   get me down to question me, my conscience had bothered me
 2   enough, so I gave them this truthful statement just to ease
 3   my conscience.  Which is, like I said, it still bothers me to
 4   this very day.  I am not proud of what I did.  I never will
 5   be proud of what I did.  And, I don't thinking anyone in that
 6   neighborhood will ever like me, which, that is usual.
 7   Q     So, you didn't have a need to cleanse your soul when
 8   you spoke to Rev. Cofield, did you?
 9   A     No, sir.  No, I didn't.
10   Q     You said that when the investigators spoke to you on
11   January the 21st, that they just asked you questions, and
12   they didn't let you give any other information.  Did I
13   understand that correct?
14   A     I may have said something else, but it was not written
15   down.  I don't think so.  If it was, I don't have any
16   knowledge of it.
17   Q     Isn't it true, Mr. Holloway, that in this statement
18   there were several breaks as far as lines being drawn about
19   things; is that correct?
20   A     Excuse me?
21   Q     I don't have the State's Exhibit.  I am not sure where
22   it is.  I am going to show you my copy of the statement.
23   This is on page 3.  You see here, after a top paragraph,
24   there is a line with your initials, and then there's another
25   paragraph with a line with your initials and a line here with
```

1   your initials and then a following line at the end down here.

2   Do you see all those lines?

3   A     Yes, sir.

4   Q     And, there's still a fourth page; correct?

5   A     Yes, sir.

6   Q     So, you and the officers were in fact talking a while;

7   weren't you?

8   A     Yes, sir, but it was still part of my statement, which

9   is written down and all.  I might have been thinking in

10  between that time to tell them everything, because I wanted

11  to get everything out in the open and make sure that I didn't

12  leave anything out.  So, I may have been thinking in between

13  time where the lines were drew, and, you know, because, like

14  I said, when I was there giving the statement, I was telling

15  the truth.  I was not holding nothing back.  I wasn't trying

16  to keep anything hidden from them, because at this point I

17  was there.  I was caught.

18  Q     So, you did have an opportunity to fill in more

19  information; right?

20  A     Yes, sir.

21  Q     All right.  In fact, you were so concerned after you

22  had shot and killed Rodney and Angela Brown, struck her with

23  ball bat, stabbed her with a knife, smothered her with a

24  pillow, had sex with her, that you went home and watched

25  Jerry Springer, Port Charles, All my Children, One Live to

*** Frances L. Roark ***

1   Live, Sister Sister, Different World, General Hospital.  That

2   is how concerned you were; right?

3   A      I was scared.  I was not about to turn myself in,

4   because I was scared.

5   Q      Now, you made a comment about when Rodney said

6   something about Felicia being at the basketball game, you

7   made the comment to Mr. Keith, that you could have confronted

8   Rodney at that time; correct?

9   A      Yes, sir.  I was high.  I was -- I had smoked

10  marijuana.  We had all smoked some that day.  Rodney tends to

11  get carried away when he gets to drinking and smoking.

12  Q      But you were not scared of him.

13  A      No, sir.

14  Q      Okay.  So you could have confronted him that day, but

15  you didn't.

16  A      Like I said, we was out.  We was all having fun.

17  Didn't dawn on me to confront him then.  Like I said, we was

18  all high.  We was drinking and all.  We had other people out

19  there in the surrounding with us.  If I'm going to talk to

20  someone about anything like that, I don't want a crowd.  I

21  don't want them to make him look bad in front of everyone.  I

22  can talk to him alone.

23  Q      But you told Mr. Keith that you would protect any

24  female that was being threatened.

25  A      Yes, sir.  And, I came back and I said that I would not

 1  go and kill for that.  No.  I would want to know what led up

 2  to the person doing the things that they did and I would want

 3  to prevent it before it happened.

 4  Q    But, I asked you, and you said, that Felicia didn't

 5  even know anything about it, did she?

 6  A    No, she didn't.  I didn't tell her.

 7  Q    But, you would protect any female that was being

 8  threatened even though Felicia wasn't being threatened.

 9  A    Like I said, Felicia did not have any knowledge of what

10  was said or anything, but she knew Rodney's history as well.

11  Everyone knew Rodney's history.  I didn't want to upset her.

12  She has two small children.  And her being nervous and jumpy

13  would not be good for them.

14  Q    But you didn't mind having sex with Angela after she

15  was dead because you were trying to get back at Rodney.  Is

16  that what you are telling us?

17  A    Yes, sir.

18         MR. LISENBY:  I don't have any other questions.

19         THE COURT:  Anything else?

20         MR. KEITH:  No further questions.

21         THE COURT:   You may step down.

22  (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

23         THE COURT:  Counsel, approach.

24  (WHEREUPON, A SIDE BAR COMMENCES.)

25         THE COURT:  Who is your next witness?

1          MR. BLANCHARD:  Defense is going to rest at this

2   time, Your Honor.

3          THE COURT:  You want to take like an hour or an

4   hour-and-a-half lunch?

5          MR. LISENBY:  Kenny has a suggestion that he would

6   like to make.

7          THE COURT:  Yes?

8          MR. LISENBY:  About doing closing arguments

9   tomorrow as opposed to just doing our charge conference today

10  and doing closing arguments first thing in the morning.

11         MR. BLANCHARD:  Suits me, Judge.

12         MR. LISENBY:  I think it is going to take a little

13  time for us to go through these charges, because we have all

14  these lesser includeds and that kind of thing.  I'm not sure

15  and hour and a half -- I'll put it this way.  Clearly the

16  jury would be back before we were through I would think even

17  with an hour and a half.  That's us not taking any time to

18  eat.

19         THE COURT:  I tend to agree with that.

20         MR. BLANCHARD:  So, we'll do closing and your

21  charge in the morning.

22         THE COURT:  Way we can do it is in the morning at 9

23  everything is done, and they are called in, you close, I

24  charge, they go out, we'll have all the verdict forms ready,

25  everything will be ready to go.  There's no reason we can't

1   have it to them by 11 o'clock.

2          MR. BLANCHARD:  All right.  I don't know how long

3   they will deliberate or anything like that.  Nobody does.  I

4   am just concerned about the beginning of the next phase, if

5   it proves necessary.

6          THE COURT:  At this point in the trial, I will tell

7   everybody not to presuppose or guess.  When we're back, we're

8   back.  We'll take it at that time.  Just sit down and do the

9   best.  I am not going to push the jury if that's what you're

10  worried about.

11         MR. BLANCHARD:  No. I am not worried about -- my

12  schedule as far as penalty phase is concerned, when would we

13  start that?  I kind of thought we might get a verdict today,

14  and would start tomorrow.  If we are not going to get a

15  verdict until sometime tomorrow, then that changes the

16  equation.

17         MR. LISENBY:  We did one, one time on Friday night.

18         MR. BLANCHARD:  But, ....

19         MR. LISENBY:  Because I was here that day.

20         MR. BLANCHARD:  I would not have a problem trying

21  to arrange things to start it on Thursday morning.  If we

22  verdict sometime tomorrow, I just don't want to be in the

23  position of having a verdict and then immediately rushing

24  into penalty phase.

25         THE COURT:  Let me ask this.  If we sent the jury

1   out until, say, 2 o'clock, either 2 or even 2:30. That

2   should give us hour to do charge conference. Verdict forms

3   -- Stephanie can be doing the verdict forms.

4         MR. GIBBS:  We are still not talking about getting

5   it to the jury ....

6         THE COURT:  It is 12:30 on Tuesday and is there any

7   rebuttal?

8         MR. LISENBY:  No.  We've talked briefly, but I

9   don't expect any.

10        THE COURT:  I don't see where we can't get it to

11  the jury today.

12        MR. GIBBS:  It would be late today.  That's my only

13  concern.

14        THE COURT:  Two-thirty.  Or, let's say 2 o'clock.

15  Closing.  Charge.  It could be to the jury before 5.

16        MR. LISENBY:  I kind of hate to make them go out

17  at 5 o'clock.  We'll do whatever the Court wants us to do,

18  but I would hate to put them out, deliberating at 5.  I don't

19  want them thinking about supper, and kids at home, that kind

20  of thing to rush into anything.  I also think that we need to

21  do closings, charge, and deliberations all at one time if we

22  can.

23        THE COURT:  The options are:  Take a break until

24  2:30.  Closings, Gentlemen, do you have any idea about your

25  length of closing?

1    MR. LISENBY:  No I will say no we don't after that

2  testimony.

3    MR. GIBBS:  I am doing the first one.  I got a

4  feeling mine will be lengthy.

5    THE COURT:  It concerns me that it could be close

6  to 5 o'clock when we send them out.

7    MR. BLANCHARD:  Yes.  That concerns me too.  I

8  don't have any problem with coming back in the morning to do

9  arguments, I really don't.  I am concerned about how things

10  go from there on.  I need some certainty as to when I'm going

11  to need to be ready, if I need to ready.

12    THE COURT:  Do you have witnesses you could simply

13  have on call?

14    MR. BLANCHARD:  Yes, I do.  I do.  Most of my

15  witnesses are here and have been here all week.  I have one

16  witness, a professional witness, who is here now, and is

17  supposed to remain.

18    THE COURT:  Put them on call and let them have a

19  little bit of flexibility that way.  I understand exactly

20  what you're talking about.  It is impossible to speculate on

21  how long a jury is going to be out.  So, the best we can do,

22  if we get it to them -- you want to start at 8:30 in the

23  morning?

24    MR. LISENBY:  Fine with us.  I really think,

25  because of the possibility of the late hour of them getting

1    it today, that that would be the better practice.  I hate to

2    lose an afternoon like the Court does, but I'm just afraid

3    that ....

4              THE COURT:  Okay.  All right.  We are going to

5    break until 9 o'clock in the morning.  Then we'll start back.

6              MR. LISENBY:  Okay.

7              MR. BLANCHARD:  Nine or ....

8              MR. GIBBS:  Nine or 8:30?

9              THE COURT:  Nine.

10              MR. BLANCHARD:  Judge, if they have no rebuttal,

11   then I'll need to renew my trial motions.

12              THE COURT:  We'll do that after we send them home.

13   (JURY PRESENT)

14              THE COURT:  Call your next witness.

15              MR. KEITH:  Defense rests, Your Honor.

16              THE COURT:  Ladies and Gentlemen, at this point the

17   Defense has rested their case.  After considering many things

18   that has been brought up here at the bench between myself and

19   the attorneys, I think the best course of action for me to

20   take at this point is to call a recess and send y'all home

21   until 9:00 in the morning.  At 9:00 in the morning, all legal

22   matters that I have to deal with the attorneys will have been

23   resolved and at 9:00 in the morning we will call you in.  The

24   attorneys will make their closing arguments to you.  I will

25   charge you on the law.  And then I'll send you back out to

1    deliberate and reach your verdict.  I want all of you to go

2    rest yourselves this afternoon.  Get a good night's sleep.

3    Be back in here in the morning in the jury room at 9:00 and

4    we'll begin with the closing arguments of counsel.  And, as I

5    said, I will immediately follow with my charge on the law.

6    We are getting close to the point in this phase of the trial

7    where it is time for to you do your duty as jurors.  It is

8    specially important at this point that you do not talk to

9    anyone about this case.  Do not discuss this case with

10   anyone, not even amongst yourselves.  Do not try to learn

11   anything about this case.  You have heard the evidence in

12   this case from the witness stand and at the appropriate time,

13   I will charge you on the law that applies to that evidence.

14   Do not talk to law enforcement officials or to any person who

15   may be witnesses in this case or to anyone who may be

16   associated in any manner with either side of this case.

17   Avoid news media coverage.  Do not read, do not listen, and

18   do not watch anything concerning this case.  Should any

19   member of the media contact you, you must immediately notify

20   them, as you would notify anyone else, that you cannot talk

21   with them about this case.

22        Any further instructions requested by State or Defense

23   prior to recess of the jury?

24        MR. LISENBY:  No, Your Honor.

25        MR. BLANCHARD:  No, Your Honor.

*** Frances L. Roark ***

1    THE COURT:  Everyone remain in the courtroom while

2    the jury exits.  With that you are in recess until 9:00 in

3    the morning.

4    (WHEREUPON, THE JURY WAS ADJOURNED UNTIL 9:00 A.M., 11 JUNE,

5    2003.)

6    THE COURT:  All right.  We are in recess.  Counsel,

7    approach.

8    MR. BLANCHARD:  At this time, Judge, both sides

9    having rested, the Defense would take the opportunity to

10   renew the mid-trial Motion for Judgment of Acquittal based

11   upon the same grounds.

12   THE COURT:  And, those are on the record.

13   MR. BLANCHARD:  Yes, sir.

14   THE COURT:  Motion denied.

15   Let's take a break for an hour.

16   (WHEREUPON, THERE WAS A NOON RECESS.)

17   **CHARGE CONFERENCE**

18   THE COURT:  We'll go on the record.  The Court has

19   prepared three verdict forms which follow the counts of the

20   indictment.  That being count one, count two, count three.

21   The attorneys for State and Defense have reviewed the same

22   and found them to be satisfactory; is that correct,

23   Mr. Lisenby, Mr. Gibbs?

24   MR. LISENBY:  Satisfactory to the extent that they

25   reflect what the Court is going to charge.  We don't think

1  that either murder nor manslaughter are lesser-included

2  offenses.

3          THE COURT:  Noted.  Mr. Blanchard and Mr. Keith?

4          MR. BLANCHARD:  Satisfactory to the Defense, Your

5  Honor.

6          THE COURT:  Okay.  Very well.  Let's talk about

7  charges.  The State and Defense have each proposed certain

8  charges.

9          MR. LISENBY:  Mr. Story has gone to make a copy.

10          THE COURT:  Let me wait until he gets back with the

11  copies.

12      Everyone look at defendant charges begin in order.  But

13  first I want everyone to look at defendant's number 13,

14  involving circumstantial evidence.

15          MR. LISENBY:  In the second line I think that

16  should say direct evidence is simply evidence like ....

17          MR. BLANCHARD:  It should.  I just saw that.

18          THE COURT: While we finish reading this, Frances,

19  go off the record.

20  (WHEREUPON, OFF THE RECORD.)

21          THE COURT:  On the record for just a second.  What

22  we are considering at this time is going to be the

23  self-defense charge, the State opposes the charge of

24  self-defense.  The Defense is asking for a charge.  Here is

25  what I have drafted up or modified from a pattern charge.

1    One of the issues in this case is self-defense.  A

2  person may use physical force upon another person in order to

3  defend himself from what he reasonably believes to be the

4  use, or imminent use of unlawful physical force by that other

5  person, and he may use a degree of force which he reasonably

6  believes to be necessary for the purpose.

7    A person may use deadly physical force in order to

8  defend himself, if he reasonably believes that the other

9  person is using, or about to use, unlawful deadly physical

10  force, or is committing, or about to commit an assault in the

11  first or second degree.  For the defendant's use of deadly

12  force against another person to be justified, the deadly

13  force must have been used under the following circumstances:

14    One, the defendant must have reasonably believed that

15  Rodney Brown was using, or about to use, unlawful deadly

16  physical force against himself, or the defendant must have

17  reasonably believed that Rodney Brown was committing, or

18  about to commit, an assault in the first or second degree.

19    Deadly physical force is force, which under the

20  circumstances in which it is used is readily capable of

21  causing death or serious physical injury.

22    A reasonable belief formed in reliance upon

23  reasonable appearances.  One more time.  A reasonable belief

24  is a belief formed in reliance upon reasonable appearances.

25  It is a belief not formed recklessly or negligently.  The

```
 1   test of reasonableness is not whether the Defense was correct

 2   in his belief, whether the belief was reasonable under the

 3   circumstances existing at the time.  The defendant is not

 4   justified in using deadly physical force upon another person

 5   and cannot prevail on the issue of self-defense if it

 6   reasonably appears, or if the defendant knows that he can

 7   avoid the necessity of using such force with complete safety

 8   by retreating, period.  The defendant does not have the

 9   burden of proving that he acted in self-defense.  To the

10   contrary, once self-defense becomes an issue the State has

11   the burden of proving beyond a reasonable doubt that the

12   defendant did not act in self-defense.

13        That is pretty much a statement from the pattern charge.

14             MR. LISENBY:  With regard to that, I have a case I

15   would like to show the Court, but if you are going to charge

16   on that, the State would ask that you also charge on part A2

17   of the code under 13A-3-23, which states:  A person may use

18   deadly physical force if the actor reasonably believes such

19   other person is, one, using or about to use unlawful deadly

20   physical force; or, two, using or about to use physical force

21   against an occupant of a dwelling while committing or

22   attempting to commit a burglary of such dwelling; or, three,

23   committing or about to commit assault in the first or second

24   degree, or burglary in any degree.  That would be A one, two

25   and three.  And then part C under 13A-3-23 states:
```

1   Notwithstanding the provision of subsection A, a person is

2   not justified in using physical force if, one, intent to

3   cause physical injury or death to another person, he provoked

4   the use of unlawful physical force by such other person; or,

5   two, he was the initial aggressor, except for his use of

6   physical force upon another person, under the circumstances

7   is justifiably if he withdraws from the encounter and

8   effectively communicated to the other person his intent to do

9   so, but the latter never-the-less continues and threatens the

10  use of lawful physical force. And, then, also to complete

11  the thought on part B:  A person is not justified in using

12  deadly physical force upon another person if it reasonably

13  appears or if he knows he can avoid the necessity of using

14  such force with complete safety by retreating, except that

15  the actor is not required to retreat if he is in his dwelling

16  or at his place of work and was not the original aggressor.

17      The reason for that, Judge, is obviously that it is the

18  State's position that Rodney Brown was completely justified

19  in any action he took inside his own residence.  I believe

20  that those statements of the law would qualify the

21  self-defense argument.

22      THE COURT:  I'm going to deny State's number ten.

23      MR. LISENBY:  Judge, for the Court's information

24  about my objection to self-defense at all for this defendant,

25  I would cite the Court to Craig, C-R-A-I-G, versus State, 719

1  So.2nd 274, a capital murder case, in which the defendant, I

2  believe, was sentenced to life imprisonment without parole

3  following a conviction.  But, in that case, the Court stated,

4  if there is evidence that the defendant could have reasonably

5  retreated instead of using deadly physical force, then there

6  would be no reason for the Court to instruct on the defense

7  of self-defense, and I would submit that the testimony given

8  by the defendant, which is similar to the testimony of the

9  defendant in this case, indicated that he could have safely

10 retreated at the time that Mr. Brown left the room where he

11 was at or he could have left the room prior to Mr. Brown's

12 returning, and stated -- this defendant on cross-examination

13 stated if he had left out of the residence at the time

14 Mr. Brown left the room, neither Rodney nor Angela Brown

15 would be dead.  That is what -- the Craig defendant also said

16 words to that effect.  So, I would ask the Court not to

17 charge on self-defense.

18          MR. BLANCHARD:  Judge, there was no need for any

19 retreat until such time Rodney Brown started charging down

20 the corridor with the baseball bat raised above his head.  At

21 that point it was impracticable for the defendant to do so

22 without exposing himself to the potential of death  or serious

23 bodily injury.

24     It's a theory of the defense charge, Judge, essentially

25 and I think the law is, if you know there's any evidence to

1  support a theory of defense in the case, even though it may

2  be weak, insubstantial, almost nonexistent, the Court is

3  obligated to give it.

4          THE COURT:  I'm going to charge on self-defense.

5      Now as to 12 and 13.  Those are the Davis charges.

6          MR. LISENBY:  Yes, sir.  Did we decide about number

7  11, also?  That also goes to our theory that Mr. Brown was

8  justified in whatever actions he took inside his own

9  residence.

10         THE COURT:  I think, as Stephanie is making copies

11 of that, I think I'm going to be more inclined to use the

12 pattern charge which states the same thing and refuse number

13 11.

14         MR. LISENBY:  Okay.

15         THE COURT:  But there will be a pattern -- I'm

16 going to go through the pattern charge and modify it.

17         MR. BLANCHARD:  Judge, I don't know what the

18 pattern charge says.

19         MR. KEITH:  What's the number, Judge?

20         THE COURT:  Number 11 is denied.

21         MR. KEITH:  No, your pattern charge you are going

22 to do.

23         THE COURT:  It is 3-8 as far as page number.

24         MR. KEITH:  Thank you.

25         MR. BLANCHARD:  Does it refer to criminal trespass?

1        THE COURT:  I think so.

2        MR. BLANCHARD:    I'm having a hard time connecting

3   up the evidence with that, because what evidence is there of

4   criminal trespass prior to Rodney Brown's use of force?

5        THE COURT:  We're going to go through it.  As to

6   pattern charge, I am going to give -- well, really the first

7   two little paragraphs.  The first paragraph is one sentence.

8   The next paragraph I am going to give.  The next paragraph,

9   third paragraph, begins with, a person may use deadly

10  physical force in order to defend himself if he reasonably

11  believes that the other person is either, one, using or about

12  to use unlawful deadly physical force or using or about to

13  use physical force against an occupant of a dwelling while

14  committing or attempting to commit a burglary of such

15  dwelling.  Is that the prong you are requesting?

16       MR. LISENBY:  Yes, sir, part of number two and

17  then ....

18       THE COURT:  Or committing or about to commit --

19  well, kidnapping A would be out.

20       MR. LISENBY:  Correct.

21       THE COURT:  Assault could be in.  Burglary could be

22  in.  Robbery out.  Rape and sodomy out.

23       MR. LISENBY:  Correct.

24       THE COURT:   I'll modify this in that way.

25       MR. BLANCHARD:  Judge, let me ask.  There's no

1   evidence that I am aware of that would suggest Rodney Brown

2   thought in his own mind that any kind of burglary was taking

3   place.

4          MR. LISENBY:   Other than the fact he went to get a

5   bat to chase the man out of his house.

6          MR. BLANCHARD:   Well, that doesn't mean there's a

7   burglary.  I am not conceding that he was trying to chase him

8   out of house, by the way.  I think trying to thrash him

9   within an inch of his life, not run him out of the house, but

10  that does not, in and of itself, provide any proof that there

11  was any kind of burglary going on, that he was seeking to

12  repel; and, therefore, I don't think there is a basis in the

13  evidence of this case to support that portion of the charge.

14  I think the State is simply trying to reverse the tables and

15  try to show that Rodney Brown was using self-defense when he

16  came down the hall with that bat, and there's simply no

17  evidence to support it.

18         THE COURT:   Well, the assault in first and second

19  language would go in Jason Holloway's defense of

20  self-defense.

21         MR. BLANCHARD:   Yes.

22         THE COURT:   The burglary is actually what Holloway

23  is indicted for.

24         MR. LISENBY:   Correct.

25         THE COURT:   I'm going to give assault and burglary.

 1   That way there's one that could be propounded on behalf of

 2   Rodney Brown and one that could be propounded on behalf of

 3   Jason Holloway.

 4           THE COURT:  Okay.  Now working on through the

 5   charge.  I am down to definition of deadly physical force,

 6   which I intend to give, then a reasonably belief, I intend to

 7   give.

 8      Now I think we are down to the next one that there may

 9   be some contention over.  The defendant is not justified in

10   using dead physical force upon another person and cannot

11   prevail on the issue of self-defense if it reasonably

12   appears, or the defendant knows, that he can avoid the

13   necessity of using such force with complete safety by

14   retreating, except that the defendant is not required to

15   retreat if he is in his dwelling or -- his place of work

16   wouldn't apply -- and was not the original aggressor or --

17   peace officer doesn't apply.  So, the only one -- the next

18   paragraph, the defendant does not have the burden of proving

19   that he acted in self-defense.  To the contrary, once

20   self-defense becomes an issue, the State has the burden of

21   proving beyond a reasonable doubt that the defendant did not

22   act in self-defense.  And, that is it.

23           MR. LISENBY:  Judge, there's still the one thing,

24   part C of that, that talks about a person is not justified

25   using physical force, basically, if he is the initial

1  aggressor or the intent to cause physical injury or death to

2  another person or provoke the use of unlawful physical force

3  by such other person.  I think that would apply here with

4  regard to Mr. Brown.

5          THE COURT:  Physical force?

6          MR. LISENBY:  Yes, sir.  This defendant would not

7  even be justified in using physical, much less deadly

8  physical force if ....

9          THE COURT:  The defendant is not justified in the

10 use of physical force and cannot prevail on the issue if with

11 intent -- no.

12         MR. LISENBY:  I think that one could apply, too,

13 but clearly the second part.  That he was the initial

14 aggressor.  But, I think the first part does too.

15         THE COURT:  Now, this would read:  The defendant is

16 not justified in the use of physical force.  Now this would

17 apply to Rodney Brown.  The only evidence that we have of use

18 of force by Holloway is deadly force.

19         MR. LISENBY:  Well, I guess the point I'm making is

20 that you're not even justified in using physical force, much

21 less deadly physical force, if you have an intent to cause

22 physical injury or death to another person, and provoke the

23 other person to use force against you; or, if you are the

24 original aggressor.  And, I think they all fit in together.

25 There are hierarchies here with regard to physical force and

1   deadly physical force.

2          THE COURT:  My charge does not have that language

3   in it about the retreat and physical force.

4          MR. LISENBY:  I realize that.  That's what I wanted

5   to go ahead and ask for it under the statute.  Because I

6   believe, I believe it fully defines self-defense.

7          THE COURT:  Read what you have got in the Code, not

8   the pattern charge, but the Code.

9          MR. LISENBY:  With regard to -- just this last part

10  we are talking about?

11         THE COURT:  Yes.

12         MR. LISENBY:  This is part C of the 13A-3-23.

13  Notwithstanding the provisions of subsection A, and

14  subsection A talks about the physical force and deadly

15  physical force.  Notwithstanding the provisions of subsection

16  A, a person is not justified in using physical force if, one,

17  with intent to cause physical injury or death to another

18  person, he provoked the use of unlawful physical force by

19  such other person; or, two, he was the initial aggressor,

20  except that his use of physical force upon another person

21  under the circumstances is justifiable if he withdraws from

22  the encounter and effectively communicates to the other

23  person his intent to do so, but the latter, never-the-less

24  continues or threatens the use of unlawful physical force.

25  And, then part three of that is:  Or the physical force

1    involved is the product of a combat by agreement, not

2    specifically authorized by law.

3        I don't think number three fits in, but I don't have

4    any objection to the Court giving that part either.

5            THE COURT:  No.  That is just too much there.  Go

6    ahead and prepare a charge based strictly on the reading of

7    the Code.

8            MR. LISENBY:  For the entire self-defense?

9            THE COURT:  No.  I have got self-defense.  There's

10   just not a pattern charge for physical force --

11           MR. LISENBY:  Okay.

12           THE COURT:  -- and that part of the Code.  It is

13   not there.  Because -- well, I can't say why, but probably

14   because the deadly force is in essence a cut off point.  Here

15   if you are not justified in using deadly physical force, of

16   course, you couldn't use physical force.  All right.  Next.

17           MR. LISENBY:  I think State's number 12.

18           THE COURT:  State's number 12.  Now that we are

19   back to 12 and 13 for State which are two Davis charges.

20           MR. LISENBY:  Yes, sir.

21           THE COURT:  I'm going to give some sort of charge

22   pursuant to State versus Adrian Davis.  Now, do you have

23   included in number 13 the following statement:  Commission of

24   a crime standing alone is inadequate to support the finding

25   of an unlawful remaining, but evidence of a struggle can

1    supply the necessary evidence of an unlawful remaining.  The

2    broken ceramic, I take it?

3         MR. BLANCHARD:  Judge, I think, you know, some

4    charge like that is probably needed in this case.  I would

5    probably say down in the last line, well next to the last

6    line where it starts with, but.  But evidence of a struggle.

7    Instead of what is written, I think closer to what the case

8    says is, but evidence of a struggle can be circumstantial

9    evidence from which you may, but would not necessarily, infer

10   evidence of an unlawful remaining.

11        MR. LISENBY:  Well, actually this is a direct quote

12   out of Davis.  That's what the first line of number 13 says,

13   what you just said basically.

14        THE COURT:  It is for you to decide whether such

15   evidence exists.  I'm going to add that.  It is for you, the

16   jury, to decide whether such evidence exists.  And with that

17   I'm going to grant 13.

18        Number 12 is also a correct statement of the law and

19   it can be argued by State or Defense either way.  So I'm

20   going to grant it.

21        All right.  Let's run through and recap back the State

22   charges and then we'll start on Defense.

23        State number 1 is refused; State number 2, granted;

24   State number 3, refused; State number 4, granted; State

25   number 5, refused;State number 6, refused; State number 7,

1  granted; State number 8, refused, State number 9, granted;

2  State number 10, denied; State number 11, denied; State

3  number 12, granted; State number 13, granted.  I will hold

4  those together and enter them somewhere in the oral charge.

5       Now, the defendant's jury charge number 1.  This goes

6  right in from State number 13, doesn't it?  Well, not quite.

7  We skip a little bit.  You skip a little bit.  This goes into

8  self-defense.  Defense number 1, reads as follows:  Ladies

9  and Gentlemen, if you believe from the evidence that the

10 killing of Rodney Brown was done by the defendant, Jason

11 Holloway, in self-defense as that term has previously been

12 defined to you, you cannot convict Jason Holloway of capital

13 murder -- of capital murder.  For the murder of two people

14 pursuant to one scheme or course of conduct nor may you

15 convict him of capital murder for murdering Rodney Brown

16 during a burglary.  That is correct.  That's a correct

17 statement.  Given.

18      Two, if you believe from the testimony that Jason

19 Holloway entered the residence of Rodney and Angela Brown

20 lawfully with their permission then you must find Jason

21 Holloway not guilty of capital murder charges contained in

22 counts two and three of the indictment unless you find beyond

23 a reasonable doubt that such permission was revoked prior to

24 the killings ....

25           MR. LISENBY:  Judge, that's commenting on the

 1 | evidence.

 2 |        THE COURT:  I don't think that necessarily a proper

 3 | statement.

 4 |    It may be proper in its effect, but I don't like the

 5 | import.  I don't like the way this conveys to the jury that

 6 | if they entered with permission then there must be a

 7 | revocation.  Well, yes, but revocation is many different

 8 | things.  This simply says unless you find beyond a reasonable

 9 | doubt that such permission was revoked prior to the killings.

10 | I'm going to refuse that as it is worded.

11 |    Three, if you believe from the evidence that Rodney

12 |    Brown

13 | was killed without revoking Jason Holloway's permission to be

14 | present in the Brown residence, then you must find Jason

15 | Holloway not guilty of burglary murder charge contained in

16 | count two of the indictment.

17 |        MR. LISENBY:  That is the same thing.

18 |        THE COURT:  Same thing?

19 |    Four, same.  Denied.

20 |    Five, if you find from the evidence beyond a reasonable

21 | doubt that a struggle occurred between Jason Holloway or

22 | Rodney or Angela Brown after Jason Holloway entered the Brown

23 | residence with their permission, but before the Browns were

24 | killed then you may draw an inference that Jason Holloway's

25 | permission to be present in the residence had been terminated

1   during the struggle, but you are not required by law to draw

2   such an inference.  That's correct.  I'm going to give that

3   one.

4        Number 6.

5        MR. LISENBY:  Not required -- I am sorry, Judge.

6   Then you may draw -- excuse me.  Let me back up.  If you find

7   from the evidence beyond a reasonable doubt that a struggle

8   occurred between Jason Holloway and Rodney or Angela Brown

9   after Jason Holloway knew Brown withdrew his permission, but

10  before the Browns were killed then you may draw an inference

11  that Jason Holloway's permission to be present in the

12  residence had been terminated prior to the struggle which by

13  law you are not required to draw such inference?

14       THE COURT:  That's right.  That is pretty much

15  under Davis or not necessarily the language of Davis.

16       Number 6, if you are not convinced beyond a reasonable

17  doubt that Jason Holloway's permission to be present was

18  terminated at some point in time prior to the killings of

19  Rodney and Angela Brown then you cannot convict Jason

20  Holloway of the capital offenses charged in counts two and

21  three.

22       I'm going to deny that because it has to do with

23  killings of Rodney and Angela Brown.

24       MR. BLANCHARD:  Judge, I'm withdrawing number 7.  I

25  think it duplicates one of the others that you have decided

1   to give.

2           THE COURT:   Number 7 will be refused.

3       I am going to deny number 8.  That not an inference

4   that can drawn from the evidence.  I've still not ruled on

5   number 6.

6       Number 9, if you believe from the evidence that

7   Jason Holloway's permission to be present in the Brown

8   residence was not revoked or withdrawn before Holloway

9   entered for a second time on  the mornings of the deaths of

10  Rodney and Angela Brown, then you must find Jason Holloway

11  not guilty of the capital murder as charged in count three of

12  the indictment.

13          MR. LISENBY:   We object to that one.

14          THE COURT:   I'm going to deny that.

15      On this second one.  There could easily be a charge that

16  on the second entry.  Rodney Brown is dead and cannot grant

17  permission and Angela Brown is incapacitated and cannot grant

18  permission.  So, in effect there could not be a grant of

19  permission for the second entry into the home.  I think that

20  would be legally based on the facts.

21      Ten, if you believe from the evidence Jason Holloway

22  killed Rodney Brown in self-defense, then you may not find

23  him guilty of the charge contained in count two of the

24  indictment or of any lesser-included charge which might

25  otherwise be applicable to that count.  Self-defense if found

1  to exist is a  complete defense of count two.  That is

2  correct.

3          MR. LISENBY:  I think that is still saying the same

4  thing in count 1 -- mean, jury charge number 1.

5          THE COURT:  Hold on.

6          MR. LISENBY:  That's just reiterating.

7          THE COURT:  That says as to count one.  This is as

8  to count two.  It applies.  Granted.

9      Eleven, ooh, somebody has marked with a red pen on this.

10          MR. LISENBY:  I am sorry.  Number 1 also talks

11  about count two.  I know it says capital murder for the

12  murder of two people then it says, namely, capital murder of

13  Rodney Brown during a burglary.

14          THE COURT:  Okay.  Mr. Blanchard, one or ten?

15          MR. BLANCHARD:  I see.  Let me confer with

16  co-counsel.

17          THE COURT:  Or mark out the last portion of 1.

18          MR. BLANCHARD:  We would take number 1, Judge.

19          THE COURT:  Go with number 1.

20          MR. BLANCHARD:  Go with number 1.  Withdraw number

21  10.

22          THE COURT:  Okay.  Number 11 is one that has red

23  markings on it.

24          MR. LISENBY:  That would conflict with number 1,

25  wouldn't it?

1        MR. BLANCHARD:  Yes, I think one was drawn at a

2   time when -- let's see.  This killing of -- what did we say?

3   No, it's number 2 where it is a complete defense.

4        THE COURT:   I have denied number 2.

5        MR. BLANCHARD:  No, I mean count two.

6        THE COURT:  Okay.  Okay.

7        MR. BLANCHARD:  Yes.  That's right.  This was

8   written late at night when I was running on fumes.  I'll take

9   that one out.

10       THE COURT:  You are probably the one that put the

11  red ink and the question mark on this charge.   Withdrawn by

12  counsel for defendant.

13       Number 12, evidence that a murder, or murders, have

14  occurred inside a dwelling standing alone insufficient to

15  establish beyond a reasonable doubt that the deaths occurred

16  during a burglary.  There must also be evidence to establish

17  beyond a reasonable doubt that the defendant entered, or

18  remained unlawfully in the dwelling, prior to or during the

19  killings.

20       MR. BLANCHARD:  I think that is right out of Davis,

21  I believe.

22       MR. LISENBY:  I kind of like that one better than

23  our State number 13.

24       THE COURT:  I'm going to give it.

25       All right.  Let's recap.

```
 1              MR. BLANCHARD:  Go slow.

 2              MR. LISENBY:  Can we just withdraw State's number

 3   13, then, if you are going to give this one?

 4              THE COURT:  Certainly.  That is the one I'd gone to

 5   all the trouble of modifying.

 6              MR. LISENBY:  Sorry.

 7              THE COURT:  I'm -- literally, y'all, I'm going to

 8   take a red pen and mark across the ones that I have denied or

 9   y'all have withdrawn, because I am going to read straight

10   from them to the jury.  So red pen on number 13, withdrawn by

11   counsel for State.

12              MR. BLANCHARD:  That's State's 13?  Okay.

13              THE COURT:  Yes.

14              MR. BLANCHARD:  I don't know how we managed both

15   putting in exactly the same number of requested charges.

16              THE COURT:Okay.  State number 1, I know I have been

17   through this Frances, denied; 2, granted; three, denied; 4,

18   granted; 5, denied; 6, denied; 7, granted; 8, denied; 9,

19   granted; 10, denied; 11, denied; 12, granted; 13, withdrawn

20   by counsel for State.  That takes care of all the State's.

21         Let's go through Defense from 1.  Defendant's 1,

22   granted; defendant's 2, denied or refused; defendant's 3,

23   refused; defendant's 4, refused; defendant's 5, granted;

24   defendant's 6, I have not ruled on.  We have covered that

25   enough in other things.  I think we have pretty well gone
```

 1  through termination.  So, I am going to deny number 6; number

 2  7, withdrawn by counsel; number 8, refused; number 9,

 3  refused; number 10, withdrawn by counsel for defendant;

 4  number 11, withdrawn by counsel for defendant; number 12,

 5  granted; number -- I don't have 13.  Yes, I do, granted.

 6      Two typos have been changed.

 7      Number 14 and last that is circumstantial and we're

 8  back to it again.  I'll give that as a closer on mine.  I'm

 9  not -- I'm going to include it directly following my

10  circumstantial.

11      Trying to see if there is any -- or if I can make

12  sense of all of this now.

13      Anything else?

14          MR. BLANCHARD:  Judge, you would just like to

15  reserve any objection until after the Court gives the

16  charge --

17          THE COURT:  Of course.

18          MR. BLANCHARD:  -- at that time note any exceptions

19  and retire from the presence of the jury and discuss it.

20          THE COURT:  Of course.  What we'll do, since you

21  know so much about what it is going to be, you may not have

22  any objections, but you can reserve that.  If so, I send them

23  out, we go over it and then I'll bring them back, and if

24  there's anything else, I'll charge them, if not I tell them

25  simply to begin.

```
 1              MR. BLANCHARD:  Right.

 2              THE COURT:  I keep telling them up to that time

 3   that I tell them to deliberate to simply not discuss any

 4   aspect.

 5       Okay.  Last thing we have got to do is the self-defense

 6   amendment; right?  You are the one asking for physical force,

 7   you are the one that has to draw it up.

 8              MR. LISENBY:  I'll have that to you first thing in

 9   the morning.

10              THE COURT:  Going to put 13 and 14 immediately

11   following my circumstantial evidence charge.

12       Is there a request for a charge on defendant's

13   testimony?  If so, it will read as follows:  The defendant

14   may testify as a witness on his own behalf, and when he does,

15   you may consider the testimony of the defendant along with

16   all other evidence, and in light of the fact that he is the

17   defendant and the interest he has in your verdict.  This is

18   to be taken into consideration together with all other

19   evidence or lack of evidence.

20              MR. BLANCHARD:  I'm not asking for it.

21              THE COURT:  Then it's time for the red pen.  Marked

22   out.

23              MR. LISENBY:  Judge, we would also request the

24   instruction with regard to conviction of a criminal.  I don't

25   know exactly what your pattern instruction has, if it still
```

 1  follows the old moral turpitude test.

 2          THE COURT:  As to impeachment?

 3          MR. LISENBY:  Yes, sir.

 4          THE COURT:  There's not a pattern charge.

 5          MR. LISENBY:  Okay.

 6          THE COURT:  But what my charge says is as follows:

 7  The law permits that a witness may be impeached in several

 8  different ways.  Impeachment simply means was of discrediting

 9  certain testimony of the witness.  For instance, a witness

10  may be impeached by proof of contradictory statements made by

11  -- typographical error -- the witness while on the stand in

12  the case or by contradictory statements made by the witness

13  at other times or places whether under oath or not.  It may

14  be proven by evidence of bad character or by showing that the

15  witness has been convicted of a crime involving moral

16  turpitude.  The fact that a witness has been impeached and

17  successfullly impeached, et cetera, et cetera.

18          MR. LISENBY:  I think the wording now is going to

19  be.

20          MR. BLANCHARD:  Crime involving dishonesty or false

21  statement.

22          MR. LISENBY:  I think that is right.

23          MR. BLANCHARD:  Really a felony or a misdemeanor

24  involved.

25          MR. LISENBY:  Crime involving dishonesty or false

1    statement.

2             THE COURT:    Judge McElroy would not be pleased

3    with y'all.

4        Well, I'll put dishonesty or false statement and mark

5    out moral turpitude.

6        Anything else?

7             MR. BLANCHARD:    I think you have already told them

8    what the stipulations are.   You don't need to charge them on

9    that again.

10            THE COURT:    No.   I don't see any need in going

11   around and around on that one.

12       Anything else?

13            MR. LISENBY:    I can't think of anything.

14            MR. BLANCHARD:    I can't either.

15            THE COURT:   Go ahead and sort through the evidence.

16   There's been a couple of things I've put stickers on for the

17   record, not for jury consideration.   Maybe one.

18            MR. LISENBY:   I was trying to remember if Court's

19   1-5 are going to the jury or not.

20   (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED UNTIL 9:00 A.M.,

21   11 JUNE, 2003.)

22                          *****

23

24

25

1
IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
2
CHAMBERS COUNTY

3  STATE OF ALABAMA,              *
                                 *     CRIMINAL NO.
4  versus                        *     CC-2000-0000166
                                 *     LaFayette, Alabama
5                                *     11 June, 2003
   JASON HOLLOWAY,               *
6        Defendant.              *     **CRIMINAL APPEALS NO.**
                                 *     **CR-02-2115**
7  * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

8                  TRANSCRIPT OF TRIAL BEFORE

9                THE HONORABLE RAY D. MARTIN,

10              CIRCUIT JUDGE, AND A JURY.

11 A P P E A R A N C E S
   FOR THE STATE OF ALABAMA:   REA S. CLARK, DISTRICT ATTORNEY
12                             FIFTH JUDICIAL CIRCUIT
                               CHAMBERS COUNTY COURTHOUSE
13                             COUNTY OFFICE BUILDING
                               LAFAYETTE, ALABAMA 36862
14
                               BY: REA S. CLARK, DA
15                                 BILL LISENBY, CHIEF ADA
                                   KENNETH GIBBS, ADA
16

17 FOR THE DEFENDANT:          BLANCHARD & ASSOCIATES, LLC
                               ATTORNEYS AT LAW
18                             505 SOUTH PERRY STREET
                               MONTGOMERY, AL 36104
19
                               BY: WILLIAM R. BLANCHARD, ESQUIRE
20                                      and
                               KEITH & HAMM, PC
21                             ATTORNEYS AT LAW
                               235 SOUTH McDONOUGH STREET
22                             MONTGOMERY, AL 36104

23                             BY: RICHARD K. KEITH, ESQUIRE

24
                               FRANCES L. ROARK, CSR
25                             OFFICIAL COURT REPORTER
                               Fr3L126

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1   PROCEEDINGS: In Open Court.

2           THE COURT:   Counsel for State and Defense have

3   jointly agreed to modification of the self-defense charge

4   which will read as follows:   One of the issues in this case

5   is self-defense.   A person my use physical force upon another

6   person in order to defend himself from what he reasonably

7   believes to be the use or imminent use of unlawful physical

8   force by that person and he may use a degree of force which

9   he reasonable believes to be necessary for the purpose.

10      A person may use deadly physical force in order to

11  defend himself if he reasonably believes that the other

12  person is either using or about to use unlawful deadly

13  physical force or using or about to use physical force

14  against an occupation of a dwelling while committing or

15  attempting to commit a burglary of such dwelling or

16  committing or about to commit either an assault in either the

17  first or second degree or a burglary in any degree.   For the

18  defendant's use of deadly physical force against another

19  person to be justified the deadly physical force must  have

20  been used under the following circumstances.

21      One, the defendant must have reasonably believed  that

22  Rodney Brown was using or was about to use unlawful deadly

23  physical force against himself that being Jason Holloway or

24  that Jason Holloway must have reasonably believed that Rodney

25  Brown was committing or about to commit either -- no -- about

1  to commit an assault in either the first or second degree.

2      Deadly physical force is force which under the

3  circumstances in which it is used is readily capable of

4  causing death or serious physical injury.

5      A reasonable belief is a belief formed in reliance upon

6  reasonable appearances.  It is a belief not formed recklessly

7  or negligently.

8      The test of the reasonableness is not whether the

9  defendant was correct in his belief, but whether the belief

10 was reasonable under the circumstances existing at the time.

11     The defendant is not justified in using deadly physical

12 force upon another person and cannot prevail on the issue of

13 self-defense if reasonably appears, or the defendant knows

14 that he can avoid the necessity of such force with complete

15 safety by retreating, except that the defendant is not

16 required to retreat if he is in his dwelling and was not the

17 original aggressor.

18         MR. LISENBY:  I am sorry, can you, as opposed to

19 defendant, put the word person as the Code states?

20         THE COURT:  So amended.  The defendant does not

21 have the burden of proving that he acted in self-defense, to

22 the contrary once self-defense becomes an issue the State has

23 the burden of proving beyond a reasonable doubt that the

24 defendant did not act in self-defense.

25     Next a person is not justified in using physical force

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1    if with intent to cause physical injury or death of another,

2    the person provoked the use of unlawful force by such other

3    person.

4         A person is not justified in using physical force if

5    he was the initial aggressor, except that his use of physical

6    force upon another person under circumstances is justifiable

7    if he withdraws from the encounter and effectively

8    communicates to the other person his intent to do but the

9    other person never-the-less continues or threatens the use of

10   unlawful physical force.

11            MR. LISENBY:  Yes, sir.

12            THE COURT:  Are we ready?

13            MR. KEITH:  Ready.

14            MR. BLANCHARD:  I believe we are, Judge.

15            THE COURT:  With that let's get ready and bring in

16   the jury.

17   (JURY PRESENT)

18            THE COURT:  Ladies and Gentlemen, let the record

19   reflect that all jurors are present, parties are present,

20   counsel are present.

21         Ladies and Gentlemen, at this point all evidence in this

22   case is at a close.  What remains in this trial is for the

23   attorneys to make their closing arguments to you and for me

24   to charge you on the law which applies to this case.  After

25   that time, I will send you out to deliberate and reach your

1  verdicts.

2      State ready?

3          MR. GIBBS:   State is ready.

4          THE COURT:   Defense ready?

5          MR. BLANCHARD:  Defense is ready, Your Honor.

6          THE COURT: You may state your case to the jury.

7                    **CLOSING ARGUMENT BY THE STATE**

8          MR. GIBBS:  May it please the Court.

9          THE COURT:   Mr. Gibbs.

10         MR. GIBBS:   Honorable defense counsel, good

11  morning, Ladies and Gentlemen of the Jury.

12         THE JURY:  Good morning.

13         MR. GIBBS:  I hope everyone had a good night's rest

14  and all of you are refreshed for today.

15     Thank you very much for being so attentive these

16  last few days.  We really appreciate that.

17     As you have been told at the onset of this

18  process.  The State of Alabama has the burden of convincing

19  soon to be 12 of you of the defendant's guilt beyond a

20  reasonable doubt.  Our burden is to prove the defendant's

21  guilt beyond a reasonable doubt, not beyond all doubt, not to

22  an absolute certainty, not beyond a shadow of a doubt, but

23  beyond a reasonable doubt.  That is our burden in this case.

24     I want to point one thing out to you when you start

25  considering the State's burden of proof in this case of the

*Vol 10*

# Court of Criminal Appeals No. __CR_____

## APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM
## CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

Circuit Court Case Number: CC 2000-166
Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From: __STATE CONVICTION_____

Sentence Imposed: _____LIFE WITHOUT PAROLE_____

Defendant Indigent: _X_ YES  _ NO

## JASON LEE HOLLOWAY

NAME OF APPELLANT

## CHARLES GILLENWATERS, & JOSEPH FIQUETTE    256-234-5018
APPELLANT'S ATTORNEY                           (TELEPHONE NO.)

## POST OFFICE  BOX 2129
ADDRESS
## ALEXANDER CITY        ALABAMA        35011
CITY                    STATE          ZIP CODE

### v.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

1    defendant's guilt beyond a reasonable doubt.  No one, no one

2    throughout this entire process has told you that the

3    defendant did not do this.  Not his lawyers, not him when he

4    took the stand.  No one has said he did not do this.  This,

5    Ladies and Gentlemen, is the defendant's handiwork.  And no

6    one has denied that the defendant caused this.

7        Instead, Defense counsel wants to justify what Jason

8    Holloway did.  They want to excuse what Jason Holloway did.

9    I submit to you, Ladies and Gentlemen, there is no excuse.

10   No excuse for this.  There is no justification for this.  Not

11   morally, not legally, for what the defendant did.

12       Now, when they argue self-defense that is a complete

13   defense.  If you believe, based on the evidence, that the

14   defendant acted in self-defense, he's not guilty of anything,

15   and that is what they want to convince you.  That he is not

16   guilty.  They want to justify it.  Yes, he did it, but he was

17   justified in doing what he did.

18       In addition to trying to justify what he did, they also

19   want to lessen what he did.  He's guilty of something is what

20   Attorney Keith said in his opening statement.  He's guilty of

21   something, but not what the State has charged him with.  They

22   want to lessen what he did.  Maybe he's guilty of murder,

23   maybe he's guilty of manslaughter, but not the capital

24   offense that the State charged him with.  They are --

25   self-defense, justify his actions, and they want to lessen

 1  his actions.

 2      Ladies and Gentlemen, first of all, I submit to you that

 3  the defendant was not acting in self-defense.  Categorically

 4  not acting in self-defense.  You've heard the testimony.

 5  What happened in that trailer on January the 12th of 2000,

 6  goes contrary, against, what your gut feelings tell you

 7  self-defense is.  He entered into the home of Rodney and

 8  Angela Brown with a gun.  Shot Rodney in the back of the

 9  head.  His back was to the defendant when he shot him.  That

10  is not self-defense, Ladies and Gentlemen.  Poor Angela.

11  She's sitting there reading her *Daily Devotional*.

12          MR. BLANCHARD:  Your Honor, I object.

13          THE COURT:  Overruled.

14          MR. BLANCHARD:  Move to strike and ask that the

15  jury be told to disregard that reference.

16          THE COURT:  Counsel, approach.

17  (WHEREUPON, A SIDE BAR COMMENCES.) .

18          MR. BLANCHARD:  Your Honor, this is the very reason

19  I asked to have that picture excluded.  I ask for an

20  immediate mistrial.

21          MR. LISENBY:  The defendant himself stated she was

22  sitting on the couch reading her magazine.

23          MR. BLANCHARD:  *Daily Devotionial* is what the

24  prosecutor said.

25          MR. LISENBY:  You can look at it and see what it

1   is.

2        THE COURT:   Sustain the objection.

3        MR. BLANCHARD:   I hate to call attention to this,

4   but I didn't want to do that.   I wanted to avoid it in the

5   first place.   This is prosecutorial [sic.] misconduct.   I ask

6   for a mistrial.   I have to ask for a curative instruction and

7   I will ask for it, but I will renew my Motion for Mistrial

8   after it is given.   Further, Judge, may I remind the Court

9   there is absolutely no evidence of Angela Brown reading

10  anything.

11       MR. LISENBY:   Except from the defendant who said

12  she was reading her magazine when he came in.

13       MR. BLANCHARD:   That's correct.   It is not a

14  statement ....

15       THE COURT:   It is in evidence that she was reading

16  some periodical covered with blood that was in near

17  proximation of the deceased's head was it not, or over by the

18  head, at least?

19       MR. LISENBY:   Yes.

20       MR. GIBBS:   Uh-huh.

21       THE COURT:   What I am going to do is instruct that

22  they are not to consider the characterization of counsel for

23  the State, but the evidence there is to judge it for what it

24  is.

25       MR. BLANCHARD:   Judge, let me put on the record

1    right now that the exhibit that we are referring to, the

2    picture of the magazine, State's Exhibit 30, and that counsel

3    objected to that and moved that it not be allowed in prior to

4    the trial.

5          MR. LISENBY:   I don't think it was prior to trial

6    at the time.

7          MR. BLANCHARD:   It was before evidence was taken.

8    I want to make it clear I am objecting to this on the grounds

9    that it deprives the defendant of a fair trial under the

10   Sixth Amendment of the Constitution.   It deprives him of due

11   process under the Fourteenth and heightened reliability of

12   capital sentencing under the Eighth Amendment and all the

13   other rights and privileges of state and federal

14   constitutions, all referenced in the memorandum of points and

15   authorities which has been adopted by the Court.

16         THE COURT:   So noted.

17         MR. BLANCHARD:   I renew my motion.

18         THE COURT:   Sustained in part and I'm giving a

19   curative instruction and then we'll move on.

20   (WHEREUPON, A SIDE BAR CONCLUDES.)

21         THE COURT:   Ladies and Gentlemen, this is closing

22   arugment of counsel.   I have on numerous occasions reminded

23   you and I will charge you later, that you are the judges of

24   the facts and the evidence.   And, the testimony that comes to

25   you from the witness stand is the evidence that you must

1    consider.  The attorneys may characterize certain evidence in

2    certain ways, but it is for you to draw what, if any,

3    inferences should be drawn from a particular piece of

4    evidence.  I am going to sustain the objection of counsel,

5    and at this point we can move on.

6            MR. BLANCHARD:  Before we move on.

7    (WHEREUPON, A SIDE BAR COMMENCES.)

8            MR. BLANCHARD:  Judge, having heard the curative

9    instruction, it is Defense's position that it does not remove

10   the prejudice from the case.  It is still highly prejudicial

11   to my client's rights, and I move for a mistrial.

12   (WHEREUPON, A SIDE BAR CONCLUDES.)

13           THE COURT:  Go ahead.  Proceed.

14   MR. GIBBS:

15       Contrary to one's gut feeling of what self-defense is

16   all about, they are in their home.  Angela was shot.  She was

17   stabbed.  She was bludgeoned and her body was defiled after

18   she laid there dead.  He violated Angela in every imaginable,

19   disgusting possible way.  And, I submit to you, Ladies and

20   Gentlemen, that that is not self-defense.  It goes contrary

21   to one's general feeling about what self-defense is.

22   Furthermore, it goes against what the law says self-defense

23   is.

24       The law says a person is justified in using physical

25   force upon another person in order to defend himself or a

 1   third person from what he reasonably believes to be the use

 2   or imminent use of unlawful physical force by that other

 3   person and use a degree of force which he reasonably believes

 4   necessary for the purpose.  That basically says before a

 5   person hits you with his fist, you can hit them back.  If a

 6   person slaps you, you can slap them back.  If a person slaps

 7   you, you can't pull out a gun and shoot them.  You can use

 8   that degree of force which is reasonably believed necessary

 9   for the purpose that is used ordinary physical force.  That

10   is not what we're talking about in this case.  We are talking

11   about the use of deadly physical force.  Force that in and of

12   itself, in and of itself, is capable of taking someone's

13   life.

14        Now, the law understands that under certain

15   circumstances it is necessary to use deadly physical force to

16   defend yourself.  The law understands that and the law makes

17   allowance and exception for that.  I submit to you that what

18   happened on January 12th came nowhere near rising to the

19   level to allow him to claim self-defense.

20        Let's review that.  A person may use deadly physical

21   force if the actor, that person, reasonably believes such

22   other person is using or about to use unlawful deadly

23   physical force.  So, if you think someone is about to use

24   deadly physical force against you, then you can return the

25   deadly physical force.

1    Angela Brown is sitting on her sofa, not a threat to

2  anyone.  Certainly, he cannot argue self-defense with respect

3  to Angela Brown by any stretch of the imagination.  What he

4  did to Angela was not justified.  What he did to Rodney is

5  not justified either, but we'll talk about self-defense.

6    A person can use physical force upon another person

7  if he believes that person is about to use  physical force

8  against the occupant of a dwelling while committing or

9  attempting to commit a burglary of such dwelling.  That means

10  if you are the lawful occupant of the dwelling, a home, your

11  home, and somebody is about to commit a burglary in your

12  home, you, the lawful occupant of that home, can use deadly

13  physical force against the intruder I submit to you.

14    Based on that, if Rodney Brown had used deadly physical

15  force against Jason Holloway, Rodney Brown would have been

16  justified in defending his home against a man with a gun.  He

17  would have been justified in defending his own home against a

18  person in there about to commit a burglary.  But not the

19  defendant, Jason Holloway.

20    You can use deadly physical force -- I am going to read

21  parentheses that apply.  If that person was about to commit

22  an assault in the first or second degree or burglary in any

23  degree.  If you think that person is about to commit an

24  assault in the first or second degree against you, you can

25  use deadly physical force.  And, again, Ladies and Gentlemen,

1    I submit to you that Rodney Brown, the victim in his own

2    home, under that statute would have been justified in using

3    deadly physical force against the defendant, Jason Holloway.

4         Now those are the limited circumstances where the law

5    recognizes ones ability to use deadly physical force.  But it

6    goes further.  In B, notwithstanding, the provisions of

7    Section A; notwithstanding even if one, two, or three

8    applies, a person is not justified in using deadly physical

9    force upon another person if it reasonably appears, or he

10   knows that he can avoid the necessity of using such force

11   with complete safety by retreating.  Even if that person is

12   about to use unlawful deadly physical force against you, even

13   if that person is about to commit an assault against you, if

14   you can retreat safely, you have a duty to do so, except

15   you're not required to retreat if he is in his dwelling or at

16   his place of work and was not the original aggressor.  You

17   don't have to retreat if you are in your own home.  You do

18   not have to retreat if you are in your own home.  Rodney

19   Brown had no duty to retreat.  He could have used whatever

20   force to get that man out of his house and he did not have

21   duty to retreat.  Unlike the defendant, it was not his home.

22   He had a duty to retreat.  It goes even further.

23        Again, notwithstanding the provision of subsection A,

24   even if the law says you could use deadly force, a person is

25   not justified in using physical force if with the intent to

1  cause physical injury; two, or cause death to another person,

2  he provoked the use of unlawful physical force by such other

3  person.  If you provoked it, if you started it, you can't

4  claim self-defense.  You can't go looking for a fight and

5  once you get in the fight, holler I was defending myself.

6  Ladies and Gentlemen, he had been stewing for at least three

7  days about this comment that he says Rodney made.  It has

8  been bothering him.  It has been on his mind.  He went to his

9  house with a loaded gun that day, that morning, to confront

10 him.  He was the initial aggressor, and as such he cannot

11 claim self-defense.

12      Two, if he was the initial aggressor.

13      One, if he provoked the use.  He's in that man's

14 house confronting him about a woman with a gun.  He provoked

15 what happened in that house.  He was the initial aggressor.

16 Under the law, Ladies and Gentlemen, he cannot claim

17 self-defense.  He was not justified in using deadly physical

18 force.  Goes against what your gut says self-defense is and

19 it goes against what the law says is self-defense.

20      Remember what I said, self-defense is an affirmative

21 defense.  It is a complete defense.  But, you cannot

22 accidently defend yourself.  If I defend myself that is an

23 intentional act, but you are saying it is justified.  What I

24 am saying is this.  He admits what he did.  And, if it is not

25 justified, it is an intentional act.  You can't accidentally

1    defend yourself.  So, by claiming self-defense, he says I did

2    it.  It was intentional act.  I intended to shoot Rodney.  I

3    intended to shoot Angela.  And, if you don't believe

4    self-defense applies, that is murder.

5         And, then they want to lessen what he did.  He's guilty

6    of something, but not what the State says.  I submit to you

7    the defendant was properly charged in this case, Ladies and

8    Gentlemen.

9         Another issue that is going to come up is intent.  What

10   was the defendant's intention?  What was he doing?  What was

11   going on in his mind?  An intent is a state of mind.

12        With regard to intent, I need you to understand this.

13   The intent can be formed in the twinkling of an eye.  The

14   intent to kill can be formed in an instant.  An intent to

15   kill can be formed in the instant he pulled that trigger.

16   Intent is state of mind.  So, I can't open the defendant's

17   head up and point to it, and say, this is what he was

18   thinking.  This is what his intent was.  What's the best way

19   to figure out what a person's intent is?  What's the best

20   way?

21        I had a friend tell me many years ago, forget what a man

22   says to you, look at what he does.  Look at what the

23   defendant did as evidence of his intent.

24        Now, the defendant took the stand and he testified.

25   There are only three people in that house that morning.

1   Fortunately he had the decency to wait until the children, at

2   least, went to school.  There were only three people in that

3   house.  Two are dead as he testified.  The defendant took the

4   stand and testified.  Now, when the Court is instructing you

5   on the law, he will talk to you about bias.  Does a person

6   have an interest in the outcome of this case?  Is a person

7   biased?   I submit to you the most biased person in this

8   courtroom today is the defendant, Jason Holloway.  He

9   certainly has an interest in the outcome of this case.  And,

10  in response to some of the questions by Mr. Lisenby, if you

11  recall, yesterday he said, "I love my life."  He said he'd

12  say anything to safe my life.  He testified.  The Court will

13  further instruct you that if you believe that a person has

14  falsely and willfully testified about a material issue in

15  this case, you can disregard his or her entire testimony.  If

16  you believe that a person willfully, falsely testified, if

17  you believe they lied, you can disregard his or her entire

18  testimony.  And, that stands to reason.  If a person lies

19  about one thing, there's a chance they might lie about some

20  other things.

21      Let's talk about the evidence in this case and what the

22  defendant said happened in this case.  It is uncontroverted

23  that the defendant was friends with Rodney and Angela.  He

24  went to school with them.  He'd been friends since 1994 with

25  Rodney when he moved back to this area.  Didn't have any

1   problem with Rodney.  They played baseball together, drank

2   together, did marijuana together.  According to the

3   defendant, no problems.  But now he says that friendship

4   deteriorated just over a week prior to this incident.  Now,

5   he claims Rodney made a statement.  Forgive me, I am

6   repeating what the statement was.  He claims that Rodney made

7   the statement about his girlfriend Felicia Phillips.  And,

8   Rodney made the comment, "I can fuck her better than you

9   can."  That is what he said he said.  Now, the defendant

10  would have you believe that I felt this was a threat.  I have

11  thought this was a threat to rape her.

12      Let's think about the context of when this statement

13  was made.  They were all at the basketball court, heavily

14  drinking, fellow whooping it up, playing, talking mess.

15  That's what that was.  Guys sitting around talking mess.  He

16  wants you to believe that he perceived that statement to be a

17  threat to his girlfriend.  And that threat bothered him for

18  several days and he just felt the need to confront Rodney

19  about it.  I really didn't understand the nature of this

20  relationship, because during his cross-examination -- well, I

21  didn't really care that much for her.  You know, I was not in

22  love with her.  I have a wife and child.

23      But now, he wants you also to believe that all of this

24  was over this statement that Rodney made about his

25  girlfriend, who he really doesn't care that much about.

1   Okay.  Does that make any sense to you, Ladies and Gentlemen?

2       This has been bothering him, on his mind at least three

3   days, possibly as much as seven days, he had planned to

4   confront him.  He had planned to confront him.  And, on

5   January the 12th, after he got off work, he went over there

6   between 6:30 and 7 o'clock that morning.  Why would I say

7   that?  The girl, Terri, testified, "We left for school about

8   6:30."  Jerome Cofield testified, "I had spoke to Angela the

9   day before and I was coming by at 7 o'clock, 7 a.m., to pick

10  her and Rodney up and go do some laundry, run some errands."

11  He got delayed, side tracked, and he did not get there until

12  11.  But, he was supposed to be there at 7 o'clock.  He and

13  Angela confirmed that.  He even went by her job after he

14  spoke with her on the phone the day before and confirmed, "I

15  will be there at 7 o'clock."  In the photographs, look at

16  Rodney and Angela, Angela still has her gown on.  Rodney

17  still has his little boxer shorts on.  They had not begun to

18  get ready to go with Jerome.  So, I submit to you that some

19  time between 6:30 and 7, the defendant comes over there,

20  makes a couple of trips at first.  The first trip he does not

21  have his gun.  What did he say?  I used my head.  I went back

22  and got my gun.  What is his thought process at this point?

23  What's he thinking?  He goes and gets his gun.  If you will

24  recall, the gun is in the second drawer when Blackstone

25  recovered it from Ms. Collier.  The bullets were in the top

```
 1  drawer.  He himself said he had to load the gun, but he
 2  denies that he was angry.  He left, went back to his own
 3  home.  Snuck in his mother's room, step-mother's room.  Took
 4  her gun.  This gun.  Exhibit 38.  Tries to load it, which I
 5  can't do.  Okay.  Loads it.  Closed it back up.  Puts it in
 6  his pocket, his jacket pocket.  I don't think it will fit in
 7  mine.  Puts it in his jacket pocket and heads over there.
 8  Knocks on the door.  Rodney let's him in.  He comes in.
 9  According to him, talks to Rodney -- talks to Rodney.  I want
10  to talk to you about what you said about my girlfriend.  His
11  own statement, Rodney says to him, "How you come you come to
12  me about this shit in front of my wife.  Wait a minute, I've
13  got something for you."
14       Now, the defendant says when he was initially in the
15  house, he was over here by this window or something or
16  another.  And at some point after Rodney goes down this
17  hallway, he comes to this point.  Now, according to his
18  testimony, he had no -- Rodney was calm.  Angela was a little
19  upset.  Rodney was calm.  "Wait a minute, I've got something
20  for you."  I had no reason to think he was upset.  I had no
21  reason to think he wanted me out of his house.  He walked
22  down the hall.  I come to here.  All of sudden he comes
23  charging out with a bat and I couldn't understand why he was
24  charging at me with a bat.  Everybody was calm except for
25  Ann, according to him.  That what's he testified to, Ladies
```

1    and Gentlemen.  That's not what really happened.  I can't

2    understand why this man is charging at me with this baseball

3    bat, both arms over his head.  You saw the photographs.

4    Mr. Blanchard pointed out that's a small room, small trailer.

5    Rodney was five ten.  Could Rodney have been wielding this

6    bat up in the air in that small trailer without hitting the

7    ceiling?  I don't think so.  You look at the pictures and you

8    decide.

9        Let's talk about what really happened.  He goes and

10   knocks on the door.  Rodney let's him in.  Angela is sitting

11   there on the sofa quietly.  He says to Rodney, "I want to

12   talk to you," in front of Angela, "about this statement you

13   made," forgive me, "that you can fuck my girlfriend better

14   than I can."  What does Rodney say?  Wait, wait a minute.

15   You come in my house, this time of morning with this mess in

16   front of my wife.  Wait a minute, I've got something for you.

17   You wait right -- I've got something for you.  That's how it

18   really happened.  And, at that point, he moved from here to

19   here.  Ladies and Gentlemen, I submit to you at that point

20   when Rodney is like, "Wait a minute, I've got something for

21   you."  He moved from there to there by the TV.  According to

22   the diagram, this other diagram of the living room, width of

23   the TV to the door.  That is only 12 inches from the TV to

24   the door.  The time it took him to get from here to here to

25   watch Rodney, he could have gotten to that door and gotten

1    out.  He had a duty to retreat.  If you can safely retreat,

2    you must.  He had a duty to retreat at the time when Rodney

3    said -- we know it was not going on calmly like he wants us

4    to believe, You wait right here, I'll be right back.  He went

5    from there to there.  Why?  So he could watch Rodney and

6    still see Ann.  I submit to you at that point, he should have

7    been headed out the door.  He had a lawful duty to retreat,

8    and he did not do so.  He cannot claim self-defense, Ladies

9    and Gentlemen.

10       Rodney comes in there with the bat.  I submit to you at

11   that point his invitation to be in that house was over.

12   We're going to talk about burglary in a few minutes.  Okay.

13   He is charged with burglary.  Rodney let him in.  No argument

14   about that.  But, when he got in, he was no longer welcome in

15   that house.  Even he said after repeated questioning by

16   Mr. Lisenby, when Rodney got the bat at you, did you think

17   you were welcome in that house?  Did you think he wanted you

18   out?  Of course, he wanted me out.  His invitation had been

19   revoked.  At that point he was remaining unlawfully in

20   Rodney's home and that is important to the burglary charge,

21   Ladies and Gentlemen.  At that point Rodney has got the bat.

22   I would imagine he said get out of my house.  But,

23   regardless, his invitation has been revoked.  And, what does

24   he do?  He's standing there.  Rodney is coming down this

25   narrow corridor.  Now, he wants you to believe that Rodney

1   was back here when I shot him, but that doesn't explain how

2   -- as he described, I shot him and turned.  He's got to

3   explain how he got a bullet hole in the back of his head.  We

4   have not even gotten to that yet.  So, what does he say?

5   When I shot him here down the hall, he turned.  Well, Ladies

6   and Gentlemen, that does not explain, if he shot him here,

7   how his body wound up all the way down here.  They were in

8   that living room, Ladies and Gentlemen, and he shot him and

9   he wants you to believe.  I shot him twice then I shot

10  Angela.  He wants you to believe that his back was to Angela.

11       The defendant says he was standing over there by the TV

12  in this picture.  Right about where Rodney wound up laying.

13  He's coming down this hall.  Rodney's first shot is to the

14  chest.  Rodney is facing him.  He is facing Rodney.  Right

15  here.  Ladies and Gentlemen, there's no way, there's no way,

16  his back is to Angela.  No possible way.  He would have to

17  been looking in this direction away from Rodney for Angela to

18  be to his back.  Why is that important?  Because he was

19  looking at Angela and point blank shot her.  He took the

20  stand and said she was behind me.  I jumped.  I was startled.

21  I was scared and I just shot her twice.  It didn't happen

22  like that.  There's no physical way for Angela to be at his

23  back.  Not in that small room.  Not if he was facing Rodney

24  and popped him in the chest.  No way.  Sitting there.  Shot

25  Rodney.  Angela is right about in this area and he puts two

1  in her.  Something else that I need to point out.  The

2  defendant's statement is in here.  As he testified, he said,

3  I shot Rodney twice, boom-boom.  Keep in mind he was actually

4  shot in the back of the head.  And, then I turned and shot

5  Angela twice.  But that is not what he said to the

6  investigators on the 21st when he told them what happened.

7  This is his statement Exhibit 57.  He went to swinging,

8  talking about the bat, and I pulled the gun from my jacket

9  pocket and shot once.  The bullet hit him in the upper chest

10  somewhere.  He went down to his knees.  That is important.

11  The guy goes down to his knees, back to him, what threat was

12  he at that point?  None.  There's no reason to shoot Rodney

13  in the back of the head.  He executed that man.  The bullet

14  hit him in the upper chest somewhere and he went down to his

15  knees and I shot him again in the back of the head.  Angela

16  had been in the room the whole time.  After I shot Rodney the

17  first time, Angela came toward me.  I shot her twice and then

18  shot the second time.  Talking about to Rodney.  After I shot

19  Rodney the first time, Angela came at me and I shot her

20  twice.  Then I shot the second time to Rodney in the head.

21  Why did he want to change it?  Because, like I said, Ladies

22  and Gentlemen, the first shot to Rodney hit him in the chest.

23  The doctor testified it went from left to right, went through

24  his lung, severed his aorta, the main artery plumbing blood.

25  Rodney went down to his knees bleeding into his chest.  He

1  was no threat to him at that point.  And, then he turned and

2  shot Angela twice.  Rodney is not a threat.  Angela's

3  certainly not a threat anymore.  What does he do?  He turns

4  again to Rodney and shoots him in the back of the head.

5  Ladies and Gentlemen, there's no justification.  That is not

6  self-defense.  That is why he changed that part of his story.

7  Clearly under that scenario, what he told the police that day

8  on the 21st, and what did he say?  I want to set the record

9  straight when he testified.  He was clear in this one.  He

10  said the bullet hit him in the upper chest somewhere.  He

11  went down to his knees and I shot him again in the back of

12  the head.  If he'd left him alone, one might believe from

13  that that they were right after each other, but he went on

14  and clarified.  He went on and clarified.  If he was setting

15  the record straight, it was already straight then. He set the

16  record straight not to clarify the statement, not to clarify

17  that I shot him boom-boom.  I shot him in the chest then I

18  shot Angela and then I shot him again.  That is the scenario.

19  He couldn't admit that on the stand, Ladies and Gentlemen,

20  because, clearly, under that scenario, he executed Rodney

21  Brown without a doubt.  He executed Rodney Brown.  Shot him

22  in the back of the head.  Rodney laid there.  Angela laid

23  there.  Then he leaves.

24      When he left, Angela was gasping for air.  And he

25  leaves.  What happens next?  He came back.  Why did he come

```
 1   back?  According to him, it was his duty.  Remember that.  It
 2   was his duty to come back.  It was already -- it was his
 3   duty.  She was suffering.  It was my duty to put her out of
 4   her misery.  And, how did he do that?  It was his duty to
 5   bludgeon her with a bat.  It was his duty.  It was his duty
 6   to smother her with this pillow to end her suffering.  It was
 7   his duty to stab her in the stomach.  It was his duty to stab
 8   her in the neck to put her out of her misery.  It was his
 9   duty?  He inflicted more suffering.  Angela had a will to
10   live.  She survived being shot in the head.  She survived
11   being bludgeoned with a bat.  She survivied being smothered
12   and final succumbed when he repeatedly, repeatedly took this
13   knife and stabbed her over and over and over.  Some of those
14   wounds going in as much as an inch to two inches into her.
15   That wasn't enough, Ladies and Gentlemen.  That wasn't
16   enough.  When Angela had breathed her last breath.  It was
17   his duty to have sex with her.  You see, that bloody mess
18   lying up there.  He got aroused.  He got erected.  He
19   inserted himself inside of her and ejaculated.  How
20   disgusting.  And they want to justify what he did.  There is
21   no excuse for what that man did.  It was his duty to do that.
22       Why did he really go back there?  It just dawned on
23   me this morning coming up here.  Why did he really go back
24   there?  Rodney was dead with a bullet in the back of his
25   head.  She survived the bullet to her head and was gasping
```

1    for air when he left the first time.  He gets home and

2    thinks:  She is still alive.  She might get to a phone.  She

3    might be a witness.  He went back to kill the eyewitness.

4    Otherwise we'd have an eyewitness to sit in that chair and

5    tell you how he came into their house, and tell you how they

6    repeatedly asked him to leave, and tell you how he executed

7    her husband.  He took out the witness.  The only witness.

8    That is why he went back.  And also defiled her to get back

9    at Rodney who lay there dead.  He executed the witness and he

10   left that awful scene for 11-and 13-year-old girls to come

11   home and find.  That is what he did, Ladies and Gentlemen.

12   Nothing, nothing can justify that.  Nothing can excuse that.

13   Nothing can lessen that.  That is what he did.

14        His intent.  Look at the type of weapon he used.

15   A .38.  What is your intent when you point one of these at

16   somebody and shoot them in the head and chest?  What is the

17   natural result of your actions?  He used this knife and

18   stabbed her repeatedly.  What was his intention to use a

19   weapon like this?  Ladies and gentlemen, the gun and knife

20   are deadly weapons.  He used deadly weapons.  When he went

21   back and she was alive, he didn't call for help.  He didn't

22   call an ambulance.  He didn't call the police.  He did what

23   he did.

24        He watched the girls get off the bus.  And, when the

25   girls came running out, he was one of the first faces they

1   saw.  He goes up there and calls 911.  He sees Mr. Cofield

2   when he pulls up.  I was in bed all day.  I don't know what

3   happened.  No.  Is that a man trying to clear his conscience?

4   No.  That's a man trying to hide what he has done.  He told

5   his mom, Ms. Collier, that he killed them, and that Rodney

6   had it coming to him for a long time.  What is his intent?

7   He killed Rodney.  He threw the shells away over the fence

8   beside his house.  And, right where they found those shells,

9   A and B on this diagram.  This is the defendant's house.  The

10  duplex.  Patterson is on one side, he's on the other.  A and

11  B is where Chuck Wright found those shell casings and Mike

12  Looser.  I had Blackstone put this little green tab where he

13  found the panties.  Now, they are going to argue there is no

14  connection of the panties to the victims in this case.  But,

15  Terri testified.  They were my panties, my sister's panties,

16  and momma's panties.  Right where the shell casings were.  He

17  took souvenirs.  He took their panties.  He planted the knife

18  and the bat.  We know he was the last one with the bat,

19  because he bludgeoned Angela.  Rodney was already dead.  He

20  had the bat.  Did he drop it by Angela?  No.  He

21  strategically placed that bat right there beside Rodney on

22  the right-hand side and placed this knife right there.  That

23  is Rodney's elbow and that's his side right here.  He placed

24  them there deliberately to make us think that Rodney had a

25  weapon in his house?  He could have all the weapons he wanted

 1    in his house.  He was trying to cover up what he did and

 2    excuse what he did.  He did not confront Rodney on the

 3    basketball court.  He didn't have a gun then.  He waited.  He

 4    thought about it.  Waited.  Stewed about.  He went over

 5    there.  I used my head.  I went and got my gun.  He didn't

 6    confront him when it was first said.  He wants us to believe

 7    I had to clear my conscience.  He didn't decide to clear his

 8    conscience until Blackstone was sitting in his living room

 9    with the murder weapon and he did not do it then.  He didn't

10    say, Jeff, let me talk to you.  Jeff left.  On his way out

11    Mike Looser calls him, hey, go back and ask him to come down

12    to talk to us.  Jeff goes back and says, Come on down and

13    talk to us.  They have got the gun.  His semen.  We can test

14    that.  And, we stipulated, both sides did, that the semen

15    that was found in Angela was his.  There is a stipulation

16    exhibit that will go back there with you.  The Court read it

17    to you once.  Both sides agree, there's no dispute, the semen

18    that was found in Angela was his.  We got the gun.  We got

19    the semen.  What does he tell Jeff Blackstone?  You know that

20    polygraph I told y'all I would take, I am going to blow it

21    up.  I am going to blow it.  Shit, smoke a cigarette.  Jeff

22    did not want to hear it at that point.  When they got to Mike

23    Looser and Chuck Wright, they took his statement.  It was not

24    until the evidence started surmounting against him that he

25    admitted his guilt.  Not to clear his conscience.

1       Now, the State of Alabama has charged the defendant with

2   three counts of capital murder.  And the Court will read the

3   law with regard to each count to you.

4       With regard to count one, the State must show you that

5   this defendant, whatever happened that day, this defendant

6   did it by one act or pursuant to one scheme or one course of

7   conduct.  In count one, this defendant, by one act or a

8   course of conduct, or course of actions, intentionally caused

9   the death of Rodney Brown and intentionally caused the death

10  of Angela Brown.  Shot him once, boom.  Shot her, boom-boom.

11  Shot him, boom.  Or you can go shot him, boom-boom.  Shot her

12  boom-boom and whatever else he did to her.  One conduct, one

13  scheme, one course of conduct.  Murder of two or more.  Kills

14  two people at the same time, that is a capital offense.  That

15  is what he did.  That is count one.

16      Count two, intentionally caused the death of Rodney

17  Brown by shooting him with a pistol.  No doubt about that.

18  Bullet hole in the head, bullet hole in the chest like

19  Krolikowski testified.  Cause of death?  Multiple gun shot

20  wounds.  During the time that the defendant knowingly and

21  unlawfully entered or remained unlawfully in the dwelling of

22  Rodney Brown and Angela Brown with the intent to commit a

23  crime therein.  He killed Rodney during a burglary.  During

24  the time the defendant knowingly and unlawfully entered or

25  remained unlawfully.  We talked about that.  I am not saying

1    he entered unlawfully. Rodney let him in. But, at some

2    point in inside, later on, his invitation was revoked. They

3    didn't want him in their house anymore.

4        Now, when you typically think about a burglary, you

5    think about, and that is what they're counting on, that you

6    don't believe a burglary occurred. This is not what you

7    typically think as burglary. You typically think of somebody

8    coming in your house and taking stuff. When you normally

9    think of burglary, that's what you think about. But the

10   definition of burglary is this: Knowingly and unlawfully

11   entering or remaining unlawfully in a building or dwelling of

12   another with the intent to commit a crime therein. Knowingly

13   and unlawfully entering or remaining unlawfully in the

14   dwelling of another with intent to commit a crime therein.

15   Typical burglar is a person who enters your house knowingly

16   and unlawfully with the intent to commit a crime, usually

17   theft, that's burglary. But it says a crime. It does not

18   have to be burglary. If he enters your house to commit an

19   assault on you, that is burglary. If he enters unlawfully or

20   remains unlawfully. If you let him in, but at some point you

21   say I don't want you here, or if there is some evidence you

22   have revoked that invitation: That is burglary. You know,

23   if my neighbor knocks at my door and I let him in. Come in,

24   John, have a seat. And, he tells me I am tired of your dog

25   being in my rose bushes. Well, wait, wait you need to leave

1    here with that.  Now, that's a verbal revocation.  I let him

2    in, but you've got to go.  He comes in and says, I am tired

3    of your dog in my rose bushes.  And, I start pushing him

4    toward the door.  I didn't say a word.  That is evidence.  I

5    don't want him in my house.  His invitation is revoked.  He

6    comes in my house, we start struggling and fighting,

7    certainly, I don't want him in then.  That is an indication

8    that his invitation has been revoked.  And, in this case,

9    Rodney came with a bat.  You wait.  I've got something for

10    you.  Comes with the bat.  Why did you come in my house with

11    this mess in front of my wife?  He was no longer welcome in

12    that house.  Huh-huh.  That is a burglary.  He came in with

13    intent to commit a crime.  He had been stewing.  He was

14    upset.  It had been bothering him.  He went over there.  I

15    don't have my gun.  Goes back and gets the gun.  Comes back.

16    Confronts him in front of his wife.  At the minimum, he

17    wanted to commit, at least, assault.  I submit to you he

18    committed the ultimate assault: Murder.  He went there with

19    intent to commit crime.  His invitation was revoked.  That's

20    burglary.  Now, if you believe that he murdered Rodney Brown

21    in the commission of a burglary, that is capital murder.

22    Counts two of the indictment.

23        Count three goes to Angela Brown.  If he killed Angela

24    during a burglary, he is guilty of capital murder with

25    respect to Angela Brown.  Angela is real easy.  Same thing

1    applies to Angela as Rodney.  When Rodney got that bat, I

2    don't want you in here, that is burglary.

3        With Angela, remember he left.  He left and came back.

4    When he came back that second time, he did not have

5    permission at that time.  Rodney was not there to open the

6    door this time.  He came back with the intent to finish off

7    Angela.  Beat her with the bat, stabbed her, smothered her.

8    When he came back, he came back with no invitation at all

9    this time.  He unlawfully entered with intent to commit those

10   crimes.  That's a burglary in and of itself.  No doubt with

11   regard to Angela.  I submit there's no doubt with regard to

12   Rodney either, but the one with Angela is much easier.  He

13   committed a second burglary when he came back and inflicted

14   the injuries to her.  That is count three.  Guilty.

15       They are going to try to get you to justify what he did

16   to Rodney and lessen what he did to Angela.  Angela was just

17   a manslaughter.  Manslaughter with Rodney.  They are going to

18   talk about provocation.  He was provoked -- to rise to

19   provocation recognized by the law -- there was no

20   provocation.  No justification to what he did.  It is not

21   manslaughter.  It was an intentional murder.

22       You ultimately will apply the facts to the law.  The

23   Court is going to instruct you on the law.  At the

24   appropriate time when all the lawyers sit down, you will have

25   the duty, you have a duty, not him.  You have a legitimate

1   duty to apply the facts to the law and render a true and fair

2   and correct verdict, based on the facts and based on the law

3   and I submit to you that as this case is laid out, the

4   defendant is guilty of intentional murder of Rodney and

5   Angela Brown during one plan, act, course or scheme of

6   conduct that is count one.

7        Count two, he is guilty of the murder of Rodney Brown

8   during a burglary.

9        Count three, he is guilty of the murder of Angela Brown

10  during a burglary.

11       And I submit to you it is your duty to return a fair

12  and true verdict according to the law, and as such I ask you

13  to return a verdicts of guilty on all three charges as

14  charged in the indictment.

15            MR. KEITH:   May counsel approach, Your Honor?

16            THE COURT:   Yes.

17  (WHEREUPON, THERE WAS A BRIEF OFF-THE-RECORD DISCUSSION.)

18            THE COURT:   Ladies and Gentlement, I am going

19  to ask that you step back to the jury room for just a few

20  minutes and I will be calling you back in.

21  (JURY OUT)

22            THE COURT:   Ladies and Gentlemen, at this point we

23  are going to be in recess for ten minutes.  I have some

24  instructions from this point on.  If you are in here when

25  proceedings begin, you will stay here until another recess is

1    called.  I understand there are some court personnel that

2    must be coming back and forth, but everyone, other than court

3    personnel, if you are in here when proceedings begin, you

4    will be here until the next recess.  And, would you make sure

5    no one comes in while in we're in session?  We'll be in

6    recess for ten minutes.

7    (WHEREUPON, THERE WAS A BRIEF RECESS.) .

8    (JURY PRESENT)

9             THE COURT:  With that Defense may state their case

10   to the jury, and you may divide your closing however you

11   choose?

12                **CLOSING ARGUMENT BY DEFENSE**

13             MR. KEITH:  Your Honor, may it please the Court.

14             THE COURT:   Mr. Keith.

15             MR. KEITH:   Counsel for the State Mr. Gibbs,

16   Mr. Lisenby, Ladies and Gentlemen of the Jury, how are you

17   this morning?

18             THE JURY:  Fine.

19             MR. KEITH:  Like we told you in opening arguments,

20   we are to put this case in context.  We are not here to

21   mislead you, confuse you, we're not here to elicit undue

22   sympathy for Jason Holloway anymore than we want you to find

23   a lack of undue sympathy for Jason Holloway.  That is not

24   your role.  That might be someone else's role to determine

25   sympathy or lack thereof for Jason.  The same for Rodney and

1    Angela Brown.  Undue sympathy for those two people is not to

2    enter into your deliberations.  The judge will explain that

3    to you.

4        You are here and you've sworn an oath and you must abide

5    by your oath and sometime later this morning, you'll go back

6    into the jury room and the judge will instruct you on how to

7    apply the facts to the law.  You must determine what the

8    facts are.  You have seen some of the law put on the screen.

9    You will apply what you determine to be the facts to the law

10   and render a just and fair verdict for all parties involved.

11   A fair verdict for Jason Holloway, a fair verdict for the

12   Browns, and the State of Alabama.

13       It is not an easy job to do that.  This has not been

14   an easy case for anybody here in this courtroom.  We tried to

15   prepare you during the voir dire that we had last week in the

16   group sessions and in the individual panels about things that

17   would be difficult to hear.  Things that are, certainly,

18   rather disgusting in nature.  We did that to bring those

19   things to your attention prior to the actual trial, because

20   you needed to be confronted with what were going to be and

21   what are some gruesome details of this crime that was charged

22   and you've seen it.  You've seen the photos.  You've seen

23   them up close.  You have seen them on the screen.  Jason has

24   remorse for that.  Sympathy or the lack thereof for his

25   remorse, anymore than the sympathy or lack of sympathy based

1   on your feelings and personal feelings about the photographs,

2   and the autopsy pictures and all of that, aren't what

3   determines whether or not Jason Holloway is guilty of capital

4   murder.  It's just that simple.

5       Again, we are here to put this in context.  If there

6   wasn't a dispute about the facts, I don't think you would be

7   here today.  There's a very large dispute about the facts.

8   The State, in Mr. Gibbs opening argument, has alluded to a

9   number of different things that the defendant testified to on

10  the stand, things that he said in his statement back on

11  January 21st, two-and-a-half, basically three years ago,

12  three-and-a-half years ago, and they want you to believe just

13  about everything Jason said in his statement.  Why is that?

14  That is for obvious reasons.  He's admitted to the death of

15  Angela Brown.  He did not try to explain it in a way that

16  would make Agents Wright or Blackstone think that someone

17  else did it.  He didn't try to explain it in a way or lie to

18  them in his statement that Angela attacked me.  He didn't do

19  that.  Jason Holloway, unfortunately or fortunately for him

20  was painfully truthful in his statement, in his confession.

21  He substantially testified to his statement he gave

22  three-and-a-half-years ago on the stand.  Yes, there were

23  some discrepancies, not to the core of his statement, and not

24  to the core of his defense.  Again, Jason has a problem

25  showing remorse.  Jason has a problem communicating

1   effectively.  He gets confused.  Mr. Lisenby brutally

2   cross-examined him, got him to react and over react, and say

3   things that just might not have been the things you would

4   have said or the way you would have said it, but we are

5   talking about Jason Holloway.

6        Normally in a murder case, much less a capital murder

7   case, there is clear cut motive about why it is the victims

8   were killed.  There's always a reason.  Well, they were

9   trying to steal my money.  They was some ongoing dispute over

10  drugs.  Whatever it might be.  There's always something that

11  you can say is why he went over there.  That is why it all

12  happened.  The State would -- can't, is not able to, or

13  doesn't want to admit basically to any motive, which leaves

14  the motive pure and simple, and it is as Jason testified and

15  it is as in his statement:  The motive is what was in Jason's

16  mind and his state of mind at the time going back to January

17  12th.

18       We all come from different walks of life and we have

19  different experiences and to a large degree that is why you

20  are here on this jury today.  It is difficult to rationalize

21  why Jason killed Angela.  We're not trying to do it.  We

22  really can't give you a good reason why it happened, Angela's

23  death.  Jason didn't do it back on January 21st of the year

24  2000.  He didn't do it on the stand.  He didn't try to do it.

25  And, we weren't pretending in this case from the very

1   beginning that there is a legal justification for what he did

2   to Angela.  We have essentially all but conceded and have to

3   the fact that Jason killed Angela.  That he murdered Angela.

4      We don't concede to the capital murder death of Angela

5   Brown for a number of good reasons.  Now, Mr. Blanchard, as

6   the judge explained a minute ago, this is going to be a two

7   part closing.  I am going to explain some things to you

8   primarily about what the defense nature is of this case and

9   Mr. Blanchard will follow-up primarily, amongst other things,

10  with the burglary aspect of this case.

11     The burglary aspect is very important and Mr. Blanchard

12  is going to explain it wasn't a burglary.  You have seen the

13  projector show where if you find an unlawful remaining and if

14  you find that Jason was invited in, or not invited in, or

15  asked to leave.  Those are legal things, and you are going to

16  use your wisdom and experience to determine whether or not

17  that burglary aspect would apply to this case.  And that is

18  the defense on Angela Brown's death.

19     I want to primarily at this point address you about

20  Rodney Brown's death.  Rodney Brown's death is different.  It

21  is completely different.  Rodney is charged primarily in

22  count two of the indictment.  Capital murder during the

23  course of a burglary.  Rodney is a also involved in count one

24  where Jason is charged with the death of two or more people.

25     There's a big difference here.  There are three counts.

1    Three opportunities to convict.  Three opportunities to

2    acquit.  And, three opportunities to find Jason guilty of a

3    lesser-included offense.

4        What was the motive and what actually happened?  It has

5    been uncontroverted essentially.  Mr. Gibbs would have you

6    believe that there are all sorts of other things that might

7    could have been going on that maybe Jason was thinking or

8    doing, and there might could have been all sorts of other

9    things happening in the mobile home.  We don't know.  He

10   doesn't know.  And, that is where that speculation and

11   conjecture comes in, and, y'all, we selected you to use your

12   common sense.  Because you have common sense.  And you have

13   got to weigh the evidence as it comes to you from the witness

14   stand and these exhibits and the State has got that burden of

15   proof.  They have to prove to you what happened.  They can

16   speculate what happened.  We can do the same and apply that

17   to the presumption of innocence and reasonable doubt that

18   everything that the State must prove.  They have to prove

19   something happened and they have got to prove him guilty

20   beyond a reasonable doubt.

21       We'll talk about that reasonable doubt here in just

22   a little bit.  Little Jason Holloway may have been friends

23   with Rodney Brown.  We don't make that an issue, because when

24   Rodney came at him with a bat whether or not there were

25   friends or enemies does not matter and didn't matter back on

1    January 12th.

2        Why was Jason -- why did he even go over there?  Is

3    there an explanation totally rational or otherwise?

4        Jason had a wife and had children.  At the time of this

5    incident he was separated.  His wife wasn't living with him.

6    He was living with his foster mother.  Jason had a

7    girlfriend.  He had a wife.  Maybe he did not love his

8    girlfriend, but he had a girlfriend.  And, obviously, because

9    of that relationship did have some feelings for her and that

10   is not an issue.  However, the threat, as perceived by Jason

11   when Rodney made the statement that he could have --

12   essentially he could have sex and would do so with his

13   girlfriend, Felicia Phillips, was the reason that the

14   friendship turned and friendship changed, and you may say

15   that doesn't seem like that big a deal.  Well, if someone

16   threatened to have sex with your girlfriend, husband, wife or

17   whatever it might be, you just got to -- certainly, it was an

18   issue for Jason Holloway.

19       Now, why was it an issue for him?  He wasn't that close.

20   He wasn't married to Felicia.  He wasn't that close to

21   Felicia.  That was his girlfriend.  That was all he had.  He

22   had a foster mother.  He had a wife that wasn't living with

23   him.  And, he had this girlfriend.  What is the big deal

24   about it?  Well, it wouldn't have been a big deal, but for

25   one little reason, or say big reason, this deal where we had

1   there.  He was consistent in his statement, consistent on the
2   stand that he had the gun in his pocket.  We'll never know
3   for sure what exactly happened in the home, but Rodney
4   couldn't have been aware that Jason had that gun when it was
5   concealed and would not have been aware of any threat from
6   Jason Holloway.  Jason said what he said for the right or the
7   wrong reasons, but the main issue here is why did Rodney do
8   what he did?

9       State would have you believe that none of it happened
10  that way.  That Jason barrelled in the house with the gun,
11  made a big confrontation, had plenty of opportunity to leave,
12  did not do so, and moved around in the house, moved around
13  the TV, and then whips that gun out and starts shooting away,
14  shooting Rodney and shooting Angela.  We only know what Jason
15  says happened.  However, there's physical evidence and the
16  lack thereof that corroborate Jason's testimony.  That is
17  where our on job comes in to put it into context, because
18  that's all we have before you.  His testimony and bits and
19  pieces of physical evidence.

20      You heard some evidence and some testimony from
21  Mr. Cofield, Rev. Cofield.  One thing he said that explains
22  what happened is that Rodney Brown can snap very easily.
23  That is consistent with this baseball bat.  What were they
24  doing in there early in the morning?  We are not trying to
25  come up with a different theory, anything different than

1   Sandra Patterson come in the courtroom and explain how she

2   had been raped by Rodney Brown and Quinton Oliver at the same

3   time.  That happened.  There are medical records that

4   document that it happened back on February 19th of 1999, and

5   it happened, and she told you it did.  Sandra lives next door

6   at the same little duplex, adjoined house, Sandra lived with

7   her mother, Jason lived right next door with Marie Collier,

8   his foster mother, and everyone knew that.  Leulla Patterson

9   explained all of that to Jason.  That's what got Jason

10  concerned.  What got him bothered.  What got him however you

11  want to describe it.  That's the reason he went over there to

12  confront Rodney Brown.  There was a credible threat and Jason

13  took it that Rodney was going to rape his girlfriend,

14  Felicia.  There was a reason to confront Rodney, because

15  Jason had knowledge that his next door neighbor has been, in

16  fact, raped by Rodney Brown, and he went over there that day.

17      I want to ask about why you were talking about rape or

18  having sex with my girlfriend.  Am I an aggressor?  Not with

19  this gun here in my pocket.  What are you talking about

20  having sex with my girlfriend for?  Little bit different.

21  Have a gun on someone.  That is pointed out openly displayed

22  is a clear threat.  That did not happen that way.  How do we

23  know?  Because there's no evidence to indicate otherwise and

24  again it is in Jason's statement.  It is in his statement has

25  been unrebutted as far as what he did when he went over

```
 1    Jason's statement, contrary to what Mr. Gibbs alleges, the
 2    local Defense counsel is not trying to justify anything. The
 3    Defense counsel is trying to explain to you, based on the
 4    evidence and lack of evidence, what happened.
 5         It is kind of a two-sided bat.  This bat convicts Jason
 6    Holloway of murder in the death of Angela Brown.  On the same
 7    token, this bat enables you to find Jason Holloway not guilty
 8    of the capital murder of Rodney Brown, not guilty of the
 9    murder of Rodney Brown, and not guilty of manslaughter of
10    Rodney Brown.  It enables you to find Jason not guilty, and
11    he has admitted what happened.  Again, it is a two-sided
12    story, he fully admits causing the death without
13    justification.  Jason didn't bring this bat over there.  This
14    bat did not magically appear in the living room.  Jason
15    didn't go get the bat and start putting it out there.  Jason
16    did go get the knife, butcher knife, and conveniently set it
17    out there on the floor.  If Jason had been conspiring and
18    scheming to do all these things they have alluded to or want
19    you to believe he did, I would suggest to you that if Jason
20    had those mental facilities he would have done a whole lot
21    better job of covering his tracks, hiding evidence, skipping
22    town, never making a statement, getting rid of the gun, done
23    a whole lot better job of hiding things.  None of that
24    happened.
25         Where's the rest of the physical evidence that enables
```

1   you to find him not guilty.  And, if he is guilty of

2   anything, he isn't guilty of anything more than manslaughter,

3   a heat of passion offense where you have a legal

4   justification due to provocation to cause someone's death in

5   a heat of passion.  Even with manslaughter this is the legal

6   provocation.  If someone comes up to you with a bat, there's

7   one simple message when someone comes after you with a

8   baseball bat.  This is deadly force.  It's a right, a legal

9   right, to defend yourself with the use of deadly force.

10        And, no, Rodney didn't know that Jason had the gun.  Can

11  we prove that?  The physical evidence is very important in

12  this case and the lack of physical evidence.  You saw

13  photographs of the living room and of the house.  There's

14  stuff on the walls, figurines around the TV, and on the

15  coffee table, all sorts of things around.  If there had been

16  a struggle with Rodney Brown with that bat, coming after

17  Jason Holloway, it would not have been much of struggle,

18  because Rodney would have overwhelmed Jason Holloway.  He is

19  significantly larger in weight and height, and it wouldn't

20  have been a whole lot of struggle going on.  There's no

21  evidence of struggle.  Y'all know what struggle probably is

22  in a small home like that and what it would have looked like,

23  what would have happened, stuff would have been everywhere,

24  furniture knocked over -- no furniture was knocked over.  One

25  little figurine, ceramic tile pieces, is the best the State

1    can come up with to make you want to believe there was a big

2    struggle.

3        The Department of Forensic Sciences expert witness for

4    the State, Mr. Sherwin Boswell testified.  They would have

5    like to have had evidence from him that there was a struggle

6    as there often can be when there is self-defense wounds.  You

7    heard testimony about the fingernail scrapings.  Typically

8    where there is a struggle and self-defense actions, there is

9    clawing and scratching fighting for your life.  We didn't

10   have that or any cells or any tissues of the defendant's in

11   either Rodney or Angela's fingernail scrapings and that is a

12   rather significant fact.  That corroborates no struggle.  The

13   lack of physical distruction in the home indicates there

14   wasn't a struggle.

15       What could be going on in the house that morning.  Did

16   Jason plant the kitchen knife there on the floor to try to

17   fool someone?  No.  I can't imagine why, since that knife, by

18   the State's on admission was not used in the commission of

19   the offense.  We can speculate what was going.  We are not

20   here to speculate.  If you need a reason to speculate or

21   wonder what was going on in the house that morning, I can

22   speculate for you.  This incident occurred in the morning.

23   You heard the State's medical examiner, Dr. Krolikowski,

24   testify about the State's toxicology report.  Rodney Brown

25   had THC, otherwise or commonly known as marijuana in his

1   system, and Angela Brown was .021 percent blood alcohol in

2   her system that morning.  I would suggest to you if there had

3   been a struggle or problems going on, it was going on in the

4   Browns' home that morning.  He was high on marijuana.  She

5   was under some degree of influence of alcohol during the

6   morning time.  There's a broken figurine in the house.  Jason

7   testified he was not aware of and didn't break anything and

8   just didn't know.  And there was a kitchen knife there that

9   had been somewhere and no testimony that anybody went to go

10  get it or had it that anyone knows of.  There appears to have

11  been problems and struggle going on in the Brown residence

12  the morning of January 12th.  That would explain why Rodney

13  snaps again that morning when Jason came over to confront

14  him.

15      Mr. Gibbs, got the diagram out, trying to draw arrows

16  and showing where he could have been.  Kind of hard to say.

17  We don't need to say exactly where everyone was because the

18  one fact is undisputed, and that's the fact that it was

19  self-defense because there's no reason, no evidence to

20  indicate otherwise.  It's consistent with his statement,

21  consent with his testimony.  And, again, the fact that Jason

22  went over there with a gun, for good or bad reasons or no

23  reason at all, be it animosity, be it anger, or with his --

24  even if he wanted to confront Rodney, the fact that he had a

25  gun does not negate his plea of self-defense.  Again, with

1    that gun in his pocket, Rodney Brown wouldn't have known he

2    had it.  Certainly, an openly displayed weapon would have

3    been different.

4         As I told you, again, there are two sides to every

5    story.  None of us here are ever going to know what truly

6    happened and trials don't often determine what truly

7    happened, they can only to some degree try to explain what

8    they know in fact happened, and the rest comes in

9    speculation.  Even in a light most favorable to the State,

10   you can't find Jason Holloway guilty of capital murder in a

11   light most favorable -- even in a light most favorable to the

12   State's evidence concerning Rodney Brown, it would certainly

13   be no more than a murder, and at best with common sense, at

14   best it would be a manslaughter where Jason over reacted,

15   maybe, prematurely.  Maybe he could have done something

16   different, like get out of the house, if he had had the

17   opportunity.  When someone's coming at you with a bat, you --

18   he did what he did.  He did what he felt he had to do and

19   that was to protect himself.  This manslaughter, again, is a

20   sudden heat of passion where there is provocation recognized

21   by law, being the baseball bat, no time to cool off, no time

22   to get away, no time to think about what you're doing, and he

23   did what he did, an act of pure self-defense.

24        We stand before you and don't try to pretend that the

25   death of Angela Brown and some things Jason did to her were

1    any act of self-defense.  Simply self-defense for Rodney

2    Brown.

3        You can certainly, contrary to Mr. Gibbs' argument

4    defend yourself in someone else's home.  Just because you're

5    a guest in someone else's home, someone comes at you with a

6    baseball bat, with a clear indication, message, that they are

7    going to cause you serious physical injury with a deadly

8    weapon, you have a clear right to defend yourself.  Doesn't

9    matter where you are.  Doesn't matter if you have a gun in

10   your pocket.  Doesn't matter if the credibility or the weight

11   of the threat was substantial or overly significant. A threat

12   is a threat.  Jason took it as a very serious threat.  You

13   may not.  That is not the issue.  The issue with Rodney is

14   very simple.  Rodney comes at him with the bat and did Jason

15   use appropriate force to defend himself against a deadly

16   weapon?

17       The State would have you believe that this could not be

18   self-defense in any way, because Rodney was shot in the back

19   of the head.  That's where the manslaughter can only come in.

20   His testimony and his statement were clear.  I went in and

21   confronted Rodney.  Angela was on the couch.  He came at me

22   with the baseball bat and I shot him in the chest.  You heard

23   Jason testify.  There might have been some confusion with

24   Jason between his testimony and his statement about the order

25   of shots, but it was clear in his statement, and y'all can

1  take it back with you in the jury room, but it is clear in

2  his statement he shot Rodney first in the chest, sees Angela

3  jumping up off the sofa, sees Rodney getting up again, he

4  perceived he was getting up to come at him, that's when he

5  got shot in the back of the head.  If he shot Rodney Brown in

6  back of the head on the first shot, I would suggest we would

7  not be up here trying to convince you that would be an act of

8  self-defense.  That was an act that occurred during the heat

9  of passion and in the commotion, and that is what Jason did.

10 Clearly it started out in self-defense:  A chest shot.

11     You swore under oath to consider the charges separately

12 and individually, and you must do it.  You swore an oath as a

13 juror and that is your duty to exercise your oath and

14 basically put a wall between the charges.  You cannot convict

15 on Rodney Brown, because of the things Jason did to Angela.

16 You can find them revolting, disgusting, inappropriate, evil

17 if you will, but you have to categorize that in separate

18 count three only with Angela Brown's death.  That might be a

19 hard thing to do, because the State wants you to be

20 sympathetic with the victims.  To be disgusted with what

21 Jason did.

22     Like we told you to begin with in this trial in opening

23 argument, this is a capital murder case.  Many of them have

24 the deaths of two or more people.  There's always blood.

25 There's always gunshot wounds.  There's always stab wounds.

1   Yes, sometimes there's sex with the victim, be it alive or

2   when they are deceased.  Those things just happen.  This

3   isn't the first case like this and it won't be the last.  But

4   the sympathy issue and the nature of your disgust of it, does

5   not determine guilt, and whether or not there was intent to

6   commit a premeditated murder or whether it was a capital

7   murder burglary.  Those are not issues or charges.  The judge

8   will instruct you on what you can consider and no where in

9   the charge does it say that if you find that after Angela

10  Brown's death that Jason Holloway committed an act of disgust

11  on her, then you would find him guilty.  That is not the law.

12  The judge will instruct you quite to the contrary.  That is a

13  matter for another day.  What he did and how he did it.  That

14  is not relevant to the issue of guilt or innocence as far as

15  the charges against him.  I can't over emphasize the sympathy

16  aspect.  Sympathy for the victims and lack of sympathy for

17  Jason Holloway.  Those issues are not to be considered during

18  deliberations and are not relevant to the charges.

19       Y'all have about heard it all.  We have tried to

20  confront it and deal with it.  The best we can do is put it

21  in context.  The bludgeoning, the stabbing, the pillow, the

22  sex, the run a mile statement, those don't go to the elements

23  of whether or not Jason defended himself against Rodney

24  Brown.

25       The theft conviction, the panties, the cut screen issue

1  with the Ms. Hands lady, those don't go to the ultimate issue

2  and shouldn't be considered.  Those are issues to create

3  prejudice.  To give you reasons to personally dislike Jason

4  Holloway.  Not reasons to find him guilty for those reasons

5  alone.  No matter how horrid we find Angela's death, Rodney

6  Brown's death is different.  Jason was provoked, right or

7  wrong reasons.  He exercised his legal duty to defend

8  himself.  Yes, he had a gun with him.  And, he defended

9  himself and did so in the appropriate legal justified manner.

10      Now, y'all have heard Jason is presumed innocent of

11  these charges.  Just because he has killed someone, or killed

12  two people, regardless for the reasons, does not mean he is

13  guilty of any capital offense.  You'll find that in count one

14  of the indictment that if you find Jason Holloway with

15  appropriate legal justification killed Rodney Brown in

16  self-defense, you will find him not guilty of the charge

17  named in count one, because he's not guilty of self-defense.

18  You also find him not guilty of the charge of capital murder

19  burglary if you find that Jason acted in self-defense.  He is

20  presumed innocent of all charges.  The State has got that

21  burden.  It is not an impossible burden, but it is a strong

22  burden.  It is a burden the State has.  When the defendant

23  makes a plea of self-defense, the State has to prove to you

24  beyond a reasonable doubt that it was not self-defense.

25  Jason Holloway does not have to do that.  His lawyers do not

 1    have to do it.  Certainly, we tried to do that as part of our

 2    role and obligation here before you, but the State has the

 3    clear burden of proving that it was not self-defense.

 4        Is there any reasonable doubt that Jason is not guilty

 5    of capital murder or murder of Rodney Brown?  Reasonable

 6    doubt is a doubt for which there is reason.  A reason you can

 7    put your finger on that enables you to say, well, looks to me

 8    like it happened this way.  There's a reasonable likelihood

 9    and reasonable possibility based on the evidence or it is

10    based on the lack of evidence.  Kind of like these bridges

11    around the county, where these counties and cities in the

12    state where they build these bridges and they go to a lot of

13    trouble to design them, and build them strong so the school

14    bus with children going to school and everyone drives over

15    them, and they can build these bridges and get by with cheap

16    materials and lightweight metals and they can do all that

17    stuff they, but they don't do it.  They take the specs,

18    specifications, that bridges require to sustain weight for

19    vehicles, and they like double it, triple it, make it ten

20    times as strong, to make sure those bridges aren't going to

21    collapse.  They do it for one simple reason:  They want to

22    make sure the bridges won't fail.  That's what reasonable

23    doubt is.  Reasonable doubt means that you want to make sure

24    that there isn't some reason, based on the evidence or lack

25    of, they've got to find him guilty beyond a reasonable doubt.

1  If there's reasonable doubt, find him not guilty.  If there's

2  reasonable doubt of capital murder, you would find him guilty

3  of a lesser offense or not guilty at all, based on your

4  common sense and wisdom.

5      Mr. Blanchard will speak to you in a short while and he

6  will explain to you the other issues before you in this

7  indictment.  And, I want to thank you for your attention.

8      The State is going to have the last opportunity  since

9  the State has the burden of proof they get to go first and

10 last.  We wish we could go last, but the State gets to do

11 that and they get to explain, you'll hear, well, you heard

12 about some things Mr. Keith said and what he wants you to

13 believe, and you heard about the things Mr. Blanchard said

14 and what he wants you to believe, and they get to do that,

15 and that is just part of it.  We ask you to remember the

16 things and consider the things that we bring forward to you,

17 and do that for the simple reason that they've got the

18 burden, and like I told you to begin with, we are here to

19 bring this out before you and lay it out on the table, and we

20 have admitted what we have done, and we explained the death

21 of Rodney Brown in a legal, justifiable manner.

22      At the conclusion of this case, we ask you to

23 find him not guilty.  Thank you.

24          MR. BLANCHARD:  May it please the Court.

25          THE COURT:   Mr. Blanchard.

1          MR. BLANCHARD:   Mr. Lisenby, Mr. Gibbs, Ladies and

2    Gentlemen of the Jury, good morning.

3          THE JURY:  Good morning.

4          MR. BLANCHARD:  Excuse, justify, lessen.   These are

5    the words that Mr. Gibbs used when he talked about what the

6    Defense was going to try to do in this case.   Excuse,

7    justify, lessen.   Well, you have been here all week.   Longer

8    than a week now.   You have heard everything from the start.

9    You heard opening statements and you heard the questions we

10   asked you on voir dire, which is that process I told you

11   about where we ask you all those questions, and I think I

12   made it clear to every group that I talked to in the panel,

13   when the 12 came in the room, that we wouldn't be here if we

14   thought a capital murder had been committed.   We didn't say

15   we wouldn't be here if we didn't think a crime had been

16   committed.

17        The reason we are here is not to excuse the murder of

18   Angela Brown.   There is no excuse for the murder of Angela

19   Brown.   We don't try to excuse that.   We have, have we not,

20   taken responsibility for that from the outset.   Our client

21   has taken responsibility for that from the outset.

22        The killing of Rodney Brown is a different matter.

23   Mr. Keith has explained that to you, has explained our

24   theory.   Mr. Gibbs has explained the theory of the

25   prosecution as to reasonable doubt -- not reasonable doubt,

1    but self-defense or the lack thereof.  There's a genuine

2    issue as to that legal concept when it comes to Rodney

3    Brown's death.  And, if, in fact, as I think you should, you

4    find self-defense applicable, then, yes, that death, as

5    regretable as it may be, as painful to the family as it may

6    be, as grotesque to look at as it may be, is justified.

7    Lessened.

8         Another word he used, lessened.  I asked you this

9    question, I put this to you:  Would it be a crime to try to

10   lessen a charge that was too high to begin with?  Would that

11   be so awful?  Ladies and Gentlemen, you have -- I don't know

12   what you expected when you came in here, when you were seated

13   as a jury.  Maybe you expected us to jump up at every word

14   the prosecution said and object and make long impassioned

15   speeches from the counsel table like you sometimes see on TV.

16   We didn't do much of that because we weren't trying to

17   excuse, as they say, the death of Angela Brown.  The only

18   time we have done that is when we felt the prosecution in

19   their zeal to obtain a capital conviction and death penalty

20   had overstepped the boundaries of fairness and due process.

21   So, we have made some objections.

22        Ladies and Gentlemen, what you see here is the State,

23   the prosecution, is attempting to stretch this case into a

24   capital case.  They are trying to stretch this case to fit

25   the definition of capital murder.  I'm talking now about

1    counts two and three.  The burglary counts.  The burglary

2    murder counts, if you will.

3         It is a bedrock principle of our law, our criminal

4    jurisprudence, if you will, that before a person can be

5    convicted of anything, a crime has to be defined.  There have

6    to be elements of that crime:  One, two, three, four, however

7    many there are.  And, Judge Martin will explain to you in

8    detail the elements of the crime of capital burglary murder

9    when his turn comes, or his time comes, to explain the law to

10   you.  He will explain that in detail and you will hear that.

11   That crime is well defined.  The question is:  Do the facts

12   here fit that crime?  If the facts that actually happened do

13   not fit the definition of that crime, you cannot convict the

14   defendant of that crime.  The facts may fit some other crime,

15   which we call lesser-included offenses, you will hear about

16   those, too.

17        As to burglary murder count two.  Let me talk about

18   counts two and three.  The burglary murder count, intentional

19   murder may be a lesser-included of those.  Now, you remember

20   we talked in voir dire about the difference between capital

21   murder and intentional murder.

22        Capital murder has an additional element.  It is not

23   just an intentional killing, but you have this additional

24   element of, let's say, in this case, the burglary added to

25   it.  Unless there is proof of the burglary, you don't have a

1    capital case.  If you don't find that a burglary has been

2    proven beyond a reasonable doubt, there is no capital case.

3    There may be an intentional murder.  You find it to have been

4    intentional and even cold-blooded, grotesque in some ways,

5    but without that specific additional element of burglary,

6    there is no capital charge.  And, that is what the State is

7    trying to do.  There was a death, a killing in a home.  No

8    doubt about it.  Now, how do we stretch it into a capital

9    case?  We add a burglary to it.  Try to convince you folks

10   that there was a burglary.  So, they are reaching and trying

11   to do that.  I remember I wrote down the words of Mr. Gibbs

12   in his opening statement.  He said, the defendant is properly

13   charged.  Why be on the offensive about that?  Why bring that

14   out right away?  Is he properly charged?  Let's think about

15   that.  You don't want to convict somebody of a higher crime

16   than what they actually committed just because the prosecutor

17   wants you to.  You've got to have proof.

18        Now, let's think about why the murder, the crime, in

19   this case, crime is not a capital murder.  What about that

20   burglary element?  Why doesn't it fit the facts?  When we

21   think about the typical burglary case, and Mr. Gibbs

22   mentioned some of this, why is it a capital murder case that

23   happened with a burglary, if a murder happens with a

24   burglary?

25        Well, it's a pretty bad thing.  Somebody goes -- breaks

1  into your house, or breaks into a house in the nighttime,

2  creeps around the house with the intention to do something, a

3  burglary -- not a burglary, but a theft, sexual assault, or

4  something, or breaks in the house and creeps around to do

5  that, commits a murder in the process:  That is a bad crime.

6  That's a bad crime.  And, breaking in the house is not the

7  only way to do it.  Obviously, if the house was difficult to

8  break in, a person could sneak in while the door was open

9  without breaking in or be invited, connive to be invited in

10  and hide in the house when everybody else had gone to bed,

11  and somehow do that, and then come out and do their dirty

12  deed, their theft and killing or something.  These are bad

13  crimes.  And, everybody can understand that kind of burglary.

14  That is what we think of as burglary, and that's why a murder

15  combined with a burglary is capital.  That's not exactly what

16  happened in this case.  That's why I said we are trying to

17  stretch it into seeming like a burglary.

18       In this case Jason Holloway undoubtedly was invited into

19  the house.  No question about it.  There was no unlawful

20  entry into the house at all.  The State, instead of bringing

21  you concrete evidence of an unlawful entry or some kind of

22  unlawful remaining like sneaking in and hiding, relies on

23  this very shakey and tenuous sort of theory, which I believe

24  the Court will refer to as an implied revocation of license.

25  On the theory that, well, when he came in, he was licensed or

 1    permitted to be in.  Then some act occurred that he should

 2    have known revoked his permission to be there so he should

 3    have left and he should have gone.  It is all kind of implied

 4    and in your mind and it is not clear at all.  There's nothing

 5    clear about it.  It is simply all by implication.  Somehow by

 6    word or deed, he should have known that Rodney communicated

 7    to him that he shouldn't be there anymore.  Mr. Keith talked

 8    about how they kind of proved this by kind of saying, well,

 9    maybe, there was a struggle that shows that he was told or

10    should have known to get out of there.

11         You heard Mr. Boswell, and the other witnesses, there

12    were a couple of ceramic pieces on the floor consistent,

13    maybe, with Angela getting up off of the sofa and bumping the

14    table where all the ceramics were and somehow they fell on

15    the floor.  Not a struggle at all.  Jason said, actually, he

16    saw a couple of pieces on the floor when he came in.  There

17    are two children in the house.  They had been there that

18    morning.  It is a small place.  I think you'll see that was

19    plenty of opportunity for delicate ceramic pieces to get

20    knocked off and broken, doesn't necessarily mean that it

21    happened in any kind of struggle.  Somebody mentioned

22    something about a piece of ceramic on top of the TV.  I saw

23    that.  If you look at that picture where Rodney Brown is

24    lying next to the TV, you'll see that too.  It looks like

25    somebody picked it up, a broken piece of ceramic, and put it

1   on top of the TV like you would do.  It is not like it is

2   just lying there like it has been knocked around or

3   something.  It has definitely been placed on the base, you

4   know, on the TV.  That is where it was.  Doesn't necessarily

5   have anything do do with what happened on the day in

6   question.  So, that piece of ceramic that doesn't indicate a

7   struggle.  Now, if I asked, as I asked one of the officers,

8   if the victims had been tied up, if they had cords around

9   their necks, or something like that, evidence of some sort of

10  torture during life, that could be the evidence of a

11  struggle, and evidence of a struggle as the Court will tell

12  you may be circumstantial evidence upon which you could rely

13  and conclude there had been a revocation of privilege to be

14  there.  In this case there is simply no evidence of any kind

15  of struggle.  No overturned furniture.  Not broken furniture.

16  No blood smears on the walls.  No pictures knocked off the

17  wall.  Nothing to indicate a struggle.  So, that -- you

18  should not rely on any kind of indication of a struggle.

19       But what about, you know, this question of Rodney coming

20  down the hall with a baseball bat.  Now, you know, the

21  prosecution argues that somebody coming at you with a

22  baseball bat, well, that is your cue that you are no longer

23  welcome in the house.  That -- here we go again.  It is not

24  clear.  It is circumstantial evidence.  There are, at least,

25  two inferences that you can draw from that.  And, the judge

1   will explain to you about direct and circumstantial evidence

2   later.  But, circumstantial evidence is just like you see

3   somebody coming in the house with a raincoat and there's rain

4   on it, well, it could mean that he walked through the

5   sprinkler on the way in or it could mean it is raining

6   outside.  Now, which one is it?  It is a circumstance and you

7   try to figure out what happened.  Probably raining, but, you

8   know, that is a circumstantial evidence illustration.  The

9   judge will tell you more about that later.

10      But this thing with the baseball bat.  Same kind of

11  thing, circumstantial evidence.  Rodney didn't say get out of

12  my house.  I don't want you here anymore.  There's no

13  evidence to that effect.  Certainly, if he said that, that

14  would have been an expressed revocation of Jason's right to

15  be there.  He didn't do that and there's no evidence that he

16  did that.  Instead, what did Mr. Gibbs say that Rodney said?

17  He did not say get out.  He said wait here.  Wait here.

18  Don't leave.  Wait here.  I've got something for you.  Did

19  not tell him to leave.  Did not tell him to get out.  He went

20  down the hall, comes back, somehow with this baseball bat,

21  who knows, over his head, over his shoulder, whatever.  He is

22  running toward Jason with the baseball bat.  We weren't

23  there.  We didn't see it.  We can only rely and draw

24  reasonable inferences about it.

25      Now at that time, Jason's got, maybe, a split second to

1  react.  And, I'm telling you from that fact there are two

2  inferences that you can draw.  You can say, well, Rodney was

3  saying with that baseball bat:  Get out of my house.  I don't

4  want to see you anymore.  I am mad at you.  Or, he could have

5  been saying, like he said, wait right here, stand right there

6  while I thrash the devil out of you, because I'm mad at you

7  about what you said in front of my wife.  And, I'd prefer to

8  do it in the privacy of my home.  That is an equally possible

9  inference.  The judge will tell you that in a circumstantial

10 case, if you can draw two inferences from a set of facts, and

11 they are both equally reasonable, then it is your duty to

12 adopt the one that is consistent with innocence and reject

13 the one that is consistent with guilt.  Because of the

14 presumption of innocence if there are two equally plausible

15 inferences, as there are in this case, I will admit that, it

16 is plausible Rodney was saying get out of my house and it is

17 equally plausible he was saying stay here while I beat you

18 with this bat.  You have to reject the one that the

19 prosecutor says and you have to adopt the one that is

20 consistent with innocence.  That is consistent with

21 self-defense.  Which is the one that said stand right here

22 while I beat you with this bat, because I am mad.

23      Now you heard Jason testify.  You remember Mr. -- he

24 got up on the stand and on direct he expressed remorse for

25 what happened and tried to explain it as best he could.  Then

 1   Mr. Lisenby got a hold of him and after leading questions,

 2   kind of argued with him a little bit, had time to think, and

 3   got him to say, well, if he's coming at you with a baseball

 4   bat, don't you think that means he wants you out of his

 5   house?  And, Jason is up there on the stand and he says,

 6   well, that sounds reasonable to me, well, sure.  Well, what

 7   do you think happened at the time?  Do you think Jason

 8   thought that at the time?  Oh, my goodness, he wants me out

 9   of his house?  No.  I think it is reasonable to conclude he

10   had about a split second not to think about:  This man wants

11   me to leave, but to think, oh, my God, here comes Rodney,

12   this big guy, much bigger than Jason, with an aluminum

13   baseball bat.  He's going to hit me with this baseball bat.

14   I am in danger.  What can I do?  And, he did -- he had a gun

15   with him and he pulled it out and at that point the shooting

16   began.  And you've heard the rest of the evidence about that.

17   I'm not going to dwell on that.  But, that is a critical --

18   there are several critical points in time in this case, and

19   that is one of them, that you have to focus on, and you have

20   to decide, based on evidence whether the State, the

21   prosecution, has proven to you beyond a reasonable doubt that

22   Jason Holloway's license to remain in that house was somehow

23   revoked in a way that everybody knew about by Rodney Brown's

24   attitude.  And, that is going to be a difficult factual

25   decision to come to grips with.  I suggest to you that in my

1   view it is clear that the Defense believes that in that

2   instance that Rodney was coming down the hall with that bat,

3   the only thing Jason to could do was defend himself.  There

4   was no revocation of license, privilege to be there, Rodney

5   simply snapped and wanted to beat Jason with that baseball

6   bat.

7       The burglary element of counts two and three is simply

8   not proven beyond reasonable doubt, and it must be so proven

9   before you can return a conviction of capital murder, and

10  that is my point.  You will also be told about

11  lesser-included offenses that you may consider.  I will not

12  dwell on that.  The Defense's position as to Rodney Brown is

13  that it was, in fact, self-defense.

14      With regard to -- let me say a couple things with regard

15  to what, in the first part of the case was, the big elephant

16  in the courtroom that nobody talked about.  You have been

17  places where this happens.  There's something going on and

18  everybody is kind of dancing around it.  Nobody talks about

19  it.  I talk about it as an elephant in the room that nobody

20  what wants to mention or talk about.  That is motive.  This

21  case is almost inexplicable when you hear about it.  It is

22  almost inexplicable.  Why some of the things in this case

23  happened, to find any motive for what occurred.  But, you

24  have, at least you have, Jason Holloway's statement and his

25  testimony where he has tried to explain, as best he can, what

1   happened and how he felt and why he did what did he.  He's

2   tried to do that.

3        You then have the theory that the State comes up with to

4   try to supply a motive.  What they think or theorize what the

5   motive may have been.  Once again, all based on

6   circumstantial evidence.  Mr. Gibbs was not there at the time

7   that all these things were happening.  It is a theory built

8   on a lot of circumstantial evidence.  So, you have to

9   consider.  What do you think the most plausible explanation

10  about what happened is?  Whether the theory that Mr. Gibbs

11  and the prosecution have constructed based on all this

12  circumstantial evidence, or what Jason told you occurred.

13  Which is the more plausible of the two?  I am not here to

14  suggest that motive is an element of the case.  The judge

15  won't tell you about motive being an element of the case, but

16  it helps to understand what happened and to pull it all

17  together if you think there is some kind of motive for it.

18       I've got to digress just a minute while we're talking

19  about that.  Mr. Gibbs said that Mr. Holloway took souvenirs,

20  the panties that were found in the trees.  I don't quite know

21  what to say about that.  You heard the testimony.  Ten days

22  after Jason was arrested a law enforcement officer goes out

23  there and finds some panties that were later identified by

24  the Zachary children as belonging to themselves and their

25  mother hanging in a tree near the Holloway property.  Well,

1    Jason couldn't have been around there for ten days.  I mean
2    if these bright colored items had been hanging in those
3    trees, well, we don't know for how long.  It could have been
4    one day.  It could have been two days, three days, maybe ten
5    days, who knows, maybe longer.  Nobody had seen them and
6    nobody had reported them missing.  And, by that time, by the
7    time they were found, let's remember Jason had confessed and
8    he had confessed to having sexual relations, if you will,
9    with the body of Angela Brown.  So it is kind of known that
10   this sort of thing went on.  And, I don't know precisely why
11   anybody would put those in that tree near Jason's property,
12   but there have been a reason to try to cast some sort of
13   blame or create some sort of evidence or suspicion.  I don't
14   know.  It is a strange thing to have happen.  I just know
15   that if I am Jason and I'm taking souvenirs and I want to
16   hide them, I don't want anybody to know, the last thing I'd
17   do is hang them up in a tree where people can see them.  I
18   don't understand that.  So, just keep in mind that Jason was
19   in jail when these were found and had been there for 10 days.
20       Again, as hard as it is to say, we have to face the
21   fact that Angela Brown was murdered.  There's no other word
22   for it.  There's no other concept for it in our law.  Even if
23   in his confused way Jason Holloway did believe he was somehow
24   showing mercy to Angela by removing her from this life at
25   that point, if he did think that, then that is still an

 1  intentional taking of a life, and it is murder under our law.

 2  But, keep in mind, again, that for a capital conviction,

 3  murder is not enough.  You must have that additional

 4  circumstance as to count three that is alleged again to be

 5  burglary.  And, you will have to come to grips with facts

 6  there and determine if you think in count three there was an

 7  unlawful entry or remaining.  That is for you to decide based

 8  on all the facts in this case.  As are the others issues in

 9  this case.

10      The judge in this case, Judge Martin, will in his

11  instructions tell you, clearly tell you, that the fact a

12  person or persons are killed in a house is not equal to

13  capital murder.  I keep emphasizing it, but I can't emphasis

14  it too strongly.  That burglary elements must be proved.

15      Mr. Keith told you about the concept of burden of proof.

16  You have heard it all along.  The State must prove these

17  things to you.  The Defense does not have to disprove them.

18  The State must prove to you, and prove it beyond, what,  a

19  reasonable doubt.

20      Now, I will say this about reasonable doubt.  It is --

21  sometimes it is a difficult concept for people to get their

22  heads around, but it is really pretty simple.  If, after you

23  hear all the evidence in the case, and you look at it, and

24  sift it, and you weigh it, and you look at the lack of

25  evidence, you look at the evidence, you look at the conflicts

1  flight in the evidence, and you look at all of that together,

2  and you say, well, if you say, I don't have any doubt that

3  the State has proven everything they need to prove to me, I

4  don't have any doubt.  Then there's no question that you vote

5  for conviction.  But, if after looking at all that, you say,

6  you know, I've got a doubt that they proved X, Y or Z.  That

7  you have to prove whatever it is.  I've got a doubt and here

8  is why I have this doubt, and you can give a reason for that

9  doubt, that you have, not just some speculation or whim or

10 surmise, but a real doubt, you can give a reason for, then

11 you have a reasonable doubt.

12      Now, what do you do with that if you have a reasonable

13 doubt?  If it may be that you have a reasonable doubt and

14 somebody else does not have a reasonable doubt.  Well, you

15 talk about that.  You talk about it and you try to hash it

16 out.  You try to make everything -- you all try to come to an

17 agreement whether there should be a reasonable doubt or not.

18 If after all of that, if you, the individual juror, still

19 have a doubt for which you can give a reason and nobody else

20 convinces you otherwise, and you have a reasonable doubt, the

21 law says, if you have, as an individual juror, a reasonable

22 doubt you cannot vote for a conviction.  You must vote to

23 acquit if you have a reasonable doubt.  If all 12 of you have

24 a reasonable doubt then there would be an acquittal.  If all

25 12 of you do not have a reasonable doubt, then there would be

1    a conviction.  Anything else is a hung jury.  It takes 12

2    either way.  The judge will tell you that, but the point is,

3    reasonable doubt doesn't belong to the jury.  It belongs to

4    the individual juror.  It is your individual responsibility

5    to determine whether you, you, you, you, have a reasonable

6    doubt, and if you conclude that you do after deliberating,

7    you must vote that way.  It would be a violation of your oath

8    to do anything else.  One other thing about reasonable doubt.

9    If you are of the state of mind after hearing everything is

10   well, you know, I kind of think he is guilty, that is not

11   enough.  That is not enough.  If you are of the state of

12   mind, if I were to bet, I would bet he is guilty.  Not

13   enough.  You have got to be convinced each and every one of

14   you by the State's proof beyond a reasonable doubt.  Not

15   beyond all doubt, but beyond a reasonable doubt, and that is

16   their burden of proof to you.

17        As I said, we did not hide from you what was done in

18   this case.  We accepted it.  We simply think that the charges

19   that have been levied are inaccurate, other charges should

20   have been brought.  You are the only ones we can go to to

21   rectify that situation, and that is why you are here.  That

22   is why Jason Holloway is here.  We are all good citizens of

23   the State of Alabama.  Sometimes I think there is pressure on

24   us, as good citizens, to say, well, we are citizens of the

25   state.  We want to do what the state government and law

1   enforcement agent do.  Let me tell you right now that the

2   State of Alabama has never lost a case in this courthouse.

3   Never lost one.  You know why?  I'll illustrate it this way.

4   In Washington, D.C. in the Department of Justice, the

5   attorney general's rotunda, there's a big inscription and

6   what is it says is the government always wins whenever one of

7   its citizens receives justice in the courts.  Likewise, with

8   the State of Alabama, when you do justice in the courts, the

9   State wins.  Doesn't matter whether the prosecution wins.

10  They are lawyers.  They want to win.  No question about it.

11  They want their conviction.  But you don't consider that.

12  You consider that you want to do justice, and Jason Holloway

13  is here for justice, too.  He's not saying he shouldn't be

14  convicted.  He's just saying, I want to be convicted of what

15  crime the law defined and prescribed, that is all.

16      Ladies and Gentlemen, you have been extraordinarily

17  patient all week, all last week.  I appreciate your attention

18  to me.  I can tell you have been paying very good attention

19  and I'm going to leave you now just by saying:  The verdict

20  we believe would be appropriate in this case would be not

21  guilty as to count one, which involves the double murder.

22  Not guilty as to Rodney Brown.  But, as to Angela Brown there

23  could be a murder conviction on that count.  Count two, which

24  is burglary murder of Rodney Brown, there should be a not

25  guilty verdict on that, because of the self-defense aspect.

1   On count three there should be a murder conviction as to

2   Angela Brown.  None of the murder convictions should be

3   capital convictions because of what I have told you.  That

4   is, what we expect and that is what we believe justice

5   requires in this case.

6       We await your verdicts.

7                **REBUTTAL CLOSING BY THE STATE**

8           MR. LISENBY:  May it please the Court.

9           THE COURT: Mr. Lisenby.

10          MR. LISENBY:  Ladies and Gentlemen, good morning.

11          THE JURY:  Good morning.

12          MR. LISENBY:  This argument is basically an

13  opportunity, because the State has the burden of proof in

14  this case, and I would say it is a high standard.  It is the

15  highest standard in the law.  But, it is not an impossible

16  standard, otherwise we would never have a criminal trial or a

17  criminal conviction of any kind.  But, because the State has

18  the burden of proof, we have the opportunity to respond to

19  some of the things that Defense counsel said in their closing

20  argument about this.  And, I'll try not to be too disjointed,

21  but as they broke up their closing a little bit, I will be a

22  little bit disjointed, I suppose.

23      Mr. Keith says the defendant came before you and he was

24  remorseful of this event and his testimony was truthful that

25  he was telling you what had occurred.  He also said that

1  about his statement.  That that was truthful when he gave

2  that on January the 21st of 2000.  Jason Holloway was so

3  remorseful about this event on January 12th that he went home

4  and watched Jerry Springer, A Different World, Sister Sister,

5  One Life to Live, General Hospital.  That is how remorseful

6  he was about the event.

7      Now, on the 21st when he was interviewed about this

8  case, after he had given his statement, after he had been

9  arrested, he asked Investigator Mike Looser, am I still going

10 to get my birthday cake, because today's my birthday.  That

11 is how remorseful Jason Holloway was during all of this.

12     The argument that he was being truthful all the time,

13 the first person he saw was Rev. Cofield, Angela's brother.

14 I've been asleep all day.  I don't know what happened.  Jason

15 Buivids that night when interviewed, he lied to him.  I got

16 home from work -- now, Mr. Keith asked the question about

17 that, he said, did Jason Buivids, did all he want was what

18 occurred after the girls got home?  Well, then why is the

19 very first line in the sentence, I got home from work around

20 6:15 a.m. this morning.  I got ready for bed and went to

21 sleep.  Now, Jason Holloway was lying.  He started lying

22 before he left the scene, Members of the Jury.  He started

23 lying.

24     Mr. Gibbs showed you the photograph and you saw where

25 the baseball bat was located at.  It would have been real

1    easy for Jason Holloway just to have thrown that bat down

2    anywhere in that room.  But, you look at it, it is laid right

3    next to Rodney Brown.  It is laid right next to him just like

4    -- if he were down on the ground, it would be right next to

5    his hand.  It wasn't laid sideways.  It wasn't laid with the

6    handle that way.  It was perfectly laid.

7         Mr. Keith even suggested to you, and I submit to you

8    nothing in the evidence goes for this, and he's asking you to

9    go outside the evidence, which Judge Martin will tell you,

10   you cannot do.  Mr. Keith even suggested to you that there

11   was some kind of fight or struggle going on between Rodney

12   and Angela that morning.  There was no evidence of that.

13   Terri Zachary, when she left that morning, testified

14   everything was fine, when I left, nothing on the floor.  The

15   defendant testified when, I got there Angela was sitting on

16   the couch reading a magazine.  He also testified when

17   Mr. Keith asked him a couple of times, trying to get him to

18   talk about this.  Did you see any of these figurine on the

19   floor or anything like that?  And, he said, no, I didn't see

20   anything like that.  I wasn't paying any attention.  I don't

21   know if they were on the table, or on the floor, or anything

22   like that.  Mr. Keith wants you to go outside the evidence

23   with regard to what occurred that day.  That is not

24   permissible.  There's no evidence of any type of activity

25   involving Angela and Rodney.

1    Mr. Keith said, you know, if Jason had really been

2    trying to do all of this, if he had been trying to plant

3    these things, of course, laying the bat right next to Rodney,

4    but also the knife, the butcher knife was laying in there.

5    It just so happened to be at Rodney's left-hand now with the

6    bat at the right hand, and almost underneath him.  You can

7    see where it is at.  No blood on it or anything like that.

8    You tell me, Members of the Jury, if the defendant wasn't at

9    the time he was leaving the residence the first time, I

10   submit to you, not planting things there.

11   Mr. Keith said, well he would have done a better job of

12   disposing of items and things of that nature.  Until Jeff

13   Blackstone went and got the gun from Marie Collier, Jason

14   Holloway did not have anything to worry about.  He had given

15   a statement to the police.  He lied to Jason Buivids on the

16   12th.  I asked him on cross, "Did you speak to Jeff

17   Blackstone on the 20th?"

18   "Yes."

19   "You didn't tell him about going in the trailer or

20   hurting anybody or seeing anybody like that?"

21   "No, I didn't."

22   He lied on the 20th.  So, until Jeff Blackstone got that

23   gun on the 21st, he didn't have any reason to be hiding

24   things.  Do you remember what Jeff said?  Mr. Blanchard when

25   he started talking about the panties and some kind of, and I

1   am not sure what he was talking about, implying that

2   Mr. Gibbs was coming up with some other motive.  I never did

3   hear what he was talking about.  I think he just wanted to

4   get you thinking about something that is not out there.

5   Because Mr. Gibbs clearly said the motive is written in the

6   statement and what he testified to.  He went over there with

7   the intent to confront Rodney about some comment that was

8   made.  That was the motive.  Why in his mind that was

9   something he needed to do, is something that is only in his

10  mind.  I don't know why it is there.  He did not explain why

11  it was there, but it was.  And, that's what is motive was.

12  But, you remember what Jeff Blackstone said he went to

13  retrieve the gun?  He said, I was in there.  I was talking to

14  Marie Collier.  We went and got the gun.  Came back in, sat

15  down, we had to fill out some paperwork.  The consent form he

16  had to fill out.  What did the defendant do?  "Momma, have

17  you gotten the mail yet?"

18      "No, I haven't."

19      He went into his room, stayed, I believe Jeff said, two

20  or three minutes, a period of time anyway, came back out with

21  both hands in his pocket and walked out.  And when he

22  returned, he did not have any mail with him.  Until Jeff

23  Blackstone found that gun, there was no need for Jason

24  Holloway to dispose of the shell casings that he had from

25  that gun.  But, he did it then.  He took those four casings,

1    I submit to you, and threw them out in this wooded area.  But
2    what else did he take?  You have seen the pictures of where
3    the panties were at.  The exact same spot where the shell
4    casings are.  He threw them too.  Now, Mr. Blanchard said why
5    would anyone go hang panties in the trees?  That isn't what
6    happened.  You can see there are panties on the ground too.
7    When he threw the shell casings, I submit to you, Members of
8    the Jury, he threw the panties also.  That is where they went
9    and that is where they stayed until, I believe, it was 10
10   days later, Jeff was back out there interviewing other
11   witnesses.  He said, "I was sitting in my car, getting ready
12   to leave, I looked up and there was something red that kind
13   of caught my attention, and I walked out there, and there
14   they were."

15        The defendant was disposing of evidence, but not until
16   he knew the police were on to him.  Because he had already
17   lied to them twice by that time of day.

18        The argument that as Rodney Brown -- now, you remember
19   that the defendant said that Rodney had the bat and had it
20   over his head with both hands.  Of course, you can see the
21   trailer.  That obviously didn't occur, because no one could
22   swing a bat.  I am, obviously, a little taller than Mr. Brown
23   was, but that trailer was not high and even Mr. Blanchard
24   asked that question to several of the witnesses.  The ceiling
25   was not that high.  So, this doesn't make sense, but he said

1   he was charging at him.  But charging at him with the bat

2   over his head in this manner.  When I asked the defendant how

3   was it, then, that a man that you are, obviously, facing at

4   the time you shot him in the chest, how is it his head is

5   coming back down the same hallway?  He said, well, he turned

6   just as I shot.  Folks, if you are running like I just was

7   with the bat over your head, coming at somebody, you can't

8   stop on a dime and turn.  That didn't happen.  Coming down

9   the hall with the bat, and getting up here and seeing the guy

10  with the gun and turning, makes perfect sense, going down to

11  his knees, and see how his head can be turned in a manner

12  that the defendant after he shot Angela, who is now over

13  here, could shoot him in the head, and then he would go down.

14  And, Angela, as the defendant said, was sitting on the couch

15  and she saw her husband shot, I submit to you, started up off

16  the couch in a manner similar to this, which would explain

17  the graze wound and then the entry wound into the

18  chest/stomach area and the shot to the top of her head, which

19  put her back on the couch, which makes perfect sense.

20       Now, maybe, in Mr. Blanchard and Mr. Keith's minds a

21  person coming at you with a bat is not telling you that you

22  want them out of your house, maybe it is not to them.  But,

23  it was to Mr. Holloway.  Because, I asked him.  And, he even

24  said on direct examination by Mr. Keith, "Did you know Rodney

25  had a bat?"

1      He said, "Yes.  Rodney told me he had a bat so if anyone

2   came in, he could get them out of his house."

3      As soon as he saw Rodney with the bat, he knew Rodney

4   did not want him in his house.  Because Rodney is

5   approaching, and he gets to this area where Rodney is

6   somewhere near the TV, where does that put the defendant?

7   It's got to put him almost at the door.  He has no choice but

8   to be there.  You remember, Dr. Krolikowski said there was

9   not soot or stippling around the wound.  So, it was not a

10  close range type wound.  Nothing of that nature.  And, Rodney

11  didn't have a shirt on.  So, there wasn't any intervening

12  material like was discussed, or a wall, or anything like

13  that.  So, the defendant had to be almost at the door, if not

14  in the doorway.  And, that, Members of the Jury, means he

15  could have retreated, should have retreated, had a duty to

16  retreat, but he did not.  The defendant, himself, said, "When

17  I saw him with the bat, I knew he did not want me in his

18  house."  And, the judge is going to instruct you that

19  unlawful remaining prong of Alabama's burglary statute is,

20  enter or remain unlawfully.  It is the unlawful remaining

21  prong of Alabama's burglary statute covers cases where a

22  person enters with license or privilege but remains after

23  termination of such license or privilege.  Mr. Blanchard said

24  that a burglary, someone coming into your house at night and

25  steals something and commits a sexual offense, that's a bad

 1  thing.  But it's a  whole lot worse, Members of the Jury, to

 2  do what Jason Holloway did.  He went over there and was

 3  invited in as a friend.  He was invited into a home as a

 4  friend while he had a gun in his pocket.  Now, I'm sorry, I

 5  can't get this to go all the way in.  Whether it was

 6  concealed or not concealed, the only person we have to be

 7  able to tell us that is that guy.  He is the only one we have

 8  to tell.  We already know he lied to the two police officers

 9  on the 12th and the 20th.  We already know he's changing

10  stories from his statement when he testified, because -- you

11  know, he initially said in his statement that the bat was by

12  the TV.  Now, Members of the Jury, that would tend to

13  indicate, huh-oh, maybe Rodney just picked that thing up.  I

14  didn't have much time to react.  But, you remember what Terri

15  said.  The testimony was in by the time he testified and he

16  heard it.  The testimony was in.  Terri said the bat was kept

17  in the bedroom.  It was kept under the bed.  He did not have

18  any choice, but to say, I was wrong in my statement.  So, in

19  his truthful statement, as Mr. Keith kept referring to it, he

20  lied.

21      Then changing the way the shot occurred.  Why is that?

22  Because, if I shoot Rodney, who maybe I can convince 12

23  people is coming at me with a bat and I have a right to

24  defend myself, even though I'm in that man's own home, if I

25  shoot Rodney two times in quick succession, maybe they won't

1   think much about that.  Maybe they'll let me by on that.  But

2   if I have taken the time to use reason in my actions and

3   reactions and in my way of doing things, which he has already

4   told you that he did when he said, "I used my head and

5   returned to my house and got the gun and loaded it."  If I

6   get up there and say I shot Rodney, and then turned to Angela

7   and shot, and then I turned back on Rodney, someone might not

8   believe that I was acting in self-defense considering the

9   fact that I have an incapacitated man on his knees at the

10  time I fired the second shot.  If I do it quickly, maybe

11  that'll be okay.  But, if I have taken the time and I have

12  already moved to another target and then return to the first

13  target someone might not believe it.  Could be.  Because it

14  doesn't fit in self-defense at all.

15      Mr. Keith said, you know, the State wants you to believe

16  -- I think I wrote this down -- the State wants you to

17  believe almost everything in the statement.  Well, it is a

18  confession to an intentional murder of two or more people.

19  We want you to believe that, no doubt about that.  It is

20  definitely a confession of the intentional murder of two or

21  more people.  It is also a confession to the intentional

22  murder of Rodney during the course of a burglary.  And, the

23  intentional murder of Angela during the course of a burglary.

24  No doubt we want you to believe that, too.  Because

25  everything he said in that statement, Mr. Gibbs went through

1    and you are going to hear what the law is from the judge.  I

2    submit to you there is no self-defense on his part

3    whatsoever.

4         One of the comments that was made was -- I am sorry, I

5    can't find it right now.  One of the things that the Defense

6    has been talking about in this is for you to believe that

7    because Rodney had the bat, Jason Holloway had the

8    opportunity to claim self-defense in this case.  All right.

9    I think -- I don't see -- I think I recall the way the

10   attorney phrased it.  I don't remember if it was Mr. Keith or

11   Mr. Blanchard.  With regard to the fact that Rodney making

12   some kind of threat with the baseball bat would reduce it to

13   manslaughter.  The judge is going to tell you about that,

14   too.  Or some kind of claim of self-defense, either one.  A

15   threat, in and of itself, even if there exists the

16   presentability to carry out the threat, is not sufficient to

17   support a claim of self-defense.  You know, this didn't

18   occur, I submit to you, it had to be by his side.  Even if,

19   even if the defendant took that as some kind of threat, as

20   Mr. Blanchard said, a reasonable inference, which I submit to

21   you is not reasonable at all, even if the defendant took the

22   fact that Rodney Brown was holding a bat and that he intended

23   to thrash Mr. Holloway to the edge of his life inside his

24   trailer.  A threat, in and of itself, even with the

25   presentability to carry it out is still not sufficient for

1    the claim of self-defense.  That wouldn't get it either.

2        So, the statement is a confession to intentional murder

3    of two or more, confession to an intentional murder of Rodney

4    during a burglary and the intentional murder of Angela during

5    a burglary, and no self-defense.  What part of the statement

6    would we not want to believe?  Only when his testimony starts

7    changing to try to make it better for himself, does it become

8    unbelievable.

9        The judge is going to tell you, you know I asked about

10   about a theft conviction that he had, and I asked him about

11   that simply because if you have got that kind of conviction,

12   the judge is going to tell you, that goes to his credibility.

13   You can make a determination if someone has been convicted of

14   a crime of dishonesty whether or not they could be honest to

15   you again.  Of course, the defendant told you, not in

16   response to anybody's question, because I would ask him

17   questions a lot of times and he would just go on and on and

18   on.  They described my cross examination as brutal.  Brutal

19   cross examination was the word they used.  Members of the

20   Jury, what he did to Rodney and Angela was brutal.  I didn't

21   get brutal.  He got brutal.  But not in response to any

22   questions, just while he's talking, he said, you know, I

23   would say anything to save my life.  That is probably the

24   most truthful statement Jason Holloway has made in the course

25   of this entire case from January 12th of 2000 to today.  I

1   would say anything to save my life. And I'll change facts.

2   I'll move things around. I'll try to do something different.

3   If I can get 12 people to think something other than what I

4   actually did. The judge is going to tell you when he talked

5   about manslaughter -- oh, let me mention this too.

6       Mr. Blanchard got up and started talking about Mr. Gibbs

7   said -- he kept using the word justification and excuse and

8   lesser and that type of thing, implying Mr. Gibbs was doing

9   something improper by that. Self-defense is a justification

10  under the law. That is just what it's called. Justification

11  under the law. You will hear the word justifiable several

12  times. Lesser-included offense. The judge is going to tell

13  you about lesser-included offenses in a capital murder

14  charge. Excuse. Those are the words that come from the law.

15  Mr. Gibbs wasn't doing anything inappropriate about that.

16  But, in those lesser-included offenses, when the judge talks

17  about manslaughter as requiring the act under the heat of

18  passion caused by a provocation recognized by the law. One

19  of the things he's going to say is mere abusive or insulting

20  words or gestures are insufficient to rise to the level of a

21  provocation recognized by the law. Just the fact that words

22  are used doesn't mean that's heat of passion, that's

23  provocation. Just abusive or insulting gesture, holding that

24  bat, is not legal provocation recognized by the law. That is

25  the kind of thing that is being talked about in this case.

1    Dr. Krolikowski in the discussion that mentioned, one of the

2    attorneys, maybe both of them, I am not sure, mentioned about

3    alcohol in Angela's system and marijuana in Rodney's  urine.

4    Dr. Krolikowski said, well, the alcohol could have been

5    caused by decomposition of the body.  The fact that the

6    person is now dead.  It's just the way the body reacts when

7    decomposing the body could produce some alcohol.  Or it might

8    have been a drink in some manner.  Remember Angela was in her

9    own home, so what difference does that make?  Certainly not

10   legally intoxicated.  That level is .08.  She was .02 at the

11   most.  Not legally intoxicated even to drive an automobile,

12   much less to be sitting in her own home.  As far as the

13   marijuana, only thing Dr. Krolikowski would say about the

14   marijuana was that at some time prior to his death, Rodney

15   Brown had used marijuana.  Well, we know from the defendant's

16   own testimony, as they are out there playing basketball, he

17   said I was drinking, Rodney was drinking, I was using

18   marijuana, Rodney was using marijuana.  So, some three to

19   seven days prior to the event, according to the defendant,

20   Rodney was using marijuana.  Doesn't have anything to do with

21   whether he was on marijuana that morning or not.  But, that

22   also goes to fact of why did this comment, that the defendant

23   said, all of this was about -- why didn't he just confront

24   Rodney Brown on the basketball court?  He said, I was drunk

25   and I was high on marijuana, but he did not have a gun,

1  either.  But, you know, in opening statements Mr. Keith said
2  that Rodney and Jason had been friends for a long period of
3  time, but there had been a deterioration in their
4  relationship.  Members of the Jury, did you hear about a
5  deterioration in any relationship?  The defendant said,
6  basically, for a long period of time I was over there about
7  every other day.  Jerome Cofield said every time I was over
8  there, I saw Jason sitting around with Rodney and Quinton
9  Oliver under the tree out there.  This comment being made was
10 a deterioration of a relationship; is that what he's talking
11 about?  And, going to the defendant's state of mind, you
12 know, Mr. Keith said, well, gee, that meant a threat to Jason
13 Holloway.  In Jason Holloway's mind with regard to Felicia.
14 Well, he took that so hard the first thing did he was not
15 call Felicia.  He never called Felicia.  He never told
16 Felicia about it.  If he wanted to protect women like he
17 described to you, I feel like self-protecting women any time
18 there's some kind of threat made.  Isn't the first thing he
19 would have done would have been to call Felicia and say, hey,
20 you need to watch out for Rodney.  Rodney might be up to
21 something.  He never did it.  He never took any action along
22 that line.

23     And introduction of the evidence from Sandra Patterson
24 about a reported rape being made by Rodney that occurred in
25 February of 1998.  Jason said, we were still good friends all

1   the way through.  All the way up to the time, up to the time

2   of this event.  Never worried or concerned me before.  Never

3   got him scared of Rodney.  I kept asking him, because every

4   time I'd asked him, he'd give me a different answer.  Well,

5   were you scared of Rodney?  Yes, I was.  Well, when you went

6   and got the gun to go back into the trailer, were you scared

7   of Rodney?  No, I wasn't scared of him.  Were you scared of

8   him when you put the bullets in?  Were you mad?  No, I wasn't

9   scared.  I wasn't mad.  You know, I submit to you that stuff

10  from Sandra Patterson was just an attempt to besmirch the

11  character of Rodney Brown.  It didn't have anything to do

12  with his state of mind.  He didn't care.

13       He was so concerned about Felicia he didn't want her.

14  He told you he could care less about her.  And, that morning

15  when he goes over to the trailer the first time, I submit to

16  you he was looking around to find out if he was there.  Find

17  out what's going on, making sure the kids are gone, and then

18  as the initial aggressor in this, I think Mr. Keith, maybe

19  Mr. Blanchard, one of them mentioned something about there

20  had to be some kind of threat, and the threat was from Rodney

21  first.  He was taking action because he told you in his

22  statement, and then he told you on the witness stand, his

23  purpose for going to that trailer that morning was to

24  confront Rodney Brown.  That is the word Jason Holloway used

25  not the words that the attorneys used to talk about this.  To

1  go in calmly to discuss this matter, to figure out what is

2  going on.  He went over to confront him.  And, that is

3  proven, I submit to you, by the fact that when he went over

4  there, he didn't say, hey, Rodney, hey, man, come here.  Step

5  outside with me.  I see Angela is in there.  I need to ask

6  you something about what you said about this girl.  He didn't

7  do that.  He went into the trailer where Angela was sitting

8  so that Angela could hear it too.  And, he said, I walked

9  over here, somewhere in front of the window over here, and

10  that is where I was talking to Rodney, who was back over here

11  in this area.  Angela is in between them.  He wanted to make

12  sure Angela knew what Rodney had said.  And, Mr. Gibbs didn't

13  say, as Mr. Blanchard indicated, I know what happened, Rodney

14  said, "Wait here.  I've got something for you."  I think the

15  words he used were, "Wait a minute.  I've got something for

16  you."

17      Now, the defendant said that was in a calm manner.  Now,

18  the prior words that he said with regard to what Rodney was

19  talking about -- because he said there were only three things

20  said in that trial that whole morning.  Mr. Keith asked him

21  and I asked him.  Only three things were said.  "Hey, Rodney,

22  why did you say you can fuck my girlfriend better than I

23  can?"

24      Rodney said, "Hey, man, why are you bringing this

25  shit here in front of my wife?"  Rodney says, "Wait a minute.

1    I've got something for you."

2        Those are the only three things that are said at that

3    trailer that whole morning according to the defendant.  Of

4    course, he's the only one we've got to know.

5        Having said that first phrase that Rodney said.  Does it

6    make any sense to you that Rodney in a calm manner said,

7    "Wait a minute.  I've got something for you," and turned to

8    go down the hall?

9        Fortunately the reason we bring in good citizens of

10   this county is that we get to rely on your everyday life

11   experiences.  And one of the questions the judge asked was is

12   everyone over the age of nineteen.  Because we want people

13   who have had life experiences.  We want you to use your

14   common sense.  Does that make sense that Rodney is angry

15   enough to make that first comment and then calmly turns and

16   leaves the room to go down the hall?  I submit to you it

17   doesn't.  On top of that why did the defendant leave this

18   area here?  If he and Angela were in the room, why didn't he

19   just talk to her?  Because, remember, he said only three

20   things were said in the trailer the whole time.  No

21   conversation between he and Angela at all at this point.

22   What did he do?  He moved to the area over here, he says, in

23   front of television set where he could see down the hallway.

24   That also blocked the door, Ladies and Gentlemen, for Angela

25   getting out and Rodney getting out.  Placing himself to make

1    sure that his intent with his gun, whether it is in his

2    pocket or out of his pocket, wherever it may be, he's making

3    sure Rodney and Angela aren't leaving until I am finished.

4    And, he finished by shooting them and then he left.  Angela

5    is gasping for air.  And he comes back.

6        Now, Mr. Blanchard says, you know, he's guilty of

7    intentional murder because, you know, Jason said he was just

8    going back to do this duty to end her suffering.  He didn't

9    have any further intent whatsoever.  That doesn't make sense,

10   Members of the Jury, he came back with a different weapon.

11   He had put up the pistol that he had gone with.  He put that

12   up.  And, he returned with a knife.  He returned with a

13   different weapon.  What is going on in his head?  The later

14   in the morning this gets, the more likely someone is out

15   there to hear gunshots going off, I'll take my knife.  And,

16   then he gets over there and the bat's there and he takes it

17   and he uses it on her.  You saw the photographs.  But, there

18   is something I want to point out to you on one of them.

19       Charles, hit the light for me for just a moment, please?

20       She's got her hand up there, Members of the Jury.  She

21   knew the ball bat was coming.  Is that some kind of struggle?

22   Mr. Blanchard wants to make a big thing about struggle.  No

23   struggling.  No evidence of struggle or that kind of thing.

24   An almost incapacitated woman seeing a ball bat coming at her

25   head struggled as best she could to keep it away from her.

1    Thank you, Charles.

2    But that was not good enough.  Now I am going to

3    smother her.  Now I am going to stab her.  No permission to

4    come in on that occasion whatsoever.  Intent to do more harm

5    to Angela Brown.  Intentional murder during a burglary.

6    Ain't no doubt about that.  That's direct proof from the

7    defendant.

8    Direct proof with regard to Rodney from the defendant,

9    remember Mr. Blanchard wanted to talk about

10   circumstantial evidence/direct evidence, that kind of thing.

11   Direct evidence from this defendant, himself, in his

12   statement and in his testimony, when Rodney had that bat, I

13   knew I was not welcome there, that is direct evidence of a

14   revocation of the license, and that is a burglary.

15   Because he went in with intent to do harm.  Rodney and

16   Angela didn't know that.  They took him in as their friend.

17   The guy that lives across the street.  The guy that hangs out

18   with me all the time.  The guy I drink with.  The guy I smoke

19   marijuana with.  They took him in as a friend and this is the

20   way, Members of the Jury, that Jason Holloway repaid that

21   friendship.  Letting this comment bother him and make him mad

22   and get him ready to do just like he told Marie Collier.  "I

23   killed them both and Rodney had it coming to him for a long

24   time.  If you are going to go a mile, you might as well run a

25   mile," and that is what he did.  That is three counts of

```
 1   capital murder.  That is brutal.  That is what Jason Holloway
 2   did in this case.  Thank you.
```

### JURY CHARGE

```
 4           THE COURT:  Ladies and Gentlemen, at this point in
 5   the trial it is my responsibility to explain to you the law
 6   which applies to this case.  This is he commonly referred to
 7   as the Court's charge to the jury.  This charge maybe
 8   somewhat long and tedious, but it is terribly important that
 9   you follow me throughout every stage of it.
10       I have watched you through the course of the week and
11   last week, and you have paid nothing but close attention to
12   every detail of the trial, and I know that during this charge
13   on the law, you will give it this same attention.
14           Initially let me reiterate one of the things that I told
15   you at the beginning of this trial.  You must put out of your
16   mind any preconceived notion of what you think the law is or
17   what you think the law ought to be, and you must follow the
18   law as I charge you.
19       When I began in law school, we were under a different
20   criminal code.  It was commonly referred to as the old code.
21   Under the old code there was a complete different body of
22   criminal law.  There were terms such as:  First degree
23   murder, second degree murder, first degree manslaughter,
24   second degree manslaughter, premeditation, with malice
25   aforethought, and all of these terms.  Ladies and Gentlemen,
```

1    they do not apply.  They do not exit.  What I'm about to go

2    over with you is a charge on the law that applies to this

3    case.

4              MR. BLANCHARD:  Your Honor, may counsel approach?

5              THE COURT:  Yes.

6    (WHEREUPON, A SIDE BAR COMMENCES.)

7              MR. BLANCHARD:  Two things, Judge.  We have been

8    sitting about an hour and a half to two hours.  This is

9    likely to be lengthy, I would like for them to have a little

10   break before you do it.  And also -- oh, I see Kenny attended

11   to my other problem which was the picture on the projector.

12   Could we have just a short break now by doing it during lunch

13   or anything like that, but I do think we ought to give them a

14   little break.

15             THE COURT:  Well, I'm going to give it to the jury.

16   We have been here all day and it just goes on and on.  I am

17   going do leave it with them.  If they want to go back and

18   take a bathroom break, that's ....

19             MR. BLANCHARD:  Sure.

20   (WHEREUPON, A SIDE BAR CONCLUDES.)

21             THE COURT:  Ladies and Gentlemen, I'm going to do

22   this at this time.  If any of you want to take a bathroom

23   break, I'll send you back to the jury room for as long as it

24   takes to do that.  Okay.  I do not expect this charge to be

25   anything as long or similar to as long as what the attorneys

1    have gone through in their closing arguments, I'll tell you

2    that. It will take me a little while to go through the

3    charge, but it will not be anything like that. If you wish,

4    and I am simply asking all of you, if you want to go to the

5    jury room and take a break to go the bathroom, to relax or

6    whatever, you can do that. As soon as you're ready I'll call

7    you back in and we'll go forward with the charge. Any

8    feelings? You want to? All right. If you would, step back

9    to the jury room. I'll call you back in. If you would, as

10   soon as you are ready, knock on the door and let Ms. Peggy

11   know.

12   (JURY OUT)

13   (WHEREUPON, THERE WAS A BRIEF RECESS.)

14   (JURY PRESENT)

15          THE COURT: As I just stated to you, there are

16   certain old terms or certain terms used in our previous

17   criminal code that have worked their way through our society

18   in which we live, and some of them have become to be sort of

19   things that we throw around, really just throw around, legal

20   terms, and that is the reason that I am telling you that none

21   of those old terms, none of the terms that apply to the old

22   criminal code have any legal importance at this time. So,

23   what you must do is to put out of your mind any proconceived

24   notion that you have held as to what the law is or ought to

25   be, and you've got to follow the law that I now charge you.

1    You are the sole judges of the facts of this case.  And,

2    I will be going over that many different ways and times

3    during the course of this charge to you.

4    Many items of evidence have been admitted.  Much

5    testimony has been given.  You will be able to carry with you

6    all of the legal evidence that has been admitted by way of

7    exhibits and other items back to the jury room with you for

8    your consideration during your deliberation.

9    I have two responsibilities in connection with this

10    case.  The first responsibility is to see that the case is

11    fairly and impartially tried and that the procedural rules

12    are followed.

13    The second responsibility I have is to charge you, or to

14    instruct you, on the law which applies to this case.

15    As I have just said, you must put out of your mind

16    any preconceived notion of what you think the law is or ought

17    to be and apply the law that I charge you.

18    I am going to break this charge down into approximately

19    three different sections.

20    First, I'm going to charge you on general matters that

21    would apply legally to any criminal case.

22    Next I'll charge you on the specific law which applies

23    to this case.

24    Finally, I'll give you instructions on how you are to

25    Weigh and consider the evidence.

1    I'm not going to hurry through this charge and

2   I'm going to go through it in, as I said, methodical way,

3   where, hopefully, at the conclusion you will understand the

4   legal principles which apply.  And it is absolutely

5   imperative that you do understand the legal principles that

6   apply.

7    There may be different things that I repeat.  For

8   example, different elements of certain crimes.  Other parts

9   of this charge may also be repetitious.  If it is, it is for

10  a reason and you must bear with me as I go through the

11  charge.

12    Now, I'm going to charge you on all of the law that I

13  think might apply.  There are some parts of this charge that

14  may not apply directly to the evidence before you.  That is

15  for your consideration and determination.  I'm giving you a

16  broad body of the law which covers many possibilities.  It

17  will be for you to take the law and to apply it to the

18  evidence in this particular case.

19    Let me hasten to add that much of my charge is going to

20  be based on the exact wording of different laws, or statutes,

21  which apply to this case.  Some of the language in my opinion

22  is difficult to follow.  But, in a serious case of this

23  magnitude, I am under a legal obligation to follow the law in

24  my charge to you as closely as possible.  While the language

25  may be difficult, you must follow it as I go through the

1  charge with you.

2      First, I'm going to begin by reading the

3  indictment in this case. And, Ladies and Gentlemen, this is

4  going to be a starting point for the rest of my charge.

5      This case is brought by way of Grand Jury indictment

6  in a three-count indictment.

7      The first count alleges murder of two or more

8  persons in one single act or scheme or course of conduct.

9      The Grand Jury of said county charges that before the

10 finding of this indictment, Jason Holloway, by one act or

11 pursuant to one scheme or course of conduct did intentionally

12 cause the death of Rodney Brown by shooting him with a

13 pistol, a further description of which is otherwise unknown

14 to the Grand Jury, and did intentionally cause the death of

15 Angela Brown by shooting, stabbing, or striking her with a

16 deadly weapon or dangerous instrument; to wit:  A pistol, a

17 knife, or knife-like object, or bat, or stick-like object,

18 further descriptions of which are otherwise unknown to the

19 Grand Jury in violation of section 13A-5-40(a)(10) of the

20 Code of Alabama against the peace and dignity of the State of

21 Alabama.  That is count one.  That alleges the murder of two

22 or more persons pursuant to one course of conduct.

23      Count two, the Grand Jury of said county further

24 charges that before the finding of this indictment, Jason

25 Holloway, did intentionally cause the death of Rodney Brown

1   by shooting him with a pistol, a further description of which

2   is otherwise unknown to the Grand Jury, and Jason Holloway

3   caused said death during the time that Jason Holloway

4   knowingly and unlawfully entered or remained, or attempted to

5   enter or remain unlawfully in the dwelling of Rodney or

6   Angela Brown with the intent to commit a crime therein, and

7   while effecting entry or while in the dwelling or in

8   immediate flight therefrom, Jason Holloway did cause physical

9   injury to Rodney Brown, who was not a participant, by

10  shooting him with, to wit:  A pistol, a further description

11  of which is otherwise unknown to the Grand Jury in violation

12  of 13A-5-40(a)(4) of the Code of Alabama against the peace

13  and dignity of the State of Alabama.  Count two alleges

14  capital murder in the form of an allegation of murder of

15  Rodney Brown during burglary first degree.

16      Count three, the Grand Jury of said county further

17  charges that before the finding of this indictment, Jason

18  Holloway, did intentionally cause the death of Angela Brown,

19  by shooting, stabbing, or striking her with a deadly weapon

20  or dangerous instrument, to wit: A pistol, a knife, or

21  knife-like object, or a bat, or stick-like object, further

22  descriptions of which are unknown to the Grand Jury, and

23  Jason Holloway caused said death during the time that Jason

24  Holloway knowingly and unlawfully entered, or remained, or

25  attempted to enter or remain unlawfully in a dwelling of

1    Rodney or Angela Brown with the intent to commit a crime

2    therein and while effecting entry or while in said dwelling

3    or in immediate flight therefrom, Jason Holloway did cause

4    physical injury to Angela Brown, who was not a participant,

5    by shooting, stabbing, or striking her with, to wit:  A

6    pistol, a knife, or a knife-like object, or a bat, or a

7    stick-like object, further descriptions of which are

8    otherwise unknown to the Grand Jury in violation of

9    13A-5-40(a)(4) of the Code of Alabama against the peace and

10   dignity of the State of Alabama.  Signed, Rea S. Clark,

11   District Attorney, Fifth Judicial Circuit.

12        The indictment in this case is not evidence and the fact

13   that the defendant has been indicted is not to be considered

14   by you as a circumstance against him.  But, the indictment is

15   merely the method of placing the defendant on trial.  It

16   provides no proof, no presumption, and no inference that the

17   defendant is guilty of the offenses charged therein.

18        I think it may be best at this point for you to get

19   into your mind a concept that basically counts one, two, and

20   three, which you are considering, are three separate cases.

21   The charges, as they stand, in counts one, two, and three,

22   are capital murder charges.  But, each has three distinct

23   basis for the charges.  They are separate.  They have

24   different elements.

25        During the course of this charge, I will be going

1    through the elements of each one and how they are different.

2    I will also be charging you on other offenses.  Sometimes

3    these are referred to as lesser-included offenses.  All of

4    these charges ultimately will be for your consideration in

5    applying the law to the evidence in this case.  And, as I

6    have said, that is your function.  You are the judges of the

7    facts.  You are to determine what the true facts are and what

8    the evidence has proven in light of the law charged.

9         Toward the end of the charge, I'm actually going to

10   have some forms placed on the projector, and I will have

11   before you a breakdown of these three separate counts which I

12   have just asked you to consider in your mind as three

13   separate cases.

14        Now, as to general principles of law.  In determining

15   what the true facts are in this case, you are limited to the

16   evidence that has been presented from the witness stand and

17   to the exhibits that have been admitted into evidence from

18   the witness stand, as opposed to matters that have been

19   stated by the attorneys during the course of the trial.

20        What the attorneys have said, both for the State and

21   Defense is not evidence in this case, and what they have

22   argued to you at varoius points in the trial is not evidence.

23   They have a right, duty, and obligation at the appropriate

24   time in the trial to make objections and to comment on the

25   evidence and to draw reasonable inferences and ask you to

1    draw reasonable inferences from the evidence as they argue

2    their respective positions to you.  What they say is not

3    evidence and you should put what they say in the proper

4    category in your thinking, and it should not be in the

5    evidence category just as the indictment in the case should

6    not be in the evidence category.

7        When a judge and a jury sit together as a court of

8    law it is the duty of the judge to see that the trial

9    progresses in an orderly fashion, to rule upon legal matters

10   presented, to define the legal issues involved, and to

11   instruct the jury as to the law applicable to the particular

12   case.  It will be your duty as jurors to follow the law as I

13   charge you.  You, therefore, render a verdict, or verdicts,

14   in accordance with the facts as you determine them to be from

15   the evidence and the law as I charge you.

16       A judge is not permitted by law to express any opinion

17   or comment on the affect of evidence or testimony presented

18   to you or the credibility of any witness in the case.

19   Therefore, any ruling, statement, or expression which may

20   have been made by me during the course of the trial is not to

21   be considered by you as any effort on my part to convey to

22   you any opinion or feeling that I have about the facts of

23   this case or the credibility of any witness.

24       Also, do not concern yourself with any ruling on

25   objections or motions that I have made during the course of

1    defendant's guilty beyond a reasonable doubt.  Even if the

2    State demonstrates a probability of guilt, it does not

3    establish it beyond a reasonable doubt, and in that case you

4    must acquit the defendant.

5        The phrase reasonable doubt is self-explanatory.

6    Efforts to define it do not always clarify the term.  It is

7    not a mere possible doubt, because everything relating to

8    human affairs is open to some possible or imaginary doubt.  A

9    reasonable doubt is a doubt of a fair-minded juror honestly

10   seeking the truth after careful and impartial consideration

11   of all the evidence in the case.  It is a doubt based upon

12   reason and common sense.  It does not mean a vague or

13   arbitrary notion, but it is an actual doubt based upon the

14   evidence, a lack of evidence, a conflict in evidence, or any

15   combination thereof.  It is a doubt that remains after going

16   over the entire case in your mind and giving consideration to

17   all testimony.  It is distinguished from a doubt arising from

18   mere possiblity, from bare imagination, or from fanciful

19   conjecture.

20       If, after considering all the evidence, you are

21   convinced of the defendant's guilt beyond a reasonable doubt,

22   then it would be your duty to convict the defendant.

23   However, if you still have a reasonable doubt, the defendant

24   is entitled to the benefit of that doubt, and the defendant

25   should be acquitted.

1   this trial.  I rule strictly according to the law and the

2   rules that apply to this case.

3       In arriving at a verdict in this case, you must not

4   permit sympathy, prejudice, bias, or any other emotion to

5   influence you one way or the other.  Do not apply any factors

6   other than the evidence presented at trial and the law as I

7   charge you.

8       Ultimately whatever verdict you reach must be unanimous.

9   That is, the verdict must be the verdict of each and every

10  one of the 12 jurors.

11      In coming before you, a jury of his peers upon a plea of

12  not guilty, the defendant is presumed innocent of the charges

13  against him.  This presumption remains with him throughout

14  every stage of the trial and during your deliberations on the

15  verdict and is not overcome unless from all the evidence in

16  the case you are convinced beyond a reasonable doubt that the

17  defendant is guilty.

18      The State has the burden of proving the guilt of

19  the defendant beyond a reasonable doubt, and this burden

20  remains on the State throughout the case.  The defendant is

21  not required to prove his innocence.

22      Reasonable doubt.  As I have already told you the burden

23  of proof is on the State to prove the defendant guilty as

24  charged.  Before a conviction can be had in this case, the

25  State must satisfy each and every member of the jury of the

1    Circumstantial evidence.  The guilt of a defendant may

2   be proved by circumstantial evidence as well as by direct

3   evidence.   The test of the sufficiency of circumstantial

4   evidence is with whether the circumstances as proved produce

5   to a moral certainty to the exclusion of all other reasonable

6   doubt of the guilt of the accused and whether the

7   circumstances are incapable of explanation upon any

8   reasonable hypothesis consistent with the innocence of the

9   defendant.   There should not be a conviction upon

10  circumstantial evidence unless it excludes to a moral

11  certainty every other reasonable hypothesis than that of the

12  guilt of the defendant.  If the circumstances no matter how

13  strong can be reconciled with the theory that the defendant

14  is innocent, then the guilt of the defendant is not shown by

15  that full measure of proof required by the law.

16    Now, you have heard the terms direct evidence and

17  circumstantial evidence used.  Direct evidence is simply

18  evidence like the testimony of an eyewitness, which, if you

19  believe it, proves directly a fact.  If a witness testified

20  that he saw it raining outside, and you believed him, then

21  that would be direct evidence that it was raining.

22  Circumstantial evidence is simply a chain of circumstances

23  that indirectly proves a fact.  If someone walked into the

24  courtroom wearing a raincoat covered with drops of water and

25  carrying a wet umbrella, that would be circumstantial

1    evidence from which you could conclude it was raining.

2    Legally there's no difference between circumstantial and

3    direct evidence.  The law does not say one is necessarily

4    better evidence than the other.  You should consider all the

5    evidence, both direct and circumstantial, and give it

6    whatever weight you believe it deserves.

7        A finding of guilt as to any crime may not be based on

8    Circumstantial evidence unless the proved circumstances are

9    not only, one, consistent with the theory that the defendant

10   is guilty of the crime; but, two, cannot be reconciled with

11   any other rational conclusion.  Also, if the circumstantial

12   evidence permits two reasonable interpretations, one of which

13   points to the defendant's guilt and the other to his

14   innocence; then, you must adopt that interpretation that

15   points to the defendant's innocence and reject that

16   interpretation that points to his guilt.

17       If, on the other hand, one interpretation of this

18   evidence appears to you to be reasonable and the other

19   interpretation to be unreasonable, then you must accept the

20   reasonable interpretation and reject the unreasonable.

21       Ladies and Gentlemen, that concludes some general

22   principles of law that applies to any criminal case.  Now, I

23   will go over with you specific law pertaining to this case.

24   And, I'm going to begin with count one.

25       The defendant is charged with capital murder.  The law

1   states that the intentional murder of two or more persons is

2   capital murder.  A person commits an intentional murder of

3   two or more persons, if he causes the death of two or more

4   persons and in performing the act that causes the death of

5   those persons, he intends to kill each of those people.

6       To convict the State must prove beyond a reasonable

7   doubt each of the following elements of an intentional murder

8   of two or more persons.

9       One, that Rodney Brown is dead.

10      Two, that Angela Brown is dead.

11      Three, that the defendant Jason Holloway caused the

12  deaths of Rodney Brown and Angela Brown by shooting Rodney

13  Brown with a pistol or gun and by shooting Angela Brown with

14  a pistol or gun and/or by stabbing her with a knife, or

15  knife-like object, and/or beating her with a bat or

16  stick-like object.

17      Four, that in committing the act which caused the deaths

18  of both Rodney and Angela Brown, the defendant intended to

19  kill the deceased persons.

20      A person acts intentionally when it is his purpose to

21  cause the death of another person.  The intent to kill must

22  be real and specific.

23      If you find from the evidence that the State has proved

24  beyond a reasonable doubt each of the above elements of the

25  offense of intentionally murder of two or more persons as

*** Frances L. Roark ***

1    charged then you shall find the defendant guilty of capital

2    murder.

3        If you find that the State has failed to prove beyond

4    a reasonable doubt any one or more of elements of the offense

5    of intentional murder of two or more persons, then you cannot

6    find the defendant guilty of capital murder.

7        Ladies and Gentlemen, I'm going straight through this

8    charge as I said with the counts as they are found in the

9    indictment.  And then I'm going to explain to you what, if

10   any, lesser-included offenses may apply to each of the three

11   counts of the indictment.

12       In further connection with the charge that I have just

13   given you on the law as it pertains to the murder of two or

14   more persons by a single act, I charge you that a knife when

15   used to cut or stab a person is a deadly weapon.

16       Because the element of intent being a state of mind or

17   mental purpose is usually incapable of direct proof, it may

18   be inferred from the character of the assault, the use of a

19   deadly weapon, and other attendant circumstances.

20       Now count one covers the murder of two or more persons

21   by one act or one scheme of conduct.

22       Count two, murder during burglary in the first degree.

23   This will cover the next two counts in the indictment.  Count

24   two pertains to Rodney Brown.  Count three pertains to Angela

25   Brown.  The language and the elements of each offense will be

1   identical, other than the names of the two defendants [sic.]

2   being different in each count and the manner of death being

3   slightly different in each.

4        The defendant is charged with capital murder.  The law

5   states that an intentional murder committed during a burglary

6   in the first degree is a capital murder.  A person commits an

7   intentional murder if he causes the death of another person

8   and in performing the act, or acts, which caused the death of

9   that person, he intends to kill that person.

10       A person commits a burglary in the first degree if he

11  knowingly and unlawfully enters or remains unlawfully in a

12  dwelling, and he does so with the intent to commit a crime

13  therein, and while effecting entry or while in the dwelling

14  or in the immediate flight therefrom, he causes physical

15  injury to a person who is not a participant in the burglary.

16       To convict the State must prove beyond a reasonable

17  doubt each of the following elements of an intentional murder

18  during a burglary in the first degree.

19       One, as to count two, the State must prove Rodney Brown

20  is dead.

21       As to count three, they must prove that Angela Brown is

22  dead.

23       Two, that the defendant, Jason Holloway, caused the

24  death of Rodney or Angela Brown as follows:  That the

25  defendant, Jason Holloway, caused the death of Rodney Brown

1  and Angela Brown by shooting Rodney Brown with a pistol or

2  gun and by shooting Angela Brown with a  pistol or gun and/or

3  by stabbing her with a knife or knife-like object and/or by

4  beating her with a bat or stick-like object.

5      Three, that in committing the acts which caused the

6  deaths of either Rodney or Angela Brown, the defendant

7  intended to kill those deceased persons.

8      A person acts intentionally when it is his purpose to

9  cause the death of another person.  The intent to kill must

10  be real and specific.

11      Four, that the defendant knowingly and unlawfully

12  entered or remained unlawfully in the dwelling of Rodney and

13  Angela Brown.

14      Five, that in doing so the defendant acted with the

15  intent to commit a crime; namely, assault and/or harassment

16  and/or menacing.

17      Six, that while in the dwelling or in effecting entry

18  thereto or in the immediate flight therefrom, the defendant

19  caused physical injury to a person who was not a participant

20  in the burglary.

21      Last, seven, that the murder took place during the

22  burglary.

23      A person acts intentionally with respect to a

24  result or to conduct when his purpose is to cause that result

25  or engage in that conduct.

1        A dwelling is a building which is used or normally used

2   by a person for sleeping, living, or lodging therein.

3        A person acts knowingly if he is aware of the fact that

4   he has no license or privilege to enter or remain in a

5   dwelling.

6        A person enters or remains unlawfully in or upon the

7   premises when he is not licensed, invited, or privileged to

8   do so.

9        There's two parts of the Alabama burglary first degree

10  statute.   The first part covers a situation where someone

11  enters, in this case a dwelling, unlawfully.   The entry

12  itself is unlawful.

13       A second situation is where a person remains unlawfully.

14  He or she may have been given access to a given premises or

15  dwelling.   That would be permissive.   However, because of

16  facts and circumstances in evidence, they, the person,

17  intruding no longer has a right to remain in that particular

18  dwelling.

19       A deadly weapon is a firearm or anything manifestly

20  designed, made, or adapted for the purpose of inflicting

21  death or serious physical injury.

22       During means in the course of the commission of, or in

23  the connection with, or immediate flight from the commission

24  of the burglary.

25       If you find from the evidence that the State has proved

1    killed, then you may drawn an inference that Jason Holloway's

2    permission to be present in the residence had been terminated

3    during the struggle, but you are not required by law to draw

4    such an inference.

5        Now, I have just charged you on the capital offenses

6    contained in counts one, two, three of the indictment.  By

7    law I am charging you on potential lesser-included offenses.

8    It will be up to you to take all of the body of law that I

9    have charged you and to take the evidence and the facts that

10   have been shown to you and to apply the correct law to the

11   evidence in reaching your verdict.

12       A lesser-included offense in this case could be murder.

13   I am simply referring to it as murder.  A person commits the

14   crime of murder if he causes the death of another person and

15   in performing the act or acts which caused the death of that

16   person, he intends to kill that person.  To convict the State

17   must prove beyond a reasonable doubt each of the following

18   elements of murder.

19       One, that Rodney Brown or Angela Brown is dead.

20       Two, that the defendant, Jason Holloway, caused the

21   death of Rodney Brown or Angela Brown by shooting Rodney

22   Brown with a pistol and by shooting Angela Brown with a

23   pistol and/or stabbing her with a knife or knife-like object

24   and/or beating her with a bat or stick-like object.

25       Three, that in committing the acts which caused the

1  beyond a reasonable doubt each of the above elements of the

2  offense of intentional murder during a burglary in the first

3  degree as charged, then you should find the defendant guilty

4  of capital murder.

5      If you find the State has failed to prove beyond a

6  reasonable doubt any one or more of the elements of the

7  offense of intentional murder during a burglary first degree,

8  then you cannot find the defendant guilty of capital murder.

9      Now, Ladies and Gentlemen, let me go ahead with some

10 other things as pertains to the burglary charge before I go

11 into potential lesser-included offenses.

12     The unlawful remaining portion of Alabama's burglary

13 statute covers cases where a person enters with license or

14 privilege, but remains after termination of such license or

15 privilege.

16     Evidence that a murder or murders may have occurred

17 inside a dwelling standing alone is insufficient to establish

18 beyond a reasonable doubt that the deaths occurred during a

19 burglary.  There must also be evidence establishing beyond a

20 reasonable doubt that the defendant entered or remained

21 unlawfully in the dwelling prior to or during the killings.

22     If you find from the evidence, beyond a reasonable

23 doubt, that a struggle occurred between Jason Holloway and

24 Rodney or Angela Brown after Jason Holloway entered the Brown

25 residence with their permission, but before the Browns were

1    deaths of Rodney Brown or Angela Brown, the defendant acted

2    with intent.

3       A person acts intentionally when it is his purpose to

4    cause the death of another person.

5       If you find the evidence that the State has proved

6    beyond a reasonable doubt each of the above elements of the

7    offense of murder as charged as a lesser-included offense,

8    then you shall find the defendant guilty of murder.

9       If you find the State has failed to prove beyond a

10   reasonable doubt any one or more of the elements of the

11   lesser-included offense of murder, then you cannot find the

12   defendant guilty of murder.

13      In the situation involving Rodney Brown, I am going to

14   charge you that a potential lesser-included offense for your

15   consideration is manslaughter.

16      This defendant is charged with manslaughter as a

17   lesser-included offense in regard to the counts that apply to

18   Rodney Brown.

19      A person commits the crime of manslaughter if he causes

20   the death of another person under circumstances that would

21   ordinarily constitute murder, except that he causes the death

22   due to a sudden heat of passion caused by provocation

23   recognized by law and before a reasonable time for the

24   passion to cool and for reason to reassert itself.

25      To convict the State must prove beyond a reasonable

1  doubt each of the following elements of manslaughter.

2      One, Rodney Brown is dead.

3      Two, the defendant, Jason Holloway, caused the death of

4  Rodney Brown by shooting him with a pistol or gun.

5      Three, that in committing the act or acts which caused

6  the death of Rodney Brown the defendant acted with intent.

7      And, four, that in so acting the defendant was lawfully

8  provoked to do the act which caused the death of the deceased

9  by a sudden heat of passion before a reasonable time for the

10 passion to cool and for reason to reassert itself.

11     Intentionally and lawfully provoked as used in this

12 instruction have the same meaning as previously explained in

13 the instruction on murder.

14     If you find from the evidence that the State has proved

15 beyond a reasonable doubt each of the elements of the offense

16 of manslaughter as charged, then you shall find the defendant

17 guilty of manslaughter.

18     If you find the State has failed to prove beyond a

19 reasonable doubt any one or more of the elements of the

20 offense of manslaughter, then you cannot find the defendant

21 guilty of manslaughter.

22     Mere abusive or insulting words or gestures are

23 insufficient to arise to the level of provocation recognized

24 by law.

25     A threat in and of itself, even if there exists the

1    presentability to carry out the threat, is not sufficient to

2    support a claim of self-defense.

3        And self-defense, Ladies and Gentlemen, will be the next

4    topic that I cover with you.

5        One of the issues in this case is self-defense.  A

6    person may use physical force upon another person in order to

7    defend himself from what he reasonably believes to be the use

8    or imminent use of unlawful physical force by that other

9    person, and he may use a degree of force which he reasonably

10   believes to be necessary for that purpose.

11       A person may use deadly physical force in order to

12   defend himself if he reasonably believes that the other

13   person is either:  One, using or about to use unlawful deadly

14   physical force; or, two, using or about to use physical force

15   against a occupant of a dwelling while committing or

16   attempting to commit a burglary of such dwelling; or, three,

17   committing or about to commit assault in the first or second

18   degree or a burglary in any degree.

19       For the defendant use of deadly physical force against

20   another to be justified, the deadly physical force must have

21   been used under the following circumstances.

22       One, the defendant must have reasonable believed that

23   Rodney Brown was using or about to use unlawful deadly

24   physical force against the defendant, Jason Holloway.

25       Or, two, that Jason Holloway must have reasonably

*** Frances L. Roark ***

1  believed that Rodney Brown was committing or about to commit

2  an assault in the first or second degree.

3      Deadly physical force which under the circumstances

4  in which it is used -- excuse me.  Deadly physical force is

5  force which under the circumstances in which it is used is

6  readily capable of causing death or serious physical injury.

7      A reasonable belief is a belief formed in reliance

8  upon reasonable appearances.  It is a belief not formed

9  recklessly or negligently.  The test of reasonableness is not

10 whether the defendant was correct in his belief, but whether

11 the belief was reasonable under the circumstances existing at

12 the time.

13     The defendant is not justified in using deadly

14 physical force upon another person, and cannot prevail on the

15 issue of self-defense, if it reasonably appears or the

16 defendant knows that he can avoid the necessity of using such

17 force with complete safety by retreating, except that a

18 person is not required to retreat if he is in his dwelling

19 and was not the original aggressor.

20     The defendant does not have the burden of proving that

21 he acted in self-defense.  To the contrary once self-defense

22 has become an issue, the State has the burden of proving

23 beyond a reasonable doubt that the defendant did not act in

24 self-defense.

25     A person is not justified in using physical force, as

1   compared to deadly physical force, if, he went to cause

2   physical injury or death to another person he provoked the

3   use of unlawful physical force by such other person.

4       A person is not justified in using physical force if he

5   was the initial aggressor, except that his use of physical

6   force upon another person under the circumstances is

7   justifiable if he withdraws from the encounter and

8   effectively communicates to the other person his intent to do

9   so but the other person never-the-less continues or threatens

10  the use of unlawful physical force.

11      If you believe from the evidence that the killing of

12  Rodney Brown was done by the defendant, Jason Holloway, in

13  self-defense, as that term has previously been defined to

14  you, you cannot convict Jason Holloway of capital murder for

15  the murder of two persons pursuant to one scheme or course of

16  conduct nor may you convict him of capital murder for

17  murdering Rodney Brown during a burglary.

18      Weighing and considering the evidence.  This is the last

19  portion of the charge before we get to the actual verdict

20  forms as they have been prepared for you.

21      Ladies and Gentlemen, I am going to go -- excuse me.  I

22  am now going to begin the part of the charge that has to do

23  with the weighing of and consideration of the evidence.

24      In your deliberations you can use your common sense.

25  Use the same common sense that you do in everyday affairs in

1    determining what you believe to be the truth based upon the

2    testimony and the evidence.

3        You are the sole judges and the exclusive judges of the

4    facts of this case.  Likewise, you are the sole judges as to

5    the weight that should be given all of the testimony in the

6    case.  It is your duty to attempt to reconcile the testimony

7    of the witnesses so as to make them all speak the truth if

8    this can be done reasonably.  If you cannot reasonably

9    reconcile all the testimony, then it is your duty to consider

10   the testimony with a view of determining what the true facts

11   are.  In doing so you may accept or reject any part of the

12   testimony of the witnesses and accept only the testimony that

13   you consider worthy of belief.

14       An attorney is an officer of the Court.  It is his

15   duty do present evidence on behalf of the respective party or

16   parties and to make such objections as he deems proper and

17   fully argue the case, and that applies to both State and

18   Defense.

19       An attorney's statement and argument are intended to

20   help you understand the evidence and apply the law.  However,

21   they are not evidence and you should disregard any remark,

22   statement, or argument which is not supported by the evidence

23   or by the law as given to you by the Court.  Likewise, the

24   statements made by the Court are not evidence.

25       These are matters of law that I am stating to you.  Not

1   matters of evidence.

2       The jury may consider the interest, bearing, and

3   demeanor of all witnesses.  In determining what the true

4   facts are from the evidence, you may take into consideration

5   any natural interest or bias a witness may have as a result

6   of any connection with the case.  You may take into

7   consideration the interest or bias a witness may have shown

8   while testifying.  You may take into consideration the

9   demeanor of any witness as to whether that witness has

10  apparently testified frankly or evasively.  If you believe

11  that any material part of the evidence of any witness was

12  willfully false, you may disregard all of the testimony of

13  that witness.

14      The law permits that a witness may be impeached in

15  several ways.  Impeachment simply means different ways of

16  discrediting certain testimony of a witness.  For instance, a

17  witness may be impeached by proof of contradictory statements

18  made by that witness while on the witness stand in this case

19  or by contradictory statements made by the witness at other

20  times or places, whether under oath or not.  It may be proven

21  by evidence of bad character or by showing that the witness

22  has been convicted of a crime involving dishonesty or

23  falsehood.  The fact that a witness has been impeached and

24  successfully impeached does not mean that you must

25  necessarily discard all of that witness' testimony either in

1   whole or in part.  For there may be other evidence in the

2   case, or other facts and circumstances in the evidence,

3   which, in your judgment, may tend to support or corroborate

4   that witness' testimony or some parts of it.

5       As I have already told you and charged you, you are

6   the sole and exclusive judges of the credibility of the

7   witnesses and the weight that you will accord their

8   testimony.

9       Witnesses have testified in this case as experts, and

10  you have been permitted, or they have been permitted to

11  express opinions or draw conclusions.  In passing upon this

12  fact, you are not required to accept the conclusions or

13  expressed opinions of the expert witnesses, but you must

14  determine for yourselves the weight to be given such

15  testimony in evidence when considered in connection with all

16  evidence material to these issues.

17      Ladies and Gentlemen, all 12 of you, and soon it will

18  be 12, must agree before you can reach any verdict in this

19  case.  Your verdicts must be the verdict of each and every

20  juror.  You are the sole judges as to the weight that should

21  be given all testimony in the case.

22      It is my duty to decide the law.  It is your duty to

23  determine the facts.  I have no opinion as to the facts of

24  this case and I don't want you to think from anything I have

25  said in this charge, or otherwise, or in any ruling that I

1   have made, that I think one way or the other about the facts

2   of this case.  Take the testimony of all witnesses together

3   with all proper and reasonable inferences which may be drawn

4   therefrom and apply your common sense.  In a fair, impartial,

5   and honest way determine what you believe to be the truth.

6   You should weigh all the evidence and reconcile it if you can

7   reasonably do so.  If you cannot reconcile a conflict in

8   testimony, then you ought to take that evidence which you

9   think is worthy of credit and give it just such weight as you

10  think it is entitled to receive.

11      Ladies and Gentlemen, I have prepared three verdict

12  forms in this case.  I'm going to go over these at this time.

13  Mr. Story, if you would, begin with the verdict form one.

14      Now, I have prepared these verdict forms, but the

15  verdict must be your verdict.

16      Ladies and Gentlemen, count one charges as I have stated

17  the murder of two or more persons.  That is the allegation

18  contained in the indictment.  If after considering all of the

19  evidence in the case, in light of the law, as I have charged

20  you, you decide the State has met their burden of proof as to

21  count one of the indictment, the capital murder count, then

22  it would be your duty to convict the defendant, and your

23  verdict form would read as follows:  We, the jury, find the

24  defendant, Jason Holloway, guilty of capital murder, as

25  charged in count one of the indictment.  Your foreperson

 1  would need to sign on this line if that's the case.

 2      If, however, after considering all the evidence and law

 3  in the case, you decide that the State has not met their

 4  burden of proof as to capital murder, then you would consider

 5  next the following verdict form, and this will be based upon

 6  your finding of fact in light of the law as I charged you.

 7      If you find that the State has met their burden of proof

 8  as to murder, as a lesser-included offense, for Angela Brown,

 9  and that the State has met their burden of proof as to

10  manslaughter in regard to Rodney Brown, then your verdict

11  form would be the second verdict form, which reads as

12  follows:  We, the jury, find the defendant, Jason Holloway,

13  guilty of the offense of murder, a lesser-included offense of

14  capital murder as contained in count one of the indictment as

15  pertains to the death of Angela Brown and further find that

16  the defendant, Jason Holloway, is guilty of manslaughter, a

17  lesser-included offense of capital murder as contained in

18  count one of the indictment as pertains to the death of

19  Rodney Brown.  If you make that finding, then it would be the

20  duty of your foreperson to sign his or her name on that

21  verdict form.

22      If, however, after considering the evidence in light of

23  the law that I have charged you, you find that the State has

24  met their burden of proof as to the offense of murder in

25  regard to Angela Brown, but they have not met their burden of

1   proof as to the offense of manslaughter as to Rodney Brown,

2   then the appropriate verdict form to conform with your

3   finding would read as follows:  We, the jury, find the

4   defendant, Jason Holloway, guilty of murder a lesser-included

5   offense of capital murder as contained in count one of the

6   indictment as to the death of Angela Brown and we find the

7   defendant, Jason Holloway, not guilty as to the death of

8   Rodney Brown.  If this is your finding under the evidence and

9   the law, then it would be your duty for your foreperson to

10  sign on this verdict form.

11      If after -- on the other hand if after consideration of

12  all of the evidence and law that applies in this case you

13  find that the State has not met their burden of proof in any

14  way as to count one, then you would use the bottom verdict

15  form, number four, which reads as follows:  We, the jury,

16  find the defendant, Jason Holloway, not guilty.  Your

17  foreperson would need to sign on that line.

18      At the very bottom is a place for your foreperson to

19  print his or her name.  Now, other than that printed name,

20  only one, only one of these verdict forms can be signed by

21  your foreperson.

22      Next, that is the verdict form as applies to count one.

23  Count two.  The verdict form for count two of the indictment

24  which alleges murder of Rodney Brown during burglary in the

25  first degree.

1     If after considering all the evidence and law, as I have

2  charged you, you find that the State has met their burden of

3  proof beyond a reasonable doubt as to the count two charge of

4  capital murder, then it would be your duty to convict the

5  defendant of that charge and the verdict form would read as

6  follows:  We, the jury, find the defendant, Jason Holloway,

7  guilty of capital murder as charged in count two of the

8  indictment.  Now, as I noted this is in regard to Rodney

9  Brown.  If that is the case, then your foreperson would need

10 to sign his or her name on this verdict form.

11    If on the other hand, after consideration of all the

12 evidence and the law which applies to this case, you find

13 that the State has not met their burden of proof as to

14 capital murder, but they have met their burden of proof as to

15 murder, then it would be your duty to convict the defendant

16 of murder, and your verdict form would read as follows:  We,

17 the jury, find the defendant, Jason Holloway, guilty of the

18 offense of murder, a lesser-included offense of capital

19 murder, as charged in count two of the indictment.  Your

20 foreperson would need to sign his or her name on this verdict

21 form.

22    If on the other hand after consideration of all the

23 evidence in the case and the law that applies thereto as I

24 have charged you, you find that the State has not met their

25 burden of proof as to either of the offenses of capital

1    murder or intentional murder, then it would be your duty to

2    consider next the potential lesser-included offense of

3    manslaughter.

4        If you find from the evidence and the law that I have

5    charged you that the State has met their burden of proof as

6    to manslaughter, then it would be your duty to convict the

7    defendant of that offense, and your verdict would read as

8    follows:  We, the jury, find the defendant, Jason Holloway,

9    guilty of the offense of manslaughter, a lesser-included

10   offense of capital murder, as charged in count two of the

11   indictment.  Your foreperson would need to sign his or her

12   name on that line.

13       Last, if you find from the evidence and the law that I

14   have charged you that the State has failed to meet their

15   burden of proof as to capital murder, as to murder, and as to

16   manslaughter, then it would be your duty to acquit the

17   defendant and your verdict form would read as follows:  We,

18   the jury, find the defendant, Jason Holloway, not guilty.

19   your foreperson would need to sign his or her name on that

20   line under that verdict form.  The only other thing for you

21   to do would be that your foreperson must print his or her

22   name on the very bottom line where it says printed name of

23   foreperson.  That completes verdict form two.

24       Now, verdict form three applies to count three of the

25   indictment.  Verdict form, count three, murder of Angela

1   Brown during burglary first degree.

2       If you find from the evidence and the law that I have

3   charged you that the State has met their burden of proof by

4   proving beyond a reasonable doubt each of the elements of the

5   offense of capital murder as charged, it would be your duty

6   to convict the defendant and your verdict form would read as

7   follows: We, the jury, find the defendant, Jason Holloway,

8   guilty of capital murder as charged in count three of the

9   indictment.  Your foreperson would need to sign his or her

10  name on that top verdict form line.

11      If on the other hand you find that the State has not met

12  their burden of proof as to capital murder in regard to count

13  three of the indictment, but you find that the State has met

14  their burden of proof as to murder, a lesser-included offense

15  of capital murder as charged in count three, then it would be

16  your duty to convict the defendant, and your verdict form

17  would read as follows:  We, the jury, find the defendant,

18  Jason Holloway, guilty of the offense of murder, a

19  lesser-included offense of capital murder as charged in count

20  three of the indictment.  Your foreperson would need to sign

21  his or her name on this form or line under the verdict form.

22      If on the other hand after consideration of all

23  the evidence in the case and all the law that I have charged

24  you, you find that the State has not met their burden of

25  proof as to capital murder or as to the lesser-included

1   offense of murder, then it would be your duty to acquit the

2   defendant, and your verdict form would read as follows: We,

3   the jury, find the defendant, Jason Holloway, not guilty.

4   Your foreperson would need to sign his or her name on this

5   appropriate line under the verdict form.

6        Last, your foreperson on verdict form number three would

7   need to, again, print his or her name at the very bottom of

8   the page.

9        Ladies and Gentlemen, these must be your verdicts

10  which must be unanimous, that is, the verdict of all 12

11  jurors.  Only one of the verdict forms may be signed on each

12  page.  Separate pages apply to separate counts.  Only one

13  verdict form can be signed on each page.  Foreperson must

14  print his or her name at the very bottom of that verdict

15  form.

16       At this time, and in just a few minutes, I am going

17  to have Mr. Story call the attorneys up.  At this time, I am

18  going to be sending you out to the jury room.  All of the

19  items of evidence that have been legally admitted for your

20  consideration will go with you, along with your verdict

21  forms.

22       You will first choose a foreperson to act on your

23  behalf.  The foreperson will basically moderate your

24  deliberations and sign the appropriate verdict form to comply

25  with what your actual verdict is.  In other words, the

1   verdict form which is signed must reflect your actual

2   verdict.  After that time, I want your foreperson to fold the

3   verdict forms in half, knock on the door, and the bailiff

4   will let me know that you are ready and at the appropriate

5   time after your verdicts have been reached, after you have

6   signed the forms, I will bring you back in here and announce

7   your verdicts here in open court.

8        Now, let me go ahead and tell you.  When I send you out

9   to the jury room.  Go ahead and choose your foreperson and

10  begin your deliberations.  Then if you immediately want to

11  take a break for lunch, or a longer break, immediately let me

12  know.  In other words, I am not pushing you at all in your

13  deliberations.  I want to get this case to you so we can

14  begin the process of deliberation, but after that point it is

15  up to you.

16       So, the first order of business will be for the

17  attorneys to approach and, Mr. Story, make certain that the

18  alternate jurors are in agreement.

19       Ladies and Gentlemen, go ahead and let me say this.  I

20  do not know which ones of you are alternate jurors.  I know

21  all of you have paid scrupulous attention throughout the

22  course of this trial.  If at any point in time during the

23  trial one or more of you had had to be excused, then the

24  alternate, whoever that is, or whoever they are, would  have

25  had to have stepped forward and been ready to go forward and

 1   fulfill the duty of the juror in finishing the trial and

 2   deliberated the verdicts.  Luckily we have not had to use any

 3   alternates.  At the same time, I want to tell whoever that is

 4   that I truly appreciate your service in this long and

 5   difficult case.  From this point you may be released and you

 6   may either stay or go.  That is completely your decision.

 7   Mr. Story, will have some information for you in any event

 8   because the four of you who are alternates will be at this

 9   time discharged and you will not have to come back as

10   pertains to this term of court.

11        Mr. Story, call the names.

12             THE CLERK:  Yes, Your Honor.  The alternates in

13   this case are Joyce Carwell.

14             THE COURT:  Ms. Carwell, you are free to go.

15             THE CLERK:  Linda Huguley.

16             THE COURT:  Ms. Huguley, you are free to go.

17             THE CLERK:  Mary Owens-Lyerly.

18             THE COURT:  Ms. Owens-Lyerly, you are free to go.

19             THE CLERK:  Mr. Philpott.

20             THE COURT:  Mr. Philpott, you are free to go.

21        I thank all of you.

22        Attorneys, come forward and gather all the evidence and

23   get all items and exhibits.

24             MR. BLANCHARD:   I need to put something on the

25   record about the charges.

1    (WHEREUPON, A SIDE BAR COMMENCES.)

2         MR. BLANCHARD:  Judge, I have an objection to two

3    portions of the charge.  One was to the giving of the State's

4    requested instruction, number 7, which reads as follows:

5    Mere abusive or insulting words or gestures are insufficient

6    to rise to the level of provocation recognized by law.  My

7    position is that's unsupported by the evidence in that

8    particular context.  There's no evidence of abusive or

9    insulting words that may have -- it was not in the case in my

10   viewpoint.  So, it may be a correct statement of the law, but

11   it does not apply to the case, so I object to it, and cite

12   the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

13   Constitution and any and all state and federal constitutions,

14   principles referenced in our memorandum.

15        Secondly, State's requested charge number 9 was given:

16   A threat in and of itself, even if there exists the

17   presentability to carry out the threat is not sufficient to

18   support a claim of self-defense.  Whereas that may be a

19   correct statement of the law, I don't believe applicable to

20   this case in the context in which it is offered.  I don't

21   believe there was any evidence of a verbal threat being made

22   by Rodney Brown prior to, immediately prior to, the act Jason

23   Holloway undertook.  I don't believe that applies to the

24   case.  And, for all the same grounds, I object to that charge

25   as well.

1        THE COURT:  Both objections will be overruled.  Any

2   motions relative to the objections are likewise denied.  The

3   grounds are on the record.  At this point I am going to send

4   the jury back to deliberate and choose a foreperson, but I

5   have already told them they can immediately break at any

6   time.  I just want deliberations to begin and then it is up

7   to them.

8        Verdict forms.

9        Ms. Shaffers, please come up.  Give the verdict forms to

10  her and the exhibits.

11  (WHEREUPON, A SIDE BAR CONCLUDED.)

12       THE COURT:  Ladies and Gentlemen, at this time, I

13  am going to send you back to choose your foreperson and begin

14  your deliberations as far as reaching your verdicts.

15       Now, I have already told you, after your verdicts are

16  reached, make sure the appropriate form is signed to conform

17  to your verdict which must be unanimous; that is, the verdict

18  of all 12, fold the verdict forms in half, knock on the door

19  and Mr. Story or the bailiff will attend to you, and I will

20  bring you back in here to announce your verdicts.  That is

21  all at the end.

22       For right now the one thing I want you to understand is

23  I want you to choose a foreperson.  I do not want to know who

24  that is at that time.  And begin your deliberations.  Then

25  immediately or whenever you want to break for lunch, let me

1  know, and we'll take a break like we have been doing every

2  day.  So, in other words, y'all go ahead and start.  Let me

3  know when you want to take a break and we will do that.

4      With that everyone remain in while the jury retires to

5  deliberate.

6  (WHEREUPON, THE JURY RETIRES TO DELIBERATE AT 1:41 P.M.)

7          THE COURT:  We will be in recess until the jury

8  let's us know.

9  (WHEREUPON, THERE WAS A RECESS.)

10  (JURY PRESENT)

11          THE COURT:  Ladies and gentlemen, I am going to go

12  ahead and send y'all to lunch.  Go get your lunch.  You may

13  come back immediately to the jury room.  The only thing I

14  need for you to do is do not begin deliberations until all 12

15  of you are present and ready to begin deliberations and to do

16  the other things that I have told you about.  Let

17  Ms. Shaffers and Mr. Story know as soon as all 12 of you are

18  in here and then at that point as soon as all 12 are present,

19  you may begin your deliberations.  You are free to go.

20  Follow the same instructions I've given you.  Do not discuss

21  this case with anyone not even amongst yourselves until the

22  proper time.  Don't allow anyone to contact you whatsoever

23  about this case in any fashion.  Do not put yourself in any

24  position of overhearing conversation about this case.  So,

25  with all the other instructions I've given you, go ahead, get

1   your lunch, come back to the jury room, let Mr. Story and

2   Ms. Shaffers know and then you can begin your deliberations.

3      Everyone remain in while the jury exits.

4   (WHEREUPON, THE JURY TOOK A LUNCH BREAD AND THEN RESUMED

5   DELIBERATIONS.)

6                           **VERDICT**

7   (WHEREUPON, THE JURY ANNOUNCED A VERDICT AT 3:36 P.M.)

8              THE COURT:  Ladies and Gentlemen, let me have a

9   brief word with all of you.  I have no idea what verdict or

10  verdicts has been reached by this jury, but I expect

11  absolutely no showing of any emotion, one way or the other,

12  when I announce these verdicts.

13     This jury did not ask to come in here.  They were

14  summoned.  They were drawn in here.  They have done their

15  duty and whatever their verdict is, is the verdict that we

16  will live with.  So, that is the instruction that I have got

17  for everybody involved in this case on both sides.  And, as

18  soon as the jury is in, I will accept and announce the

19  verdicts.

20     Is the State ready?

21             MR. LISENBY:  State is ready.

22             THE COURT:   Is Defense ready?

23             MR. BLANCHARD:  Ready, Your Honor.

24  (JURY PRESENT)

25             THE COURT: Ladies and Gentlemen, first let me ask

1    you:  Have you chosen a foreperson to act on your behalf?

2    Who is the foreperson?  Thank you, sir.

3        Let me go through and announce each of these verdicts

4    and then I will ask you in turn if this is your verdict.

5        This is verdict form count one.  Murder of two or more

6    persons.  Is this your verdict?  We, the jury, find the

7    defendant, Jason Holloway, guilty of capital murder as

8    charged in count one of this indictment.  This is your

9    verdict.

10       Next, count two, murder of Rodney Brown during burglary

11   first degree verdict form.  Is this your verdict?  We, the

12   jury, find the defendant, Jason Holloway, guilty of the

13   offense of murder, a lesser-include offense of capital murder

14   as charged in count two of the indictment.  Is this your

15   verdict?

16       And, last, as to count three, murder of Angela Brown

17   during burglary first degree.  Is this your verdict?  We, the

18   jury, find the defendant, Jason Holloway, guilty of capital

19   murder as charged in count three of the indictment.  Is this

20   your verdict?.

21           THE COURT:  I ask that counsel for State and

22   Defense, if there's any request for polling of the jury on

23   these different verdicts?

24           MR. BLANCHARD:  Yes, sir, Your Honor.

25           THE COURT:  Ladies and Gentlemen, I am going to ask

1   each of you in turn, beginning with your foreperson down here

2   and I'll go in turn with each one of you to make sure that

3   each of these verdicts I announced is in fact your individual

4   verdict.

5        Is this your verdict?

6             FOREPERSON BENSON:  Yes,it is.

7             THE COURT:  Is this your verdict?

8             JUROR TWO:  Yes, sir.

9             THE COURT:  Is this your verdict?

10            JUROR THREE:  Yes.

11            THE COURT:  Is this your verdict?

12            JUROR FOUR:  Yes

13            THE COURT:  Is this your verdict?

14            JUROR FIVE:  Yes.

15            THE COURT:  Is this your verdict?

16            JUROR SIX:  Yes.

17            THE COURT:  Is this your verdict?

18            JUROR SEVEN:  Yes.

19            THE COURT:  Is this your verdict?

20            JUROR EIGHT:  Yes.

21            THE COURT:  Is this your verdict?

22            JUROR NINE:  Yes.

23            THE COURT:  Is this your verdict?

24            JUROR TEN:  Yes.

25            THE COURT:  Is this your verdict?

```
 1              JUROR ELEVEN:  Yes.

 2              THE COURT:  Is this your verdict?

 3              JUROR TWELVE:  Yes.

 4              THE COURT:  Ladies and Gentlemen, at this time I am

 5    going to send you back to the jury room and I'll be calling

 6    you back out in just a few minutes.  There are some matters

 7    that I need to take up with the attorneys at this time.  So,

 8    step back there and I'll be calling for you in 10 minutes.

 9   (JURY OUT)

10              THE COURT:  Counsel, approach.

11   (WHEREUPON, A SIDE BAR COMMENCES.)

12              THE COURT:  It is 20 minutes to 4.  To go ahead

13   with the sentencing phase at this point as to counts one and

14   three would entail several hours.  I do not know if there's

15   any compelling reason to begin the sentencing phase or to

16   just send the jury home for the night and then begin first

17   thing in the morning.

18              MR. LISENBY:  How long do you think you would be?

19              MR. BLANCHARD:  I think we could finish tomorrow.

20   I think we have, best of my recollection, five witnesses that

21   I intend to call.  I don't know whether you intend to call

22   any or not.

23              MR. LISENBY:  Sounds like we can be through in a

24   day.

25              THE COURT:  Okay.  If we finish tomorrow, I see no
```

1    reason why we shouldn't do that and let this jury go home and

2    rest.  Y'all agree?

3              MR. BLANCHARD:  We agree.

4              THE COURT:   Do you agree?

5              MR. LISENBY:  Yes, sir.

6              THE COURT:  Mr. Story, bring them back out here.

7    (JURY PRESENT)

8              THE COURT:  Ladies and Gentlemen, it is 3:45, 15

9    minutes to 4 central time, and I know for a lot of you, you

10   are on eastern time and that would make it even later.  After

11   confirming with the attorneys, and really it is my

12   inclination anyway to send y'all home and let you get a good

13   night's rest.  Okay.

14       There are other proceedings that we've got to begin

15   relative to counts one and four [sic.] of the indictment

16   based upon the verdicts returned.  I think the best thing to

17   do at this point is to call a recess for tonight.  Have you

18   back in the jury room at 9:00 in the morning and we'll begin

19   the next phase of this trial.

20       It is absolutely imperative that you follow the

21   instructions I am about to give you.  I know I have given

22   them so many times you can probably go along and repeat them

23   with me as we go, but that's the way it is.  You are not a

24   sequestered jury.  You will be going home tonight.  We will

25   begin the next phase of this trial tomorrow.

*** Frances L. Roark ***

1    Do not talk with anyone about any aspect of this case.

2    Don't discuss any aspect of this case with anyone, and

3  I'll tell you now, not even amongst yourselves.  You have

4  finished one phase of this trial.  We still have other things

5  that we have to begin in the morning.

6    Avoid all contact with family members, that being both

7  for the family of the victim and the defendant.

8    Do not talk to law enforcement official or any person

9  who may be a witness or potential witness in any of the

10  proceedings that we have yet to complete.

11    Avoid news media.  There may be coverage of this case.

12  I do not know, but I just know that if there is coverage, if

13  it is on television, you must not watch it.  If it is on

14  radio, you must not listen to it.  If it is in the newspaper,

15  you may not read it.  In short, you must completely insulate

16  and isolate yourself from any mention whatsoever of any

17  aspect of this case.

18    The instructions that I have given you apply to all

19  family members as well.

20    At the conclusion of all proceedings in this case, and

21  at some time in the future, it will be your personal choice

22  to discuss your service as a juror with anyone if you desire,

23  or not to discuss with anyone if that is your desire.  But,

24  at this time, understand that you are under an absolute court

25  order not to discuss any aspect of this case.

1   In your comings and goings this afternoon and in the

2   morning, isolate yourselves from any situations where people

3   may be discussing this case or any aspect of this case.  When

4   you get here in the morning, report immediately to the jury

5   room, be in the jury room by 9:00.

6   Any further requested instructions by counsel for State

7   or Defense?

8   MR. BLANCHARD:  No, Your Honor.

9   MR. LISENBY:  No, sir.

10  THE COURT:  With that everyone remain in this

11  courtroom while the jury exits.  Go ahead go home, rest, get

12  a good night's sleep.

13  (WHEREUPON, THE JURY WAS ADJOURNED UNTIL 9:00 A. M.,  12

14  JUNE, 2003.).

15  THE COURT:  With that court is recessed until 9:00

16  in the morning.

17  (WHEREUPON, PROCEEDINGS WERE ADJOURNED UNTIL 9:00 A.M., 12

18  JUNE, 2003.)

19                          *****

20

21

22

23

24

25

```
 1                    IN THE CIRCUIT COURT
           FIFTH JUDICIAL CIRCUIT OF ALABAMA
 2                       CHAMBERS COUNTY

 3    STATE OF ALABAMA,              *
                                     *      CRIMINAL NO.
 4    versus                         *      CC-2000-0000166
                                     *      LaFayette, Alabama
 5                                   *      12 June, 2003
      JASON HOLLOWAY,                *
 6          Defendant.               *      CRIMINAL APPEALS NO.
                                     *      CR-02-2115
 7    * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 8                   TRANSCRIPT OF TRIAL BEFORE

 9              THE HONORABLE RAY D. MARTIN,

10              CIRCUIT JUDGE, AND A JURY.

11    A P P E A R A N C E S
      FOR THE STATE OF ALABAMA:   REA S. CLARK, DISTRICT ATTORNEY
12                                FIFTH JUDICIAL CIRCUIT
                                  CHAMBERS COUNTY COURTHOUSE
13                                COUNTY OFFICE BUILDING
                                  LAFAYETTE, ALABAMA 36862
14
                                  BY: REA S. CLARK, DA
15                                    BILL LISENBY, CHIEF ADA
                                      KENNETH GIBBS, ADA
16

17    FOR THE DEFENDANT:          BLANCHARD & ASSOCIATES, LLC
                                  ATTORNEYS AT LAW
18                                505 SOUTH PERRY STREET
                                  MONTGOMERY, AL 36104
19
                                  BY: WILLIAM R. BLANCHARD, ESQUIRE
20                                     and
                                  KEITH & HAMM, PC
21                                ATTORNEYS AT LAW
                                  235 SOUTH McDONOUGH STREET
22                                MONTGOMERY, AL 36104

23                                BY: RICHARD K. KEITH, ESQUIRE

24
                                  FRANCES L. ROARK, CSR
25                                OFFICIAL COURT REPORTER
                                  Fr3L126
```

*** Frances L. Roark ***

**PENALTY PHASE**

1

2  PROCEEDINGS:  In Open Court.

3  (WHEREUPON, A SIDE BAR COMMENCES.)

4          MR. BLANCHARD:  I just want to let everybody know

5  how I intend to handle my exhibits when we get to that point.

6  Bill and I have, Judge, reached a stipulation as to the

7  authenticity of them a while back.  Do you remember that?

8          MR. LISENBY:  Yes.

9          MR. BLANCHARD:  I don't even intend to ask the

10 questions, the predicate questions, because we have

11 stipulated to that.  In any event, I'm not going to put in

12 anything Joe Dixon didn't consider in reaching his

13 conclusions.  So, they are sort of independently admissible

14 that way, anyhow.

15         MR. LISENBY:  Are you intending to offer all those

16 records that you gave us?  The only reason I ask is this.  I

17 saw a couple of records in there from Rosco Holloway and Rosa

18 Holloway.  I am not sure how they are relevant.

19         MR. BLANCHARD:  I'll tell you.  They are relevant,

20 because Joe Dixon considered them in reaching his

21 conclusions.  He looks at family history, genetic sort of --

22 you know, the relatives, the biological relatives, and the

23 first degree of relevance to what he decides, their mental

24 capacities and all.  We'll tie all that up.  I do intend to

25 offer it.

1    I'll have about 35 exhibits.  A lot of which have these

2    blow ups that go with them that we are going to take and show

3    the jury.  What I intend to do is this:  I'll show Dixon the

4    exhibit and ask him if it is something he considered.  And,

5    if has a blow up with it while we talk about the exhibit,

6    we'll probably put the blow up on the easel.  I am not going

7    to admit the blow up.  I am just going to admit the exhibits.

8        Also, it has been awhile since Dixon looked at some of

9    these and some of these exhibits are relatively dense with

10   information.  So to save time, he's got, or I have, copies,

11   additional copies, that he went through and highlighted.  I'm

12   going to hand him a copy of his highlighted exhibit so he can

13   quickly locate what is relevant.  I'm not going to put the

14   highlighted exhibit in.  Just the original that I have

15   marked, but that is how I intend to handle it.

16           MR. LISENBY:  I think we have the same type of

17   situation.  I think Kenny has gone through the records and

18   done some highlighting, too, so he'll probably do the same

19   thing.  He'll probably just walk up and show him the

20   highlighted portion and have him read that or whatever.

21           MR. BLANCHARD:  That's fine.  Do you know ....

22           MR. LISENBY:  I'm sorry.  I was just going to

23   mention one other thing.  We had talked about -- Bill and

24   Richard and I had talked about when they came in about the

25   statutory mitigating factor of no significant criminal

1    history, and it is my understanding that they do not intend

2    to offer that as mitigator in this case.  I'd just like to

3    get that on the record.

4              THE COURT:  I'm going to read all, what is it:

5    eight, no, it is seven, and not exclusive list.  I just

6    intent to read the list.

7              MR. LISENBY:  The concern I have about that, Judge,

8    is that I would feel obligated then to offer into evidence

9    the other criminal convictions that Mr. Holloway has.

10             THE COURT:  If y'all stipulate ....

11             MR. BLANCHARD:  Yes, sir.  I don't want you to do

12   that.  I just want you to talk about what mitigation is and

13   how it is not exclusive of any factor.  And, then, if I have

14   identified specific nonstatutory mitigators or specific

15   statutory mitigators, I want you to read those and say you

16   can consider this and give it what you weight you determine.

17   Same with his aggravators.  I wouldn't want you to read the

18   whole list.  That gets into a numerical comparison of how

19   many you've got out of the ....

20             THE COURT:  How many aggravators?

21             MR. LISENBY:  Three.

22             THE COURT:  Those being?

23             MR. LISENBY:  Two or more, burglary, heinous,

24   atrocious and cruel.

25             THE COURT:  Okay.  All right.

 1             MR. BLANCHARD:  One other thing, do you know yet

 2   whether you are putting on victim impact?

 3             MR. LISENBY:   Kenny went out to talk with them.

 4   If the Court, can give us, maybe, five minutes, I ought to be

 5   able to tell you that.

 6             MR. BLANCHARD:  I have another concern here.  What

 7   was it?  I know what it is.  Well, we won't know heinous,

 8   atrocious and cruel.  I expect that as to the two statutory

 9   mitigators -- not mitigators, but aggravators, you'll claim

10   that have already been found.  You'll take the position that

11   those have been found unanimously.

12             MR. LISENBY:  Correct.

13             MR. BLANCHARD:  With regard to heinous, atrocious

14   and cruel, we won't know whether that's been found

15   unanimously unless there's something else on the verdict

16   form.  Now, I know the State probably takes the position that

17   it doesn't have to be found unanimously, but my concern is

18   *Eric Ring versus Arizona.*  I would have an objection if an

19   aggravator is not found unanimously by the jury, but is used

20   by the jury.

21             THE COURT:   I am going to charge that it must be

22   unanimous.

23             MR. LISENBY:  That the finding of the aggravator

24   must be unaimous?  Is that what you are saying?

25             THE COURT:  I don't think it needs to be on the

1   verdict form.

2        MR. LISENBY:  Yes.  They might have a question as

3   to -- if they have to find the aggravator unanimously, but

4   they can vote 12 all the way down to 12 to 2 for the death

5   penalty.

6        MR. BLANCHARD:  That's a problem.  I understand

7   that's an inconsistency that we have to deal with sort of

8   between our statute and the current Supreme Court

9   jurisprudence.  I am not ....

10        MR. LISENBY:  I would disagree.  I don't think Ring

11   -- well, I don't think Ring applies in Alabama at all, first

12   of all.  I certainly don't think Ring requires that finding

13   of unanimity on an aggravating circumstance.

14        MR. BLANCHARD:  I guess the question is whether you

15   are going to apply Ring, as the Supreme Court decided and if

16   it applies to Alabama, then it has got to be unanimous on all

17   the aggravators.  If you are not going to apply ring, then 12

18   to 2 is sufficient.

19        THE COURT:  Well, in the overall scheme of things,

20   I see how you could have a requirement for a unanimous

21   finding of aggravator, but still follow the requirement of 12

22   to 2, because of the balancing.

23        MR. LISENBY:  The weight.

24        THE COURT:  Weight and consideration.  I don't

25   think that is any problem.

1            MR. LISENBY:   I understand.   I just -- I don't

2   know -- obviously, when we get to that point, I guess we can

3   find out exactly how your charge is going to read just so

4   we'll know how --

5            THE COURT:   Right.

6            MR. LISENBY:   -- it needs to be presented to the

7   jury.

8            THE COURT:   Mr. Blanchard has 45 proposed charges.

9            MR. LISENBY:   I have been trying to read through

10  them very quickly this morning.   I have a couple of

11  objections.

12           THE COURT:   Let's go ahead and get started.   Now,

13  one of yours, don't you have a unanimity on the aggravator in

14  here somewhere?

15           MR. BLANCHARD:   I am trying to remember.   I don't

16  think that I do, because I didn't think about that until

17  recently.   Those charges were written before Ring in the most

18  part.   I don't think I've got that.

19           THE COURT:   If not anything else, I am simply going

20  to charge them that the finding of aggravating circumstances

21  must be unanimous, period.

22           MR. BLANCHARD:   Do you intend to charge them that

23  aggravators have to outweigh mitigators beyond a reasonable

24  doubt?

25           THE COURT:   Hang on just a second.

 1              MR. LISENBY:  I am sorry, can you repeat that?

 2              MR. BLANCHARD:  I asked if he intended to charge

 3  them that the aggravators had to outweigh the mitigators.

 4              THE COURT:  The defendant has the burden of

 5  interjecting the issue if the factual existence of a

 6  mitigating circumstance is in question.  This merely means

 7  the defendant must show, at least, a possibility that the

 8  mitigating circumstance exists.  Then the burden of proof is

 9  on the State to disapprove the existence of a mitigating

10  circumstance by a preponderance of evidence.  Hold on.  That

11  is not what you asked.

12              MR. BLANCHARD:  That is not what I asked.

13              MR. LISENBY:  I think it's probably going to be a

14  little further in the charge, Judge, about the weighing

15  process.

16              THE COURT:  The State has the burden of proving

17  beyond a reasonable doubt the existence of any aggravating

18  circumstance.

19              MR. BLANCHARD:  Well, what about the weighing

20  between aggravators and mitigators?  That's what I'm asking

21  about.  I would contend that aggravators have to outweigh.

22              THE COURT:  It is your duty and task to weigh the

23  relative merits of the aggravating and mitigating

24  circumstances in reaching your verdict.  The process of

25  weighing the aggravating and mitigating circumstances to

 1   determine the sentence is not a mere tallying of aggravating

 2   and mitigating circumstances for the purpose of numerical

 3   comparison.   Instead it is the process by which circumstances

 4   relevant to sentence are marshalled and considered in an

 5   organized fashion for the purpose of determining whether the

 6   proper sentence in view of all relevant circumstances in an

 7   individual case is life imprisonment without parole or death.

 8         MR. BLANCHARD:   I am asking that they be further

 9   instructed that they must find that in order to return a

10   death sentence that the aggravators outweigh the mitigators

11   beyond reasonable doubt.

12         MR. LISENBY:   I don't think there's anything in law

13   with regard to that.   It is just a weighing process as

14   described by the Court.

15         THE COURT:   Deny that.

16         MR. BLANCHARD:   Once again, and my basis for that

17   is, the Ring decision which indicates that the jury has to

18   make all the findings necessary for imposition of the death

19   sentence as juries do, proof beyond a reasonable doubt, so

20   that finding -- I think there is a crucial finding there,

21   which is that aggravators outweigh mitigators and under the

22   presentence of Ring it should be done beyond a reasonable

23   doubt.

24     And, once again since these charges were largely written

25   prior to Ring, I'm not sure that is included in my requested

1    charges, but I want to make clear that I am requesting that,

2    and I will, you know, if the Court requests, I'll try to

3    draft something.

4          THE COURT:  What I'm considering doing is simply

5    stating that aggravating factors must be shown to outweigh

6    mitigating factors beyond a reasonable doubt.

7          MR. LISENBY:   I would object to that.  That is not

8    the law.  That is not even close to the law, because it is

9    simply a weighing process.  That's putting the burden on the

10   State way too high in this case.  Once the aggravating

11   factors are proven beyond a reasonable doubt, the jury

12   considers that.  They look at the mitigating circumstances.

13   And, if they haven't been disproven by a preponderance of the

14   evidence, then those mitigators can be considered.  They then

15   simply weigh them pursuant to the Statute 13A-5-48.  There's

16   a case that *Williams versus State*, 601 So. 2nd, 1062, Alabama

17   Court of Criminal Appeals, 1991, that, according to the

18   headnote, I can get the case, but -- if the death penalty be

19   imposed in Alabama, it does not have to be proven that beyond

20   a reasonable doubt the aggravating circumstances outweighed

21   the mitigating circumstances.  The aggravating circumstances

22   must simply outweigh the mitigating circumstances.  That is

23   straight out 13A-5-48, in the weighing process.

24         MR. BLANCHARD:  Bill, what was the date of that

25   case?  When was it decided?

 1              MR. LISENBY:   It was decided  in 1991.

 2              MR. BLANCHARD:   That was decided 12 years before

 3    Ring.

 4              MR. LISENBY:   Well, Ring doesn't have any

 5    discussion about the weighing process.  The only thing Ring

 6    says is that the jury, and again, I don't think Ring applies

 7    in Alabama at all, but assuming just for the moment for

 8    argument's sake, the owning thing that Ring says is that the

 9    jury must have proven to them beyond a reasonable doubt that

10    the aggravating circumstances exist to make a person death

11    eligible.  Once that occurs, it is still up to the State to

12    fashion whatever process they want to use in the

13    determination of what sentence is appropriate in front of the

14    jury.  It is just a weighing process.  It has nothing to do

15    with beyond a reasonable doubt at that point.  Ring never

16    even talks about that weighing process.

17              MR. BLANCHARD:   Bill and I have a disagreement on

18    that point.  My point would be this:  What Ring says is that

19    any factual finding that must be made before a death sentence

20    can be imposed, has to be made by a jury unanimously.  And,

21    my position is that weighing process constitutes a factual

22    finding that must be made by the jury.  And, I think that, if

23    the Court instructs the jury that way, it may well insulate

24    any, you know, verdict from a Ring challenge later down the

25    road.  That is all I am saying.

1          MR. LISENBY:  Well, in ex parte Waldrop the Alabama

2    Supreme Court interpreted how Ring would apply.  They did not

3    talk about -- the Alabama Supreme Court in its interpretation

4    of Ring to the Alabama Statute never indicated that it had

5    anything to do with beyond a reasonable doubt as far as the

6    aggravating circumstances outweighing the mitigating

7    circumstances.

8          THE COURT: Based on your case, I'll deny the charge

9    of a finding by the jury that the aggravating must outweigh

10   mitigating beyond a reasonable doubt.  However, I am going to

11   give the unanimous charge that aggravators must be found by

12   unanimous jury.

13         MR. BLANCHARD:  Okay.  At the proper time, we'll

14   make an objection on the record.

15         THE COURT: Yes, sir.

16         MR. BLANCHARD:  One other thing, before we start,

17   there was something that came up during voir dire and I want

18   to -- because it may recur in this phrase and I want to get

19   some clarity on it.  I asked a question having to do with the

20   concept of mercy.  Bill objected to it.  You sustained it.  I

21   didn't go any further with it.  I want to make sure that I'm

22   not prohibited from or would not be objected to for use of

23   that term in the penalty phase.  I think, certainly, that

24   mitigating evidence, if it is anything, it is the kind of

25   evidence that calls for mercy.  And, that there are certainly

1   cases and I think they are elucidated in what I have

2   submitted to you that mercy is a relative factor in

3   sentencing.  I certainly want to be able to mention it.

4         MR. LISENBY:  I have multiple cases saying that

5   mercy is not a relevant factor.  It is not something that can

6   be considered.  I will be glad to get them for the Court to

7   take a look at.

8         MR. BLANCHARD:  It is different from sympathy in

9   the guilt phase.  If we're talking about sympathy for guilt

10  or innocence, that's one thing.  When we're talking about

11  mitigating factors giving rise to feelings of mercy, that is

12  what mitigating factors do.  That's what they are.  If they

13  are not that, they are nothing.

14        THE COURT:  Okay.

15        MR. LISENBY:  Judge, I have three Alabama cases

16  that discuss the fact that mercy is not appropriate, sympathy

17  is not appropriate in this phase.  First, one is *Rieber*,

18  *R-I-E-B-E-R, versus State*, 663 So. 2nd 985, Court of Criminal

19  Appeals, 1994, affirmed by the Alabama Supreme Court on page

20  995 of the opinion.  The appellant alleges the trial court

21  erroneously refused to instruct the jury that it could

22  consider mercy in its sentence recommendation.  And, then it

23  lists out the requested charge that includes in it, nothing

24  in the law forbids you from extending mercy out of compassion

25  or believe that life imprisonment is sufficient under all the

1  circumstances, and the Court there said clearly this charge

2  was an incorrect statement of the law, and cited *Whisenhant*,

3  *W-H-I-S-E-N-H-A-N-T, versus State* for that proposition.

4      The second case is *Kudnzel, K-U-D-N-Z-E-L-, versus*

5  *State*, 577, So. 2nd 474.  Again, that was affirmed by the

6  Alabama Court of Criminal Appeals 1990, affirmed by the

7  Alabama Supreme Court, in which the district attorney in that

8  case argued that a plea for mercy and a plea for sympathy

9  really doesn't have a place in the courtroom based on and in

10 response to the argument that the defense attorney made with

11 regard to mercy and sympathy and the Kudnzel court said that

12 was inappropriate for consideration by the jury, mercy and

13 sympathy.

14     And, *Morrison versus State*, 500 So. 2nd, 36, Court of

15 Criminal Appeals 1985, also affirmed by the Alabama Supreme

16 Court, in which again it was a requested instruction that

17 said, if you see fit whether mitigating circumstances exist

18 or not, you may recommend mercy for the defendant.  This

19 recommendation is solely in your discretion and not

20 controlled by any rule of law.  You may make such

21 recommendation with or without a reason.  Again, the Morrison

22 court said that this charge was incorrect, and they state on

23 43, we noted while it was clearly the duty of the jury to

24 weigh aggravating and mitigating circumstances, it is not, as

25 this charge implies, free to arbitrarily ignore any factor it

1    implies in the negative in arriving at the correct sentence.

2         Those were the three I can think of here.  I know there

3    are some others.  I can't find immediately.  I looked quickly

4    when Mr. Blanchard went and got -- pointed out his requested

5    charges 36 through 38 with the authority, and the only

6    authority I see in them are Tennessee cases and a California

7    case and then looks like a United States Supreme Court case

8    that also came out of California.  I am not familiar with any

9    of those cites.  Clearly in Alabama those cases that have

10   reviewed this issue, that have been affirmed through the

11   Court system, and the Alabama Supreme Court and U. S. Supreme

12   Court, have indicated that mercy and sympathy are not proper

13   consideration even at the penalty phase of the trial.

14         MR. BLANCHARD:  Judge, if I may have a brief

15   rebuttal, as you know, our objection or our request to be

16   allowed to use the concept of sympathy is based on principles

17   of federal constitutional law.  In particular the need for

18   heightened reliability in the sentencing process and the

19   Fourteenth Amendment's due process clause as well as the

20   Sixth Amendment, and all the related Alabama constitutional

21   principles.  But the point is, that the cases he cited are

22   Alabama cases, it doesn't appear that they have been

23   subjected to any federal review on those principles.

24   Whereas, the cases I have given you are backed up by Supreme

25   Court and, I believe, relevant Supreme Court principles.

*** Frances L. Roark ***

```
 1        In addition, I could not find what I was looking for a
 2   moment ago.  I am pretty sure that an Eleventh Circuit
 3   precedent allows the use of the concept of mercy in this
 4   phase of the case.  I think it is Zant v. Stephens.  I can't
 5   give you a cite.  I'll look for it.  I couldn't locate it at
 6   this particular moment in time.
 7        THE COURT:  I've looked at your 36, 37, and 38.
 8   I'll consider something along the lines of 37, but I'm going
 9   to deny 36 and 38.
10        What 37 states, your exercise of  sentencing
11   discretion may be influenced by a sympathetic response to
12   mitigating evidence.  You may consider mitigating evidence
13   related to Jason Holloway's character and background, whether
14   or not related to the offense for which he is on trial
15   precisely because that evidence may arouse  sympathy or
16   compassion for the defendant.
17        MR. BLANCHARD:  That's what I'm saying, Judge.
18   That's all I'm asking for.
19        THE COURT:  I'm going to allow you to do that and
20   it is under federal principles that I am allowing it.  I
21   understand that Mr. Lisenby is correct on the State, but we
22   are in a transitional stage as far as capital punishment.
23   There is a different trend -- not a different trend, but
24   there is a trend under Ring versus Arizona and other statutes
25   for heightened levels of care, if you will, in sentencing
```

```
 1   phase.  So, Mr. Lisenby, I think you are correct on the

 2   Alabama case law, but I am going to give 37 for the

 3   defendant, and because it does tie to mitigation.  Mitigation

 4   is, of course, the standard.

 5            MR. LISENBY:  Just so I understand too.  Is the

 6   word mercy going to be objectionable because I see that 37

 7   talks about sympathy.  Just so we know where we're headed.

 8            MR. BLANCHARD:  I would like to be able to

 9   sympathetic or merciful feelings arising from ...

10            THE COURT:  Why don't you use sympathy.

11            MR. BLANCHARD:  Okay.

12            THE COURT:  Use sympathy and I'll -- you won't have

13   to object then.  Use sympathy that way it will just -- it is

14   the same, as far as my conception of it, it is about the same

15   concept.  That way we'll get one objection out of the way.

16       Now, I think that your arguments, of course, you would

17   say that in the nature of mitigation, you are asking for

18   sympathetic response because of mitigation.  Of course, your

19   argument can be exactly the contrary.

20            MR. LISENBY:  Yes, sir.

21            THE COURT:   I think that is fair.  Okay.

22            MR. KEITH:  What about the HAC Motion in Limine?

23            MR. BLANCHARD: I am trying to remember, what?

24            MR. KEITH:  HAC to a deceased person or use of

25   sexual assault or ....
```

1          MR. LISENBY:  We are not talking about that.  I'm

2    sorry.  We made that determination that the only evidence

3    apparently is from the defendant's statement that the sex

4    occurred after the beating and smothering and stabbing, and

5    we'll just stick with the beating, smothering and stabbing

6    part.

7          THE COURT:    Okay.  Y'all ready?

8    (JURY PRESENT)

9          THE COURT:  Let the record reflect all jurors

10   present, parties present, counsel present.

11       Ladies and Gentlemen, at this time we are going to begin

12   what is referred to as the sentencing phase of this trial.

13       You will hear opening statements by counsel.  You will

14   hear evidence.  And, you will hear arguments.  Just as you

15   did in the phase involving determination of guilt or

16   innocence.

17       In this case, ultimately you will either recommend life

18   imprisonment without parole or death as the sentence to be

19   entered.  One of those two.

20       In general, you base your recommendation on the

21   aggravating and mitigating circumstances if any are proven.

22   I will give you detailed instructions as to the law that

23   applies to this phase of the trial after the conclusion of

24   all evidence and argument by counsel, just as you did in the

25   earlier trial.

1          Your recommendation is extremely important, and you must

2     consider it just as carefully as you did the matters

3     involving the guilt and innocence phase of this trial.

4          What the attorneys say is not evidence, just as in the

5     earlier trial.  It is important that you understand at this

6     point that in this phase of the trial, the attorneys are not

7     limited to the facts of the offense itself, but they may

8     present evidence about the defendant which tend to show

9     whether or not he should be put to death or whether or not he

10    should be sentenced to life without parole.

11         Are there any additional opening instructions

12    requested by counsel?

13              MR. LISENBY:  Not by the State, Your Honor.

14              MR. BLANCHARD:  Nor by the Defense, Your Honor.

15              THE COURT:  The procedure that we will follow is

16    just as in the earlier case, will be that first the attorneys

17    will make their opening statements to you.  Then the State

18    will be given an opportunity to present their evidence.  Then

19    the Defense will be given an opportunity to present their

20    evidence.  If there is any rebuttal by the State it would

21    follow the defendant's evidence.  Then there will be closing

22    arguments by counsel for State and Defense.  After that time,

23    I will charge you on the law that applies to this phase of

24    the trial.

25         You may state your case to the jury.

1                **OPENING STATEMENT BY THE STATE**

2                MR. LISENBY:  May it please the Court,

3    Mr. Blanchard, Mr. Keith, Members of the Jury, good morning.

4                THE JURY:  Good morning.

5                MR. LISENBY:  I want to thank you on behalf of the

6    State in returning again today to continue this phase and

7    this part of the trial.

8        Obviously, as you know, yesterday concluded what is

9    called the guilt phase of the trial, and this will be the

10   penalty phase of the trial.

11       You will hear testimony probably of several witnesses

12   during the course of this proceeding today, and it will be in

13   regard to as judge just told you, aggravating factors and

14   mitigating factors.

15       Aggravating factors are those things that make the death

16   penalty a more appropriate sentence; the mitigating factors

17   are ones that indicate life without parole to be the

18   appropriate sentence.

19        With regard to listening to the witnesses that come in

20   today be mindful also that you should consider during the

21   course of this proceeding all the testimony that came in

22   during the guilt phase, the first part of this trial, for

23   your consideration for aggravators or mitigators, either one

24   whichever you consider relevant for whatever weight you want

25   to put on them.  I'll talk about that in just a couple of

1    moments.

2        The State will submit to you during the course of this

3    phase of the trial three aggravating circumstances.

4        One, being the fact that this capital offense occurred

5    in which two or more people were intentionally killed by one

6    act or pursuant to one scheme or course of conduct.

7        Second, that the capital offense was committed during

8    the course of a burglary.

9        And, third, is that aggravating factor known as the

10   capital offense that occurred was heinous, atrocious and

11   cruel as compared to other capital offenses.

12       The judge is going to instruct you at the close of the

13   case with regard to the law and he is going to tell you, as

14   in all criminal cases, the burden of proof remains on the

15   State of Alabama with regard to the proof of the aggravating

16   circumstances in this case.  And, that burden of proof is,

17   again, beyond a reasonable doubt that the aggravating

18   circumstance exists.

19       I will submit to you also that during the course of this

20   the judge will also tell you at the close in his instructions

21   that your guilty verdicts yesterday have proven beyond a

22   reasonable doubt the first two aggravating circumstances that

23   I mentioned.  That being the fact that two or more people

24   were killed by just one act or during one scheme or course of

25   conduct, and that the murder of Angela Brown occurred during

1   the time of a burglary.  So, I will submit to you that those
2   two aggravating factors have already been proven beyond a
3   reasonable doubt based on your guilty verdicts.

4        With regard to the third aggravating factor, that being
5   heinous, atrocious and cruel, the State will again submit the
6   evidence with regard to the events of that day, January the
7   12th of 2000.  The fact that Angela Brown witnessed her
8   husband being shot and killed, that, she, herself was in fact
9   shot and left to die in her trailer, and that after that the
10  defendant returned on that occasion to beat her with a ball
11  bat, to try to smother with a pillow, stabbed her with a
12  knife, this being during the time she was still alive.  And,
13  we submit the evidence being from the pathologist,
14  Dr. Krolikowski, as well as the defendant's own statement,
15  the fact that Angela Brown was still alive at the time he
16  returned to the trailer.

17       So, I would tell you that the State will ask at the end
18  of this proceeding that you find that three aggravating
19  circumstances will have existed during the course of this
20  capital offense.

21       And, again, you should consider all of the evidence that
22  comes in today, as well as during the trial that you have
23  already heard.  It is relevant to the aggravating
24  circumstances and whatever mitigating circumstances you may
25  now find.  You should consider that.  Then the judge will

1  tell you at the end about a weighing process.  It is not a

2  numbers process, not just counting up numbers, you should

3  weigh that and he'll give you some instructions about how to

4  do that, as far as the aggravating circumstances and the

5  mitigating circumstances in reaching your determination.

6      At the close of this proceeding, the State requests that

7  you return a verdict that death is the appropriate sentence

8  in this case, because the aggravating factors will outweigh

9  the mitigating factors.  Thank you.

10            **OPENING STATEMENT BY THE DEFENSE**

11            MR. BLANCHARD:  May it please the Court,

12  Mr. Lisenby, Mr. Gibbs, Ladies and Gentlemen of the Jury,

13  Good morning.

14            THE JURY:  Good morning.

15            MR. BLANCHARD:  It is frankly hard for me to get up

16  before you today.  You reached a verdict, or verdicts, in

17  this case, and I'll tell you right now we accept those

18  verdicts.  We may have disagreement about some of the facts,

19  but we do accept them.  And, now, it is time for us to move

20  on to the next phase of this case.  It is now time for you to

21  determine which of two very severe punishments that the law

22  allows is appropriate for Jason Holloway in this case.

23      And the way this is framed up for you to decide is with

24  the aggravating circumstances that exist or that you find to

25  exist versus being weighed against the mitigating

1   circumstances that we will present to you.

2        Mitigating circumstances being those kinds of

3   circumstances of a person's life and entire record that may

4   create feelings that he should not be executed, that he is in

5   fact worthy of some degree of sympathy from you no matter

6   what he may have done on one occasion in his life.

7        You heard about this terrible, awful incident that

8   occurred.  And, as you know, we don't shrink from it.  We

9   acknowledge it.  We acknowledge the suffering of the families

10  of both victims.  It is a terrible thing.  And, if there were

11  any way that a death sentence would relieve suffering by

12  bringing those two back into life, I would escort Jason

13  Holloway to that chamber myself.  But, there's no way that

14  that can happen.  It will never relieve that suffering.

15       We've looked at that terrible blunt awful incident

16  that happened that day, and that's what we do in court a lot

17  of times.  We focus on an hour or two hours or three hours of

18  things that happened within that very short frame of time

19  like we did in this case.  We may look at one day, a few

20  hours.

21       In this case, in this phase, we tell you the story of a

22  a life.  We tell you about Jason Holloway's life so you can

23  judge it all in context, and that is a much harder thing to

24  do, to show a broad picture of what happened with some detail

25  of a person's life.

1    And I'll tell you right now that aggravating -- he

2    mentioned aggravating circumstances.  The law says some

3    aggravating circumstances have been proven.  That the law,

4    he's going to try to prove another one.  We recognize that.

5    There are aggravating circumstances in this case.  No

6    question about it.  But, that is anything -- you also have to

7    look at mitigating circumstances and those are the kinds of

8    things that I said may give rise to some feelings of sympathy

9    and tell you whether this is the kind of person, or not who

10   is worthy of some human compassion, or whether this person is

11   the kind of person that ought to be destroyed.

12    We are going to talk about what life forces have pushed

13   Jason Holloway to where he is today.  There will be numerous

14   -- the State talked about three aggravating circumstances.

15   We will present to you numerous mitigating circumstances.

16   And we will outline for you exactly what they are at the

17   appropriate time.

18    I'm going to tell you a little bit about them in just a

19   few minutes.  But, I want to emphasize to you, it is not a

20   numbers game.  You don't take the number of mitigating

21   circumstances versus the number of aggravating and say, well,

22   you've got a number here and a less number there.  That is

23   not the way it works.  One mitigating circumstance, just one

24   mitigating circumstance, you may individually feel outweighs

25   a whole host of aggravating circumstances.  That's for your

1    individual judgment.  So, it is not just a numbers game.

2        Will any of these mitigating circumstances excuse what

3    happened?  No.  We're not here about an excuse.  We are not.

4    There is no excuse.  Jason Holloway will be punished no

5    question about it, a severe punishment.  The question is

6    which of the two punishments that are allowed by law should

7    he receive?

8        As I said that involves the story of his life that we

9    are going to tell up through witnesses in a little while

10   today.  And, in order to tell that story, we need to go all

11   the way back to time before Jason was born, back to about

12   1970 or 1971.  At that time, right here in Chambers County,

13   there lived a woman name Rosa Jane Holloway.  Rosa Jane

14   Holloway, as the records and testimony will bring before you,

15   we'll show was perceived by the social workers and others

16   that dealt with her that she was a little mentally slow.  She

17   was married to a man named Robert Holloway.  Their marriage

18   was a stormy one.  Robert Holloway drank a lot.  So did Rosa

19   Jane Holloway.  The records will reflect, and you'll hear

20   testimony to the effect, that they were both in fact

21   alcoholics.  During the course of their relationship, Rosa

22   Jane Holloway gave birth ultimately to eight children, but at

23   the time we begin our story she had seven.  There was Rosco,

24   who you will hear from.  There was Larry.  There was Robert.

25   There was Fanny, Mary, Rose, and Dorothy.  Seven children.

1    Jason came later.  They were in ages, I believe, ranging from

2    nine to two at the time of Jason's birth.

3        Ladies and Gentlemen, the evidence will show you these

4    people lived in absolute squalor.  A condition none of God's

5    children should ever have to exist in right here in Chambers

6    County.

7        As I said, alcohol was a prevalent part of this family's

8    lifestyle.  They were in and out of trouble.  Mr. Holloway,

9    when he was there, was abusive to Rosa Jane Holloway.  But,

10   he was often not there at all.  She's left on her own to fend

11   and gather resources to feed these children.

12       In about 1972, she became pregnant again, and this time

13   it was with Jason.  We'll have evidence that she drank

14   throughout the pregnancy, heavily at times.  Ultimately Jason

15   was born on January 21, 1973.  At the time he was born, he

16   was born without the aid of a  midwife, with no prenatal

17   care, nothing of the sort that we all take for granted today.

18   His mother gave birth on the bed in their little shack out in

19   the country.  I believe Knight's Mill Road here in LaFayette.

20   There was no midwife attending her.  Rosco, his brother,

21   witnessed the birth in that home.

22       Jason was extremely small.  Very small.  You will hear

23   evidence, and you'll see pictures to show you, how tiny he

24   was.  And, Ladies and Gentlemen, you will hear evidence, I

25   will bring a psychologist before you, who will have opinions

1  about what occurred and backed up by records that we will

2  show you, you will hear about the fetal alcohol effect.  Some

3  of you may have heard of Fetal Alcohol Syndrome.  The fact

4  that the consumption of alcohol by a pregnant mother can have

5  on the developing fetus and, particularly, to the brain, the

6  developing brain, and how that can lead, as it did in Jason's

7  case, to very, very low intelligence and other problems that

8  a person can experience from this, essentially, birth defect,

9  in this case, a damaged or defective brain.

10  Jason, as I said, was very small when he was born.  He

11  was the youngest of all these children.  They continued to

12  exist in this squalor that I have described.  There was very

13  little food.  Rosco, one of the older children, would have to

14  go out and beg food from the preacher down the road in order

15  for the family to exist.  The mother was a drunk lying in

16  bed.  She hardly went out at all except when the social

17  worker required her to do so.  Rosco and his sisters would

18  cook when they could find food.  In some cases, Jason, who

19  was the youngest, all the other children were hungry and were

20  older, and they would get the food.  And, you will be told

21  that Jason often had to go hungry as a tiny baby because the

22  other children would take food from his mouth.  They were not

23  being intentionally cruel, they were all very, very hungry.

24  Jason failed to develop as he should and this condition

25  continued for almost two years, almost two solid years.

1   Until 21 months after Jason was born, someone finally took
2   attention to it, a social worker came in, and said enough.
3   This woman is not getting better.  We must take these
4   children.  At which time, they were taken out of that
5   situation and all of the children were placed in foster care.
6   Thank goodness none of them ever had to go back to that
7   situation.

8        They were placed some -- the children were placed some
9   in one family, some in another.  Jason and his brother were
10  placed with the Collier family.  Marie Collier and her
11  husband, at the time, Jack Collier.  This was a good thing.
12  You'll hear testimony that these were good people and they
13  did their best to help Jason.  They were not extraordinarily
14  wealthy people.  They will tell you -- Ms. Collier will
15  testify.  She will tell you they were just country folk.  She
16  said she was shocked.  Even though they had seen poverty,
17  they were shocked by the condition of these children that
18  came to them.  Jason's arms and legs were like sticks.
19  Twenty-one months old, he could not form sentences, even
20  simple ones.  He could say a few words.  His brothers and
21  sisters had taken care, what care there was of him, and he
22  had not learned anything that he should have learned.  He was
23  not anywhere close to potty trained or anything of that sort.
24       But, he came to live with the Colliers the evidence
25  will show you, and because of his small size, he became kind

1  of a pet in that family.  He was a cute child.  You will see

2  that.  You will see pictures of him.  He became a pet and he

3  bonded particularly with Mr. Jack Collier.  Remember he had

4  not had a father in his home.  He bonded with Mr. Jack

5  Collier.  They became very close.  You will hear testimony

6  that their relationship was very, very close.  Mr. Collier

7  would take Jason places with him and Jason finally for a

8  briefly golden time had the influence of a family for a few

9  years with a father present.

10      When Jason was about seven years old,

11  Mr. and Mrs. Collier had marital problems leading to their

12  separation.  When Jason was about eight years old he and his

13  brothers came home on the bus one day and were told that,

14  Jason was told that his father had committed suicide.

15      Once again Jason is abandonded without a

16  father figure.  His brothers, who were older, started to

17  leave the foster home and go on to other things.  Jason is

18  now alone in that foster home with Ms. Collier and with other

19  foster children who come into the home.  At the same time,

20  Jason is now school age and his brain problems are beginning

21  to show up in his academics.  You will see school records to

22  show how slow Jason was.  Intelligence tests that we'll show

23  you.  IQ tests that will show you that his intellect is

24  consistent with being pegged in the bottom 16 percent of the

25  population.  Even though not mentally retarded, he doesn't

1   quite meet that standard, but his intelligence is so low that
2   it is within the 16th -- below the 16 percentile of the
3   population.  In other words 84 percent of the people in the
4   country have more intellect than Jason.

5       He had difficulty in school because of that.  He failed
6   the first grade.  He was kept back.  He was kept back in
7   other grades.  He was in special learning classes.  Things of
8   that sort.

9       By the time Jason reached his purberty, right around
10  that point, he's pretty much reached his academic potential
11  based on that damaged brain I told you about.  At the same
12  time, one of the effects the psychologist will tell you, is
13  that people who have this effect, are unable -- they have
14  poor judgment.  They are unable to profit from experience
15  like many of us are.  Like all of us should be.  And, he'll
16  explain that to you more.  But this is a tremendous source of
17  frustration.  If you are unable to learn from what happens to
18  you day-to-day, unable to learn from your experiences and
19  profit from them, you don't have proper guidance from a
20  family, you become very frustrated.  Jason had needs.  He
21  began to lash out.  We begin to see Jason getting angry.  He
22  began acting in strange ways.  He began this peeping tom
23  thing around the neighborhood.  You have already heard a
24  little about that.  Eventually Jason goes into -- from a
25  foster home, because of these problems nobody understands,

1  you will hear that he went into the juvenile system.  The
2  people try to figure out what to do with Jason.  He ended up
3  going to a series of places.  One of which is the Porta Cras
4  School and Green Pines in Birmingham and Anniston, and they
5  tried to do things to help him there.  And, at one point
6  Children's Hospital -- actually he tried to commit suicide at
7  one point in his young life.  He tried to take his life with
8  an overdose of pills and he was treated in a hospital, and
9  you will see records from that hospital that will show you
10 they looked at him and saw a problem and tried to figure out
11 how to treat him, but no one ever quite figured it out.  He
12 never quite got the treatment that he needed.

13     He never graduated from high school.  His mental
14 problems held him back from that.  He never quite made that
15 leap.  When he finally was more or less pushed out of the
16 Porta Cras School, he had no system to fall back on.  He
17 could stay with Ms. Collier from time to time, but he is now
18 an adult, out there at the mercy of the world.  And, he goes
19 and engages in a series of blue collar type of jobs.  He gets
20 married.  Father's a child.  And eventually through
21 frustration that marriage breaks up and he's separated.  He's
22 still married today.  He and his wife are separated.  And, he
23 ends up living back here in the Welch community of Roanoke.
24 And, essentially, you know the rest from there.  That is how
25 Jason got to where he is.  And, the evidence will show you in

1   greater detail that those were life pressures that were

2   working on Jason.

3        What I think all this evidence shows you, and will show

4   you, Ladies and Gentlemen, is not that all these horrible

5   things that happened to Jason throughout his life make it,

6   while he was growing and developing, make it okay for him to

7   do horrible things to other people.  That is not what we are

8   about.  We are here, as I said, simply to determine in the

9   context of his whole life whether he is the kind of evil,

10  remorseless, horrible, terrible person, such as Ted Bundy or

11  Osamma Bin Lauden, Tim McVay, or someone like that, or the

12  Sniper Killers, who deserve and need to be put out of

13  society, or whether he is someone with whom we can have some

14  sympathy and say, Jason, you cannot remain with us in

15  society, but we have a place for you.

16       Mitigating circumstances are something that call you,

17  tell you that Jason is after all human.  That he is deserving

18  of some feeling from you.  That he does not deserve to be

19  judged on the basis of this one terrible incident in his

20  life, but deserves, like all of us do, to be judged on the

21  basis of all of our life and records.

22       So, that is what we will be bringing before you today,

23  Ladies and Gentlemen, and I hope and pray that at the end of

24  that time, you will weigh the factors as the law requires you

25  to do, and return a verdict that says Jason Holloway may live

1   out his life that has been dealt to him in the penitentiary

2   system of the State of the Alabama.

3       Thank you.

4           THE COURT:  You may proceed.  Call your first

5   witness.

6           MR. LISENBY:  The State reoffers and reintroduces

7   all the testimony, physical exhibits previously introduced at

8   the guilt phase of the trial for purposes of this phrase of

9   the trial.

10          THE COURT:  Ladies and Gentlemen, all of the

11  testimony and evidence that has been previously admitted in

12  the first phase of this trial is hereby adopted as evidence

13  and testimony in this phase of the trial for your

14  consideration.

15          MR. GIBBS:  State calls Bertha Brown.

16          MR. BLANCHARD:  Your Honor, may we approach just

17  briefly before we?

18  (WHEREUPON, A SIDE BAR COMMENCES.)

19          MR. BLANCHARD: Ms. Brown?  I assume where we're

20  going is victims impact?

21          MR. LISENBY:  Yes.

22          MR. BLANCHARD:  Judge, I object to it.  I don't

23  know specifically what Ms. Brown is going to say.  Obviously,

24  the State is limited to certain aggravating circumstances,

25  and I don't see how victim impact is related to or relevant

1    to any of the aggravating circumstances that they can prove

2    at this phrase.

3             THE COURT:  Hummm.  I think this something I have

4    allowed in a limited basis and it has always been affirmed.

5             MR. LISENBY:  I think it is allowable under *Payne*

6    *versus Tennessee.*

7             MR. BLANCHARD:  My point is Payne was a Tennessee

8    case, and of course, a different system.  If they want to

9    rely on a case from ....

10            THE COURT:  Where's that case from that you were

11   citing a while ago, wasn't that Tennessee?

12            MR. BLANCHARD:  No, California, I think.

13   Different.  But it was a Supreme Court case.  I understand

14   that.

15       It was not, it was not analyzed under our system is the

16   point.  I think since we are limited to these specific

17   aggravators, I don't know what Tennessee does, if they have

18   specific aggravators or not, you know.  It may be that they

19   don't.  But, we do, and I think anything that comes in, has

20   got to be revelvant to one of those aggravators.

21            MR. LISENBY:  The Payne court basically held that

22   victim impact was admissible, as in common sensibly, all

23   criminal cases because the victim impact is important for the

24   sentencing decision.

25            THE COURT:  I'm going to allow it in a limited

1    fashion, but I also intend to charge that only the

2    aggravating factors can be considered.

3          MR. BLANCHARD:  Can you go further and charge that

4    the victim impact evidence is not aggravating?

5          THE COURT: It is testimony for their consideration,

6    but I will not allow it to be in the nature of attached to

7    aggravating circumstance or aggravating factor.  In short,

8    I'm pretty well -- I'm giving Defense the full rein with

9    whatever you want to put on within the limits of law.  But,

10   what I am doing, is giving the State an opportunity to, at

11   least, broach the subject of victim impact.

12        For both sides, it is still aggravating weighing

13   against mitigating.

14        MR. LISENBY:  While we're up here so we won't have

15   to cause another interruption down the road, I would object

16   to any testimony about that the Defense intends to offer that

17   would occur prior to the birth of Jason Holloway.  I don't

18   think that has any relevance whatsoever in this particular

19   case.

20        The mitigating circumstances go, as I understand it, to

21   the life of the individual.  And, one of the first things

22   Mr. Blanchard talked about in his opening statement were

23   events that occurred prior to his birth.  Now, if he wants

24   to, I think, the portion about that his mother drank alcohol

25   that led to fetal alcohol syndrome, I don't think that is

1   objectionable from our part.  But, the discussion he had

2   about his mother was beaten by her husband.  He was -- the

3   father was an alcoholic prior to his birth.  I don't think

4   has any relevance whatsoever.

5           MR. BLANCHARD:  It goes to the environment he was

6   born into.

7           THE COURT:  I think everything from the time of his

8   birth on is relevant.  And, the circumstances as they existed

9   at the time of his birth is what I understand that you were

10  putting in front of the jury.

11          MR. BLANCHARD:  That's correct.

12          THE COURT:  The brothers, sisters, the family

13  situation, all of that existed at the time of his birth.  So,

14  in that respect, I'm going to allow it.

15          MR. BLANCHARD:  I don't intend ....

16          THE COURT:  I agree with Mr. Lisenby that I don't

17  think going back through the life and times of the mother and

18  father --

19          MR. BLANCHARD:  I don't intend to.

20          THE COURT:  -- but everything as it existed at the

21  time of his birth on is relevant.

22          MR. BLANCHARD:  Okay.

23  (WHEREUPON, A SIDE BAR CONCLUDED.)

24          THE COURT:  Call your first witness.

25          MR. GIBBS:  The State calls Bertha Brown.

1    BERTHA BROWN

2    HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

3    THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

4    TESTIFIED AS FOLLOWS:

5    DIRECT EXAMINATION

6    BY MR. GIBBS:

7    Q    Ms. Brown, I am going to ask you to keep your voice up

8    so the members of the jury can hear you.  If you would, slide

9    up so that everyone can see you from the jury box.  Okay.

10    Would you tell us your name for the record, please?

11   A    Bertha Brown.

12   Q    I am sorry.

13   A    Bertha Brown.

14   Q    Okay.  And, Ms. Brown, did you know Rodney Brown during

15   his life time?

16   A    Yes.  He was my oldest son.

17   Q    Your oldest son.

18   A    Um-hmmm.

19   Q    How many children do you have?

20   A    I had eight.  I have seven now.

21   Q    Okay.  All your other children are still alive.

22   A    Um-hmmm.

23   Q    Prior to January the 12th of 2000, when did you last

24   see Rodney alive?

25   A    January the 11th.

*** Frances L. Roark ***

1    Q     The day before.

2    A     Um-hmmm.

3    Q     How often would you see your son, ma'am?

4    A     He would be at my house every day if he was not working

5    no where.  He'd come when he Ann would go to work and she

6    would pick him up in the evening.

7    Q     He'd come over when Ann went to work?

8    A     Um-hmmm.

9    Q     Who was Ann?

10   A     His wife.

11   Q     His wife, Angela, the other victim in this case; right?

12   A     Um-hmmm.

13   Q     Would she often come with her husband to see you?

14   A     Um-hmmm.

15   Q     If you would, Ms. Brown, would you tell the members of

16   the jury what effect the lost of your son has had on you,

17   what impact the loss of your son has had on you and your

18   family?

19   A     Yes.  We used to have big dinners every Sunday.  We

20   don't have them no more.  We can't sleep at night half of the

21   time.  I really don't like to go no where but to church and

22   back home.  Just lost.

23   Q     The family doesn't get together anymore?

24   A     No big dinners.

25   Q     Ma'am?

*** Frances L. Roark ***

```
 1  A     Not no big dinners.

 2  Q     Where would you have these Sunday dinners, ma'am?

 3  A     At my house.

 4  Q     Do you think you'll ever get over this, ma'am?

 5  A     I really don't know.  I never lost a child.

 6  Q     You never lost a child before.  Now, you have

 7  grandchildren by Rodney; is that correct?

 8  A     Um-hmmm.

 9  Q     Particularly Tashia and Terri; is that correct?

10  A     Yes.

11  A     My step-grandkids.  He had a daughter of his own.

12  Q     He has another daughter; correct?

13  A     Um-hmmm.

14  Q     Prior to the murder of Angela and Rodney, what was your

15  relationship with Terri and Tashia?

16  A     We got along real good.

17  Q     How often would you see Terri and Tashia?

18  A     Before they died?

19  Q     Yes, ma'am, before the deaths.

20  A     Nearly every other day.

21  Q     What has been the effect on your relationship with

22  Terri and Tashia, what effect has the death of your son and

23  Angela had on that?

24  A     We really miss them because we don't ever see them.

25  Q     Have you seen them here in court, ma'am?
```

```
 1   A      Um-hmmm.

 2   Q      Prior to that, when was the last time you saw them?

 3   A      I think it was the last time I seen was when Rodney and

 4   Ann died.

 5   Q      How long ago would that have been?

 6   A      I think three years this year.

 7   Q      You hadn't seen them in three years.

 8   A      Huh-huh.

 9   Q      Since court today.

10          MR. GIBBS:  Nothing further, Ms. Brown.  The

11   Defense counsel may have some questions for you.

12          MR. BLANCHARD: Ms. Brown, the Defense sincerely

13   regrets your loss and has no questions for you.  Thank you.

14          THE COURT:  Thank you, ma'am.  You may step down.

15   (WHEREUPON, THE WITNESS TESTIMONY WAS CONCLUDED.)

16          THE COURT:  Call your next witness.

17          MR. GIBBS:  State calls Jerome Cofield.
```

18                        **WILLIAM JEROME COFIELD**

19              **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

20                 **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

21                           **TESTIFIED AS FOLLOWS:**

22                           **DIRECT EXAMINATION**

```
23   BY MR. GIBBS:

24   Q      Tell us your name, please.

25   A      William Jerome Cofield.
```

1   Q      And, Mr. Cofield, did you know Angela Brown during her

2   lifetime?

3   A      Yes, I did.

4   Q      And, how did you know Angela during her lifetime?

5   A      That was my sister.

6   Q      Do you have any brothers or sisters?

7   A      I had two brothers and Angela was my only sister.

8   Q      There were four of you?

9   A      Four.

10  Q      She was the only girl?

11  A      Yes.

12  Q      Out of the four of you where did she rank:  Oldest,

13  youngest, in the middle?

14  A      She was the oldest.

15  Q      Out of your brothers and sister, how would you say your

16  relationship was with Angela?

17  A      With Angela, she was the only girl, she and I was very,

18  very close.

19  Q      If you would, would you please tell the members of the

20  jury, what effect the lost of Angela has had on you and you

21  are family?

22  A      It has also ripped our family apart.

23  Q      How so?

24  A      Tashia and Terri.  I don't get a chance to see them.

25  Before this happened, I would see them every day or talk to

1   them on the phone.  But, I very seldom get a chance to see

2   them now.

3   Q      Where are they now?

4   A      They are in Hogansville, Georgia, with their biological

5   father.

6   Q      They were uprooted also.

7   A      Yes.

8   Q      They had to leave their friends.

9   A      School.

10  Q      Church?

11  A      Yes.

12  Q      Everything.

13  A      Everything.

14  Q      Please continue with the other effects that the lost of

15  Angela has had on you and your family.

16  A      It has caused me, I feel, to -- I had to carry the

17  whole weight.  Because one of my brother's had passed away

18  before this happened.  And, I had to be strong for the

19  family.  I had to learn how because the girls stayed with me

20  probably a month or so after this happened.  I had to deal

21  with what had happened and at the same time remain strong for

22  the girls to help them through what had happened.

23  Q      And, forgive me, you have your own family and wife to

24  deal with also; correct?

25  A      Yes, that's correct.

1   Q      And, did this detract from your time, attention,

2   affection of your family?

3   A      Yes, it did.  Yes.

4   Q      Is this something that you will ever get over?

5   A      I never will get over it.  There's no way.  There is no

6   way.

7   Q      Would you tell us your feelings about this:  Remorse,

8   betrayal, what feelings has this brought to you and effected

9   your life?

10  A      Well, you said it best, both remorse and betrayal.

11  Q      Betrayal, how?

12  A      The day that this happened, at that moment I was

13  looking for some comfort.  I had seen the bodies.  I knew

14  what had happened.  The day that this incident happened on

15  January 12th of 2000, I was asked to sit in a patrol car

16  until the detectives were able to get some information from

17  me.  I was in the patrol car, my two nieces were in the

18  patrol car, and the defendant was in the patrol car with me.

19  He comforted me.  He told me everything was going to be okay.

20  I had nothing to worry about.  But, on January 21st, I felt

21  betrayal because the one that I too ran to for comfort, I

22  felt betrayed me.

23          MR. GIBBS:  Thank you, Mr. Cofield, the Defense may

24  have some questions for you.

25          MR. BLANCHARD:   Mr. Cofield, the defendant regrets

1  your loss as well and has no questions for you.

2          THE COURT:  Thank you, sir.  You may step down.

3  (WHEREUPON, THE WITNESS TESTIMONY WAS CONCLUDED.)

4          THE COURT:  Call your next witness.

5          MR. GIBBS:  State would rest for this portion, Your

6  Honor.

7          MR. BLANCHARD:   Judge, as our first witness we

8  will call Rosco Holloway.

9                    ROSCO LEWIS HOLLOWAY

10      HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

11         THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

12                   TESTIFIED AS FOLLOWS:

13                   DIRECT EXAMINATION

14  BY MR. BLANCHARD:

15  Q    Please tell the ladies and gentlemen of the jury and

16  the Court your name.

17  A    Rosco Lewis Holloway.

18  Q    Keep your voice up real good so they can hear you.

19      When were you born, Mr. Holloway?

20  A    January 1st, 1964.

21  Q    And when were you born?  I mean, where were you born,

22  excuse me?

23  A    Chambers County, LaFayette.

24  Q    You were born in '64.

25  A    Yes, sir.

*** Frances L. Roark ***

```
 1  Q      Now, we've talked about Jason's birthday.  Are you his

 2  brother?

 3  A      Yes, I am his older brother.

 4  Q      And, he was born in when 1973?

 5  A      Yes.

 6  Q      January of '73.

 7  A      Yes.

 8  Q      Were you present at his birth?

 9  A      Yes.

10  Q      And, how old were you at the time?

11  A      I think I was nine.

12  Q      About nine?

13  A      About nine.

14  Q      Who was your mother?

15  A      Rosa Jane Holloway.

16  Q      And, your father?

17  A      Robert Holloway.

18  Q      Did they -- at or about the time of Jason's birth, were

19  they living together?

20  A      Yes.

21  Q      Where?  Here in ....

22  A      Knight's Mill Road.

23  Q      Knight's Mill Road.

24  A      Yes.

25  Q      Were your mother and father always peaceful together?
```

*** Frances L. Roark ***

```
1   A    No.

2   Q    Did they sometimes fight?

3   A    Yes.

4   Q    Were they bad fights?

5   A    Yes.

6   Q    Was there any drinking that went on between your mother

7   and father?

8   A    Yes.

9   Q    Tell us about that.

10  A    Well, my mom and dad both were alcoholics and they

11  drank every day.

12  Q    What -- in particular, what would your mother drink?

13  A    Vodka.

14  Q    Vodka?

15  A    Yes.  Moonshine.

16  Q    Or moonshine.

17  Q    Where would she get moonshine?

18  A    From our preacher that we lived next door to.

19  Q    And, she drank most every day?

20  A    Yes.

21  Q    Would she sometimes drink heavily?

22  A    Yes.

23  Q    What kind of house did you live in on Knight's Mill

24  Road?

25  A    We lived in a three-room shack.
```

1  Q    Did it have windows and glass in all the windows?

2  A    Not all of the windows.  Just some of them.

3  Q    Did it have heat?

4  A    No.

5  Q    Did it have air conditioning?

6  A    No.

7  Q    In the winter time, when it would get cold, what did

8  you do for heat?

9  A    We curled up with lots of blankets to stay warm.

10 Q    Did it have a fireplace or anything?

11 A    It had a fireplace, but we hardly used it.

12 Q    I'm sorry, keep your voice up.  We had a fireplace, but

13 we never used it.

14 Q    Never used it.  So, the only way you could keep warm

15 was to wrap up with blankets.

16 A    Yes.

17 Q    How many children?  And, I'm talking about before Jason

18 was born?

19 A    Seven.

20 Q    You were the oldest.  Were there seven?

21 A    Yes.

22 Q    Can you name them and tell us about how old they were?

23 A    Fanny Holloway, is my oldest sister.  Mary is the next

24 oldest to Fanny.  Then I am the oldest boy.  Following me

25 would be Larry, Rosemarie is the next girl, Dorothy would be

1  the next, and Jason is the baby.

2  Q    Now, about the time Jason was born, and we'll talk

3  about his birth in a minute, but around that time was your

4  father supporting the family?

5  A    Occasionally.

6  Q    Was your mother working?

7  A    No.

8  Q    Did you ever know her to work?

9  A    Yes.

10  Q    When did she work?

11  A    She worked in '71, '72, and right up to just before

12  Jason was born, but after then, no work.

13  Q    She didn't work anymore?

14  A    No.

15  Q    While she was working, do you know what she did with

16  her money?

17  A    Mostly drank it up.

18  Q    Was she able to move into any better housing because

19  she had a job?

20  A    Well, if she would put the money to good use, we could

21  have, but she just drank it up.

22  Q    Mr. Holloway, did your mother feed and care for you

23  children?

24  A    Occasionally, but not properly.

25  Q    What do you mean not properly?

*** Frances L. Roark ***

```
 1  A    Well, it was days, maybe, weeks we went hungry, nothing

 2  to eat sometimes no clothes or shoes.

 3  Q    Where would she be?

 4  A    Drunk at home.  At home drunk.

 5  Q    How did you get your clothes?

 6  A    From our next door neighbor a preacher.

 7  Q    And did you -- how did you get food when your mother

 8  was drunk?

 9  A    From the next door neighbor, the preacher.

10  Q    Who prepared the meals?

11  A    Sometimes I or my sisters.

12  Q    And, you were about eight or nine years old.

13  A    Yes.

14  Q    How old was your sister?

15  A    Twelve and ten.

16  Q    What kind of things would you eat?

17  A    Well, we'd open cans of beans or fried chicken.  Stuff

18  like that.  Biscuits.

19  Q    Now, do you remember Jason's birth?

20  A    Yes.

21  Q    Where was he born?

22  A    In one of the shotgun rooms that we had when we was

23  living in the house on Knight's Mill Road on the bed.

24  Q    Did you witness the birth yourself?

25  A    Yes.
```

1    Q    Did you notice anything about -- did anything appear

2    unusual to you about Jason?

3    A    He was premature.  Small.

4    Q    Very small?

5    A    Yes.

6    Q    Can you show us about how big he was.  About like that?

7    A    Yes.

8    Q    And, right after he was born, did your mother breast

9    feed him?

10   A    Yes.

11   Q    And, just so I am clear about this, Rosco, did your

12   mother during the time she was pregnant with Jason, was she

13   still continuing to drink?

14   A    Heavily; yes.

15   Q    Do you know if she drank during the early part of her

16   pregnancy?

17   A    Yes.

18   Q    During the middle part?

19   A    Yes.

20   Q    And, even during, right before he was born.

21   A    Yes.

22   Q    Would it always be Vodka and moonshine?

23   A    Yes.

24   Q    All right.  Now, after Jason was born, and your mother,

25   I believe, you said breast fed him initially.

1   A      Yes.

2   Q      After, he got a little bigger and needed something else

3   to eat, how would he be fed?  How did he get nutrition?

4   A      Well, we'd go to the preacher and get it and feed him.

5   Q      Did you always have enough for everybody?

6   A      No, sir.

7   Q      When there wasn't enough for everybody to go around,

8   how would Jason, since he was so young, get his?

9   A      Just have to wait to the next turn.

10  Q      Did you ever see or know of anybody taking food out of

11  Jason's mouth?

12  A      No.

13  Q      You didn't see that happen?

14  A      No.

15  Q      All right.  Did, after Jason was born and during these

16  conditions that you have described, did you continue to live

17  in this same house?

18  A      Well, twenty-one months after he was born, we left that

19  house and went to a foster home.

20  Q      Well, I mean before you went to the foster home.

21  A      Yes.

22  Q      You continued to live in the same house you have

23  already described.

24  A      Yes.

25  Q      How long did you live in that house after Jason was

*** Frances L. Roark ***

```
 1   born?
 2   A     Well, we lived there for 20 months prior to when Jason
 3   was born.  And, then we moved from there to a foster home.
 4   Q     Okay.  How old was Jason when you moved to the foster
 5   home?
 6   A     He was 21 months and some days.
 7   Q     From the time of his birth until you moved to the
 8   foster home, you lived in that same house.
 9   A     Yes.
10   Q     Did it ever get any better?  Did you ever get windows
11   in it?  Heat and air conditioning or anything?
12   A     No.
13   Q     Was there an in-door bathroom in that house that
14   worked?
15   A     No.  No.
16   Q     Where did you use the bathroom?
17   A     Outside or either had a bucket on the inside when it
18   was cold.
19   Q     Was the house clean, Mr. Holloway?
20   A     No.
21   Q     Can you describe the condition of the inside of the
22   house?
23   A     It was a wooden floor.  No rug or linoleum on the
24   floor, windows was out, walls -- holes knocked in the walls.
25   No lights.
```

1    Q    Now, you said you and the other children would be

2    taking care of Jason.

3    A    Yes.

4    Q    Was anybody there to teach him how to walk?

5    A    Yes.  We, my sister and I tried to teach him how to

6    walk.

7    Q    Rosco, did you, or Jason, or the other children have

8    any toys?

9    A    No.

10   Q    Was Jason kind of a toy for you and the others?

11   A    Yes.

12   Q    You played with him a lot.

13   A    Yes.

14   Q    Did your sisters pick him up?

15   A    Yes.

16   Q    They carried him around.

17   A    Yes.

18   Q    Did they ever drop him?

19   A    Few times.

20   Q    Did he ever hit his head on anything?

21   A    I recall one time.

22   Q    Was he injured?

23   A    Yes.

24   Q    How so?

25   A    Not severe.  Just had him checked out.  It was just a

*** Frances L. Roark ***

1  fracture.

2  Q    A fracture?

3  A    Yes.

4  Q    Did y'all have a doctor during that time?

5  A    No.

6  Q    You didn't get any medical treatment.

7  A    No.

8  Q    Anybody seeing about your teeth.  Any dental for you

9  and Jason and the others?

10 A    No, not at that time.

11 Q    No?  Tell me this, Mr. Holloway, talking about all your

12 brothers and sisters, have you noticed anything about your

13 brothers and sisters, as far as their -- how quick they are

14 in thinking or how slow they may be, anything unusual about

15 them?

16 A    Yes.

17 Q    What have you noticed?

18 A    They're mental.  Like they have mental problems, slow

19 speech or learning.

20 Q    Are any of the -- any of your brothers and sisters

21 better or worse in that regard than the others?

22 A    Yes.

23 Q    Can you tell me who you are talking about?  Rose

24 Holloway, Fanny Holloway, and sometimes Mary.

25 Q    Sometimes Mary.

*** Frances L. Roark ***

```
 1   A    Yes.

 2   Q    All right.

 3   A    And Jason.

 4   Q    And Jason.  You've noticed Jason has that same ....

 5   A    Yes.

 6   Q    What are we talking about?  What was wrong with Jason

 7   that you thought?

 8   A    I think something -- a birth defect from the mom

 9   drinking like she did, because she drank with all of them.

10   Q    How did it show up in Jason?  What did Jason do or not

11   do?

12   A    Well, when he was born, he was born real tiny.

13   Q    Mentally did you see anything different about Jason?

14   A    No, sir.

15   Q    Was he about like the others?

16   A    Yes.

17   Q    Do, you, yourself sometimes feel like you have, maybe,

18   some problem relating to that?

19   A    Sometimes; yes.

20   Q    How do you feel?

21   A    Lost.

22   Q    Do you remember the time that you went to the foster

23   home?

24   A    Yes.

25   Q    Jason was 21 months old.
```

```
 1   A      Yes.

 2   Q      Now, how did that happen?  Did somebody come, a social

 3   worker come and take y'all out of the house?

 4   A      Yes.

 5   Q      Where they take you?

 6   A      To Welch, Alabama, Route 4, Box 124 Welch, Alabama.

 7   Q      Is that the Collier residence?

 8   A      The Collier residence.

 9   Q      Who went to the Collier residence?

10   A      The four boys.  Larry, Robert, Jason and I.

11   Q      All four of you.

12   A      Yes.

13   Q      Where did the girls go?

14   A      Two went to Valley and two also went to Welch, Alabama.

15   Q      Now, in the Collier residence, were things improved

16   there?  Did things get better?

17   A      One hundred percent.

18   Q      One hundred percent?

19   A      Yes.

20   Q      Can you tell us whether the Colliers -- what were the

21   parent's names, the foster parents?

22   A      Ms. Marie Collier and Mr. Charles Collier.

23   Q      And, what did they -- what did they do for a living?

24   A      Well, Ms. Collier were a RN, and Mr. Collier worked

25   over at West Point Pepperell in LaGrange, Georgia.
```

1   Q    Did they kind of live in a rural, country area?

2   A    Yes.

3   Q    Did you have any other foster children in the home

4   besides you four at the time you went there?

5   A    No, sir.

6   Q    Now, at this point, Jason is 21 months old; right?

7   A    Yes.

8   Q    And, how long did you stay in that foster home?  Let's

9   ask you that question.

10  A    From 12 to 18.

11  Q    So you were there about eight years.

12  A    Yes.

13  Q    Was Jason there that whole time?

14  A    Yes.

15  Q    Now, was Jason, at the time he went to the foster home

16  with you, what was his physical appearance like?  What did he

17  look like?

18  A    You mean, after he got there or before?

19  Q    Before.

20  A    His appearance?  Rough.

21  Q    Was he healthy and kind of fat?

22  A    No.  No.

23  Q    Was he skinny?

24  A    Skinny.

25  Q    Were you skinny?

*** Frances L. Roark ***

1  A    Yes.

2  Q    All right.  When you got to the foster home, did you

3  get some medical attention?

4  A    Yes.  Immediately.

5  Q    You started seeing a dentist.

6  A    Yes.  .

7  Q    Got some attention that way.

8  A    Yes.

9  Q    Did you start getting regular meals?

10 A    Yes.

11 Q    Jason too?

12 A    Yes.

13 Q    Tell us how you feel about Mr. and Mrs. Collier as

14 foster parents?

15 A    They were great as our foster parents.

16 Q    You were there for eight years.

17 A    Yes.

18 Q    Now, did, during the time that you were there, did

19 Jason develop any special relationships with either of the

20 faster parents?

21 A    Yes.

22 Q    Which one?

23 A    Mr. Collier and Ms. Collier.

24 Q    Mr. and Mrs. Collier.

25 A    Yes.

1    Q    Did he have an especially close relationship with

2    Mr. Collier?

3    A    Yes.

4    Q    Tell us about that.  What did you see?

5    A    Well, Mr. Collier took to him and raised him, and he

6    was attached to him and took him places and bought him

7    things, made him feel like he had a father.

8    Q    Did they have names for each other?

9    A    No more than Mr. Collier and Jason.

10   Q    Okay.  Now, Mr. Holloway, did any of you children have

11   trouble in school?

12   A    Yes.

13   Q    Tell me what you know about that.  Particularly about

14   Jason, if you know.

15   A    I am not familiar with Jason, you know, Jason's

16   schooling.

17   Q    What yours, did you have any problems?

18   A    Yes, sir.  I had a little bit of problem when I went to

19   school.

20   Q    Were you classified in a learning disability?

21   A    Yes.

22   Q    All right.  And, where did you go to school?

23   A    Five Points High.

24   Q    Did you graduate from high school?

25   A    No.

*** Frances L. Roark ***

1  Q    Do you know if any of the children did?

2  A    I think one of us did.  Mary.

3  Q    Mary.

4  A    Yes.

5  Q    All went to school, though?

6  A    Yes, all went to school.

7  Q    Do you remember a time when Jason was about, I guess,

8  about eight years old, coming home on the school bus and

9  getting some bad news?

10 A    Yes, sir.

11 Q    What was that bad news?

12 A    That Mr. Collier had committed suicide.

13 Q    Do you know how he committed suicide?

14 A    No.

15 Q    You just know he did.

16 A    Yes.

17 Q    Was Jason present when you got the news?

18 A    Yes.

19 Q    Jason -- was Mr. Collier living in the house where

20 y'all lived at the time that happened?

21 A    No.  Were he and Ms. Collier separated?

22 A    Yes.

23 Q    How did Jason take the news of Mr. Collier's death?

24 A    Well, he took it sincerely.  I mean, it hurt him.  I

25 could tell that.  You know, it took something from him.

| | | |
|---|---|---|
| 1 | Q | It took something from him. |
| 2 | A | Yes.  By not never having a daddy and then get one and |
| 3 | | then, you know, losing him. |
| 4 | Q | Over the next, I guess, few years, Mr. Holloway, |
| 5 | | Rosco -- |
| 6 | A | Yes. |
| 7 | Q | -- did you and Larry and Robert leave the foster home? |
| 8 | A | I did. |
| 9 | Q | Okay. |
| 10 | A | And Larry and Robert. |
| 11 | Q | And Larry and Robert. |
| 12 | A | Yes. |
| 13 | Q | Did you all leave at different times? |
| 14 | A | Yes. |
| 15 | Q | Do you know where Larry went? |
| 16 | A | I think he went to Lanett at that time. |
| 17 | Q | Do you know where he is now? |
| 18 | A | Yes. |
| 19 | Q | Does he still live in Alabama? |
| 20 | A | No.  Well, Mobile, yes. |
| 21 | Q | What about Robert, where is he? |
| 22 | A | Los Angeles. |
| 23 | Q | All right.  And, your sisters, do they live in Alabama? |
| 24 | A | Yes. |
| 25 | Q | Are any of them here in the courtroom? |

1    A    Just one.

2    Q    Just one?  Which one is here?

3    A    Mary.

4    Q    Have the others been here during the week?

5    A    Yes.

6    Q    Which ones have been here?

7    A    Dorothy and also Rose.

8    Q    Dorothy, Rose, and Mary have all been here during this

9    week.

10    A    Yes.

11    Q    While you were living in the foster home, and you had

12    an opportunity to be there and be there with Jason, how did

13    Jason behave toward his foster parents?

14    A    It was excellent.  You know, they never had any problem

15    out of him not at the time when I was there.

16    Q    Was he respectful to them --

17    A    Yes.

18    Q    -- or disrespectful?

19    A    Yes, he was respectful.

20    Q    Were there any pets in the home?

21    A    Yes.

22    Q    Was Jason given any special duties or privileges with

23    regards to the pets, and what kind of pets were they?

24    A    Dogs.  German sheppard and a Rotweiler and Doberman

25    Pincher.

1   Q     Was Jason -- did Jason do anything with them?

2   A     Played with them.

3   Q     Did he have any duties or chores with regard to taking

4   care of them.  Was Jason good to the animals?

5   A     Yes.

6   Q     All right.

7         Rosco, you've heard this case.  You've been here in

8   court, haven't you?

9   A     Yes.

10  Q     And, you've heard what Jason did.

11  A     Yes.

12  Q     What he has admitted to.  How do you feel about Jason?

13  A     I feel remorse about it.  You know, I hate he did it.

14  I don't know why he did it.  Probably won't never know why he

15  did it.

16  Q     But, with regard to Jason, himself, do you have any

17  feelings for or against him?

18  A     Yes.

19  Q     What are your feelings?

20  A     I love him because he's my baby brother.

21  Q     All right.

22        MR. BLANCHARD:  Those are my questions.

23  Mr. Lisenby may have some questions for you.

24                    CROSS EXAMINATION

25  BY MR. LISENBY:

1   Q    Good morning, Mr. Holloway.

2   A    How you doing.

3   Q    I have just a few questions.

4        You named your other brothers and sisters.

5   A    Yes.

6   Q    Can you tell us where they live now?

7   A    Larry is in Mobile. Robert is in Los Angeles. I am

8   here in LaFayette right at the moment. Fanny is in Randolph

9   County. Mary is here in Chambers County. Rose is here in

10  Chambers County. And, Dorothy is in Lanett.

11  Q    Back in January of 2000, was everybody living basically

12  the way you have described it?

13  A    Yes.

14  Q    Now, do you work anywhere, Mr. Holloway?

15  A    Not at the moment.

16  Q    Have you previously worked somewhere?

17  A    Yes.

18  Q    When was the last time you worked somewhere?

19  A    2000.

20  Q    2000?

21  A    Yes.

22  Q    What about your other brothers and sisters, do they

23  work anywhere now?

24  A    Larry does and also Robert.

25  Q    So, just Larry and Robert.

*** Frances L. Roark ***

1  A    Yes.

2  Q    Do you know what Larry does?

3  A    No.

4  Q    Do you know what Robert does?

5  A    No, sir.

6  Q    Okay.  But, you know they work somewhere.

7  A    Yes.

8  Q    All right.

9        Now, when you -- when Mr. Blanchard, excuse me, was

10 asking you some questions about if you noticed anything about

11 any of your other brothers and sisters having some kind of

12 problem or being slow with speech.  Do you remember him

13 asking you that?

14 A    Yes.

15 Q    He asked you to name specifically who it was.

16 A    Yes.

17 Q    And, you said it was the three girls and Jason.

18 A    Yes.

19 Q    So, I take it that Larry and Robert do not have that

20 problem, the way you have took the question to be, whatever

21 it might be.

22 A    Yes.

23 Q    Okay.  And, are Larry and Robert, are they older than

24 you or younger than you?

25 A    They are younger than me.

*** Frances L. Roark ***

1  Q     Did they also live at the home that you described to

2  Mr. Blanchard?

3  A     Yes.

4  Q     And, they also went to the Colliers' residence in

5  foster care; is that correct?

6  A     Yes, sir.

7  Q     So, the four boys all went to one home.

8  A     Yes.

9  Q     Now, you said you stayed there from between the ages of

10  12 to 18.

11  A     Yes.

12  Q     And, did you just leave to go out on your own at age

13  18?

14  A     Yes, sir.

15  Q     And do you know about Larry and Robert when they left?

16  A     Larry left, I think, when he was 16.  He left and went

17  to another home.

18  Q     Okay.  He stayed in foster care, but went to another

19  home?

20  A     Yes.

21  Q     What about Robert?

22  A     I can't remember how Robert left, because at that time,

23  I was not in town.

24  Q     Okay.  Do you know if he stayed after Larry had left?

25  A     Yes.  He stayed after Larry left.  Yes.

VOL 11

## Court of Criminal Appeals No. __CR_____
# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM
## CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2000-166
### Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From: __STATE CONVICTION_____

Sentence Imposed: _____LIFE WITHOUT PAROLE_____

Defendant Indigent: _X_ YES    _ NO

## JASON LEE HOLLOWAY_____

NAME OF APPELLANT

**CHARLES GILLENWATERS, & JOSEPH FIQUETTE**    **256-234-5018**

APPELLANT'S ATTORNEY                         (TELEPHONE NO.)

## POST OFFICE BOX 2129_____

ADDRESS

**ALEXANDER CITY**        **ALABAMA**              35011

CITY                STATE            ZIP CODE

### v.

## STATE OF ALABAMA_____

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

1  Q    Now, were there other foster children in the home also?

2  A    Not at that time.

3  Q    Not at the time while you were there.

4  A    After we was there some came in.

5  Q    Okay.  I see.  When y'all went there, y'all were the

6  first foster  ....

7  A    We were the first; yes.

8  Q    How many other foster children were there?

9  A    I would say probably eight came through there at the

10 time.  But, they was there, maybe, however it would be that

11 DHR set them up:  For a week, or two weeks, three months,

12 until they could find a place for them.  That was the way

13 they would establish them.

14 Q    So, I am sorry, did you say eight came through?

15 A    Yes, approximately eight came through.

16 Q    So eight came through the home, but they would stay

17 maybe two or three months at the time.

18 A    Yes.

19 Q    Okay.  Did you see how Jason would interact with those

20 people?

21 A    Yes.

22 Q    Did he have trouble with those kids?

23 A    No.

24 Q    Never had any trouble at all?

25 A    No.

1    Q    You never saw him have fights with them or anything of

2    that nature?

3    A    No.

4    Q    You indicated that Jason had a good relationship with

5    Marie Collier.

6    A    Yes.

7    Q    I believe you said he loved her.

8    A    Yes.

9    Q    Did he trust her?

10   A    Yes.

11   Q    And, you were raised in the same home that Jason was

12   raised in --

13   A    Yes.

14   Q    -- basically up until age 18; is that right?

15   A    Yes.

16   Q    You are obviously older than Jason, but you lived in

17   the same home otherwise; is that right?

18   A    Yes.

19   Q    Have you killed anybody?

20   A    No.

21        MR. LISENBY:    I don't have any other questions.

22   Thank you.

23        THE COURT:    You may step down.

24   (WHEREUPON, THE WITNESS TESTIMONY WAS CONCLUDED .).

25        MR. BLANCHARD:    Call Marie Collier.

*** Frances L. Roark ***

1                <u>MARIE COLLIER</u>

2     HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

3       THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

4              TESTIFIED AS FOLLOWS:

5              DIRECT EXAMINATION

6  BY MR. BLANCHARD:

7  Q     Pull up just as far as you can, Ms. Collier, so

8  everybody can see you.

9      Tell the ladies and gentlemen of the jury and the Court

10  what your name is.

11  A     My name is Marie Collier.

12  Q     All right.  And, where do you live?

13  A     1011 County Road 250.

14  Q     Where is that?

15  A     In the Welch community.

16  Q     In the Welch community.  Have you lived in Chambers

17  County all your life?

18  A     Well, practically all my married life.  I have lived

19  out of Chambers County for a few years.

20  Q     All right.

21  A     Two or three or so.

22  Q     Okay.  Do you know the defendant in this case, Jason

23  Holloway, over there?

24  A     Yes, I do.

25  Q     How do you happen to know him?

\*\*\* Frances L. Roark \*\*\*

```
 1   A      Well, he was my foster son.  The social worker brought

 2   him to my home.

 3   Q      And, were there some other brothers with him that came

 4   to your home?

 5   A      Yes.

 6   Q      What were their names.  Rosco Holloway and Larry

 7   Holloway?

 8   Q      Was Robert Holloway there as well?

 9   A      Not at that time.

10   Q      He came later.

11   A      He came later.

12   Q      All right.  Were you married at the time these foster

13   children came to live with you?

14   A      Yes, I was.

15   Q      What was your husband's name?

16   A      Charlie Collier.  Most people called him Jack.  Most

17   knows him by Jack Collier.  He used Charlie on business and

18   stuff like that.

19   Q      What did you and Mr. Collier do for a living?

20   A      I was a nurse and Mr. Collier worked at West Point

21   Pepperell at that time in LaGrange, Georgia.

22   Q      And, did you live in a rural area of Chambers County?

23   A      Rural area?

24   Q      Um-hmmm.

25   A      Yes.
```

1  Q    Did you have any children of your own?

2  A    Yes.

3  Q    How many?

4  A    Two.

5  Q    Two?  Is one of them named William?

6  A    Yes.

7  Q    He's your son.

8  A    Yes.

9  Q    Is he here today?

10 A    Yes, he is.

11 Q    How old was William at the time the foster children,

12 the Holloways came to live with you?

13 A    Right off, I can't tell you that.  William was born in

14 1956.  And, this was 1974.

15 Q    All right.  So, he'd have been pretty close to 18 years

16 old, I guess.

17 A    He had finished high school.

18 Q    When these children came to you, did you have contact

19 with the social worker that placed them in your home?

20 A    Yes.  The social worker brought them.

21 Q    What did the social worker tell you about the need for

22 these children to come live with you?

23 A    Need?  They said they were improperly seen about in the

24 home.  The mother was incapable of seeing about them, and

25 they had to move them out of the home, out of her home.

1    Q      I am sorry.

2    A      She said, the mother wasn't capable of taking care of

3    them properly, and so they had to move the children out of

4    her home for that reason.  She weren't able to take care of

5    them.  She wasn't taking care of them properly.

6    Q      Did the social worker give you any details of what had

7    gone on in that home?

8    A      Well, she said that the mother was an alcoholic and she

9    pretty much was out in the bed drunk all the time and just

10   wasn't seeing about the kids properly.

11   Q      What did the children look like when they were brought

12   to your home.

13   A      Describe how they were dressed or how they were?  Is

14   that what you mean?

15   Q      Yes.  How were they dressed and what was their physical

16   condition?

17   A      Jason was very, very tiny.  His little limbs was very,

18   very tiny.  He was able to walk and he couldn't put a

19   sentence together.  He could say a word.  He called his

20   brother Larry.  Labby and Waco.  In that manner.

21   Q      And, you said he was very, very tiny.

22   A      Yes, he was.

23   Q      Can you give the ladies and gentlemen of the jury any

24   better idea of just exactly how small he was?

25   A      His little legs and limbs was very tiny.  Little larger

1    than that.  My finger and this thumb.  And, his eyes was

2    protruding, like protruding out of his head, and he was just

3    -- he didn't look well.  He didn't look like somebody

4    healthy, like a healthy child.

5    Q    Were the other children in similar condition?

6    A    They wasn't that tiny.  Rosco and Larry weren't that

7    tiny, but they looked a lot better than Jason.

8    Q    You were a registered nurse.

9    A    LPN.

10   Q    A LPN.  A nurse.  And, had you seen people before who

11   were malnourished?

12   A    Yes.

13   Q    Did these children appear to be malnourished?

14   A    Yes, they did.

15   Q    Did you grow up in a rural area or the city?

16   A    Rural area.

17   Q    Had you seen poverty before.  Poverty?  Poor people?

18   A    Oh, yes.

19   Q    You had been around poor folks.

20   A    Yes.  We were poor.

21   Q    People who didn't have enough or have as much as other

22   folks.  You have been around that.

23   A    I can't say I've lived around it, but I've maybe seen

24   like that.  The community where I live the people didn't seem

25   to be in that poverty that much.

1  Q     Did these children appear to be people who lived in

2  poverty?

3  A     Yes, I suppose so.

4  Q     When you took them in, into your home and you and

5  Mr. Collier, how did they adapt?  Were they able to come in

6  your home and be a part of the home automatically?

7  A     It did not take very long.  Immediately they started.

8  Q     I need for you to speak up.  I really can't hear you.

9  A     Immediately they took, you know, pretty quick, you

10 know.  Just like, wasn't today, but each day seemed like they

11 got better and better.

12 Q     Had they ever had any toys to play with?

13 A     They didn't bring any there with them.

14 Q     Did he know how to play with toys?

15 A     I suppose so.

16 Q     Okay.  Did they -- were they accustomed to getting

17 themselves dressed and all those things, or did you have to

18 teach them some things that maybe they should have known by

19 the ages they were?

20 A     Yes, I had to teach them some things.

21 Q     I couldn't hear you.

22 A     Yes, I taught them some things.

23 Q     What about Jason?  How far along -- was he as far along

24 as he should have been in things like toilet training and

25 things of that nature?

```
 1   A     No.   When -- may I?

 2   Q     Yes.

 3   A     When Jason came there, he couldn't even feed himself.

 4   Larry was the one seemed like had took care of him more.

 5   He'd take Larry -- he wouldn't even sit in a chair and try to

 6   learn how.  He'd sit in Larry's lap and Larry would spoon

 7   feed him.  He did not even try to feed himself.

 8   Q     Ms. Collier, did these children tell you about how

 9   things had been in the house that they came from?

10   A     A few things.  Like once Rosco asked me, he said,

11   "Momma" they called me Momma.  "Momma, these people up here

12   don't act like the people in LaFayette where I came from."

13         I said, "What way?"

14         He said, "Most of the women down there drink and the

15   women up here don't do that."

16         I said, "Well, which one you like better:  Where they

17   drink or better where they don't?"

18         He said he liked it better up here where they don't

19   drink.  Every woman, you see, in his opinion mostly drank.

20   Every lady in LaFayette that he knew of drank.

21   Q     Did he tell you anything about how they would get food

22   and get fed in their mother's home?

23   A     He said that.  Yes.  He said sometimes they would go

24   out and get food from this friend or somebody that lived down

25   the road, across the -- anyway, near them.  And, sometimes
```

1  they didn't have food.  And, he said, when his mother got her

2  check, she would go buy food, but it didn't last but two or

3  three days, and from then on until the next time, they didn't

4  have any food in the home.

5  Q    What I'm about to ask you about may be a little

6  disgusting or disturbing, but I need to ask you about it. Was

7  there a bucket they told you about in that house?

8  A    Yes.

9  Q    What was that bucket used for?

10  A    Bathroom purposes.

11  Q    Bathroom?

12  A    Um-hmmm.

13  Q    Was there any story related to you, or told you, by the

14  children that had to do with Jason and that bucket?

15  A    Yes.  They said Jason would crawl around and get to

16  this bucket and sometimes he would get feces out of the

17  bucket and eat them.

18  Q    Feces out of the bucket and eat it?

19  A    Yes.

20  Q    Why would he do that?

21  A    I guess because he was hungry and that was the only

22  thing he could get to chew on.

23  Q    Only thing he would have to eat?

24  A    I guess so.

25  Q    Once Jason and the other children had been there for a

1  while in your home, and had gotten used to it, when Jason was

2  say three, four, five years old, and around that time, was he

3  a good child or a bad child or a problem, not a problem?

4  A     He was not a problem, but he was -- seemed like he

5  didn't understand a lot of things.  And, we taught him and

6  telling and all.  He would, like, he would listen, but then

7  for a while he would go on and do something else, you know,

8  something different, like he didn't understand or wasn't

9  paying attention.

10  Q     Was he respectful to you?

11  A     Yes.

12  Q     Did Jason continue to be small in size?

13  A     Yes.

14  Q     Has he always since been rather small in size?

15  A     Yes.

16  Q     Did he ever have any problems with other children

17  because of his small size?

18  A     Not that I can recall.

19  Q     You don't know of any?

20  A     I don't know of any.  I don't know of any, but he act

21  sometimes like he had problems or maybe afraid of some kids

22  or something like that.

23  Q     Did he go to school at the proper age?

24  A     Yes.  Let me see, he went to school.  He was born in

25  January.  I think, maybe like -- he went to kindergarten at

1  the age of five.

2  Q    When he went to kindergarten at the age of five, did he

3  continue -- did he go right on into the first grade after one

4  year of kindergarten?

5  A    No.  He repeated kindergarten.

6  Q    He was kept back a year in kindergarten?

7  A    Yes.

8  Q    On whose recommendation was that?

9  A    His teacher.

10 Q    His teacher?

11 A    Um-hmmmm.

12 Q    Do you remember at this time what the teacher said

13 about it?

14 A    She said, she talked with me and told me that Jason,

15 she felt like it would be better if she kept Jason in

16 kindergarten for another year because he didn't progress like

17 he was supposed to have.  She couldn't keep him -- his

18 attention was very short and she couldn't keep him still long

19 enough for him to understand or pay attention to know what

20 she was saying, assignments, stuff like that.

21 Q    When the time came, did he go on into the first grade?

22 A    Yes.

23 Q    Did he do well in elementary school or not well?

24 A    He's never done well in school that way.

25 Q    I couldn't hear you.

1    A    He never done that well in school.

2    Q    Never did well in school.

3    A    I mean, in elementary.

4    Q    Do you know if he ever graduated from high school?

5    A    No, he didn't.

6    Q    Now, let's go back again, one more time, to kind of the

7    early years.  Your husband was living there with you at the

8    time.

9    A    Yes.

10   Q    Did Jason have any kind of special relationship with

11   your husband, Jack?

12   A    Well, he was like, him being so tiny and like the

13   youngest child in the family or what, he spent a lot of time

14   with him.  Such as, petting him and letting him know that he

15   was loved and cared for.  That he loved him.  And, also he

16   take him with him a lot of times when he didn't take the

17   others boys.  Jason was kind of special.  And, he would take

18   him a lot of times when the other didn't get to go.

19   Q    Did there come a time when you and your husband no

20   longer lived together?

21   A    Yes.

22   Q    How did Jason react to the fact that Mr. Collier was no

23   longer in the home?

24   A    He missed him.

25   Q    He missed him.

1    A    He wanted to go where he was --

2    Q    He missed him.

3    A    -- to visit.

4    Q    Ms. Collier, I hate to even have to mention this, I

5    know there came a time that from Rosco's testimony your

6    husband, that you and he were separated; is that right?

7    A    Yes.

8    Q    And, he took his own life.

9    A    Yes.

10   Q    Is that what happened?  And, Jason found out about it.

11   He found out about it.  He was told about it. How did that

12   effect him?

13   A    He cried.

14   Q    He cried?

15   A    Yes.  I want to see my daddy again.

16   Q    Did it take him a long time to get over it?  Was it

17   something he got over quickly?

18   A    I think it took ....

19   Q    I couldn't hear you.

20   A    I think it took him a while to get over it.

21   Q    Did there come a time, Ms. Collier, when you began to

22   have trouble with Jason?

23   A    Yes.

24   Q    What happened?  When did it start?  And, what kind of

25   trouble was there?

```
 1   A      It was -- I was told that he was peeping in people's

 2   windows.

 3   Q      Peeping in people's windows?

 4   A      I was told that.  Well, looking in windows.  I guess

 5   that's the same thing.  I was told he was looking in some

 6   people's window.  You know, family windows in their home.

 7   Q      And, did the court get involved, the juvenile court?

 8   A      Once.

 9   Q      Okay.  And, did you have to go to court about that?

10   A      Yes.

11   Q      Did they put him in sort of juvenile detention facility

12   or home?

13   A      Yes.

14   Q      All right.  Did he continue to have trouble of that

15   sort from time to time?

16   A      Well, the second time, I know, I heard that, he, you

17   know, did that too.

18   Q      I couldn't hear you.

19   A      The second time; yes.

20   Q      A second time?                    -

21   A      I mean, I know of him to do it twice.  I heard of it

22   being done twice.

23   Q      All right.  Did there come a time when Jason was, I

24   don't remember how old he was, but a teenager, that they

25   said, the authorities, were going to take him from your home
```

1    and put him in a special school or special place somewhere?

2    A    Yes.

3    Q    Did Jason like that?

4    A    No, he didn't.  That was not what he wanted to do.

5    Q    Do you know whether Jason tried to harm himself?

6    A    Yes.

7    Q    What did he do?

8    A    They said that he took a lot of pills and he wrote a

9    note.

10   Q    Did you see the note?

11   A    Yes, I read it.

12   Q    What did the note say?

13   A    The note said, the police already, or the sheriff won't

14   get me by the time they get here, because I be dead, and I

15   took, swallowed some pills.  I don't know what kind they

16   were.  He didn't say what kind they were.

17   Q    That the police or sheriff were coming to take him to

18   this other home; is that right?

19   A    I don't know.  No, the social worker took him.  But, I

20   don't know what he meant by the police wouldn't get me.  I

21   will be dead before they get here.  I will be dead.

22   Q    Was he taken to the hospital?

23   A    The social worker took him.  And, they told me later

24   that he took him to -- no, what happened, after the social

25   worker was gone somewhere or hadn't got there, Jason -- that

```
 1   is when he did the swallowing of the pills.  And, when the
 2   social worker came and got him and they left, the social
 3   worker was coming back to LaFayette before they were going to
 4   do whatever, and I went in the room.  When I went in the
 5   room, I saw this note lying up there that Jason had written.
 6   They won't take me to jail because I will be dead before they
 7   get here.  I immediately called Mr. McCantz and told him,
 8   read the note to him, and he said, "Why didn't you give me
 9   the note when I was there?"
10       I said, "I didn't see it."  I just came in the room
11   since he left, and that is when I saw the note.
12   Q     About how old was Jason when he tried that suicide
13   attempt?
14   A     Maybe 14.
15   Q     Fourteen?
16   A     Maybe.  I don't remember, but maybe 14, 15, or
17   something.
18   Q     Did he -- obviously he was treated and he recovered, no
19   question about that.
20   A     Hmmmm.
21   Q     Did he go to the Children's Hospital at one time to be
22   treated?
23   A     Yes.  He went to Children's.
24   Q     Do you know what he was being treated for there?
25   A     He went -- the social worker said they were going to
```

1    take him up there, let him be evaluated, you know, whether

2    he's mentally or -- anyway for evaluation.

3    Q    Do you know how old he was then?

4    A    Maybe 12.  Twelve or something.

5    Q    Twelve?  Somewhere around there?

6    A    Somewhere around in there.  I don't know if he was 12

7    or 13 or -- but, anyway, somewhere around in there.

8    Q    Young teenager?

9    A    Yes.

10   Q    Probably.  All right.  Did he continue to remain in

11   your home or to visit and come back to your home after he

12   started having these problems and had to go in juvenile home?

13   A    Yes.  When he go in juvenile home and when he'd get out

14   of the juvenile home, he would come back to me.  He was --

15   still wasn't 18.  Human Resources still had him.

16   Q    Do you know if they sent him to a school called Porta

17   Cras School?

18   A    Yes.

19   Q    How long did he stay there?

20   A    I believe three years.

21   Q    And, he was about 19 when he got out of there, wasn't

22   he?

23   A    I believe so.

24   Q    Are you aware whether he got married sometime after

25   that?

1  A    Yes.  Sometime after that I heard that he got married.

2  I was not there.  I don't know where they married.  I heard

3  he got married.

4  Q    I can't hear you, Ms. Collier.

5  A    Yes, they said he got married.  I was not there.  I

6  don't know when, but they told me that they got married.

7  Q    And, did he, after you heard he got married, where were

8  you?  Were you still living in the Welch community?

9  A    Yes.

10  Q    At some point did he come back to live with you?

11  A    Yes.

12  Q    He did?

13  A    Yes.

14  Q    Where was he working -- Jason?

15  A    Well, after he came back to live with me, the first job

16  he worked was Hardees place, fast food place, there in

17  Roanoke.  Then he got a job with -- well, he worked at AMOCO,

18  it was called at that time.  I think the name has been

19  changed since then, since he worked there.  And, then he

20  worked at aluminum, Franklin Aluminum plant in Franklin,

21  Georgia, then he worked at Wehadkee Yarns at Rock Mills,

22  Alabama.

23  Q    Yarn mill, was that the last place he worked?

24  A    Yes.  That's where he was working.

25  Q    He was living with you at the time the crimes we heard

1    about occurred; is that right?

2    A    Yes.

3    Q    Since -- well, since the crimes occurred and since he

4    was arrested, do you know where he has been?

5    A    I beg your pardon?

6    Q    Do you know where he has been since his arrest?

7    A    Since his arrest?

8    Q    Yes.

9    A    In the Chambers County Jail.

10   Q    He's been in the Chambers County Jail; is that right?

11   A    Um-hmmm.

12   Q    Have you been to visit him there?

13   A    Yes.

14   Q    Ms. Collier, one other thing, let me go back in time,

15   again, to the time Jason was younger and living there with

16   you, were there other foster children that came in after his

17   brothers had left?

18   A    Um-hmmm.

19   Q    Did Jason ever have any fights?  Did he get in any

20   trouble or fights with any of these other children?

21   A    Not to my knowledge.

22   Q    Pardon me?

23   A    To my knowledge, he didn't.

24   Q    Were they or him picking on each other?  Did they ever

25   have any trouble that you know of?

1  A    There may have been some just agreements, about this is

2  mine or I am going here.  You can't.  Stuff like that.

3  Q    Nothing really unusual for children?

4  A    No.

5  Q    After what you -- based on what you know about Jason

6  and after everything you have heard here and everything you

7  know, how do you feel about Jason today?

8  A    I very much regret what he has done.  I love Jason.

9  And, I want him to live.  That's how I feel about it.  I

10  still love him even though -- what he's done or whatever.

11  Whatever has been done, I say, I hate it.  I wish it had not

12  happened, but out of all of that, I still love him, and I

13  want him to live.

14            MR. BLANCHARD:  Those are my questions, Mr. Lisenby

15  may want to ask you some things, Ms. Collier.

16                    **CROSS EXAMINATION**

17  BY MR. LISENBY:

18  Q    Good morning.

19  A    Good morning.

20  Q    I have just a few questions for you if I could.

21       Ms. Collier, you indicated that Jason came to live with

22  you when he was about 21 months old.  Does that sound right?

23  A    Yes.

24  Q    He actually lived in your home for how long?

25  A    He lived in my home until he was out of foster -- 18.

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1  It is not, you know -- well, anywhere until after he was 18,

2  but then he always -- he would always come back.  He'd go off

3  and when he'd come back, my home was his home.  That's where

4  he'd come back to.

5  Q    The reason I asked that, I was not quite clear when

6  Mr. Blanchard was asking about Jason being taken somewhere

7  and staying at a school or something like that.  Do you know

8  what age that was?

9  A    When they took him to school?

10  Q    Yes.

11  A    He must have been in the ninth grade and he stayed

12  there until the 12th grade.  But, he did not -- he didn't get

13  to march, but he went to 12th grade.  He did not get to

14  march.

15  Q    Was he living still in your house when he went to this

16  school?

17  A    Yes.

18  Q    So, it wasn't like he was taken to a school and lived

19  elsewhere from you?

20  A    No.

21  Q    Okay.  Okay.

22       When Jason came with his other brothers and moved

23  in with you, was that at the 1011 County Road 250 address?

24  A    At that time it was Route 4, Box 124.

25  Q    Okay.  Same house.

1   A     Yes, same place.  Um-hmmm.

2   Q     And, there -- did you have in-door plumbing at the

3   time?

4   A     Yes.

5   Q     And running water.

6   A     Yes.

7   Q     And, there was, obviously, someone there to spend time

8   with Jason at that point; is that correct?

9   A     Yes.

10  Q     I worked at night and my husband worked in the day.  So

11  my husband be there with them at night, and my son that

12  hadn't finished school would be there with them in the

13  morning.  If my husband had gone to work, he would be there.

14  He wouldn't get on the bus until I got there.  So, I would be

15  when, he was there in the morning.

16  Q     Okay.  When your husband -- you and your husband

17  separated, how was the arrangement at that time?

18  A     After we separated?  After we separated?

19  Q     Yes, ma'am?

20  A     The arrangements was that Rosco was a big boy and all,

21  then my sister would look after him until I got there.

22  Q     Okay.  So, there was, basically, from the time that

23  Jason was 21 months old until he left your home around age

24  18, there was someone to take care of him.

25  A     Yes.

1    Q    Okay.  Was there always food in the house?

2    A    Yes.

3    Q    And was he fed at that point?

4    A    Oh, yes.

5    Q    You indicated that when he arrived, you thought he was

6    probably malnourished.

7    A    Yes.

8    Q    But, he had a good appetite and ate well and that type

9    of thing?

10   A    He did not eat too well at first, except for rice and

11   stuff like that.  He couldn't tolerate it, you know.

12   Q    But afterwards.

13   A    Yes, after a few weeks and all, he could tolerate it

14   well.

15   Q    Okay.  Now, you indicated to Mr. Blanchard at some

16   point in time Jason started having some trouble with people

17   and you described that as peeping in people's windows?

18   A    That is what I was told.

19   Q    Was that somewhere in the Welch community where this

20   was occurring?

21   A    Yes.

22   Q    Did it involve women?

23   A    Yes, a lady's house, he was peeping in.

24   Q    I am sorry.

25   A    Yes, it was.  This lady's house that she said -- she

1    didn't say he was peeping in.  Anyway, he went to her house

2    and tried to break in as she described.

3    Q      Okay.  And, you said you knew of two times.  You say

4    you knew two times he was peeping in somewhere or something

5    like that?

6    A      I heard of two times.

7    Q      What was the other time?  Do you recall?

8    A      The other time was this lady had some children.  They

9    all went to school.  She had two girls.  And the children,

10   they were around the same age, I think they had been to

11   school up there or something that night.  When they came back

12   from the school, she said, he went -- him and some other boys

13   went on over to their house and he said that some of the boys

14   went in the house and he went in too, but the lady said, she

15   didn't pay much attention, you know, children, how children

16   is, she didn't pay no attention.  Said he did not do

17   anything.  She said he was just in my house.  She said that

18   is my fault.  The door wasn't locked.  He did not break in.

19   The door wasn't locked, but she said I should have checked

20   the door and seen if the door was locked.  But, you know,

21   children don't pay attention, you know, all the time.  She no

22   harm, but I just wanted you to know that he was in my house,

23   but he didn't do anything.

24   Q      Just so I understand, you are talking about he went

25   into another person's house that he was not supposed to be in

1  at the time; is that what you are describing?

2  A    I am not saying he was not supposed to be in, but it

3  was just late after they had been to school somewhere or some

4  school affair or something like that.  I mean, maybe, like 9

5  or 12 o'clock.  I don't know what time it was.  But, she said

6  the children come in, and some boys came in too.  And, she

7  said when, you know, she discovered that somebody was in

8  there, she just asked them to leave, and Jason was one of the

9  ones that was in there.

10  Q    Okay.  So, you are talking about people were at home.

11  A    Yes, she was home.

12  Q    She was at home and you are saying her children came

13  in?

14  A    Her children had been -- they had been somewhere.  I

15  think to a school affair, maybe a ball game ....

16  Q    Okay.  Why did that seem to indicate that he was

17  peeping in, ma'am?

18  A    Say what now?

19  Q    Okay.  I am trying to make sure I am not confused.

20  Mr. Blanchard asked you if there came a time when there were

21  some problems with Jason, and you indicated, yes, he was

22  peeping in windows, I think is what you said, and then you

23  told Mr. Blanchard that you were aware of two times.  Is this

24  the second time that you are describing, or is there another

25  incident?

1    A    Well, the same time that this lady says he was trying

2    to break in her house.

3    Q    Right.

4    A    He came on and stopped by another house and said he was

5    looking in the window.

6    Q    Okay.  So, there were two times of looking in a window

7    or trying to get in the house like the lady described.

8    A    Yes.

9    Q    Okay.  All right.  Now, you indicated that there were

10   other foster children that were in your home too; is that

11   correct?

12   A    I kept a number of foster children, but at this

13   particular time, they wasn't any there.  Wasn't any in my

14   home.

15   Q    Did these other foster children stay for long periods

16   of time?

17   A    No.  It was all short-term.

18   Q    But the Holloway children basically lived with you --

19   A    Yes.

20   Q    -- most of their young life.

21   A    Once they came, they never left until, you know, I mean

22   something came up.

23   Q    Okay.  Now, can you tell me when it is that Jason -- I

24   think in response to one of Mr. Blanchard's questions, you

25   indicated that Jason moved back in with you.  Do you remember

```
 1   when that was?

 2   A      It was -- I don't remember what year.  I can't

 3   remember.  It was in the '90s.

 4   Q      In the '90s.

 5   A      Yes.

 6   Q      And, you indicated that you had become aware that he

 7   had gotten married.

 8   A      Yes.  Not when he was back, but after he moved back in.

 9   Q      You became aware of it.  When he moved back, I guess,

10   he told you he had gotten married?

11   A      No.  He had not gotten married when he moved back.

12   Q      Oh, I am sorry.  Okay.  So, he moved back in with you

13   and then did he leave again and get married?

14   A      Yes.  He left again.

15   Q      Okay.  And, did you know about that wedding?

16   A      No.  Until he told me.

17   Q      When he told you, had he already then separated from

18   his wife?

19   A      Huh-huh.

20   Q      No?

21   A      He had not been separated when he told me they had got

22   married.  To my knowledge, they hasn't.

23   Q      Do you know if at the time he was married if he was

24   working then?

25   A      Working where?
```

```
 1   Q      If he was working at that time while he was married?

 2   A      He lived -- he was in Montgomery.  So, I really don't

 3   know.

 4   Q      You don't know.

 5   A      Huh-huh.

 6   Q      Okay.  Because you listed off several places that he

 7   had worked since he'd moved back in and was living with you,

 8   I just wondered if you knew if he was working during the time

 9   he was married?

10   A      At the time they lived in Montgomery.

11   Q      Okay.  Do you know -- do you recall if in 1997, Jason

12   was either living with you, or you had pretty close contact

13   with him, then?

14   A      I don't remember 1997.  I don't remember.

15   Q      You don't remember?

16   A      I don't think he was.  I can't really remember 1997 if

17   he was living with me.

18   Q      Let me ask you this:  Did you become aware that he

19   received a license or certificate to, according to this, ....

20          MR. BLANCHARD:  I'm going to object.  Hold on just

21   a minute.  Can we approach?

22   (WHEREUPON, A SIDE BAR COMMENCES.)

23          MR. BLANCHARD:  He is about to show a certificate

24   of license for Jason to be some sort of lay preacher or

25   something of that sort.   It's State's Exhibit number ....
```

1          MR. LISENBY:  I don't have a number yet.

2          MR. BLANCHARD:   I thought that is what he was

3    about to do and I just don't know what the relevance of it is

4    or where he is going with it.  Seems like it might be

5    prejudicial.

6          THE COURT:  overruled.

7    **(WHEREUPON, A CERTIFICATE WAS MARKED STATE EXHIBIT 58 FOR**

8    **IDENTIFICATION.)**

9    MR. LISENBY:

10   Q    Ms. Collier, what I was going do ask was, were you

11   aware in 1997 that Jason received a certificate of license to

12   preach the gospel from Bethlehem Baptist Church?

13   A    I said I don't remember the year, I remember he

14   received a certificate.

15   Q    Okay. Let me ....

16   A    I said a certificate.  What is it, a license?

17   Q    Yes, ma'am.  Let me show you, this is State's Exhibit

18   number 58.  Does that look familiar to you?

19   A    Um-hmmm.  Can I read it?

20   Q    Yes, ma'am. You can hold it if you want to.

21   A    I don't have my glasses.

22   Q    Please.  I am sorry.

23   A    Oh, yes.

24   Q    Do you recall that?

25   A    Yes.

```
 1   Q      Okay.

 2              MR. LISENBY:  We offer number 58, Your Honor.

 3              THE COURT:   Admitted.

 4   (WHEREUPON, A CERTIFICATE MARKED AS STATE EXHIBIT 58 WAS

 5   ADMITTED.)

 6              MR. LISENBY:   Thank you, Ms. Collier, I don't have

 7   any other questions.  May I publish this to the jury?

 8                       REDIRECT EXAMINATION

 9   BY MR. BLANCHARD:

10   Q      Excuse me, Ms. Collier, I need to clear up one or two

11   things.

12          Do you remember when I asked you if Jason went to a

13   school called Porta Cras School?

14   A      Yes.

15   Q      Do you remember that?

16   A      Yes.

17   Q      Where is that school?

18   A      It's -- I really -- they said Birmingham, above

19   Birmingham, out from Birmingham, or some where like that.

20   But it is Porta Cras, I think it was, School and Green Pond,

21   Alabama, Green Pond was the community.

22   Q      How long was Jason at that school?  Was it a number of

23   years?

24   A      Yes.  Maybe three.

25   Q      Maybe three years.
```

1    A       I believe so.

2    Q       During that time, did you continue to live in the Welch

3    community?

4    A       Yes.

5    Q       So, during that time, he was not living with you.

6    A       Not three years.  Not when he was out there.  He would

7    have visits, you know, visits, come back and visit me.  He

8    never -- he did not leave there.  Maybe a weekend or

9    something, holidays or something.

10   Q       I asked this questions because Mr. Lisenby suggested

11   that Jason lived with you the whole time until he reached the

12   age of 18 or 19, when in fact, he was at that school in Green

13   Pond above Birmingham for about three of those years; is that

14   correct?

15   A       Um-hmmm.

16   Q       Let me ask you about this license to preach the gospel.

17   A       Yes.

18   Q       Did Jason go to a theological seminary to get that

19   license?

20   A       To my knowledge, he did not.

21   Q       He did not?  Do you know who gave it to him?

22   A       Yes.  The pastor for the Bethlehem Baptist Church.

23   Q       The pastor?

24   A       Trammel, William Trammell.

25   Q       Rev. Trammell.  Did Rev. Trammell kind of take Jason

```
 1  under his wing and tried to get him involved in that?

 2  A      Yes.

 3  Q      But Jason didn't go to any special school to learn to

 4  be ka preacher, did he?

 5  A      No, sir, not to my knowledge.

 6  Q      He did not take any written examinations or anything

 7  like that, to your knowledge?

 8  A      Not to my knowledge, he didn't.

 9          MR. BLANCHARD:  All right.  Thank you very much.

10  Those are all my questions.

11          THE COURT:  You may step down.  Thank you, ma'am.

12  (WHEREUPON, THE WITNESS TESTIMONY WAS CONCLUDED.)

13          THE COURT:  Call your next witness.

14          MR. BLANCHARD:  William Collier.

15                      WILLIAM COLLIER

16       HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

17        THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

18                    TESTIFIED AS FOLLOWS:

19                     DIRECT EXAMINATION

20  BY MR. BLANCHARD:

21  Q      State your name for the ladies and gentlemen of the

22  jury and for the Court.

23  A      William Collier.

24  Q      Mr. Collier, how old are you?

25  A      I am 46.
```

1    Q     Where do you live?

2    A     I live at 1523 Carter Drive, Anniston, Alabama.

3    Q     Are you employed?

4    A     Yes, sir, I am.

5    Q     What do you do for a living?

6    A     I am employed by United States Department of the

7    Treasury, Internal Revenue Service.  My job description is

8    internal revenue agent.

9    Q     All right.  Now, are you related to the Ms. Collier

10   that just testified?

11   A     She's my mother.

12   Q     And, do you know the defendant in this case?

13   A     Yes, I do.

14   Q     Is he your foster brother?

15   A     Yes, he is.

16   Q     Mr. Collier, would you tell us -- were you living in

17   the home here in Chambers County when Jason and his brothers

18   came to live with you?

19   A     I think I had just -- I was in the process of moving.

20   I was still in the home.  I was in the process of going to

21   Atlanta, but I was there when they came; yes.

22   Q     Do you have any memories or impressions of what you saw

23   when those children first came to your home?

24   A     Yes, I do.

25   Q     Can you relate that to the ladies and gentlemen of the

1    jury?

2    A    Well, on the day that they came, the social worker left

3    and I remember my first impression they were sort of standing

4    in the yard there and my first thoughts, I guess, they

5    reminded me of pictures you see of children, basically, from

6    third world countries.  They were dressed in -- not very

7    well.  Tattered clothing.  Jason was just very small.  He

8    seemed -- he seemed emaciated like children you would see in

9    some of these pictures.  And, it was just kind of startling

10   to see.  Because even though we had lived in the rural and

11   had been around just everyday working people, I still had not

12   seen anything like that, especially in the community there.

13   Q    You said you were in the process of moving out and

14   going to Atlanta; is that right?

15   A    Yes.

16   Q    So, would it be true, that you were out of the home,

17   essentially, around the time Jason or you moved out shortly

18   after?

19   A    I move out shortly afterwards because -- I'm a little

20   fuzzy on the exact date.  I think they came, like, in October

21   and I left shortly thereafter, because I had employment in

22   Atlanta.

23   Q    Once you left to go to Atlanta, did you ever come back

24   to live in that home again?

25   A    Yes.

1  Q    Was Jason still there?

2  A    Yes.

3  Q    So, you spent some time in the home being around him.

4  A    Yes.  I was only in Atlanta for one year.

5  Q    Okay.

6  A    And, I returned home for college.

7  Q    How long were you there in that home with Jason and

8  some of his brothers?

9  A    I returned home in 1975, and I were there until

10 September of '79.

11 Q    So around four years?

12 A    Yes.

13 Q    During that time, what were your observations of Jason,

14 if any?

15 A    Early on after Jason got there and kind of settled in,

16 Jason was so small until he was kind of -- he was cuddled and

17 petted a lot.  He was sort of like everybody's pet.  Even in

18 -- not only in the home, but in the community and in the

19 church.  Everybody just sort of took to Jason.  As he got

20 older, I could see that Jason did not grasp things as well as

21 others and not only Jason, but the others there.  I mean, it

22 was obvious.

23 Q    Can you think of any particular examples?  I know it

24 has been a long time.

25 A    Well, there were -- I guess, in being there and helping

1   all of them sometimes with their school work, I knew they had

2   difficulty comprehending the formal type of things as far as

3   in school.  And also just general instructional type of

4   things as far as chores and things around the house.  It

5   seemed to take a lot of repetition for them to understand.

6   And at times, when something was told to them or explained

7   once, the very next time, you would have to go through that

8   same explanation process.

9   Q    And, Jason would be included within that?

10  A    Yes.  Yes.

11  **(WHEREUPON, PHOTOGRAPHS WERE MARKED AS DEFENDANT EXHIBITS 35**

12  **AND 36 FOR IDENTIFICATION.)**

13  MR. BLANCHARD:

14  Q    Let me show you, Mr. Collier what I have marked

15  Defendant's Exhibit 35 and 36, and ask if you recognize them?

16  A    Yes, sir.

17  Q    Tell the ladies and gentlemen of the jury what they

18  are.

19  A    These are photos taken at my wedding in August of 1980,

20  in which Jason was the ring bearer.  And, these are pictures

21  in the church during and after the ceremony.

22  Q    If it was 1980, Jason would have been about seven years

23  old?

24  A    Yes.  Jason would have been approximately

25  seven-and-a-half years old at this time.

1  Q      All right.  Do these pictures accurately reflect the

2  scene as it existed at that time?

3  A      Yes, sir.

4          MR. BLANCHARD:   Your Honor, I move to admit

5  Defendant's Exhibits 35 and 36.

6          THE COURT:  Admitted.

7  **(WHEREUPON, PHOTOGRAPHS MARKED AS DEFENDANT EXHIBITS 35 AND**

8  **36 WERE ADMITTED.)**

9          MR. BLANCHARD:  I don't know how to work this

10 thing.  I haven't tried it yet.  Is it on?  Can we have the

11 lights?  I don't know how good this focus is on that or how

12 well you can see it.

13 MR. BLANCHARD:

14 Q      Do you see Jason in that picture?

15 A      Yes.

16 Q      Can you point him out and tell us where he is?  Is the

17 child in the picture?

18 A      The child is Jason.  He's standing right -- I am the

19 second person from the left and there's Jason right next to

20 me.

21 Q      You are this person here?

22 A      Yes, I am.

23 Q      And this is Jason.

24 A      That is Jason.

25 Q      How old was he?  He was seven years old at that time.

1   A      Yes, sir.

2   Q      All right.  And that's Defendant's Exhibit 35.

3          Let me show you another.  Defendant's Exhibit 36.  Is

4   Jason also in that picture?

5   A      Yes.

6   Q      And, he's walking up the aisle.  Is that him?

7   A      That is Jason.

8   Q      This is not an adult with him, is it?

9   A      No.  That is my, at the time, nine-year-old

10  sister-in-law.

11  Q      So that is a nine-year-old and Jason there is seven

12  years old.

13  A      Yes.

14  Q      Do you know how tall he was and how much he weighed at

15  that point?

16  A      No, sir.  I can only guess.

17          MR. BLANCHARD:  Judge, may I publish these to the

18  jury?  I think they can see them a little better.

19          THE COURT:  Yes.

20  MR. BLANCHARD:

21  Q      Mr. Collier, after -- well, while you were there, those

22  four years or so with Jason, was Jason a well-behaved child?

23  A      Yes.

24  Q      Was he respectful to you and your mother?

25  A      Yes.

1   Q      Any behavior problems you could identify during that

2   period of time?

3   A      Not in the home during that time.  I cannot recall any

4   specific.

5   Q      Are you aware of any later behavior problems that Jason

6   had?

7   A      Yes, sir.

8   Q      What do you know about that?

9   A      I know about the instances as far as -- that occurred

10  where Jason was removed from the home and at times where

11  there was involvement by the social worker.  As Jason was

12  placed in group homes, we would always visit him.  So, I knew

13  where he was.  And, I would always, my mother and others, we

14  would always go to visit him.  Even the time that he was

15  under evaluation at the University of Alabama at Birmingham,

16  we went out there to see him.

17  Q      While he was living with you, in your home, did you

18  develop any fondness or feelings for Jason?

19  A      Yes.  Everyone, my brother, myself, and like I stated,

20  just everyone in the community, everybody was fond of Jason.

21  Q      And, do you still, as you are here today, hearing all

22  you have heard, do you still feel a fondness for Jason?

23  A      Yes, I do.  I feel bonded to Jason.  The relationship,

24  especially between Jason and my mother, it also creates a

25  bond for me.  I guess, I sort of took on a kind of the role

1    of my father, even after I was married and left home, I was

2    back frequently to see my mother, and I sort of did a lot of,

3    I guess, one-on-one parental-type conferences with Jason.  I

4    basically treated Jason like I treated my son.  I have a

5    20-year-old son.  I would have a lot of conversations along

6    the same lines.  A lot of conversation about being

7    responsible and taking care of my mother and being an asset

8    in the house rather than a distractions.

9    Q    Did Jason seem to profit from what you told him?

10   A    Jason -- although, I never had a problem with Jason, as

11   far as, and sometimes I would get on him pretty hard about

12   things, but as far as Jason ever being aggressive toward me

13   or being disrespectful to me, I've never had that to happen.

14   I know there were some times when I probably did ride him

15   kind of hard about things, especially about things around the

16   house that my brother and I would have to come back to do,

17   small things, that he could do.  But, I have never had a

18   problem with him.  All of our encounters they've not been

19   confrontational with me.

20   Q    I'm not talking about confrontations.  What I am asking

21   you, were there times when you would have these sessions with

22   Jason one day and maybe later on something would happen and

23   you would feel like, maybe, he had not heard what you ?

24   A    Yes.  Jason -- many, many times I would tell Jason

25   things and would point things out and it would be almost as

1   if we verbally agreed, but Jason would not follow through.

2   Jason, in my opinion, and from any observation, sometimes

3   getting from point A to point B was hard for Jason.  His

4   reasoning abilities just didn't appear to be intact.  In

5   other words, he could not, in many instances, did not appear

6   to make the connection between actions and consequences or

7   what the reaction would be toward his actions.

8           MR. BLANCHARD:  Thank you, Mr. Collier.

9   Mr. Lisenby may have some questions for you.

10                     CROSS EXAMINATION

11  BY MR. LISENBY:

12  Q    Good morning.  Just a few questions, Mr. Collier.  You

13  indicated that you had a brother also.

14  A    Yes.

15  Q    Is that brother older or younger?

16  A    He's younger.

17  Q    Was he living at the home at the time that you left?

18  A    Yes.  He was still in high school at that time.

19  Q    Do you know how long he remained there at your home?

20  A    Remained in the home until August of '77, when he went

21  into the military.

22  Q    Okay.

23       And, you mentioned that at some point you became aware

24  of some behavioral problems, I think that was the word you

25  used, involving Jason, and you talked about him being in

1  different places and you would have to go visit him in group

2  homes and things like that.  Can you tell me what you mean by

3  behavioral problems?

4  A      Primarily what I was aware of would the instances that

5  my mother previously spoke about.  The one incident where he

6  -- where the neighbor, one of our next door neighbors, told

7  my mother that she saw Jason peeping in the window.

8       The other problems, some of the other things, now, I was

9  not.  I later found out about the lady mentioning -- my

10 mother told me about the lady that said that Jason and some

11 more boys were in her house.  I think she had daughters of

12 the same age or whatever, and she asked them to leave, and

13 they did.  But that was primarily, I think, the instances

14 where I think the social worker was involved.

15 Q      Okay.  So, you are talking, basically, about two or

16 three instances.

17 A      Yes.  As far as the other things would just have been

18 something in the home where I disagreed with basically

19 something that I felt he should have been doing or was not

20 doing.  It was more along the lines of a family concern, as

21 far as, you know, you should be doing this thing, or you I

22 shouldn't have to come home to mow the lawn when you are

23 here.

24 Q      You should take the trash out if mother says to.  That

25 kind of thing?  Is that what you were talking about when you

1   spoke to Mr. Blanchard about that you would sit down and get

2   on to him hard sometimes and those kinds of things that we

3   all do growing up around the house?

4   A      Yes.

5   Q      Cutting the grass, taking the trash out, not making

6   your bed, maybe; things along those lines.

7   A      Yes.

8   Q      Did you know either Rodney or Angela Brown from the

9   community there?

10  A      Yes.  I've known Angela basically all of her life.  I

11  think we moved next to Ms.Clara like in November '61.

12  Ms. Clara was Ann's grandmother.  She was living with her

13  grandmother at that time.  And, I was a preschooler then, but

14  I've known her all of her life.  And, she was a sweet girl.

15  And she was family.  My mother, brother -- Jerome and I are

16  first cousins.  Jerome's father and my mother are brother and

17  sister.  So, he was not Ann's father, but, still, it was like

18  family.

19  Q      What about Rodney?  Did you know him?

20  A      I did not know Rodney.  Well, he knew him by sight.  I

21  had spoken to him a few times if I was sitting out in the

22  yard when I came to my mother's, I would throw my hand up and

23  he'd throw his hand up.  But, I didn't know Rodney

24  personally.  I don't think we ever engaged in conversation,

25  no more than just speaking.

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1          MR. LISENBY:  Okay.  All right.  Thank you, sir.

2          MR. BLANCHARD:  I have no further questions.

3          THE COURT:  You may step down.  Thank you, sir.

4   (WHEREUPON, THE WITNESS TESTIMONY WAS CONCLUDED.)

5          MR. BLANCHARD:  May we approach?

6   (WHEREUPON, A SIDE BAR COMMENCES.) .

7          MR. BLANCHARD:  Judge, my next two witnesses are

8   correction officers.  They are at work right now.  I have

9   them on call.  Do you want to let the jury go have lunch and

10  do right after?

11         THE COURT:  One of them is here.

12         MR. BLANCHARD:  No, that's not him.

13         MR. LISENBY:  He's back there.

14         MR. BLANCHARD:  I couldn't see him.

15         THE COURT:  He wouldn't be long, would he?

16         MR. BLANCHARD:  I wouldn't think so.

17         THE COURT:  Go ahead and excuse him.  Call him.

18  Then who would be next?

19         MR. BLANCHARD:  The other correctional officer.  We

20  could take him right after lunch and then Joe Dixon and that

21  is it.

22         THE COURT:  Okay.  We're in good shape.

23  (WHEREUPON, A SIDE BAR CONCLUDED)

24         THE COURT:  Call your next witness.

25         MR. BLANCHARD:  Tommy Spratlin.

*** Frances L. Roark ***

```
 1              TOMMY SPRATLIN

 2       HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

 3         THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

 4                  TESTIFIED AS FOLLOWS:

 5                  DIRECT EXAMINATION

 6  BY MR. BLANCHARD:

 7  Q    Would you state your name for the ladies and gentlemen

 8  of the jury?

 9  A    Tommy Spratlin.

10  Q    Mr. Spratlin, or Officer Spratlin, or should I say

11  Deputy Spratlin?

12  A    No correctional officer.

13  Q    Correctional Officer Spratlin, that's a mouthful.

14  A    Just say Tommy or whatever.

15  Q    Okay.  You work at the Chambers County Jail?

16  A    Yes, sir.

17  Q    How long have you been there?

18  A    July will be four years.

19  Q    Four years.  Right after you got there, did an inmate

20  named Jason Holloway come to be there?

21  A    Come there not too much longer after I got there.

22  Q    And, since that time, have you been familiar with him?

23  Have you come in contact with him?

24  A    Yes, sir, I have talked to him just about everyday.

25  Q    Do you have the ability -- not the ability, but the
```

1   duty of supervising and overseeing him?

2   A    Well, we oversee all of them from the pipe to when we

3   take them out on the yard and stuff like that.

4   Q    Now, I'm not suggesting that Chambers County in

5   particular is an awful jail or anything like that, but county

6   jail is not really a nice place to be; is it?

7   A    No, sir, not as far as I can see.

8   Q    And, sometimes there is trouble there with the inmates.

9   A    Yes, sir.  We have had fights and stuff like that over

10  there.

11  Q    And, it is not uncommon for that to happen; is that

12  right?

13  A    No, sir.

14  Q    My question is this.  As far as Jason Holloway is

15  concerned, have you found him to be particularly aggressive

16  or troublesome?

17  A    Well, he has been -- he has had some problems.  He has

18  had some fights, but, I mean, like you said, that goes on all

19  the time.

20  Q    Many other inmates have the same thing?

21  A    Yes, sir.

22  Q    As far as Jason is concerned, he doesn't stand out in

23  that regard?

24  A    No, sir.

25  Q    As a matter of fact, would you say Jason, overall, is a

1  pretty good inmate?

2  A    Yes, sir, I would.

3  Q    Did you realize what he was in for at the time right

4  after he came in?

5  A    No, sir, I didn't know it for a while.

6  Q    You didn't know it for a while.  You wouldn't have

7  suspected him being in for double murder?

8  A    No, sir.

9  Q    Would you say that he's made a pretty good adjustment

10 from being on the outside to being on the inside?

11 A    Yes.

12 Q    All right.  No real trouble to you?

13 A    No, sir.

14 Q    Always respectful to you?

15 A    Yes, sir.

16      MR. BLANCHARD:  All right.  Thank you.  That is

17 all.

18      THE COURT:  Mr. Lisenby?

19                   **CROSS EXAMINATION**

20 **BY MR. LISENBY:**

21 Q    Officer Spratlin, just a couple of questions.

22      Good morning.

23      You indicated that Mr. Holloway had had some problems.

24 A    Yes, sir.  He has been in some fights over there.  I

25 was on the disciplinary board for it, but, you know, other

*** Frances L. Roark ***

```
 1  than that, like I said, he's no different than the rest of

 2  them.   No problem.

 3  Q      With regard to the fights, you said you were on the

 4  disciplinary board.

 5  A      Yes.

 6  Q      There is, obviously, some kind of action taken when a

 7  fight occurs; is that correct?

 8  A      Yes, sir.

 9  Q      And, that ranges from taking a television way from you

10  to--

11  A      Or lock down.

12  Q      -- lock down.

13  A      Yes, sir.

14  Q      That means putting that person in an isolated cell or

15  something of that nature.

16  A      Yes.

17  Q      Do you recall, I see you don't have a file with you, do

18  you recall any of the punishments that Mr. Holloway received?

19  A      He has been in lock down some in I block.

20  Q      I block.   That is the isolation ward; is that basically

21  what it is called?

22  A      We've got I block and also B block.

23  Q      So.   He has had up to, I guess, that would be the

24  maximum punishment in the county jail, wouldn't it, to be

25  placed in the isolation cell?
```

1   A    Yes.

2   Q    He has had that on down to whatever other punishments

3   might have been.

4   A    That is basically what we have done.

5        MR. LISENBY:  Okay.  Thank you.

6        THE COURT:  Thank you, sir.  You may step down.

7   (WHEREUPON, THE WITNESS TESTIMONY WAS CONCLUDED.).

8        MR. BLANCHARD:  Captain Belohlavek.

9                    **GEORGE BELOHLAVEK**

10    **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

11      **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

12                **TESTIFIED AS FOLLOWS:**

13                **DIRECT EXAMINATION**

14  **BY MR. BLANCHARD:**

15  Q    State your name and, please, spell it for the court

16  reporter.

17  A    George Belohlavek.  B as in boy, E-L-O-H-L-A-V as in

18  Victor, E-K.

19  Q    Captain Belohlavek, I see sheriff patches on your

20  shoulder as well.  Do you work at the jail?

21  A    Yes, I am currently captain.

22  Q    You're captain of the jail.

23  A    Correct.

24  Q    Is that equivalent to being warden?

25  A    Assistant administrator.

1  Q    Assistant administrator. All right.  How long have you

2  been there?

3  A    Approximately, end of this year will be eight years.

4  Q    Eight years.  So, the entire time Jason Holloway has

5  been there, you have also been there.

6  A    Correct.

7  Q    Captain, jail is a pretty rough place.

8  A    Yes.  Yes and no.  I mean, ....

9  Q    Can be?

10  A    It can be.

11  Q    And inmates get into fights sometimes.

12  A    Correct.

13  Q    And, that is not unusual?

14  A    It does happen.  It is not an everyday occurrence.

15  Q    But, it is an expected occurrence from time to time?

16  A    It does happen; yes.

17  Q    And, as far as Jason is concerned, you heard Tommy

18  Spratlin's testimony.  Would you find yourself pretty much in

19  agreement with that?

20  A    Yes, I agree.  He's -- in the three years and five

21  months he has been there, he has been in approximately five

22  fights that he has been written up.

23  Q    Okay.  Received some punishment for that.

24  A    Correct.

25  Q    Were the fights always his fault, if you know?

1  A     All five fights he was proven -- he was given a guilty

2  sentence from the disciplinary board, but at the same time

3  the other inmates were given guilty sentences as well.

4  Q     Would it be fair to say that Jason can have a little

5  bit of a temper if pushed?

6  A     If pushed; yes, I believe.

7  Q     Okay.  All right.  He doesn't just take things lying

8  down, so to speak?

9  A     In those situations, no, he did not.

10 Q     But in other respects, you would classify him as a good

11 inmate?

12 A     He is average.

13 Q     Average inmate?

14 A     Correct.

15 Q     Made an average, at least, adjustment to life inside?

16 A     Correct.

17 Q     All right.  He's not a terrible problem for you.

18 A     No, no major problems.

19 Q     No major problems. All right.

20        MR. BLANCHARD:  That is all.  Thank you.

21        THE COURT:   Mr. Lisenby?

22        MR. LISENBY:   I have no questions.

23        THE COURT:  Thank you, sir.  You may step down.

24 You are free to go.

25 (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

1    THE COURT:  Ladies and Gentlemen, we're going to

2    take a recess until 1 o'clock.  Follow the same instructions

3    I have given you at this phase of the trial just as you

4    followed them at the first phase.

5    Do not discuss any aspect of this case among yourselves

6    at this time.  At the proper time, after I have charged you

7    on the law that applies, then you will deliberate and then

8    you would reach verdicts or recommendations.

9    Do not put yourself in a position of overhearing anyone

10   talk about this case.  Go ahead, go to lunch, and then come

11   straight back to the jury room.  Be in the jury room at 1

12   o'clock and we'll continue our proceedings.

13   And, in short, just during this entire time, isolate

14   and insulate yourself from any situation that might affect

15   your ability to be a fair and impartial juror.  Thank you.

16   Everyone remain in while the jury leaves.

17   (JURY OUT)

18   THE COURT:  We'll be in recess.

19   (WHEREUPON, THERE WAS A NOON RECESS.)

20   (JURY PRESENT)

21   THE COURT: You may be seated.

22   MR. BLANCHARD:  Call Joe Wheeler Dixon.

23   **JOE WHEELER DIXON**

24   **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

25   **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

*** Frances L. Roark ***

1    **TESTIFIED AS FOLLOWS:**

2    **DIRECT EXAMINATION**

3    BY MR. BLANCHARD:

4    Q    Would you tell us your name, please?

5    A    Joe Wheeler Dixon.

6    Q    What do you do for a living?

7    A    I am a clinical psychologist.

8    Q    And, you are a Ph.D.?

9    A    Yes, sir, I am.

10    Q    You are a doctor of psychology?  You are a doctor in

11   psychology [repeating.]

12   A    Yes, sir, I am.

13   Q    All right.  Are you a forensic psychologist?

14   A    Yes, sir, I am.

15   Q    Would you please explain to the ladies and gentlemen of

16   the jury what a forensic psychology is; what he does?

17   A    A forensic psychologist is someone who has received

18   postdoctoral training and certification in assessing clinical

19   conditions in people who come to the attention of the courts.

20   Q    And, are you, I guess, trained in the procedures of the

21   courts and how to testify in court?

22   A    Yes, I am.  For three years, I was chief of forensic

23   training for the State Department of Mental Health and

24   trained during that time all of the medical doctors and

25   psychologists in the State of Alabama who wished to become

```
 1   forensic examiners.

 2   Q     Now, in order to get to be a forensic psychologist/

 3   forensic examiner you have to undergo an educational process?

 4   A     Yes, quite extensive.  Yes, yes you do.

 5   Q     Would you briefly explain to us what that educational

 6   process involves.  What you went through.

 7   A     You mean including getting the PhD?

 8   Q     Yes, sir.

 9   A     PhD typically takes seven years of graduate training

10   after earning a bachelor's degree.  You have to complete and

11   internship and residency much like you do in medicine.  And,

12   then for the forensic aspect there is an additional six

13   months of training, three months of didactic classroom

14   training and observing other forensic psychologists conduct

15   forensic evaluations of pretrial detainees and people who

16   have come to the attention of the legal system, and then you

17   have to, under close supervision, conduct three independent

18   evaluations on your own.  And, once the chief of forensic

19   training for the State department feels that you are

20   competent, he certifies you.

21   Q     Just for the record, where did you get your

22   undergraduate training?

23   A     Alabama.

24   Q     All right.

25   A     And, I'm probably in the wrong part of the state to say
```

```
 1  that.  I'm sorry.

 2  Q     And, your postgraduate training?

 3  A     University of Tennessee.

 4  Q     All right.  Just for the record, have you also been to

 5  any other professional schools?

 6  A     Yes.  after 12 years of working for the State

 7  Department of Mental Health, I took early retirement and I

 8  went to law school and graduated from law school in 2001,

 9  from the Cumberland School of Law in Birmingham.

10  Subsequently I taught at Cumberland for a semester.

11  Q     Have you taken the bar exam?

12  A     No, I have not.

13  Q     So, you are not a licensed attorney, but you have been

14  to law school.

15  A     Yes.  I have been to law school.  What I have done now

16  is I have entered teaching.  I teach now at the interface of

17  psychology and law.

18  Q     Okay.  Does that summarize your educational experience

19  relevant to your duties in this case?

20  A     Yes.

21  Q     Do you have any licensure or certifications?

22  A     Yes, I am a certified forensic examiner and I'm

23  licensed as a psychologist in both Florida and in Alabama.

24  Q     Do you maintain membership in any professional

25  societies?
```

1   A      Yes, I do.   The American Psychological Association and

2   various subgroups of the APA.

3   Q      All right.   Would you -- you have had professional

4   experience as well; is that right?

5   A      Yes.

6   Q      In your field, in the field of psychology and forensic

7   examination.

8   A      Yes.   Approximately 15 years of experience.

9   Q      Okay.   Can you, again, briefly summarize the experience

10  that you have had relevant to your duties in this case?

11  A      Well, relevant to this case, for a year I was the

12  psychologist on staff at a hospital in Florida where we dealt

13  exclusively with people with substance abuse problems.   And,

14  we came across the need to provide diagnostic and treatment

15  services to many men and women who were alcoholics and abused

16  medication, heroin addicts, cocaine addicts, et cetera.

17  During the course of that time, I met with and counseled with

18  several women who were pregant at the time and who were

19  alcoholics.   And I got a lot of close up, hands on experience

20  in dealing with these ladies and dealing with the birth of

21  their children who basically were born drunk.   It is very --

22  anybody who has dealt with alcoholics realizes it is

23  extremely hard to get people to stop abusing alcohol.

24  Q      Are there any other aspects of your professional career

25  and your work that may be relevant to this case?

1    A      For 12 years I was chief of forensic assessments at --

2    actually for nine years I was chief of forensic assessments

3    at Bryce Hospital in Tuscaloosa, the state psychiatric

4    hospital, and in the course of those duties, I evaluated or

5    supervised the evaluation of hundreds of patients,

6    psychiatric patients, who were coming in, many of which who

7    had substance abuse type problems.

8    Q      Have you had occasion to, in your professional career,

9    to evaluate offenders and alleged offenders in criminal cases

10   for purposes of presenting your findings to the courts?

11   A      Yes, sir, I have.  Hundreds of times.

12   Q      Hundreds of times.  Have you testified in capital

13   cases?

14   A      Yes, I have.  Many times.

15   Q      Have you testified for the State of Alabama --

16   A      Yes.

17   Q      -- in death penalty case?

18   A      Many times.

19   Q      Have you testified for the Defense in death penalty

20   case?

21   A      Yes, sir, I have.

22   Q      Have you testified more frequently for one or the

23   other?

24   A      It's about 50/50 now.  When I was still in the employ

25   of the State, it appeared that it was about 60/40 in favor of

1  testifying -- my testimony favored that of the State, or

2  prosecution.

3  Q    Okay.  Each time when you testified for either the

4  State or the Defense, are you pay for doing that?

5  A    Yes, sir, I am.

6  Q    All right.  And, has your involvement in this case been

7  approved by the Court?

8  A    Yes, sir.

9  Q    Is it your understanding that you will be paid for your

10 work in this case?

11 A    Lord, I hope so.

12 Q    All right.  Now, with regard to -- well, let me first

13 tender Dr. Dixon to the Court as an expert in the area of

14 forensic examination and psychology?

15          THE COURT:  He is accepted as an expert in that

16 field.

17          MR. BLANCHARD:  Thank you, sir.  All right.

18 MR. BLANCHARD:

19 Q    Dr. Dixon, did I engage you to perform any service in

20 this case?

21 A    Yes, you did.

22 Q    Can you tell the ladies and gentlemen of the jury

23 approximately -- well, about when that was, and what you were

24 engaged to do?

25 A    In the early spring of 2001, you contacted me at my

1  office, and asked -- told me a little bit about the case and

2  asked if I would evaluate your defendant, Jason Holloway.    I

3  agreed to take the case.  And, in May of 2001 and then in

4  August of 2001, I traveled to the LaFayette, LaFayette County

5  Jail, where I evaluated Mr. Holloway.

6  Q    All right.  What was the scope of your evaluation, if

7  you will?

8  A    At that time you wanted me to do a comprehensive

9  evaluation.  So, I evaluated him with respect to his

10 compentency to stand trial, his competency to have waived his

11 Miranda Rights, his mental state at the time of the alleged

12 offense, and I also examined him and his history, his records

13 for any mitigating factors.

14 Q    Did you find him to be competent to stand trial?

15 A    Yes, sir, I did.

16 Q    Explain for the ladies and gentlemen of the jury what

17 that means.

18 A    United States Supreme Court in the Dusky ruling in

19 1961, said that a defendant, in order to get a fair trial,

20 must be able to understand and assist attorney in his own

21 defense when he is a defendant in a trial.  And, so the

22 purpose of the competency to stand trial evaluation is to

23 look at his cognative abilities, his memory, his ability to

24 think, his ability to remember the details of the crime he's

25 charged with, and to be able to cooperate and assist his

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1    attorney in planning for and executing defense at trial, and

2    I found, of course, that Mr. Holloway was competent.

3    Q     And, you said you also evaluated his mental state at

4    the time of the offense?

5    A     Right.  Typically there what I'm looking for is any

6    evidence of mental retardation, or any evidence of severe

7    mental illness, such as schizophrenia, which might be used as

8    grounds for an insanity defense.

9         When I first met with Mr. Holloway, I realized I

10   was dealing with someone who was below average intelligence.

11   I didn't know how much below, so I gaven him an IQ test and

12   reviewed several medical reports, and found that his IQ was

13   not in the mentally retarded range so there would be no

14   grounds for an insanity defense there, at least, from a

15   clinical point of view, and I didn't find any indication of

16   any severe mental illness during the two times I spent

17   evaluating him in May and August of 2001.  So, I ruled out,

18   from a clinical perspective, any clinical or psychological

19   grounds for an insanity defense.  With his low IQ, I also

20   looked at what, was he competent when he waived his Miranda

21   Rights.  The Supreme Court has held that when a defendant is

22   charged with a crime and they waive their constitutional or

23   Miranda Rights, they must be competent to knowingly and

24   intelligently, voluntarily waive those rights.  And, I found

25   that Mr. Holloway did, indeed, knowing and voluntarily and

1   intelligently waived his rights.

2      Now, when I say that, he's not the brightest crayon in

3   the box, but at the same time he did understand what he was

4   doing.  And, so, I felt he was competent.  No grounds for an

5   insanity defense.  And, he was also competent to have waived

6   his Miranda Rights.

7   Q    With regards to the crime or the crimes that the ladies

8   and gentlemen of the jury have found him to be guilty of, in

9   other words, was your finding that he was not insane at the

10  time of those crimes?

11  A    No.  In my opinion, he was not.

12  Q    He was capable of understanding the difference between

13  right and wrong.

14  A    He knew the right from wrong and he could form the

15  prerequisite intent; yes.

16  Q    That doesn't mean he is all okay, does it?

17  A    No, sir, it doesn't.

18  Q    Did you, you went on then to consider his

19  characteristics and mentality in terms of evaluation for

20  mitigating factors?

21  A    Yes, sir.

22  Q    All right.  Did you make any findings that would be

23  relevant to the assessment of whether his mental condition is

24  substantially impaired?

25  A    Well, his IQ, the IQ that I obtained and the way I do

1    this, I typically conduct my psychological or

2    neuropsychological testing, then I want to see what is in the

3    records.  I do that so that I don't contaminate my mind.  If

4    I read somebody else's opinion about somebody, then I

5    evaluate them, that might influence me.  I try to do that

6    independently.  In this case I did.  I gave him an IQ test

7    and without going through -- well, I'll go into as much

8    details as the Court wants.  But, he's got an IQ of 85.  That

9    means that -- that's the 16 percentile.  That means that he

10   is in the bottom 16 percent of people who this test of

11   cognitive functioning, thinking, memory, et cetera, he's in

12   the bottom 16 percent.  That means that 84 percent of people

13   who are given this IQ test score above him.  Anything below

14   the 25th percentile we are trained in graduate school to

15   become doctors that that is a red flag.  Somebody like that,

16   that scores that low, is going to have problems in life, and

17   they are probably going to need some kind of structure or

18   assistance.  They are -- they don't have both oars in the

19   water.  When you talk to them and we see them and meet them

20   casually on the street, you would think, well, he's okay.

21   there's nothing really that stands out as odd or unusual

22   about these folks.  But, after you get to talk to them for a

23   little while, or if you are a clinical psychologist and

24   you're doing an assessment of them, you begin to realize that

25   they do not understand, they don't learn, they don't perceive

1  reality exactly like everybody else does.  And, so, they are

2  in kind of an at risk category.

3  Q    And you evaluated Jason as in that category?

4  A    Yes, sir.  He is.  He is below the 25th.  He is at the

5  16th percentile. And, subsequent to my IQ testing, I then got

6  the records from school, public schools, and the records from

7  Children's Hospital, and found that they also had doctors

8  evaluate him and got very similar IQ results.  So, that kind

9  of triangulates it and confirms it for me that my initial

10 diagnostic impression are accurate because other doctors at

11 other times in his history, in his life, have come up with

12 very similar results.

13 Q    Based on your evaluation of him and your reading of his

14 record, do you have a conclusion as to whether his ability to

15 appreciate the criminality of his actions, not that he is

16 insane, but the ability to appreciate the criminality of his

17 actions is substantially impaired?

18 A    It is impaired; yes.

19 Q    Could you explain that in a little more detail?

20 A    Does he know that killing someone is wrong?  Yes.  Does

21 he have the full appreciation that a normal person would have

22 about the taking of human life.  No, he doesn't.  He does

23 knows it is wrong, but he doesn't fully appreciate that.

24     I hope that doesn't sound like psychobabble and double

25 talk.  But Ladies and Gentlemen of the Jury have a full

1    appreciation just as the judge would and the attorneys in the

2    case.  And, hopefully, even you and me would have a full

3    understanding of the ramifications of killing someone.

4        People with an IQ of 85 simply lack that appreciation.

5    It is just not in taking a human life.  They lack full

6    appreciation of social environments and relationships in all

7    walks of their lives.

8    Q     Do people with IQs under the level we are talking

9    about, is there any component, do they tend to be impulsive

10   or do they act deliberately?

11   A     The frontal lobes of the human brain are the province

12   that or have the province that they control what we call

13   executive functioning, abstract thought, thinking, planning,

14   initiating activities, stopping activities.  His frontal

15   lobes are at about -- like, I said, he's significantly

16   impaired, so he is going to have very limited insight.

17   Insight means, does he understand himself and others, at the

18   full level an average person would, and does he exercise good

19   judgment.  No, no he doesn't.  He has significant impairment

20   in having a full appreciation of social relationships and

21   effect that his behavior has on other people.  And, he will

22   misperceive things that other people say and do, and tend to

23   over react.  In reading the Children's Hospital records and

24   the records from TriWill which is an institutional setting he

25   was in for a number of years.  The case workers, the

1   psychologists, the social workers, the house mothers who

2   worked with him, repeatedly described Jason as someone who

3   didn't just seem to quite get it.  He didn't quite understand

4   what was going on.

5   Q      Do persons like Jason, then, have a full ability to

6   profit from experience?

7   A      No.  People in this level of IQ, with this kind of

8   brain damage, they tend to not fully profit from experiences

9   like the average person on the street.  Trial to trial

10  learning is going to take many, many trials, and probably

11  someone there to explain it to him several times before he

12  understands it.  He's not going to profit from past mistakes.

13  Think of it as bumping into the wall and he keeps bumping in

14  to the wall until someone comes and says, look, here is the

15  door, try the door, and then they get through the wall by

16  using the door.

17  Q      Would a person such as Jason tend to engage in behavior

18  that others might view as inappropriate to the situation at

19  the time?

20  A      Yes, because he exercises poor judgment.

21  Q      And is it possible that behavior of that type might be

22  interpreted as a like of remorse?

23      Let me give him you an example.  There's evidence before

24  the Court that Jason Holloway confessed to the crimes on what

25  was his birthday in the year 2000, January 21st.  After he

1   had essentially confessed to a double murder, he, then, asked

2   the jailer if he could have his birthday cake now?

3   A      That is a good example.

4   Q      Can you -- does that speak of anything to you?

5   A      It talks to the lack of judgment.  The lack of value.

6   The lack of importance of events.  In other words, I have

7   just confessed to double homicide, but, hey, it's my

8   birthday, do I get my birthday cake.  For someone like Jason

9   that is about of equal importance.  It is because of the

10  brain damage.  It is because of the limited ability to

11  understand.

12  Q      So, from your perspective and am I correct in assuming

13  you would not necessarily judge that remark to evidence a

14  lack of remorse?

15  A      It doesn't really go to remorse.  What goes to remorse

16  is his inability to understand how his behavior impacts and

17  at times hurts others.

18  Q      Is he capable of feeling remorse?

19  A      Sure.

20  Q      I think what I would like to do now is explore with you

21  some of the records that you reviewed to develop some of the

22  history of this.  Tell the jury what you reviewed.

23  A      Okay.  I looked at the Children's Hospital records, all

24  of his public school records, which include psychological

25  testing, the narrative and summary reports from TriWill,

1   which is the place he went, a residential treatment facility.

2   Q     Is that the same as Porta Cras School?

3   A     Yes, it is.  Thank you.  I couldn't remember that.

4         I read the American -- excuse me, the Alabama Bureau of

5   Investigation and police arrest reports.  I reviewed the

6   autopsies reports, witness statements, the confession of

7   Mr. Holloway, federal probation reports, also school records

8   of one of his brothers and one of his sisters, and the DHR

9   foster care reports covering his childhood from his early

10  childhood all the way up to the time and past the time he was

11  placed with the Collier family.

12  Q     Would it be accurate to say you reviewed literally

13  hundreds of pages of documents?

14  A     The stack you sent me was about that thick; yes, sir.

15  Q     And, did that, reviewing those records give you an

16  understanding as to the, what I'll call, the etiology of his

17  condition?

18  A     Yes, it did.  Yes, sir.

19  Q     For those who may not be familiar with the term, would

20  you explain what it means?

21  A     Etiology is one of those fancy terms we doctors like to

22  use to keep everybody confused.  It means cause.  What would

23  cause his low IQ.

24  Q     All right.

25        MR. BLANCHARD:  May he step down, Your Honor?

```
1              THE COURT:  Yes.

2   MR. BLANCHARD:

3   Q    Dr. Dixon, come over here, please.  What I'm going to

4   do is I'm going to give you this thing that has a laser

5   designator on it.  I'm going to put some, in some cases I'll

6   put a blow up on the easel and you can use that to highlight

7   what you saw in the document.

8   A    Okay.

9              MR. BLANCHARD:  Can he testify from here, Judge?

10             THE COURT:  Yes.

11  (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 1 FOR

12  IDENTIFICATION.).

13  MR. BLANCHARD:

14  Q    I'm going to show you what has been marked for purposes

15  of identification as State -- Defendant's Exhibit one.  Is

16  that a record you reviewed?

17  A    Yes, sir, it is.

18  Q    Now, I'll hand you one, a copy, that you have marked

19  with a highlighter; is that correct?

20  A    Yes, sir.

21             MR. BLANCHARD:  I'll move Defendant's Exhibit 1

22  into evidence --

23             THE COURT:  Admitted.

24             MR. BLANCHARD:  -- as something he reviewed.

25  (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 1 WAS
```

1    **ADMITTED.).**

2              MR. BLANCHARD:   Richard, number 1, page number 1.

3    MR. BLANCHARD:

4    Q    First of all, Dr. Dixon, what is this document that we

5    are looking at here?

6    A    This looks like home visit report for when Jason was

7    still living at home with his biological mother and DHR

8    worker was working with the family and with Ms. Holloway to

9    get her into some treatment.

10   Q    Are these written records kept by the welfare agency,

11   Department of Human Resources?

12   A    Yes, sir.  They are.

13   Q    To your understanding are they more or less

14   contemporaneous records that social workers make in writing

15   about their contacts with families?

16   A    That is exactly what they are.  They are daily progress

17   reports.

18   Q    Does this one come from the records of Rosa Jane

19   Holloway?

20   A    Yes, sir, it does.

21   Q    Would you tell us what you found to be significant in

22   terms of the issue we are discussing on that document?

23   A    Okay.  When you're considering a fellow, such as

24   Mr. Holloway, with a low functioning intelligence, one of the

25   things your concerned about is whether or not it is

1   biological, biogenetic, were they born that way, or did the

2   environment cause it?  And, you begin to then look for the

3   intellectual and cognitive functioning of the parents, the

4   biological parents and the siblings.

5       You can see here, this is Fanny, one of his sisters, at

6   age eight, in the second grade, where she was reported to be

7   a rather slow student.  The social worker indicated here that

8   she was very slow mentally, which is a biological sister,

9   never seem to exactly answer any question, just rambled

10  around in her speech.  Failed first grade but told social

11  worker her favorite subject was reading.

12      Another sister, Mary Helen, age seven, grade, made Cs,

13  Ds, and Fs.

14      "I wonder," this is the social worker writing in her

15  notes, she says, "I wonder if the environment could be

16  causing these children to have such poor grades, as

17  Ms. Holloway seems to be slow mentally," that would be the

18  mother," herself and there seems very little conversation in

19  the home."  If you've got biological parents and children all

20  of very low IQ, that is a hallmark, red flag, social worker

21  home visit that something is not right.  People who come from

22  low functioning homes with low performance children, there is

23  not a lot of conversation.  There are usually not a lot of

24  toys.  You may find a TV set on with nobody watching or

25  understanding.  This is what that suggests to me.  And, also,

1    she mentions Rosco who is six at the time, starting school in

2    September, attending HeadStart which is a special program for

3    children who have been identified as having some sort of

4    intellectual deficit, and they are going to need help before

5    they actually begin public school.  That is all I got off of

6    that one.

7    Q     Anything on the second page of that two-page exhibit?

8             MR. BLANCHARD:    Richard, will you bring that

9    second page of number 2.

10            THE WITNESS:  We continue with this entry talking

11   about Larry, another of the brothers, she made no comment

12   there that, I, as a psychologist found germane.

13       Then speaks of Robert, Jr., who will be three years old,

14   and indicated that he had not had all of his baby shots,

15   suggesting to me, and the social worker says this, neglect in

16   the home.

17       And she speaks of Rosa Marie who was age three could not

18   talk plain at all.  She was filthy and only had a little

19   shirt on with no panties or other clothes sucking a bottle

20   with no food in the bottle.  And, all of the children were

21   very dirty, and all of them seemed to be rather slow

22   mentally.

23       According to this social worker, Mom was really slow

24   mentally and so are all the kids.  There was an out-door

25   toilet.  She, the mother, Ms. Holloway, said they don't

1   usually use the out-door toilet because there is snakes in it

2   and it is just no account.  Ms. Holloway said they usually

3   just go in woods for this purpose.

4       So, I'm getting a picture, as I'm reviewing these

5   records, of mentally impaired, probably the entire family,

6   living in poverty and squalor, no in-door plumbing, the out

7   house does not work, can't use it because it has snakes in

8   it, so we are talking about an impoverished childhood

9   basically here.

10      And, then down here is the social worker's assessment,

11  "There just seemed to be so many problems in this family, it

12  is a question of where to begin to start working on them all.

13  The children need baby shots.  The children need to be in

14  HeadStart and in school.  The children and Ms. Holloway need

15  adequate clothing and the family needs to be encouraged to

16  clean up themselves, their house, and to get their out-door

17  toilet repaired."  Pretty sad life.

18  **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 2 FOR**

19  **IDENTIFICATION.).**

20  MR. BLANCHARD:

21  Q     Let me show you now what I have marked as Exhibit 2.  I

22  don't have a blow up on this one.  Let me see.  Is this

23  something you reviewed?  Another social worker's record?

24  A     Yes, it is.  This is from 1971.

25  Q     All right.  Rosa Jane Holloway's record.

```
 1   A      Yes, it is.
 2              MR. BLANCHARD:  I'll move that into the record,
 3   Defendant's Exhibit 2.
 4              THE COURT:  Admitted.
 5   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT  2 WAS
 6   ADMITTED.)
 7   MR. BLANCHARD:
 8   Q      Here is your highlighted copy.  There's no blow up on
 9   this one.  Tell us what you saw on that one that may be
10   significant.
11   A      "Ms. Holloway came into the office stating she had to
12   buy her baby's medicine and she had no funds with which to
13   buy it with."  I highlighted in here, but several places in
14   the record Ms. Holloway, Jason's mother, tells the social
15   worker, she realizes that some of children need medicines
16   that she can't afford the medication.  There's no mention of
17   what medicine it was or what it was for.
18         Then I also noted down here.  I, this is the social
19   worker, "I talked with her about her responsibility as a
20   mother to her young children, and also the fact that her
21   children were depending on her, to this she appeared to have
22   a rather deaf ear, and she was more interested in trying to
23   see her husband experience another jail sentence rather than
24   taking care of the needs of the children."
25   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT  3 FOR
```

1   IDENTIFICATION.)

2   MR. BLANCHARD:

3   Q    Number 3, we do have a blow up on that.

4        Is this another record, Defendant's Exhibit 3, something

5   else you reviewed?

6   A    Yes, sir, it is.

7   Q    I'll show you your highlighted copy.

8            MR. BLANCHARD:  I move number 3 in the record,

9   Defendant's Exhibit 3.

10           THE COURT:  Admitted.

11  **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT  3  WAS**

12  **ADMITTED.)**

13           THE WITNESS:  Here the social worker is describing

14  that some of the window panes are out of the house.  There is

15  no outside toilet facility.  The house is wired for

16  electricity, but the current has been turned off.  She

17  states, Ms. Holloway stated she would have to rely on wood to

18  keep them warm during the winter.  Ms. Holloway seems to be

19  very defensive in regards to her drinking problem.

20  Ms. Holloway is rather untidy in her appearance.  And,

21  Ms. Holloway has a very bad body odor.  That's all I

22  highlighted in that one.

23  MR. BLANCHARD:

24  Q    Does that support your findings or have any

25  significance?

1   A     Yes.   This is just more of the same which is suggestive

2   of impoverished childhood of Mr. Holloway's life.

3   **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 4 FOR**

4   **IDENTIFICATION.)**

5   MR. BLANCHARD:

6   Q     Defendant's Exhibit 4, is that another document from

7   the Rosa Jane Holloway records that you have reviewed?

8   A     Yes, sir.

9         MR. BLANCHARD:  I'll move number 4, Defendant's

10  Exhibit 4 into evidence.

11        THE COURT:  Admitted.

12  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT EXHIBIT 4 WAS**

13  **ADMITTED.)**

14  MR. BLANCHARD:

15  Q     And, I'll hand you the highlighted copy.

16        MR. BLANCHARD:  There's no blow up on that,

17  Richard.

18        THE WITNESS:  This is also a 1971 evaluation.  The

19  social worker is writing, "This continues to be a very

20  disturbed, frustrated mother.  When Mr. and Mrs. Holloway

21  were both locked up for disorderly conduct," that would be

22  Jason's parents, " many warrants have been issued previously

23  on Mr. Holloway and Mrs. Holloway.  The judge has worked

24  continuously with this couple on domestic relations and their

25  conduct in front of the children.  It seems this was to no

1   avail."  The social worker is describing two alcoholic

2   parents who argue and fight with one another, who are in

3   trouble in the community, they have been locked up.  The

4   mother, this mother, Ms. Holloway, is also eager for her

5   children to acquire a good education, she has little thought

6   though for their clothing and for their tidiness.  And

7   sanitary conditions in the home.  On many occasions

8   Ms. Holloway has been picked up for disorderly conduct on the

9   street, having been intoxicated, and especially on the

10  highways driving intoxicated.  These were concerns the social

11  worker was having with Ms. Holloway.

12           MR. BLANCHARD:  Number 5.  We have one on that,

13  Richard.

14  (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 5 FOR

15  IDENTIFICATION.)

16  MR. BLANCHARD:

17  Q    Let me show you a multiple page exhibit, Defendant's

18  Exhibit number 5.  Is this also something from the Rosá Jane

19  Holloway records that you reviewed?

20  A    Yes, sir.

21           MR. BLANCHARD:  All right.  I'll move Defendant's

22  Exhibit number 5 in evidence.

23           THE COURT:  Admitted.

24  (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 5 WAS

25  ADMITTED.).

```
 1   MR. BLANCHARD:

 2   Q    Let me hand you your highlighted copy, Dr. Dixon.  Show

 3   me what page you have highlighting on.  We may have a blow up

 4   of that.  Page 25.

 5            MR. BLANCHARD:  Richard, do we have a blowup of

 6   page 25 of Exhibit number 5?  May not have 25.

 7   (WHEREUPON, THERE WAS A BRIEF OFF-THE-RECORD DICUSSION.)

 8            THE WITNESS:  "Ms. Holloway," again this is the

 9   social worker, "Ms. Holloway does not have any

10   self-motivitation, but I think future visits and contact can

11   help somewhat.  Ms. Holloway incapacity is also a great

12   hindrance to her.  It is very difficult for her to tell me

13   what the ages and grades of her children are, and whether or

14   not their school work is adequate.

15   MR. BLANCHARD:

16   Q    I believe we have page 26 up.  Oh, yes.  That is the

17   same thing.  Anything you need to point out there?

18   A    "While I was in the home, I became quite disturbed over

19   the conditions that the children were living in."  She talks

20   about a potbellied stove.  "Although it was burning quite

21   heavily, the room was still quite chilly.  All of the

22   children, but one were barefooted.  One of the little boys

23   had on a pair of tennis shoes that did not lace up with no

24   socks.  One of the little girls had on nothing but a vest

25   which was the lining to a coat.  She had no underclothes on.
```

1   The newborn baby, Jason, was wrapped only in a blanket.

2   Ms. Holloway told me that all children had colds, but that

3   Jason had recently had a checkup and was okay.  There were

4   window panes out and the wind seemed to blow right through

5   the house.  I asked Ms. Holloway if there things that she

6   needed at this time, but she told me that they were not.

7   Later, back in the office, I discussed the situation with the

8   director, and told her how upset I was over the situation."

9        Now, as a psychologist, who reviewed records of social

10  workers for many, many years, my perception of this is this

11  lady is writing these notes is beginning to get very

12  concerned about this family.  Page 27.

13  MR. BLANCHARD:

14  Q    Twenty-seven.

15  A    And, here, Ms. Lloyd, who is family or friend, I talked

16  with her about her sister-in-law's situation.  The

17  sister-in-law is Ms. Holloway -- Ms. Lloyd was quite

18  reluctant to tell me her sister-in-law drinks quite heavily.

19  There are times when some of the Holloway children come to

20  their house to tell them that their mother is drunk and

21  cannot take care of them.  Ms. Lloyd and her husband have

22  found Ms. Holloway and friends out in the road several times

23  in an intoxicated stated.  Ms. Lloyd went on to tell me that

24  Ms. Holloway's child that was born about 3 a.m. on 1/23/73.

25  That is Jason.  And that nobody came to attend to her.  It

1   was not until 9:30 that same morning that anyone found out

2   that the child had been born.  When Ms. Lloyd went to ask the

3   midwife to attend to Ms. Holloway, the midwife refused as

4   Ms. Holloway had not paid her for the last two deliveries.

5   It was only when Mr. Lloyd guaranteed payment that the

6   midwife came to attend to Ms. Holloway.

7        "Ms. Lloyd told me she had tried so many times in the

8   past to help Ms. Holloway to spend her money in useful ways

9   and has never been successful in getting Ms. Holloway to

10  cooperate."

11       And, the next paragraph, "Ms. Holloway does receive

12  commodity, but gives half of them to the Brooks who live next

13  door.  She has no reason for this, but told me she has fussed

14  a great deal about her giving them away.  Ms. Lloyd does not

15  know with whom Rosa Jane drinks or how she gets her liquor.

16  Sometimes she's seen strange cars parked in the yard, and she

17  feels this is the way she gets her liquor."

18  **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 6 FOR**

19  **IDENTIFICATION.)**

20  MR. BLANCHARD:

21  Q    I'm showing you Defendant's number 6.  Is that a record

22  you considered?

23  A    Yes, it is.

24  Q    What is it?

25  A    Rosa Jane Holloway's progress notes.

1    Q    Progress notes.  All right.  I'll show you, your

2    highlighted copy.

3            MR. BLANCHARD:  I move Defendant's number 6 into

4    the record.

5            THE COURT:  Admitted.

6    **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT EXHIBIT 6 FOR**

7    **IDENTIFICATION.)**

8            THE WITNESS:  This one starts off by mentioning

9    that Ms. Holloway had not sent the children to school.  The

10   social worker explained to her the importance of keeping a

11   clean house, as the house was a wreck on this date.  It was

12   really upsetting to see all the nastiness though, but she

13   told me she would do better.

14       Here we have, on this date, DHR had received a

15   complaint that Rosa Marie Holloway, seven years old was

16   drunk.  One of the children.

17       This paragraph she's describing, "However, all of the

18   children, including Rosa Marie," the one who was found drunk,

19   "stated she had drunk about a fifth of a bottle of Red Dagger

20   Wine.  Rosa Marie had apparently gotten over the worst as she

21   showed no obvious signs of drunkenness.  At close

22   observation, she did walk with a swagger and she was also

23   much less active than her usual self."  Again this is a

24   seven-year-old.

25   MR. BLANCHARD:

1  Q     Let me stop you there and ask you a question.  The

2  events you are relating that are recorded here, are shortly

3  after the birth of Jason Holloway; is that correct?

4  A     Yes, sir.

5  Q     All right.  Now, let me ask you this question:  If the

6  records you reviewed for the time leading up to Jason's

7  birth, and the information that you have gained from family

8  members who have talked about that; is there any significance

9  or any connection that you can draw between Jason's apparent

10 low intelligence and the conduct of his mother?

11 A     Yes.  It is apparent from these records, these official

12 records, that Ms. Holloway was an alcoholic and she drank to

13 excess prior to Jason's birth, during the time she was

14 pregnant with him, and continued to drink after he was born.

15 Alcohol being consumed by a pregnant mother damages the

16 development of the fetus.  It is neurotoxin.  When an adult

17 female who is pregnant ingests alcohol it goes right through

18 the body of the mother, right through the placenta into the

19 child.  Now, an adult mother has a full, adult-size liver,

20 which can metabolize that alcohol.  The fetus has a very tiny

21 liver and it cannot metabolize it.  So, if the mother drinks

22 to excess and gets drunk for a couple of hours, the fetus

23 could literally be drunk for several days.  This amount of

24 alcohol, and the records indicate episodic binge drinking,

25 worst type.  With a neurotoxin the brain simply doesn't

1   develop.  Now, I can't stand here today and tell you her

2   drinking is what caused his low IQ.  But, if it didn't, I'll

3   eat my hat.  I have worked with enough people to know this is

4   one of the main etiologies or causes for brain damage in

5   people.  When their mother's, during the gestational period,

6   are alcoholics or consuming alcohol.  It causes brain

7   damages.  This is the worst kind of brain damage, because you

8   don't recover from it.  Once the child is born, and sometime

9   they are actually born drunk, when the child is weaned off

10  the alcohol, these infants have to go through withdrawal,

11  alcohol withdrawal, and it is a horrible thing to see.  When

12  these babies are born they, like I said, they can be born

13  drunk and they are weaned off, the damage to the brain is

14  irreversible.  So they are not dealt a full deck from the get

15  go, from the day of birth.

16  Q     All right.  Please continue with your review of that

17  document, Doctor.

18  A     Where were we?  Oh, just down here at the bottom.

19  Throughout the whole conversation, Ms. Holloway, she,

20  continually contradicted herself saying one thing and then

21  saying another.  She would say that the white boys had broken

22  into the house one minute and the next minute she would say

23  there'd been no white boys there.  Just parts of the flavor

24  of the kind of mental confusion that the mother,

25  Ms. Holloway, herself, was suffering.

1        Next page 35.

2    Q    Is there another on that.  Page 31?

3    A    You don't have 35 there?

4    Q    That may be another exhibit.  That is exhibit 7.  We do

5    not have a blowup of that.  That was the only one we chose to

6    blow up.  Explain if there's something else in this document.

7    A    Reading from this same progress note where we were

8    describing the little girl drinking, the seven year old being

9    drunk, "It is obvious that Ms. Holloway is not caring

10   properly for her children at the present.  The house was

11   nasty, the children were dirty, they do not go to school.

12   Ms. Holloway drinks, et cetera.  No progress was made through

13   our short conversation because of her slight intoxication.

14   On the date of this particular note, Ms. Holloway presented

15   as intoxication and later when I arrived at the home in the

16   afternoon, Ms. Holloway was drunk.  When questioned about

17   this she said she had only had half of a beer.  I told her

18   that I had some sense and that I knew she would drink more.

19   The house was still a wreck.  Jason, the baby, had no diapers

20   on and had just, quote, done a job on Ms. Holloway.  She was

21   close to staggering.  She was so drunk.  I did explain to her

22   that if she'd had a diaper on Jason, this would not have

23   happened."

24       This note was later on the following day when the social

25   worker had gone to the Dairy Delight and she met a teacher of

```
 1   one of the Holloway children, and she writes, "While I was at
 2   the drive-in one of the children's teachers was there and she
 3   kept pointing her out and telling me how badly Ms. Holloway
 4   treated her child.  She wondered why they would treat one of
 5   their own kind, one of their children, that way.  I feel sure
 6   Ms. Holloway must be an alcoholic since I have seen her
 7   drinking night and day now for two days."
 8   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 7 FOR
 9   IDENTIFICATION.)
10   MR. BLANCHARD:
11   Q     Let me show you now, what I have marked as Defendant's
12   Exhibit 7, another page from the Rosa Jane Holloway records.
13   Is that something you reviewed?
14   A     Yes, sir.
15   Q     Here's your marked copy.
16         MR. BLANCHARD:   I move Defendant's Exhibit 7 into
17   evidence.
18         THE COURT:  Admitted.
19   (WHEREUPON, A DOCUMENT MARKED AS DEFENDANT EXHIBIT 7 WAS
20   ADMITTED.)
21         THE WITNESS:  This is an entry, again later in
22   1973, "The police department were called at the home of the
23   director at 12, concerning the woman arrested for drunk --
24   driving while intoxicated with two children nine and eleven.
25   Rosco nine and Fanny eleven.  Since we had no boarding home
```

1    in the vicinity, and she stated she had no relatives near

2    that could take these children, I suggested that the police

3    call the juvenile judge."

4        A later entry, "They came to report that Rosa Jane had

5    been arrested the previous night on DWI charges.

6    Ms. Holloway would not give them the names of any relatives

7    who could care for them, meaning the children.  The children

8    did spend the night with Ms. Holloway in the jail.

9    Mr. Brooks and Mr. Lloyd reported to me that other children

10   were apparently at home and that the six-month-old child,"

11   which would be Jason, "apparently had not had any milk since

12   the previous night."   Later on my way to Rosa Jane

13   Holloway's home, I stopped at her step-mother's home and

14   asked if she would be willing to keep Jason, the

15   six-month-old baby.  She told me that she really did not feel

16   like it.  Later I went by Judge Alsabook's office to talk

17   with him about having Ms. Holloway's two older children

18   released from jail to me."  This was the nine and eleven year

19   old.  "He called the jail and stated that I could go down and

20   pick them up.  I explained to him that I felt they were

21   needed at home as they were two older children."  Also

22   somewhere in these records it indicates that the older

23   children were basically parenting the younger children.

24   **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 8 FOR**

25   **IDENTIFICATION.).**

```
 1   MR. BLANCHARD:

 2   Q     Let me show you Exhibit 8, another page from Rosa Jane

 3   Holloway's record.  Is that something that you reviewed?

 4   A     Yes, sir.

 5           MR. BLANCHARD:  Move to admit Defendant's Exhibit 8

 6   into the record.

 7           THE COURT:  Admitted.

 8   (WHEREUPON, A DOCUMENT MARKED AS DEFENDANT EXHIBIT 8 WAS

 9   ADMITTED.).

10   MR. BLANCHARD:

11   Q     And, I'll hand you the highlighted copy.  Do you have

12   that?

13   A     This was 8/20/74, the social worker's notes.  "At this

14   time, I went to the store and bought a few groceries for the

15   children until Ms. Holloway could get in town the next day in

16   a soberer state to buy some groceries.  I explained to

17   Ms. Holloway her responsibility to her children and her

18   negligence.  She flat lied to me.  Ms. Holloway very flatly

19   refuses to believe that she has a drinking problem and will

20   not even admit that she is unable to take care of her

21   children when she is drinking.  I also talked with her about

22   spending money on the children instead of on her own personal

23   wants.  She does become loud and sometimes hostile in her

24   language if you do not pacify her while she is drinking.

25   Ms. Holloway with my super and director and another co-worker
```

1    was discussed.  It was generally agreed that relatives of the

2    children and Ms. Holloway needed to be contacted and a

3    diligent search made to try to get the children into another

4    home away from Ms. Holloway.  She is not caring for her

5    children as she should and I plan to do all I can to see they

6    are taken care of, even if it means taking the children out

7    of the home."

8         The following day she went to Ms. Rosa Burton's

9    house to speak with her about Ms. Holloway.  "Ms. Burton told

10   me that she knew that the children had been in a horrible

11   environment although she would not suggest their presence in

12   any -- although she would not suggest their presence in any

13   home of any decent people she knew.  She feels these children

14   are corrupt having been brought up under such low morals that

15   they are hopeless."

16   **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 9 FOR**

17   **IDENTIFICATION.)**

18   MR. BLANCHARD:

19   Q    Is Defendant's Exhibit 9 something you reviewed?

20   A    Yes, sir.

21   Q    Is this another page from the Holloway records?

22   A    Yes, sir.

23        MR. BLANCHARD:   Move to admit Defendant's Exhibit

24   9 into evidence.

25        THE COURT:  Admitted.

1    (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 9 WAS

2    ADMITTED.).

3    MR. BLANCHARD:

4    Q     And, I'll give you the highlighted copy.

5    A     "September 19, '74.  The school records show that

6    school attendance is very poor and several short entries

7    written by teachers saying that the mother had been

8    neglectful and the school work was poor because of the home

9    environment and the fact that the children are filthy and

10   ridiculed by classmates.  The school records did indicate

11   that there had been a definite problem with the absentees and

12   the children are making mostly unsatisfactory grades on their

13   report cards.  The principal talked with me and told me the

14   children were very dirty.  The children were filthy and have

15   a terrible odor.  And that mother had never had them -- the

16   mother never had them clean when they came to school.  The

17   children have still not been attending school.  All the

18   children are hovered around the single fire in the room.

19   None of the children have on any shoes.  They are not dressed

20   adequately at this time.  Ms. Holloway had not had the

21   electricity turned on at this date.  It was obvious that she

22   had been drinking and she were talking very loudly."

23   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 12 FOR

24   IDENTIFICATION.)

25          MR. BLANCHARD:  Defendant's Exhibit 12.  We are now

1   moving to the Jason Holloway records instead of the Rosa

2   Holloway records.

3   MR. BLANCHARD:

4   Q    Is this document, Defendant's Exhibit 12, something

5   from the Jason Holloway records of DHR that you reviewed?

6   A    Yes, sir.

7            MR. BLANCHARD:  I move Defendant's Exhibit 12 into

8   the record.

9            THE COURT:  Admitted.

10  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT EXHIBIT 12 WAS**

11  **ADMITTED.)**

12  MR. BLANCHARD:

13  Q    Take a look at the highlight copy, Dr. Dixon, and point

14  out anything relevant there.

15  A    Jason at this point in time -- this is his record.

16  Q    I think that's a different one.

17  A    He's one year old.  "October 2nd, 1974, and the terms

18  and conditions of this admission discharge form are that,

19  quote, he is to be placed in a foster home of Marie Collier."

20  Q    Anything on the following pages of that exhibit?

21  A    Oh, yes.  "October 2nd, 1974.  Jason remained in the

22  lap of his older sister Fanny Louise throughout the hearing.

23  Ms. Holloway sat in a chair on the other side of the room and

24  he did not cry for her or want her to hold him at all during

25  the hearing.  When Ms. Holloway did leave the room again,

1    Jason remained calm as his eyes followed her as she left the

2    room."   That was his mother.  "Jason Holloway is a

3    21-month-old negro male.   Jason is being removed from the

4    home after a hearing which proved Ms. Holloway had been

5    giving inadequate care to him.  Ms. Rosa Jane Holloway is an

6    alcoholic and has left Jason at home numerous times with his

7    older brothers and sister to look at him.   Ms. Holloway does

8    not feed Jason nutrious foods and he seldom drinks the milk

9    that he needs.   Ms. Holloway has failed to hold the child in

10   a comforting and loving way.   The other children have assumed

11   most of the responsibilities that a mother usually assumes.

12   Jason is unable to talk and walk at a late age because his

13   mother did not take the time with him to teach him or

14   encourage him in these areas.   Ms. Holloway did not give the

15   child any type of supervision in the home and the discipline

16   of Jason was left up to the other children."

17        "The whole time I visited Jason in his home with his

18   mother, he never had on a pair of shoes and he did not own a

19   pair.   Short range goals were:  Jason needs to be toilet

20   trained."  He's just under the age of two.   "Jason needs to

21   be encouraged to talk."  He's not talking.   "He also needs

22   toys to play with and learn from.   He has not ever had any

23   toys before.   His mother tried to comfort him by talking to

24   him during the hearing, and he continued to scream and cry

25   until finally Jason's mother let Rosa, his sister, take him

1  back in the seat and hold him.  As soon as she took him, he

2  quit crying."

3  Q     Is it important for children of that age to have toys

4  to play with?

5  A     Absolutely.

6  Q     Why is that?

7  A     It helps with their cognitive development, their

8  hand-eye coordination and spatial training.  It is brain

9  food.  If indeed he was born drunk, and the first two years

10 of life he received no stimulation, then the deficit he

11 started with cognitively is exacerbated, were made worse, in

12 the first 21 months of his life.

13 **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 11 FOR**

14 **IDENTIFICATION.)**

15 MR. BLANCHARD:

16 Q     This is Defendant's Exhibit 11, page 4 of Jason

17 Holloway's record.  Is that something you reviewed?

18 A     Yes, it is.

19        MR. BLANCHARD:  I'll move Defendant Exhibit number

20 11 into the record.

21        THE COURT:  Admitted.

22 **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT  EXHIBIT 11 WAS**

23 **ADMITTED.).**

24        THE WITNESS:  "August 11, 1975, the foster mother

25 called to let me know that she had found earlier in the

1  afternoon that Jason had worms.  He had an extremely large

2  pin worm in his bowel movement."

3      Two weeks later.  "Jason is now potty trained except

4  for an occasional accident when he is busy playing and

5  forgets to go to bathroom.  He is also beginning to talk in

6  very simple sentences and enjoys talking on the phone after

7  placement with Ms. Collier.

8  Q    How old is he at this point?  He was born in January

9  of ....

10 A    He was Born in '73.  So two.

11 Q    Two years old.

12 **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 12 FOR**

13 **IDENTIFICATION.).**

14 MR. BLANCHARD:

15 Q    I show you Defendant's Exhibit 12 from the Jason

16 Holloway record.  Is that a record that you considered?

17 A    Yes, sir.

18      MR. BLANCHARD:  I move Defendant's Exhibit 12 into

19 evidence.

20      THE COURT:  Admitted.

21 **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT  EXHIBIT 12 WAS**

22 **ADMITTED.)**

23 MR. BLANCHARD:

24 Q    I think there is only one place where we highlighted

25 that one, Doctor.  Tell us ....

1  A       "Nineteen seventy-eight, social worker entry, he does

2  get angry on occasion still." This was -- she picked Jason

3  up at school. He was attending kindergarten at Five Points,

4  still living with the Colliers, and the record is beginning

5  to show some of the entries that report on his anger

6  outbursts.

7  Q       What significance does that have to you?

8  A       Well, all kids get angry from time to time. We all get

9  angry from time to time. But, you see a pattern in Jason

10 throughout these records where it becomes evident, as we go

11 through all of these, where typically, and in structured

12 settings he's very calm, very likeable, very mannerable.

13 These are the words that school teachers and social workers

14 used to describe him. But, when provoked he does not get

15 just a little bit angry, he goes over the top. Much like a

16 light switch. He's either real calm or very angry. That is

17 very consistent with frontal lobe brain damage.

18 **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 13 FOR**

19 **IDENTIFICATION.)**

20 MR. BLANCHARD:

21 Q       Let me show you for purposes of identification

22 Defendant's Exhibit 13 from the Holloway records. Do you

23 recognize that?

24 A       Yes, sir.

25 Q       Is that something you considered?

```
 1   A      Yes, it is.
 2            MR. BLANCHARD:    I move Defendant's Exhibit 13  into
 3   the record.
 4            THE COURT:  Admitted.
 5   (WHEREUPON, A DOCUMENT MARKED AS DEFENDANT  EXHIBIT 13 WAS
 6   ADMITTED.).
 7   MR. BLANCHARD:
 8   Q      I show you your highlighted copy.
 9   A      Entry from 1981 Jason is a very cute young boy.  He is
10   4'1" tall and weighs 50 pounds.  He has dark brown hair, eye,
11   and skin.  Ms. Collier identifies no health problems that
12   Jason was experiencing.  However, Ms. Collier did describe
13   Jason as hyperactive and it further seems this comes from
14   Jason's teacher at school.
15        Again, consistent with about 20 percent of the
16   population are hyperactive in school.  I was or so my mother
17   tells me.
18   Q      Does Jason's small size have any significance to you
19   with regard to the Fetal Alcohol Syndrome problem?
20   A      It is consistent with Fetal Alcohol Syndrome.  These
21   children are small.  Skeletal development.  They are small,
22   short of stature.  They often have character -- prior to
23   pubescence they will have characteristic facial features,
24   flattened small nose, large area here, ears set back.  But,
25   once pubescence or adolescence onset and hormones start to
```

1  develop we see a general loss of facial features.  But the

2  only way to diagnose Fetal Alcohol Syndrome is through

3  records like this.  But being short and very small is

4  consistent with Fetal Alcohol Syndrome.

5  **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 14 FOR**

6  **IDENTIFICATION.)**

7  MR. BLANCHARD:

8  Q     Let me show you for identification, Defendant's Exhibit

9  14.  Is that something from Holloway records?

10  A     Yes.

11          MR. BLANCHARD:  I move Defendant's Exhibit 14 into

12  the record.

13          THE COURT:  Admitted.

14  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT  EXHIBIT 14 WAS**

15  **ADMITTED.)**

16  MR. BLANCHARD:

17  Q     This is 1983 IBP plan by the social workers at DHR with

18  administrative review.  "Jason was placed in foster care in

19  1974 at age of 21 months.  He was very undernourished.  His

20  mother was drinking excessively.  At the present time she,"

21  the mother, "denied having a drinking problem, but continues

22  to use alcohol to excess.  It has been reported to this

23  agency by other family members that she," Ms. Holloway, "has

24  recently been hospitalized and is suffering from extensive

25  liver damage because of the excissive use of alcohol.

1    Ms. Holloway is also placed in the Chambers County Jail this

2    past weekend on public intoxication.  However, she continues

3    to deny that she uses alcohol at all.  Jason is in the fourth

4    grade at Five Points Elementary School.  Ms. Collier reports

5    he does not study like he should and does not observe things

6    that the teacher said.  He did have to repeat the first

7    grade.  Since being in school he has never applied himself.

8    She stated that she knows -- Ms. Collier states that she

9    knows she has spoiled him and she is aware that she should

10   require him to spend more time on his studies.  She stated

11   she has felt sorry for him and he appears to be so lonesome

12   since his brother, who formerly lived with the Colliers in

13   the Collier home moved, and the other children in the

14   neighborhood his age have also moved away.  Jason is very

15   attached to his foster mother and will not sleep in a

16   separate bedroom.  Jason is a very likeable child with a nice

17   personality.  It is felt that he is intelligent and capable

18   of learning if he is made to spend more time on his studies.

19   He has black hair and brown eyes and is somewhat small for

20   his age.  He is 4'4-1/2" tall and weighs 62 pounds.

21       "Diagnosis, case of ten-year-old child who has been in

22   foster care since age of 21 months.  His natural parent has

23   not expressed an interest in having him back in her home.  He

24   enjoys a close relationship with his foster mother who

25   desires very much to adopt."

*** Frances L. Roark ***

1   Q     Was there anything in there of particular significance

2   in particularly the entry regarding his schooling?

3   A     What did I just read?  My mind is blank.

4   Q     I believe you said he repeated the first grade.

5   A     He had to repeat the first grade.  Failed first grade.

6   Well, that's consistent with low IQ.

7   **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT  EXHIBIT 15 FOR**

8   **IDENTIFICATION.)**

9   MR. BLANCHARD:

10  Q     Defendant's Exhibit 15.  Is that a record you reviewed?

11  A     Yes, sir.

12        MR. BLANCHARD:  All right.  I move Defendant's

13  Exhibit 15 into the record.

14        THE COURT:  Admitted.

15  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT  EXHIBIT 15 WAS**

16  **ADMITTED.)**

17  MR. BLANCHARD:

18  Q     And, I'll show you your highlighted copy.

19  A     This is the case plan review, October 1986.  "Jason is

20  in some learning disabilities classes and is rather slow in

21  some subjects.

22        Diagnosis, in the past Ms. Collier has expressed

23  adoption of Jason, however at this time she is quite

24  reluctant to follow through with this.  However, the plan for

25  Jason is long-term foster care."

1   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT EXHIBIT 17 FOR

2   IDENTIFICATION.).

3   MR. BLANCHARD:

4   Q     I'm going to skip a number and go to Exhibit 17.   I

5   show you Defendant's Exhibit 17 for identification.   Do you

6   recognize it?

7   A     Yes, sir.

8   Q     Is it part of what you reviewed?

9   A     Yes, sir.

10          MR. BLANCHARD:   I move Defendant's Exhibit 17 into

11  the record.

12          THE COURT:  Admitted.

13  (WHEREUPON, A DOCUMENT MARKED AS DEFENDANT EXHIBIT 17 WAS

14  ADMITTED.)

15  MR. BLANCHARD:

16  Q     All right.  Here is your highlighted copy.  Would you

17  tell us what, if any, significance you found in that DHR

18  record?

19  A     The record from 1989, "Mr. David Armstrong of Coosa

20  Valley Attention Home called regarding Jason Holloway.

21  Mr. Armstrong explained Jason would be out of school on June

22  1st, 1989, but would be required to stay longer at the

23  Attention Home because he has been in trouble recently.  He

24  must stay seven days longer because he exposed himself to

25  some girls at the Attention Home.  The following day

1    Ms. Collier was contacted to discuss the agency's plan for

2    Jason.  Ms. Collier still wants to give Jason a try and

3    she'll pick him up on the day he is discharged from the

4    Attention Home coming back into foster care at her home.

5         A later entry.  Ms. Lonza Hands -- no.  "Lazona Hands,"

6    pardon me, "age 75, was in the office on this day regarding

7    her concern for Jason who she reported tried to break into

8    her home on Saturday June 24th, 1989.  According to

9    Ms. Hands, Jason came to her home around 9 on Saturday night

10   and knocked on the door, told her his name, and asked to come

11   in.  When she told him she didn't let anyone in the home

12   after dark, she reported that Jason then cut her screen door

13   on the porch and came in.  He tried to knock the latch off

14   the door of her home and break in.  She took her pistol that

15   she has for self-protection and fired it.  She said she was

16   not trying to hit Jason, just scare him off.  Ms. Hands has

17   visited the juvenile court and filed a petition on Jason.

18   She is concerned that he may get hurt if he continues.  I

19   reported to Ms. Hands the entire neighborhood is concerned

20   and very afraid of Jason.  There have been several reports of

21   voyeurism.  Ms. Hands said she hated to report this on Jason.

22   She really doesn't want anything bad to happen to him, but

23   she feels he really needs help before he is seriously hurt or

24   harms someone.

25        "Later I contacted Mr. Gresham of the Chambers County

1  Juvenile court.  Ms. Hands has completed two delinquency

2  petitions on Jason.  One for destruction of property and the

3  other criminal harassement.  Ms. Collier said she was aware

4  of the reports.  She had not contacted our agency because she

5  is waiting on someone from the agency to call her.  She said

6  she has received reports from several neighbors that Jason

7  had gone around the neighborhood peeping in windows of women.

8  And, on one occasion he was caught uninvited in a neighbor's

9  home at two in the morning.  She said people in the

10  neighborhood have begun to talk and appear to be very afraid

11  of Jason.  She requested that Jason be removed from her home

12  and receive some type of treatment for his problem.

13      "And, also a worker talked with Jason about this and he

14  did admit that he tried to break in Ms. Hands' home, but

15  denied any sexual intention toward her.  He said he wanted to

16  talk to her about lying on him, particularly these reports

17  that he had been peeping in her window.  According to Jason,

18  he was with two friends earlier that evening and he had been

19  drinking.  Ms. Collier advised that Jason -- later in the day

20  Ms. Collier advised that Jason had taken an overdoes of

21  Sudafed Cold pills.  Jason was taken immediately to the

22  Lanier emergency room where he was treated and released.  He

23  was later transported to the Coosa Juvenile Detention Center

24  for placement by a worker.  Jason did admit that he does have

25  problems and he wants to get help with these problems.

1    "Later he was referred to a clinical psychologist for a

2    clinical evaluation and subsequently accepted and transferred

3    to TriWill Porta Cras School in Green Pond, Alabama.

4        "Jason seems to be easily persuaded to engage in

5    inappropriate behavior.  He has poor judgment and insight

6    that is felt by his strong desire to return to his community

7    where he has developed an apparent negative reputation.

8    Mr. Woods feels Jason needs a high level of structure based

9    on the community -- the worker arranged for someone in

10   Anniston -- for a psychological evaluation?

11   Q    Dr. Dixon, what you just shared with us out of these

12   reports, is that consistent with your diagnosis of a low IQ?

13   A    Yes.  Frontal lobes, like I said earlier, in my

14   testimony, help us to determine how to behave, when to begin

15   behavior and when to stop behavior, which we typically refer

16   to as judgment.  And, you know, that small children very

17   often act impulsively.  They don't think.  That is a hallmark

18   characteristic of someone with brain damage.  If you have

19   ever known an adult who was involved in an automobile

20   accident, after they are all physically okay and the doctor

21   says they are fine, they can go home, you notice a change in

22   their personality, they are irascible, they are irritable,

23   they're cranky, and their personality has fully changed, that

24   is because there has been some damage or some change in the

25   human brain.  And, people with brain damage, act impulsively.

1    They see something they like and they grab it, take it, and

2    use it, do it, whatever it is.  And, that's a hallmark of

3    people with brain damage.

4    Q    We're going to start skipping around a little bit in

5    the numbers here.

6    **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 25**

7    **FOR IDENTIFICATION.)**

8    MR. BLANCHARD:

9    Q    Let me show you what's been marked as Defendant's

10   Exhibit 25.  Have you reviewed that, Doctor?

11   A    Yes, I have.

12        MR. BLANCHARD:    Move 25 into the record.

13        THE COURT:  Admitted.

14   **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 25 WAS**

15   **ADMITTED.)**

16   MR. BLANCHARD:

17   Q    Would you take a look at that and tell us what it is

18   how it relates to your findings?

19   A    This is the Alabama State Testing Report, Individual

20   Student Profile.  It is on Jason Holloway.  The important

21   thing here is you've got all these various, all these various

22   scores, basically these are academic scores.  Over here you

23   see how well they did or if they did good or did not do well.

24   Down here is the one that is the most important.  It is the

25   total battery, the total composit score of how he did.  Can

1    you this column here, S?  He scored in the second stay nine

2    (phonetic).  Let me tell you what stay nine are.

3        Each normal performance for a group of children on all

4    of these academic test and you divide them up, and this is

5    school system way they do this, they divide them up into nine

6    parts.  Nine stay nines.  So, the people who scored in the

7    highest stay nine, number nine, they scored better than

8    everybody else.  If you scored in the first stay nine, you

9    scored worse than everybody else.  You can see where Jason

10   scored, in the second stay nine.  Almost at the bottom.  Not

11   merely at the bottom.  With the first stay nine group, you

12   usually have people who are mentally retarded.  He scored in

13   the second stay nine.  These are people significantly below

14   average, intellectually, but they are not mentally retarded.

15   So, even in his academic standardized tests, we are still

16   getting the same kind of results.  That is, he is

17   significantly below average, but not mentally retarded.

18   Q    What grade level does that reflect Dr. Dixon?

19   A    I believe he was in the second grade.

20   Q    He was in the second grade when this was done.

21   **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 26**

22   **FOR IDENTIFICATION.)**

23   MR. BLANCHARD:

24   Q    Exhibit 26.  Let me show you Defendant's Exhibit 26.

25   Is that his third grade report just like one we did on second

1    grade?

2    A      Yes, sir, it is.

3    Q      And did you review that for your results?

4    A      Yes, I did.

5            MR. BLANCHARD:  I move Defendant's Exhibit 26 into

6    the record.

7            THE COURT:  Admitted.

8    (WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 26 WAS

9    ADMITTED.)

10           THE WITNESS:  1983, third grade, Jason Holloway,

11   total battery first stay nine.  Did a little worse this year.

12   So he is still at or near the bottom.  Here he is at the

13   bottom.

14   MR. BLANCHARD:

15   Q      And, once again, is that consistent with low IQ and all

16   the things we have been talking about?

17   A      Yes, sir.

18   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 27

19   FOR IDENTIFICATION.)

20           MR. BLANCHARD:  Number 27, Richard.

21   MR. BLANCHARD:

22   Q      I show you Defendant's Exhibit 27, and ask you what

23   that is.

24   A      It is his fourth grade report like the last two we have

25   just looked at.

1    MR. BLANCHARD:   I move Defendant's Exhibit 27 into

2  the record.

3    THE COURT:  Admitted.

4  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 27 WAS**

5  **ADMITTED.)**

6    THE WITNESS:  1984, grade four, total battery, .3

7  stay nine.  He's making relative -- this is Jason getting

8  worse.  Jason is getting worse.  Relative to the other kids

9  learning more year after year, he is actually slipping

10 further behind his peers.  He's not even at the first stay

11 nine.  Now he's at the .3.  He's almost at the total bottom.

12    MR. BLANCHARD:  Twenty-eight.

13 **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 28**

14 **FOR IDENTIFICATION.)**

15 MR. BLANCHARD:

16 Q    Now, let me show you Exhibit 28.  Did you review that?

17 A    Yes, sir, I did.

18 Q    Is that something of his academic record for grade

19 five?

20 A    Yes, sir, it is.

21 Q    All right.  Would you tell us what it is?

22    MR. BLANCHARD:  I move 28 into the record.

23    THE COURT:  Admitted.

24 **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 28  WAS**

25 **ADMITTED.)**

 1              THE WITNESS:  This is the Stanford Achievement

 2   Test, which is the Otis Lenin Abilities School Test.

 3        This means reading, writing, and arithematic.  This is

 4   kind of a group administered IQ test, the Otis Lenin Test.

 5   Here you can see if he had scored above average, these bars

 6   would be up here or if he scored average.  But, you can see

 7   that in all areas vocabulary, spelling, language, math,

 8   science, he is below average in everything.  One, now, he

 9   does get into the average concepts of numbers.  He is below

10   average or into average range.  Total battery, excuse me,

11   total battery below average.  And you will notice that if you

12   read this straight down it looks like around the middle of

13   the bar for a total battery looks to be about the 9th or 10th

14   percentile.  That is consistent with the IQ I got which was

15   in the 16 percentile.  And, the Otis Lenin School is very

16   highly correlated with IQ tests.  In fact, some people use it

17   as a group administered IQ test.  And, you can see what we've

18   got on there, looking at, maybe, the 5th percentile.  What

19   this means is, the last three or four standardized

20   achievement tests and this one, are just telling me that year

21   after year after year, he is consistently scoring well below

22   average.

23              MR. BLANCHARD:  Twenty-one.

24   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 21

25   FOR IDENTIFICATION.)

1 | MR. BLANCHARD:

2 | Q    Let me show you Defendant's Exhibit 21.  Do you

3 | recognize that?

4 | A    Yes, sir.

5 | Q    Is this a record you reviewed?

6 | A    Yes, sir.

7 |        MR. BLANCHARD:    I move to admit Defendant's

8 | Exhibit 21 into the record.

9 |        THE COURT:  Admitted.

10 | **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 21 WAS**

11 | **ADMITTED.)**

12 |        THE WITNESS:  I think this is a report card from

13 | the seventh grade.  He was retained -- he failed the seventh

14 | grade.  Remember he also failed the first grade.  And, you

15 | can see -- now these scores here, they don't look too bad.

16 | He manages a 42, 60, science 61, 53, but remember he in

17 | special ed and they have special grading standards that they

18 | don't use for the mainstream children.  Special education

19 | children are graded, compared with other special ed children.

20 | But, he was retained.

21 |        MR. BLANCHARD:  Number twenty-two.

22 | **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 22**

23 | **FOR IDENTIFICATION.)**

24 | A    Let me show you Defendant's Exhibit 22.  Is that a

25 | record you reviewed?

 1  A    Yes, sir.

 2        MR. BLANCHARD:  All right.  I move Defendant's

 3  Exhibit 22 into the record.

 4        THE COURT:  Admitted.

 5  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 22 WAS**

 6  **ADMITTED.)**

 7        THE WITNESS:  This is the Stanford again with the

 8  Otis Lenin, and it is from grade eight.  Now we are going

 9  steadily higher in grades.  Here he scored almost average in

10  comprehension, but below average in every other area, and

11  remember the Otis Lenin School is kind of like an IQ test,

12  and you can see that he is well below average, and it looks

13  like is around the 10th percentile.  So, again, year after

14  year, consistent poor performance in reading, writing,

15  arithematic, and IQ is very ....

16        MR. BLANCHARD:  Number 23, Richard.

17  **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 23**

18  **FOR IDENTIFICATION.)**

19  MR. BLANCHARD:

20  Q    I'll show you 23.  Did you review that?

21  A    Yes, sir, I did.

22        MR. BLANCHARD:  All right.  I move to admit 23 into

23  the record.

24        THE COURT:  Admitted.

25  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 23 WAS**

1   **ADMITTED.)**

2   MR. BLANCHARD:

3   Q      Take a look at page 2 of that document you are looking

4   at.  You see a blow up of it there?

5   A      This is University of Alabama School of Medicine,

6   Department of Psychiatry, the Smolian Psychiatric Clinic.

7   Jason was sent here for evaluation and this evaluation took

8   place in 1988.  He was administered the Kaufman,

9   K-A-U-F-M-A-N, Test of Educational Achievement and

10  Comprehension.  He was 15-1/2 years old at this time.  And,

11  this is the second page of the report.  It says since

12  mid-June Jason has reported dizziness associated with heat

13  and smelling sulphur with the on set of a headache.  That is

14  consistent with migraines.  He also reported hearing others

15  calling his name when no one was present and upon waking

16  seeing people over his bed and in his doorway who weren't

17  there.  However, once fully awakened Jason reported that the

18  images would disappear.  And, you might think those are

19  auditory and visual hallucinations.  No they are probably not

20  genuine auditory and visual hallucinations.  What they are is

21  confusion on awakening, which we all experience, but someone

22  with low IQ might perceive it as real and get frightened.  We

23  have all seen illusions.  We are out in the dessert and see

24  water shimmering in the dessert.  You know it is not water.

25  It's the heat.  But, it looks like water.  Well, when your IQ

1  is 85, you might really think it is really water.  And,

2  sometimes with no explanation to the contrary from mom and

3  dad, will convince someone any differently.

4      They just repeat again that he was retained or failed

5  first grade and seventh grade.  And, they also mention down

6  here in Smolian Clinic Psychological Report, Jason is often

7  very quiet and complaisant, and it is difficult for him to

8  assume responsibility and ignoring inappropriate behavior of

9  his peers.  He is easily influenced.  Now, here is a scene we

10 have seen in these records several times, and I want to bring

11 it to your attention here that Jason is often very quiet and

12 compliant.  Calm, quiet, likeable child until provoked.  If

13 something pushes his buttons, then he goes over the top.

14 That is consistent with what we have.

15     He gets in a lot of fights.  He hurts people.  He hurts

16 himself.  So, he's either quiet or in a fight.  There's no in

17 between for him.

18     And also down here, the purpose of him being at the

19 Smolian Clinic is his achievement, reading, writing and

20 arithmetic testing.  Here again you see -- we have even a

21 third type of achievement test.  The percentile ranks how

22 many people scored below you.  He's down at the .5 -- one,

23 second, third, first, first.  The totals battery was 1st

24 percentile.  That means that 99 percent of the people given

25 this test scored higher than Jason.  That gives you a feel

1   for what it means.  What the implication is of an IQ of 85.

2   Because an IQ of 85 may not sound too low, but you can see

3   the devastating impact it has on learning.

4           MR. BLANCHARD:  Twenty-nine.

5   **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 29**

6   **FOR IDENTIFICATION.)**

7   MR. BLANCHARD:

8   Q    I show you Defendant's Exhibit 29; and, ask you, if you

9   can identify that.

10  A    Yes, sir, I do.

11  Q    Is this the Children's Hospital record from Jason's

12  admission?

13  A    Yes, sir.

14  Q    Did you review that?

15  A    I did.

16          MR. BLANCHARD:  I move 29 into the record, Your

17  Honor.

18          THE COURT:  Admitted.

19  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 29  WAS**

20  **ADMITTED.)**

21  MR. BLANCHARD:

22  Q    See if there is anything in 29 that you have

23  highlighted?  We have one more page that is blown up.  I am

24  not sure whether that is the correct one, but we'll see.

25  A    First one that I have made some highlighted notes on is

1   on page 2.

2       Jason was referred to the Children's Hospital because

3       the

4   social workers were beginning to see some odd and unusual

5   thinking processes in his thinking that they thought sounded

6   kind of crazy.  So they referred him here to have him

7   evaluated to see if there was some kind of psychotic process

8   going on.  Very often people with brain damage do think oddly

9   and they speak oddly, and that can worry -- he was sent to

10  the hospital where the psychiatrists and psychologists and

11  medical doctors, radiologists could do some brain scans of

12  him, and see what was going on.  This is the best work up he

13  had in his entire life.

14      Now, they ruled out psychotic process.  There was no

15  evidence of psychosis by the testing done.  He seems to have

16  an extreme attachment to his foster mother.  He has inability

17  at times to control his anger.  A neurologist, this is a

18  medical doctor, someone does CAT scans and MRIs.  A neurology

19  consult was obtained to determine if they could see if there

20  was any structural or physiological processes going on

21  consistent with disease, and to see if they could find out

22  why he was having migraine type headaches.  The neurology

23  results were negative.  They did not find anything

24  physiologically wrong with his brain.  He was discharged in

25  good condition with no medication in the care of his mother.

1     The IQ test that he received there, if I can find it --
2   is that this here?  Jason was administered the Weschler
3   Intelligence Scale for children, the MMPI, Rocschach Ink
4   Blot.  He was cooperative and put forth good effort on all
5   tests.  The test were evaluated by the doctor.  His full
6   scale IQ was 79.  That's a few points lower than mine was,
7   but still consistent.  His verbal IQ is 74 and his
8   performance IQ was 87.  So, you get three IQ scores this
9   particular test.  The tests I gave was 85.  We are getting
10  very consistent IQ.  Sixteenth percentile.  Same as mine.
11  His MMPI -- he was given -- an MMPI is a test of pathological
12  personality characteristics.  We're looking for any kind of
13  serious mental illness.  And, Jason was found to be dysphoric
14  and sad.  He tends to exaggerate distress to a certain
15  degree, but his profile is one of a friendly, social person,
16  with underlying distress, distrust, and distance in his
17  relationships with others.  See, we're getting a dichotomy
18  here.  The Rorschach test presented a cooperative, agreeable
19  person who was wearing a mask over very poorly controlled
20  hostile impulses.  Here again another test, a third test
21  showing that dichotomy.  He's sweet and easy-going and
22  agreeable on the surface when everything is going okay and
23  when things are not going okay impulsive, anger, acting out,
24  violence.
25  Q     Is that consistent with the type of brain damage you

1 have concluded he has?

2 A     Yes, sir.

3 Q     The telling thing here was.  This was his only in

4 hospital evaluation and their recommendation was that Jason

5 be entered into intensive psycho therapy to assist him in

6 dealing with tremendous underlying anger and frustrational

7 and affectional needs that appeared to underlie his social

8 demeanor.  Unfortunately for everyone in this courtroom,

9 including Jason, he never received such treatment.

10         MR. BLANCHARD:  Thirty-three, Richard.

11 **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 33**

12 **FOR IDENTIFICATION.)**

13 MR. BLANCHARD:

14 Q     I'll show you Defendant's Exhibit 33, Dr. Dixon; is

15 that something you reviewed?

16 A     Yes.

17         MR. BLANCHARD:  Move to admit 33 into the record.

18         THE COURT:  Admitted.

19 **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 33 WAS**

20 **ADMITTED.)**

21         THE WITNESS:  More testing.  Another IQ test.

22 Chambers County Board of Education.  Test was administered in

23 1986, when he was 13 years old.  We got an IQ of -- remember

24 I got mine in 2001, was 85 -- they got an 84.  Also there is

25 a range of error around these scores.  So, you can see that

1  that is very consistent with the 79 that Children's Hospital

2  got and the 85 that I got.

3      I could give you the breakdown of some subscores that

4      are

5  in this particular IQ test, but the bottom line is, again

6  16th percent, IQ of about 85.

7          MR. BLANCHARD:  Exhibit 20, Richard.  I think there

8  are several pages to that one.  But this is about the last

9  one.  One of the last ones.

10 **(WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 20**

11 **FOR IDENTIFICATION.)**

12 MR. BLANCHARD:

13 Q    Number 20.  Defendant's Exhibit 20.  Do you recognize

14 that?

15 A    Yes, sir, I do.

16 Q    All right.  Is this something you reviewed?

17 A    Yes, sir.

18          MR. BLANCHARD:  I move 20 into the record.

19          THE COURT:  Admitted.

20 **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 20 WAS**

21 **ADMITTED.)**

22          MR. BLANCHARD: Put up the first page of that,

23 please.

24 MR. BLANCHARD:

25 Q    Take a look at that document and tell us what it is and

1   you can tell us what you found to be significant about that.

2   A      Jason was referred to Dr. Summerlin, a psychologist in

3   1989.  He was, I believe, 15 at this age.  At this time he

4   was, again, given an IQ test.  We've got a full scale IQ of

5   79.  That is the exact same score they got at Childrens.

6   Let's see on the front page here.  Jason's foster mother was

7   having increasing difficulty in dealing with his lying,

8   stealing, and oppositional behavior, he was caught looking in

9   a neighbor's bathroom window.  That's the same episode we

10  have already covered in the record.  On November 25th, 1988 a

11  request was made by Jason's foster mother to have him removed

12  from the foster home because of his behavior.  He has been

13  receiving special education placements.  He was 16 years old

14  at the time of this evaluation.  He had been seen by the

15  Smolian Clinic and we have reviewed those records.  Mental

16  status examination was unremarkable.

17       What a mental status examination is, is when a doctor,

18  a psychiatrist or psychologist, who has been trained to

19  interview people for serious mental illness, that's what --

20  they sit down and have an interview:  are you seeing things,

21  are you hearing things, do you have odd thoughts, odd

22  sensations, strange behavior, do you regularly have dinner

23  with people from another planet every night.  Things like

24  that.  Do dead people talk to you?  Do you talk to them?  You

25  are looking for something really strange.  His was, again,

1    normal.  He was able to respond concretely, accurately, with

2    no indication of anything serious, but when they gave him the

3    test there was some suggestion of some tenuous contact with

4    reality.

5         The scales, the MMPI, seem to indicate some slightly

6    tenuous contact, poor contact with reality, and this is,

7    again, consistent with people who have low IQ.  They

8    sometimes can't tell what is real and what's not real.  It

9    does not mean they are crazy.  It is just they have a little

10   problem.  They are socially uncomfortable, emotionally

11   labile, generally calm, again we are getting that same

12   pattern.  All these doctors over the years have been

13   describing Jason in the same way.

14        They again recommend further testing, for follow-up,

15   which treatment he never got.

16   Q    And, are all those findings you just summarized

17   consistent with your findings.

18   A    Consistent with my finding and consistent with all the

19   medical records throughout his life.

20            MR. BLANCHARD:  One more.  Number 30.

21   (WHEREUPON, A DOCUMENT WAS MARKED AS DEFENDANT'S EXHIBIT 30

22   FOR IDENTIFICATION.)

23   MR. BLANCHARD:

24   Q    You stated it was important to review information about

25   the biological siblings.

1  A     Yes, sir.

2  Q     All right.  Did you review any of that?

3  A     Yes, sir, I did.

4  Q     Let me show you Defendant's Exhibit 30, and ask you, if

5  you recognize that.

6  A     Yes, sir, I do.

7  Q     Is that something you reviewed?

8  A     Yes.

9          MR. BLANCHARD: Move number 30 into the record.

10         THE COURT:  Admitted.

11  **(WHEREUPON, A DOCUMENT MARKED AS DEFENDANT'S EXHIBIT 30 WAS**

12  **ADMITTED.)**

13         THE WITNESS:  This is permanent school records from

14  Alabama.  It is on Jason's older brother, Rosco, who

15  testified here earlier today.  And, it just shows that

16  sibling low functioning.  Rosco was diagnosed with educable

17  mental retardation.  He was in special education classes.

18  MR. BLANCHARD:

19  Q     All right.  I think that's all.  Thank you.  You can

20  take your seat back on the witness stand.

21       We have been through a lot of information.

22  A     Yes, sir.

23  Q     And, before I conclude my examination, I would like to

24  ask if you can summarize very briefly your findings with

25  regard to Jason.

1    A     In all probability his mother was an alcoholic during

2    the gestational period, during the pregnancy, that caused the

3    brain damage as has been measured by many doctors throughout

4    the course of his lifetime.  People in Jason's intellectual

5    level don't do well in school.  They don't profit from

6    experience.  They are not real bright.  They are the kind of

7    people you describe as, maybe, having one oar in the water.

8    When you just meet them briefly, they look kind of okay.  If

9    you get to know them a little bit, you realize they don't

10   think, feel, and behalf like everybody else.  They don't

11   really understand.  They don't really have a total grip and

12   understanding like the average person does about what is

13   going on.

14       If Jason is committed to the Alabama Department of

15   Corrections to spend the rest of his natural life there, will

16   he be able to cope given his limitations and make an

17   adjustment to that environment?

18   A     In that structure, he will do better than he would on

19   the outside with no supervision.

20   Q     If you know, are you familiar with the Department of

21   Corrections in general?

22   A     Yes, sir.  For about two years I was special consultant

23   to the Department of Corrections and provided therapy

24   services at Saint Clair Correctional Facility in Saint Clair,

25   Alabama, just north of Birmingham.

1    Q      Is there any help for someone like Jason available in

2    the Department of Corrections?

3    A      Yes, sir.  They have nurses, medical doctors,

4    psychiatrists.  They have counselors.  In fact, I was hired

5    to do counseling with people like Jason in the prison system.

6    Q      One other thing, we have heard testimony from a couple

7    of jailors here earlier today, I believe you were here and

8    heard it, that Jason has gotten into some fights in the jail,

9    but that he was pretty much an average inmate.  Is there

10   anything there in that information of significance to you?

11   A      The Department of Corrections will do MMPI and IQ

12   testing when Jason enters the prison system and they make

13   classification decisions based upon those results and

14   recommendations by the Court, and they'll probably, in all

15   probability, place him in a special unit with people like

16   himself.  They are not, probably, going to put him out in the

17   general population just to start with.  So, they'll take

18   account of that; yes.

19   Q      Of the prison population, is there a significant number

20   of person with IQs like Jason?

21   A      Yes, sir.  Federal studies have indicated to us that

22   about 40 percent of the inmate population in federal

23   penitentiaries in this country, and is probably reflected in

24   state DOC populations, have significant measurable brain

25   damage.

*** Frances L. Roark ***

 1          MR. BLANCHARD:  Thank you, Dr. Dixon.  Those are

 2    all my questions.  Please answer theirs.

 3          THE COURT:  Cross-examination.

 4       Ladies and Gentlemen, do you need to take a break before

 5    we begin?  If you would, just step back to the jury room and

 6    let your bailiff know when all of you are ready.

 7    (JURY OUT)

 8          THE COURT:  We will be in recess.

 9    (WHEREUPON, THERE WAS A RECESS.)

10                    **CROSS EXAMINATION**

11    **BY MR. GIBBS:**

12    Q      Doctor, --

13    A      Yes, sir.

14    Q      You stated that you spoke with the defendant at the

15    jail back in May of 2001 and August of 2001; is that correct?

16    A      Yes, sir.

17    Q      Would that be the only two times that you say you saw

18    the defendant?

19    A      Other than here in the courtroom; yes, sir.

20    Q      Now, in the May 2001 meeting at the jail, was there a

21    little room that you were allowed to use?

22    A      Yes, sir.

23    Q      And, how long did you spend with him in May of 2001, on

24    this particular day?

25    A      Hour and a half would be my guess.

```
 1   Q      An hour and a half; okay.  And, you came back three
 2   months later and saw him in August.
 3   A      Yes, sir.
 4   Q      At the jail still.
 5   A      Yes, sir.
 6   Q      And, how long did you spend with him in August?
 7   A      An hour and a half to two hours.  I did the testing
 8   with him at that time.
 9   Q      You did testing.
10   A      Yes, sir.
11   Q      What kind of testing did you do?
12   A      IQ test and I also did a TOMM which is a Test of Memory
13   Malingered.  It is a test to determine if the person I'm
14   assessing is being honest with me or not.
15   Q      Okay.  And, you talked about evaluating him on several
16   levels, one the ability to assist his counsel at trial; is
17   that correct?
18   A      Yes, sir.
19   Q      And, you determined that he can assist his attorneys
20   and can be very helpful to them in preparing for trial;
21   correct?
22   A      Yes, sir.
23   Q      Let me clear something up for my benefit, please.  You
24   kept referring to his IQ as below average.
25   A      Yes, sir.
```

1    Q    But when I look at your report, and it may be just a

2    technical term to me, you say low average, and I read

3    Dr. King's report, and some of the Children's Hospital, and

4    they refer to him as low average.

5    A    Yes, sir.

6    Q    So, his score is in the average range, but on the lower

7    end?

8    A    No, sir.

9    Q    Average is 90 to about a 115.  Eighty to 90 is a low

10   average range.  It is a special distinction.  Eighty to 90 is

11   low average.

12   Q    Low average.

13   A    Yes, sir.  I know it is confuse ....

14   Q    Not below average.

15   A    Yes, it is below average and it is not average.  It is

16   a low average range.  I know it is confusing because the word

17   average is used both times.

18   Q    And, you are not telling this jury that he suffers from

19   any mental disease or defect; is that correct?

20   A    That is correct.

21   Q    And, he is not insane by any stretch of the legal

22   definition, is he?

23   A    No, not in my opinion; no, sir.

24   Q    He fully understands the difference between right and

25   wrong; is that correct?

1    A    Yes, sir, he does.

2    Q    You used the phrase not the brightest crayon in the

3    box.

4    A    No, he is not.

5    Q    He's  not the dullest either, is he?

6    A    No, sir, he is not.

7    Q    And, you also said he can form the intent to commit

8    crimes.

9    A    Yes, he can.

10   Q    Now, when you spoke to him on those occasions -- have

11   you spoken with him since you have been here this last week

12   or two?

13   A    On the last break, just to give him some aspirin for a

14   headache.

15   Q    Okay.  You did not speak with him.

16   A    No.

17   Q    Well, the other times back in May and August.

18   A    Yes.  Just May and August are the only times I have had

19   a conversation with him.

20   Q    Did he have any trouble understanding you?

21   A    No, he did not.

22   Q    Or you him?

23   A    I don't think so.

24   Q    Very articulate gentleman.

25   A    He is.

1  Q      Now, you said that his -- and if I misstate you,

2  please, correct me; okay -- his ability to appreciate the

3  criminality of what he did is impaired, or what he does is

4  impaired.

5  A      Yes, sir.

6  Q      He doesn't fully apprehend.

7  A      Comprehend.

8  Q      I'm sorry.

9  A      He doesn't fully comprehend the ramifications or the

10 nature or the quality of his acts.  He knows right from

11 wrong.  He knows when he does something that is wrong.  He

12 knows that.  But, he is impaired in his ability to fully

13 appreciate either the rightfulness or wrongfulness of an act.

14 Q      Okay.

15 A      It is mild.  It is a mild type of impairment.

16 Q      Doesn't fully comprehend the ramifications of his

17 actions?

18 A      Correct.

19 Q      Well, Doctor, if he doesn't understand the

20 ramifications, the full consequences of his actions, if the

21 evidence showed that he lied to the police officers about

22 what he did, wouldn't that evidence some recognition of the

23 consequences of my actions?

24 A      Yes, it would.

25 Q      And, furthermore, wouldn't hiding the murder weapon, a

1  knife, cleaning the blood off the knife, discarding the

2  projectiles; wouldn't that indicate a comprehension of the

3  consequences of my actions?

4  A      He knew it was wrong and his subsequent behavior is

5  consistent with someone who understands that what he did was

6  wrong and he tried to cover up or hide or lie about it.  What

7  you are describing there.  So, the answer is yes.

8  Q      Thank you, Doctor.

9         You also described him as impulsive.

10  A      Yes, sir.

11  Q      You said his frontal lobes were impaired.

12  A      Yes, sir.

13  Q      Now, Defense counsel provided me with all these

14  documents, for the most part, the pertinent ones.  I didn't

15  see any paperwork or any documentation where a CAT scan or

16  anything of that nature was done.  Was one done to your

17  knowledge?

18  A      Yeah.  They did a radiological study when he was at

19  Childrens and the results were negative.  The actual

20  radiological report, I didn't find that.  It is not in there.

21  It is referenced in another physician's note.

22  Q      And you mentioned an neurological report.

23  A      Yes, sir.

24  Q      And that ....

25  A      And, that report is absent.  I never saw the neurology

1    report, but I see where another physician read it, and,

2    obviously, he had it or she had it, and said the results were

3    negative.

4  Q    The results were negative.

5  A    Yes, sir.

6  Q    Okay.  Now, you started out by reading a number of

7    excerpts from DHR records.  Those were dated in 1970, '71,

8    '72.

9  A    Yes, sir.

10 Q    The defendant wasn't born until 1973; is that correct?

11   January of '73; correct?

12 A    Um-hmmm.

13 Q    So, most of what you read, initially anyway, was going

14   on before he even got in the household; correct?

15 A    Well, most of it.  What I tried to do was read reports

16   that described the home condition and the behavior of the

17   mother before the pregnancy, during the pregnancy, and after

18   the pregnancy.

19 Q    My question simply is this:  The first few reports you

20   read were, like, from '70 all the way up to the middle of

21   '73.

22 A    Yes, sir.

23 Q    Aside from the '73 ones, he was not born yet; is that

24   correct?

25 A    That is correct.

1  Q    And, was there anything in those records to indicate

2  that this behavior that you talked about before he was born

3  had been going on for a while in the household prior to him

4  being born.

5  A    I don't remember reading anything specifically that

6  talked about how long before those records started she may

7  have been -- the household may have been in that condition.

8  Q    Okay.

9  A    I think the records just -- whenever the DHR worker

10 started those records, that is when I -- from that point

11 forward.

12 Q    Okay.  You indicated that he tends to overreact.

13 A    Yes, sir.

14 Q    You used -- you talked about the affects of his mother

15 drinking, and you used a couple of sentences that came to my

16 attention.  You said, if, indeed he was born drunk, and you

17 said in all probability his mother was an alcoholic at birth.

18 Those phrases indicate to me that you're not certain that he

19 was born drunk.

20 A    I am not certain.

21 Q    And, you're not certain that he has this, what you

22 call, Fetal Alcohol Syndrome?

23 A    Right.

24 Q    You are not certain of that; are you?

25 A    The history and his current condition are consistent

1   with it, but, no, I'm not certain that he had that at birth.

2   Q    Okay.  And, you said, you know, you reading those

3   reports.  All that went on before he was born and all that

4   went on while he was being born.  And, pretty much all the

5   kids endured this.

6   A    Yes.

7   Q    Now, he's the baby; correct?

8   A    Yes, sir.

9   Q    So, would it be safe to say the other kids endured it a

10  heck of a lot longer than he did.

11  A    Well, they had been alive longer; so, yes.

12  Q    Okay.  And, I think one of the things you commented

13  that he was short and thin of stature.  Thin of stature takes

14  me out of it, huh?

15  A    Me too.

16  Q    Rosco, stand up for me, please.

17  A    Rosco is a pretty tall fellow; isn't he?   Healthy

18  fellow.  Very healthy fellow. Grew up in the same house.  You

19  may be seated.  Thank you.  Grew up in same environment.

20  A    I just don't know if, when Ms. Holloway was pregnant

21  with Rosco, to what extent she drank.

22  Q    Okay.  Now, you talked about these studies and, forgive

23  me for not having a full understanding of what these studies

24  are based upon, but apparently you did some clinical work or

25  something of that nature.

1    A    I am not following you.

2    Q    I am sorry.  You talked about working with mothers; is

3    that correct?

4    A    Oh, yes, the hospital I worked at in Jacksonville,

5    Florida, was a substance abuse hospital, and it had a lot of

6    mothers who came there for treatment who were alcoholics who

7    were pregnant.

8    Q    And, did every child come out with this Fetal Alcohol

9    Syndrome?

10    A    No.

11    Q    Okay.  You read a report, Doctor, and the report in

12    particular I am talking about is one where there were these

13    reports of hallucinations to the Children's Hospital.

14    A    Um-hmmm.

15    Q    He was referred there to see about this reports of

16    hallucinations; correct?

17    A    Yes, sir.

18    Q    And, that was time when that neurological analsysis was

19    elected to be done or supposed to have been done, and came

20    back negative.

21    A    Yes, sir.

22    Q    And, indicated in your testimony that those

23    hallucinations -- I think you used an analogy of when you

24    wake up kind of groggy and out of it, it is not really an

25    hallucinations.  And, you equated that with his low IQ;

1    correct?

2    A    Illusions are real.  Like the shimmering water on the

3    dessert.  We misperceive those because our senses are being

4    fooled.  But, the average person once that is explained to

5    them understands it.  When you have some with one low IQ and

6    they suffer with some illusions, which are now real, they may

7    think -- they may report that to other people and other

8    people, will say, my God, he's pyschotic.  He's having

9    hallucinations, which are not real.  So, they sent him to the

10   hospital and tested him.  They say he's not having

11   hallucinations.  He's not psychotic.  That's my understanding

12   of what happened.

13   Q    Now, when you interviewed the defendant in May and

14   August, he reported some hallucinations to you, didn't he?

15   A    Initially; yes, sir, he did.

16   Q    In your report you said he endorsed visual

17   hallucinations although these were unconvincing to you;

18   correct?

19   A    Yes, sir.

20   Q    And you went on to, in your subsequent meeting, to

21   confront him about these reports of hallucinations; is that

22   correct?

23   A    Yes, sir, I did.

24   Q    And, upon your confronting him, your report says he

25   relented that they were merely a ploy for sympathy.

```
 1   A      Yes, sir.

 2   Q      You know, Dr. King, Glenn King?

 3   A      Yes, sir, I know him well.

 4   Q      Who is Dr. King?

 5   A      He is a clinical pyschologist in Montgomery.

 6   Q      And, he also did an evaluation of this defendant, did

 7   he not?

 8   A      Yes, he did.

 9   Q      Have you seen a copy of that report?

10   A      I have.

11   Q      Have you read it?

12   A      Yes, sir.

13   Q      And, you don't really disagree with what's in

14   Dr. King's report, do you?

15   A      No, I don't.

16   Q      He reported hallucinations to Dr. King also; is that

17   correct?

18   A      Now, that I don't remember, but ....

19   Q      I have may have copy.  I'll show you my copy.  I'm

20   merely referring to the last part down here.

21   A      This is clearly an illusion.  He claims that he has

22   visual hallucinations in which he sees people, including his

23   son and his father for a couple of minutes.  It should be

24   noted that visual hallucinations are extremely rare even in a

25   chronically hospitalized psychiatric population.  Thus, these
```

1    reports do not have credibility.

2    Q    He also concluded as you did.

3    A    Exactly.

4    Q    Now, regarding your report, Doctor, and on this second

5    visit you performed numerous tests; is that correct?

6    A    IQ test and TOMM test, the memory test, plus the

7    interview.

8    Q    Okay.

9    A    TOMMs is not really a test.  It is an interview.

10   Q    You determined that his thought productivity and

11   continuity were both within normal limits; is that correct?

12   A    Yes, sir.

13   Q    Memory for recent and remote events was within normal

14   limits; is that correct?

15   A    Yes, sir.

16   Q    His insight and judgment were fair to poor; correct?

17   A    Yes, sir.

18   Q    He has a history of impulsivity.

19   A    Yes, sir.

20   Q    Acting out and poor judgment.

21   A    Yes, sir.

22   Q    He acts without thinking.

23   A    At times.

24   Q    Now, you showed, when I say you, Defense counsel,

25   showed us some school records.

*** Frances L. Roark ***

1    A    Um-hmmm.

2    Q    I'm specifically referring to Defendant's Exhibit 21,

3    the Defendant's seventh grade report card.  Remember this

4    one?

5    A    Yes.

6    Q    And, I think when you were referring to this document,

7    you said, well, his grades were not that bad, but these are

8    special ed classes; is that correct?

9    A    That is correct

10   Q    Now, I am going to show you what has been marked for

11   Exhibit 30, as an exhibit showing the grades of Rosco

12   Holloway.

13   A    Um-hmmm.

14   Q    Take that one, please.

15   A    Now, Rosco's exhibit is from Five Points High school

16   also; is that correct?  Five Points School.

17   A    Yes, it is.  Five Points High.

18   Q    Okay.  And, on Rosco's report card, it has got special

19   ed written all over it; doesn't it?

20   A    It sure does; yes.

21   Q    But I fail to see special ed written on Jason

22   Holloway's report card.

23   A    Um-hmmm.

24   Q    And, the only reason I bring that out to you is in

25   Dr. King's report he says, he took regular classes and some

```
 1   special ed classes.  Not all of his classes were special ed;
 2   is that correct?
 3   A     That is my recall.  That's correct.
 4   Q     That all of his classes were special ed?
 5   A     No.  That some were not.
 6   Q     Some were not. Okay.  When you pointed out that these
 7   grades are not that bad, but he was in special ed, not all
 8   these classes are special ed classes.
 9   A     Correct.
10   Q     Thank you, Doctor.
11   (WHEREUPON, A DOCUMENT WAS MARKED AS STATE'S EXHIBIT 59 FOR
12   IDENTIFICATION.)
13   MR. GIBBS:
14   Q     Doctor, I am showing you what's been marked for
15   identification purposes as State's Exhibit number 59.  And,
16   have you ever seen documents similar to that in all the stuff
17   you looked through?
18   A     I don't recall this one; no.
19   Q     Okay.  Well, if I submit to you that that was given to
20   me by Defense counsel in the stack they gave me ....
21   A     This part looks familiar.  That does not.  I'm an old
22   man and my memory is probably shot.
23          MR. GIBBS:   I move to admit Exhibit 59, Your
24   Honor.
25          THE COURT:  Admitted.
```

 1            MR. BLANCHARD:  Objection.

 2    (WHEREUPON, A SIDE BAR COMMENCES.)

 3            MR. GIBBS:  On what basis?

 4            MR. BLANCHARD:  I believe he said he didn't see it.

 5            THE COURT:  I misunderstood, then.  I'm sorry.

 6            MR. GIBBS:   These are documents you gave me.

 7            MR. BLANCHARD:  Yes, I know.  I did.  I am just

 8    trying to figure out what the basis for admitting it is.  I

 9    gave you other documents that I have not admitted.

10            THE COURT:  What is it?

11            MR. GIBBS:  It is another report card where his

12    grades were considerably higher.

13            THE COURT:   Overruled.

14    (WHEREUPON, A SIDE BAR CONCLUDED.) .

15    MR. GIBBS:

16    Q    Doctor, Exhibit 59 is an Anniston High School

17    withdrawal form for the defendant, Jason Holloway, at grade

18    nine.

19    A    Okay.

20    Q    And, at the time of his withdrawal, his grades were

21    Alabama History, 93; English, 86; PE 100; that math is like a

22    59; but science is 65.  I don't know what LD09 is, but he had

23    a 77 in whatever it was.  And, EHP I'm assumming is

24    vocabulary, 81.  In the ninth grade.  Pretty good grades,

25    aren't they?

1  A    The percentages; are, yes.

2  Q    Thank you.

3       Doctor, I was just dark up there where you are now.  Oh,

4  they are coming back on slowly.  Okay.

5  A    It is an illusion.

6  Q    It's an illusion.  Okay.

7       Doctor, you're not telling these members of the jury

8  that people can't overcome those deficits and hardships you

9  described; are you?

10 A    The neurological deficits there is no evidence that --

11 those brain cells that would fail to develop in the womb,

12 those are lost for life.

13 Q    Well, you talk about neurologic deficits, but the only

14 testimony we have at this point is that neurological tests

15 were negative.

16 A    Oh, no, the IQ tests are neurologic tests, too.

17 Q    Okay.

18 A    And, all the achievement tests that he took over all

19 those years.  They are all measuring brain function or the

20 lack thereof in this case.

21 Q    Now, ....

22 A    But, I think what you are asking was can they do a work

23 around?  Can they still learn to be adaptive, functional

24 people?  Sure.

25 Q    Okay.  Thank you, Doctor.

```
 1   A      That is what I think you were going for.

 2   Q      Thank you, Doctor.

 3   A      Sure.

 4   Q      And, all the things you talked about, the out houses

 5   and back 32 years ago, the no clothes; one can overcome those

 6   things, can't they?

 7   A      Some people can and most people do.

 8   Q      He was only in that environment for 21 months; is that

 9   correct?

10   A      Yes, sir.

11   Q      And, at that point, he was put in the loving home of

12   Ms. Collier and her husband; is that correct?

13   A      Correct.

14   Q      Where he got clothes.  He got food.

15   A      Yes.

16   Q      This attention from others around him.

17   A      Um-hmmm.   That is correct.

18   Q      Loving nurturing environment.

19   A      I believe it was.

20   Q      And, can things like that help one overcome those

21   deficits early on?

22   A      Yes, sir.

23   Q      I am showing you Defense Exhibit 35, and that little

24   smiling kid in the middle is the defendant.  He looks pretty

25   happy, doesn't he?
```

```
 1   A     Yes, sir.

 2   Q     Looks pretty well adjusted, doesn't he?

 3   A     Well, I don't know about well adjusted, but he sure

 4   looks happy.

 5   Q     Okay.  Just a few more minutes.  I am sorry.

 6         Doctor, in your report, you talk about -- refer to him

 7   as socially inept and shy and withdrawn.  Socially inept.  He

 8   is married; correct?

 9   A     Correct.

10   Q     Got a couple of kids; correct?

11   A     Yes.

12   Q     Has a girlfriend.

13   A     Yes.

14   Q     Has friends.

15   A     Playing basketball with the boys.

16   A     Um-hmmm.

17   Q     I think she needs you to say yes.

18   A     Yes.  I am sorry.

19   Q     I know, for the record.

20         And, this he has had jobs; correct?

21   A     Yes, he has menial jobs; yes.  Uh-huh had.

22   Q     But employed.

23   A     Employed.

24   Q     I think in one of the reports, he has a driver's

25   license.
```

1    A    Yes, he does.  He did.  He passed the test.

2    Q    Okay -- I am sorry.

3    A    He passed the test.

4    Q    That's a written test; isn't it?

5    A    Yes.

6    Q    And, again, Doctor, you may have, or may not have, seen

7    this, one of the blow ups already.  I think you have.  This

8    is a report from the doctor that is a part of the report from

9    Children's Hospital.

10   A    Um-hmmm.

11   Q    And, in there they talk about a particular incident of

12   violence.  Can you tell me -- read for the members of the

13   jury what that says from right there.

14   A    "In one case he struck other foster children in his

15   home with his fists because they were annoying him.  In

16   another case, he struck a former girlfriend with his fists

17   during an argument."

18   Q    Okay.  Thank you.  This is a document from TriWill.  Do

19   you recognize that document, Doctor?

20   A    I do; yes.

21   Q    Okay.  And, with regard to this particular part that is

22   highlighted, would you read what it says, please.

23   A    "Jason is a sensitive young man who is easily hurt by

24   criticism."  And, this too?

25   Q    Yes.

1  A      "He has been involved in three physical altercations

2  over the past six months, one of which resulted in a peer

3  needing stitches above the eye.

4  Q      Thank you.

5      And, lastly, Doctor, another TriWill document.  I think

6  you guys maybe talked about that one over there with the blow

7  up; is that correct?

8  A      No, I don't think Mr. Blanchard had me go over this

9  one.

10  Q      Okay.  Now, would you read this highlighted paragraph

11  for me.  Yes, sir.  On 5/26/93, Jason hit another student in

12  the face and he pressed charges against Jason.  Jason had

13  improved greatly in staying out of fights at school until

14  this incident happened in May.  When Jason realized he could

15  be tried as an adult and possibly sent off, it scared him

16  enough that I don't think he will have any further problems

17  with that."

18  Q      That would have been in '93, so he would have been 20

19  when this happened.

20  A      Twenty years old.

21  Q      Thank you.

22      And, also with regard to this document, it is his final

23  grades at West Brockton High School, where his grades were as

24  follows:  Welding, 81; math, 82; social studies, 98; and

25  English, 92.

1  A     Yes.

2  Q     Yes, sir.

3  A     I don't know what that -- is that an LE or ....

4  Q     It looks like an LE.

5  A     I don't know -- I am not familiar with West Brockton

6  School System, so I don't know if LE means those are special

7  classes or mainstream classes.  I don't know.

8         MR. GIBBS:  Thank you, Doctor.  Thank you, Doctor,

9  I have no further questions for you.

10         MR. BLANCHARD:  I have some redirect.

11                    **REDIRECT EXAMINATION**

12  BY MR. BLANCHARD:

13  Q     Doctor, Mr. Gibbs, asked you about your contact with my

14  client in the jail.

15  A     Um-hmmm.

16  Q     And, he got you to say that he was, quote, articulate,

17  when you met with him.  How do you use that term?

18  A     Well, he can verbally in conversation make his thoughts

19  and wants noted and carry on a conversation.

20  Q     That doesn't mean he's eloquent, does it?

21  A     No, sir.

22  Q     It just means he can speak and get his point across

23  most of the time; is that right?

24  A     Yes, sir.

25  Q     All right.  Does that -- does the fact that he can do

1    that have any impact on your opinion?

2    A      No.   That is consistent with his intellectual level.

3    Q      Okay.   He talked to you about the number of hours you

4    spent with Jason down there.   I don't remember the number.

5    But you described it to him.   Was there anything substandard

6    or not up to professioinal  norms about the amount of time

7    you spent with him?

8    A      No.   It was twice as long as Dr. King spent with him.

9    Q      That's the report the State made.

10   A      Yes, sir.   No, it was standard.   Both of them were

11   standard.

12   Q      He talked to you -- Mr. Gibbs asked you about a CAT

13   scan result and you said it was negative.   Is there anything

14   significant about that for your findings?

15   A      No.   Often with people with the kind of impairment that

16   Mr. Holloway has, radiological studies such as CAT spec,

17   F-MRI studies, they won't pick up, because those are taking

18   pictures of the anatomy of the brain.   And, what we are

19   talking about here is the function of the brain, physiology

20   of the brain.   So, it has to be fairly gross damage for us to

21   get a picture of it.   I would anticipate, in fact at one

22   point you asked me, should we request neurological studies on

23   Mr. Holloway, and I said no, because the radiologic studies

24   probably would be negative as were at Childrens.

25   Q      The fact that they would be negative wouldn't add or

1    take anything from your opinion?

2    A    No, sir.

3    Q    In doing your work up in this case, was the behavior of

4    the mother, Rosa Jane Holloway, vis a vis alcohol prior to

5    and during her pregnancy with Jason significant?

6    A    Yes, I believe it was, because it shows a predilection

7    and a history of alcohol abuse, which started before he was

8    born, and in all probability occurred during the pregnancy.

9    His brother Rosco, told me yesterday, that his mother drank

10   while she was pregnant with Jason and, apparently, she

11   continued to drink subsequently, which the records we

12   reviewed earlier today indicate, and she's now in a hospital

13   with liver failure.

14   Q    Mr. Gibbs got you to -- let see -- say you were not

15   sure that Jason was born drunk like some children; is that

16   right?

17   A    Born drunk is a term we use for children who are born

18   of alcoholic mother's; and, no, I don't know if Jason was

19   born drunk or not.

20   Q    Okay.  Even if you are not, quote, born drunk, you can

21   still suffer with Fetal Alcohol Syndrome; is that correct?

22   A    Yes, sir.  Research shows that sometimes just a few

23   drinks a day can cause significant brain damage in neonates.

24   Q    And, you said you weren't certain he had Fetal Alcohol

25   Syndrome at birth, that is, Jason; but, you weren't able to

1  see a detailed photograph of his face close up, were you?

2  A    No.   The only way we can be certain of that is for a

3  psychologist or medical doctor to exam the baby during the

4  neonatal phase which is the first 30 days after birth.

5  Everything else is circumstantial.

6  Q    But given what you know about his mother's behavior and

7  what happened during his pregnancy, plus what you see of him

8  now, physically, and what you know about his weight at birth

9  and his academic performance and all of that, I believe you

10  said on direct you would eat your hat if he wasn't.

11  A    I would eat my hat; yes, sir.

12  Q    That's a pretty good degree -- maybe  not absolute

13  certainty, but that's pretty sure.

14  A    I am confident

15  Q    Okay.  We know from the records and from testimony of

16  Rosco that Ms. Holloway drank heavily while pregnant with

17  Jason.  Do we know -- we don't know if she did the same thing

18  12 years when she was pregnant with Rosco.

19  A    I don't know.  I have no records from that time period.

20  Q    All right.  Do you know if any of Jason's siblings have

21  been in trouble with the law?

22  A    Yes, I do know that.

23  Q    All right.  Tell us what you know about that from your

24  review?

25  A    One of his brothers has been in trouble with the law.

*** Frances L. Roark ***

1    Q    Served time in prison.

2    A    Yes, sir.

3    Q    When you tested Jason, did you do any tests to

4    determine whether Jason was malingering or trying to deceive

5    you?

6    A    I did.

7    Q    What test was that?

8    A    That was the TOMM.  The Test of Memory Malingered.  On

9    the surface it appears to be a very simple memory test, but

10   it is very cleverly designed to catch people who are not

11   putting forth good effort, and Jason put forth excellent

12   effort.

13   Q    I believe in your report you gave, I forgot to mention

14   this earlier, but you gave Jason a diagnosis of, or finding

15   of Antisocial Personality Disorder, did you not?

16   A    I did.

17   Q    Now, that Antisocial Personality Disorder that sounds

18   kind of bad.  Does that mean he's a psychopath?

19   A    No, he's not a psychopath.

20   Q    Does that mean he's a sociopath?

21   A    No.

22   Q    What do those things mean?  What are those?

23   A    Psychopath and sociopath are two terms for basically

24   the same condition.  These are people who systematically

25   violate the rights of others, legal rights.  They harm and

 1    hurt others.  They have no remorse.  No compunction.  No

 2    guilt.  These are your career, pardon my French, bad ass

 3    criminals.  These are the ones you want to never meet in a

 4    dark alley on a Saturday night.  Jason is not that.  Adult

 5    Antisocial Personality Disorder is a diagnosis that I

 6    rendered for Jason's, based on past behavior.  He does

 7    violate the rights of others.  He slaps people.  He hits

 8    people.  He's a peeping tom.  He urinates in public places.

 9    And, we have -- the reason we are here today, he has killed

10    two human beings.  Murdered two human beings.  That diagnosis

11    is made on history of conduct.  Generally unlawful conduct.

12    But it doesn't go to the psychopaths/sociopaths which are

13    your career criminal types.

14    Q    Do you find many people with low IQ sometimes retarded

15    who get that destination of Antisocial Disorder?

16    A    Yes.  Frequently.  Because they don't exercise good

17    judgment and they just go willy-nilly through life.  Usually

18    it is not going to be anything serious, but they engage in

19    law violations, legal infractions.  They see something they

20    like, they pick it up and walk off with it.  That's theft of

21    property in this state.

22    Q    All right.  Did you -- did you do a test call Bender

23    Gestalt test with him?

24    A    No, I didn't, but other doctors previously did a Bender

25    Gestalt which is a neurological screening device and test,

1    and he made errors on that which are consistent with brain

2    damage.

3    Q    Errors consistent with brain damage?

4    A    Yes, sir.

5    Q    All right.  Do you know if he ever graduated from high

6    school?  You were shown some grades.

7    A    No, he failed the state test for -- to actually get a

8    diploma.  He was certificated, I think they call it.

9    Q    He tried several times, didn't he?

10   A    Three times and failed all three times.

11   Q    When would a person, such as Jason, with his IQ be

12   expected, within our educational system to sort of reach his

13   academic potential, if you can make that judgment?

14   A    You mean when they derive maximum educational benefits?

15   A    Right.

16   A    Ooh, I really don't have an expert opinion on that.  I

17   am sorry.

18   Q    Okay.

19        MR. BLANCHARD:  Where is the exhibit that you put

20   in a few minutes ago from the Anniston High School?

21   MR. BLANCHARD:

22   Q    Let me show you this State's Exhibits number 59 that

23   they put up there on the screen a few minutes ago showing

24   these grades of Alabama History, 93; English, 96; and all

25   that kind of thing.  Does this show he was withdrawn on

1   October 17 of 1989?

2   A    Yes, sir.

3   Q    All right.  And, in the ninth grade.  Says, his reason

4   for leaving, I presume this means he left school at that

5   point, withdrawn from school.

6   A    That would be -- that would be my inference because it

7   said W1.  So, it looks like he just withdrew.  He'd only been

8   there a month.

9   Q    We don't know whether these are some kind of LD classes

10  or not.

11  A    Doesn't say.

12  Q    We can't tell from that, but he had only been there a

13  short period of time.  These grades would have been

14  accumulated over a short period of time?  Presumably around

15  the first of the year?

16  A    Presumably; yes.

17  Q    School year.

18  A    Yes.

19  Q    And, as to that other set of grades, you saw that

20  designation LE next to them.

21  A    Yes, sir.

22  Q    You don't know what that means for sure.

23  A    No, sir.

24  Q    Could mean learning something, we don't know.

25  A    Could be; yes, sir.  LD is learning disabled.  They

1    typically refer to them as LD classes or special ed, but LE,

2    I am not familiar with.

3    Q    You mentioned that -- I believe -- I don't remember the

4    question, but something about Jason learning to being

5    adaptive and function, or people like Jason can learn to be

6    adaptive and functional.

7    A    Yes, sir.

8    Q    Does that mean that Jason could learn to be adaptive

9    and functional in a prison setting?

10   A    Yes, sir.

11   Q    And, in a prison setting, would he have help doing

12   that?

13   A    Yes, sir.

14   Q    What does being adaptive and functional mean?

15   A    It means learning to adapt in a productive way and in a

16   way that's socially appropriate with the environment that you

17   are in.  Learning to find out what the rules are and to play

18   by the rules.

19   Q    Mr. Gibbs talked about the environment we portrayed of

20   the early years of the mother and children, and that he was

21   only in that environment for 21 months.

22   A    Yes, sir.

23   Q    What about the period of time he spent in his mother's

24   womb, that nine months?  Could that be added to time he was

25   in that environment?

1  A    Surely, yes, sir.

2  Q    And that nine months, plus the first 21 months of his

3  life being in that environment, would you characterize that

4  as significant or not?

5  A    It was significant.

6  Q    Would the period of time and his development in the

7  womb and in very early infancy being in that environment have

8  implications for later life?

9  A    Absolutely.  In the womb, during the gestational

10  period, the central nervous system forms.  If there are lack

11  of oxygen, lack of nutrients biogenetic precursors, you can

12  suffer birth defect, permanent damage to the central nervous

13  system from which the child never recovers.  You add to that,

14  which I believe, like I said, I don't know, but I believe she

15  abused alcohol excessively, binge-like drinking during

16  pregnancy.  Then when the baby was born, Jason was born, for

17  the first 21 months apparently, according, if you believe the

18  records of the DHR workers, and I do, it was environment

19  deprivation.  It was filth and squalor.  It was lack of food,

20  lack of warmth, lack of social comfort, lack of training, no

21  maternal bonding.  That is probably one of the worst

22  conditions for a human being to try to get a start in his

23  life that you can imagine, or certainly that I can imagine.

24  Q    Why is it, from your perspective, that some handicapped

25  people like Jason can pull themselves up by their bootstraps

1    apparently and others can't?

2    A    Social support.  Two words.

3    Q    All right.

4    A    Loving, caring families.  If he had been placed with

5    the Colliers at birth, we probably wouldn't be here today.

6    Q    That delay of 21 months made a lot of difference?

7    A    Critical.

8    Q    Critical.

9         Finally, there were some questions about Jason fighting

10   and being involved in assaultic behavior.  Again, I ask you,

11   is that consistent with his profile as you see it?  Is that

12   -- can you explain it?  Is there something about his

13   psychological profile that leads to that?

14   A    Yes.  He does not tolerate emotional excitation very

15   well.  When you push his buttons, he goes off like a volcano.

16   He is either angry or he is quiet.  I don't think there's

17   much in between.

18   Q    If somebody in the jail over there, for instance, some

19   other inmate that wants to provoke him and get something

20   started, they could do that pretty easily?

21   A    I believe they could with Jason; yes.

22   Q    And, Jason wouldn't have profitted by experience enough

23   to know that his buttons were being pushed?

24   A    No, he wouldn't.

25        MR. BLANCHARD:  No further questions.

1           MR. GIBBS:   Just a few.  I won't even get up, Your

2   Honor.

3           THE COURT:   Go ahead.

4                 **RECROSS EXAMINATION**

5   **BY MR. GIBBS:**

6   Q     Jason did get to the 12th grade; is that correct?

7   A     He didn't actually graduate, but he went through 12

8   years of schooling; yes.

9   Q     And, people pushing people's buttons and making them

10  react, you can do that to any person of average or above

11  intellect; can't you?

12  A     You can.  Yes.

13          MR. GIBBS:   Nothing further, Doctor.  Thank you.

14          THE COURT:   Thank you, sir.  You may step down and

15  you are released.

16  (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

17          THE COURT:   Call your next witness.

18          MR. BLANCHARD:   At this time the defendant rests.

19          THE COURT:   Ladies and Gentlemen, I am going to ask

20  you to step out to the jury room.  Follow the same

21  instructions I have given you so often.

22  (JURY OUT).

23          THE COURT:   I'll need to see counsel up here.

24  (WHEREUPON, A SIDE BAR COMMENCES.)

25          THE COURT:   How long do you want to take for

1    argument?

2            MR. LISENBY:  I'm sorry?

3            THE COURT: How long do you want to take to argue?

4            MR. LISENBY:  Until we get through.

5            THE COURT:  If that's going to be like the guilt

6    phrase that will give us some trepidation.

7            MR. BLANCHARD:  We'll have to come back next week

8    if that is the case.

9    (WHEREUPON, THERE WAS A BRIEF RECESS.)

10           THE COURT:  Ladies and Gentlemen, I have spoken to

11   the attorneys and it is going to be my inclination to let you

12   go home for the night.  If finished today, we would be late.

13   We can finish early in the morning and my entire thing in

14   this two weeks has always been to -- at the first phase to

15   get the case to y'all and at the second phase to get the case

16   to you.  But, after the case is submitted to you, I do not

17   want you to feel any pressure whatsoever or constraint as to

18   time.  After it is sent to you, it is up to you, as to what

19   your deliberations will entail and how long we will be here.

20   In other words, I do not want you under any pressure

21   whatsoever and I do want you fresh.  It's been a long two

22   weeks.  We finish the case tomorrow.

23       What will remain will be my charge -- excuse me.  The

24   closing arguments of counsel, then my charge on the law to

25   you.  The charge on the law will not be quite as long and

1  detailed as the first charge.  It will deal specifically with

2  this phase of the trial.

3      I want all of you to follow the same instructions that I

4  have been through so many times.  But, it is as critical now

5  as it has been critical every time.

6      Do not discuss the case with anyone, not amongst

7  yourselves.

8      Do not allow anyone to engage you in any conversation

9  whatsoever about this case.

10     Don't put yourself in a position of overhearing anything

11  about this case.

12     As to media, again, do not watch, listen to, or read

13  anything about this case.  Turn away from it.  Even with

14  family and at this stage, as I said, it is critical.  You've

15  got to tell family you can't discuss the case, and, please,

16  don't tell me anything about it that you have heard.

17     All right.  With that everyone remain in while the jury

18  exits.  Be in here at 9 o'clock in the morning and we'll

19  finish.

20  (WHEREUPON, THE JURY WAS ADJOURNED UNTIL 9:00 A.M., 13 JUNE,

21  2003.)

22     THE COURT:  All right.  We'll be in recess until

23  9:00 in the morning.

24     MR. BLANCHARD:  This is for the record, being it is

25  ex parte.  You authorized certain lodging expense in this

 1  case.  I think you authorized each of us to spend about $925

 2  projected.  Anyway, as to lodging expenses, I spent, as I

 3  thought I might, a couple days up here getting ready for

 4  trial, and then this has gone on a little longer than I

 5  anticipated.  So, I am going to have probably four --

 6  depending on tomorrow, four to five days more than I thought

 7  and at about $80 dollars a day, so 400.  You know, whatever

 8  that would be.  If you could make a docket notation, or

 9  something, to add an additional $400 to the amount.

10           THE COURT:  Certainly.  We'll just add it on the

11  case action summary.  We'll do that in the morning.  Do you

12  need the same thing, Richard?

13           MR. KEITH:  I don't think I'm going to need it,

14  Judge, I am probably going back tonight and will commute in

15  the morning.  I went back over the weekend and checked out

16  checked.  I don't think I'm going to have problem with the

17  limit.

18           THE COURT:  Let Stephanie know the amount to put in

19  and she'll do that in the morning.

20           MR. BLANCHARD:  All right.

21           THE COURT:   Let's go ahead and knock out the

22  charges.

23                    **CHARGE CONFERENCE**

24           MR. LISENBY:  Judge, I'm sorry, based on ....

25           THE COURT:  Okay.  As to defendant's requested

1  charge 1, withdrawn by counsel.  Number 2, refused.  Number

2  3, given.  Number 4 is not there.  There is no 4.  Number 5

3  is given.  Number 6 is given.  Number 7, given.  Number 8,

4  given.  Number 9, given.  Number 12, given.  Number 11,

5  given.  That brings up to Mr. Lisenby has noted an objection

6  to 12.

7         MR. LISENBY:  Yes, sir, based on Dr. Dixon's

8  testimony, he indicated that the meaning of Antisocial

9  Personality Disorder was that an individual had a history of

10  criminal conduct.  I cannot imagine that could be a

11  mitigating circumstance:  To have a history of criminal

12  conduct.  That is what he testified to.

13         THE COURT:    That was his testimony.

14         MR. BLANCHARD:  Well, we have, looks like, we have

15  a state case here *Klesby v. State* given as authority.  Both

16  phases must be considered and antisocial personality at the

17  very core of the case.  I would ask that the Court look at

18  that case before

19         THE COURT:  Do you have 456 So. 2nd?  Get that in

20  the morning.  Hold on 12.

21     Now, 13 is given; 14, given; 15, given; 16, given; 17,

22  given; 18, given; 19, given, 20, given; 21, withdrawn by

23  counsel for the defendant; 22, refused; 23, given; 24,

24  refused; 25, is where we got up to.

25     Holloway is loved by his family and Holloway loves his

1    family.

2            MR. LISENBY:  State would object to both 25 and 26.

3    I think that is not a mitigating circumstance in either

4    direction.

5            MR. BLANCHARD:  All right.  I certainly think here

6    is evidence here he is loved by both his biological and his

7    foster family.  I might want to add that in if I didn't say

8    that -- biological and foster families.  I do think that

9    shows the person has some worth.  I don't think it is true

10   that families always express love and et cetera.  We all know

11   of families that have black sheep and they don't want to see

12   them around.

13           THE COURT:  I will give 25, granted; 26, granted,

14   27, granted; 28, granted; 29, refused; 30.

15           MR. LISENBY:  We object to 30.

16           THE COURT:   I am going to refuse that.

17           MR. LISENBY:   I have a case cite for that.

18           THE COURT:  I remember something from that.  Yes,

19   sir, it is the Morrison case at 500 So. 2nd 36.  Is what I am

20   referring to.

21           THE COURT:   Thirty-one, given; 32 -- we stopped on

22   32.

23           MR. LISENBY:  We would object to -- the second

24   line, I think, is an incorrect statement.

25           THE COURT:  Refused.  Thirty-three, given; 34.

```
 1              MR. BLANCHARD:  Hold on.  I am catching up.  Okay.

 2              MR. LISENBY:  We object to 34 based on the Rieber,

 3    R-I-E-B-E-R, 663 So.2nd 985.

 4              THE COURT:   Thirty-four is, refused.  Thirty-five.

 5              MR. LISENBY:   Same objection.

 6              THE COURT:  I have read all of these before.

 7    Refused.   Thirty-six, refused; 37, granted; 38, refused.

 8              MR. BLANCHARD:  Whoa, whoa.  Thirty-seven?  I

 9    missed that.

10              THE COURT:   Thirty-seven, granted.

11              MR. BLANCHARD:  Thirty-seven, granted  and the one

12    before it?

13              THE COURT: Refused.  Thirty-eight, refused; 39,

14    granted, and I'm up to 40.

15              MR. LISENBY:  We object to 40.

16              THE COURT:   Refused.  There are two 40s.  Let's

17    add -- 40 and 40A.

18              MR. LISENBY:  We object to 40A.

19              THE COURT:   Refused.  Forty-one, mitigating is not

20    justification.

21              MR. LISENBY:   We object to 41.

22              THE COURT:   Refused.   Forty-two, granted; 43,

23    refused.

24              MR. LISENBY:   I think that was one that was

25    withdrawn.
```

*** Frances L. Roark ***

```
 1              THE COURT:  Withdrawn.

 2              MR. BLANCHARD:  I did.  I withdrew it.

 3              THE COURT:  Forty-four, granted; 45, granted.

 4              MR. LISENBY:  I am sorry, I'll bring you a copy of

 5    the Klesby case tomorrow.

 6              THE CLERK:  Number 12 is the last thing we have to

 7    look at.

 8              THE COURT:  This is the pattern charge.  I know

 9    y'all are familiar with it.  I have got one that I give.  The

10    pattern is more inclusive.  So many of those.  I guess, what

11    I'm getting around to is with all the defendant's charges,

12    the pattern may actually be over redundant.  I mean, I will

13    think about it tonight and go through my notes.  I've got one

14    which I always give which is an abbreviated pattern.  I think

15    it would be sufficient in light of your extensive charges.

16              MR. BLANCHARD:  Okay.  I am not insisting on the

17    pattern at all.  The last time I looked at it --

18              THE COURT:  The pattern is like 16 pages long.

19              MR. BLANCHARD:  -- I didn't much like the pattern,

20    either.

21              THE COURT:  All right.  We're off the record.

22    (WHERUPON, THE PROCEEDINGS WERE ADJOURNED UNTIL 9:00 A.M., 13

23    JUNE, 2003)

24                             *****

25
```

IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
CHAMBERS COUNTY

STATE OF ALABAMA,        *

                      *     CRIMINAL NO.

versus               *     CC-2000-0000166

                      *     LaFayette, Alabama

                      *     13 June, 2003

JASON HOLLOWAY,        *

    Defendant.        *     **CRIMINAL APPEALS NO.**

                      *     **CR-02-2115**

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF TRIAL BEFORE

THE HONORABLE RAY D. MARTIN,

CIRCUIT JUDGE, AND A JURY.

A P P E A R A N C E S

FOR THE STATE OF ALABAMA:    REA S. CLARK, DISTRICT ATTORNEY
                              FIFTH JUDICIAL CIRCUIT
                              CHAMBERS COUNTY COURTHOUSE
                              COUNTY OFFICE BUILDING
                              LAFAYETTE, ALABAMA 36862

                              BY: REA S. CLARK, DA
                                    BILL LISENBY, CHIEF ADA
                                    KENNETH GIBBS, ADA

FOR THE DEFENDANT:          BLANCHARD & ASSOCIATES, LLC
                              ATTORNEYS AT LAW
                              505 SOUTH PERRY STREET
                              MONTGOMERY, AL 36104

                              BY: WILLIAM R. BLANCHARD, ESQUIRE
                                     and
                              KEITH & HAMM, PC
                              ATTORNEYS AT LAW
                              235 SOUTH McDONOUGH STREET
                              MONTGOMERY, AL 36104

                              BY: RICHARD K. KEITH, ESQUIRE

                              FRANCES L. ROARK, CSR
                              OFFICIAL COURT REPORTER
                              Fr3L126

PROCEEDINGS: In Open Court.

MR. LISENBY:  With regard to number 12, I have
checked the Klesby case that the Court asked me to, and it
appears that, although the definition given by that doctor in
that case is different than the definition given by this
doctor, I think the Court is going to go ahead and give
number 12; is that correct?

THE COURT:  Right.

MR. LISENBY:  Number 10, Judge, in reading over
these real quickly yesterday, on page 6, for number 10, the
second line has the word must in it again.  I would just ask
the Court to change that to may.

THE COURT:  Okay.

MR. LISENBY:  And on charge number 11, which is on
page 7, the third line down.

THE COURT:  Must.

MR. LISENBY:  Must again and then the fourth line
has the word must in it.

And then on number 28, on page 13, in reading
over this again last night.  Again, I was reading these
quickly yesterday.  Twenty-eight states, "If you believe that
any of the other participants in this crime induced or
encouraged Jason Holloway to commit the crime at issue, even
though this inducement or encouragement certainly does not
excuse the crime, it constitutes a mitigating circumstance."

1   There was no testimony there were other participants involved

2   in this crime.

3             MR. BLANCHARD:    Mr.  Lisenby has convinced me of

4   the rightness of that position and I will with not contest

5   having it taken out.

6             THE COURT:    Okay.

7             MR. LISENBY:    That's all I have.

8             THE COURT:    In determining whether you believe the

9   aggravating circumstances of heinous, atrocious and cruel

10  have been proven you must not consider anything that may have

11  occurred after the death of Rodney and Angela Brown.

12            MR. BLANCHARD:    That's correct, Judge.

13            THE COURT:    I think that is a correct statement.

14            MR. BLANCHARD:    That is our number 46.  It is

15  handwritten on a yellow sheet.

16            THE COURT:    It is granted.

17            MR. BLANCHARD:    All right.  The only other thing I

18  wanted to do is this:  I have not seen in detail the charge

19  that the Court proposes to give.  You said you were not going

20  to give the pattern, but you would give your own.  Here's the

21  point, I am sure it has an instruction in there that the

22  aggravating circumstance of burglary during a murder and

23  burglary -- I mean, murder during a burglary, excuse me, and

24  murder -- well, the killing of two people.  Those two

25  aggravating circumstances were proven during the guilt phase

1  and you have to accept those and consider those.  That's not

2  the exact language, but you understand what I mean.  Am I

3  correct that a charge equivalent to that is included?

4         THE COURT:  Yes.  Those two are brought forward:

5  Heinous and atrocious.  You have to prove that to them.  The

6  others -- now, you agree that murder during burglary and

7  murder of two or more are two aggravators.

8         MR. BLANCHARD:  Here's what I am saying.  I agree

9  that the law says that those are aggravating circumstances

10  and I agree that law says if they are proven beyond a

11  reasonable doubt by necessity in the guilt phase that they

12  are brought forward to the penalty phase.  I agree the law

13  says that.  Here's my point.  I object to having them given

14  because they constitute double counting.

15         THE COURT:  First and second.

16         MR. BLANCHARD:  Yes, in other words, you count them

17  once to elevate the crime to capital, which means you have

18  got, at least, life without parole, and then you bring them

19  into the penalty phase and you can use them to elevate it

20  again.  So, they are double counted and I think that that

21  does not perform the narrowing function contemplated by the

22  Eighth Amendment.  I object to it on the basis of the Eighth,

23  Fourteenth Amendment and the Sixth Amendment  to United States

24  Constitution and analagous provisions of the Alabama

25  Constitution and federal jurisprudence that has kind of grown

 1   up around that circumstance and any of the other points in

 2   our Memorandum of Authorities.

 3       I think there is a case out of the Louisiana, a

 4   federal case, *Lowenfeld versus Phelps*, that said in that

 5   particular circumstance it wasn't double counting or it was

 6   okay, our statute, our state statute has never, as far as I

 7   know, faced federal scrutiny on that point.  So, I want to go

 8   ahead and make that objection to -- allowing the

 9   circumstances to be considered as already having been proven

10   or to be considered at all in the penalty phase of this case

11   as aggravating circumstances.

12           THE COURT:  Okay.  Overruled.

13           MR. BLANCHARD:  With that I think we're ready to

14   go.

15           MR. LISENBY:  This is the verdict form we looked at

16   yesterday.

17           THE COURT:  I may just give the pattern

18   instruction.  It covers everything.  It is early in the

19   morning.  Whatever.

20           MR. LISENBY:  I am not familiar with that one or --

21   either one to tell you the truth.  I assume it covers

22   everything that needs to be covered.

23           MR. BLANCHARD:  The pattern plus the one you've

24   indicated.

25           THE COURT:  I'm giving yours.

1     MR. BLANCHARD:  All right.

2     THE COURT:  Are you ready?

3     MR. LISENBY:  I think so.

4 (WHEREUPON, THE BAILIFF WAS SWORN.)

5     THE COURT:  Is the State ready?

6     MR. GIBBS:  Yes, sir.

7     THE COURT:  Is the defense ready?

8     MR. BLANCHARD:  Yes, sir.

9 (JURY PRESENT)

10    THE COURT:  Let the record reflect all jurors

11 present, counsel present, parties present.

12   Ladies and Gentlemen, the last things that remain in

13 the trial of this case will be closing argument of counsel

14 and then the charge on the law that applies to this phase of

15 the trial.  After that you will be sent back to deliberate

16 and reach your verdict.

17   Is the state ready?

18    MR. GIBBS:  State's ready.

19    THE COURT:  Defense ready?

20    THE COURT:  State your case to the jury.

21      **CLOSING ARGUMENT BY STATE**

22    MR. GIBBS:  May it please the Court.

23    THE COURT:  Mr. Gibbs.

24    MR. GIBBS:  Honorable Defense Counsel, Ladies and

25 Gentlemen of the Jury.  Good morning.

```
 1              THE JURY:  Good morning.

 2              MR. GIBBS:  It has been a long, long, long two

 3    weeks.  It has been a full two weeks.  We have accomplished a

 4    lot in those two weeks.  And, I would venture to say that

 5    when you leave here today, you won't be the same as when you

 6    came here.  You have and still are experiencing something

 7    that very few people will ever have the opportunity to

 8    experience.  This doesn't happen very often, Ladies and

 9    Gentlemen.  These types of cases do not happen very often.

10    Not only are you serving on a jury, you are on a capital

11    murder jury.

12              You know, I often times find myself among people that

13    are not lawyers, never been in a courtroom setting, and I

14    just sit back and I listen as they talk about the system,

15    talk about criminal justice system, talk about attorneys, and

16    I think to myself they do not have a clue as to what it's

17    really all about.  Much like yourselves when you showed up

18    here two weeks ago.  You didn't have a clue of what to

19    expect.  I think back on those voir dires.  As I sat there

20    and looked out at you all and asked my questions and you

21    answered them as best you could and sometimes you didn't

22    understand my questions.  And, I explained them again, and

23    you still didn't understand some of them.  We got in those

24    little pannels.  You raised your hands.  I don't understand.

25    And, we tried to explain the law to you, the Judge instructed
```

 1    during those voir dires, and maybe you understood it at that
 2    time; maybe you didn't.  But, we got through it.  We picked
 3    you all, put you in the box, and said go to it.  Go do your
 4    job.  We call that on-the-job training.  That's what y'all
 5    did.  Not certain what was expected of you, not certain of
 6    what you could do, put you in the box, and said go to it.
 7    You know what?  You did it.  You figured it out.  The hard
 8    way, but you did it.  And, for that I commend you.  Y'all
 9    have done a wonderful job.  You have been a great jury.  You
10    learned it as you went along.  And, again, I want to thank
11    you for that.  For that I applaud you.  So, when you leave
12    here today, you may not leave here with an admiration for the
13    system.  You may not leave here admiring lawyers and what we
14    do or the criminal justice system, but I would like to think
15    that you would at least leave here a little wiser, a better
16    understanding of what it is all about; and, maybe a modicum
17    of appreciation for what we do.  So the next time you are in
18    those groups that are talking about the system, talking about
19    lawyers, you know, wait, a minute now, whoa, it is not that
20    easy, and you can share your life experiences with them.
21        Ladies and Gentlemen, two weeks ago, confused, uncertain
22    you all have reached inside and raised the bar.  You've
23    accomplished something that you were not certain you could
24    accomplish two weeks ago.  I have got to feel right within
25    myself with what I do.  I am not certain about this

1  reasonable doubt.  I'm not certain of what's expected of me.

2  I am not -- but you raised the bar, Ladies and Gentlemen, you

3  accomplished something you were not certain that you can

4  accomplish.  And, again, I applaud you for that and I thank

5  you for that.  And, I reiterate, you have done a great job up

6  to this point.  And, I have no reason to think you won't

7  continue to do a great job.

8       Now, Ladies and Gentlemen, we are going to raise that

9  bar even higher.  We are going to raise it again.  But, you

10 know what, I've got confidence in you.  I know you can do it.

11 You have already proven that you can meet challenges.  And I

12 think you will meet this one, just like you met the last one.

13      This type of case is as serious as it gets, Ladies and

14 Gentlemen.  It doesn't get anymore serious than this.  It is

15 not easy.  It is not supposed to be easy.  It is hard by

16 design.  It is hard by design.  It is not easy for me to sit

17 here and look each and everyone of you in the eye and ask you

18 to ultimately return the highest penalty under the laws of

19 this State of Alabama.  It is hard.  And, I'll tell you, this

20 isn't the first time I have had to look into 12 people's eyes

21 and ask this.  It doesn't get any easier for me.  I know it

22 is going to be hard for you.  It is supposed to be hard for

23 you.  I can tell on your faces now it is hard for you.  When

24 I watched you come out of that jury box, come out of that

25 jury room, you've got your crumbled up tissues where you've

1   been wiping your eyes, your eyes are all red when you come

2   out, your faces are all red when you come, your faces are all

3   crumbled up, frowning, you come out here and wouldn't look at

4   me or anybody.  Okay?  That's okay.  I don't like seeing that

5   on your face.  I don't like that you have to go through that,

6   but if that is what it takes for the system to work; then so

7   be it.  And, again, I thank you for that.  It is not going to

8   be easy, but it is not impossible.  You have already proven

9   that in the prior phase.  It wasn't easy, but it wasn't

10  impossible.  You have done a great job up to this point.

11      In this phase the State must prove to you beyond a

12  reasonable doubt what we refer to as the aggravators.  The

13  State must prove to you, each and every one of you, beyond a

14  reasonable doubt, things that we call aggravators.

15      Now, in Mr. Lisenby's opening in this section, we told

16  you what aggravators were.  They are factors in the case that

17  make the death penalty a more appropriate sentence in this

18  case.  And, Defense counsel presented to you what they refer

19  to as mitigators in this case.  And, mitigators are factors

20  that tend suggest that life without parole is the more

21  appropriate sentence in this case.  And, once we present our

22  mitigators and once they presented theirs -- just the

23  opposite.  I am sorry.  Once we present our aggravators and

24  they present their mitigators, it is a weighing contest, a

25  balancing contest.

1   Now, we must prove the aggravators beyond a reasonable

2   doubt.  Once you are convinced that they exist beyond a

3   reasonable doubt, then you just weigh them.  The reasonable

4   doubt standard does not apply to the weighing.  Just

5   weighing.  And, if the aggravators from the State outweigh

6   the mitigators, then you should return a vote for the death

7   penalty.  But, if you feel that the mitigators outweigh the

8   State's aggravators, then the law says you must return a vote

9   for life without parole.

10   Now, about that weighing process.  It is not a numerical

11   thing.  State's got three.  They've got ten, well they

12   automatically win.  Or the State's got three and they have

13   got one, the State automatically wins.  It is not about

14   numbers.  One aggravator, if you give it that much weight,

15   and you determine what weight you will give to that

16   aggravator or mitigator, that's up to you.  One aggravator

17   can outweigh 10 mitigators if you give that aggravator that

18   much weight.  It is not about numbers, Ladies and Gentlemen.

19   It is the weight that you give each mitigator and each

20   aggravator.

21   Now, in the guilt phase you all had to return your

22   verdicts of guilty unanimoulsy.  All 12 of you had to decide

23   the defendant's guilt and all 12 of you came to that decision

24   that he was guilty.  Now, he sits there a guilty man.

25   There's no presumption of innocence anymore.  He is guilty by

 1  virtue of your verdicts.

 2     But, now in this phase, you're vote does not have to be

 3  unanimous.  It does not.  It doesn't take 12 of you to decide

 4  the death penalty or life without parole.  The law says in

 5  order to return a vote for the death penalty, it only takes

 6  10 of you, a minimum of 10 of you have to vote for the death

 7  penalty to determine such a verdict.  It can be 10 for the

 8  death penalty and two for life without parole, 11 for the

 9  death penalty and one for life without parole, or all 12 for

10  the death penalty.  Any of those combinations.  But, it does

11  not have to be unanimous.  Okay.

12     Now, with regard to returning a vote for life without

13  parole.  The law merely requires a majority.  At least seven

14  for life without parole versus five.  Seven, five; eight,

15  four; nine, three; eleven, one.  But, at a minute seven to

16  five.  But, for the death penalty a minimum of 10 to two.

17     Only certain cases are even eligible for the death

18  penalty.  We don't stand up here for the State and ask for

19  the death penalty often.  Only certain cases are death

20  eligible.

21     The law has held that cases in which you murder two or

22  more people, those types of cases are eligible for the death

23  penalty.  Now, let's think about the rationale.

24     Killing one person is pretty bad.  Killing one person is

25  pretty serious.  And, if we catch you and convince a jury

1  beyond a reasonable doubt, they convict you for killing one,
2  you are are going to get a pretty stiff sentence.  It is
3  pretty bad to kill just one.  But, when you kill two or more
4  pursuant to one act, pursuant to one scheme or plan; that's
5  really bad, and the law recognizes that.  And, the
6  legislature down in Montgomery making our laws have said that
7  this is so serious that if you kill two or more people by a
8  plan or a scheme or one course of conduct that, in and of
9  itself, is an aggravator.  So, if you kill two or more
10  people, one plan or scheme, act, course of conduct, is an
11  aggravator.  And, by virtue of your verdicts in the last
12  phase, count one, convicted the defendant of murder of two or
13  more.  So, by virtue of your verdicts, you have already
14  decided that the State has already proven to you beyond a
15  reasonable doubt that he killed two or more people.  So
16  that's one aggravator in the bag right there.  We have
17  already proven that to you.

18      Now, if you recall, when we got to this phase and the
19  judge said, State, state your case.  Mr. Lisenby stood up and
20  said we reoffer and resubmit all testimony, all evidence, all
21  exhibits from the last phase, which means everything you
22  heard and saw in the guilt phase comes over here in this
23  phase.  And, by virtue of your verdicts, you've already
24  proven beyond a reasonable doubt that one aggravator exists:
25  Murder of two or more.

1    The legislature also says, the law says, that another
2    type of case, or murder, that is eligible for the death
3    penalty is a murder during a burglary.  Murder during a
4    burglary.

5    Again, let's think about that.  It is bad enough to
6    break into someone's home or remain unlawfully in someone's
7    home and commit a crime.  That's bad enough.  And, if we
8    catch you and get you convicted, you are going to get some
9    serious time.  Now, add to that while you're in that home in
10   someone's castle.  In someone's sanctuary, you take their
11   life intentionally, that rises the bar, Ladies and Gentlemen.
12   And, again, our legislature, recognizing the seriousness of
13   those actions, has said that if the capital murder was
14   committed while the defendant was in the course of committing
15   a burglary, that's an aggravator.  And, by virtue of your
16   verdicts in count three with regard to Angela Brown, the
17   murder of Angela Brown during a burglary.  When you returned
18   your guilty verdicts, you have already decided that the State
19   has proven to you beyond a reasonable doubt that the murder
20   of Angela Brown occurred during a burglary.  That's two.  Two
21   aggravators already proven and I have not done anything.
22   Okay.

23   Third aggravator.  The capital offense, count three,
24   with regard to the death of Angela and I guess count one the
25   death of Angela Brown was especially heinous, atrocious and

1   cruel.

2       Now, any murder in and of itself is heinous, atrocious

3   and cruel, especially, even more so, heinous, atrocious and

4   cruel, you remember the facts.  You saw the picture.  I'm not

5   going to flash the pictures anymore.  You have seen them

6   enough.  Okay.

7       First of all, with regard to Angela.  The thing that we

8   refer to as premortem suffering.  Suffering before she died.

9   And, what that is, is this:  As the defendant stood there

10  looking down the hallway, or wherever he was, looking at

11  Rodney with Angela sitting there on that sofa, he put a

12  bullet into Rodney.  Angela is sitting right there in that

13  small living room facing him and she sees this.  And, what is

14  the next thing she sees?  That gun gets turned to her.  She's

15  already watched her husband get shot and he turns the gun on

16  her.  She sits there helpless nothing, God, I'm next.  He

17  puts two into her.  And, then turns and executes Rodney with

18  the bullet to the back of the head.  That's premortem

19  suffering.  She watched her husband die knowing that she was

20  next.  Heinous.  Especially even more so heinous, atrocious

21  and cruel.

22      And lastly let's us not forget what she endured, how she

23  died.  It wasn't enough to put a bullet in her head; wasn't

24  enough to bludgeon her with a bat; wasn't enough to try to

25  smother her, he then stabbed her repeatedly in the stomach,

1   neck, some of those knife wounds went at least an inch to two

2   inches deep.  She had to lie there and endure all of that.

3   She finally, after she couldn't fight it any longer to

4   survive, to stay alive, she succumbed to his actions.

5       Ladies and Gentlemen, she endured what no person should

6   ever have to endure at the hands of that man right there.  I

7   submit to you that was especially heinous, atrocious and

8   cruel.  That's three.

9       The State has three aggravators, Ladies and Gentlemen,

10  and that's all we are arguing, those three.  And, you will

11  have to balance those three against whatever mitigators

12  they've shown you.  And, again, you give each whatever weight

13  you feel it warrants.

14      Let's talk about some of their mitigators.  As best I

15  can figure, and if you remember more, that's fine, you listen

16  to them, consider them, and remember what they are worthy of.

17      Talked about the defendant having a difficult family

18  history.  Okay?  A lot of that stuff they talked about

19  occurred before the defendant was even born.  They said this

20  was in '71, '72 about his mother.  He was only in that

21  environment for 21 months, Ladies and Gentlemen.  His brother

22  Rosco was there a lot longer.  Rosco hasn't killed anybody.

23      He had a poor upbringing.  He had a poor upbringing

24  [repeating].  Well, I had a poor up bringing.  I am just

25  saying to put this in perspective.  Put them in perspective.

1    Draw on your life experiences.

2         They talked about out houses and stuff like that.

3    No plumbing.  I want you to think about something.  And, we

4    are talking about 1970 some 33 years ago.  How have things

5    changed?  Now in '70, I was four.  As long as I can remember

6    we have had in-door plumbing.  But, I remember as a small

7    child we'd go to the country, that's what I called it, to

8    visit my Uncle Toby and Aunt Rose.  I was a little kid, long

9    dirt road, but I remember they had a well.  They had an out

10   house.  I didn't want to go in that out house.  That was just

11   some 26, 25 years ago.  Times have changed now.  But back

12   then, who knows.  I had fun.  They had the best fried

13   chicken.  Wasn't until years ago I learned that those were

14   the chickens that were in the yard.  Okay.  But it was still

15   good.  Okay.  By today's standards that was pretty bad.  But

16   back then, kids didn't think anything about it.  It was a way

17   of life.  I am not trying to belittle what they are arguing,

18   but let's put this in perspective.  I've always had lights

19   and power that I can remember, but I've listened to my mother

20   talk about kerosene lamps and pot bellied stoves, and I've

21   seen some pot bellied stoves, even put the wood in pot

22   bellied stoves.  Doesn't make it bad, does it?

23        I remember my great grandfather on my mother's side

24   worked for the railroad company.  And they would go down at

25   the railroad yard and their idea of fun was watching a little

1   conveyor belt load the coal in the car.  And, that was fun

2   for them.  That is how they entertained themselves.  Tell a

3   kid now days go watch some coal being loaded and they'll

4   think you're crazy.  Everyone has Nintendo.  These games cost

5   50 bucks a piece.  Thirty years ago, times were different.

6   Yes.

7       I remember my mother telling me they didn't always have

8   power in Montgomery until they moved to the other side of

9   town where they had power.  Did that make it bad?  No.  Just

10  different.  Times have changed.  And, I just say that for you

11  to keep these in perspective, Ladies and Gentlemen, in

12  deciding what weight you are going to give to some of these

13  things.  That's all.

14      He had a sorry mother.  I am sorry for that, too.

15  But he was only in that environment for 21 months.  I venture

16  to say, he doesn't even remember what happened when he was 21

17  months or younger.  He -- you saw that photograph.  He was

18  taken out of that home and put in the loving home of

19  Ms. Collier and Mr. Collier.  You saw that photograph.  Happy

20  little kid.

21      He's small.  Okay.  I'm small.  But does that mean a bad

22  childhood?  No.

23      The best and most compelling thing in this trial, he

24  took the stand.  You got to see him for yourself.  You got to

25  hear him.  You got to observe him.  Very articulate fellow.

1    Very well spoken.  Quick on his feet.  All that verbal

2    jousting back and forth with Mr. Lisenby.  I venture to say

3    that's not what you expected at all.  They put up all these

4    tests scores of history and record cards.  He flunked the

5    first and seventh grades, Ladies and Gentlemen.  They put his

6    grades up in the second grade.  Well, I showed you the ninth

7    grade.  The ninth grade grades, they were pretty good.

8        He's got a driver's license.  Passed a written test.  I

9    know a lot of folks don't pass that test.  Okay.  I flunked

10   the first one.

11       Doctor -- I can't think of his name.  Dr. Dixon.  He

12   told you he doesn't suffer from mental retardation.  He's not

13   insane.  He does not suffer from a mental disease or defect.

14   He knows right from wrong.  And, he can form the intent to

15   commit a crime.  He told you that.  And, that's not what you

16   expected to hear from him, I imagine.  The doctor tried to

17   tell you he just doesn't get it.  He doesn't appreciate the

18   seriousness of his actions.  He does not appreciate the

19   seriousness of his actions [repeating].  "Doctor," when I

20   asked him, "hey, when he lied to the police, doesn't that

21   indicate he realized something serious was going on?  Hiding

22   the murder weapon.  Cleaning it off.  Doesn't all that

23   indicate he knows something pretty serious is going on?"

24       "Yes."

25       Okay.  He lied about hallucinations even to his own

 1  doctor.  The doctor tried to tell you the hallucinations were

 2  the results of low IQ and frontal lobe something or another.

 3  I got a question about that frontal lobe -- the only

 4  neurological test that came into evidence as testimony was

 5  negative for any neurological damage.  But, nonetheless, he

 6  tried to tell you all those hallucinatons were the result of

 7  that.  I asked him, "Doctor, didn't he tell you about those

 8  hallucinations and you didn't believe him."

 9       "Yes."

10       "And you confronted him, didn't you?"

11       "Yes."

12       "And he recanted and told you ...."

13       "Yes.  Okay.  'I was saying that for sympathy.'"

14       Remember the guy said I love my life and I'll say

15  whatever I have to say to save my life.  He said that on the

16  stand.

17       He suffers from an emotional disturbance, Ladies and

18  Gentlemen.  You can take that how you want to.  He's just

19  mean.  Always getting into fights, beating up the other

20  foster kids, history of assaults, voyeurism, peeping in

21  windows, little old lady's house, cutting the screen.  That's

22  his history.

23       Fetal Alcohol Syndrome.  His momma drank.  His doctor

24  couldn't tell you for certain he suffered from Fetal Alcohol

25  Syndrome.  He couldn't even tell you if he was born drunk.

1   "If he wasn't, I'll eat my at hat."  But, he did not know for

2   certain.  He was just speculating.  Even the doctor admitted

3   you can overcome these adversities with a good support group.

4   I submit to you that is what Ms. Collier was:  A good support

5   group.  He got nourishment.  He got education.  He had a

6   loving family, a loving environment.  Ms. Collier's oldest

7   son came and testified he spent time with him and talked to

8   him.  That's a support group.  He had it and at a very early

9   age.  Mr. Collier died while he was young and that affected

10  him.  Ladies and Gentlemen, there's not a person in here that

11  has not or will not experience death in your family.  You

12  deal with it any way you want to deal with it, Ladies and

13  Gentlemen.

14      He has a learning disability.  We have talked about his

15  grades.  You saw them.  You judged it.  That's all the

16  mitigators I can think of at this point.  They may think of

17  some more.  And, all I ask is that you listen to them,

18  consider them, but keep them in contest.  Draw on your

19  everyday experiences in your life in deciding what weight to

20  give each and every one of them.  And, I want to point out

21  something to you.  Do not lose sight of the victims in this

22  case.  We tend to get wrapped up in Mr. Holloway, but don't

23  lose sight of Rodney and Angela in this and their families.

24  Do not lose sight of that.

25      The State has given to you three aggravators:  Murder of

1  two more, you have already decided that.  Murder burglary,
2  you have already decided that.  And, I submit to you that
3  from all the testimony you heard we have proven to you beyond
4  a reasonable doubt that regarding the death of Angela, her
5  murder was especially heinous, atrocious and cruel.  Three
6  aggravators, Ladies and Gentlemen.

7      You know, I think back to when we were sitting around
8  talking about the death penalty last week and asking you some
9  pretty intense questions about what you thought you could or
10  could not do.  All of you said you would consider all the
11  facts.  Some said I need to weigh them, weigh and talley
12  them.  Some said people can overcome hardships.  Certainly.
13  If it was gruesome, I can vote for the death penalty.  This
14  was gruesome, Ladies and Gentlemen.  I've got to feel
15  comfortable within myself.  I've got to feel right about what
16  I do.  But I can vote for the death penalty if the facts are
17  such.  Won't know until I hear all the facts.  Sometimes the
18  death penalty is needed for justice.  Some people don't need
19  to get out.  Some of you wanted to know what led up to the
20  guilt.  A ridiculous statement made on a basketball court
21  amongst a bunch of guys playing ball, drinking, smoking
22  marijuana, according to the defendant, about what could be
23  done to his girlfriend.  And he stewed over that and that's
24  what led up to the what happened in the trailer.  If the
25  facts warrant it and the death penalty is necessary, I can

1  vote for the death penalty.  Depending on the circumstances,

2  wouldn't automatically vote for the death penalty.  I have

3  got to hear all the facts.  But if there was burglary,

4  somebody was cut, deliberate, brutal act; then I could vote

5  for the death penalty.  We have shown you that.  Weigh all

6  the facts -- I can listen to everything.  And if it was a

7  selfless act, I could vote for the death penalty.

8      The defendant had a fair trial, Ladies and Gentlemen.

9  He had two hell of a good lawyers.  They have been doing this

10  a lot longer than I have.  He had a fair trial.  He had a

11  great jury.  Heard all the facts and listened to everything.

12  He got a hell of a lot more than he gave Angela and Rodney

13  before he decided to execute them.  The defendant had no

14  regard for human life.  He needlessly killed those two

15  people.  He entered their home as a friend nonetheless, and

16  needlessly, senselessly, and brutally took their lives, with

17  regard to Angela.  He executed Rodney, boom, point blank.  He

18  at least, had a beef with Rodney, but there was no reason for

19  what happened to Angela.  He went back and put her through

20  what no one should have ever have to endure to get even with

21  Rodney.  He says, he lay there dead.  I submit to you to get

22  release.

23      Go break in her house.  We don't like that.  We punish

24  you for that.  You start killing to kill that raises that

25  bar, Ladies and Gentlemen.

1       I ask that you consider all of the evidence in this

2   case, consider all of the evidence.  Thoughtfully,

3   respectively listen to one another.  And, I know nobody in

4   this group would raise their voices back there.  Okay.  That

5   would never happen.  Be respectful of one another.  And with

6   courage, with courage, do what needs to be done.  If the

7   facts warrant it, you could vote for the death penalty you

8   said.  Be courageous.  It is not going to be easy.  It is not

9   supposed to be easy, but it is not impossible.  Do what needs

10 to be done and I stand here and look each and every one of

11 you in the eye.  Those of you that will look at me.  Okay.

12 And, I ask you to return a verdict of the death penalty in

13 this case because it is warranted.  Thank you.

14                 **CLOSING ARGUMENT BY DEFENSE**

15         MR. BLANCHARD:  May it please the Court.

16         THE COURT:   Mr. Blanchard.

17         MR. BLANCHARD:  Mr. Gibbs, Mr. Lisenby, Ladies and

18 Gentlemen of the Jury.  Good morning.

19         THE JURY:  Good morning.

20         MR. BLANCHARD:  I want to tell you at the outset

21 that this is just like the last time I stood before you.  I

22 have to follow Mr. Gibbs' talk and Mr. Lisenby will get up

23 and talk after me.  In this particular case, Mr. Keith will

24 not be taking part in this part of the case.  So, you won't

25 have to worry about having another lawyer get up and talk to

1   you for the Defense after I finish.  But, he will have the

2   opportunity to speak after I speak and reply to what I say.

3   I'll not have the opportunity to get back up and reply to

4   anything he may say after I finish.  I would like for you to

5   consider that and understand that there are a lot of things I

6   might want to get up and say, but I won't have the

7   opportunity to do it so I would like for you to kind of put

8   yourself in my role if you will and think what I might want

9   to say when that happens.

10       Ladies and Gentlemen, this is not about who can

11  ingratiate themselves to you the most by flattering you about

12  the job you've done.  This is not about that.  This is not

13  about who can talk the longest, or who can make the prettiest

14  speech, or he can amuse you, even, who is the best actor.

15  This is not about that.  This is not about any of those

16  things.  This is deadly serious business.  Deadly serious.

17  We are down now to the ultimate issue.  We are down now to

18  the question of whether we kill Jason Holloway.  There could

19  not be a more stark moral choice for you to make.  This young

20  man, and he is a young man, look at him.  There he is.  He

21  sits there his life is in my hands right now.  And, in just a

22  little while, it is going to be in your hands.  And, this is

23  going to be a terribly difficult decision for you and it

24  should be.  It should be [repeating].

25       Do you remember when you came in here, we did that

1    voir dire as Mr. Gibbs talked to you a few minutes ago and

2    explained it to you and went through:  Can you vote for the

3    death penalty, can you not?  You noticed there are not any

4    folks on this jury that said they couldn't vote for the death

5    penalty.  That is because the law requires that.  If you

6    can't ever vote for it, you can't serve on a jury in one of

7    these cases.  Likewise, if you would always vote for it, in

8    any case, you can't serve on one of these juries.  Every one

9    of you said, yes, I can consider the death penalty.  It is

10   part of our law and in some cases it may be warranted.  But,

11   you know what else you said?  And, it is part of your oath.

12   You said, I could also consider the punishment of life

13   without parole, which is a very severe punishment.  I can

14   consider that as well and I wouldn't necessarily throw out,

15   like Mr. Gibbs tried to do, all those things about the

16   person's character, and record, and the circumstances of his

17   life.  I could consider those things as mitigating.  I could

18   think about that.  He wants you to throw all that out.  You

19   all took an oath said you could do that and, you know, we are

20   all here doing a job.  Mr. Gibbs and Mr. Lisenby are doing a

21   job.  The judge is doing a job.  The court reporter here,

22   she's been working all week.  Defense counsel are doing their

23   job.  And, you are doing your job.  And, we do appreciate it.

24   I do not denigrate it or anything like that.  We appreciate

25   your hard work and what you do, but I am not going to stand

 1  here and try to flatter you.  You're doing your job and

 2  everybody expects you to do your job.  And, we want you to be

 3  able to hold your heads up when it's through and say you did

 4  the right thing, the moral thing, and I know you will do

 5  that.

 6      I'm going to use notes, just like Mr. Gibbs did.  This

 7  is just way too important to try to remember everything off

 8  the top of my head and maybe forget something important.

 9      I want to take some time and go back through a little of

10  the evidence with you and think about it, but I don't want to

11  dwell on it.  You heard it.  You heard it from the witnesses

12  in this case.  And, I'd much rather let the witnesses speak

13  for me then get up here and try to reiterate it and bore you

14  with it.  Think back to what they said.  As I said to you,

15  what we are here to talk about is a choice between the two

16  most extreme methods of punishment that the law allows.  The

17  death penalty by lethal injection on one hand or the life

18  without parole in the penitentiary on the other.

19      We talked about life, life without parole, but we are

20  not really talking about life like you and I know it, are we,

21  when we talk about the life for the defendant, when I say

22  give him life?  We are talking about life without the ability

23  to go out and stroll the streets.  We are talking about life

24  without the ability to go to the movies or read a book if you

25  want to.  You don't have those choices anymore.  LIfe without

1   the ability to play with your children.  life without the
2   ability to talk to your friends when you want to or be with
3   your loved ones.  We are talking about life in a steel and
4   concrete cage.  We are talking about -- we are talking about
5   life in an area where you eat your breakfast in the same area
6   you use the bathroom.  That's the kind of life we are talking
7   about.  We are talking about a severe punishment.  We are
8   talking about life without choices, without freedom.

9        You get food.  Yes, you get food, but you don't get what
10  you want.  You get a hard cot to sleep on and a little room
11  to live in.  And, you get to think about why you are there
12  for the rest of your life.

13       You know, Jason Holloway has already been in the chains
14  of the state for three and a half years.  I don't know
15  whether you have heard it, but every day, from what I know,
16  he gets here, you here chains rattling behind that door over
17  there.  We are talking about a life in the chains of the
18  state.  The only choice he gets, the only time he gets out of
19  there, is when he comes to the courtroom.  The only time he
20  gets any choice as to what he puts on, is when he gets to
21  dress in clothes that are appropriate for the courtroom.

22       The life we are talking about is life, not as we
23  recognize it, but it is a life that is continuous punishment
24  everyday for the rest of ones life.  This case is not about
25  not being punished.  This case is about which of two

1   punishments.

2       If there's no necessity -- one of the bedrocks, I think,

3   of our society is there's no necessity to kill.  We as a

4   society, do not endorse killing.  We go to war when we have

5   to go to war and we may engage in self-defense.  I know, what

6   the prosecutor is going to say.  He is going to say he didn't

7   have to kill.  He didin't.  We are here because he committed

8   a murder.  Two murders.  That's why we are here.  But, us, as

9   a society, we don't kill unless we have to.  That's what

10  makes us civilized.  That's something you need to think about

11  when you are considering this.  We have ways of punishing

12  people.  In almost every case I've ever tried, death penalty

13  case, the prosecutor usually says, and may say in his

14  closing, something like, well, if this isn't a case for the

15  death penalty, there never will be one.  Or, if we don't

16  impose the death penalty in this case, we might as well just

17  take it off the books.  Well, don't believe that, Ladies and

18  Gentlemen.  Don't believe that.  The death penalty is not

19  automatic and it is not every case receives the death

20  penalty.  There are only a few case the law contemplates it.

21  There are only a few cases, even capital cases, out of the

22  many that would be eligible for the death penalty.  If you

23  think about it, think about your common experience about

24  cases you have heard about in the community and in the nation

25  that were horrible, horrible cases that didn't get the death

1   penalty.  Think about Susan Smith.  Remember her?  She loaded

2   her three or four children into a car, strapped them in with

3   their little seatbelts into the car -- this happened in North

4   or South Carolina -- and then pushed that car into the water

5   and watched as that water came up while your children

6   struggled in that car for the very breath of life and while

7   they died.  She saw it.  Would that be a case for the death

8   penalty?  She didn't get the death penalty.  Not every case

9   warrants the death penalty just because it is ugly.  All

10  murders are brutal and ugly.  And I expect that they are

11  going to get up in closing and talk to you more about how

12  brutal and ugly this case is.  It is.

13      All murders are, but we are talking not only about

14  murder, the facts of the case, but also the life of the

15  defendant.  All of that has been considered.  There have been

16  cases right here in this circuit that were heinous cases that

17  didn't get the death penalty.  I think of a case in Dadeville

18  a few years back where a young man of Indian decent kidnapped

19  some people from a Hardees.  You may have heard about it.  He

20  took them out in the woods; made them lie down on a  river

21  bank or lake bank, and while they were lying there he shot

22  one of them, blew their brain out right there; and then he

23  slowly turns to the other one and shoots him with a shotgun.

24  The second one didn't die.  He lived to give evidence, but he

25  did not get the death penalty.  He didn't get did the death

1   penalty for that.

2       There is a case of two young men over in Macon County,

3   also in this very circuit, that one morning walked into the

4   room where their grandparents, who were harboring them in

5   their home, and the grandparents were having breakfast, took

6   a gun and shot both of their grandparents, shot them down in

7   cold blood.  They were prosecuted, but they didn't get the

8   death penalty.

9       Terrible crimes.  Awful crimes.  But, they didn't get

10  the death penalty, and the point is, the death penalty is not

11  automatic.  You consider both options.  You consider all the

12  facts of the crime and of the life of the defendant.  No

13  automatic death penalty.

14      I suggest to you that based on the mitigating

15  circumstances we have shown to you, and we'll discuss again

16  in a little while, that this is such a case that if you do

17  give the death penalty, it ought to be taken off the books.

18  This is not about excuse.  This is not about justification.

19  It is not about that at all.  It is not about blaming

20  somebody else for what happened here.  It is about explaining

21  the forces that acted on Jason Holloway throughout his life

22  and to help you put this into perspective and understand what

23  happened and what led to this point in his life.  It is not

24  about right and wrong.

25      Mr. Gibbs was up here a little while ago and told you

1   that Dr. Dixon said, well, he knows the difference between

2   right and wrong.  He knows that.  He does.  We didn't plead

3   insanity.  That would be not knowing the difference between

4   right and wrong.  We understand that. We understand that he

5   can form intent.  We understand all those things and don't

6   argue with any of them.  The point is about what Dr. Dixon

7   said is that he has low intelligence, and we'll talk about

8   that in a little while, because of Fetal Alcohol Syndrome and

9   because of that one of the things is he is substantially

10  impaired.  That means impaired to a large degree.  He is

11  unable to appreciate the criminality of his acts.

12       What does that mean?  Does that mean he doesn't

13  understand right from wrong?  No, it doesn't mean that.  What

14  it means is, he understands right from wrong, but he can't

15  fully appreciate the impact of what his acts have on others.

16       Mr. Gibbs said, well, he cleaned up the weapons so on so

17  forth, he lied to the police, he had to know it was wrong.

18  Yes, he knew it was wrong.  But, remember, he asked for his

19  birthday cake at he had given the confession.  Does that mean

20  did he completely appreciate what was going on?  Do you

21  think?  The way I see it is like this, Ladies and Gentlemen.

22  I like pets.  I have dogs and cats in my home.  Two dogs and

23  my wife like cats.  She has seven of them.  She has a lot of

24  them.  I put up with cats.  I like the dogs, though.  But,

25  what I have noticed about my dogs is this.  Dogs have a sense

*** Frances L. Roark ***

1  of right and wrong.  A dog when you correct it a couple of

2  times, scold it, well, it gets the point and realizes the

3  extent of its transgression to a degree when it has done

4  something wrong.  Correct it a few times and then when the

5  dog chews on the rug or chews on a piece of furniture,

6  destroys a slipper, you scold that dog in a voice that tells

7  it, it has done wrong.  The dog slinks away.  It cowers down.

8  It knows that it has done something wrong.  Does that dog

9  know you are going to have to go out and pay $500 for a new

10  piece of furniture?  Does it understand the inconvenience it

11  is putting you to?  Does it fully appreciate the wrong of

12  what it has done?  No.  It understands the difference between

13  right and wrong to a degree, but it doesn't fully appreciate

14  the consequences of its acts.

15      I am not saying Jason Holloway is a dog or anything

16  like that.  I am just using that as an analogy to help you

17  understand what Dr. Dixon was trying to say.  That here is a

18  person that appreciates the difference between right and

19  wrong.  He is not like the rest of us.  He doesn't fully

20  appreciate the impact of the criminality of those actions on

21  other people, and that is a mitigating circumstance that you

22  can take into effect.  Because he is not like a sociopath or

23  psychopath who fully understands the consequences and the

24  impact of what he's doing and does it for joy and the fun of

25  doing it and to -- for whatever reason.  He is not like that.

1   And, that is a mitigating circumstance.

2        As I said, it is not about right and wrong,

3   knowing the difference between right and wrong.  It is not

4   about being insane or not insane.  He is not.  We never

5   suggested, and certainly not asking you, to disregard your

6   oath as jurors and find that or anything like that.  We are

7   asking you to live up to your oath as jurors and to consider

8   all of the various factors and the diverse frailties that

9   make up our life and how people come to be the way they are.

10       I want to discuss with you a little bit the structure

11  and process that we are going to go through here.  You have

12  already started hearing about the aggravating and mitigating

13  circumstances.  Let's talk about the aggravating

14  circumstances.  Mr. Gibbs covered most of that.  You

15  understand you have to weigh aggravating and mitigating

16  circumstances.  He told you what the State's aggravating

17  circumstances are supposed to be.

18       The fact that you have found by your verdicts that

19  two people were killed during one course of conduct or one

20  act and that one of the murders, at least, occurred during a

21  burglary.  Those are two aggravating factors that the judge

22  will tell you have been proven by virtue of your verdict.

23       The third one which they are asserting which is heinous

24  atrocious and cruel.  And, that one has not been proven.

25  What I mean by that is this, the judge will tell you any

1   aggravating circumstance, and they are limited.  You can only

2   consider the ones you find to be proven.  But, any

3   aggravating circumstance has got to be proven beyond a

4   reasonable doubt.  So, in order for you to consider that the

5   murder was heinous atrocious or cruel, if you find it was,

6   first, you've got to consider that that has been proven

7   beyond a reasonable doubt before you can even weigh that

8   against the mitigating circumstances.

9        Now, I am going to address that one first for a moment.

10  Mr. Gibbs described it to you, and he told you why he thought

11  the crime was especially heinous, atrocious and cruel.  But

12  there is one critical thing he left out.  One critical part

13  of that definition, and the judge will read it to you, that

14  that capital crime was especially heinous, atrocious and

15  cruel as compared to other capital murders.  Not just that it

16  was ugly, all murders are ugly.  All murders are brutal.

17  But, that in comparison to other capital crimes it is

18  especially heinous, atrocious and cruel.  There's that thing

19  I'm talking about.  Even for capital murder, we don't presume

20  that death is the appropriate punishment.  In order -- one of

21  the aggravating factors is in order for it to be a death

22  eligible case, it has got to be especially heinous, atrocious

23  and cruel even as compared to other capital murders.

24       Remember the Susan Smith case we talked about and the

25  other cases that I have just described to you.  Is this case

*** Frances L. Roark ***

1   that much worse than those cases?  Is any worse than those

2   cases?  That is for you determine.  But you don't decide

3   heinous, atrocious and cruel factor in a vacuum, just with

4   regard to this case.  Oh, my heavens it is ugly.  You look at

5   it in comparison to other cases and is it especially bad

6   compared to other capital cases.  If not, then I submit to

7   you that that circumstance has not been proven.  And, I

8   submit to you that this case, although it is ugly, although

9   it was brutal, is not especially heinous, atrocious and

10  cruel.  The judge will tell you that a case which is

11  especially heinous, atrocious and cruel involves some decree

12  of pitiless infliction of torture or cruelty upon a victim.

13  You get the idea.  The kind of thing like the Mary Nealy case

14  years ago where the people who murdered the victim in that

15  case, the Nealies, injected DrainO in the veins of the victim

16  before they killed them.

17       Especially pitiless.  Inhumane.  In this case, yes, we

18  have a brutal murder.  Rodney was apparently killed fairly

19  quickly.  I don't think he suffered much.  The prosecutor has

20  tried to make it appear to you that Angela may have suffered

21  greatly, and she may have.  I am sure she did suffer some.  I

22  am sure she did.  But, I would like for the family, and for

23  you to believe, as I believe, that she probably didn't suffer

24  to the degree that they would have you believe she did.  She

25  was shot.  She received a gunshot wound to the head.  Now,

*** Frances L. Roark ***

1    that could have rendered her unconscious, even though she was

2    still breathing.  We have the defendant's statement.  He does

3    not say anything about her doing anything other than

4    breathing during the time that he went back to the house and

5    committed the final act of murder.  I submit to you that had

6    she been conscious while this was going on, while the

7    stabbing and beating was going on, that she would have fought

8    back.  There would have been -- there would have been skin

9    under the fingernails which was not there.  There would have

10   been some evidence that she was conscious and able to

11   experience that.  In fact, when he went back to the house 30

12   minutes later, the only evidence that we have is that she was

13   right where she was.  She had not moved.  Had she been

14   conscious, sensate, she might have gotten up and tried to get

15   help.  But, I suggest to you that the evidence shows she was

16   simply unconscious, breathing but unconscious.

17        They showed you a picture with her hand up by her face,

18   like this, and Mr. Lisenby suggested she saw the bat coming

19   and put her hand up.  We don't know that.  He was not there.

20   I was not there.  We do know that people that are dead have a

21   condition called rigor mortis in which the muscles contract.

22   It doesn't mean stiff like that.  It means muscles do this

23   and that they can contract.  That easily could have been what

24   is called a postmortem condition or artifact where the hand

25   simply comes up.  I don't know.  I don't claim to know.  It

1   is, again, a piece of circumstantial evidence, and you heard

2   the judge talk about that in the last phase.  And,

3   circumstantial evidence, you try to figure out what it means.

4   We try to figure out what it means.  It may not mean what

5   they say it means.  It may not mean what I say it means.  You

6   have to figure that out yourself.  But, I suggest to you in

7   terms of heinousness, atrociousness and cruelness, if that's

8   what they want to call it, this case doesn't compare to

9   others and the facts simply have not been proven beyond a

10  reasonable doubt in this case to show that it is in fact

11  heinous, atrocious and cruel.  So, I suggest to you that you

12  should not consider that as a proven circumstance.  And, if

13  you do think it is proven, you should given it very little

14  weight.

15      Let's talk about the other aggravating circumstances,

16  that the murder was committed -- that it was the murder of

17  two or more people in one act, series of conduct.  Well,

18  let's think about that for a second.  They want you to give a

19  lot of weight to that.  But, haven't we already given it a

20  lot of weight?  They are asking you to double count it.  You

21  counted in the first phase of this case when you found the

22  defendant guilty of capital murder.  If you found him guilty

23  of regular murder on that count, he could only receive a life

24  sentence.  That would be the most he could get.  He could get

25  as little as ten years if you found him guilty of regular

1  murder.  You didn't.  You found him guilty of capital murder

2  in that count.  Why?  Because it was a murder of two or more

3  people in a single incident.  So, in that case, you

4  automatically counted it, and you elevated his punishment to,

5  at least, life without parole.  Now, they want you to count

6  it again.  The same fact.  They want you to give it double

7  weight.  And, say, okay, same circumstance, not only does it

8  justify the elevation of the sentence to life without parole,

9  it also elevates the things to the death penalty.

10      Ladies and Gentlemen, I can't tell you the

11  circumstance has not been proved.  The judge said it has been

12  proved and by your verdict it has been proven.  But, that

13  doesn't mean you have to give it one single ounce of weight.

14  You can completely give it no weight.  And, I suggest to you,

15  because that it is a double counting sort of thing, you

16  should give it very little, if any weight.

17      The same thing applies to the burglary case, doesn't it?

18  If the murder of Angela had been murder without the burglary

19  added, he could have only gotten a life sentence, as little

20  as ten years.  But, because your verdict says, there was a

21  burglary involved, then automatically he's going to get life

22  without parole, at least.  At least.  That is what he should

23  get.  But, once again, the State wants you to consider that

24  circumstance again.  They want you to give it double weight.

25  They want you to pile that circumstance on top of itself

Court of Criminal Appeals No.___CR_____    VoL 12

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
## FROM
# CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2000-166
### Circuit Judge: Honorable RAY D. MARTIN

Type of Conviction / Order Appealed From:___STATE CONVICTION_____
Sentence Imposed:_____LIFE WITHOUT PAROLE_____

Defendant Indigent:  _X_ YES  _ NO

## JASON LEE HOLLOWAY
<div align="right">NAME OF APPELLANT</div>

CHARLES GILLENWATERS, & JOSEPH FIQUETTE    256-234-5018
APPELLANT'S ATTORNEY                         (TELEPHONE NO.)

POST OFFICE  BOX 2129
ADDRESS
ALEXANDER CITY        ALABAMA        35011
CITY                  STATE          ZIP CODE

<div align="center">v.</div>

## STATE OF ALABAMA
<div align="right">NAME OF APPELLEE</div>

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

1   essentially to justify their claim for a death penalty

2   against Jason Holloway.  And, those are the three

3   circumstances.  And, I suggest you should give the burglary

4   circumstance very little weight for that reason.  Also

5   because, as I told you in closing for the guilt phase of this

6   case, this is not exactly the kind of burglary that we are

7   talking about.  I know it meets the legal definition barely,

8   we're talking about Angela's case.  He entered the house.

9   Yes.  Okay.  Was it unlawfully?  If you say so.  So, it is

10  unlawful entry, but it wasn't a breaking into the house at

11  night and, you know, going in and killing the occupants,

12  things like that.  It wasn't the kind of burglary we

13  ordinarily think about.  So, I suggest for those reasons,

14  those circumstances should be given very little weight.

15      The aggravating circumstances -- think about it in your

16  mind.  They are all about the crime.  They relate to nothing

17  but the crime.  The burglary.  The two or more.  The heinous,

18  atrocious and cruel.  We're focusing on the aggravating

19  circumstances on one day.  The worst day in Jason Holloway's

20  life and in the life of the victims to be sure.  But, one day

21  isolated.  That's all we are talking about.  It completely

22  ignores the rest of his life.

23      And, what we're talking about, the mitigating

24  circumstances that we bring to you, is the rest of his life.

25  What happened to him in the womb is important.  It is a

*** Frances L. Roark ***

```
 1  crucial thing.  What happened to him when he was born and
 2  developing.  Again, a crucial thing.  All of those things we
 3  have talked about.  Very critical.  But, we focus on the
 4  entire case.  That is what the mitigating circumstances are
 5  about.
 6       And, I would like to go over that same -- well, not the
 7  same list, but a list of the mitigating circumstance that I
 8  have made.  And, I'll tell you what I think some of them are
 9  and I'll tell you this, though, whereas the State is limited,
10  you can only consider the three aggravating circumstances or
11  any that you feel have been proven.  You can only -- any of
12  those three that you feel have been proven.  You can consider
13  only those.  As far as mitigating circumstances are
14  concerned, you can consider anything you feel is mitigating
15  as an individual person.  So, the list I'm going to read to
16  you, not read to you, tell you about is not an exclusive
17  list.  If I go through my list, and you think, well, he
18  didn't mention it, but I think this other thing that I think
19  about is pretty mitigating, then you consider it.  It is up
20  to you.  That's the way this works.  I can't give you --
21  since they are unlimited I could never list exhaustively
22  every possible mitigating factor.  It is up to you to
23  consider what you feel are mitigating.  But, I do believe and
24  the judge will tell you that you can consider certain things.
25  Again he'll tell you his list is not exhaustive either.
```

1    The difficult family history that we talked about,

2    certainly, is a mitigating factor in this case.  In that it

3    impacted on his development and the way he came to adulthood.

4    The fact that he has emotional-type of disturbance that

5    results from that is a mitigating circumstance.  Those are

6    two.

7        We talked about his capacity to appreciate the

8    criminality of his conduct.  That is a huge mitigating

9    circumstance.  Tremendous mitigating circumstance.

10       That he suffered the effects of alcohol consumed by his

11   mother during the pregnancy, you know, the Fetal Alcohol

12   Syndrome.  Now, Mr. Gibbs told you that, well, Dr. Dixon, you

13   know, he couldn't say for sure that Jason had that.  Well,

14   you heard what he said, he said look, when these children are

15   very young you can see certain things in the face, hallmarks

16   about the eyes, and the nose, but these things fade by the

17   time of adolescence and you can't see them anymore.  You

18   can't make the diagnosis that way.  But, everything he sees

19   about Jason:  The low birth weight, the neurologic condition,

20   the low IQ, things of that nature, are consistent with Fetal

21   Alcohol Syndrome.  And, we know in this case from the

22   testimony of records, relatives, and records that she drank

23   heavily during her pregnancy.  So, it all fits together.

24   What did Dr. Dixon say:  That he had it.  I am confident.  I

25   would eat my hat.  We know that old expression.  You wouldn't

1  want to have to eat your hat. So, he is pretty confident
2  about that although, of course, you know, we explained to you
3  about proof in human circumstances. Nobody can ever be
4  absolutely certain of most things in human conduct. Is he
5  certain? No. But he's confident. He would eat his hat.

6      Jason Holloway, I submit to you, had and shows the
7  effects of Fetal Alcohol Syndrome. Which means that during
8  some critical time of the pregnancy, his mother was consuming
9  alcohol and his brain did not develop properly which gives
10 rise to the low IQ and all the effects that we talked about.
11 Fetal Alcohol Syndrome is not something that we don't know
12 about. You can walk right across the street to the State
13 store, ABC store. And, you can find a bunch of these bottles
14 like this. And, what it is going to say on the back of them
15 are: According to the Surgeon General, women should not
16 drink alcohol beverages during pregnancy because of the risks
17 of birth defects. This is not something we made up. The
18 Surgeon General of the United States requires that it be put
19 on every bottle of alcohol. What kind of birth defects?
20 Brain damage birth defects. That's what happened to Jason
21 Holloway. And, what did that result in? For one thing the
22 low IQ.

23     Now, let's talk about that mitigator for a minute.
24 Mr. Gibbs gets up here and says, well, he did well in high
25 school. So, you ought to consider that. Well, I don't think

*** Frances L. Roark ***

1  he did well in high school.  He failed the high school exit

2  exam three times.  The grades you saw that he put up there,

3  see that LE next to them?  What does that mean?  What do you

4  think?  What do you think that means?  Some sort of learning

5  enhanced class?  I don't know precisely what it means.  I

6  suggest to you those scores, whatever they were, were scaled

7  scores, and that Jason Holloway was competing against a group

8  of people like himself, not people out in the normal -- not

9  people with normal IQ.  Remember what Dr. Dixon said?  A

10  person with Jason's IQ is where?  In the lower 16 percent of

11  the population.  Sixteen percentile.  Eighty-four percent of

12  the people in this country are smarter have higher

13  intelligence.  And, they would have you believe that is not

14  true, but Dr. Dixon found an IQ of 85 and these -- let's see,

15  these are his grade five, Stanford Achievement Test scores.

16  Look at that.  Most everything right in that area or below

17  these little percentiles across here:  1, 5, 10, 20

18  percentile.  All his scores are in this range:  Word studies,

19  reading, all of that.  This is an objective test.  This is

20  not teacher grading his scores against a bunch of other

21  students like him.  This is the objective computer scored

22  test that shows where he is compared to nation wide students.

23  Consistent with Dr. Dixon's findings likewise.  That was

24  Exhibit 28.  Exhibit 22 same thing.  A different grade level,

25  grade eight.  Same kind of document.  Look where they are.

1   Still in 1, 5, 10 -- highest -- we have got something up here

2   in the 30s and 40s, but the vast majority are below average,

3   and in that range that Dr. Dixon described.  Once again an

4   objective test, computer scored, not somebody giving him the

5   benefit of the doubt on a test in school.  Not somebody that

6   wants to pass him on to the next grade for whatever reason.

7       Achievement Test, Exhibit 23.  Let's see, this was done

8   at the UAB Child Adolesence Center and here we have

9   percentile ranges for these very low 1.  The highest is 3,

10  .05 up here.  And grade equivalent on some of them.  Now, he

11  is an adolescent, remember.  Grade equivalent maybe a third

12  grade equivalent.  Highest would be about a fourth grade

13  equivalent.  That is where he is at the time he was

14  adolescent, meaning 13, 14, 15 years old.  Somewhere in

15  there.  He's way behind at that point.  Way behind.

16      We have IQ records from the Children's Hospital.  Verbal

17  IQ of 74, performance IQ of 87.  I think he has a full scale

18  on here somewhere but I don't see it.  Seventy-nine.  Full

19  scale IQ of 79.  Even lower than the 85 Dr. Dixon found, but

20  within that range.  Again, consistent.

21      Exhibit 33, let's see, we have verbal score 91,

22  performance score 78, full scale IQ score 84.  Plus or minus.

23  Eighty-four would be right in there.  That is on a

24  standardized IQ test administered by the Chambers County

25  Board of Education.

*** Frances L. Roark ***

1    Now, prosecution would apparently have you think that we
2    are tying to pull some wool over your eyes.  Make you think
3    he is dumb when he is actually pretty smart.  What did those
4    tests tell you?  We didn't do any of those tests.   Those are
5    in the records and they are consistent over time.

6    Ladies and Gentlemen, he has an IQ of about 85.
7    Dr. Dixon told you, just because a person can talk, these
8    people who have these IQs -- it is not like they are mentally
9    retarded, low functioning people.  They can communicate.
10   They might present to you -- present meaning talk to you or
11   confront, come to you, talk to you, meet with you -- and you
12   wouldn't know necessarily.  They are not going to be
13   drooling.  They are not going to be stuttering.  They are not
14   going to be stumbling over words, necessarily.  But there is
15   something wrong.  They don't perceive things like we do, like
16   people with normal IQ do.  Remember Jason, he, said would
17   think that maybe an innocuous thing said to him was an insult
18   of some sort because of his low IQ.  I suggest to you that's
19   what happened in the jail environment.  Sometimes he'll hear
20   something and take something as an insult or slight, and
21   ruminate about it, think about it for days, and that's why he
22   gets into these scrapes that he does in the jail.  It is
23   consistent with that low IQ that comes from the condition he
24   was born with and was exacerbated, or made worse, by the
25   terrible environment.  We showed you all about the way the

1    house was.  The way his mother and his father -- what that

2    situation was.  To show you the kind of environment he was

3    born into.  And, the fact he didn't get proper nutrition, and

4    he didn't get proper care, and he was not taught, and he was

5    deprived in the first 21 months of life can be critical.

6    That's the time in which your mind is developing, other than

7    things are developing.  These are going to have lifelong

8    effects on you.  This is, again, a crucial mitigating

9    circumstance.  It affects him as he sits here today.

10        The prosecutor has told you that, well, you know, by

11   golly I was brought up poor and I didn't kill anybody.  Or,

12   you know, maybe I didn't have enough to eat or somebody else

13   did not have enough to eat, and we didn't kill anybody.  Or,

14   brothers and sisters and that sort of thing.  Well, folks,

15   everybody is an individual.  You can't isolate these things.

16   You can't say, well, because somebody didn't have enough to

17   eat when they were young that means they are going to go out

18   and kill somebody.  We are not saying that.  We are saying

19   this is a unique individual with a chain of circumstances

20   that nobody I know necessarily has had.  Starting with the

21   Fetal Alcohol Syndrome, the mother drinking while he was in

22   the womb, going on to the poor care that he experienced when

23   he was a young infant.  Remember that bucket?  Everybody

24   remember that bucket?  The children -- Rosco had to go out

25   and beg food from the preacher and there wasn't always enough

1  to go around so sometime Jason wouldn't get his share.  Where

2  did he go to get it?  Sometimes he went to that bucket that

3  was there for the family to use as bathroom.  Remember that?

4  You think that couldn't have an effect on somebody?  Growing

5  up like that is not something you should consider because it

6  was long time ago?  Folks, I'll tell you there's not one of

7  us, not one of us, that would want one of our children to

8  experience anything like what Jason Holloway experienced from

9  the time he was in the womb until the time he was 21 months

10  old.  Not one of us.  Why?  Because we all know what it would

11  do to that child.  We know that it would have a severe

12  debilitating effect.  And, unless that child had

13  extraordinary character, and fortitude, and a great support

14  system that that child would never pull out of it.  We know

15  that.  That is why we would not want our own children to

16  experience it.  Well, Jason didn't have a  choice, folks.  He

17  experienced it.  He experienced every minute of it.  Does he

18  remember it?  I don't know.  Probably not.  That doesn't mean

19  it did not happen.  And, it doesn't have to be recalled in

20  order to be traumatic.  It doesn't have to be remembered to

21  have these effects we are talking about.  These are physical

22  effects.  Brain damage.  And, I have to remember that to have

23  an effect?  You don't have to remember it at all.  So, that

24  doesn't matter.

25       People looking at cars unloading people, putting wood in

```
 1  stoves, you know, that doesn't have anything to do with this
 2  case.  It doesn't have a thing to do with this case.  He is
 3  trying to suggest to you because other people have hard
 4  times, they don't necessarily go out and kill people; and,
 5  that's true.  But, let me tell you this, what do our
 6  experiences during war time teach us?  They teach us that
 7  every man has his breaking point and every woman has her
 8  breaking point.  But, some of them break sooner than others.
 9  Everybody is not equal.  Everybody is born equal in terms of
10  rights and opportunities, but everybody is not born equal in
11  terms of character and ability and intelligence and things of
12  that nature.  Some people start a little further down the
13  scale than others for reasons, not just because it just
14  happens, and that is what happened with Jason Holloway, and
15  that I submit to you is a strong mitigating circumstance.  He
16  has obviously suffered the physical and mental impact of
17  severe poverty in early life.  That is a mitigating
18  circumstance.
19      He has mental and/or emotional disturbances that
20  manifested at an early age.  We have seen that in the
21  records.  That these psychological disorders he has, and has
22  had for many years, are not only treatable and not only can
23  they not be -- excuse me.  Not only can they be addressed, as
24  they were not addressed as Dr. Dixon told you.  Dr. Dixon
25  told you he didn't get proper analysis and treatment.  Not
```

1    his fault.  In a prison setting they can be addressed, not

2    only can they be addressed in the prison setting, but they

3    can be addressed better than they can out here in society,

4    and that I submit to you is a powerful mitigating

5    circumstance.  A reason why you ought to spare his life and

6    send him to prison for the rest of his life, rather than to

7    kill him.  A powerful mitigating circumstance.

8        You heard the law enforcement officers that came in and

9    testified to you.  The jailer.  Jason Holloway has good,

10   average behavior in jail.  Does he in some fights?  Sure.

11   For the reasons I told you.  But, has he been disrespectful

12   to his jailer?  No.  Has he had otherwise good conduct?

13   Sure.  Has he been an average inmate.  Yes.  Jail is a rough

14   place.  It is not a nice place.  You are in there with a

15   bunch of bad people.  Can they sometimes push Jason's buttons

16   and get him into fights?  Of course, they can.  That is

17   something that happens.  But, he has not tried to escape.  He

18   has not brought contraband into the jail, tried to get things

19   smuggled in.  He's not done any of that kind of thing.  So,

20   they have told you he is no major problem if he is locked up,

21   and that is a powerful mitigating circumstance.

22       Jason Holloway obviously has respect and love for his

23   family members.  You heard him apologize to one of them when

24   he had to say something ugly on the witness stand.  And, it

25   is also obvious that both his biological and his foster

1   family love him.  They have been here for him.  They've come

2   every day of this trial.  The ones that could work it out to

3   be here.  And, they testified.  You heard the testimony of

4   Ms. Collier and her son, William, and Rosco Holloway.  They

5   consider him a son and brother and that they love him.  They

6   do not want anything to happen to him.  It would add to their

7   suffering.  It would add to the total mass of suffering in

8   this case if Jason Holloway were to be executed, and it would

9   not bring back Angela or Rodney Brown.  It will not alleviate

10  anyone's suffering.  It would only add.

11      You may find that Jason Holloway has remorse for his

12  crime.  You saw him on the witness stand.  I don't know how

13  you viewed his testimony.  But, I did see some emotion from

14  him when he testified earlier.  He knew Angela as a friend.

15  He knew Rodney.  I believe that he does have some sense of

16  remorse even though what I believe doesn't matter.  Let me

17  tell you that.  What I say on that regard is not evidence.  I

18  don't mean to suggest to you that I am testifying.  I am not

19  doing that.  I am saying to you that from that witness stand

20  you may conclude that that is the case.  And, certainly, I

21  have explained to you the remark about the birthday cake and

22  you heard Dr. Dixon talking about that.  They tried to

23  suggest that that indicates a lack of remorse.  No, it just

24  indicates that he doesn't appreciate the criminality of what

25  is going on and the impact of his actions on others.

 1          Jason can adapt to prison life.  You heard Dr. Dixon

 2     tell you that.  He can adapt.  He does have some adaptive an

 3     abilities.  So, that he would be able to get in there and

 4     become a part of that life and would not be any kind of major

 5     problem.  He could be an inmate in our system and not be a

 6     terrible problem to anybody.

 7          Each of you -- and there may be other mitigating

 8     circumstances, but I think those are entitled, certainly, to

 9     great weight and I hope there will be others that you find

10     that I may not have thought about.

11          That each juror makes his or her decision about

12     aggravating circumstances and the mitigating circumstances

13     and how much weight to accord to each one.  Each juror also

14     decides how much weight, how much weight to give those.  What

15     I am trying to get to is this:  Mr. Gibbs told you about

16     aggravating circumstances and how to weigh it, talking about

17     giving weight and deciding how much weight and all of that.

18     What he didn't tell you and what I want to tell you is this:

19     That is an individual decision.  Each of you make that

20     decision for yourself.  It is not that you get together as a

21     group and say, well, we think this mitigating circumstance or

22     that aggravating exists, and we are going to give it ten

23     points and we all vote, majority vote on it.  That's not the

24     way you do it.  The way you do it is that you, and you, and

25     you, and you decide for yourself which ones of the

```
 1  aggravating circumstances and which ones of the mitigating
 2  circumstances you feel deserve weight.  You may feel one
 3  mitigating circumstance deserves a ton of weight and another
 4  juror may feel that same mitigating circumstance deserves
 5  little weight.  That's okay.  Because you figure that
 6  internally and you come to a conclusion yourself, each one of
 7  you whether the mitigating circumstances and the aggravating
 8  circumstances you find to exist outweigh the mitigating or
 9  vice versa.  You make that decision.  And then, only then, do
10  you vote.  Now, you are to talk about all this with each
11  other, understand that, and you should, but it is an
12  individual moral decision.  And, then you vote.  When you
13  vote, if your vote is at least seven of you for life, as I
14  think it will be, then you vote for a life sentence.  If your
15  vote is 10 or more for the death sentence, then you recommend
16  a death sentence.  But, you do the weighing yourself.  It is
17  an individual -- it is an individual thing.  It is not a
18  group decision.  We want the full benefit of each person's
19  moral value in this case.  And, each person's consideration
20  of the mitigating and aggravating circumstances.  It may be
21  -- it may be in this process that you feel that they are of
22  equivalent weight.  If you look at all the circumstances you
23  find, you might say, well, gosh, I can't determine which is
24  heavier, the aggravators or the mitigators.  I suggest to you
25  in that particular circumstance, the law would say, or
```

 1    require, that you vote for a life sentence.  You give the

 2    defendant the benefit of the doubt if you think the

 3    circumstances are of equal weight.

 4         I wrote down a couple of things that Mr. Gibbs said.  He

 5    said, and I expected this, I kind of -- I've heard in other

 6    cases.  The defendant is just plain mean.  Just plain mean.

 7    Well, if I could, I would take y'all out here and we'd go

 8    down to the hospital, find a local hospital, and go into a

 9    place where the babies are born and look in those cribs and

10    we'd try to figure out which ones are just plain mean.  And

11    then, we'd go over to a nursery school and we'd play with

12    some of those children and we'd try to figure out which one

13    of those kids are just plain mean.  Then we'd go to the

14    schools.  And, who is just plain mean?  Nobody is born just

15    plain mean.  People act and do things in certain ways and we

16    are all a product to some degree of our upbringing and

17    experiences that we have had, products of our environment.

18    Not 100 percent, but not 0 percent either.  Not 0 percent.

19    Nobody is just plain mean.  We are not saying that people

20    don't have free will.  Of course, people have free will.  But

21    we're talking about influences that act on people, on

22    children as they grow up and influences their behavior later

23    on.  That's what we are talking about.  All of us as human

24    beings have strengths and weaknesses of character some

25    greater, some less, and we've talked about that.  War time.

1    Things about people breaking.  But some people just don't

2    have as strong a character as others.  Anybody who has ever

3    agonized over a child, or brother, or sister going off the

4    track, going wrong, knows what I am talking about.

5        Oh, and, Mr. Gibbs says, well, you know, maybe Jason

6    did have a hard time early on, but it is okay because the

7    Colliers picked him up and dusted him off.  It was all right

8    from then on because they gave him this loving home for a

9    while and took care of him so it was all right after that.  I

10   say to you again, would any of us want any of our children to

11   experience one of the things that Jason experienced?  And, it

12   is because we know what the effects of that would be.  I am

13   repeating that.  I wanted to repeat it in this context.  It

14   is not okay.  They did what they could for him, but that

15   didn't fix him and make him shiny brand new.  He still has

16   got the brain damage.  Nobody can fix that entirely.  He

17   still has all of that.  I would suggest to you that we have

18   got this weekend, Father's Day that is coming up, Sunday, a

19   couple of days from now.  Jason didn't have a father, not one

20   that was around during his first 21 months.  Why do we

21   celebrate Father's Day, anyway?  Well, because fathers are

22   important.  Father's give guidance.  They help children.

23   They provide role modeling for children to model on and

24   develop.  Father's are tremendously important.  Jason did not

25   have one at a very early age.  For a while there he did.  He

1   came and he got a close relationship with Mr. Collier until

2   he was about eight years old at which time Mr. Collier killed

3   himself.  You've heard the testimony Jason was very affected

4   by that.  Took him a long time to get over it.  I'm not sure

5   he has yet.  But, that's another kind of trauma, an

6   abandonment, that Jason suffered at a very early age.

7       If we just take Jason and we look at him up until the

8   time he is eight years old and don't look at anything else,

9   we already know we have a scarred and damaged individual

10   right there.  Even if we never look at anything else that

11   happened in his life.

12       Just look at his life from start to finish.  I'm not

13   going to go through all those details.  That is what you have

14   taken oath to do, and as I said, in opening statement, not

15   one of God's children should have to go through any of things

16   that Jason went through in his early life.  We are making a

17   moral decisioin here about whether we kill somebody.  As I

18   told you in the first.  Is this Ted Bundy?  Ted Bundy who

19   stalked and raped and killed women in three or four different

20   states.  Is that who we are looking at?  Are we looking at

21   terrorist who sets off a bomb in front of federal building

22   with children in a nursery school right inside the window

23   consciously?  Somebody who did that.  Is that what with we

24   are looking at?  He got the death penalty.  Those people got

25   the death penalty.  Is that what we're looking at here?  Is

 1   this a sociopath or psychopath like we've Dr. Dixon talk

 2   about?   No.   There is no evidence of that here.   Charles

 3   Manson.   Is this Charles Manson?   No.   He didn't get the

 4   death penalty by the way.   He's still alive.   Is this

 5   somebody who has the smarts, the ability, the knowledge, you

 6   know, to carry on in life, or is this just really some poor

 7   person who never got dealt a full hand at birth and never had

 8   a real chance in life?   Jason Holloway didn't choose his life

 9   and that's something you can take into the consideration.

10        You know there's a -- there's a verse that we all know.

11   And we may have heard it in our early education or we may

12   have heard it in a number of places.   Some of us may have

13   heard in a song by a group called the Birds.   And, that verse

14   goes, "For everything there is a season and a time for every

15   purpose under heaven."   And, I suggest to you, Ladies and

16   Gentlemen, that this is a time to punish.   It is a time to

17   punish and punish severely, but it is not a time to kill.   It

18   is not a time to kill.   I ask that you send Jason Holloway to

19   the penitentiary and there to live out the remainder of his

20   life.   Let this rough journey that he has been on continue

21   there until his natural death. It is enough, Ladies and

22   Gentlemen.   It is enough.   Thank you.

23                    **REBUTTAL CLOSING BY STATE**

24        MR. LISENBY:   May it please the Court, Members of

25   the Jury.   Good morning.

1          THE JURY:  Good morning.

2          MR. LISENBY:  I know you've been sitting here a

3    long time and I will try not to talk for a long period of

4    time.  There are a lot of things Mr. Blanchard said that I

5    need to respond to.  There are a couple of things I agree

6    with him on.  Most of the things I disagree with him on.  I

7    do agree that this is deadly serious business.  Obviously,

8    you have sat through this trial and you know it is deadly

9    serious business.  Two people are dead.

10         Mr. Blanchard talked about some cases around this

11   circuit in which the death penalty had not been imposed.

12   But, there have been cases around this circuit in which the

13   death penalty has been imposed.  The case in Macon County in

14   which two men sitting in a car apparently drug dealers or at

15   the minimum drug users were shot to death by a man who is now

16   sitting on death row.  Mr. Gibbs and I prosecuted that case.

17   Mr. Clark prosecuted a case over in Dadeville where a man

18   killed his girlfriend.  He did it in the manner of he shot

19   her, left her on the side of the road, returned to check on

20   her to find out if, in fact, she were dead, found out she was

21   not dead, so he tried to smother her by putting a plastic bag

22   over her head.  When that didn't work, he set her on fire.

23   That man is sitting on death row.  Those are the kinds of

24   cases that the legislature talked about the death penalty

25   being appropriate.

1          Mr. Blanchard said they, and he pointed over to

2    Mr. Gibbs and I, they, the State, wants you to double count

3    the aggravating circumstances.  But the they, Members of the

4    Jury, that he is talking about are you the citizens that

5    elect representatives to vote the laws that reflect your

6    judgments and your values.  The they is not Kenny Gibbs and

7    Bill Lisenby, the they is you 12 people.  And, the law, as

8    the judge will give it to you, indicates that because of your

9    guilty verdicts in the first phase of this trial, there are

10   two aggravating circumstances proven to you beyond a

11   reasonable doubt, and you can use them, because the law has

12   you and your representatives indicate say they can be used.

13   And, it is common sense, Members of the Jury, because as

14   Mr. Blanchard said, aggravating circumstances do focus on the

15   crime.   That's what punishment is all about, to punish the

16   crime.

17         The aggravating circumstances should focus on the crime

18   and the additional aggravating circumstance in this case that

19   the State suggests has been proven beyond a reasonable doubt

20   is especially heinous, atrocious and cruel.

21         And, Mr. Blanchard said that those kinds of cases should

22   be -- should have some kind of pitiless action by the

23   defendant or something that was inhumane.  Does that not fit

24   into what happened here?  I mean, you heard the defendant

25   himself.  His testimony was to you, "I had a duty."  His

1   words.  "I had a duty to end her suffering."  That wasn't

2   what he did.  He simply caused more suffering.  Because, in

3   the course of what occurred, striking her with a ball bat --

4   you remember the next thing he said he did to her?  I went to

5   the bedroom and got a pillow and came back.  He knew she was

6   still alive at that point when he hit her with the ball bat.

7   So he got the pillow and he tried to smother her.  And I

8   think is statement says words to the effect of, "I could tell

9   that wasn't having any effect."  He knew the woman was still

10  alive.  And, then he took a knife and stabbed her repeatedly

11  in the stomach and neck.  Is that not pitiless?  Is that not

12  inhumane just as Mr. Blanchard said it should fit into?

13  Three aggravating circumstances in this case.

14      Mr. Blanchard talked about Susan Smith.  He said Susan

15  Smith the woman in South Carolina drown her little children

16  and did not get the death penalty.  But, you know, it is kind

17  of like having your cake and eating it too with his argument.

18  Because what he says that you should do in this case is also

19  to take into account the life of the defendant.  You don't

20  know what was taken into account by that jury in South

21  Carolina about the life of that defendant as to why they made

22  that decision.  That's why we have 12 people come in to

23  listen to these types of things.  They listened to the

24  evidence in that case.  All he talked about were the facts

25  and he says to you, you can't just listen to the facts of the

 1  crime.  But that's all he recited to you about Susan Smith.

 2  You don't know what other factors that jury took into

 3  consideration in making their determination.  But, you do

 4  know the other factors here.

 5      In his opening statement to this part of the case,

 6  Mr. Blanchard said he wanted to tell the story of a life to

 7  put it into context.  And, then during their part of the

 8  case, they presented what they submitted to you were

 9  mitigating circumstances.  One of the ones, you remember, was

10  a discussion with Dr. Dixon about an Antisocial Personality

11  Disorder.  Mr. Blanchard said, "Does he have that?"

12      He said, "Yes, he does."

13      Dr. Dixon said that Antisocial Personality Disorder is a

14  person who has a history of unlawful conduct.  A history of

15  unlawful conduct.  Dr. Dixon said when you push his buttons,

16  the defendant's buttons, he goes off.  That's obvious.  He

17  had behavioral problems during the time of his life as he was

18  growing up:  The peeping into the windows, the fights with

19  the foster children, the things of that nature.  A number of

20  fights over the years.  One led to stitches on an individual

21  one time.  One involved his own girlfriend.  You recall the

22  defendant testified he likes to protect women.  One of the

23  fights involved his own girlfriend.  A history of unlawful

24  conduct over his life.  The story of a life.

25      I believe it was Defense Exhibit number 17 -- you will

1  have those exhibits when you go back -- is a report that

2  neighborhood is scared of him.  The neighborhood is scared of

3  him.  Is that not the kind of person that the death penalty

4  should be aimed at?  A person who commits the kind of crimes

5  the legislature and you the citizens say you should have the

6  death penalty imposed, and the entire neighborhood he lived

7  in was scared of him.

8      Mr. Blanchard said that his good general behavior in

9  jail was a powerful mitigator.  That was the words he used.

10  That he can adapt to prison life.  Well, he adapted so well

11  during the course of this time in jail, he has had five

12  fights in which the person, the correction officer testified,

13  "We have given him the maximum punishment each time, which is

14  isolation."  That's how well he has adapted.  That's how good

15  his general behavior has been in the Chambers County Jail.

16  Is that not the kind of person the death penalty is aimed

17  for?

18      Mr. Blanchard said he is not a psychopath, he's not a

19  sociopath, he's not that kind of thing, that's what Dr. Dixon

20  said, and he wasn't.  Mr. Blanchard also made the comment, he

21  said that the capacity to appreciate the criminality of his

22  acts, this is a huge, tremendous mitigating circumstance.

23  But, he left out a part of the phase that the judge is going

24  to tell you about that mitigating circumstance.  The capacity

25  to appreciate the criminality of acts is substantially

 1  impaired.  What did Dr. Dixon say about that?  He said it was

 2  mild.  That was the word Dr. Dixon used, the defendant's own

 3  expert.  It was mild.  Not substantially impaired as the

 4  mitigating circumstances will be listed out to you by the

 5  judge.

 6      Mr. Blanchard talked about brain damage.  And, Mr. Gibbs

 7  pointed out to you that the only physical exam showed that

 8  there was no brain damage and the neurological exam that was

 9  in records that was presented to Dr. Dixon showed no brain

10  damage.  And, Dr. Dixon's response was, "Well, the other

11  things, the low IQ, that indicates to me that is probably

12  some form of brain damage that occurred."  There are other

13  ways of having low IQ.  The records actually indicated that

14  the social worker thought that the family was mentally slow.

15  That was the description that the social worker put in the

16  records.  Mentally slow.

17      Because Jason Holloway was born to parents that were

18  mentally slow, does that rise to the level of a mitigator in

19  this case?  We can't determine who our parents are.  We don't

20  know who that is going to be.  We all have the parents that

21  we have and that's all we can do with it.  But brain damage

22  didn't come into that, Members of the Jury, I submit to you.

23  Maybe his parents were slow.  Maybe he's a little slow.  He

24  had good grades, bad grades, all the way through school.

25  They went back and forth.

1       Mr. Blanchard showed the bad grades.  Mr. Gibbs showed

2  the good grades.  And those grades were in as Dr. Dixon said

3  regular classes and learning disability classes.  They were

4  in both.  As a matter of fact, the one record that was shown

5  by Mr. Blanchard in which Dr. Dixon said, these were all

6  learning disability classes, didn't say it anywhere on that

7  record that that is what they were.  But, the ones involving

8  Rosco Holloway showed clearly that they were learning

9  disability classes.  Good grades.  Bad grades.  You got the

10 opportunity to hear him speak, to watch him read the

11 statement.  Remember Mr. Keith showed him the statement, he

12 said, "Let me refresh your memory with this," and he actually

13 read out some of the statement to you.  Those are the things

14 that you can look at in making your determination.

15      Mr. Blanchard said that you can take into account his

16 difficult family history.  Okay.  Up until 21 months he was

17 in, maybe, an environment that the rest of us wouldn't want

18 to be in.  But, again, I want my cake and I want to eat it

19 too.  Because at 21 months he went to a home in which he

20 later says, Mr. Blanchard later says, that clearly his

21 biological and foster family love him.  And, that should be a

22 mitigating circumstance.  So, he wants to have it both ways

23 again.  Because in that home, he clearly had someone he loved

24 and trusted and that loved and trusted him.  Marie Collier,

25 Jack Collier.  He has had that since the time that he was 21

1   months old all the way up until the time of his arrest in

2   this case.

3        Going back to this difficult family history, does that

4   really come into play in regard to what he did in this

5   particular case?

6        Mr. Collier and Ms. Collier when they testified said

7   they did not know of any real problems that Jason had other

8   than the two instances involving the peeping in the window of

9   the neighbor and cutting the screen of the neighbor.  They

10  didn't even know about the reports and records, apparently,

11  about striking other foster children and things of that

12  nature.  But, it wasn't a difficult family upbringing at that

13  point.  At that point he was getting everything he needed.

14  Dr. Dixon said loving, nurturing environment can help

15  overcome those kinds of deficits that Jason Holloway has.  So

16  you can't have it both ways as Mr. Blanchard would argue to

17  you.

18       The fact, excuse me, one of the things, obviously, that

19  came up during the course of the proceedings when I asked

20  Ms. Collier about this certificate or license to preach the

21  gospel.  On his redirect of Ms. Collier, Mr. Blanchard said,

22  "Do you know who this came from?"

23       "Yes."  Came from a preacher near Standing Rock.

24       "Did that preacher kind of take Jason under his

25  wing and help him?"

1    She said, "Yes."

2    So, he had all those benefits that, in fact, the Defense

3  is now arguing that he didn't.  You can't have your cake and

4  eat it too.  Just what Mr. Blanchard wants you to believe in

5  this case.

6    Mr. Blanchard says because the defendant was

7  remorseful, you can take that into account as a mitigating

8  circumstance.  But, how remorseful was this defendant?  I

9  mean, we have talked about what happened to Angela after he

10 left the trailer the first time and he came back.  But, he

11 was calm enough to go home and watch TV for several hours.

12 But even more than that, even more than that, Members of the

13 Jury, what did Terri say?  "When I got off the bus, I saw

14 Jason peeping around the corner of the house when we got off

15 the bus."

16    And I asked Mr. Holloway while he was testifying, I

17 said, "You knew when you left that trailer and didn't call

18 anybody, make any contact, you knew that the two daughters

19 were going to be coming home to find their mother and

20 stepfather, didn't you?"

21    And he said, "Yes, I did."  That is how remorseful he

22 was on the day of this event.  He was so remorseful he knew

23 an 11 year old and 13 year old would be the people to walk

24 into the trailer and see that scene that you have only seen

25 in photographs that they will have to keep in their minds for

1   the rest of their lives.  That's how remorseful Jason

2   Holloway was in regard to his actions involving Rodney and

3   Angela.

4       Mr. Blanchard said I want you to go back and return a

5   verdict so that the defendant will spend the rest of his life

6   in prison.  Life in prison without parole, because that means

7   he won't have the opportunity to see movies, go out and walk

8   on the street without chains, have someone behind him, not be

9   able to see his love ones on a daily basis.  Well, folks,

10  these people sitting over here on this side of the courtroom

11  are never going to see Rodney or Angela ever again.  That is

12  not going to happen.

13      What is the appropriate punishment for the crime and for

14  this life that you have heard about leading up to this crime?

15  Mr. Blanchard said this is stark moral choice.  Those are the

16  words he used.  Stark moral choice.  In that, if there is no

17  necessity to kill, then you don't have to kill.  There's no

18  necessity to kill in this case two people in their own home

19  and the citizens of Chambers County have the right to defend

20  themselves, too, from people like Jason Holloway.  They have

21  the right to make sure that this kind of person here and now

22  for his crime, for what he did, for what he acted, to make

23  sure that he gets punished and to make sure that other people

24  know that if you do this kind of crime, if you go into

25  people's houses and you kill them, we are not going to stand

1   for it here.  We are not going to stand for it in Chambers

2   County, because we don't want that kind of thing to happen in

3   our environment.

4       And, I asked you when we were in those panels, I started

5   off my whole questioning to you, I said, look, I am not

6   asking you to tell me what you would do in this case, because

7   you don't know any facts.  You have not heard any testimony.

8   You have not heard the law.  So, I am not asking you to tell

9   me what you would do.  I just want to know what you could do.

10  I am asking each of you now to do what you know is right and

11  what you know needs to be done with regard to the proper

12  punishment for Jason Holloway.  And, as Mr. Gibbs said, I ask

13  that you use your courage, your ability, the skills that you

14  have as 12 individual people coming in knowing what's

15  happened in this case and use the courage to give the

16  appropriate penalty to Jason Holloway, and that members of

17  the jury is to vote for the death penalty.  Thank you.

18                          **JURY CHARGE**

19          THE COURT:  Ladies and Gentlemen, the purpose of

20  this hearing is for to you recommend whether the defendant

21  should be put to death or should be sentenced to life without

22  parole.

23      Life without parole means that the defendant would

24  remain in the penitentiary for the remainder of his natural

25  life.

1       Following your earlier verdict, only these two

2    sentencing options exist.

3       You may consider all of the evidence you have heard,

4    both in the guilt phase and in the sentencing phase as

5    bearing on the issues of this hearing.  You may also consider

6    all of the evidence about the defendant and the kind of

7    person he is.  All of this is relevant to the question of

8    what the sentence should be in this case.

9       As to the issues of aggravation and mitigation, in order

10   to make your decision concerning this matter, you will

11   consider evidence of both aggravating and mitigating

12   circumstances.

13      Aggravating circumstances are matters reflecting

14   unfavorably on the defendant and possibly indicating that he

15   should be put to death.

16      Mitigating circumstances reflect favorably on the

17   defendant and indicate that he should not be put to death.

18      The law describes or defines certain circumstances as

19   aggravating or mitigating.  With regard to aggravating

20   circumstances, the Code of Alabama sets out eight aggravating

21   circumstances.  Only those eight can be considered.  You may

22   not generate any other circumstances which you believe to be

23   aggravating.  The State cannot prove or argue to you other

24   circumstances as aggravating.

25      Naturally, some of these aggravating circumstances

1   relate to totally different types of cases and are totally

2   irrelevant to the facts of these cases.  In this case the

3   State is submitting three statutory aggravating circumstances

4   which are being submitted to you for consideration.

5       One, the capital offense in this case was committed

6   while the defendant was engaged in the commission of a

7   burglary in the first degree.

8       Two, the capital offense committed involved the murder

9   of two or more persons pursuant to one scheme or course of

10  conduct.

11      Three, the capital offense was especially heinous,

12  atrocious or cruel as compared to other capital offenses.

13      The term heinous means extremely wicked or shockingly

14  evil.

15      The term atrocious means outrageously wicked and

16  violent.

17      The term cruel means designed to inflict a high

18  degree of pain with utter indifference to or even enjoyment

19  of the suffering of others.

20      What is intended to be included in this aggravating

21  circumstance is only those cases where the actual commission

22  of the capital offense is accompanied by such additional

23  facts as to set the crime apart from the norm of capital

24  offenses.  For a capital offense to be especially heinous,

25  atrocious or cruel, it must be a consciousless or pitiless

1   crime, which is unnecessarily torturous to the victim.

2       All capital offenses are heinous, atrocious and

3   cruel to some extent, but not all capital offenses are

4   especially heinous, atrocious or cruel compared to other

5   capital offenses.  You should not find or consider this

6   aggravating circumstance unless you find that this particular

7   capital offense involved a consciousless or pitiless crime,

8   which was necessarily torturous to the victim.

9       In my earlier charge during the guilt phase, I discussed

10  the meaning of reasonable doubt, and that phrase has the same

11  meaning in this hearing.

12      The State has the burden of proving beyond a reasonable

13  doubt the existence of any aggravating circumstance.

14  However, any aggravating circumstance which the verdict

15  convicting the defendant establishes was proven beyond a

16  reasonable doubt at trial shall be considered proven beyond a

17  reasonable doubt for the purpose of this sentencing hearing.

18      Mitigation.  The defendant is allowed to offer

19  mitigating circumstances as reasons why he should not be put

20  to death.  The law defines certain circumstances that it

21  holds to be mitigating circumstances.  Mitigating

22  circumstances include, but are not limited to the following:

23  The capital offense was committed while the defendant was

24  under -- excuse me.  The capital offense was committed while

25  the defendant was under the influence of extreme mental or

1    emotional disturbance.  The victim was a participant in the

2    defendant's conduct or consented to it.  The defendant acted

3    under extreme duress or under the substantial domination of

4    another person.  The capacity of the defendant to appreciate

5    the criminality of his conduct or to conform his conduct  to

6    the requirements of law was substantially impaired.

7        A person's capacity to appreciate  the criminality of

8    his conduct or to conform his conduct to the requirements of

9    the law is not the same as his ability to know right from

10   wrong generally, or to know what he is doing at a given time,

11   or to know what he is doing is wrong.  A person may, indeed,

12   know that doing the act that constitutes a capital offense is

13   wrong and still not appreciate its wrongfulness because he

14   does not fully comprehend, or is not the fully sensible to

15   what he is doing, or how wrong it is.  Further, for this

16   mitigating circumstance to exist, the defendant's capacity to

17   appreciate does not have to have been totally obliterated.

18   It is enough that it was substantially lessened or

19   substantially diminished.  Finally this mitigating

20   circumstance would exist even if the defendant did appreciate

21   the criminality of his conduct if his capacity to conform to

22   the law was substantially impaired since a person may

23   appreciate that his actions are wrong and still lack the

24   capacity to refrain from doing them.

25        Unlike aggravating circumstances where you are limited

1   to those listed in the law or the statute, you may consider

2   any circumstance which you would reasonable believe to

3   reflect favorably on the defendant as a reason why the

4   defendant should not be put to death.

5       The defendant has the burden of interjecting the issue

6   if the facts existence of a mitigating circumstance is in

7   question.  This merely means that the defendant must show at

8   least the possibility that the mitigating circumstance exists

9   then the burden of proof is on the State to disapprove the

10  existence of the mitigating circumstance by a preponderance

11  of the evidence.  This means, that unless the State shows

12  that more likely than not the mitigating circumstance does

13  not exist, you should consider the mitigating circumstance as

14  established.  You will note that this burden differs from the

15  usual requirement that the State must prove its point beyond

16  a reasonable doubt.

17      In order to consider an aggravating circumstance, it is

18  necessary that the jury unanimously agree upon its existence.

19  All 12 jurors must be convinced beyond a reasonable doubt and

20  to a moral certainty that an aggravating circumstance exists

21  in order for any of you to consider that aggravating

22  circumstance in determining what the sentence should be.

23  However, it is not necessary for there to be unanimous

24  agreement on the existence of a mitigating circumstance

25  before you can consider it in setting punishment.

1    If you, as an individual juror, find under the law, as I

2    have given it to you, that a mitigating circumstance exists

3    then you can individually consider it and weigh it against

4    any aggravating circumstances regardless of whether any other

5    jurors agree with you about the existence of that mitigating

6    circumstance.

7    There must be unanimous agreement on the existence of

8    a particular aggravating circumstance before it can be

9    considered by any juror.  There need not be unanimous

10   agreement on the existence of any particular mitigating

11   circumstance before it can be considered.

12   It is your duty and task to weigh the relative merits of

13   the aggravating and mitigating circumstances in reaching your

14   verdict.  The process of weighing the aggravating and

15   mitigating circumstances to determine the sentence is not a

16   mere tallying of aggravating and mitigating circumstances for

17   the purpose of numerical comparison.  Instead, it is a

18   process by which circumstances relevant to the sentence are

19   marshalled and considered in an organized fashion for the

20   purpose of determining whether the proper sentence in view of

21   all of the relevant circumstances in this individual case is

22   life imprisonment without parole or death.

23   In your deliberations you may presume that if Jason

24   Holloway is sentenced to life imprisonment without benefit of

25   parole that he will spend the remainder of his natural life

1    in prison.  This is, in deed, a true statement.  For in

2    Alabama a sentence of life without parole means exactly that.

3         You must assume that if you sentence the defendant to

4    death, that he will be executed by means of lethal injection,

5    which is Alabama's method of imposing the death sentence.

6         Both the prosecution and Jason Holloway are entitled

7    to the individual opinions of each juror.  Each of you must

8    consider the evidence for the purpose of reaching a verdict

9    if you can do so.  Each of you must decide the punishment for

10   yourself, but you should do so only after discussing the

11   evidence and the instructions with other jurors.  Do not

12   decide any question in a particular way simply because the

13   majority of jurors, or any of them, favor such a decision.

14        In determining the punishment to set for Jason Holloway

15   you are limited to considering only the aggravating

16   circumstance that are described to you by the Court and which

17   the prosecution have proved beyond a reasonable doubt.  You

18   may not consider any other circumstance as aggravating other

19   than the specific aggravating circumstances given to you by

20   the Court.

21        Aggravating circumstances which are specifically

22   limited by law to those charged to you by the Court if proven

23   beyond a reasonable doubt are factors put forth to show that

24   death by lethal injection may be considered as one of the

25   sentencing alternatives.

1       If you find an aggravating circumstance is proved beyond

2   a reasonable doubt that does not automatically -- that does

3   not automatically or necessarily mean that you should

4   sentence Jason Holloway to death by lethal injection.

5   Instead, such a finding only means that you must consider

6   other factors, more specifically mitigating circumstances

7   before deciding whether a sentence of life imprisonment

8   without possibility of parole or death by lethal injection is

9   appropriate.

10      A mitigating circumstance is anything about the

11  defendant or the crime itself which in fairness should be

12  taken into account in deciding the appropriate punishment for

13  this defendant.  Even where there is no excuse or

14  justification for the crime, our law requires consideration

15  of more than just the basic facts of the crime.  Therefore, a

16  mitigating circumstance may stem from any one of diverse

17  facilities of human kind.  Mitigating facts are any facts

18  relating to the defendant's character, education,

19  environment, mentality, life and background, or any aspect of

20  the crime itself which may be considered extenuating or

21  reducing the defendant's moral cupability or making him less

22  deserving of the extreme punishment of death by lethal

23  injection.  You may consider as mitigating circumstance any

24  circumstance which tends to justify the penalty of life

25  imprisonment without the possibility of parole.  You may

1    consider all evidence in mitigation.  Mitigation may be

2    established by any evidence introduced by either party, the

3    defendant's lawyer, or the prosecution, at either the guilt

4    or innocence phase of the trial, or at the sentencing phase

5    of the trial or both.

6        The weight you give a particular mitigating circumstance

7    is a matter for your moral and factual judgment.

8        Mitigating factors are circumstances that do not

9    constitute a defense, legal excuse, or justification for the

10    crime, but which decreases its enormity.

11        A mitigating factor is one that can be considered as

12    extenuating or reducing the degree of moral cupability of the

13    defendant, and tends to support the imposition of a life

14    imprisonment without parole sentence.

15        I will state for you some of the circumstances of this

16    case which may, or which the law recognizes, as mitigating

17    factors.  You may consider all of the factors I state to you

18    as mitigating factors.  The weight that you give to a

19    particular mitigating circumstance is a matter for your moral

20    and factual judgment.  However, you may not refuse to

21    consider any evidence of mitigation; and, therefore, give it

22    no weight.  In other words, if I instruct you that situation

23    X is a mitigating circumstance for you to consider, the

24    weight you give to it is for your moral and factual judgment,

25    but you may not simply refuse to consider X as a mitigating

1    circumstances.

2        Mitigating circumstances differ from aggravating

3    circumstances in one respect.  Because you are not required

4    to be convinced beyond a reasonable doubt of a mitigating

5    circumstance before you may take that circumstance into

6    account as you deliberate the penalty phase of this trial.

7    You may consider a mitigating circumstance if you believe

8    that there is any evidence to support it.

9        You may consider as a mitigating circumstance any

10   evidence that Jason Holloway possessed an Antisocial

11   Personality Disorder.

12       You may consider as a mitigating circumstance as any

13   evidence of Jason Holloway's difficult family history.

14       You may consider as a mitigating circumstance any

15   evidence of Jason Holloway's emotional disturbance.

16       You may consider as a mitigating circumstance that Jason

17   Holloway's capacity to appreciate the criminality of his acts

18   is substantially impaired.

19       You may consider as a mitigating circumstance that

20   Jason Holloway suffered the effects of Fetal Alcohol Syndrome

21   or the effects of alcohol consumed by his alcoholic mother

22   while he was still in her womb.

23       You may consider as a mitigating circumstance that

24   Jason Holloway experienced physical and mental impact of

25   severe poverty and deprivation during the early part of his

*** Frances L. Roark ***

1   life.

2       You may consider an emotional disturbance as a

3   mitigating factor even though it was not the cause of the

4   crime at issue.

5       You may consider as a mitigating factor any evidence

6   that Jason Holloway suffered from any learning disability.

7       You may consider as a mitigating factor any evidence

8   that Jason Holloway at an early age exhibited signs of mental

9   or emotional disturbance.

10       You may consider as a mitigating factor evidence that

11   the psychology disorders from which Jason Holloway may suffer

12   are not only treatable but better treatable in the structured

13   environment of a prison setting.

14       You may consider the fact that Jason Holloway is loved

15   by his family as a mitigating circumstance.

16       You may consider the fact that Jason Holloway loves his

17   family members as a mitigating circumstance.

18       If you find that Jason Holloway is remorseful for his

19   crime, you may consider that as a mitigating circumstance.

20       If you believe that during Jason Holloway's

21   incarceration in Chambers County Jail that the defendant

22   engaged in good general behavior as a prisoner, you may

23   consider this as a mitigating circumstance.

24       It is the intent of the laws of Alabama that a death

25   penalty sentencing scheme provide a meaningful basis for

 1   distinguishing the few cases in which the death penalty is

 2   imposed from the cases in which it is not.  You must decide

 3   if this particular case is one of those few cases

 4   distinguishable from the many in which the death sentence is

 5   appropriate.

 6        Your exercise of sentencing discretion may be influenced

 7   by a sympathetic response to mitigating evidence.  You may

 8   consider mitigating evidence relating or related to Jason

 9   Holloway's character and background, whether or not related

10   to the offense for which he is on trial, precisely because

11   that evidence may arouse sympathy or compassion for the

12   defendant.

13        Any aspect of the offense or Jason Holloway's character

14   or background that you consider mitigating can be the basis

15   for rejecting the death penalty, even though it does not

16   lessen the legal cupability for the present offense.

17        In order to find the existence of a mitigating fact or

18   circumstance it does not have to be proven beyond a

19   reasonable doubt.  You must find the existence of a

20   mitigating fact or circumstance if there is any evidence to

21   support it.

22        Any juror who believes from the evidence that no

23   aggravating circumstance has been proven beyond a reasonable

24   doubt, must vote for the sentence of life without parole.

25        Any juror who believes from the evidence that the

1    mitigating circumstances offered by the defense and not

2    disproven by the State outweigh the aggravating circumstances

3    proved beyond a reasonable doubt by the State, must vote for

4    a sentence of life without parole.

5        In determining whether you believe the aggravating

6    circumstance of heinous, atrocious and cruel has been proven,

7    you must not consider anything that may have occurred after

8    the death of Rodney and Angela Brown.

9        It is your duty and task to weigh the relevant merits

10   of aggravating and the mitigating circumstances in reaching

11   your verdict.  The process of weighing the aggravating and

12   mitigating circumstances to determine the sentence is not a

13   mere tallying of aggravating and mitigating circumstances for

14   the purpose of numerical comparison.  Instead it is a process

15   by which circumstances relevant to the sentence are

16   marshalled and considered in an organized fashion for the

17   purpose of determining whether the proper sentence in view of

18   all relevant circumstances in an individual case is life

19   imprisonment or death.

20       The verdict.  After your deliberation, you are to return

21   an advisory verdict as follows.  If you determine that no

22   aggravating circumstance exists, you shall return an advisory

23   verdict recommending that the penalty be life imprisonment

24   without parole.  If you determine that one or more

25   aggravating circumstances exists, but do not outweigh the

1   mitigating circumstances, you shall return an advisory

2   verdict recommending that the penalty be life imprisonment

3   without parole.  If you determine that one or more

4   aggravating circumstances exist, which outweigh the

5   mitigating circumstances, you shall return an advisory

6   verdict recommending that the penalty be death.

7        Your decision to return an advisory verdict

8   recommending a sentence of life imprisonment without parole

9   must be based on a majority of the vote of the jurors.  That

10  is seven.  A decision to recommend a sentence of death must

11  be based on verdict of at least 10 jurors.  The verdict of

12  the jury must be specified on the verdict form.

13       Appropriate forms have been prepared for your use.

14       Do not let's personal opinion outweigh the law.  Weigh

15  the aggravating and mitigating circumstances carefully and

16  dispassionately.  Do not be swayed by anger, sympathy,

17  prejudice, or any type of passion, or emotion.  The weighing

18  and comparing of the aggravating and mitigating circumstances

19  requires the exercise of sound judgment on your part.  It is

20  not a matter of unbridled discretion.  A human life is in

21  issue.  It is a matter of calm reflection, not for indulgence

22  of emotion.  You are to weigh the aggravating and mitigating

23  circumstances and honestly and rationally evaluate the two

24  options before you in light of those circumstances.  You are

25  to use common sense in the evaluation.  Your verdict, as

```
 1    always, is based on the evidence.
 2        Ladies and Gentlemen, if you will, look at the top of
 3    the verdict form, which is on the projector and I will read
 4    along with you.
 5        At least 10 votes are required for the recommendation of
 6    the death sentence.  A majority is required for
 7    recommendation of life imprisonment without parole.  Your
 8    foreperson must sign the appropriate verdict form.
 9        The verdict form must indicate your vote, not who voted
10    which way.  All right.  It has just got to be a number of who
11    votes in favor of a particular verdict.  If I poll you as a
12    jury after your verdict, I will not ask you who voted which
13    way.  I will only ask you if this is your verdict.
14        So, from the top, if from the evidence and the law that
15    applies you find that the proper sentence in consideration of
16    all that I have charged you and the evidence that has been
17    presented, you find that the death penalty is appropriate,
18    your top verdict form would read as follows:  We, the jury,
19    recommend that the defendant, Jason Holloway, be punished by
20    death.  The vote is as follows.  You would need to enter the
21    number of those voting in favor of death and those voting in
22    favor of life without parole.  Your foreperson would have to
23    sign that verdict form.
24        If on the other hand, after consideration of all
25    evidence and the law as I have charged you, you find that
```

1   appropriate punishment is life imprisonment without parole,
2   then the verdict form would be the next form, which reads as
3   follows: We, the jury, recommend that the defendant, Jason
4   Holloway, be punished by life in prison without parole.  The
5   votes is as follows.  You will need to put the number voting
6   for death, he number for life without parole.  Your
7   foreperson would have to sign the next verdict or that
8   verdict line. Only one of these two verdict forms can be
9   signed.  At the very bottom is a place for your foreperson to
10  print his or her name.

11      After you have reached your verdict fold this form in
12  half, knock on the door, Mr. Story will bring the form to me
13  and I will bring your back in court and announce your verdict
14  in open court.

15      Counsel.

16  (WHEREUPON, A SIDE BAR COMMENCES.)

17          MR. BLANCHARD:  All right.  I object on the basis
18  of the bench conference we had earlier today about the
19  instructions saying aggravating circumstances proven at
20  trial, guilt phase, are proven for purposes of the penalty
21  phase.  Same rationale, same grounds for that one.

22      Let's see, there was -- when you read the pattern
23  instruction, Judge, there were something in there in your
24  definition of mitigating evidence, which said that mitigating
25  circumstances are those that reflect favorably upon the

1    defendant.  I don't think that's necessarily true.  A

2    mitigating circumstance does not have to reflect favorably.

3    In other words, it does not have to be positive evidence.

4    Obviously, for instance the circumstance of Antisocial

5    Personality Disorder may not reflect -- sound like a good or

6    positive thing, but, yet, it is a mitigating factor.  I am

7    afraid that makes it sound like the only kind of mitigating

8    evidence can be evidence of good character or something of

9    that nature.  So, I would object to that portion of the

10   charge upon the Eighth and Fourteenth Amendments,

11   particularly heightened reliability in the sentencing

12   process, and all the other points and authorities mentioned

13   in our earlier memorandum.

14           MR. LISENBY:  I don't remember that particular word

15   being used, but if it was, I think, the entire charge and

16   context will completely clear that up, including the

17   defendant's requested charges that were given.

18           THE COURT:  Anything else?

19           MR. BLANCHARD:  Yes, sir.  There were several

20   references made to advisory or recommended verdict in this

21   last phase in the instructions and in talking about the jury

22   verdict forms.  I object to that on the basis of *Ring versus*

23   *Arizona* and *Caldwell versus Mississippi* impermissibly

24   diminishing the juror's sense of responsibility for the

25   verdict.

1      Judge, something occurred during Mr. Lisenby's argument

2   that I thought about a little later on.  He said, if I

3   recall, that Dr. Dixon testified that Jason's ability to

4   appreciate the criminality of his action was not

5   substantially diminished but was mild.  I recall, my

6   recollection is different.  I recall that during my direct he

7   did say, he answered, yes, that it was.  But, what I am going

8   to say is this, I would ask the Court to give an instruction

9   to the effect that what the lawyer say in this phase is not

10  evidence either and that their recollection will govern if

11  there is a difference between what the lawyers told them the

12  evidence was and what the evidence was.

13          MR. LISENBY:  I will just response to that quickly.

14  Your question to Dr. Dixon did use the phrase substantially

15  in it.  His response, however, was simply it is impaired and

16  in cross-examination Mr. Gibbs asked that question, and

17  Dr. Dixon did use the word mild.

18          MR. BLANCHARD:  Well, I don't know that there is a

19  real difference between mild and substantial, anyway.

20  Somthing can be mild but still be substantial.

21      But, let me go through my requested charges that weren't

22  given quickly and see if there is anything I need to except

23  to.

24          MR. LISENBY:  Judge, do you need to tell them to

25  use the same foreman?  I noticed that you used the words his

```
 1   or her name.

 2             THE COURT:  Yes, I think I need to say something

 3   about that.

 4             MR. LISENBY:   It doesn't matter to me.

 5             MR. KEITH:  They can use the same one.  I don't

 6   think that they have to.

 7             MR. BLANCHARD:  Number 24 of the requested charges,

 8   the fact that Jason Holloway would never be released from

 9   prison is a factor mitigating in favor of the sentence of

10   life without parole.  That was refused.  I will object to

11   that saying it is a mitigating factor and all those points

12   and authorities we cited.

13             THE COURT:  Okay.

14             MR. BLANCHARD:  Let's see, all right, number 29.

15   The lingering doubt charge.  You didn't give the lingering

16   doubt charge.  I would object to that on the basis of the

17   authorities cited in the requested charges and all of the

18   constitutional authority cited in the points of memorandum of

19   points and authority.

20             Number 34.  I am not going to read it.  You can see what

21   it is there.  That one was refused.  I object to the refusal.

22   I believe it is a correct statement of the law and object to

23   your refusal to give it based on the points and authorities

24   cited earlier, and the case cited in the requested charges.

25             Number 36.  This is the mercy instruction.  I object to
```

1    the refusal to give number 36 on the basis of the authorities

2    contained in the request to charge, and also the other

3    authorities cited in the memorandum of points and authorities

4    we have been referencing all along.

5        Refusal to give number 38.  That is a similar

6    instruction regarding consideration of sympathy, pity, or

7    compassion or mercy which is raised by the evidence.  I

8    object to the refusal to give that one also on the same

9    grounds as the last one, plus the authorities cited in the

10   requested charge.

11       Number 40.  Similar.  Same objection.  Refused to charge

12   on that one.  There are two number 40s.  Remember there is a

13   40 and 40A both were refused, and I object to both on the

14   basis of the authorities cited in the request and also all

15   the other points and authorities.

16       Number 41 was refused.  Same objection.  The authorities

17   cited plus the other authorities.

18       I think that covers it.  That's all.

19           THE COURT:  I am going to simply give the

20   definition of aggravating and mitigating and the instruction

21   on what the attorneys say is not evidence.  Then I am going

22   to send them back.

23   (WHEREUPON, THE SIDE BAR CONCLUDES.)

24           THE COURT:  Ladies and Gentlemen, during the phase

25   of the trial we have just completed, I want you to understand

1    that the same instruction that I gave you earlier in the

2    guilt or innocence phase concerning statements of the counsel

3    applies here.  What the attorneys say, and what they have

4    said to you, both for State and Defense, is not evidence.

5    You may consider their arguments.  You may listen to their

6    arguments.  But you must understand that what they say is not

7    evidence.  You are the ones that heard the testimony and the

8    evidence in this phase of the trial, just as you did the

9    first.  You are the ones to determine what the evidence has

10   shown.

11       One last thing, and on matter of aggravating versus

12   mitigating circumstances.  An aggravating circumstance is a

13   circumstance specified by the law which indicates or tends to

14   indicate that the defendant should be sentenced to death.  A

15   mitigating circumstance is any circumstance that indicates or

16   tends to indicate that the defendant should be sentenced to

17   life imprisonment without parole instead of death.

18       What says State?

19           MR. LISENBY:  State is satisfied, Your Honor.

20           THE COURT:  Defense?

21           MR. BLANCHARD:  Satisfied with the reservations.

22           THE COURT:  Mr. Story, if you would, allow the jury

23   to retire.  You have previously elected a foreperson, so you

24   won't have to do that.  You may retire, deliberate your

25   verdict, execute the appropriate form, keep in mind that your

1    numerical vote must be recorded on whatever verdict you

2    return.  Let Mr. Story know, I will bring you back into the

3    courtroom and announce your verdict.  If there are any items

4    of evidence that are to go back with the jury, they will need

5    to take it now, and you may retire and deliberate.

6    (WHEREUPON, THE JURY RETIRED AT 11:46 A.M. TO DELIBERATE AND

7    REACH A VERDICT.)

8              MR. LISENBY:  I want to put something on the record

9    real quick.  In response to Mr. Blanchard's objection about

10   the statement of advisory verdict.  I want to make a note for

11   the record that during Mr. Blanchard's closing argument, he

12   actually used the word recommendation to the jury which the

13   State, Mr. Gibbs and I, have never used.  We used the word

14   verdict or vote.  And, I believe that whatever it was you

15   were reading from was the pattern jury charge.

16             THE COURT:  It was.  And, I mean, I understand

17   Ring, but I know that in Alabama right now it is advisory.

18             MR. LISENBY:  Thank you.

19   (WHEREUPON, THERE WAS A RECESS.)

20   (WHEREUPON, AT 12:46 P.M. THE JURY ANNOUNCED THEY HAD REACHED

21   A VERDICT.)

22                           **VERDICT**

23             THE COURT:  Bring them in.

24   (JURY PRESENT).

25             THE COURT:  Ladies and Gentlemen, have you reached

1    a verdict?

2           MR. BENSON:  Yes, we have.

3           THE COURT:  And, is this your verdict?  We, the

4    jury, recommend that the defendant, Jason Holloway, be

5    punished by imprisonment for life without parole.  The vote

6    four death, eight life without.  Is this your verdict?

7           MR. BENSON:  Yes.

8           THE COURT:  Is there a request by State or Defense

9    as to polling of the jury?

10          MR. BLANCHARD:  No, Your Honor.

11          MR. LISENBY:  No, sir.

12          THE COURT:  Ladies and Gentlemen, with that this

13   concludes your term of court and your service on this trial.

14       I want to sincerely, on behalf of all the judges of the

15   Fifth Circuit, thank you for your diligence, for your

16   service.  I know this has been a long hard two weeks on you.

17   You have fulfilled a very basic and important civic duty.

18       Mr. Story will meet you back in the jury room.  After

19   that time you are discharged.  And, again, thank you.

20       We are in recess.

21   (WHEREUPON, THE JURY WAS DISCHARGED FROM SERVICE.).

22          THE COURT:  All right, Mr. Blanchard and Mr. Keith.

23   I take it there will be a request for presentence report?

24          MR. BLANCHARD:  Correct.  Yes, sir.

25          THE COURT:  Presentence report will be hereby

1    ordered.  Formal sentencing will be set for July 23rd.  July

2    23rd will be the formal sentencing date.  Are there any other

3    matters we need to put on the record?

4            MR. LISENBY:  Is that different than the sentencing

5    date in the other cases?

6            THE COURT:  Yes.  This will be the only one set for

7    that day.  July 23, 9 a.m.  Anything else on the record at

8    this time?

9        With that we are in recess and court is adjourned.

10   (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

11                              * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   IN THE CIRCUIT COURT
            FIFTH JUDICIAL CIRCUIT OF ALABAMA
 2                     CHAMBERS COUNTY

 3   STATE OF ALABAMA,           *
                                 *      CRIMINAL NO.
 4   versus                      *      CC-2000-0000166
                                 *      LaFayette, Alabama
 5                               *      23 July, 2003
     JASON HOLLOWAY,             *
 6        Defendant.             *      CRIMINAL APPEALS NO.
                                 *      CR-02-2115
 7   * * * * * * * * * * * * * * * * * * * * * * * * * * *

 8              TRANSCRIPT OF SENTENCING BEFORE

 9            THE HONORABLE RAY D. MARTIN,

10                     CIRCUIT JUDGE

11   A P P E A R A N C E S
     FOR THE STATE OF ALABAMA:   REA S. CLARK, DISTRICT ATTORNEY
12                               FIFTH JUDICIAL CIRCUIT
                                 CHAMBERS COUNTY COURTHOUSE
13                               COUNTY OFFICE BUILDING
                                 LAFAYETTE, ALABAMA 36862
14
                                 BY: REA S. CLARK, DA
15                                   BILL LISENBY, CHIEF ADA
                                     KENNETH GIBBS, ADA
16

17   FOR THE DEFENDANT:          BLANCHARD & ASSOCIATES, LLC
                                 ATTORNEYS AT LAW
18                               505 SOUTH PERRY STREET
                                 MONTGOMERY, AL 36104
19
                                 BY: WILLIAM R. BLANCHARD, ESQUIRE
20                                        and
                                 KEITH & HAMM, PC
21                               ATTORNEYS AT LAW
                                 235 SOUTH McDONOUGH STREET
22                               MONTGOMERY, AL 36104

23                               BY: RICHARD K. KEITH, ESQUIRE

24
                                 FRANCES L. ROARK, CSR
25                               OFFICIAL COURT REPORTER
                                 Fr3L126
```

1   PROCEEDINGS: In Open Court.

2                    **SENTENCING**

3        THE COURT: State ready?

4        MR. LISENBY:  Yes, sir.

5        THE COURT:  Defense?

6        MR. BLANCHARD:  Well, we don't have our client in

7   yet.

8        THE COURT:  Okay.  Counsel approach.

9   (WHEREUPON, A SIDE BAR COMMENCES.)

10        THE COURT:  we are on the record in the State of

11   Alabama versus Jason Holloway, Circuit Court Chambers County,

12   Alabama, CC-00-166.  The State is present, the defendant is

13   present, counsel for the defendant are also present.

14      Ladies and Gentlemen, we will begin the process of going

15   through now, going through the sentencing hearing of course.

16      I have previously received a copy of the presentence

17   report and have reviewed it.  I assume that both State and

18   Defense have done the same.

19        MR. LISENBY:  Yes, sir.

20        MR. BLANCHARD:  Correct, Your Honor.

21        THE COURT:  Are there any objections to or requests

22   for additions to the Presentence Investigation Report?

23        MR. LISENBY:  There are some matters the State

24   wishes to present in addition to -- compliment the report,

25   Your Honor.

1          THE COURT:  We will allow the State do that and

2    then we'll allow the Defense to do the same.

3          MR. KEITH:  We also have a few corrections to the

4    report, Your Honor.

5          THE COURT:  I'll have this report marked as Court

6    Exhibit number one.

7    **(WHEREUPON, THE PRESENCE REPORT WAS MARKED AS COURT**

8    **EXHIBIT 1 TO THE SENTENCING.)**

9          THE COURT:  On the Court's motion, this is hereby

10   admitted and made a part of the record in this cause.

11       With that the State may proceed.

12         MR. LISENBY:  Mark these.

13   **(WHEREUPON, DOCUMENTS WERE MARKED AS STATE EXHIBITS 1, 2 AND**

14   **3 FOR IDENTIFICATION.)**

15         MR. LISENBY:  Your Honor, at this time in

16   connection with the presence report, the State would offer

17   State Exhibits for purposes of this hearing number 1, number

18   2, and number 3, which are certified copies of the

19   convictions of Jason Holloway.

20         THE COURT:  Those will be admitted and made a part

21   of the record.

22   **(WHEREUPON, DOCUMENTS MARKED AS STATE EXHIBITS 1, 2 AND 3**

23   **WERE ADMITTED.)**

24         MR. BLANCHARD:  Judge, I would like to note for the

25   record at this point I don't have any objection to those

1  documents.  I believe information about each of them was

2  placed before the jury in some form during the sentencing

3  hearing or in the actual trial of the case .

4          THE COURT:  That's correct.

5          MR. LISENBY:  Again, in connection with the

6  presentence report, Your Honor, the State would call Jeff

7  Blackstone.

8                    **JEFF BLACKSTONE**

9        **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

10         **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

11                   **TESTIFIED AS FOLLOWS:**

12                   **DIRECT EXAMINATION**

13 **BY MR. LISENBY:**

14 Q    Would you tell us your name and where you are employed,

15 please?

16 A     Jeff Blackstone, Investigator, Chambers County

17 Sheriff's Department .

18 Q     Investigator Blackstone, you were one of the

19 investigators in this case involving Jason Holloway; is that

20 correct?

21 A     Yes, sir.

22 Q     Subsequent to the trial involving Mr. Holloway, did you

23 also become aware of a report made at the Chambers County

24 Jail concerning Mr. Holloway?

25          MR. BLANCHARD:  Excuse me, let me put my objection

1    on the record about this.

2          THE COURT:  Go ahead.

3          MR. BLANCHARD:  What Mr. Lisenby is about to go in

4    to with Mr. Blackstone is an alleged incident at the Chambers

5    County Jail involving Mr. Holloway which took place, if it

6    took place at all, on June 25th of this year after the trial.

7    Now, we were made aware of this -- in fact, we were not made

8    aware.  Richard was not made aware of it.  I was made aware

9    of it by discovery document or series of documents sent to my

10   office mailed on July 14th, 20 days later.  It arrived in my

11   office on about July 18th, at which time I was on vacation in

12   Boston, Massachusetts.  I saw it for the first time when it

13   was FAX'd to my hotel on Monday of this week.  Due to --

14   number one, due to late disclosure of this event, I would

15   argue that it is a violation of due process, the Fourteenth

16   Amendment and Eighth Amendment, reliability in the sentencing

17   process, to allow the State to go into this incident.

18        Secondly, I would object on the grounds that the

19   incident itself bears no relation to any aggravating

20   circumstance that the State is allowed to prove at this phase

21   of the case.

22          THE COURT:  What says State?

23          MR. LISENBY:  Your Honor, when the investigation

24   was completed and Investigator Blackstone provided this to

25   our office, I believe on July 14th, the date that this was

1    mailed to defense counsel, that is when this office became

2    aware of it and was able to provide all of the information to

3    Defense counsel at that time.  We mailed it at the same time

4    as we mailed the memorandum brief that the Court has with

5    regard to our position supporting the death penalty.

6         It is my understanding, based on the case law and the

7    Statutory law, that any events that occur prior to the

8    sentencing date, which is today, are relevant and admissible.

9    I would submit that this also goes to the negate the

10   mitigating the circumstance provided by the Defense to the

11   jury and listed to the Court, I believe I can tell you what

12   number, number 13, that Jason Holloway is capable of adapting

13   to prison life and number 14 that Jason Holloway has not been

14   any major problem or difficulty for the Chambers County

15   Jailers over his three years awaiting trial incarceration.  I

16   believe, it goes directly to those two mitigating

17   circumstances listed.

18        THE COURT:  All right.  This is, of course, a bench

19   sentencing.  We are past the stage of jury participation.  I

20   will allow you to go ahead and question the witness so that

21   the Court can understand the basis of whatever conduct it is.

22   At that time, I'll make a decision as to whether it should be

23   excluded from any consideration and whether or not it is

24   legally admissible for consideration.

25        So, you may proceed.  Your objection is on the record .

```
 1              MR. LISENBY:  Thank you, Your Honor.

 2   MR. LISENBY:

 3   Q      Investigator Blackstone, I believe my question was,

 4   subsequent to the trial involving Mr. Holloway, did you become

 5   aware of an incident at the Chambers County Jail, I believe

 6   on June the 25th of 2003?

 7   A      Yes, I did.

 8   Q      And, in the course of that, did you conduct an

 9   investigation as to the allegations made?

10   A      Yes, I did.

11   Q      Tell the Court, if you would, what you did in your

12   investigation.

13   A      On the 27th I went to the jail and spoke with Angela

14   Carol Smith and took some photographs or had some photographs

15   taken of her leg that she supposedly said Mr. Holloway

16   grabbed.

17   Q      Ms. Smith was the complainant and with regard to this

18   incident; is that correct?

19   A      That's correct.

20   Q      You said you spoke to her.  Did you take a written

21   statement from her?

22   A      Yes, I did.

23              THE COURT:  Now, was this person an inmate?

24              MR. LISENBY:  She was at the time.  She has

25   subsequently made bond.
```

 1    MR. LISENBY:

 2    Q      Do you know, Investigator Blackstone, what Ms. Smith

 3    was incarcerated for?

 4    A      DUI and possession of a controlled substance.

 5    **(WHEREUPON, A DOCUMENT WAS MARKED AS STATE SENTENCING EXHIBIT**

 6    **4 FOR IDENTIFICATION.)**

 7    MR. LISENBY:

 8    Q      I want to show you what is marked as State's Exhibit

 9    number 4, and tell me if you recognize what that is, please.

10    A      This is a copy of the statement I took from Angela

11    Carol Smith on June 27th, 2003.

12    Q      Where was that taken at?

13    A      At the Chambers County Detention Center in the library.

14    Q      Other than the fact it is a copy, any changes, marks,

15    or alterations on State's Exhibit number 4 from your

16    original?

17    A      It is the same.

18              MR. LISENBY:  We offer number 4, Your Honor.

19              MR. BLANCHARD:  Your Honor, I object to the entry

20    of exhibit number 4 into evidence based on the same grounds I

21    stated earlier:  The late production of this material to us

22    and the Eighth and Fourteenth Amendments.

23              THE COURT:  Overruled.  It is admitted.

24    **(WHEREUPON, A DOCUMENT MARKED AS STATE SENTENCING EXHIBIT 4**

25    **WAS ADMITTED.)**

1    MR. LISENBY:

2    Q    Would you read the statement?

3    A    This statement was taken 6/27/03, in the Chambers

4    County Detention Center.

5    A    Statement of Angela Carol Smith.  Statement reads on:

6    6/25/03 I was arrested in the Valley, Alabama by Jerome

7    Bailey, Valley PD for DUI and possession of controlled

8    substance.  I blew in a small black box that Jerome had and

9    he said I blew a 1-0 and I failed the sobriety test.  I was

10   transported to the Chambers County Detention Center where I

11   was put in a holding cell.  I went to sleep and was wakened

12   by a ballheaded black male.  I heard him say, "Please don't

13   tell me this is a woman."  He was standing in front of me.

14   Excuse me -- "Please don't tell me this is a woman."  He said

15   it about three times.  I raised up to go to the intercom.  He

16   was standing in front of me.  He pushed me back so I wouldn't

17   mash the intercom.  He told me he hadn't been with a woman in

18   three years and he was here on capital murder and accused of

19   killing his cousin and he was sentenced to life without

20   parole.  He told me by raping me and killing me, what does he

21   have to loose.  I was standing at the door and I turned to go

22   back to the other side of the room away from him and he

23   grabbed my left leg and I snatched away.  Ms. Spence turned

24   and looked my way.  About three or four seconds later a male

25   officer walked by and Ms. Spence told the male officer to get

1   Holloway out of the cell.  I've got four or five

2   fingerprint-size bruises on the inside of my upper left leg.

3   Bill Langley spoke to me about the matter and he asked me why

4   didn't I tell him earlier?  I told him I tried.

5   Q       You indicated at that time that you had photographs --

6   A       That's correct.

7   Q       -- made of those.  Polaroid photographs, I believe?

8   A       Polaroids.

9   **(WHEREUPON, A PHOTOGRAPH WAS MARKED AS STATE SENTENCING**

10  **EXHIBIT 5 FOR IDENTIFICATION.)**

11  MR. LISENBY:

12  Q       I want to show you what's been marked for this hearing

13  as State's Exhibit number 5, and ask if you recognize that,

14  please.

15  A       This is a Polaroid that Sgt. Kirk at the jail did for

16  me and I put the date on it, 6/27/03 and Sgt. Kirk is the one

17  -- the photographer on this one.  And, the Polaroid that she

18  gave me once she came out of the bathroom.

19  Q       Excuse me.  Sgt. Kirk is an employee at the Chambers

20  County Jail?

21  A       Yes, sir.

22              MR. LISENBY:  We offer number 5, Your Honor.

23              MR. BLANCHARD:    I object to number 5 on the basis

24  that person who took the photograph is not here to

25  authenticate that it accurately reflects what he saw at the

1    time he took the photograph; and, therefore, the proper

2    predicate has not been laid.  And, further, on the same

3    objections I made to the entry of State's Exhibit number 4.

4              THE COURT:  Did you personally observe or view the

5    area of this person depicted in this photograph?

6    A     No, sir.

7              THE COURT:  Sustained.

8              MR. LISENBY:  May I make a brief argument to that

9    in response?

10        Your Honor, I believe under 13A-5-45(d), states any

11   evidence which has probative value and is relevant to

12   sentencing shall be received at the sentencing hearing

13   regardless of it's admissibility under the exclusionary Rules

14   of Evidence provided the defendant was accorded a fair

15   opportunity to rebut any hearsay statements.  I believe it

16   would be admissible for purposes of this hearing.

17             MR. BLANCHARD:  Your Honor, I stand on my earlier

18   objection, and I would also like to add as a basis for this

19   entire line of questioning, and these exhibits, something

20   that Mr. Lisenby just pointed out, which is the fact that

21   hearsay statements are involved in all of this, and due to

22   the late discovery which I pointed out, the defendant will

23   not be afforded a fair opportunity to rebut.

24             THE COURT:  Several issues have already been raised

25   in the context of this sentencing hearing.  I understand,

1    Mr. Lisenby, what you are submitting as far as the admission

2    of hearsay evidence under the sentencing provision of the

3    Rules.  On the other side, this evidence itself could have

4    direct impact on whether or not a death sentence is imposed

5    in this case.  I'm going to go ahead and allow you to admit

6    the photograph for the purposes of this hearing with the

7    caveat that I've got several, as I said, issues that have

8    already been raised that I have to review more thoroughly

9    before I take action on it one way or the other.  When did

10   this first come to your attention or the attention of the

11   District Attorney's office?

12            MR. LISENBY:   I believe Investigator Blackstone

13   had a brief conversation with Ms. Newsome of our office.  Do

14   you recall the date?  I got this on July the 14th and give me

15   one second to look at a calendar, Your Honor.  July the 14th

16   was on a Monday.  My recollection is that Investigator

17   Blackstone spoke to Ms. Newsome either that Thursday or

18   Friday before that date.  That is my best recollection.  I

19   would say it would have had to have been during that week of

20   July the 7th, and I know that she, Ms. Newsome -- I was not

21   in the office that week.  Ms. Newsome told me on Monday and I

22   contacted Blackstone about it and he brought the information

23   directly over to us.

24            THE COURT:  So, the incident allegedly occurred on

25   or about?

1    MR. LISENBY:  June 25th, 2003.

2        THE COURT:  It came to the attention of your office

3   on or about?

4        MR. LISENBY:  Just a guess, Your Honor, I'm going

5   to say -- Thursday is July the 10th.  Does that sound about

6   right or do you recall at all?

7        MS. NEWSOME:  I don't recall.

8        MR. LISENBY:  I am going to say July the 10th just

9   as guess, Your Honor.

10       THE COURT:  And forwarded to Defense counsel.

11       MR. LISENBY:  July 14th, which would have been the

12  following Monday.

13       THE COURT:  And received by Defense counsel?

14       MR. BLANCHARD:  Yes, let us complete that.

15    First of all, to say it was sent to Defense counsel is

16  some what of a misstatement.  It was sent to only one of us,

17  me.  And, I think the sheet that was sent, the cover sheet

18  with it -- well, I don't see it, has my name only on it.  Am

19  I not correct?

20       MR. LISENBY:  Yes, that's correct.  Mr. Blanchard

21  had been the attorney that handled the penalty phrase of the

22  trial, so we sent it directly to him.

23       MR. BLANCHARD:  I don't think there's any issue it

24  was sent only to me.  I had left town on a trip to Boston,

25  Massachusetts on a Wednesday of last week -- no, Thursday,

 1    excuse me.  I left town on Thursday which was, I believe, the

 2    17th of the week, of the month of July; am I correct?

 3              THE COURT:    Thursday is the 17th.

 4              MR. BLANCHARD:    So I had received all mailed

 5    through Wednesday and reviewed it, and I did not receive it

 6    prior to that time.  I left my secretary in charge of the

 7    office with instructions to FAX to me at my hotel anything at

 8    hotel of importance that was received.  The first FAX I

 9    received was on the 21st, which was Monday of this week, at

10    which time I received a 38-page FAX, including the documents

11    that Mr. Lisenby has offered in evidence and some others.  I

12    assumed that Mr. Keith had received the same thing.  However,

13    it later turned out that he did not.  He had -- he and I

14    talked about it, I believe, on either Monday or Tuesday.

15    There was a telephone call.  I returned yesterday.  Let me

16    digress and say that my flight was delayed.  I was supposed

17    to come in about 5 o'clock yesterday from Boston, but because

18    of weather conditions we did not get into Hartsfield Airport

19    until around 7 o'clock and had to drive back to Montgomery

20    and didn't arrive until about 9 o'clock.  I believe Richard

21    and I had a brief conversation during the day yesterday while

22    I was at the airport.  At which time I made reference to

23    this.  He appeared to know about it, but that was simply, I

24    learned, later was a one-line reference to it in the

25    presentence report.  He had not received the documents.  So,

```
 1   in fact, there's been no Defense opportunity to deal with

 2   this in any meaningful way until today.

 3            THE COURT:  One more time.  I don't mean to belabor

 4   this point, but you first received information through FAX or

 5   otherwise on what date?

 6            MR. BLANCHARD:    Monday, July 21st.

 7            THE COURT:  And today, of course, is July 23rd.

 8            MR. LISENBY:  Do you happen to know -- if I may

 9   ask, Your Honor, when your office received it?

10            MR. BLANCHARD:   I can only say that it had to have

11   been Thursday or Friday.  My secretary was out ill apparently

12   on Friday.  If it had been received on Thursday, she would

13   have FAX'd it to me I presume on Friday and she was unable to

14   do so because she was out sick.  The result being I didn't

15   get it until Monday.

16            THE COURT:  So far subject to taking the Defense's

17   objection under advisement, I have conditionally allowed in a

18   hearsay statement and a photograph that under the Rules of

19   Evidence has not been properly authenticated.

20            MR. LISENBY:  And just as a proffer to the Court,

21   the only other thing with regard to this incident that I

22   intend to offer is the interview with Mr. Holloway about it.

23            THE COURT:  When was this interview?

24            MR. LISENBY:   July the 2nd of 2003.

25            MR. BLANCHARD:  Just to give you an indication of
```

1    my thinking on that, Your Honor.  All parties were aware that

2    the defendant had counsel and they could have contacted

3    counsel had they desired to do so prior to interviewing

4    Mr. Holloway about the incident.  He was apparently

5    Mirandized at the time of making his statement; yet, counsel

6    were not contacted.

7            MR. LISENBY:  I believe that would be because he

8    did not have Sixth Amendment right to counsel with regard to

9    this alleged incident at the time because no formal charges

10   were pending.  Therefore, he would not have been entitled to

11   counsel on another case to be involved in the interview in

12   this particular investigation, which, I think, Investigator

13   Blackstone will probably be able to testify was basically

14   more, if anything, an internal investigation as to what took

15   place in the jail on that day.

16           MR. BLANCHARD:  Judge, he was at the time

17   incarcerated pending final sentencing in a capital case.  He

18   certainly has all his rights under the Eighth and Fourteenth

19   Amendments for reliability of sentencing in the capital

20   process and due process of law.  It would be our position

21   that under those circumstances counsel should have been

22   contacted and afforded an opportunity to represent

23   Mr. Holloway in that situation.  That Mr. Holloway had a

24   right to that.

25           THE COURT:  So it's the State's position he had no

1  right to counsel on any potential charges that might come

2  about from this June 25 incident?

3          MR. LISENBY:  Well, it is our position that under

4  the Fifth Amendment to the Constitution, it was a requirement

5  because he was in custody for the investigator to advise him

6  of his right to counsel, which he agreed to waive.  It is

7  further our position that his Sixth Amendment right to

8  counsel, which is following initiation of formal accusation

9  or proceedings had not attached at that time with regard to

10  this particular investigation by the sheriff's department on

11  this particular incident.  And, therefore, he would not have

12  been entitled to counsel absent his request under the Fifth

13  Amendment.

14          THE COURT:  Somewhere under the constitution

15  provisions and under the Miranda decision, does not the focus

16  go to the evidence that would be admitted against the

17  defendant?

18          MR. LISENBY:  I'm not sure I understand your

19  question, but I'll try to respond to what I think you are

20  asking.

21          THE COURT:  Up to this point what you have told me

22  is about his constitutional rights not applying to this

23  conduct, alleged conduct on June 25th --

24          MR. LISENBY:  Well, ....

25          THE COURT:   -- in that they do not apply.

1            MR. LISENBY:  Not applying is not what I'm arguing,

2    Your Honor.  What I am stating is that prior to any

3    interview, the investigator would have had to have advised

4    him of his Miranda Rights, which is a Fifth Amendment -- not

5    being required to -- compelled to testify against yourself

6    requirement.  To say that he was not entitled to his

7    constitutional rights, that is not what I am arguing.  It is

8    simply our position that at that time he was advised of his

9    Fifth Amendment right to counsel on the incident that he was

10   being interviewed about and he agreed to waive that Fifth

11   Amendment right.  Because there was not a pending charge at

12   that time on this incident, he would not have been entitled

13   to Sixth Amendment right to counsel, which only occurs after

14   initiation of formal proceedings.

15            MR. BLANCHARD:  May I inquire, if, in the course of

16   that advisement that he was given with regard to right to

17   counsel, was he at any point advised that the material being

18   elicited from him might be used against him in the sentencing

19   phase of this case?

20            MR. LISENBY:  We can certainly ask Investigator

21   Blackstone.  My guess is no, because I don't think

22   Investigator Blackstone was looking at it in that context.

23            THE COURT:   All right.  Here is the bottom line.

24   Under the constitutional rights that we have been discussing

25   at some point in time the focus must ultimately go to the

1   evidence being used against him.  If it is not used against

2   him, moot point.  While there are, as far as I know, no new

3   charges filed, State is relying on this evidence at this time

4   in an effort to get this Court to impose the sentence of

5   death.  If that's not being used against him, I don't know

6   what is.  Although there may not be a new misdemeanor charge,

7   or whatever, it is certainly being proffered against his, of

8   course, ultimate issue, ultimate interest in this case, that

9   being his life.  I'm going to allow you to proceed, but we

10  will have to come back to this.  So, as I have said, I have

11  noted the objections and taken each under advisement up to

12  this point.  And, I am going to allow you to finish your

13  direct examination of this witness.

14              MR. LISENBY:  Thank you.

15              THE COURT:  Go ahead.

16  MR. LISENBY:

17  Q     Investigator Blackstone, after you had spoken with

18  Ms. Smith and the photographs had been taken, did you later

19  have an opportunity to speak with Jason Holloway?

20  A     Yes, I did.

21  Q     And, where was that at, please?

22  A     Maj. Landrum's office, the jail administrator's office.

23  Q     Because Mr. Holloway was still incarcerated at the

24  Chambers County Jail; is that correct?

25  A     He requested to speak to Maj. Landrum about this issue.

1    I come in at the end of the interview.

2    Q       You came in at the end of what?

3    A       Well, he was speaking to Maj. Landrum when I walked in.

4    We went over this and I read him his rights.  When I became a

5    part of it, I did read him his rights.

6    Q       Do you know what took place prior to your entry?

7    A       No.

8    Q       Was this in a room; is that what you are saying?

9    A       It was a room.  He'd requested to speak to Maj. Landrum

10   himself.

11   Q       Did Maj. Landrum provide you any information about what

12   had been said or anything of that nature?

13   A       No, sir.  He waited until I got in and asked me, did I

14   want to write the statement and he had a typewriter there, so

15   I said you write it out.  We will all listen and that's what

16   we did.  We was all in the same room together.  We all signed

17   the statement together.

18   **(WHEREUPON, DOCUMENTS WERE MARKED AS STATE SENTENCING**

19   **EXHIBITS 6 AND 7 FOR IDENTIFICATION.)**

20   MR. LISENBY:

21   Q       I want to show you what's been marked as State's

22   Exhibit number 6, and tell the Court what that is, please.

23   A       The rights form from Chambers County Sheriff's Office.

24   Q       That's a copy; is that correct?

25   A       That is a copy.

```
 1   Q      Any changes, marks or alterations from that copy to
 2   your original?
 3   A      No, sir.
 4   Q      Can you tell the Court what, if any, rights you advised
 5   Mr. Holloway?
 6   A      I sat Mr. Holloway down and advised him and read him
 7   all his rights.  He had a right to remain silent.  Anything
 8   you say can and will be used against you in a court of law.
 9        You have the right to have a lawyer and have him present
10   while questioning.  If you cannot afford to hire a lawyer,
11   one will be appointed to represent you before any questioning
12   if you wish.
13        I advised him any time you decide to exercise these
14   rights and not answer any questions.
15        I also read his waiver of rights.  And, then I had
16   him to read them back.  He read them himself and initialed
17   them as he read them.
18   Q      Is that the waiver of rights on the form?
19   A      Yes, sir.  "I read the statement of my rights or had
20   them read to me.  I understand what my rights are and I am
21   willing to waive these rights and make a statement.  No
22   promises or threats have been made to me and no pressure or
23   coercion of any kind has been used against me."  And it is
24   signed Jason Holloway.
25   Q      And I understood you to say something about he read the
```

1  rights also?

2  A    Yes.  I gave them to him and he read his rights.  And,

3  once he read them himself also, he initialed every one of

4  them.

5          MR. LISENBY:  We offer number 6, Your Honor.

6          MR. BLANCHARD:  Your Honor, we have objection to

7  number 6.  Same grounds as stated earlier when we were

8  discussing the proffer of this information:  That being, the

9  Eighth Amendment, reliability in capital sentencing; the

10 Fourteenth Amendment, due process; and, I will add to that,

11 as an additional and separate ground, the Fifth Amendment

12 right against self-incrimination.

13         THE COURT:  Overruled at this point.  The objection

14 is noted and will be considered at the completion of this

15 witness' testimony -- reconsidered, excuse me.

16     Go ahead.

17 **(WHEREUPON, A WAIVER OF RIGHTS FORM MARKED AS STATE**

18 **SENTENCING EXHIBIT 6 WAS ADMITTED.)**

19 MR. LISENBY:

20 Q    Now, Investigator Blackstone, you mentioned earlier

21 after you advised Mr. Holloway of his rights you had a

22 conversation with him.

23 A    That is right.

24 Q    And, prior to your speaking to Mr. Holloway, did you,

25 or anyone in your presence, threaten or coerce him?

1    A      No, sir.

2    Q      Did you, or anyone in your presence, promise him

3    anything or offer him any hope of reward?

4    A      No.

5    Q      Did you, or anyone in your presence, tell him it would

6    be better for him to make a statement than to not make a

7    statement?

8    A      No, sir.

9    Q      Did he then make a statement?

10   A      Yes, sir.

11   Q      Tell us, again, how that was taken down.

12   A      Maj. Landrum took the statement on the computer hisself

13   as we was going along.  He was telling us what happened.

14   Q      Who was telling us what happened?

15   A      Mr. Holloway.

16   Q      Okay.

17   A      And, he wanted to tell us what had really happened in

18   that cell.  And Maj. Landrum took the statement.  After he

19   took the statement, I read it myself, Mr. Holloway, and this

20   was the statement he gave us.

21   Q      Did you read the statement to Mr. Holloway or did you

22   simply hand it to him for him to read; or, how was that done?

23   A      I believe I handed it to Mr. Holloway and he read the

24   statement.  And, I read it and Maj. Landrum, Bill Landrum,

25   he, read it.

1    Q    Subsequently, did Mr. Holloway sign the statement?

2    A    That is right.

3    Q    Was that done in your presence?

4    A    Yes, sir.

5    Q    There was another signature, I think you mentioned on

6    there.

7    A    You've got my name, Jeff Blackstone, Shane House was

8    present, and Bill Landrum.

9    Q    I'll show you what's marked as State's Exhibit number

10   7, and ask if you recognize what that is.

11   A    It is a copy of the original statement.

12   Q    Any changes, marks or alterationis on number 7 from

13   your original?

14   A    No, sir.

15        MR. LISENBY:  We offer number 7, Your Honor.

16        MR. BLANCHARD:  Your Honor, I object on the same

17   grounds to which I interpose the objection on Exhibit 6.

18        THE COURT:  Overruled at this point under the same

19   conditions.

20        Go ahead.

21   **(WHEREUPON, A STATEMENT MARKED AS STATE SENTENCING EXHIBIT 7**

22   **WAS ADMITTED.)**

23   MR. LISENBY:

24   Q    If you would, read the statement for us.

25   A    Statements taken 7/2/03 in Maj. Bill Landrum's office,

1    Chambers County Detention Center.  Statement reads:  "On

2    6/25/03 at approximately 1430 I called the POD and told them

3    I needed to see Sgt. Davidson.  Officer Meadows took me down

4    to J2 holding cell where he placed me to wait.  I saw someone

5    covered up on a bench and I kept looking.  I said, 'This

6    can't be a woman.'  I went over to her and tapped her on the

7    leg and asked, 'Are you a female?'  She sat up and I mashed

8    the intercom.  She then mashed the intercom.  We sat back

9    down and she asked what I was in jail for.  I asked what she

10   was in jail for and she said DUI.  Officer Spence was in

11   central on the phone and I mashed the button again.  She

12   stood up at the window and told I her that I was not going to

13   bother her.

14        She replied, 'I am not worried about you, I just want to

15   use the phone.'

16        The only other time we touched was when I told her my

17   name and she told me hers, and we shook hands.  Officer

18   Spence told Officer Spratlin to get out of J2, he then took

19   me over to visitations."  Signed Jason Holloway.

20            MR. LISENBY:  Thank you, Investigator Blackstone.

21   I believe that is all I have, Your Honor .

22            THE COURT:  Cross-examination.

23            MR. BLANCHARD:  Judge, before I proceed with cross

24   examination, I would like again to restate all of my

25   objections to this entire line of testimony, and make it

1    clear that I don't wish to waive anything by cross examining

2    this witness.

3            THE COURT:  That's well understood, and as I said,

4    I will, of course, reconsider your objections as I have

5    previously told you I would.

6                    **CROSS EXAMINATION**

7    BY MR. BLANCHARD:

8    Q    Now, Investigator Blackstone, how did Angela Smith and

9    Jason Holloway get in the same cell?

10   A    One of our corrections officers accidently put Holloway

11   in the cell with her.  She was supposed to have been on the

12   bench covered up.

13   Q    When you say accidentally, you were not there when it

14   happened.

15   A    I was not there.

16   Q    And you don't know whether it was done on purpose or

17   not?  You don't, do you?

18   A    It shouldn't have been done, but I don't know.

19   Q    You don't know that.  In any event, Mr. Holloway,

20   didn't sneak into the cell with her.

21   A    No, sir.

22   Q    He couldn't do that.  Somebody had to put him in there?

23   A    That's correct.

24   Q    Somebody had to put her in there.  Somebody in the jail

25   had to put both of them in that cell at the same time.

```
 1  A    That's correct.

 2  Q    Mr. Holloway couldn't have had any influence on that,

 3  could he?

 4  A    No, sir.

 5  Q    Now, you've read all of the witnesses statements

 6  involved in this alleged incident; haven't you?

 7  A    Yes, sir.

 8  Q    Is there a statement by Maj. Bill Landrum in there?

 9  A    Yes, sir.

10  Q    Okay.  And does Mr. Landrum or Maj. Landrum, excuse me,

11  statement say that he spoke with inmate Smith?

12  A    Yes, he did.

13  Q    Right after the alleged incident.  And did he ask her

14  if she was all right, if he had done anything to her?

15  A    You want me to read his statement?

16  Q    If that's what you need to do.  I am just asking you

17  what's in it.

18  A    I'll just read his statement.  "On June 25th, 2003, at

19  approximately 1450 Sgt. Davidson came to me and said

20  something had just happened.  She said she needed to report

21  to me.  Sgt. Davidson said Officer Tony Meadows had placed

22  inmate Jason Holloway in a holding with inmate Angela Smith.

23  I went to J2 where inmate Smith was and talked to her.  When

24  I walked in she stated, 'Major, do you know what I just did?'

25       I replied, 'Yes.'
```

```
 1   Q     Let me stop you here.  Would you read that again?  Do
 2   you know what I ....
 3   A     "I went to J2 where inmate Smith was and talked to her.
 4   When I walked in, she said, 'Major, do you know what they
 5   just did?'
 6         I replied, 'Yes, Sgt. Davidson told me.  I asked her if
 7   she was all right and if she had done anything to her -- he
 8   had done anything to her.
 9   Q     Would you read ....
10   A     "I asked her if she was all right and if he had done
11   anything to her.  She replied, 'He scared me.  He told me he
12   ought to kill me.  It wouldn't matter they can't do anything
13   else to him.'
14         "I told her that I understood that he had scared her,
15   but had he physically hurt her.  She replied he scared me.
16   His eyes looked funny when he was talking to me.  I advised
17   inmate Smith if she was all right, I was going to talk to the
18   other officers and see what happened."
19   Q     Let me stop you right there.  So, Maj. Landrum talked
20   to her.  This statement -- he talked to Angela Smith right
21   after this statement and asked her if she was all right,
22   physically all right, and she said yes she was.
23   A     That's what Maj. Landrum said.
24   Q     And -- all right.  And, that he had said some things to
25   her, scared her, because his eyes looked funny.  That's what
```

1  she said.  All right.  Then what did Maj. Landrum put in his

2  report after that?

3  A      " I entered central control where Officer Meadows had

4  been and called back down the hall to meet with Sgt. Davidson

5  and myself.  Sgt. Davidson told Officer Meadows to look at J2

6  where inmate Smith was standing.  He replied, 'Oh, no.  I

7  didn't know there was a female in J2,' and was upset.  He

8  said, 'I was trying to hurry and the person in J2 was covered

9  up and I messed up.  I should have looked.'  All officers

10 were advised to write their reports.  I returned to my office

11 and started my report too on this incident when I heard some

12 -- inmate Smith in the hall saying she wanted to see the

13 nurse.  I had inmate Smith brought to my office.  I told her,

14 'I heard her hollering saying she wanted to see a nurse.'  I

15 asked what she wanted to see the nurse about.  She replied

16 that her leg hurt.  She was pointing at a bruise.  I asked

17 what happened and she said that is where he, Holloway,

18 grabbed her.  I told inmate Smith that I had asked her twice

19 did he do anything to her and she did not mention that he had

20 touched her.  She replied, 'But, he grabbed my leg.'

21       I then asked, 'Did he do anything else?

22       She replied, 'No, just what he said.'

23       I sent her to the nurse's office."

24            MR. BLANCHARD:  Your Honor, I have a copy of that.

25 MR. BLANCHARD:

*** Frances L. Roark ***

```
 1   Q      Would you look at what I'm handing you and tell me if

 2   that same thing as report that you just read?

 3   A      Yes.

 4           MR. BLANCHARD:   I'm going to mark this, Judge, as

 5   Defendant's Sentencing Exhibit number 3 .

 6           MR. LISENBY:   State has no objection.

 7   (WHEREUPON, A STATEMENT WAS MARKED AS DEFENDANT'S SENTENCING

 8   EXHIBIT 3 FOR IDENTIFICATION.)

 9           THE COURT:   Admitted.

10   (WHEREUPON, A PHOTOGRAPH WAS MARKED AS STATE SENTENCING

11   EXHIBIT 3 FOR IDENTIFICATION.)

12   MR. BLANCHARD:

13   Q      Now, did you also have an opportunity to review the

14   statement of Denise Lyons?

15   A      Yes, sir, I did.

16   Q      And was Denise Lyons an inmate in the Chambers County

17   Jail about the time of this incident?

18   A      Yes, she was.

19   Q      Do you know what she was in for?

20   A      I don't know what she was in for, but I did speak to

21   her.

22   Q      Do you have her statement there?

23   A      Yes, I do.

24   (WHEREUPON, A STATEMENT WAS MARKED AS DEFENDANT'S SENTENCING

25   EXHIBIT 5 FOR IDENTIFICATION.)
```

MR. BLANCHARD:

Q    All right.  Would you read her statement to us?  Let me
-- first of all, let me show you this copy I have.  Is that a
complete and an accurate copy?

A    Yes, it is.

Q    All right.  You can use that one and read it to us.

A    The statement was taken 7/2/03 Chambers County
Detention Center by myself and Investigator House from Denise
Lyons an inmate.  Her statement reads, "Last week Angela
Smith, a white female, was put in the block with me, H block,
but she wasn't put in my cell.  She came into my cell and
told me that the officer put Jason Holloway in the holding
cell with her downstairs.  She told me she was laying on the
bench with her head covered up.  She heard a man say, 'Please
don't tell me this is a woman.'  She told me he pulled the
cover back and said, 'A pretty woman at that.'  She told me
he had reached and grabbed her by the leg and she got up and
snatched -- started mashing the intercom button to let the
correction officer know what was going on.  She told me he
told her -- excuse me.  She told me he told her he was in
jail for capital murder and he told her, 'Why don't I just go
on and kill you?'  That he didn't have anything to lose
anyway.  I told her she could get a lawsuit for that because
they shouldn't have done -- excuse me -- they shouldn't have
done that putting him in this same cell with her, because he

1   could have killed her." And that's the end of the statement.

2   Q     That's the entire statement?

3            MR. BLANCHARD:  Judge move to admit the statement

4   of Denise Lyons as Defendant's Sentencing Exhibit number 5.

5            THE COURT:  Admitted.

6            MR. LISENBY:    State has no objection.

7   **(WHEREUPON, A STATEMENT MARKED AS DEFENDANT'S SENTENCING**

8   **EXHIBIT 5 WAS ADMITTED.)**

9   MR. BLANCHARD:

10  Q     So, Investigator Blackstone, what you have is a woman

11  who has just been put in jail for DUI and drug possession;

12  right?

13  A     That's correct.

14  Q     And, she has just blown a .1, you know, legally

15  intoxicated on the intoxicator meter when she's put in this

16  cell; correct?

17  A     That's correct.

18  Q     And, do you know if she had a prior record?

19  A     I don't know.  I didn't check it.

20  Q     All right.  So, she's in the cell and somebody puts

21  Jason Holloway in there with her; correct?

22  A     That's correct.

23  Q     And, she comes out of the cell and tells Maj. Landrum

24  that she's okay.

25  A     By her first ....

1  Q    She was not physically hurt.  Then at some point she

2  speaks with an inmate who tells her she should have a lawsuit

3  against the county and the jail because he put her in with a

4  murderer.

5  A    That's correct.

6  Q    And, then at some point she starts complaining about an

7  injury she got from this person that she was put in the cell

8  with?

9  A    That's correct.

10 Q    That's a pretty accurate rendition of the facts?

11 A    Yes.

12 Q    All right.  Do you know anything about the credibility

13 of this person that made these hearsay statements against my

14 client?

15 A    Ms. Smith?

16 Q    Yes.

17 A    I don't know -- I've never met her before.

18 Q    You are prepared to testify she's a truthful person.

19 A    I am not.

20 Q    Are you familiar with the Chambers County Jail?

21 A    Somewhat.

22 Q    Are you familiar with this cell that these two people

23 were in?

24 A    Yes, sir.

25 Q    Is it a closed cell with no windows in it?

```
 1  A      No, sir.  It is a closed cell with windows facing into

 2  it.  You can look in and they can look out .

 3  Q      If someone was standing in the hallway, would that

 4  person be able to see into the cell ?

 5  A      If they're directly in front of it, they would .

 6  Q      There would be no problem for someone walking down the

 7  hall to look into that cell.

 8  A      That is right.

 9  Q      A guard who happens to be coming by.

10  A      That's correct.

11  Q      So, this is not a location where someone could attack

12  another person and ravish or rape them and be free from the

13  view of others?

14  A      It is in view.

15  Q      Okay.

16         MR. BLANCHARD:  Judge, I think that is all I have

17  on cross of this witness.

18         THE COURT:  Investigator, do you know what drug

19  charge this individual has pending or had been arrested on?

20  I know you said that about the DUI charge, but you also

21  mentioned another.  Do you know what that was ?

22         THE WITNESS:  I believe it was pills is what the

23  controlled substance was .

24         THE COURT:  Pills would be a felony --

25         THE WITNESS:  Yes, sir.
```

P. O. Box 763
Wedowee, AL 36278
(256)357-4268

1           THE COURT:    -- charge?

2       Anything else from counsel for State or Defense from

3   this witness?

4           MR. LISENBY:    I have no other questions for

5   Investigator Blackstone.

6           MR. BLANCHARD:    No other questions.    I restate all

7   my objections.

8           THE COURT:    You may step down.

9   (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.) .

10          THE COURT:    What else does the State have to offer

11  as to sentencing?

12          MR. LISENBY:    That's all in regard to testimony,

13  Your Honor.    We are prepared for argument, but that is all

14  for testimony.

15          THE COURT:    All right.    What, then, does Defense

16  have to present in the form of testimony or evidence as to

17  this part of the sentencing hearing?

18          MR. BLANCHARD:    Judge, we are, obviously, because

19  of the indications I gave you earlier, unable to present any

20  direct testimonial evidence to counter what the State has put

21  up.    We tried to do our best through cross-examination to

22  indicate and -- through our objections to indicate why the

23  Court should not consider that.

24  (WHEREUPON, DOCUMENTS WERE MARKED AS STATE SENTENCING

25  EXHIBITS 1 AND 2 FOR IDENTIFICATION.)

1          MR. BLANCHARD:  In addition to that I have handed

2    up to the Court earlier Defense Sentencing Exhibits 1 and 2,

3    I believe, and excuse me, if had the numbers wrong on them.

4    But number one is a list of mitigating circumstances, which

5    we believe were established at trial.  We don't mean for

6    those to be all inclusive or preclude the Court's

7    consideration of any mitigating circumstances that the Court

8    may find that we have not seen in the evidence.  But I tried

9    to be as comprehensive as I could based on my recollection of

10   trial testimony.

11         Secondly, Defense exhibit 2 is exhibits that we have

12   created that summarizes recent Alabama Capital cases, that

13   while they may not have gone up on appeal, because of the

14   fact that no death sentence was imposed, where the sentence

15   of life without parole was imposed, and the facts in those

16   cases, we would argue, are similar and in many cases more

17   aggravated than the facts in this case, and this is given

18   essentially to rebut the State's contention that the crime

19   here was so heinous, atrocious and cruel as compared to other

20   capital offenses that it is deserving of the death penalty.

21   Obviously, when you read that, you will see that there have

22   been many, many cases where the facts were much more heinous

23   and in which the death sentence has not been imposed.

24         I believe -- Richard, do you have some objections or

25   comments?

1       MR. KEITH:  Judge, I have just a few corrections at

2   some point in time to be made to the presentence report.

3       THE COURT:  Go ahead.

4       MR. KEITH:  Judge, on the front page of the

5   presentence report it explained that Jason Holloway was found

6   quilty in a jury trial of three counts of capital murder.  I

7   believe that should be corrected to two counts of capital

8   murder, the killing of two or more and during a burglary for

9   Angela Brown.  He was convicted of murder in the death of

10  Rodney Brown.

11      THE COURT:  Two counts of capital murder.  One

12  count murder.

13      MR. BLANCHARD:  Correct, Your Honor.

14      THE COURT:  Now count one alleged.

15      MR. KEITH:  Two or more.

16      THE COURT:  Two or more.  Count two?

17      MR. KEITH:  Judge, that was capital murder

18  burglary, I believe, that was Rodney Brown's if I am not

19  mistaken, I'd have to refer to the indictment .

20      MR. LISENBY:  That's correct.

21      THE COURT:  Count three burglary .

22      MR. KEITH:   Capital murder burglary and the death

23  of Angela Brown.

24      THE COURT:   Angela.  Go ahead.

25      MR. KEITH:  Judge, on page 3 of the presentence

1  report, essentially the second paragraph, there is an

2  explanation where it was stated in Jason's statement that he

3  went to the Brown's residence to talk to Rodney about

4  something.  Well, that portion of the something was in his

5  statement.  I think presentence report should be revised more

6  accurately to reflect that he went to confront Rodney Brown

7  about the statement than something being where Mr. Holloway

8  explains and has explained in trial in his testimony and in

9  the statement that Rodney stated that he could have sex with

10  Jason Holloway's girlfriend better than he could was the

11  something that I think might deserve some additional

12  explanation.

13        THE COURT:  I'm noting that more detail is

14  contained in the statement.  Go ahead.

15        MR. KEITH:  Your Honor, page 7, on the health

16  section in the second paragraph, it says the issue of Fetal

17  Alcohol Syndrome was raised during trial proceedings.  We

18  request that be amended to clarify that the defendant's

19  exert, Dr. Joe Wheeler Dixon testified and was given

20  expertise status and testified as in his opinion that Jason

21  Holloway did suffer from Fetal Alcohol Syndrome and I think

22  the Court mirght recollect that he said if he doesn't have

23  Fetal Alcohol Syndrome, that Dr. Dixon would eat his hat.

24  And, he provided substantial testimony and background

25  information to form that expert opinion.  And, we object that

1  issue not raised -- expert testimony to substantiate the

2  Fetal Alcohol Syndrome.

3        MR. LISENBY:   The State would object to that, Your

4  Honor.  I believe that was disproven by a preponderance of

5  the evidence based on Dr. Dixon's testimony during

6  cross-examination.  He did not know if Jason Holloway

7  suffered from Fetal Alcohol Synderome and he was not able to

8  say because he had not seen Jason Holloway at the time of his

9  birth, whether he suffered any of those effects.

10        MR. KEITH:   That's correct, Your Honor.  Dr. Dixon

11  had to admit he did not have an opportunity to examine Jason

12  Holloway at birth, but not until approximately 27 years

13  later.  But, in his opinion, based on the literature,

14  research, and the history of his mother, Jason's mother, in

15  his opinion that he felt he did suffer from that syndrome.

16        THE COURT:   Go ahead.

17        MR. KEITH:   No further corrections to the

18  presentence report, Your Honor.

19        MR. BLANCHARD:  Judge, ....

20        THE COURT:Those are noted on the record.

21     Mr. Blanchard, what else?

22     Go ahead.

23        MR. BLANCHARD:  Judge, going back to Defendant's

24  Sentencing Exhibit number 1 for just a minute.  There's one

25  thing I wanted to call your attention to there that I think

1   deserves some comment.  As you will see, we have listed 18

2   mitigating circumstances.  And, again, I believe that the

3   evidence supports each and every one of them and none of them

4   have been disproven by a preponderance.  Number 18 is the

5   one, I believe, that deserves some further comment because of

6   case law from the Supreme Court.

7       Number 18 reads as follows:  That the jury

8   selected hear this case after several days of hearing all

9   about the crime and about Jason's life experiences

10  recommended a sentence of life without parole by a vote of

11  eight to four, which is greater than the minimum number

12  needed for a life sentence and it is six votes short for the

13  minimum number needed for a death sentence.

14      Now, let me turn to the language in the case of ex parte

15  Tarus Carroll decided on petition for writ of certiorari,

16  Supreme Court of Alabama, recently -- I'm looking for the

17  date on this.

18          MR. LISENBY:  Your Honor, I am sorry, may I ask a

19  question as to procedure at this point?  Mr. Blanchard is

20  involved in argument.  Because if he is, I believe that would

21  be out of the order at this point.

22          THE COURT:  Well, I sort of took it to expand

23  number 18 on the mitigating circumstances enumerated in

24  Defense Sentencing Exhibit Number 1.

25          MR. BLANCHARD:  Judge, I don't care when I get do

*** Frances L. Roark ***

```
 1   say it, as long as I get to say it.

 2            THE COURT:  We'll take up the legal issues during

 3   the course of the arguments.

 4       Is there anything else to be amended as far as the -- as

 5   far as the documents that have been admitted here?

 6            MR. BLANCHARD:  No, sir.

 7            THE COURT:  And, for the record, Defendant Exhibits

 8   1 and 2, I take it, have been offered or will be offered?

 9            MR. BLANCHARD: They are offered at this point.

10            THE COURT:  They are admitted.

11   (WHEREUPON, DOCUMENTS MARKED AS STATE SENTENCING EXHIBITS 1

12   AND 2 WERE ADMITTED.)

13            THE COURT:  Off the record.

14   (WHEREUPON, THERE WAS A BRIEF OFF THE RECORD.)

15            THE COURT:  And they have been admitted over

16   objection by Defense.

17       Let's go ahead at this point and both State and Defense

18   can proceed with their arguments in support of their relative

19   positions in this case.  However, I've got a couple of other

20   cases I simply need to call for status which are on the

21   agenda for today's docket, and I'll go off the record in this

22   case and we'll be coming back to the capital case in just a

23   few minutes.

24   (WHEREUPON, THERE WAS A BRIEF OFF THE RECORD.)

25            THE COURT:  Is the State ready to argue and go back
```

1    on the record in State versus Holloway?

2            MR. LISENBY:  State is ready.

3            THE COURT:  You may proceed.

4            MR. LISENBY:  Thank you, Your Honor.

5        May it please the Court, Mr. Blanchard and Mr. Keith.

6    Obviously, Your Honor, we have previously submitted a

7    memorandum brief with regard to our position supporting the

8    death penalty in this case, and I will try not to bore the

9    Court during this argument, nor in my rebuttal argument

10   following Defense counsel.  But, I think it is important that

11   the Court understand that the State does recognize that the

12   death penalty is reserved for only specially deliniated

13   cases, certain kinds of cases that the legislature has set

14   out that have been upheld throughout the appellate courts of

15   this State and this State's Supreme Court.

16       In this case, the State submits that there are three

17   aggravating circumstances that have been proven beyond a

18   reasonable doubt as required by the statutes.

19       The first of these being the intentional killing of two

20   or more persons pursuant to one scheme or course of conduct.

21   That being found by the jury in count one of their guilty

22   verdict, or during the guilt phase of the trial.  This

23   particular aggravator was actually recognized by the

24   legislature in Alabama in 1999 as a circumstance that should

25   be considered in determining whether the death penalty is

1    appropriate or not.  And, I submit to the Court that the

2    reason for that is simple.  As opposed to talking about the

3    intentional killing of one person, we are now talking about

4    the intentional killing of at least two people, and it says

5    two or more.  So, the legislature recognized that as you

6    begin to have your mind set that more than one person should

7    die on a particular occasion, that that should be an

8    aggravating circumstance.

9         The second aggravator the State submits is proven

10   is the fact that Angela Brown was murdered, intentionally

11   murdered, during the course of a burglary, but it wasn't just

12   any burglary.  In fact, Your Honor, because for that capital

13   conviction to apply, it is a burglary in the first degree.

14   That requires the invasion of a dwelling or home of some

15   manner, plus in this particular case, because of the

16   allegations in the indictment, a physical injury to a

17   nonparticipant in the crime.

18        In this particular case, Angela Brown was basically an

19   innocent bystander in her own home when Jason Holloway came

20   over to confront Rodney Brown with whatever it was he came to

21   confront him about.  And, Angela Brown was simply there

22   reading a magazine sitting on the couch as Jason Holloway

23   came in armed with a pistol.  And, the confrontation

24   escalated to the intentional killing of both individuals

25   present.

1           The third aggravating circumstance is that this capital

2    murder is especially heinous, atrocious and cruel as compared

3    to other capital offenses.  I know that, Your Honor, has been

4    on the bench for over 10 years now, and has been a lawyer for

5    over 20 years.  You have seen a number of cases come through

6    this circuit and probably practiced in other circuits also

7    during the time that you were in private practice.  You have

8    seen cases come through, I would submit to you that this is a

9    particularly brutal event because Angela Brown, as I said,

10   was sitting in her own home and had to go through the

11   psychological fear of watching her own husband in front of

12   her in a small room being shot by Jason Holloway.  And, then,

13   right after that knowing that she was going to be next,

14   because then two shots followed into her.  But, even more

15   than that, even more than just the psychological fear of

16   watching the first victim being shot and injured, possibly

17   even killed, at that moment by Jason Holloway, following that

18   was the use of multiple weapons by Jason Holloway.  After he

19   have shot Angela Brown, he left her there.  But, returned,

20   not with the same weapon that he had come with before, but a

21   separate weapon.  When he got there, initially he told the

22   Court during his own testimony to this jury, during the

23   guilty phase of the trial, that he believed it was his duty

24   to go and alleviate the pain that Angela Brown suffered.  I

25   submit to you that doesn't make sense, Your Honor, because he

1   came with a separate weapon.  He didn't use that weapon

2   initially.  He used a ball bat to bash Angela Brown's head.

3   He used a pillow to try to smother her.  Then he used the

4   knife that he had brought with him to stab her five times in

5   the neck area and one time in the stomach.  And, the reason

6   he said that he did what followed after that was because he

7   was trying to get back at Rodney Brown.  He was not there as

8   duty to alleviate pain, he was there, as the cases say, in a

9   consciousless and pitiless manner and inflicted pain on

10  Angela Brown that was unnecessarily tortuous to her first by

11  leaving her there, still, in his own statement and testimony,

12  gasping for air, and then returning and using multiple

13  weapons on her to finish the task that he started out with.

14      This is especially heinous, atrocious and cruel as

15  compared to other capital offenses, clearly in this circuit,

16  and I submit to you as around the state.

17      Now concerning the mitigating circumstances that the

18  Defense has proffered and they say they have 18 here and they

19  don't want to limit the Court to that.  Well, obviously the

20  statutes and cases are quite clear.  You should consider·

21  everything that occurred during this trial:  In the guilt

22  phase and penalty phase.  And, I know the Court is going to

23  do that whether it is in this list or whether you find

24  something else.  I submit to you that Mr. Blanchard in his

25  opening statement to the jury in the penalty phase said

1    something I think is pretty important.  He said in the guilt

2    phase of the proceeding that was basically a snapshot.

3    Something occurred on a particular day at particular time.

4    But in the penalty phase you should review this as a a life

5    story.  You should focus on the life story of Jason Holloway.

6          Now, maybe Jason Holloway came from abject poverty.

7    Maybe he did.  There is testimony through records and things

8    of that nature about what had taken place.  I believe his

9    brother talked about things that occurred while he was young.

10   But, Jason Holloway was taken out of this abject poverty

11   before the age of two.  I think he was taken out about the

12   age of 21 months, taken out of that and placed, you known, in

13   a loving and caring home.  The Court heard Marie Collier, his

14   foster mother, and William Collier, his foster brother, talk

15   about how he was taken care of.  He was helped.  There was

16   testimony with regard to a foster father that took a

17   significant interest in him at the time he was growing up and

18   he had that person die in his life, as many other people have

19   people die in their lives.  Maybe he did come from the abject

20   poverty, but only after he got in this great home with these

21   loving people, and they are, they are, obviously Marie

22   Collier has taken in a number of foster children.  She

23   mentioned about that in her testimony.  She took in Jason

24   Holloway.  No doubt about that.  Loving people.  Only after

25   he was in this great home did his live turn out to be a life

 1   of a peeping tom, the life of entering homes of other people
 2   without their permission, developing an antisocial
 3   personality, which the Defense expert defined as a history of
 4   unlawful conduct.   There was an exhibit offered by the
 5   Defense, number 17 in the penalty phase, in which the report
 6   was that the neighborhood is scared of Jason Holloway.  He
 7   has convictions for public lewdness, criminal surveillance,
 8   theft of the property in the third degree.  Since he has been
 9   in Chambers County Jail awaiting these charges on capital
10   murder, he has had five fights.  The Defense offers that
11   being a good model citizen inside the confinements of jail.
12   Even after the conviction in this case, even after going
13   through the sentencing phase, yet another event arises with
14   Jason Holloway in the Chambers County Jail.

15       I ask the Court in looking at all of that, what
16   mitigation, what mitigation comes from this life story of
17   Jason Holloway?  What good has come of this life at all?  In
18   regard to the decision that this Court has to make as to
19   whether the death penalty is appropriate or life in prison
20   without parole is appropriate.  I realize Ms. Collier loves
21   Jason Holloway and his other family members talked about
22   that.  And, even though Marie Collier was his foster mother,
23   she was, in fact, Jason Holloway's mother.  And, only God
24   help us, if our mother doesn't love us, and she does.  But
25   what does that mean when Jason Holloway still lived the life

1   that he did?

2       On top of that, do these facets of Jason Holloway's

3   life, do they outweigh the aggravating circumstances that he

4   himself created on January 12th of 2000, inside the home of

5   Rodney and Angela Brown?  I submit to you they do not.

6       So, why, then, did the jury in this case recommend a

7   sentence of life without parole for a vote of eight to four,

8   which again the statutes say the Court is required to

9   consider?  They were good citizens of this county.  They went

10  through a long process involving finding out who should best

11  sit on this jury.  They were brought in off the street and

12  they had to make a decision, a couple of decisions:  Whether

13  Jason Holloway was guilt or not guilty, and then whether

14  Jason Holloway should die or not die.  They had to listen to

15  testimony about serious crimes involving brutal facts.  And

16  the Court knows that is not the same as deciding what car to

17  buy, or what movie to go see, who to date or even who to

18  marry.  That decision was weighing on them just as it is

19  weighing on this Court today.  It was weighing on them

20  because they were brought in off the street, something they

21  were not accustomed to, whereas this Court, as I said, has

22  been a lawyer other 20 years and has seen a number of things.

23  I submit to you that's one of the reasons why the legislature

24  has provided for the possibility of the Court overriding the

25  jury's sentencing, because you do have experiences with

1    regard to the crime system, with regard to people that you

2    come in contact with on a daily basis.

3        Just two days ago this Court saw some 50 people or so in

4    sentencing with regard to events that ranged from simple

5    theft of a lawnmower up to coming into someone's house and

6    shooting them.  You have seen all of that.  You have seen all

7    of this in this case.

8        But with regard to this jury, Your Honor, I would ask

9    you to recall in the penalty phase, Mr. Gibbs when he got up

10   in his portion of the argument, he said, "The State realizes

11   this is a difficult decision for you the jury to have to

12   make, and I will tell you that to your face when I can get

13   you to look at me."  When I can get you to look at me, I will

14   tell you it is a difficult decision.  You had the opportunity

15   to view this jury during the course of the guilt phase.

16   Obviously, an extremely attentive.  And, during the penalty

17   phase, obviously very burdened by what they had to do.  They

18   wouldn't even look at any of the lawyers.  They didn't want

19   to look up, because they had already made one tough decision,

20   determining whether Jason Holloway was guilty of a serious

21   and brutal crime.  I submit to you it was weighing too

22   heavily on them to make an informed decision as to whether or

23   not he should receive the death penalty.

24       Your Honor, as I read the capital murder sentencing

25   statutes, when the judge is instructing the jury with regard

1    to what their duties are in the penalty phase, the Court

2    instructs them that if they find no aggravating

3    circumstances, the verdict that they return shall be life

4    without parole.

5        Notice the word shall in that portion of the statute.

6    If there's no aggravating circumstances, the verdict shall be

7    life without parole.  If the aggravating circumstances that

8    exist do not outweigh any mitigating circumstances that

9    exists, the verdict shall be life without parole.  Again, the

10   word shall.  If the aggravating circumstances that exist do

11   outweigh the mitigating circumstances, the verdict shall be

12   death.

13       I submit, Your Honor, that the only way that Jason

14   Holloway can be sentenced in this case, in this Court to life

15   without parole, is if you find that the aggravating

16   circumstances submitted by the State do not outweigh the

17   mitigating circumstances.  But, I submit, in fact, the

18   aggravators, the three aggravating circumstances, I submit to

19   you have been proven beyond a reasonable doubt and far

20   outweigh any mitigation the Court might find in any of the

21   factors listed by the Defense or anything that the Court

22   heard during the course of this trial.  And ask that you

23   impose the sentence, not lightly, but resolutely of death.

24   Thank you.

25            THE COURT:  Mr. Blanchard.

1       MR. BLANCHARD:  May it please the Court,

2   Mr. Lisenby.

3       Your Honor, in this case the jury, which sat there and

4   endured this two-week ordeal, we all went through and heard

5   day after day and ream after ream of evidence about the crime

6   and about the defendant's life, and viewed pictures, graphic

7   evidence, saw exhibits, each of these 12 people, who come

8   with their diverse experiences of life, sat here and

9   attentively listened and shouldered that burden throughout

10  this trial.  And, they, that jury, by a vote of eight to

11  four, more than required by law, determined that Jason

12  Holloway is not one of those remorseless, pitiless

13  individuals, whom our system, for right or wrong, says are so

14  bad, so terrible, like the Ted Bundies of the world, like the

15  Tim McVays of the world, like the Osamma Bin Laudins of the

16  world, such as those individuals, are deserving of death.

17  This jury having heard all of the evidence decided that Jason

18  Holloway was not such a person.

19      Why did they decide that?  They were given clear

20  instructions by the Court as to how they should take the

21  evidence they heard and process it.

22      What about the aggravating circumstances?  The law says

23  that two aggravating circumstances were proven beyond a

24  reasonable doubt by the jury verdict in the double murder of

25  Angela and Rodney and by the burglary murder of Angela.

1    Now, if that is not double counting, I don't know what

2  is.  We have it counted toward the capital conviction.  We

3  elevated -- we use those factors to elevate his sentence

4  automatically to life without parole, and the State wants to

5  then turn around, as the law says they can, and use them

6  again to elevate his sentence to death.  The law says in

7  Alabama and Alabama says that is proper.  The Supreme Court,

8  I submit, to you has not passed on that in the Alabama

9  statute.  The Supreme Court of the United States that

10 procedure has not in Alabama stood federal review.  And, we

11 have that objection on the record to double counting and

12 should it become necessary, we would ask the Supreme Court to

13 review that.

14    However, what I suggest to the Court is that the Court

15 should consider the fact that those circumstances are being

16 double counted in determining how much weight, if any, to

17 give to those two mitigating -- I mean, aggravating

18 circumstances.  I would suggest to the Court that for that

19 reason, they deserve very little weight.

20    Now, the third aggravating circumstance is the

21 aggravating circumstance of -- that the State has offered to

22 you that the crime is particularly heinous, atrocious and

23 cruel.  We don't know what circumstances the jury found exist

24 and which circumstances they did not find to exist.  But,

25 certainly, the jury heard ample evidence and ample argument

1    from which they could have concluded either way on that

2    particular issue.  They certainly had evidence to weigh that

3    with.

4        And, at this point, it may be a proper time to remark

5    that it seems as to the jury verdict, the State wants to have

6    it both ways.  The jury was proper and right and did

7    everything wonderfully well and were very accurate when they

8    returned these convictions on the capital cases that the

9    State wanted.  But suddenly the same jury, we turn around the

10   next day is somehow overwhelmed by fatigue, or whatever you

11   want to call it or responsibility, and now they can't make a

12   responsible decision.  They can't voice the conscience of the

13   community any more because the State doesn't like what they

14   said.

15       Judge, that's not the way it works.  The State has told

16   you that the Court, you know, it is proper for the Court to

17   override, because the Court has more experience.  I would ask

18   the State to remember why we have 12 people on the jury:

19   Because those 12 people from the diverse backgrounds and the

20   diverse educations and experience that they bring into this

21   courtroom is the very reason that we have juries in the first

22   place.  They are the conscience of the community, and when

23   they speak, they speak with a loud voice, and one person's

24   opinion of the case, no matter how much experience that one

25   person may have, should not be allowed to overrule the

1    opinions of those 12 people, who after all have heard just as

2    much of the evidence as the Court heard.  They sat here

3    throughout the entire proceeding.  There's nothing hidden

4    from them that this Court knows about that would make any

5    difference or have any impact or that would be a proper

6    factor to consider in sentencing.

7        Now, the State has argued that -- I can go back to the

8    especially heinous, atrocious and cruel factor; and, as you

9    know, I argued during the course of the trial and to the jury

10   in sentencing, that we needed to look at the language of the

11   law and we needed to be sure we are comparing the facts of

12   this case to the facts of other cases that we know about to

13   determine whether this case is especially heinous, atrocious

14   and cruel as compared with other capital cases.  And I've

15   given the Court a listing of 10 cases, recent Alabama cases,

16   in which the sentence imposed was life imprisonment without

17   parole, and all of these are capital cases.

18       I'll start, the first one, August of 1999,

19   Waverly Lindsey sentenced in Mobile to life without parole

20   for, let's say, arson, for murder, and hire death of Henry

21   Lee, Diane Brooks, and Ms. Brooks' three children, five

22   people.  The children were ages six years, five years, six

23   months.  Mr. Lindsey was hired to start that fire that killed

24   those five victims.  He did it for money.  For -- out of

25   greed.  You could make all kind of arguments about how

 1   terrible that was.  Convicted of five counts of capital

 2   murder in April of 1999, and the Judge followed the jury's

 3   sentencing recommendation of life imprisonment without

 4   parole.  Can you argue that the facts of that are much

 5   worse than this case?  Certainly you can.

 6       A more recent case.  Jermain Rachkal Hart of Jefferson

 7   County.  Shooting deaths of his girlfriend's grandfather and

 8   aunt.  When Ms. Jones' grandmother, Elizabeth Knowles was

 9   awakened by noise, Mr. Hart and Ms. Jones, his codefendant,

10   stabbed her numerous times, then doused her with lighter

11   fluid and set her on fire leaving her for dead.  Then

12   Mr. Hart and his codefendant also repeatedly stabbed Ashley

13   Jones' little sister, Mary Jones, when she tried to

14   intervene.  She passed out from blood loss, and did not die.

15   Mr. Hart was convicted of capital murder and sentenced to

16   life without parole following the jury's recommendation.  The

17   Judge in that case said, "What you did was unspeakable but

18   giving you the death penalty that would be too easy.  Now you

19   will suffer every day for the rest of your life."  That

20   points out that the sentence of life without parole is not a

21   slap on the wrist.  We don't have any choices to be lenient

22   here.

23       Jeffery Franklin, a 2001 case, June of 2001, Madison

24   County Circuit Court, killed and maimed several members of

25   his family with an axe.  He killed his parents and seriously

1  injured three of his siblings.  He had Satanic etchings

2  carved into his chest.  The jury recommended life without

3  parole and the Court followed it.

4      June of '98.  Michael Sean Barnes.  Two capital murders

5  committed mere weeks a part in Saraland, Alabama.  In

6  December of '93, Mr. Barnes raped and strangled a 68-year-old

7  woman, set her on fire, and robbed her house.  On January

8  2nd, just a little later, he killed 73-year-old John Edward

9  Kimbrick, hacking him to death with an axe.  Once, again, the

10 jury recommended life without parole, and the Judge followed

11 that recommendation.

12     In October of '95, Hale County Circuit Court, Kelvin

13 Washington was sentenced to life without parole.  He was

14 charged with four counts of capital murder.  One for the

15 murder of two or more people, a burglary murder, an arson

16 murder, and a rape murder.  Mr. Washington was serving a 20

17 year sentence for attempted murder at the time of the crime.

18 He was an inmate at the State cattle ranch and he was mad

19 because he had been obliged to spend his evening off picking

20 up pecans.  So, he went to the warden's house early in the

21 morning, bound and strangled his 68-year-old wife, and then

22 killed two inmates that tried to come to her aide, and then

23 killed the warden.  Killed four people.  Jury recommended

24 life without parole and the Court followed it.

25

1   Judge, there are several other cases here.  There's a

2  case of Ronald Terry Kanard who was convicted for the 1988

3  capital murder of a 90-year-old Marion woman.  He stabbed in

4  the back with a pocket knife, kicked her feet out from under

5  her, got a brick and a piece of concrete from her yard,

6  carried it inside and beat her with each in turn, and then

7  went and retrieved a 30 pound piece of concrete from

8  underneath her drain pipe, carried that back into the house

9  and smashed her head with it, went into the kitchen wrapped a

10  yellow sponge around a large butcher knife and stabbed her in

11  the chest with such force that the knife penetrated the floor

12  beneath the body.  The jury recommended life without parole

13  and the Court followed that recommendation.

14   I won't belabor the Court with all of these.  You can

15  read them.  One other that I do want to point out.  In May of

16  '93.  Karvin Stargill.  He killed two people with a baseball

17  bat.  A beating death.  He was in a gang called the insane

18  gangster disciples and killed two adolescents, Alan Eakes and

19  Kevin Duncan, 14 and 15 years of age after a gang initiation.

20  Killed them with a baseball bat.  He then tried to beat to

21  death a young woman who was a witness leaving her comatose.

22  She lived.  But, he was convicted of two counts of capital

23  murder and certainly was sentenced to life without parole and

24  the Court followed that sentence.

25   All of these cases are mind-numbingly brutal,

1    mind-numbingly brutal.  They all exceed the brutality of the

2    case we see here.  Yet, in each of those cases a life

3    sentence of life without parole was imposed.

4        Judge, all murders are brutal.  They all involve some

5    Brutality by default.  There are no gentle or kind murders.

6    And, what we are talking about is certainly a matter of

7    degree.  But I think there's sample evidence in this record

8    and through argument and the exhibits that you have before

9    you to conclude that this case is not especially heinous,

10   atrocious and cruel as compared to other capital cases in

11   which the death penalty has been imposed.

12       I would like to also address the mitigating

13   circumstances briefly here.  Once again, you have our listing

14   of those.  Some 18 that we have numbered.  I'll go through

15   those briefly.

16       Number 1, Jason Holloway experienced a very difficult

17   family history, including the abandonment by biological his

18   farther, severe neglect by his alcoholic biological mother,

19   and suicide of his foster father when he was very young.  You

20   remember, I said that if we just closed the book on Jason

21   Holloway at age eight when his foster father to whom he was

22   very attached committed suicide, we would be able to say we

23   have a very damaged individual who may never recover.  But,

24   surely you remember the lengthy testimony that we had from

25   his family members concerning the very, very terrible

1  conditions, about the abandonment by his biological father,

2  never provided support, wasn't around, the drinking that his

3  mother did, the way the other siblings had to -- you remember

4  Rosco Holloway's testimony, the other siblings had to raise

5  Jason who was very small, and who was the youngest.  And, how

6  everybody needed food, and sometimes Jason didn't get food,

7  because of the way they were being raised, and the things he

8  had to do just simply to survive at that very young age.

9       That he experienced -- number 2, he experienced

10 physical and mental impact of severe poverty in his early

11 life.  That's what we're talking about.  Those kinds of

12 deprivations in your very early formative years that effect

13 your ability to cope and to think and to have judgment later

14 in life.

15      Number 3, that Jason Holloway had to be placed in foster

16 care when he was only 21 months of age and was never fully

17 reunited with his biological family.  That's true and there's

18 no dispute about that at all, and it is, I submit to the

19 Court, a mitigating circumstance, because to take some -- we

20 all know how important the biological family is, and to be

21 taken away and not have such a family is certainly a

22 mitigating circumstance.

23      Number 4, Jason Holloway has brain damage because of his

24 mother's excessive use of alcohol while he was in her womb.

25 This condition sometimes referred to as Fetal Alcohol

1    Syndrome and Fetal Alcohol Effects.  We know for a fact from

2    the DHR records, which are numerous and voluminous, from the

3    contemporary reports of siblings that Jason Holloway's mother

4    drank heavily.  I believe it was Vodka or brown spirits or

5    some sort of alcohol, not just beer, not just wine.  She

6    heavily imbibed and was drunk a lot while pregnant with

7    Jason.  Dr. Dixon told you what Fetal Alcohol Syndrome or

8    Fetal Alcohol Effects are.  They are brain damages which

9    occur during pregnancy when alcohol jumps the placental

10   barrier and effects the developing brain and other

11   characteristics of the infant in the womb.  And he told you

12   that characteristics of this are low birth weight, which

13   Jason had, extremely low birth weight.  One of the

14   characteristics.  Also low intelligence.  Poor judgment is

15   characteristic of these people.  Certainly you can look

16   through Jason's testing when he was young and see, even up to

17   adulthood, and see that he has suffered from the effects of

18   what happened to him.  Was Dr. Dixon there on the scene to

19   look at him and try to make a diagnosis when he was born?

20   No, he was not.  Was he confident from what he saw in the

21   records, and in the testimony, and from his testing of Jason

22   that Jason suffered from this; yes, he was.  He used the word

23   confident and if he doesn't have it, I'll eat my hat. So, I

24   think you can -- that circumstance is proven and not

25   disproven.

1          Number 5, that Jason Holloway suffers from significantly

2    subnormal intelligence and consistently tested in the bottom

3    16 percent of the population during  his elementary and

4    junior high school years.  And you have exhibits.  We have

5    submitted many exhibits in the record to show that he was in

6    -- that he consistently over the years never tested outside

7    of that bottom 16 percent.  He, because of this Fetal Alcohol

8    Syndrome, have brain damage which resulted in very low

9    intellectual functioning.

10         Number 6, Jason Holloway suffers from a learning

11   disability or disabilities.  He repeated grades in school.

12   He had learning -- LD classes.  He was never able to graduate

13   from high school.  He failed the high school graduation exam

14   three times.  All of this ties back into the way in which he

15   was raised in his early life and the debilitating effects of

16   the alcohol his mother consumed while he was in the womb.

17         Number 7, Jason Holloway has suffered emotional and

18   mental disturbances from an early age.  You have, once again,

19   records before you that -- are in the records showing that,

20   yes, he would have -- I believe he was hearing people.  He

21   would have auditory hallucianations.  He was treated at

22   Childrens Hospital or evaluated, at least, at Childrens

23   Hospital and reported these things.  He would go and -- go

24   into people's homes.  He did this on at least one occasion.

25   Yes.  He was emotionally and mentally disturbed and people

1    were concerned about him and I'm sure some of them, because

2    of this strange behavior, were frightened of him.

3        Number 8, that Jason Holloway did not receive

4    appropriate diagnosis and needed treatment while in the

5    custody of the State in his teenage years.

6        Judge, we have evidence before us that he was in foster

7    care all of his life until about age 19.  And, he was

8    evaluated at one point, or maybe more than one point, but we

9    don't have information that he received appropriate treatment

10   for these conditions that he had.  And, in fact, it appears

11   that the main condition, fetal alcohol condition, was not

12   even fully recognized or diagnosed.  So, I don't think there

13   is any doubt that he failed to receive appropriate treatment

14   while he was in the custody of the State during those years

15   before he was emancipated.

16       Number 9, that Jason Holloway's capacity to appreciate

17   the criminality of his conduct is substantially impaired.  I

18   believe there is adequate testimony from Dr. Dixon upon which

19   you could base that finding.

20       Number 10, that Jason Holloway's capacity to exercise

21   mature and appropriate judgment is impairment.  Again,

22   Dr. Dixon's testimony gives you ample evidence that Jason

23   Holloway, because of his brain damage, is unable to exercise

24   -- he may know the difference between right and wrong.  Just

25   as the example I gave of an animal.  You may train the animal

1   to know that it's wrong to chew up the sofa.  But, the animal

2   doesn't understand fully why.  It doesn't fully appreciate,

3   because of its limited mentality.  So that makes this person

4   different in terms of their responsibility.

5        Number 11, that Jason Holloway suffers from Antisocial

6   Personality Disorder.  And, I expected that the prosecution

7   to focus on that a little bit, because it sounds bad.  You

8   remember the testimony was, that doesn't make him a

9   psychopath.  A psychopath understands, has good judgment, and

10  chooses to override it, and do the wrong things.  They have

11  good -- they know fully what they are doing and choose to be

12  evil.  An Antisocial Personality Disorder is just the

13  diagnosis that is made often for people like Jason who have

14  poor judgment.  Who don't fully understand why it may wrong

15  to go into somebody's house, or how that is a violation of

16  their personal space.  And, they do these things.  These

17  little things throughout their life and they end up with

18  those little conduct problems all over their record, which

19  ends up in a diagnosis of Antisocial Personality Disorder.

20  But, it certainly does not mean that he's a psychopath or

21  evil person.  It just means he's suffering from a mental

22  condition.

23       Number 12, that the psychological disorders that Jason

24  Holloway suffers are not only treatable, but better treatable

25  in a structured setting of a prison environment.

1    I believe you have the testimony of Dr. Dixon for that

2    particular mitigating factor.  That he is better able in that

3    structured environment to receive help.

4        Thirteen, that Jason Holloway is capable of adapting to

5    prison life.  He certainly -- we have that testimony from

6    Dr. Dixon as well.

7        Number 14, that Jason Holloway has not been any major

8    problem or difficulty for the Chambers County jailers over

9    his three years of pretrial incarceration.

10       Now, the State says, well, he's had five fights over

11   three years.  Well, number one, that is not a great number of

12   fights considering he's been in jail for three years; and,

13   number two, remember what Dr. Dixon said, specifically about

14   Jason.  He tends to perceive things that are said to him as

15   slights.  Now, that because of his limited mentality, you may

16   say something perfectly innocent to him, but he would

17   perceive it as a slight, and it might tend to get him in

18   scrapes or fights, particularly in a jail situation such as

19   over here where he's not receiving all the programs and

20   treatments that he could receive in the State system.  I

21   think that system in terms of being able to treat people and

22   to keep them manageable is much better than a county jail

23   system with its limited funding.  They are mainly to

24   warehouse people pending trial.  Even so, the jailers that

25   came and testified told you he had not been major problem or

1    difficulty for them over his three years of pretrial

2    incarceration.  Apparently they don't regard these little

3    fights as being all of Jason's making or regard them as any

4    particular major problem.  Certainly, we have no report of

5    anyone being seriously injured.

6        Number 15, Jason Holloway feels some remorse from his

7    crimes.  You know he testified, he told you his view of the

8    things that happened, and I believe during that testimony he

9    did express some remorse and some feelings, some

10   identification, with the victims in this crime, particularly

11   with Angela whom he had known for some time.  And, so he has

12   the capacity to feel that.

13       Number 16, Jason Holloway's biological siblings and

14   foster family have exhibited love for him and concern for his

15   fate.  Certainly they have.  They have been here in court.

16   One of them testified.  His brother, his older brother came

17   and testified for him.  And, they have been here and they

18   have shown their support and love and concern for his fate.

19       Seventeen, Jason Holloway has the capacity to love and

20   care about his biological siblings and foster family.  I

21   believe we saw that, again, through his testimony when he

22   testified during trial.

23       Number 18, that the jury selected to hear this case

24   after several says of hearing all about the crime and Jason's

25   life experiences recommended a sentence of life without

1    parole by a vote of eight to four.  Once, again, which is
2    greater than the minimum number of votes needed for a life
3    sentence and fully six votes short of the minimum number
4    needed for the death sentence.

5        Now, I mentioned that earlier and I was going to turn to
6    the language from ex parte Carroll in that regard.  And, this
7    is a case which was decided in July of last year, almost
8    exactly a year ago July 26, 2002.  And, in this case, the
9    Supreme Court was confronted with a  situation where the jury
10   had recommended life imprisonment without the possibility of
11   parole and the Court had overridden, the trial court had
12   overridden the decision.  The Supreme Court says, "We take
13   this opportunity to further explain the effect of the jury's
14   recommendation of life imprisonment without the possibility
15   of parole.  Such recommendation is to be treated as a
16   mitigating circumstance.  The weight to be given that
17   mitigating circumstance should depend upon the number of
18   jurors recommending a sentence of life imprisonment without
19   parole, and also upon the strength of the factual basis for
20   such a recommendation in the form of information known to the
21   jury:  Such as conflicting evidence concerning the identity
22   of the trigger man or recommendation of leniency by the
23   victim's family," are a couple of examples they gave.  Then
24   the Supreme Court said, "The jury's recommendation may be
25   overridden based on information known only to the trial court

1   and not to the jury when such information can properly be

2   used to undermine mitigating circumstances." My point is

3   this:  We didn't hold anything back during that hearing

4   before the jury.  The jury heard about Jason Holloway's life

5   with all its warts, with its good points, with its bad

6   points.  When you consider the strength of the evidence, the

7   strength of the factual basis of the jury's determination,

8   including all those mitigating circumstances I have just gone

9   through and the facts that supported them, it is abundantly

10  clear that the jury had a strong basis factually for

11  returning that particular verdict.  And, not only that, when

12  it says the jury recommendation may be overridden, it talks

13  about based information known only to the trial court not the

14  jury.  Once, again, we have a situation where as far as the

15  record of this case is concerned, the jury knows everything

16  that the Court knows or the Court knows everything the jury

17  knows.

18      We can get into talking about this little incident that

19  there's been testimony about here today and say, well, the

20  jury didn't know about that.  And, we subject -- we submit,

21  Your Honor, that if the jury had known about it, it wouldn't

22  have made any different, number one, and, number two, we have

23  objections to it and we don't think it is properly before the

24  Court; and, number three, if it is good for anything, it is

25  good only to undermine a mitigating circumstance, and the

```
 1   only mitigating circumstance it could possibly undermine
 2   would be the offered mitigating circumstance that Jason
 3   adjusts well to incarceration.  Something of that nature.
 4   That is only one of 18 mitigating circumstances.  And, I hope
 5   the Court will not feel that this undermines that
 6   circumstance at all, because of the peculiar nature of the
 7   alleged event in the first place.  Where Jason is placed,
 8   against his knowledge or will, in with a female in a small
 9   room.  Now, this is not the kind of thing that normally goes
10   on in a prison experience, I'm sure.  So, the possibility for
11   that to recur, if it occurred at all in the first place,
12   would seem to be fairly remote; and, therefore, not something
13   that ought to undermine that particular mitigating
14   circumstance, because it is so far outside the normal course
15   of events that would occur in a person's prison life anyway.
16        Judge, I have probably talked too long, but I will just
17   sum up by saying, we feel all those mitigating circumstances
18   that I just went through have been proven beyond
19   preponderance of the evidence; that the State didn't disprove
20   any of them; and that really only -- it would only take a
21   couple of them, the major ones, to outweigh the aggravating
22   circumstances supplied by the State.
23        Once, again, we feel that the jury's recommendation in
24   this case was correct.  It is right.  It places Jason in the
25   correct category, and not in the category of that small group
```

1   of people for whom the death penalty may be appropriate.  We

2   ask the Court to follow the jury's recommendation.

3           MR. LISENBY:  May it please the Court.

4       I will, again, try not to take too much time in

5   response.  But there are a couple of things, I do wish to

6   respond to that Mr. Blanchard said.  Obviously, when he gets

7   up and talks about Ted Bundy and Tim McVay, Ossama Bin

8   Lauden, those names, obviously, come to everyone's minds when

9   you are talking about individuals that are entitled to the

10  death penalty.  Ted Bundy, as I recall, was only convicted of

11  one murder and received the death penalty there involving a

12  young child.  But the point I wish to make about that is, our

13  legislature, our appellate courts, the United States Supreme

14  Court never said that you have to be Ted Bundy or Tim McVay

15  or Ossama Bin Laudin to receive the death penalty.  It says

16  there are specially deliniated cases that require special

17  consideration and a determination that the death penalty is

18  appropriate.

19      You know, in this particular case, you've got an

20  individual who killed two people.  That's one more than Ted

21  Bundy did.  Mr. Blanchard read through several cases that he

22  had cited to the Court involving life without parole.  I

23  noted interestingly enough that one of the comments he

24  mentioned was by Judge Bahakel, if I'm pronouncing that

25  correctly.

1          THE COURT:   Jefferson County.

2          MR. LISENBY: Out of Jefferson County; yes, sir.

3     "What you did was unspeakable, but giving you the death

4  penalty, that would be too easy.  Now you will suffer

5  everyday for the rest of your life."  If she'd said that

6  during voir dire, she would have been struck from the jury

7  panel.  I mean, that is not the kind of thing, not the kind

8  of individual that ought to be making decisions, when they

9  have a preconceived notion about the death penalty.  I don't

10 think this Court has that kind of preconceived notion.

11      Interestingly enough, too, in citing all these cases,

12 the Defense has done exactly the same thing they did in front

13 of the jury when talking about other capital cases receiving

14 life without parole.  They wanted to talk about the facts,

15 but they didn't want to talk about what the mitigating

16 circumstances were.  We don't know in these cases what the

17 mitigating circumstances were that were presented:  The age

18 of defendant, the mental capacity of the defendant; whether

19 there was a codefendant involved; what happened in those

20 cases; things of that nature that just were not listed.  The

21 facts were listed and they are bad facts.  No doubt about

22 that.  But, the State also cited to the Court several cases

23 in our memorandum that I would like to mention.  Ex parte

24 McNair.  In that case the Court stated, "The evidence

25 indicates that McNair," I am sorry this is a Supreme Court of

1   Alabama, "The evidence indicates that McNair asked Ms. Riley,
2   the victim in this case, for a glass of water.  While she had
3   her back to him, he attacked her stabbing Ms. Riley twice in
4   the neck with a knife.  One of the blows severing her carotid
5   artery causing a massive loss of blood.  McNair left Ms.
6   Riley, who the evidence suggests, remained conscious for
7   several minutes following the attack alone on the floor of
8   her kitchen to die.  Suffice it to say that the evidence was
9   sufficient to show that this killing was consciousless or
10  pitiless and unnecessarily torturous to Ms. Riley.  In this
11  regard this case is materially indistinguishable from ex
12  parte McLean, Knock, Bui, B-U-I, and ex parte Jefferson.
13  I'll omit the cites wherein this aggravating circumstance,
14  being heinous, atrocious and cruel, was found to exist.  In
15  those cases the victims were viciously cut with knives on and
16  around their throats and remained alive during and for a
17  short time after the attacks.  In this particular case,
18  heinous, atrocious and cruel was found after only two stab
19  wounds.  Many more times with regard to Angela Brown here.
20      I know the court is familiar with ex parte Jefferson,
21  Albert Lee Jefferson with regard to the events that
22  transpired there.  And, the Supreme Court said those two stab
23  wounds materially indistinguishable from that kind of case.
24      In ex parte Taylor, two people were killed after the
25  defendant attempted to make some kind of purchase of

1  anautomobile.  Taylor and McMillan, who was the codefendant,

2  came and went from that place of business several times

3  during the day.  That evening day, Taylor armed with a .380

4  caliber pistol and McMillan armed with a BB pistol returned

5  to the dealership.  Taylor shot and killed Sherry Gaston, the

6  sales person with whom he had been pretending to negotiate,

7  and Bruce Gaston, her husband, and Steve Dyas the owner of

8  the business, stole the vehicle that Taylor had pretended to

9  be interested in buying and also stole the personal effects

10 of the victim.  That case received the death penalty.  That

11 was the murder of three people.

12     *Barber versus State*, Court of Crime Appeals stated in

13 quoting the trial judge, "A summary of the facts are

14 appropriate.  Roberts was beaten into a helpless state.  She

15 was then raped by Hester as she lay helpless.  Barber

16 concluded that she must die because she knew who her

17 attackers were and he stabbed her nine times with such force

18 that two of the blows penetrated Roberts back.  Barber left

19 the murder weapon protruding from Roberts chest.  Barber then

20 set a fire or fires in an attempt to hide the criminal act.

21 The fires resulted in some mutilation of Roberts' body.

22     There are multiple cases in which the death penalty has

23 been given involving circumstances that are even less heinous

24 and atrocious than this particular case.  So, obviously,

25 there should be a comparison.  That is why I said earlier

1    that I submit that is why the legislature has provided the

2    jury override provision for a judge who last seen things, who

3    has experience in these matters, to make that kind of

4    determination.  Mr. Blanchard says the State argues that the

5    jury ought not to be the voice or conscience of the

6    community.  The State has never argued that.  What I

7    submitted to the Court was, when you looked at this jury

8    making your determination about what weight, if any, to give

9    to their verdict, you should look at what their burdens were,

10   and how they were reacting to them.  Those people worked

11   hard.  No doubt about it.  As I said earlier, they are good

12   citizens of the county.  Very attentive.  But when it got

13   into the penalty phase, they stopped looking at people.  They

14   were not looking at witnesses.  They were not looking at

15   lawyers.  One lady sat during the entire penalty phase with

16   hand over her head.  Those jurors were burdened by their

17   decision.  As I said, it is a difficult one.  Not an easy one

18   for you, either.  But that is something that I believe the

19   Court can consider and that is basically what the Court, the

20   Alabama Supreme Court said in ex parte Taylor.  In that case

21   the judge stated that, quote, the sentence recommendation of

22   a properly functioning jury is entitled to great respect,

23   close quote.  He reasons, however, that, quote, while the

24   jurors in this case were cooperative, harmonious, diligent

25   and attentive, some juror's outbursts of emotion after they

 1   found the defendant guilty of capital murder indicated that

 2   they were overwhelmed by their impending duty to consider the

 3   death penalty as required by law.  The trial judge then

 4   concluded that the crimes proved against Taylor were

 5   abominably aggravated and at best only faintly mitigating.

 6   Thus the trial judge considered the jury's recommendation as

 7   required by Alabama's Death Penalty Statute, but permissibly

 8   assessed it very little weight given the particular

 9   circumstances of this case.  I submit that's the reason we

10   have the law, and that's the purpose behind it.

11       Mr. Blanchard argued that the Court, because of the

12   alleged double counting involved in this case, ought to

13   assess minimal amounts of weight to the aggravating

14   circumstances.  I find that an interesting argument, because,

15   clearly, the Defense barr, defendant lawyers in cases such as

16   *Ring versus Arizona* say we want you to put those kinds of

17   things in an indictment so that a jury can make a

18   determination and decision about it, but by the same token,

19   now, the argument comes back to us, well, we don't want you

20   to use those in the sentencing consideration.  Those are two

21   diametrically opposed positions.  One that the legislature

22   and the appellate courts have determined is not appropriate.

23   Double counting in the sense of calling it that, I think, is

24   a terrible misnomer for it.  Becuase in fact, it is a

25   recognition of circumstances that entitle an individual to be

1   given the death penalty.

2       Mr. Blanchard said that we don't know if the jury found

3   this case to be found -- found the aggravating circumstance

4   of heinous, atrocious and cruel.  I submit to you that based

5   on ex parte Waldrop this Court has authority to look at the

6   facts independently and make a determination as to whether

7   you find heinous, atrocious and cruel.  If you find that to

8   be the case, assess whatever weight you think is appropriate

9   with regard to the circumstances.

10      I'm only going to talk about a couple of the mitigating

11  circumstances, Your Honor, just to show in kind of general

12  terms the State's position that we have disproven these

13  mitigating circumstances by a preponderance of the evidence.

14      The number 4 listed on here about the Fetal Alcohol

15  Syndrome.  As I mentioned earlier, not only did Dr. Dixon say

16  he couldn't say for sure that Jason Holloway had it, but he

17  testified affirmatively that not every child born to an

18  alcoholic pregnant woman has this syndrome.  In fact, the

19  only neurological test introduced during the entire case

20  showed no brain abnormality of Jason Holloway going against

21  what Dr. Dixon said ought to have been found.

22      Number 7, was mentioned.  Jason Holloway suffered

23  emotional and mental disturbance from an early age.

24  Mr. Blanchard said that comes about from the fact that he was

25  having auditor hallucinations, going around talking to people

1   and things that were not there.  As you recall, Dr. Dixon

2   said that he found the auditory hallucination reports were

3   not credible to him, because people with those type of

4   hallucinations, in fact, have serious mental illnesses, and

5   he did not find that in Jason Holloway.  So, that is one of

6   those things that I don't think goes to show any type of

7   mitigation.

8        Number 8, Jason Holloway did not receive appropriate

9   diagnosis and treatment while in the custody of the State in

10  his teenage years.  Interestingly enough the Defense did

11  provide the fact that he was evaluated on several occasions.

12  He was not treated for any of these things.  I submit to you

13  that may be because he did not have any of those things.

14  They didn't see Fetal Alcohol Syndrome, because it was not

15  present.  They didn't see a learning disability because it

16  was not present.  In fact, there were grades -- excuse me.

17  There were school years that he had very good grades.  They

18  showed the bad grades and the State showed the good grades.

19  Those are the types of things that people were looking at

20  overall in Jason Holloway's life.  So, I submit that

21  mitigating factor has not been shown.

22       Number 9, Jason Holloway's capacity to appreciate

23  the criminality of his conduct is substnatially impaired.

24  Dr. Dixon was asked twice by Defense counsel was his capacity

25  to appreciate the criminality of his conduct substantially

 1   impaired.  The best Dr. Dixon could say was it is impaired.

 2   He wouldn't use the word substantially as the statute does in

 3   the statutory mitigating circumstances, because, I submit to

 4   you, that it was not.  When asked twice, the best he could

 5   say was it was impaired.

 6       I've talked about the antisocial personality.  The fact

 7   that they list here Holloway being capable of adapting to

 8   prison life.

 9       Jason Holloway feels some remorse for his crimes.  Your

10   Honor, I guess, I'm almost offended by that even being

11   mentioned.  The fact that Jason Holloway left these two

12   people to be found by a 13-year-old and 11-year-old child,

13   the children of these people.  He left them there for them,

14   went back and killed Angela Brown, finished her off, when he

15   could have called for help if he had remorse.  If he thought

16   he were acting in self-defense, as he tried to submit to the

17   Court, he could have taken some action.  There's no remorse

18   that Jason Holloway has in this case.

19       When looking at the aggravating circumstances as

20   opposed to the mitigating circumstances here, I submit to the

21   Court that whatever mitigating circumstances the Court finds

22   from the evidence in this case have been far outweighed by

23   the aggravating circumstances.  This is one of the most

24   heinous cases in Chambers County, Alabama that has ever come

25   about, and Jason Holloway deserves to have the ultimate

1   punishment so that evil person will not be left with regard

2   to this crime.  Thank you.

3          THE COURT:  The Court has a number of factors to

4   consider in entering a sentence in this case.  There must be

5   a consideration of the role of the Court, of the role of the

6   jury, and of the law procedure that applies to both.  I have

7   been a member of this legal community going into 23 years,

8   and this is going on my 13th year on the bench.

9       As the State submitted earlier, this Court has seen a

10  lot of things; some good and then some of the most depraved

11  acts committed by one human being against another.  In short,

12  we are going to be in recess on this case.  I am going to

13  recess everyone in this case until 1:30.  I'll need to have

14  this defendant back here at 1:30.  I'm going to dispose of

15  some other matters between now and that time and give myself

16  some time to go through all the submissions made by the State

17  and Defense today.  So, with that, if you are here on State

18  versus Jason Lee Holloway, and you are here on that case

19  alone, then you may go ahead and leave and be back in this

20  courtroom by 1:30 central time.

21  (WHEREUPON, THERE WAS A RECESS.)

22          THE COURT:  We will be back on the record.  Is

23  there anything else to be submitted by State or Defense?

24          MR. LISENBY:  Not from the State, Your Honor.

25          MR. BLANCHARD:  Nor from the Defense, Your Honor.

1              THE COURT:  This, of course, is capital murder

2    convictions based upon jury verdicts in counts one and three

3    of the indictment.  The defendant is convicted of the offense

4    of murder in count two of the indictment.

5         Previously the jury as stated has returned the verdicts

6    of guilty of capital murder in counts one and three, and then

7    proceeded into sentencing hearing before the jury and

8    recommendation of life without parole was made by the jury.

9    This was by a vote of eight to four.  For the record, this

10   was a long and difficult case on everyone involved.  This

11   case involves not one, but two brutal murders, two senseless

12   murders.  The Court, by law, is required to consider

13   aggravating circumstances contained in 13A-5-49 of the

14   Alabama Code three of which have been submitted by the State

15   for consideration both before the jury and, again, before the

16   Court.  This Court has also considered the statutory

17   mitigating circumstances as contained in 13A-5-51.  And,

18   further, has considered the mitigating circumstances

19   submitted by the Defense today in defendant's exhibit number

20   1 for sentencing, which enumerates some 18 mitigating

21   circumstances.

22        For the record, the decision to be made in a case such

23   as this is, of course, not a matter of mathematical weighing

24   of a numerical finding of either aggravating or mitigating

25   circumstances.  There must be found aggravating circumstances

1    before the sentence of death can be imposed.

2        This case involved a trial of some two weeks in

3    duration.  During the trial an enormous amount of the

4    evidence was presented for the jury's consideration.  After

5    being charged on the law by the Court, the jury returned two

6    capital verdicts of guilty and one noncapital verdict of

7    guilty.  At both trial and during the sentencing phase before

8    the jury in this case, everything was basically laid before

9    the jury, both in the guilt phase and in the sentencing

10   phase.  This was a terrible, heinous, crime committed by this

11   defendant.  And all of the awful details of these murders

12   were squarely submitted for the jury's consideration on

13   making their advisory verdict as to imposition of either life

14   imprisonment without parole or the death sentence itself.

15   Cases such as this must have consideration of all of the law

16   in the State of Alabama that apply to such a case and also to

17   federal law as established by the United States Supreme Court

18   and other federal courts.  The remaining question to be

19   decided by this Court is whether or not the jury's

20   recommendation of life without parole in lieu of the death

21   sentence, or instead of the death sentence, should be allowed

22   to stand, or whether this Court should override the

23   recommendation of the jury.  Taking all things into

24   consideration, I cannot, under the law, find that the jury's

25   verdict -- or, excuse me, the jury's recommendation, should

1    be overridden.  And, according to all the law -- excuse me,

2    all of the evidence presented, both at trial and in the

3    sentencing phase before the jury and the sentencing hearing

4    today, in light of all the law, state and federal that

5    applies to this case, it is the opinion of this Court that

6    after considering the aggravating and mitigating

7    circumstances, which will be set forth in a written order

8    detailing the same, that this defendant should be sentenced

9    to the penitentiary of the State of Alabama for a term of

10   life without parole.  And, it is, therefore, ordered.  A full

11   typewritten sentencing order will be prepared and will be

12   entered in this record just as soon as possible.

13       Counsel, approach and I'll need to see y'all for just a

14   second.

15   (WHEREUPON, A SIDE BAR WAS HELD OFF THE RECORD.)

16       THE COURT:  On the record, the entry of the

17   sentence of life without parole is basically going to render

18   your objection to the admissibility of the State's Exhibit 5

19   and other statements as to the incident which took place in

20   the jail moot.

21       MR. BLANCHARD:  I agree with that, Judge.

22       THE COURT:  So, as far as the record, I think that

23   issue at this point is moot and I would even assume that the

24   objections would be withdrawn.

25       MR. BLANCHARD:  Yes, sir.  You can assume that.

1        THE COURT:  A sentencing order will be prepared

2   which enumerates the factual basis or background of the case,

3   aggravating circumstances and mitigating circumstances .

4        MR. BLANCHARD:  Judge, would it be necessary or

5   appropriate to sentence him on count two at this time?

6        THE COURT:  Oh, I'm going to go ahead.  I just

7   wanted to deal with this one at this time.  And, thank you

8   for that.  All this applies only to count one and count three

9   of the indictment.

10      As to count two of the indictment, is there anything to

11  else to be submitted by State or Defense?

12       MR. LISENBY:  No, sir.

13       MR. BLANCHARD:  No, sir.

14       THE COURT:  It is the judgment and order of the

15  Court that the defendant be, and hereby is, sentenced to the

16  penitentiary of the State of Alabama for a term of life in

17  count two.  I think without anything else said that should

18  take care of that one.

19       MR. BLANCHARD:  Yes, sir.

20       THE COURT:  All right.  That's it.

21       MR. KEITH:  Thank you, Your Honor.

22  (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

23                           *****

24

25

1
IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
2
CHAMBERS COUNTY

3    STATE OF ALABAMA,              *
                                   *     CRIMINAL NO.
4    versus                        *     CC-2000-0000166
                                   *     LaFayette, Alabama
5                                  *
     JASON HOLLOWAY,               *
6         Defendant.               *     **CRIMINAL APPEALS NO.**
                                   *     **CR-02-2115**
7    * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

8
C E R T I F I C A T E
9

10
STATE OF ALABAMA   )
11
AT LARGE           )
12
     I do hereby certify that the above and foregoing
13
transcript of testimony in the matter aforementioned was
14
taken down by me in computerized machine shorthand and
15
transcribed under my supervision, and that the foregoing
16
represents a true and correct transcript of the proceedings
17
had upon said hearing.
18

19                                 _____

20                                 FRANCES L. ROARK, CSR, OFFICIAL
                                   COURT REPORTER, NOTARY PUBLIC
21                                 STATE OF ALABAMA AT LARGE

22                                 My Commission Expires 09/23/06.

23

24   Delivered and filed with the Circuit Clerk

25   the _____ day of _____, 2003.

CR-02-2115

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JASON LEE HOLLOWAY, APPELLANT    )

VS.

) CASE NO. CC-00-166

STATE OF ALABAMA, APPELLEE    )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ON APPEAL FROM THE CIRCUIT COURT OF
CHAMBERS COUNTY, ALABAMA

BRIEF AND ARGUMENT

OF

APPELLANT

CHARLES R. GILLENWATERS, Esq.
JOSEPH D. FICQUETTE, Esq.
Kelly R. Booker, Esq.

ATTORNEYS FOR APPELLANT

ADDRESS OF COUNSEL

POST OFFICE BOX 2129
ALEXANDER CITY, ALABAMA  35011-2129
(256)234-5018
Fax (256) 234-2034

**ORAL ARGUMENT NOT REQUESTED**

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant does not request oral argument before the Judges of this Court.

i

# TABLE OF CONTENTS

Statement Regarding Oral Argument...............................i

Table of Contents............................................................ ii

Table of Authorities.....................................................iii

Statement of the Case ...................................................1

Statement of Issues.... ...................................................3

Statement of the Facts...................................................4

Standard of Review......................................................13

Summary of Argument...................................................15

Argument .....................................................................16

Conclusion....................................................................32

Rulings Adverse to Appellant........................................33

Certificate of Service....................................................38

## TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES

### CASES

**PAGE**

_Breckenridge v. State_, 628 So. 2d 1012 .....................................13, 17
(Ala. Crim. App. 1993)

_Davis v. State_, 737 So. 2d 480 (Ala. 1999) ..........................17

_Dealto v. State_, 677 So. 2d 1236 ..............................................27
(Ala. Crim. App. 1995)

_Ex Parte Arthur_, 472 So. 2d 665, 668 ...............................27
(Ala. 1985)

_Ex Parte Cofer_, 440 So. 2d 1121, 1123 ...............................27
(Ala. 1983)

_Ex Parte Drinkard_, 777 So.2d 295, 296 ...............................29
(Ala. 2000)

_Ex Parte Gentry_, 689 So. 2d 916 (Ala. 1996) ..................17

_Ex Parte State_, (In re: Adrian Roderick Davis v. State),
737 So. 2d 480 (Ala. 1999) .....................................................18

_Hayes v. State_, 717 So. 2d 30 ..............................................13
Ala. Crim. App. 1997).

_McClendon v. State_, 813 So.2d 936, 944 ...............................30
(Ala. Crim. App. 2001)

_McCorvey v. State_, 686 So.2d 424 ......................................26
(Ala. Crim. App. 1995)

_Pope v. State_, 365 So.2d 369, 371 .......................................27
(Ala. Crim. App. 1978)

_Rowell v. State_, 647 So.2d 67, 70 ......................................26
(Ala. Crim. App. 1994)

_Smith v. State_, 795 So.2d 788, 818 (Ala. Crim. App. 2000) ...26

<u>Spellman v. State</u>, 473 So.2d 618, 621............................................28
(Ala. Crim. App. 1985)

<u>United States</u> v. Cathey, 591 F.2d 268, 276.........................................31
(5th Cir.1979)

<u>United States v. Shapiro</u>, 565 F.2d 479, 481.................................31
(7th Cir.1977)

<u>Wilsher v. State</u>, 611 So. 2d 1175...........................................................14
(Ala. Crim. App. 1992).

<u>Woodard v. State</u>, 846 So.2d 1102.........................................................30
(Ala.Crim.App. 2002)

STATUTES:

Section 13A-7-5, Ala. Code 1975..............................................................15

RULES:

Rule 609(d) of the Alabama Rules of Evidence

Rule 403 of the Alabama Rules of Evidence

Rule 609(b) of the Alabama Rules of Evidence

TREATISE:

<u>McElroy's Alabama Evidence</u> § 145.01(19)(4th ed. 1991)

## STATEMENT OF THE CASE

The Defendant, Jason Lee Holloway, hereinafter referred to as Jason Holloway, was arrested on a warrant on January 24, 2000, wherein he was charged with Capital Murder causing the intentional death of Rodney and Angela Brown in violation of 13A-005-040(A)(10).    (C. 1, 2.)    He was indicted in Chambers County, Lafayette, Alabama, for three counts of capital murder. (C. 68.)    Count One, charged him with the death of Rodney Brown and Angela Brown in violation of 13A-005-040(A)(10). Count Two charged him with the intentional death of Rodney Brown during the course of a burglary in the first degree in violation of Section 13A-5-40(a)4.    Count three charged him with the intentional death of Angela Brown during the course of a burglary in first degree in violation of Section 13A-5-40(a)(4). Holloway was tried before a struck jury and found guilty of capital murder as alleged in count one and three and a lesser included offense of murder in count two.    (C. 497-499.) The jury then recommended that the Defendant, Jason Holloway be punished by life imprisonment without parole. The vote was 8 for life without parole and 4 for death. (C.

1

590.) The trial court held a sentencing hearing on July 25, 2003, and after considering the aggravating circumstances and the mitigating circumstances followed the jury's recommendation and sentenced Jason Holloway to life in prison without parole for counts one and three. As to count two Holloway was sentenced to the penitentiary for a term of life. (C. 548-50.) Trial counsel was allowed to withdraw and appellant was appointed appellant counsel on the 27th day of August 2003. (C. 556.) Notice of Appeal was filed on the 27th day of August, 2003. (C. 557-59.)

## STATEMENT OF THE ISSUE

I. THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL TO COUNTS TWO AND THREE OF THE INDICTMENT BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT HIS CONVICTION FOR MURDER COMMITTED DURING THE COURSE OF A BURGLARY.

II. THE TRIAL COURT ERRED TO REVERSAL BY ALLOWING THE STATE TO COMMENT ON AN INCIDENT THAT OCCURRED ON JUNE 24TH, 1989 AT THE HOME OF A MS. LAZONA HANDS.

A. The incident that occurred on June 24th, 1989 happened when the Defendant was a juvenile and thus was not properly admitted for purposes of impeachment.

B. The probative value of the admission of this incident that occurred over 13 years prior to the Trial of this cause was outweighed by the prejudicial effect of said admission.

C. The incident that occurred on June 24th, 1989 was so old as to render its admission error due to the remoteness of said incident.

3

## STATEMENT OF FACTS

On January 12, 2000, the police responded to a call with regard to a possible double homicide at the home of Rodney and Angela Brown. (R. 925.) Upon arriving at the Brown's residence at approximately 4:11 p.m., Sergeant Michael Parrish saw a large crowd of people standing in the street. (R. 926, 932.) Parrish entered the residence and saw Rodney lying face down on the floor of the living room. (R. 926.) He found Angela lying on the couch in the living room and noticed that she had a head wound. (R. 926.) Parrish checked both Rodney and Angela for a pulse but they did not have one. (R. 926.)

Sherwin Boswell of the Victims Crime Response Unit arrived at the scene and found a baseball bat containing blood stains on the living room floor next to Rodney. (R. 943, 949.) Near the couch was a coffee table. (R. 944.) Small, ceramic pieces were also found on the coffee table. (R. 944-45.) Boswell also found a butcher knife beside Rodney's body. (R. 948.) A white pillow was on top of Angela. (R. 949.)

4

Dr. John Krolikowski, Alabama Department of Forensic Sciences Medical Examiner, performed the autopsies and determined that Rodney died from gunshot wounds to his chest and to the back of his head. (R. 826.) Dr. Krolikowski determined that Angela had a gunshot wound to her chest and on the top of her head. (R. 831.) She had a stab wound in her stomach and several stab wounds on her neck. (R. 834.) Angela also had two lacerations on her forehead, which were consistent with having been caused by the use of a baseball bat. (R. 837.) Dr. Krolikowski determined that Angela died from multiple gunshot wounds and sharp and blunt-force trauma; however, he could not determine if Angela was alive at the time she was hit in the head and stabbed. (R. 837, 845.)

Investigator Victor Jason Buivids also arrived at the scene on January 12, 2000. (R. 963.) Buivids took a statement from a nearby resident, Jason Holloway. (R. 964.) Holloway told Buivids that he had arrived home from work that morning at approximately 6:15 p.m. (R. 966.) He went to sleep. (R. 966.) Between 11:30 a.m. and 12:00 p.m., he awakened and went outside to the mailbox. (R. 966.) While outside he saw Jerome Cofield, Angela's

5

brother, in his vehicle outside the Brown residence. (R. 966.) Cofield blew his horn and when no one came out of the residence, Cofield left. (R. 966.) Holloway told Buivids that he went back inside his house and was watching television when he heard children screaming outside. (R. 966.) He went outside. (R. 966.) Angela's children, who had just arrived home from school, were outside screaming that their mother and Rodney were dead. (R. 966.) Holloway ran to the Brown's trailer and looked inside the doorway. (R. 966.) He saw Angela lying on the couch and Rodney lying on the floor. (R. 966.) Holloway ran to his house and called the police. (R. 966.)

In response to receiving some information from Quinton Oliver, a friend of Rodney's, Investigator Mike Looser directed Investigator Jeff Blackstone to go to Holloway's residence to try to obtain consent to search the residence for a certain weapon. (R. 974.) On January 21, 2000, Investigator Blackstone went to Holloway's residence. (R. 989.) When Blackstone arrived at the residence, Holloway's mother invited him inside. (R. 990.) Blackstone told her that he had some information that she owned a handgun. (R. 990.) Blackstone followed Holloway's mother to her bedroom

6

where she opened a dresser drawer and pulled out a brown paper sack. (R. 992-93.) Inside the paper sack was a .38 Colt pistol. (R. 993.) She turned the gun over to Blackstone. (R. 993.) The gun was unloaded. (R. 994.) Before leaving the residence, Blackstone asked Holloway if he would come to the police department to talk with him. (R. 998.) Holloway agreed. (R. 998.)

Once Holloway arrived at the police department, he was questioned by Investigator Charles Wright and Investigator Looser. (R. 1062-63.) After waiving his rights, Holloway told the investigators that on January 12, 2000, he arrived home from work at approximately 6:15 a.m. and went to sleep. (R. 1068.) He was awakened by a knock on the door at approximately 9:00 a.m. (R. 1068.) When he opened the door, he saw the insurance man driving away. (R. 1068.) At some point, Felicia Phillips, his girlfriend, called him on the telephone. (R. 1068.) At approximately 10:00 a.m., he walked over to Rodney's house. (R. 1068.) There was no answer at the door. (R. 1068.) Holloway went back to his house. (R. 1068.) One hour later, Holloway went back to Rodney's house. (R. 1068.) Holloway had a gun. (R. 1068.) Holloway told the police that the reason he went to

7

see Rodney was to confront him about a comment Rodney made several days earlier that he could fuck his girlfriend better than Holloway could. (R. 1068.) Rodney answered the door. (R. 1068.) Holloway entered the residence and asked Rodney about the comment. (R. 1068.) Rodney got a baseball bat that was by the television and swung it at Holloway. (R. 1068-69.) Holloway pulled the gun from his jacket pocket and shot Rodney in the chest. (R. 1069.) Rodney fell to his knees. (R. 1069.) Angela came toward him. (R. 1069.) Holloway shot her twice and then shot Rodney again. (R. 1069.) Holloway left the residence. (R. 1069.) He returned thirty minutes later. (R. 1069.) Angela was gasping for air. (R. 1069.) Holloway had left the gun at the house, but he had brought a survival knife with him. (R. 1069.) Holloway picked up the baseball bat and hit Angela two or three times across the head. (R. 1069.) Seeing that Angela was still alive, Holloway went to the bedroom and got a pillow. (R. 1069.) He tried to smother Angela with the pillow. (R. 1069.) According to Holloway, she was still alive so he stabbed her three or four times around the neck and once in the stomach. (R. 1069.) Once he determined Angela was dead, Holloway had

8

sex with her. (R. 1069.) Holloway told the police that he then left the residence and locked the door. (R. 1069.) He went back to his house and watched television. (R. 1069.) Later that afternoon, he heard the school bus outside. (R. 1069.) Shortly thereafter, he heard Angela's children screaming. (R. 1069-70.) He went outside. (R. 1070.) The children told him that their mother and Rodney were dead. (R. 1070.) He went to the trailer and looked inside. (R. 1070.) He ran to his house and called 911. (R. 1070.) Holloway told the police that the gun his mother gave to Blackstone was the gun used to shoot Rodney and Angela and that they could find the knife used to stab Angela under the kitchen sink. (R. 1070.) He told the investigators that he threw the four empty shell casings over the fence behind his house. (R. 1070.)

After taking Holloway's statement, Investigator Looser told Blackstone to go to the Holloway residence and find the knife. (R. 1003.) Blackstone went to the Holloway residence, told Holloway's mother what he wanted to do, and obtained her consent to search the home. (R. 1003.) Blackstone found the knife under the kitchen sink. (R. 1003.) On February 3, 2000, Investigator Wright went to a

9

fenced area near Holloway's residence to look for the spent shell casings. (R. 1055.) In the area Holloway had stated the shell casings would be, Investigator Wright found two spent .38 shell casings. (R. 1057.)

At trial, Holloway testified that in January of 2000, he worked the nightshift at Wehadkee Yarn Mills. (R. 1116.) He and Rodney had been close friends for several years prior to the shooting. (R. 1116-17.) However, a week before the shooting, Rodney made a comment to Holloway about Holloway's girlfriend, Felicia Phillips. (R. 1118.) Holloway thought that Rodney was threatening to rape Felicia because he had heard that in 1998 Rodney had raped Sandra Patterson, Holloway's previous neighbor. (R. 1118.)

On January 12, 2000, Holloway went to Rodney's home and took a pistol. (R. 1120.) Holloway testified that he took the pistol because he knew Rodney had a violent history and because Rodney had previously told him what he would do to someone. (R. 1120.) Rodney opened the door and let Holloway inside. (R. 1120.) When Holloway entered the residence, he saw Angela sitting on the couch. (R. 1124.) Holloway asked Rodney why he would make such a comment toward Felicia. (R. 1121.) Rodney asked Holloway why he

10

would confront him with that comment in front of his wife. (R. 1124.) Holloway testified that Rodney did not seem upset. (R. 1124.) Rodney said in a nice voice, "I'll be right back. I've got something for you." (R. 1121, 1124.) Rodney went to his bedroom and got a bat. (R. 1121.) Rodney came at Holloway with the bat. (R. 1121.) Holloway felt threatened and thought that his life was in danger. (R. 1122.) Holloway reached inside his jacket pocket, pulled out the pistol, and pulled the trigger, shooting Rodney in the chest. (R. 1127, 1171.) Holloway testified that he did not have time to retrieve because Rodney was too close to him and that whether he stayed or tried to leave Rodney would have hit him either way. (R. 1128.) After being shot in the chest, Rodney turned and fell to his knees. (R. 1171.) Rodney tried to stand up, and Holloway shot him in the back of the head. (R. 1171.) Holloway heard a jump and shot Angela twice before "[he] even knew what [he] was doing." (R. 1128.) Angela was still breathing. (R. 1130.) Holloway became scared and left the residence. (R. 1130.) He went home, got a knife, and went back to the Brown residence. (R. 1130-31.) Holloway testified that he went back to the residence

11

because he did not want Angela suffering. (R. 1131.) Holloway had sex with Angela, he said, to get back at Rodney. (R. 1131, 1198.)

Holloway testified that he did not tell the police the truth initially because he was scared. (R. 1133.) When questioned why parts of his testimony conflicted with the statement he gave to the police, Holloway testified that he was confused at the time he gave the statement and that he wanted to set the record straight during the trial. (R. 1175.) When the prosecutor asked why he did not confront Rodney at the time Rodney made the comment about Felicia, Holloway testified that it did not occur to him to confront Rodney at that time because he and Rodney had been drinking alcohol and smoking marijuana. (R. 1197.) He also did not want to confront Rodney in front of a crowd. (R. 1197.)

## STANDARD OF REVIEW

I. "The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury be fair inference could have found the appellant guilty. ... In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error."

Breckenridge v. State, 628 So. 2d 1012, 1018 (Ala. Crim. App. 1993)(internal citations omitted).

II. Evidence, otherwise relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. The trial court is vested with the power to make this determination, and the trial court's ruling will not be disturbed absent an abuse of discretion. Hayes v. State, 717 So. 2d 30 (Ala. Crim. App. 1997).

"'It is within the sound discretion of the trial judge to decide whether a conviction is too remote in time to have any present probative value toward showing the lack of credibility of the witness.' C Gamble, McElroy's Alabama

13

Evidence § 145.01(19)(4th ed. 1991)." <u>Wilsher v. State</u>, 611 So. 2d 1175 (Ala. Crim. App. 1992).

## SUMMARY OF ARGUMENT

I.    The trial court erred when it denied Holloway's motion for a judgment of acquittal to counts two and three of the indictment because there was insufficient evidence to support his convictions for murder committed during the course of a burglary.    There was no evidence that Holloway "knowingly and unlawfully entered or remained unlawfully" in the Brown's residence, a required element of burglary.

II. The trial court erred when it allowed the State to impeach the Defendant by asking him about a prior bad act. First,    the    incident    that    occurred    on    June    24th,    1989 happened when the Defendant was a juvenile and thus was not properly admitted for purposes of impeachment.    Second, the probative    value    of    the    admission    of    this    incident    that occurred over 13 years prior to the Trial of this cause was outweighed    by    the    prejudicial    effect    of    said    admission. Third, the incident that occurred on June 24th, 1989 was so old as to render its admission error due to the remoteness of said incident.

15

**ARGUMENT**

I. THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL TO COUNTS TWO AND THREE OF THE INDICTMENT BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT HIS CONVICTION FOR MURDER COMMITTED DURING THE COURSE OF A BURGLARY.

The trial court erred when it denied Holloway's motion for a judgment of acquittal to counts two and three of the indictment because there was insufficient evidence to support his convictions for murder committed during the course of a burglary. There was no evidence that Holloway "knowingly and unlawfully entered or remained unlawfully" in the Brown's residence, a required element of burglary. See Section 13A-7-5, Ala. Code 1975.

> "The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury be fair inference could have found the appellant guilty. ... In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error."

16

Breckenridge v. State, 628 So. 2d 1012, 1018 (Ala. Crim. App. 1993)(internal citations omitted).

Section 13A-7-5, Ala. Code 1975, provides:

"(a) A person commits the crime of burglary in the first degree if he *knowingly and unlawfully enters or remains unlawfully* in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime:

"(1) Is armed with explosives or a deadly weapon; or

"(2) Causes physical injury to any person who is not a participant in the crime; or

"(3) Uses or threatens the immediate use of a dangerous instrument."

(Emphasis added.)  "A person 'enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." Section 13A-7-1(4), Ala. Code, 1975.

In Ex parte Gentry, 689 So. 2d 916 (Ala. 1996), the Alabama Supreme Court overruled prior case law holding that evidence of a murder and a struggle inside the victim's residence was sufficient to establish that any initial license to enter had been withdrawn. In Gentry, supra, the Alabama Supreme Court condemned a finding of burglary merely because a crime had been committed and could not be

17

deemed to be within the scope of the privilege to enter. The Court did not want to convert every crime committed after a privileged entry into a burglary.

In <u>Ex parte State (In re:   Adrian Roderick Davis v. State)</u>, 737 So. 2d 480 (Ala. 1999), the Alabama Supreme Court stated that in condemning the use of evidence of a struggle as indicative that a defendant's license or privilege to remain had been revoked in <u>Gentry</u>, it was trying to sweep out "mere evidence of the commission of a crime following privileged entry." 737 at 483.   The Court stated that in doing so, it had "swept with too broad a broom." 737 at 483.   The Court held that evidence of a struggle can constitute circumstantial evidence of a revocation of a license or privilege in order to prove an unlawful remaining.   However, the Court also stated that "the mere fact of the victim's death cannot be equated with a struggle." 737 at 484.   The Court stated that "evidence of a privileged entry followed by death from an injury inflicted by surprise or stealth and causing instantaneous death would not constitute circumstantial evidence of an unlawful remaining." 733 at 484.   The Court further stated that "a privileged entry followed by death from an injury

18

inflicted by a delayed mechanism, such as poison, would be equally deficient." 733 at 484. Because Davis chose to strangle and stab the victim, what the Court considered less-than-instantaneous techniques, the Court concluded that the evidence was sufficient for the jury to find that Davis killed his victim during a burglary because the jury could have reasonably found that from the point Davis began committing his criminal acts, Davis remained unlawfully.

In the present case, there was no evidence that Holloway unlawfully entered the Brown's residence. In fact, the evidence indicated that Rodney opened the door and let Holloway inside the residence. Thus, in order to establish the offense of burglary, the State had to prove that Holloway "remained unlawfully" inside the residence. At trial, the State argued that the act of Rodney getting a baseball bat and swinging it at Holloway was a complete termination of any license or privilege Holloway had to be in the residence. That fact alone does not indicate that Holloway's permission to be in the residence was revoked. One can infer from Rodney coming at Holloway with a baseball bat that Rodney wanted Holloway to remain inside so that Rodney could beat him with the baseball bat.

19

Furthermore, there was no evidence that either Rodney or Angela verbally indicated to Holloway that his license to remain had been revoked.

The State also argued at trial that the fact that there were a number of ceramic pieces on or near the coffee table is circumstantial evidence that a struggle occurred. Although it appeared that a ceramic figurine sitting on a coffee table had been broken into several pieces, there is no evidence that a figurine was broken as a result of a struggle or that Holloway had anything to do with the ceramic figurine being broken. The figurine could have been bumped or knocked off the table by anyone. There was no evidence indicating that a struggle had taken place. All the furniture and pictures were in tact. There was no evidence that the victims had scratched Holloway. Thus, the evidence was insufficient to prove that a struggle had occurred, thereby revoking Holloway's privilege or license to remain.

There was also no evidence that Rodney's death was less than instantaneous. Therefore, the evidence was insufficient to prove that a Holloway's license or privilege to remain had been revoked. Because there was no

20

revocation of Holloway's privilege or license to remain in the residence prior to Rodney's death, the evidence was insufficient from which a jury could reasonably find that Holloway killed Rodney during a burglary. Thus, the trial court erred when it denied Holloway's motion for a judgment of acquittal as to count two of the indictment.

With respect to count three of the indictment, which charged Holloway with killing Angela Brown during a burglary, counsel relies on his previously stated arguments that the act of Rodney swinging a bat at Holloway and the broken ceramic figurine are insufficient evidence from which a jury could reasonably infer that Holloway's privilege or license to remain had been revoked. At trial, the State argued that because Holloway not only shot Angela twice but also hit her with a bat, attempted to smother her, and stabbed her, Holloway chose a non-instantaneous type death for Angela and, therefore, directly removed his license to remain. Holloway chose the technique of shooting Angela, a technique usually associated with causing instant death. Does the fact that Angela did not die as quickly as Holloway would have liked, thereby causing him to try other methods, create evidence that

21

Holloway's license to remain had been revoked?    If the answer to the question is "yes," then the rule the Alabama Supreme Court appeared to set forth in Davis creates a problem.    The Court seemed to be saying that if a defendant chose a less-than-instantaneous technique to kill a victim, that fact alone could constitute sufficient evidence from which a jury could infer that a license to remain had been revoked.    If the answer is "yes," then distinguishing between a capital-burglary/murder case, in which the inference of an implied revocation will be supported, and a non-capital offense of an indoor murder, in which that inference will not be supported by the evidence, will turn on how quickly the victim died and whether the defendant tried alternative methods to kill the victim after initially trying to kill the victim by shooting him or her. Is that an appropriate basis on which to distinguish capital crimes from non-capital crimes?

The Court in the Davis case chose a construction of "remains unlawfully" that has the potential to make almost every murder committed indoor a capital murder, the very thing the Court stated in Gentry that it wanted to guard against.    Rather than looking to the manner of death chosen

22

or how instantaneous death was, the Court should require that the unlawfulness of the remaining be proved separately from the act of committing a crime inside the residence. Evidence from which a revocation of a license or privilege to remain can be inferred should be derived from something separate and apart from the act of killing. Once a person begins the act of killing someone, be it by strangulation, shooting, or otherwise, the commission of the crime of murder has begun. Evidence of a revocation should have to come before a person commits an act to kill someone. Otherwise, there is no separation between the unlawfulness of the remaining and the act of a committing a crime inside the dwelling or building.

23

II.   THE TRIAL COURT ERRED TO REVERSAL BY ALLOWING THE
STATE TO COMMENT ON AN INCIDENT THAT OCCURRED ON JUNE 24TH,
1989 AT THE HOME OF A MS. LAZONA HANDS.

During the trial of this cause, the State of Alabama in
a sidebar conference argued that certain comments made by
the Defendant during his direct examination allowed the
State to challenge the Defendant with information and
reports concerning an incident that occurred on June 24th,
1989 at the home of a Ms. Lazona Hands.   (T-1136-1150)
During this sidebar, the Trial Judge asked the Court
Reporter to read back the portion of the Defendant's
testimony that "opened the door" for the mention of the
June 24th, 1989 incident during cross-examination. (T-1142)
The Court Reporter answered as follows:

> Answer: "I had my back to her and I
> shot him the second time and I heard
> this motion and I was already — I
> was scared. Paranoid.   I'd never
> shot anyone a day in my life. **I'd
> never even made any threat of
> violence in my life**, and, so, I
> heard this jump and all. I turned
> real quick and I ended up pulling
> the trigger twice before I even knew
> what I was doing. "

24

(emphasis added) (T-1142) The Trial Court later misquoted the Defendant's statement by, "...[s]tatement was I'd never had a history of violence in my life." (T-1143) After hearing argument of counsel, the Trial Judge ruled that the first two sentences of the report detailing the events at Ms. Hands' home would be admissible for the purpose of impeachment of the Defendant. (T-1146) Learned Trial Counsel for the Defendant timely lodged several objections to the Trial Court's decision. (T-1138-1150) For ease of review, the Appellant would argue each of these objections individually below.

A. The incident that occurred on June 24th, 1989 happened when the Defendant was a juvenile and thus was not properly admitted for purposes of impeachment.

Rule 609(d) of the Alabama Rules of Evidence states as follows:

> (d) Juvenile or Youthful offender adjudications. Evidence of Juvenile or youthful offender adjudications is not admissible under this rule.

25

The Act that occurred at the home of Ms. Hands occurred while the Defendant was a juvenile. In fact he was 16 at the time of this occurrence. (T-1138) The judicial resolution of this incident occurred in the Juvenile Court.(T-1139) Alabama Law is clear that juvenile convictions are not appropriate for impeachment purposes. McCorvey v. State, 686 So.2d 424 (Ala.Crim.App.1995); Rowell v. State, 647 So.2d 67, 70 (Ala.Crim.App.1994); Smith v. State, 795 So.2d 788, 818 (Ala.Crim.App.2000)

The Appellant would aver that the foregoing rule of evidence and the above cited cases show that the Trial Court in the cause erred to reversal by allowing the prosecution in this case to comment on the incident that occurred at Ms. Hand's residence.

B.  The probable value of the admission of this incident that occurred over 13 years prior to the Trial of this cause was outweighed by the prejudicial effect of said admission.

Rule 403 of the Alabama Rules of Evidence states as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

26

The Appellant would initially submit that evidence of prior bad acts in inadmissible if the only probation function of that evidence is to show that the defendant has bad character or to show that the defendant has a propensity to commit the crime he is presently charged with. Dealto v. State, 677 So. 2d 1236 (Ala. Crim. App. 1995) This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of crime in question. Pope v. State, 365 So. 2d 369, 371 (Ala. Crim. App. 1978) The basis for this rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them and that such evidence of prior crimes has an almost irreversible impact upon the minds of the jury. Ex Parte Arthur, 472 So. 2d 665, 668 (Ala. 1985) The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged. Ex Parte Cofer, 440 So. 2d 1121, 1123 (Ala. 1983)

The trial court allowed the State of Alabama to bring to the jury's attention on cross examination the

27

incident concerning Ms. Hands. (T-1146) This admission dealt with an incident that occurred over 14 years prior to this trial and was very similar in nature to the offense charged at trial.   In fact, the State of Alabama was able to discuss the 75 year old woman who was the victim in thee incident that occurred over 14 years prior to the trial of this cause.   Although the State may find a reason to disagree, the image of the lonely 75 year old woman with only a door separating her from the Defendant is very stark.    Evidence concerning the Defendant's collateral crimes or acts may be relevant, but it should be excluded if it would serve comparatively little or on purpose except to arouse passion, prejudice, or sympathy of the jury. Spellman v. State, 473 So.2d 618, 621 (Ala. Crim. App. 1985)

The image invoked by Ms. Hands in dire peril those many years ago simply cannot be ignored.   As such, the Appellant would aver that the Trial Court erred to reversal by allowing the State to comment on this incident over the Defendant's timely Rule 403 objection.

C.  The incident that occurred on June 24th, 1989 was
    so old as to render its admission error due to the
    remoteness of said incident.

    Rule 609(b) of the Alabama Rules of Evidence

states as follows:

(b)  Time Limit.  Evidence of a conviction under this
     rule is not admissible if a period of more than
     ten years has elapsed since the date of the
     conviction or of the release of the witness from
     the confinement imposed for that conviction,
     whichever is the later date, unless the court
     determines in the interest of justice, that the
     probative value of the conviction supported by
     specific facts and circumstances substantially
     outweighs its prejudicial effect.  However,
     evidence of a conviction, more than ten years old
     as calculated herein, is not admissible unless the
     proponent gives to the adverse party sufficient
     written notice of intent to use such evidence to
     provide the adverse party with a fair opportunity
     to contest the use of such evidence.

The prosecution at trial used an incident that

occurred over 14 years prior to the trial of this cause

in an attempt to impeach the Defendant. (T-1140)

Evidence of collateral crimes is presumptively

prejudicial because it could cause the jury to infer

that, because the defendant has committed crimes in the

past, it is more likely that he committed the

particular crime with which he is charged.  Ex Parte

Drinkard, 777 So.2d 295, 296 (Ala.2000) This fact is

likely to draw the juror's minds away from the charge being tried. Woodard v. State, 846 So.2d 1102 (Ala.Crim.App. 2002)

For the admission of a conviction that is greater than ten years old, a trial court must determine that the probative value of the conviction "substantially outweighs" its prejudicial effect to the Defendant. See McClendon v. State, 813 So.2d 936, 944 (Ala.Crim.App. 2001)

During its deliberation concerning the admission of this incident, the trial court reasoned that the incident at Ms. Hand's home was admissible for impeachment purposes and to show the intent of the Defendant. (T-1140) In its analogy, the trial court placed particular emphasis on the similarity of the incident at Ms. Hand's and the charge before the trial court. The Trial Judge stated:

Noted. "I will also note that the tenner of this case is that the Defendant, Jason Holloway, went to and entered the residence of Angela and Rodney Brown while armed with a pistol. His stated intention in doing was to confront Rodney Brown with the things that he, Rodney Brown, had said about the girlfriend of Jason Holloway. Here in the portion that is being admitted on cross examination, this defendant, Jason Holloway, **attempted to enter the home of another**

30

**individual**, that being and older woman, apparently cut her screen, and stated the purpose of his actions was to confront her about, quote, lying on him. Not only does the Court believe this can be admissible for purposes of impeachment of his direct testimony from the stand relative to acts of violence, I think this is also relevant to actually showing his mental intent. "

emphasis added (T-1148)

When the prior conviction and the charged act are of a similar nature, the danger of unfair prejudice increases. United States v. Shapiro, 565 F.2d 479, 481 (7th Cir.1977) If a prior conviction is similar to the new charges, the jury may misuse the prior conviction as evidence of guilt. United States v. Cathey, 591 F.2d 268, 276 (5th Cir.1979) It appears from the record of this cause that the main reason the Trial Court admitted this disputed evidence concerning the Ms. Hand's incident is that it was similar to the facts at the case at bar. (T-1148) Based upon the foregoing, the Appellant avers that the Trial Court committed reversible error by allowing the information concerning this incident to be admitted over the Defendant's remoteness objection.

31

## CONCLUSION

Based on the foregoing, Appellant JASON LEE HOLLOWAY respectfully urges this Court to reverse his convictions and render judgment for the Appellant.

Further, Appellant prays for such other relief as the Court deems proper all premises considered.


Charles R. Gillenwaters (GIL-002)
Gillenwaters & Ficquette, LLC
Attorney for Appellant
JASON LEE HOLLOWAY


Joseph D. Ficquette (FIC-003)
Gillenwaters & Ficquette, LLC
Attorney for Appellant
JASON LEE HOLLOWAY


Kelly R. Booker (BOO-34)
Gillenwaters & Ficquette, LLC
Associate
Attorney for Appellant
JASON LEE HOLLOWAY

## RULINGS ADVERSE TO APPELLANT

ACTION OR RULING                        RECORD PAGE NO.

Denial Motion to Suppress          Clerk's 133

Denial of Motion In Order
Dated 5/23/03                 Clerk's 446 - Clerk's 449

Refusing Requested Jury Charges   R-0471 Through R-492
Harmless error, bur list one denied
As Ruling Adverse to Appellant.

Objection to Excusing Juror           R-23 through R-25
Stephanie Thomas

Objection to Excusing Juror           R-52 through R-53
Mildred Heard

Objection to Excusing Juror #236      Page 120
McFarin, Jehovah's Witness

Objection to Excusing Juror #347      R-25 through R-256
Ms. Thomas, Grandchild's Surgery

Challenge Excusing, Terry Brown       R-276

Sustaining State's Objection          R-492
"Mercy"

Court's excluding Juror who failed R-501 through R-503
to disclose he "know" Defendant

Court's Excusing Juror Mylinda Clifton
                                      R-552 through R-553
100% certain

Denied Defendant's Challenge for      R-637 through R-
638 Cause, Juror, Bailey              New Granted
                                      R-640, No Error

33

Motion In Limine, Denied Panties  R-760 through R-765

Denied Defendant Jury Charge at   R-771 through R-775
Commencement of Evidence

Granting State's Motion in Limine    R-879
Regarding Angela Brown prior Specific Acts

Granting State's Motion not to        Rule 404(b)(2)(a)
Question Witness, William Cofield,    R-898
as to Victim, i.e. Rodney Brown's use
of Drugs & Alcohol

Sustaining State's Objection          R-900

Sustaining State's Objection to       R-903
Snapping very Easy

Sustaining State's Objection          R-904

Sustaining State's Objection          R-905
Not Responsive

Sustaining State's Objection          R-922
Argument between Victims

Overruling Defendant's Objection      R-945 through R-946
To State's Exhibit #30
Photograph of Scene with blood on
Religious Magazine

R-950, Exhibit #30 is Photo of        R-950
Bloody Magazine close to females
Head

Overruling of Defendant's Objection R-985 through R-986
To State's Ex #36 you seized from
Tyrone Hatcher, gun excluded by
Ballistic Exam

Overruling Defendant's Objection,     R-989
Relevant State's Exhibit #37-38 Caliber
Gun seized from Oliver's

34

Objection Noted                                    R-1000

Objection to picture of parties      R-1059 through R-1060
in tree State's Ex. #46,47,48,49
(Found on 11311) (R-1073) 74,75
Jason Arrested January 21, 2000
Overruling Defendant's Objection     R-1062
to parties being addicted State's
Exhibit #4


Overruling Defendant's Objection     R-1067
to Defendant's Statement, State's
Exhibit 57

Judgment of Acquittal                R-1080 through R-1091
Insufficient to support implied
Revocation denied as to count
Three, count two denied, count
One denied

Sustaining State's Objection         R-1105

Sustaining State's Objection         R-1107

Sustaining State Objection to        R-1151
other acts of violation

Sustaining State's Objection         R-1108
To his general representation
for violence in community

Sustaining State's Objection         R-1111

Sustaining State's Objection         R-1118

Sustaining State's Objection         R-1119

Sustaining State's Objection         R-1123

Sustaining State's Objection         R-1125

Objection to Juvenile incident   R-1146, 1147, 1148
Being used by State in cross         R-1149

35

Examination of Defendant 404(b)
Specifically Overruled                    R-1176

Sustaining State's objection              R-1185

Sustaining State Objection                R-1188
Leading

Denying Defendant's Requested    R-1220 through R-1226
#2,#3,#4,#6,#8,#9

Overruling Defendant's Objection R-123(b)
Victim Reading Daily
Devotional –Closing Argument
Then sustained on                         R-1238

Motion for Mistrial Never                 R-1238
Ruled on

Objection by Defense to State             R-1358
Requested Instruction #7
Abusive or Insulting Words

Objection to State's Request              R-1358
Charge #9- A Threat Overruled             R-1359

Denying Charge that "In Order    R-1376 through R-1379
To Return Death Sentence that
the aggravators outweigh the
mitigator's beyond a Reasonable Doubt"

Overruling Defense's Objection            R-1403
to Victim's Impact

Overruling Defense's Objection            R-1464
to Preaching Certificate
State's Exhibit #58

Overruling Defendant's Objection          R-1571
to Admission of Report Card with
higher grades

Denying Defendant's Jury Charges R-1591 through R-1595
#22,24,29,30,32,34,35,36,38,40

36

and 40(a)

Double Counting-Aggravating     R-1599 through R-1600
Circumstances-Objection overruled


Objection to Jury Charge     R-1679
Aggravator proven at Trial
Proven at Penalty Phase

Objection to Jury Charge     R-1680
Mitigating Circumstances
Reflect favorable upon the Defendant

Objection to Jury Verdict     R-1680
Being Advisory

Objection to Refusing     R-1682 through R-1684
Defendant's Request Charge #24,
29,34,36,38,40, 40(a) and 41.

Overruling Defense Objection to     R-1693
Event at Jail after Jury Trial

Overruling Defense Objection     R-1695

Overruling Defense Objection     R-1709

Overruling Defense Objection     R-1711

37

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon the Honorable William Pryor, Attorney General, State of Alabama, 11 South Union Street, Montgomery, Alabama 36130, by mailing a copy thereof, postage prepaid, on this the 21st day of January, 2004.


_____
Charles R. Gillenwaters (GIL-002)

_____
Joseph D. Ficquette (FIC-003)

_____
Kelly R. Booker (BOO-034)


COUNSEL'S ADDRESS:

GILLENWATERS & FICQUETTE, L.L.C.
POST OFFICE BOX 2129
ALEXANDER CITY, ALABAMA  35011-2129
(256)234-5018

No. CR-02-2115

In the COURT of CRIMINAL APPEALS
*of ALABAMA*

———————————◆———————————

JASON LEE HOLLOWAY,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

———————————◆———————————

*On Appeal From the Circuit Court of
Chambers County
(CC-00-166)*

**BRIEF OF APPELLEE**

Richard F. Allen
*Acting Attorney General*

Andy S. Poole *
*Assistant Attorney General*

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300*

March 3, 2004                    Counsel of Record*

## STATEMENT REGARDING ORAL ARGUMENT

The State does not request oral argument.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT........................... i

TABLE OF CONTENTS.......................................... ii

TABLE OF AUTHORITIES...................................... iii

STATEMENT OF THE CASE...................................... 1

ISSUES PRESENTED FOR REVIEW............................... 5

STATEMENT OF THE FACTS.................................... 5

STATEMENT OF THE STANDARD OF REVIEW...................... 13

SUMMARY OF THE ARGUMENT.................................. 14

ARGUMENT................................................. 18

   I.   The Trial Court Properly Denied Holloway's Motions
   For Judgment Of Acquittal As The State Presented A Prima
   Facie Case In Support Of The Indictments That Supported
   The Jury's Verdicts. .................................. 18

   II.  The Trial Court Properly Exercised Its Discretion
   In Allowing The State To Cross Examine Holloway Concerning
   An Earlier Incident When Holloway Injected His Character
   Into Evidence During His Own Direct Testimony ......... 26

CONCLUSION............................................... 36

CERTIFICATE OF SERVICE................................... 37

# TABLE OF AUTHORITIES

**Cases**

Cooley v. State, 686 So. 2d 546 (Ala. Crim. App. 1996)... 31

Ex parte Bailey, 590 So. 2d 354 (Ala. 1991)............. 24

Ex parte Davis, 737 So. 2d 480 (Ala. 1999)........... 19-20

Ex parte Gentry, 689 So. 2d 916 (Ala. 1996)............ 21

Ex parte Loggins, 771 So. 2d 1093 (Ala. 2000).......... 30

Ex parte Woodall, 730 So. 2d 652 (Ala. 1998).......... 24

Fortner v. State, 582 So. 2d 582 (Ala. Crim. App.
  1990) ................................................. 19

Hayes v. State, 717 So. 2d 30 (Ala. Crim. App.
  1997) ................................................. 34

Johnson v. State, 555 So. 2d 818 (Ala. Crim. App. 1989).. 24

Long v. State, 838 So. 2d 1067 (Ala. Crim. App. 2002).... 35

Marshall v. State, 629 So. 2d 766 (Ala. Crim. App.
  1993) ................................................. 24

Samuels v. State, 584 So. 2d 958 (Ala. Crim. App.
  1991) ................................................. 19

Smith v. State, 745 So. 2d 284 (Ala. Crim. App. 1998).... 34

U. S. v. Roper, 135 F.3d, 430 (6th Cir. 1998)........... 31

United States v. Beltran-Rios, 878 F.2d 1208 (9th Cir.
    1989) .................................................. 31

Walker v. State, 631 So. 2d 294 (Ala. Crim. App. 1993)... 30

White v. State, 546 So. 2d 1014 (Ala. Crim. App. 1989)... 24

Whitehead v. State, 429 So. 2d 641 (Ala. Crim. App.
    1982) ................................................. 25

Williams v. State, 695 So. 2d 644 (Ala. Crim. App.
    1996) ................................................. 31

Zumbado v. State, 615 So. 2d 1223 (Ala. Crim. App.
    1993) ................................................. 25

**Other Authorities**

Ala. Code (1975)

    §13A-7-5 ............................................. 18

**Rules**

Ala. R. Evid.

    Rule 404(a)(1) ...................................... 30

    Rule 611(b) ......................................... 30

## STATEMENT OF THE CASE

On January 12, 2000, Jason Holloway went into the home of his neighbors, Rodney and Angela Brown, and murdered them both. Holloway shot Rodney Brown in his chest and the back of his head, causing Mr. Brown to die almost instantly. Holloway shot Angela Brown in the head and chest, although she did not die immediately. Holloway left the Browns' home, but returned shortly thereafter. Finding Angela still alive, Holloway struck her on the head with a baseball bat, smothered her with a pillow, and stabbed her. After she died, Holloway committed a sexual assault on her body. Holloway then returned home and watched television, waiting for Angela Brown's eleven and thirteen year old daughters to return home from school to find the bodies of their mother and stepfather.

The jury convicted Holloway of the capital murder of two persons; the intentional murder of Rodney Brown; and, the capital burglary-murder of Angela Brown. On appeal, Holloway does not challenge the sufficiency of the evidence to support his conviction of the capital murder of two persons; he does, however, challenge his convictions for the murder of Rodney Brown and the capital murder of Angela

Brown, arguing that there was insufficient evidence to
support the underlying charge of burglary contained in the
indictment for capital murder.  The State responds that
Holloway's argument does not affect his conviction for the
intentional murder or Rodney Brown because Holloway's
conviction for the lesser included offense did not require
proof of a burglary.  The State further avers that the
evidence supported Holloway's conviction for the capital
murder of Angela Brown because there was evidence that his
original license to be in their home had been revoked,
showing he unlawfully remained in the home.  Further,
Holloway's return to the home to assure that Angela Brown
was dead evidenced an unlawful entry that supported the
conviction.  In addition to his sufficiency arguments,
Holloway contends that the State improperly impeached him
with evidence of a collateral act that occurred when he was
a juvenile.  The State responds that the evidence was
properly allowed in response to Holloway's assertion of his
good character during his direct testimony that he had
never threatened violence in his life.  Holloway's
arguments are due to be rejected and his convictions are
due to be affirmed.

On August 23, 2000, the Chambers County Grand Jury returned a three-count indictment against Holloway. (C. 68, 501) Count I charged Holloway with the intentional capital murders of Rodney and Angela Brown pursuant to one scheme or course of conduct, in violation of Alabama Code Section 13A-5-40(a)(10). Count II charged Holloway with the capital murder of Rodney Brown during the course of a burglary, in violation of Alabama Code Section 13A-5-40(a)(4). Count III charged Holloway with the capital murder of Angela Brown during the course of a burglary, in violation of Alabama Code Section 13A-5-40(a)(4). Holloway was arraigned on September 14, 2000 and pleaded not guilty and not guilty by reason of mental disease or defect. (C. 501-502)

Trial commenced before a jury on June 3, 2003, Judge Ray D. Martin presiding. Following the presentation of evidence and the court's oral charge, the jury returned verdicts finding Holloway guilty of capital murder of Rodney and Angela Brown on Count I in the indictment; guilty of the lesser included offense of intentional murder of Rodney Brown on Count II of the indictment; and, guilty of the capital murder of Angela Brown during the course of

3

a burglary on Count III of the indictment. (C. 497-499; R. 1361-1362)

The court then conducted the sentencing phase of trial. Following the presentation of evidence and the court's oral charge, the jury returned a verdict recommending punishment by life in prison without parole by a vote of 4 for death and 8 for life without parole. (C. 500; R. 1686)

The court conducted a sentencing hearing on July 23, 2003. After conducting a weighing of the aggravating and mitigating circumstance present in the case, and with consideration of the jury's recommended punishment, the court sentenced Holloway to life in prison without parole for the capital murder convictions contained in Counts I and III of the indictment. (R. 1766-1768) The court sentenced Holloway to life imprisonment for the conviction of intentional murder contained in Count II of the indictment. (R. 1769) The court issued a written order on July 25, 2003, setting out its findings. (C. 548-550)

Holloway filed written Notice of Appeal on August 29, 2003. (C. 557)

4

## ISSUES PRESENTED FOR REVIEW

1.  Did the trial court properly deny Holloway's motions for judgment of acquittal on Counts II and III of the indictment as the State presented sufficient evidence to establish a prima facie case of burglary supporting the capital charges contained in the indictments?

2.  Did the trial court properly allow the State to impeach Holloway with evidence of a prior act in rebuttal to Holloway's assertion of good character during his direct testimony that he had never made a threat of violence in his life?

## STATEMENT OF THE FACTS

On January 12, 2000, eleven-year-old Terri Zachary and thirteen-year-old Tashia Zachary left their home, where they lived with their mother and stepfather, to go to school.  When the girls returned that afternoon, they found their mother, Angela Brown, and their stepfather, Rodney Brown, dead on the floor in their home.  (R. 907-913)

Jerome Cofield, Angela Brown's brother, had previously planned with his sister to come to her home early that

morning to drive her on some errands. He was delayed and did not arrive at their home until approximately 11:30 a.m.. As he approached the Browns' home, Mr. Cofield saw Jason Holloway, a neighbor, standing at the corner of his house. Mr. Cofield thought Holloway's behavior was unusual because he had grown up with Holloway and they usually spoke when Mr. Cofield came to the area. On this date, Holloway did not even look toward Mr. Cofield. Mr. Cofield drove his car into the yard of the Browns' residence and blew the car horn. When no one responded, Mr. Cofield left. (R. 886, 889)

Terri and Tashia arrived home from school around 4:00 p.m.. As she was getting off the school bus, Terri saw Holloway "peeping around the corner" of his house watching the girls get off the school bus. (R. 915) The front door was not usually locked when Angela and Rodney were home; when Terri got to the door, it was locked. She knocked on the door and no one answered. She then ran back to Tashia and got the key from her. Returning to the house, Terri went inside and found the bodies of Angela and Rodney. Terri ran from the house; Holloway was coming toward her and asked her what happened. Holloway then continued on

6

toward the Browns' home. (R. 912-914) Several broken ceramic pieces were found on the floor. (R. 943-945) Terri knew they had not been there that morning because they had cleaned the house the night before. (R. 917)

Dr. John Krolikowski performed autopsies on the bodies of Angela and Rodney Brown. Mr. Brown had been shot in his chest and the back of his head. (R. 820-822) The cause of Mr. Brown's death was the multiple gunshot wounds. (R. 826) Angela Brown also had gunshot wounds to her chest and to the top of her head. (R. 831-832) She also had a grazing wound to her chest. Additionally, Angela had been stabbed in the stomach and neck, and had lacerations on her forehead consistent with use of a blunt instrument such as a bat. The cause of death for Mrs. Brown were the "multiple gunshot wounds, sharp and blunt-force trauma." (R. 834-838)

During the course of investigating the murders, police officers developed information concerning pistols owned by several people. On January 21, 2000, Investigator Mike Looser dispatched Investigator Jeff Blackstone to Holloway's home based on information that Holloway's foster mother, Marie Collier, owned a handgun. (R. 973-975)

7

Investigator Blackstone spoke with Ms. Collier and she agreed to give him the gun. Holloway was present and initially acted angry, but later acted nervously. (R. 990-993, 995-997) Investigator Blackstone left Holloway's residence and spoke with Investigator Looser. Looser directed him to return and ask Holloway if he would come down and talk with the officers. Holloway agreed and got in the car with Investigator Blackstone to drive to the Investigations Office. During the drive, Holloway said to Investigator Blackstone, "Jeff, that lie detector test I told you I would take, … if I took it right now, I would blow it off the wall." Investigator Blackstone told Holloway to wait until they got to the office to talk. (R. 998-1001)

At the investigators' office, Holloway was interviewed by Investigator Looser and Alabama Bureau of Investigations Agent Charles Wright. The officers informed Holloway of his constitutional rights and Holloway waived his rights and agreed to give a statement. (R. 1063-1065) Holloway admitted going to the Browns' home while armed with a pistol but his intent was to confront Rodney concerning a comment Rodney had made previously about Holloway's

8

girlfriend. Holloway stated that Rodney got a baseball bat and swung it at him and Holloway then shot Rodney. He then shot Angela twice and shot Rodney a second time. Angela was still alive "gasping for air" and Holloway left the house and returned in approximately thirty minutes. He did not bring the pistol the second time but brought a knife with him. Angela was still alive and Holloway hit her with the baseball bat. He then got a pillow and attempted to smother her. He then stabbed her several times. After she died, Holloway had sex with her body. He then returned home and watched television that afternoon until he heard the school bus and then Angela's daughters screaming. He went out and the girls told him that their mother and Rodney were dead. He looked in the home and then went to his house and called 911 and reported the murders. Holloway admitted that the pistol his foster mother gave Investigator Blackstone was the one he used to shoot the Browns and told the officers where to find the knife and the empty shell casings. (R. 1068-1070)

Because of an unexpected delay in trial, counsel for Holloway and the State entered a stipulation to avoid inconveniencing an out-of-state witness. Among the

evidentiary matters stipulated to were that DNA testing of semen found on a vaginal swab taken from Angela Brown identified the semen as coming from Holloway. Blood found on the baseball bat was primarily that of Angela Brown with some being from Rodney Brown. (R. 882-883)

Holloway testified in his own behalf and admitted going to the Browns' home armed with a pistol but denied any intention to kill them. He and Rodney Brown had been friends for a number of years but their friendship had deteriorated. Holloway said that he became aware that Rodney Brown had raped a girl on an earlier occasion; Rodney Brown then made a comment concerning Holloway's girlfriend that Holloway claimed he took as a threat against the girl. He asked Rodney why he would make a comment such as that concerning the girl. Holloway said that Rodney took his comment out of proportion because it was said in front of Rodney's wife. Rodney then told Holloway to wait for a moment, he had something for him. Holloway testified that Rodney then went to his bedroom, and returned charging at him while holding a baseball bat. (R. 1117-1121) Holloway stated that he had no choice but to shoot Rodney because he did not have an opportunity to

10

get out of the door.  He shot Rodney twice and then heard

Angela moving and shot her twice.  (R. 1124-1128)  Angela

was still breathing and he left and went to his home.  He

came back after a few minutes because he did not "want to

see her suffering."  He brought a knife with him on this

occasion and hit her with the bat and stabbed her.  He said

he had sex with her after she died as a way of "getting

back at Rodney for the things he had did in his life to

women."  Holloway admitted remembering what he had done but

that he was not "in control of himself" and everything he

had done was "stupid" and "dumb."  (R. 1130-1132)

    During his testimony, Holloway stated, "I'd never shot

anyone a day in my life.  I'd never even made any threat of

violence in my life."  (R. 1128)  Following his testimony,

the State asked to take a matter up with the court outside

of the presence of the jury before beginning its cross-

examination.  The State referenced Holloway's broad

statement of never having done anything like this and

stated there was evidence concerning previous acts of

striking people as well as an attempt to break into the

home of an elderly woman by cutting the screen on her door.

(R. 1135-1136)  The court asked the State to detail the

matters they sought to use for impeachment. The court had

the court reporter read the portion of Holloway's testimony

that the State argued open the door for this impeachment.

The court held that a limited portion of a report

concerning the incident when Holloway attempted to gain

entry into a home would be allowed for impeachment purposes

but excluded the other matters sought by the State. (R.

1135-1146) The court stated a limiting instruction would

be given that the testimony was limited to the purpose of

impeachment. (R. 1149)

On cross-examination, the State asked Holloway if he

had not earlier testified that he "had never had a history

of violence in [his] life"; Holloway affirmatively replied

that had been his testimony. The State then asked Holloway

about the incident that occurred in 1989. Holloway denied

breaking into a home but said that he was drunk and went to

the home and knocked on the door. The woman did not come

to the door but was talking through the door. Holloway

admitted he had a knife and cut the screen. (R. 1176-1177)

Following this testimony, the court gave an instruction

that the testimony was limited to the purpose of

impeachment. (R. 1178)

12

Holloway testified that Rodney never told him to leave the house and continued to claim that he did not have the opportunity to do so because of the manner in which Rodney charged at him with the baseball bat. Holloway acknowledged, however, that Rodney Brown's actions indicated that he did not want Holloway in his home. (R. 1180-1181)

## STATEMENT OF THE STANDARD OF REVIEW

I. The standard of review applicable to Holloway's allegation that the evidence was not sufficient to support his guilty verdicts under Counts II and III is whether the State presented a prima facie case, considering the evidence in the light most favorable to the State, from which a "rational factfinder could have found the defendant guilty beyond a reasonable doubt." Johnson v. State, 555 So. 2d 818, 819 (Ala. Crim. App. 1989); Ex parte Woodall, 730 So. 2d 652, 658 (Ala. 1998). When the State makes a sufficient prima facie case presenting a factual question to be determined by the factfinder in the case, "the verdicts rendered thereon are conclusive on appeal." Johnson, 555 So. 2d at 820.

13

II. The standard of review on Holloway's allegation that the trial court erred in admitting evidence of a collateral act is whether the court abused its discretion in admitting the evidence. Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000). It is an appropriate exercise of discretion to allow the State to impeach the defendant on cross examination by rebuttal evidence when the defendant has asserted his good character on direct examination. Rule 404(a)(1), Alabama Rules of Evidence.

## SUMMARY OF THE ARGUMENT

I. Holloway does not challenge the sufficiency of the evidence of his conviction under Count I of the indictment for the intentional murder of two persons. He does challenge the sufficiency of the evidence for his convictions under Counts II and III for the intentional murder of Rodney Brown and the capital burglary murder of Angela Brown. He argues the State did not sufficiently prove the necessary element of burglary that he "knowingly and unlawfully entered or remained unlawfully" in the Browns' home that was the basis for the capital charges. His argument offers no basis undermining his conviction for

14

the intentional murder of Rodney Brown.  Because he was
convicted of the lesser included offense, the statutory
elements of burglary have no bearing on his conviction for
the murder of Rodney Brown.  Samuels v. State, 584 So. 2d
958, 962 (Ala. Crim. App. 1991).  Contrary to his argument,
the State presented sufficient evidence supporting the
charge of capital murder during the course of a burglary
charge for the intentional murder of Angela Brown.  The
State presented evidence of a struggle that was sufficient
to support an inference, and establish a jury question,
that Holloway's initial privilege of being in the home had
been revoked and he therefore unlawfully remained in the
home.  The evidence established that Rodney Brown retrieved
a baseball bat and came toward Holloway with it; there was
also evidence of broken ceramic pieces in the room that had
previously been on a table.  The evidence of a struggle
sufficiently showed revocation of Holloway's privilege and
established a question to be submitted to the jury.  Ex
parte Davis, 737 So. 2d 480, 483 (Ala. 1999).  Further, the
evidence established that after first shooting Rodney and
Angela Brown, Holloway left the home while Angela was still
alive.  He returned shortly thereafter to ensure that she

15

was dead, at which time he stabbed her, smothered her with

a pillow, and struck her with a baseball bat, thereby

completing her murder.  The second entry was certainly an

unlawful entry that supported the capital charge.

Sufficient evidence was presented to support the jury's

verdicts of guilty returned against Holloway.

II.  The trial court properly exercised its discretion

in allowing the State to cross examine Holloway about an

earlier incident of violence after Holloway injected his

character into issue by his own direct testimony that he

had "never even made any threat of violence in [his] life."

(R. 1128)  In response to Holloway's injection of his good

character into evidence, the State was properly allowed to

rebut the evidence.  Rule 404(a)(1), Alabama Rules of

Evidence.  The limited examination allowed by the court was

clearly within the scope of cross examination on a matter

"affecting the credibility of the witness."  Rule 611(b),

Alabama Rules of Evidence.  Holloway's assertion of a

history of nonviolence opened the door for the trial

court's authorization of the State to inquire about an

earlier incident where Holloway, when a woman refused to

answer the door to him, cut the screen off the door with a

knife in an effort to enter the home and confront the woman. Holloway's assertion of his good character justified the State's cross examination about this relevant previous instance of conduct inconsistent with his assertion of good character. Ex parte Woodall, 730 So. 2d 652, 663, fn. 4 (Ala. 1998), citing C. Gamble, McElroy's Alabama Evidence, §26.02(9) (5th Ed. 1996). The trial court limited the State's examination and gave a limiting instruction on the use of the cross examination by the jury. The trial court properly exercised its discretion in ruling on this matter and did not commit error. Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000).

17

ARGUMENT

I.   The Trial Court Properly Denied Holloway's Motions For
     Judgment Of Acquittal As The State Presented A Prima
     Facie Case In Support Of The Indictments That Supported
     The Jury's Verdicts.

Holloway does not challenge the sufficiency of the

evidence of his conviction under Count I of the indictment

for the intentional murder of two persons as defined by

Alabama Code Section 13A-5-40(a)(10).  He does, however,

challenge the sufficiency of the evidence supporting his

convictions for the intentional murder of Rodney Brown and

the capital burglary murder of Angela Brown.  Holloway

argues that the State's evidence did not prove the

necessary element of the underlying burglary charge that he

"knowingly and unlawfully entered or remained unlawfully"

in the Browns' home.  Ala. Code §13A-7-5.  The State avers

that Holloway's allegations are without merit and are due

to be rejected and his convictions are due to be affirmed.

In addition to Holloway not challenging his conviction

under Count I, the State avers his argument does not offer

a viable legal challenge to the conviction under Count II

for the intentional murder of Rodney Brown.  Although

Holloway's Motion for Judgment of Acquittal was directed to

18

the original indicted charge of the capital murder of
Rodney Brown during the course of a burglary, the jury
acquitted Holloway of this charge and convicted him of the
lesser included charge of intentional murder of Rodney
Brown. The elements of this offense do not contain the
requirement that Holloway argues was lacking – proof that
he unlawfully entered or unlawfully remained in the Browns'
home. Even if Holloway's Motion for Judgment of Acquittal
should have been granted, there is no error because of the
jury's verdict of guilt on the lesser charge. See Samuels
v. State, 584 So. 2d 958, 962 (Ala. Crim. App. 1991);
Fortner v. State, 582 So. 2d 582, 583 (Ala. Crim. App.
1990).

Thus, the only conviction actually before this Court
for consideration of the sufficiency is the conviction
under Count III for the capital murder during the course of
a burglary of Angela Brown. In thoughtfully considering
Holloway's Motion for Judgment of Acquittal on Counts II
and III before denying the motion, the trial court noted it
was a close question on the capital murder charge
concerning the murder of Rodney Brown. The court held,
under the authority of Ex parte Davis, 737 So. 2d 480 (Ala.

19

1999), that there was evidence of a struggle sufficient to infer that Holloway's license to be in the home was revoked and he unlawfully remained, based largely on Holloway's own statement that Rodney retrieved the baseball bat and came at Holloway with it. The court found that evidence sufficient to support an inference and, therefore, establish a jury question, concerning the revocation of Holloway's license to be in the home. As to the capital murder charge concerning the death of Angela Brown, however, the court found there was no basis supporting a judgment of acquittal. In addition to the evidence referenced concerning the death of Rodney Brown, the court noted the evidence established that Holloway left the home after shooting Angela, but then returned and struck her with the bat and stabbed her to assure that she died. (R. 1090-1091)

As noted by the trial court, a close question existed on whether Holloway's original legal entry into the home was revoked, therefore rendering him remaining unlawfully in the home to support the elements of burglary underlying the capital charge. In Davis, the authority cited by the trial court, the Alabama Supreme Court revisited its

previous decision in Ex parte Gentry, 689 So. 2d 916 (Ala. 1996). In Gentry, the Supreme Court addressed the issue of whether a burglary could be shown merely because a crime occurred within a home, particularly when there was no evidence of an unlawful entry. The Gentry decision condemned "a finding of burglary merely from the commission of a crime that could not be deemed to be within the scope of the privilege to entry. To hold otherwise would have converted every privileged entry followed by a crime into a burglary, thereby running afoul of the constitutional requirement of reserving capital punishment for only the most egregious crimes." Davis, 737 So. 2d at 483, citing Gentry, 689 So. 2d at 921. In readdressing Gentry, the Davis court found it had "swept with too broad a broom" in rejecting the argument that evidence of a struggle could show revocation of the privilege to remain and prove the necessary element of unlawfully remaining. The Davis court concluded: "Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based." Davis, 737 So. 2d at 483.

21

The State presented sufficient evidence that Holloway's initial privilege to enter the home had been revoked by evidence showing a struggle. Holloway admitted in his statement that, after he confronted Rodney Brown about a comment Mr. Brown made about Holloway's girlfriend, Mr. Brown left the room telling Holloway he had something for him. Mr. Brown returned wielding a baseball bat. (R. 1068-1069) The State also presented direct and documentary evidence of the scene showing that several ceramic pieces on a table in the room where Holloway killed Rodney and Angela Brown were found broken on the floor that had not been broken that morning. (R. 917, 943-945) Such evidence of a struggle reasonably gives rise to an inference that Holloway's original license to be in the home had been revoked and he remained unlawfully in the home.[1]

Certainly, however, Holloway has no basis to reject the trial court's finding that his second entry into the home for the purpose of assuring that Angela Brown was dead was

---

[1] Although not before the court at the time the motions for judgment of acquittal were denied, the State notes that on cross-examination Holloway later reluctantly admitted his license to be in the home had been revoked, although he asserted self-defense because he did not have the opportunity to leave. (R. 1181)

22

an unlawful entry. After shooting both Rodney and Angela,
Holloway left the home. Rodney apparently died almost
instantly; Angela, however, "was slumped on the couch
gasping for air." (R. 1069) Holloway left the home and
returned within thirty minutes. Angela "was still gasping
for air." At that time he hit her several times with the
bat, attempted to smother her with a pillow, and finally
stabbed her with a knife he brought on the second occasion.
After finally succeeding in killing her, Holloway sexually
assaulted her body. Holloway has no viable legal argument
against the evidence that he unlawfully entered the home on
the second occasion. As correctly found by the trial
court, under either of the reasons cited, the State
presented sufficient evidence supporting the capital charge
in the murder of Angela Brown.

The trial court properly denied Holloway's Motion for
Judgment of Acquittal. The general standard for reviewing
whether the evidence is sufficient to withstand a motion
for judgment of acquittal is "whether there existed legal
evidence before the jury, at the time the motions (for
acquittal) were made, from which the [factfinder] by fair
inference could have found the defendant guilty [beyond a

23

reasonable doubt]." Ex parte Bailey, 590 So. 2d 354, 357
(Ala. 1991). In reviewing an allegation of insufficiency
of the State's evidence and the propriety of the trial
court's denial of a motion for judgment of acquittal, the
evidence must be viewed by accepting the State's evidence
as true and considering it in the light most favorable to
the State by according all legitimate inferences that arise
from the State's evidence. Marshall v. State, 629 So. 2d
766, 770 (Ala. Crim. App. 1993). In according these
presumptions, the question is whether a "rational
factfinder could have found the defendant guilty beyond a
reasonable doubt." Johnson v. State, 555 So. 2d 818, 819
(Ala. Crim. App. 1989). The appropriate standard is not
whether the State's evidence excludes every reasonable
hypothesis except that of the defendant's guilt, but
whether evidence exists from which the jury might so
conclude that every reasonable hypothesis except that of
guilt has been excluded. White v. State, 546 So. 2d 1014,
1016 (Ala. Crim. App. 1989); see also Ex parte Woodall, 730
So. 2d 652, 658 (Ala. 1998). "Where evidence raises a
question of fact for the jury and such evidence, if
believed, is sufficient to sustain the conviction, the

24

denial of a motion to exclude the State's evidence does not
constitute error." Whitehead v. State, 429 So. 2d 641, 643
(Ala. Crim. App. 1982).  It is not an appropriate exercise
of appellate review to invade the province of the jury and
reweigh the evidence presented at trial. Zumbado v. State,
615 So. 2d 1223, 1240-1241 (Ala. Crim. App. 1993).  When
the State presents a sufficient prima facie case and
presents a factual question, "the verdicts rendered thereon
are conclusive on appeal." Johnson, 555 So. 2d at 820.

Holloway does not challenge his conviction for the
capital murder of two persons.  He offers no viable legal
challenge to his conviction for the intentional murder of
Rodney Brown as his argument concerning the sufficiency of
the evidence for a capital charge has no application in
this case because he was acquitted of the capital charge
and convicted of the lesser included offense of murder.
Contrary to his arguments, the State presented sufficient
evidence proving the underlying offense of burglary
supporting the charge of the capital murder of Angela
Brown.  There was evidence of a struggle showing revocation
of Holloway's original lawful entry into the home; there
was evidence of a second entry into the home that was

25

clearly unlawful.  Holloway's arguments are due to be

rejected and his three convictions are due to be affirmed.

**II.  The Trial Court Properly Exercised Its Discretion In Allowing The State To Cross Examine Holloway Concerning An Earlier Incident When Holloway Injected His Character Into Evidence During His Own Direct Testimony.**

During his direct testimony in his own defense,

Holloway maintained that he had no intent to kill Rodney

and Angela Brown when he went to their home armed with a

pistol.  He testified to his fear of Rodney Brown and that

his murderous acts were only a spontaneous reaction to

Rodney Brown's alleged attempt to assault him.  Describing

the events, Holloway testified:

> I was scared.  Paranoid.  I'd never shot
> anyone a day in my life.  I'd never even made any
> threat of violence in my life.

(R. 1128)

Before beginning its cross examination, the State asked

the court to take up a matter outside the presence of the

jury.  The State noted that Holloway had "made a broad

comment saying he'd never done anything like this before."

The State asked the court for permission to cross examine

26

Holloway by use of records showing previous incidents where
Holloway had struck other people and an incident where he
attempted to break in the home of an elderly woman by
cutting the screen door.  The State argued that Holloway's
testimony, not elicited by the State, opened the door for
the State to cross examine him concerning prior incidents.
(R. 1135-1136)  Holloway objected to the State's request to
cross-examine him on this basis.  (R. 1136-1138)

The court asked the court reporter to read back the
portion of Holloway's testimony the State averred opened
the door to this line of cross examination.  (R. 1142)  The
court then held that the State could use a prior conviction
of Holloway for theft for impeachment.  The court ruled
that the incidents of striking others would not be allowed
but the State could cross examine Holloway concerning the
incident where he cut a screen in an attempt to enter the
home.  (R. 1142-1144)  The court reviewed the report of the
incident and limited the State to the first two sentences
of the report that indicated Holloway's admission to
attempting to break into the home for the purpose of
talking to the woman about lying about him.  (R. 1146)  The
court ruled that Holloway's testimony was all that allowed

27

this to be even considered and it would be limited as the court had instructed. The court also indicated it would give a limiting instruction that the evidence was to be considered solely for the purpose of impeachment of credibility. (R. 1149)

After first cross examining Holloway concerning his description of the event involving Angela and Rodney, the State asked, "You said in your earlier testimony that you had never had a history of violence in my life; is that right?" Holloway responded, "Yes, sir." The State then asked Holloway about the incident in June 1989 when he attempted to break into the home of the elderly woman. Holloway replied:

> I did not try to break in on anyone. I went to the house. I knocked on the door. She did not come to the door. She was talking through the door. I was drunk. If what -- I was drunk. I was young. I wasn't no more than about 14 or 15 years old. Dumb. I went to the house. I had a knife. I got upset. I cut the screen. She told me to leave. I left. All this stuff she's saying about I came up on the porch and she pulled a gun on me. All of that is a lie. I left when she told me to leave. I went back up toward my house. By this time, she come out on the house and she shot in the air. I left.

(R. 1176-1177)

Following this exchange, Holloway's counsel asked the court to give a limiting instruction. The court instructed the jury:

> Ladies and Gentlemen, the testimony that was just divulged after questions by the State has a limited purpose. The purpose of that testimony, offered by the State, is for potential impeachment of the testimony of this witness. That is the only purpose for which it is admitted into evidence for your consideration. It will be up to you, at the appropriate time, to decide whether or not the impact of that testimony is to impeach any part, whatsoever, of this witness' testimony.

(R. 1178)

Holloway argues that the trial court committed reversible error by allowing the State to cross examine him concerning this incident. The State avers that the trial court's action was a correct and appropriate exercise of its discretion in presiding over trial because Holloway opened the door to the cross examination by injecting his character into evidence by an assertion of a spotless history concerning violence. The State will first set out the legal basis supporting the trial court's decision and then respond to Holloway's particular objections.

The control of trial proceedings and the admissibility of evidence are placed in the broad discretion of the trial

29

court and exercise of that discretion will only be reversed
with a showing of a clear abuse of that discretion.  Ex
parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000).  Rule
611(b), Alabama Rules of Evidence, defines the scope of
cross examination as extending "to any matter relevant to
any issue and to matters affecting the credibility of the
witness."  (emphasis added)  Evidence of character is
generally not admissible; however, an exception to this
rule is that the accused may offer evidence of his
character and the prosecution may offer evidence rebutting
the evidence offered by the accused.  Rule 404(a)(1),
Alabama Rules of Evidence.

The State did not inject Holloway's character into
trial; Holloway did so with his direct testimony that "I'd
never even made any threat of violence in my life."  (R.
1128)  The State is allowed to examine a witness on matters
injected into a case by the defense.  Walker v. State, 631
So. 2d 294, 301 (Ala. Crim. App. 1993).  If the accused
testifies "to his own good character, then the prosecution
can similarly ask on cross-examination about relevant prior
instances of inconsistent conduct."  Ex parte Woodall, 730

So. 2d 652, 663, fn. 4 (Ala. 1998), <u>citing</u> C. Gamble,

<u>McElroy's Alabama Evidence</u>, §26.02(9) (5th Ed. 1996).

   Holloway's voluntary injection of his character and

alleged history of nonviolence into the trial opened the

door for the State to inquire into "the entire subject

which the law had kept closed for his benefit and to make

himself vulnerable where the law otherwise shields him."

<u>U. S. v. Roper</u>, 135 F.3d, 430, 433-434 (6th Cir. 1998),

<u>citing</u> <u>Michelson v. United States</u>, 335 U.S. 469, 479

(1948).  When a defendant injects an issue into evidence,

unsolicited by the State, the court acts properly in

allowing reasonable examination of that assertion.  The

trial court is allowed to do so to protect the integrity of

the judicial system when a defendant attempts to mislead

the jury by his own testimony.  <u>Cooley v. State</u>, 686 So. 2d

546, 551 (Ala. Crim. App. 1996); <u>Williams v. State</u>, 695 So.

2d 644, 646-647 (Ala. Crim. App. 1996).  A defendant cannot

be allowed to give potentially misleading testimony and not

escape the consequences of opening the door to further

inquiry into that area.  <u>United States v. Beltran-Rios</u>, 878

F.2d 1208, 1212 (9th Cir. 1989).

Holloway voluntarily injected his character with his assertion of a history of nonviolence. The State was properly allowed to rebut the assertion of good character. Rule 404(a)(1). The State was also properly allowed to test the veracity of Holloway concerning this matter. Rule 611(b), Alabama Rules of Evidence. The trial court, mindful of the potential dangers, limited the scope of the State's inquiry, and gave a limiting instruction to the jury immediately following the State's cross examination on this matter. The trial court properly exercised its discretion in allowing the State to inquire into the matter after Holloway opened the door by his direct testimony.

Holloway offers three primary objections to the trial court's ruling. He first argues that the cross examination was improper under Rule 609(d), Alabama Rules of Evidence, because it involved a juvenile adjudication that is prohibited under Rule 609(d), Alabama Rules of Evidence. The State first notes that the cross examination of Holloway was not an impeachment by evidence of conviction under Rule 609; it was rebuttal of character evidence asserted by Holloway under Rule 404(a)(1) and appropriate cross examination under Rule 611(b). Further, even

juvenile adjudications are not strictly forbidden from being introduced into a case when the defendant opens the door for such introduction by his own testimony. <u>Cooley</u>, 686 So. 2d at 550-551. Again, however, it was not evidence of a juvenile adjudication that was offered under Rule 609 for impeachment by a prior conviction; the State inquired on cross examination into Holloway's assertion of good character by specifically referencing him to a contradictory incident.

Holloway also complains that the evidence was not relevant and should have been excluded under Rule 403 because it unfairly prejudiced him and the prejudice outweighed the probative value. He specifically asserts that the State was improperly allowed to project the image to the jury of an elderly woman being assaulted by Holloway. Again, Holloway injected his own alleged spotless history of nonviolence into the proceedings. The State's rebuttal of his assertion of good character by questioning him about an inconsistent event is certainly probative of Holloway's veracity and credibility. The details of who Holloway chose as an intended victim at an

earlier time cannot reasonably be asserted now as a defense by him to appropriate cross examination.

Finally, Holloway contends that the incident was too remote and should have been excluded under Rule 609(b) because it occurred almost fourteen years before trial. The State first notes that the incident occurred only some ten and one-half years before Holloway murdered Angela and Rodney Brown. The State again notes that its cross examination was not under Rule 609 by proof of a prior conviction but under Rule 404. Rule 404 does not contain any limitations based on remoteness. Further, the ten year rule set out in Rule 609 has not even been held to be an absolute cutoff prohibiting any introduction of matters more than ten years. There has never been a "specified time period that rendered evidence of a collateral matter too remote to be admissible." Cooley, 686 So. 2d at 550. Further, the question of remoteness generally goes to the weight and credibility of the evidence, not to its admissibility. Smith v. State, 745 So. 2d 284, 289 (Ala. Crim. App. 1998); Hayes v. State, 717 So. 2d 30, 37 (Ala. Crim. App. 1997).

34

Holloway placed his character into issue and the State was properly allowed to rebut hit. Long v. State, 838 So. 2d 1067, 1070 (Ala. Crim. App. 2002). The trial court properly exercised its discretion in allowing the State to inquire on cross examination into the matter that Holloway opened the door to; the trial court limited the State's inquiry and gave a limiting instruction to the jury that it was to be considered only on the issue of whether it impeached Holloway's earlier testimony and not for any other reason. (R. 1178) The incident of Holloway attempting to enter a home by cutting the screen off a door with a knife when the homeowner would not answer the door to him is certainly a reasonable area of inquiry in response to Holloway's claim to have "never even made any threat of violence in [his] life." (R. 1128) The trial court properly exercised its discretion in this matter and the ruling cannot be reversed because it is not clearly erroneous. Hayes v. State, 717 So. 2d 30, 36 (Ala. Crim. App. 1997). The trial court's ruling was appropriate and Holloway's convictions are due to be affirmed.

35

## CONCLUSION

Based on the foregoing, the State of Alabama avers that Jason Holloway's convictions for two counts of capital murder and one count of intentional murder are due to be affirmed.

Respectfully submitted,

Richard F. Allen
*Acting Attorney General*
By:

Andy S. Poole
*Assistant Attorney General*

36

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>3rd</u> day of March, 2004, I served a copy of the foregoing on attorneys for Holloway, by placing the same in the United States mail, first class, postage prepaid and addressed as follows:

> Charles R. Gillenwaters
> Joseph D. Ficquette
> Kelly R. Booker
> Gillenwaters & Ficquette, LLC
> P. O. Box 2129
> Alexander City, Alabama  35011-2129


_____
Andy S. Poole
Assistant Attorney General


ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300
139662/POOLE
58253-001


37

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

<div>

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



**RELEASED**

AUG 1 3 2004

CLERK
ALA COURT CRIMINAL APPEALS

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

</div>

<u>MEMORANDUM</u>

CR-02-2115                    Chambers Circuit Court CC-00-166

<u>Jason Lee Holloway v. State</u>

McMILLAN, Presiding Judge.

The appellant appeals from his convictions on Count II of the indictment charging him with capital murder, committed during the course of a burglary, a violation of § 13A-5-40(a)(4), Ala. Code 1975, wherein the jury convicted him of the lesser-included offense of the intentional murder of Rodney Brown, a violation of § 13A-6-2, Ala. Code 1975, and Count III, charging him the capital murder of Angela Brown, committed during the course of a burglary, a violation of § 13A-5-40(a)(4), Ala. Code 1975. The appellant does not appeal his convictions listed in Count I, which charged him with the intentional murder of two persons, Rodney Brown and Angela Brown, violations of § 13A-5-40(a)(4), Ala. Code 1975. He was sentenced to life imprisonment with parole on Counts I and III of the indictment, and life imprisonment on Count II of the indictment, the murder conviction.

1

I.

The appellant argues that the trial court erred in denying his motion for a judgment of acquittal on grounds that there was insufficient evidence to support his conviction for murder committed during the course of a burglary. More particularly, he contends that the State did not prove the necessary element of the underlying burglary charge that he "knowingly and unlawfully entered or remained unlawfully" in the victims' home, pursuant to § 13A-7-5, Ala. Code 1975.

Although the appellant's motion for a judgment of acquittal was directed toward his original indicted charge for the capital murder of Rodney Brown, during the course of a burglary, the jury convicted him of the lesser-included offense of murder. Because the appellant was convicted of the lesser-included offense, he was, in effect, acquitted of the greater offense. Because the elements constituting the offense of murder do not require proof that the appellant unlawfully entered or unlawfully remained in the victims' home, it is irrelevant whether the State proved that he "unlawfully entered or unlawfully remained" in the victims' home. Assuming that the appellant's motion for a judgment of acquittal should have been granted, there was no error due to the jury's verdict of guilt on the lesser charge. See Samuels v. State, 584 So. 2d 958 (Ala. Crim. App. 1991); Wysinger v. State, 448 So. 2d 435 (Ala. Crim. App. 1983).

Additionally, the appellant argues that the trial court erred in denying his motion on Count III for the capital murder of Angela Brown, committed during the course of a burglary. The trial court found that, based upon the facts, there was no basis to support a judgment of acquittal. The trial court noted that the evidence presented by the State tended to show that the appellant left the Browns' home after shooting Angela twice and leaving her to die on the sofa. Evidence was presented that when he left, the victim was breathing. The appellant went to his home, watched television and then decided to return to the Browns' home to make sure Angela was dead. He then struck her with a baseball bat and stabbed her to ensure that she was dead. Because the State presented evidence that the appellant's second entry was an unlawful entry that supported the capital murder charge, there was sufficient evidence presented to the jury which, if

2

believed, would justify the verdict of guilt.

## II.

The appellant argues that the trial court erred in allowing the State to cross-examine the appellant about an earlier incident of violence.

The record reveals that the appellant took the stand in his defense and testified that he had "never even made any threat of violence in [his] life." In response to the appellant's testimony concerning his good character, the State was allowed to rebut the evidence pursuant to Rule 404 (a)(1), Ala. R. Evid. The record reveals that the trial court allowed a limited examination, wherein the State was allowed to inquire about an earlier incident in which the appellant cut the screen off a door in an effort to enter the home when a woman refused to let him in. The trial court found that the testimony fell within the scope of cross-examination on a matter "affecting the credibility of the witness." Rule 611(b), Ala. R. Evid. See also Ex parte Woodall, 730 So. 2d 652 (Ala. 1988). The record indicates that the trial court gave a limiting instruction to the jury on the use of the cross-examination by the jury. Because there was no abuse of the trial court's discretion, no error occurred here. Ex parte Loggins, 771 So. 2d 1093 (Ala. 2000).

The judgment of the trial court is affirmed.

AFFIRMED.

Cobb, Shaw, and Wise, JJ., concur. Baschab, J., concurs in the result.

3

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-02-2115**

Jason Lee Holloway v. State of Alabama  (Appeal from Chambers  Circuit Court: CC00-166)

# CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on August 13th 2004:

## Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 1st day of September, 2004.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. Ray D. Martin, Circuit Judge
   Hon. Charles W. Story, Circuit Clerk
   Joseph D. Ficquette, Attorney
   Charles R. Gillenwaters, Attorney
   Andy Scott Poole, Asst. Atty. Gen.

COURT OF CRIMINAL APPEALS NO. _____ CR 05-0185

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ CHAMBERS _____ COUNTY, ALABAMA

CIRCUIT COURT NO     CC 2000-166

CIRCUIT JUDGE     HON. RAY MARTIN

Type of Conviction/ Order Appealed From:     RULE 32

Sentence Imposed:

Defendant Indigent:  ☑ YES  ☐ NO

## JASON LEE HOLLOWAY

NAME OF APPELLANT

PRO-SE JASON LEE HOLLOWAY # 230296

(Appellant's Attorney)                         (Telephone No.)

1000 ST CLAIR ROAD

(Address)

SPRINGVILLE,          ALABAMA          35146

(City)                (State)          (Zip Code)

### V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

# Alabama Court of Criminal Appeals
## Appeal From Chambers County
## Rule 32 Petition
### Appellant: Jason Lee Holloway
### CC 2000-166
### INDEX

| | PAGE |
|---|---|
| PETITION FOR RELIEF FROM CONVICTION OR SENTENCE | 001 |
| INFORMA PAUPERIS DECLARATION | 017 |
| ORDER CRIMINAL APPEALS, INEFFECTIVE ASSISTANCE ISSUE DENIED | 020 |
| ORDER CRIMINAL APPEALS, WRIT OF MANDAMUS DISMISSED | 021 |
| ORDER, PETITION DISMISSED AS UNTIMELY FILED | 022 |
| NOTICE OF APPEAL BY TRIAL CLERK | 023 |
| NOTICE OF APPEAL PRO-SE | 024 |
| REPORTER'S TRANSCRIPT ORDER | 025 |
| ALABAMAM CRIMINAL APPEALS DOCKETING STATEMENT | 026 |
| ORDER CRIMINAL APPEALS, DISMISSING APPEAL | 027 |
| CERTIFICATE OF JUDGMENT CRIMINAL APPEALS COURT | 028 |
| ORDER, SETTING ASIDE DISMISSAL OF RULE 32 PETITION PER CRIM. APP. ORDER | 030 |
| CRIMINAL APPEALS MEMORANDUM | 031 |
| CERTIFICATE OF JUDGMENT-AFFIRMED BY MEMORANDUM | 034 |
| PRO-SE AMENDMENT TO PETITION | 035 |
| RESPONSE OF THE RESPONDANT | 037 |
| PETITION FOR WRIT OF MANDAMUS PRO-SE | 039 |
| ORDER, DENYING PETITON FOR RELIEF FROM CONVICTION OR SENTENCE | 044 |
| NOTICE OF APPEAL TO COURT OF CRIMINAL APPEALS PRO-SE | 045 |
| REPORTER'S TRANSCRIPT ORDER-(NO TRANSCRIPT) | 047 |
| COURT OF CRIMINAL APPEALS DOCKETING STATEMENT | 049 |
| CASE ACTION SUMMARY SHEETS | |
| TRIAL CLERKS NOTICE OF APPEAL TO CRIMINAL APPEALS | |
| CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL | |

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

(Pursuant to Rule 32,
Alabama Rules of Criminal Procedure)

) Note Court Clerk:

Filed Pursuant to Rule 32. 6 (c), A.R.Cr.P.

Case Number

IN THE _____ Circuit _____

|  CC | 00 | 166. |
|------|-----|------|
|  ID  | YR  | NUMBER |

COURT OF Chambers Co., ALABAMA

Jason Lee Holloway _____ vs. _____ State of Alabama
Petitioner (Full Name)                                    Respondent

[Indicate either the "State" or,
if filed in municipal court, the
name of the "Municipality"]

Prison Number 230296

Place of Confinement St. Clair Cor. Fac.

County of conviction Chambers

**NOTICE:  BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.**

1. Name and location (city and county) of court which entered the judgment of conviction or sentence under attack Circuit Court of Chambers County, Lafayette, Alabama 36862

2. Date of judgment of conviction July 23, 2003

3. Length of sentence L.W.O.P

4. Nature of offense involved (all counts) Capital murder of two persons pursuant to one course of conduct, and capital murder during a burglary, and capital murder during a burglary.

What was your plea?   (Check one)

(a)  Guilty _____

     Not guilty  **X**

     Not guilty by reason of mental disease or defect _____

(d)  Not guilty and not guilty by reason of mental disease or defect _____

1

6.  Kind of trial: (Check one)

    (a)  Jury _X_

                      (b)  Judge only _____

7.  Did you testify at the trial?

    Yes _X_                    No _____

8.  Did you appeal from the judgment of conviction?

    Yes _X_                    No _____

9.  If you did appeal, answer the following:

    (a)  As to the state court to which you first appealed, give the following information:

        (1)  Name of court _ALABAMA COURT OF CRIMINAL APPEALS_

        (2)  Result _____

           _____

        (3)  Date of result _____

           _____

    (b)  If you appealed to any other court, then as to the second court to which you appealed, give the following information:

        (1)  Name of court _____

           _____

        (2)  Result _____

           _____

        (3)  Date of result _____

           _____

    (c)  If you appealed to any other court, then as to the third court to which you appealed, give the following information:

        (1)  Name of court _____

           _____

        (2)  Result _____

           _____

        (3)  Date of result _____

           _____

10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes _____          No __X__

11.  If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

(a)   (1)   Name of court _____ N/A _____

      (2)   Nature of proceeding _____ N/A _____

      (3)   Grounds raised _____ N/A _____

      _____

      _____

      _____

      _____

      (attach additional sheets if necessary)

      (4)   Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____          No __X__

      (5)   Result _____ N/A _____

      (6)   Date of result _____ N/A _____

(b)   As to any second petition, application, or motion, give the same information:

      (1)   Name of court _____ N/A _____

      (2)   Nature of proceeding _____ N/A _____

      (3)   Grounds raised _____ N/A _____

      _____

      _____

      _____

      (attach additional sheets if necessary)

      (4)   Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____          No __X__

      (5)   Result _____ N/A _____

      (6)   Date of result _____ N/A _____

(c)   As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

      (1)   Name of court _____ N/A _____

3

3

(2)   Nature of proceeding _____ N/A _____ ) _____

(3)   Grounds raised _____ N/A

_____

_____

_____

_____

(attach additional sheets if necessary) _____

(4)   Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____               No __X__

(5)   Result _____ N/A

(6)   Date of result _____ N/A

(d)   Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1)   First petition, etc.        Yes _____    N/A    No _____

(2)   Second petition, etc.      Yes _____    N/A    No _____

(2)   Third petition, etc.       Yes _____    N/A    No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)   If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

_____ N/A _____

_____

_____

12.   Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include all facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):

__X__   A.   The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

For your information, the following is a list of the most frequently raised claims of constitutional violation:.

4

(1) Conviction ob~~~~led by plea of guilty which was unlawfu~~...~~nduced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2) Conviction obtained by use of coerced confession.

(3) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5) Conviction obtained by a violation of the privilege against self-incrimination.

(6) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7) Conviction obtained by a violation of the protection against double jeopardy.

(8) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

X (9) Denial of effective assistance of counsel.

This list is not a complete listing of all possible constitutional violations.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

X B.  The court was without jurisdiction to render the judgment or to impose the sentence.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

C.  The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

D.  Petitioner is being held in custody after his sentence has expired.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

E.  Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable ~~~~gence; and

The facts are not merely cumulative to other facts that were known; and

5

The facts do not merely amc͟u͟n͟t͟ ͟t͟o͟ ͟i͟m͟p͟e͟a͟c͟h͟m͟e͟n͟t͟ ͟e͟v͟i͟d͟e͟n͟c͟e͟;͟ ͟a͟n͟d͟

I͟f͟ ͟t͟h͟e͟ ͟f͟a͟c͟t͟s͟ ͟h͟a͟d͟ ͟b͟e͟e͟n͟ ͟k͟n͟o͟w͟n͟ ͟a͟t͟ ͟t͟h͟e͟ ͟t͟i͟m͟e͟ ͟o͟f͟ ͟t͟r͟i͟a͟l͟ ͟o͟r͟ ͟s͟e͟n͟t͟e͟n͟c͟i͟n͟g͟,͟ ͟t͟h͟e͟ ͟r͟e͟s͟u͟l͟t͟ ͟w͟o͟u͟l͟d͟ ͟p͟r͟o͟b͟a͟b͟l͟y͟ ͟h͟a͟v͟e͟ ͟b͟e͟e͟n͟ different; and

T͟h͟e͟ ͟f͟a͟c͟t͟s͟ ͟e͟s͟t͟a͟b͟l͟i͟s͟h͟ ͟t͟h͟a͟t͟ ͟p͟e͟t͟i͟t͟i͟o͟n͟e͟r͟ ͟i͟s͟ ͟i͟n͟n͟o͟c͟e͟n͟t͟ ͟o͟f͟ ͟t͟h͟e͟ ͟c͟r͟i͟m͟e͟ ͟f͟o͟r͟ ͟w͟h͟i͟c͟h͟ ͟h͟e͟ ͟w͟a͟s͟ ͟c͟o͟n͟v͟i͟c͟t͟e͟d͟ ͟o͟r͟ ͟s͟h͟o͟u͟l͟d͟ n͟o͟t͟ ͟h͟a͟v͟e͟ ͟r͟e͟c͟e͟i͟v͟e͟d͟ ͟t͟h͟e͟ ͟s͟e͟n͟t͟e͟n͟c͟e͟ ͟t͟h͟a͟t͟ ͟h͟e͟ ͟d͟i͟d͟.͟

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

F.    T͟h͟e͟ ͟p͟e͟t͟i͟t͟i͟o͟n͟e͟r͟ ͟f͟a͟i͟l͟e͟d͟ ͟t͟o͟ ͟a͟p͟p͟e͟a͟l͟ ͟w͟i͟t͟h͟i͟n͟ ͟t͟h͟e͟ ͟p͟r͟e͟s͟c͟r͟i͟b͟e͟d͟ ͟t͟i͟m͟e͟ ͟a͟n͟d͟ ͟t͟h͟a͟t͟ ͟f͟a͟i͟l͟u͟r͟e͟ ͟w͟a͟s͟ ͟w͟i͟t͟h͟o͟u͟t͟ ͟f͟a͟u͟l͟t͟ o͟n͟ ͟p͟e͟t͟i͟t͟i͟o͟n͟e͟r͟'͟s͟ ͟p͟a͟r͟t͟.͟

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13.    **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

"S͟u͟c͟c͟e͟s͟s͟i͟v͟e͟ ͟P͟e͟t͟i͟t͟i͟o͟n͟s͟. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A.    Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes _____        No __X__

B.    If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

(a)   Name of court _____ N/A _____

(b)   Result _____ N/A _____

(c)   Date of result _____ N/A _____
       (attach additional sheets if necessary)

C.    If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes _X_        No _____

15. Give the name and addre       if known, of each attorney who repres       ed you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing *Richard Keith, 235 South McDonough Street, Montgomery, Alabama 36104 And*

(b) At arraignment and plea *William Blanchard, P.O. Box 746, Montgomery, Alabama 36101-0746*

(c) At trial _____ *//* _____

(d) At sentencing _____ *//* _____

(e) On appeal *Charles R. Gillenwaters And Joseph D. Ficquette, 1397 Dadeville Road, P.O. Box 2129,*

(f) In any post-conviction proceeding *Alexander City, Alabama 35011-2129*

*N/A*

(g) On appeal from adverse ruling in a post-conviction proceeding _____

*N/A*

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _X_          No _____

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____          No _X_

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

*N/A*

(b) And give date and length of sentence to be served in the future: _____

*N/A*

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____          No _X_

18. What date is this petition being mailed?

*April 12, 2004 Anno Domini 7002-0510-0000-0709-551*

Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

7

GROUND ONE

Rule 32.1(b) Ala.R.Crim.P., THE COURT WAS WITHOUT JURISDICTION TO RENDER JUDGMENT OR TO IMPOSE SENTENCE

CLAIM ONE: Holloway's capital murder of Angela Brown during a burglary conviction and Life Without Parole [L.W.O.P.] sentence is due to be vacated and reduced to intentional murder with a twenty year sentence because an inconsistant findings of fact is required to establish the commission of this offense when the petit jury acquitted Holloway for the capital murder of Rodney Brown during a burglary of the same dwelling both victims possessed but was found guilty of the lesser included offense of intentional murder.

CLAIM TWO: Holloway's intentional murder conviction of Rodney Brown, as a lesser included offense of the indicted charge of capital murder during a burglary, and life sentence is due to be vacated in toto because this conviction is a form of preparation to commit Holloway's capital murder conviction of two persons pursuant to one course of conduct.

CLAIM THREE: Holloway's capital murder of Angela Brown during a burglary conviction and L.W.O.P. sentence is due to be vacated because the intentional murder part of this offense is an element or form of preparation to commit Holloway's capital murder conviction of two persons pursuant to one course of conduct.

CLAIM FOUR: Holloway's capital murder of Angela Brown and Rodney Brown of two persons pursuant to one course of conduct conviction and L.W.O.P. sentence is due to be vacated and reduced to two separate intentional murders of Angela Brown and Rodney Brown with a twenty year sentence because the intentional murder

-1-

8

of Rodney Brown conviction found by the petit jury as a lesser included offense of capital murder during a burglary and the intentional murder part of the capital murder of Angela Brown during a burglary conviction is elements or forms of preparation to commit this offense.

CLAIM FIVE:   Holloway's intentional murder of Rodney Brown conviction, as a lesser included offense of the indicted charge of capital murder during a burglary, and life sentence is due to be vacated because the trial court constructively amended the indictment and instructed the petit jury to find facts and elements not named in the indictment, to wit; the grand jury found Holloway had a intent to commit a (unnamed) crime in the dwelling C.R. 68, but the Court instructed Holloway had the intent to commit assault and/or harassment and/or menacing. T.R. 1337.

CLAIM SIX:   Holloway's capital murder of Angela Brown during a burglary conviction and L.W.O.P. sentence is due to be vacated because the trial court constructively amended the indictment and instructed the petit jury to find facts and elements not named in the indictment, to wit; the grand jury found Holloway had an intent to commit a (unnamed) crime in the dwelling C.R. 68 but the Court instructed Holloway had the intent to commit assault and/or harassment and/or menacing. T.R. 1337.

CLAIM SEVEN:   Holloway's capital murder of Angela Brown and Rodney Brown of two persons pursuant to one course of conduct conviction and L.W.O.P. sentence is due to be vacated because the trial court constructively amended the indictment and failed to instruct the petit jury to a material element named in the

-2-

indictment, to wit; the grand jury found Holloway intentionally caused the death of the victims by one act or pursuant to one scheme or course of conduct C.R. 68, but the court omitted instructing the jury to convict for this capital offense the jury must find Holloway caused the death of the victims by one act or pursuant to one scheme or course of conduct T.R. 1334. Thus, depriving Holloway of his right to be convicted for what he was charged and put on trial for.

CLAIM EIGHT:   Holloway is due a new trial based on the cumulative effect of these errors of law exclusively made by the Court and it's officer's. Collectively, these errors present a unclear and unreliable jury's verdict because of the officer's of the Court and the Court have in concert failed to properly, elect for prosecution and limited the offenses for the jury to find and render a clear and reliable verdict of a certain degree of guilt.

CLAIM NINE:   Holloway's capital murder of Rodney Brown during a burglary indictment is due to be dismissed for failing to charge an offense because it fails to set forth the specific crime intended to be committed within the dwelling.

CLAIM TEN:   Holloway's capital murder of Angela Brown during a burglary indictment is due to be dismissed for failing to charge an offense because it fails to set forth the specific crime intended to be committed within the dwelling.

-3-

GROUND TWO

<u>Rule 32.1 (a) Ala.R.Crim.P.</u>  THE CONSTITUTION OF THE UNITED
STATES OR OF THE STATE OF ALABAMA REQUIRES A NEW TRIAL, A NEW
SENTENCE PROCEEDING, OR OTHER RELIEF.

<u>CLAIM ONE:</u>  Holloway was denied effective assistance of counsel
when his trial counsel(s) failed to move the Court to dismiss both counts
of capital murder during a burglary in his indictment for failing to set
forth the specific crime intended to be committed within the dwelling
because the case law of <u>Lanier v. State</u>, 733 So.2d 931. Requires an
indictment charging burglary must set forth the specific crime intended
to be committed within the dwelling.

Had trial counsels moved the Court to dismiss both these counts for
failing to charge an offense then the trial court would not have amended
the indictment (without Holloway's consent) in the Courts oral charge
to the jury, T.R. 1337, with an intent not even concurrent with the
breaking and entering and prejudiced Holloway to notice of nature and
cause of the offenses he was put on trial for. See <u>Watkins v. State</u>, 389
So.2d 186, 188 (Ala.Crim.App. 1980), a person who breaks and enters with
no intent to commit a felony, but who after entry forms such an intent
is not guilty of the statutory offense herein specified (Burglary)
(overruled on other grounds) See also <u>Jackson v. State</u>, 102 Ala. 167,
15 So. 344, 345 (Ala. 1894) intent must be concurrent with the breaking
and entering.

Holloway is due a new trial because it was impossible for trial
counsels to have intelligently defended him against an intent to commit
a crime not named in the indictment but amended by the Court after the
close of the case in the Court's oral instructions to the jury in the
presence of counsel.

-4-

11

CLAIM TWO:  Holloway was denied effective assistance of counsel when his trial counsels failed to object to the Courts constructive amendment to the indictment without Holloway's consent.  Counsels should have objected to the Court supplying the indictment with facts and elements not found by the Grand Jury but the Court instructing the Petit Jury to find Holloway had an intent to commit assault and/or harassment and/or menacing T.R. 1337.  Had counsel(s) objected to the Court's constructive amendment to the indictment the Court could not have informed the Petit Jury to find Holloway had an intent to commit a crime not found by the Grand Jury and not concurrent for the commission of a capital murder during a burglary offense.

Holloway is due a new trial because Holloway's counsels knew he was not put on Notice by the indictment that he had an intent to commit assault and/or harassent and/or menacing, and counsel(s) knew Holloway went through trial and they had not defended Holloway from having an intent to commit assault and/or harassment and/or menacing while inside the dwelling.

CLAIM THREE:  Holloway was denied effective assistance of counsel when his trial counsels failed to object to the trial court failing to instruct the Petit Jury to a material element of capital murder wherein two persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct.

Counsel should have objected when the Court failed to instruct the jury in order to convict they had to find the defendant killed the victims by one act or pursuant to one scheme or course of conduct. T.R. 1334

Counsels knew the indictment charged Holloway by one act or pursuant to one scheme or course of conduct intentionally killed the victims, and counsel(s) are charged with knowing the statute law states that it is a capital offense to; murder wherein two persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct. See §13A-5-40(a)(10) Alabama Code 1975.

Had counsels objected to the Courts omission of instructing the Petit Jury to this material element to constitute a capital offense then Holloway would not be improperly convicted on fewer elements than necessary to constitute the capital offense he now stands convicted for. Holloway is due a new trial because he had a right to be convicted on the material elements of the indictment and law that constitute the capital offense but counsels did not protect this right and allowed Holloway to be convicted for a capital offense on the jury instructions of an intentional murder and not for capital murder of two persons pursuant to one course of conduct.

CLAIM FOUR: Holloway was denied effective assistance of counsel when appellant counsel(s) failed to raise any one of Holloway's jurisdictional claims raised herein because each of those errors of law are a matter of case on the face of the record and without waiver the appellant court can address jurisdictional claims at any time.

Had appellate counsels raised anyone or all of those claims the appellate court would have reversed completely or in part Holloway's four convictions of an intentional murder involved where only two persons actually died and have reversed the capital murder during a burglary where the Petit Jury acquitted

-6-

the same capital murder during a burglary of the same dwelling and have reversed the capital murder of two persons pursuant to one course of conduct where the Court did not instruct the jury to this material element to constitute a capital offense and have ordered Holloway a new trial for counsel(s) ineffectiveness.

NOTICE TO DISTRICT ATTORNEY

If the District Attorney is willing. Holloway is willing to plead guilty to two intentional murders with a twenty year sentence for each running concurrently or in alternative Holloway demands a new jury trial.

-7-

<u>NOTICE TO COURT</u>

Motion for Court to take Judicial Notice of it's own records in this case namely, the clerk's record and trial record, and motion for Court to acknowledge it has taken Judicial Notice of the entire record, that is, all the intrinsic facts of this case.

Motion for Court to issue order pursuant to Rule 32.7(a) Ala.R.Crim.P., to cause the District Attorney to respond within thirty (30) days of the filing of the petition or by a specified date ordered by this Court.

Motion for Court to appoint Holloway counsel. He is unable to obtain the assistance of counsel. Holloway asks this Court to appoint him counsel to assert and protect his rights. Because Holloway is indigent and desires counsel.

*CC 00-166*

# PETITIONER'S VERIFICATION UNDER OATH
# SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _____
(Date)

_____
*Mason Lee Holloway*
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the _9_ day of ___*April*_____ *2004*

_____
*J H Gill*
Notary Public

## OR *

# ATTORNEY'S VERIFICATION UNDER OATH
# SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon ~~information and belief, the foregoing~~ is true and correct. Executed on _____
(Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____, _____

_____
Notary Public

Name and address of attorney representing petitioner
in this proceeding (if any)

_____

_____

_____

_____

*Prepared on Behalf of
Petitioner BY:
Henry Neal Ferguson III*

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

*NOTE: Court Clerk*

*Filed pursuant to*
*Rule 32.6(C), A.R.Cr.P.*

Case Number

ID   YR   NUMBER
(To be completed
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

## IN THE Circuit Court OF Chambers CO, Alabama
[Insert appropriate court]

JASON LEE Holloway
(Petitioner)

vs.

STATE OF ALABAMA
(Respondent(s)

### DECLARATION IN SUPPORT OF REQUEST TO PROCEED
### IN FORMA PAUPERIS

I, ___ JASON LEE Holloway _____, declare that I am the petitioner
in the above entitled case; that in support of my motion to proceed without being required to prepay
fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs
of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed?    Yes _____     No _X_

    a. If the answer is "yes", state the amount of your salary or wages per month, and give the
       name and address of your employer.

       _____ X _____

    b. If the answer is "no", state the date of last employment and the amount of the salary and
       wages per month which you received.

       _____ INCARCERATED _____

2. Have you received within the past twelve months any money from any of the following sources?

    a. Business, profession, or other form of self-employment?

       Yes _____          No _X_

    b. Rent payments, interest, or dividends?

       Yes _____          No _X_

    c. Pensions, annuities, or life insurance payments?

       Yes _____          No _X_

    d. Gifts or inheritances?

       Yes _____          No _X_

    e. Any other sources?

       Yes _____          No _X_

FILED IN OFFICE THIS

4-15-04

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

2

If the answer to any of t  above is "yes", describe each source  money and state the amount received from each during the p  /twelve months.

_N/A_

3. Do you own cash, or do you have money in a checking or savings account?

Yes _____          No _X_

(Include any funds in prison accounts.)

If the answer is "yes", state the total value of the items owned.

_N/A_

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____          No _X_

If the answer is "yes", describe the property and state its approximate value.

_N/A_

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

_N/A_

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _____ _ANNO DOMINI_
            (Date)

X _Jason Lee Holloway Sr._
  Signature of Petitioner

## CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ _81.70_ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said _St. Clair C.F._ institution:

_4/5/04_
  DATE

AUTHORIZED OFFICER OF INSTITUTION

Rule 32

18

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS
ST. CLAIR CORR FACILITY

AIS #: 230296    NAME: HOLLOWAY, JASON LEE    AS OF: 04/05/2004

| MONTH | # OF DAYS | AVG DAILY BALANCE | MONTHLY DEPOSITS |
|-------|-----------|-------------------|------------------|
| APR | 25 | $0.00 | $0.00 |
| MAY | 31 | $0.00 | $0.00 |
| JUN | 30 | $0.00 | $0.00 |
| JUL | 31 | $0.00 | $0.00 |
| AUG | 31 | $0.00 | $0.00 |
| SEP | 30 | $0.00 | $0.00 |
| OCT | 31 | $0.00 | $0.00 |
| NOV | 30 | $0.00 | $0.00 |
| DEC | 31 | $2.57 | $35.02 |
| JAN | 31 | $5.15 | $77.00 |
| FEB | 28 | $3.90 | $75.00 |
| MAR | 31 | $1.72 | $40.00 |
| APR | 5 | $27.49 | $30.00 |

# COURT OF CRIMINAL APPEALS
# STATE OF ALABAMA

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

CR-02-2115

Jason Lee Holloway v. State of Alabama  (Appeal from Chambers  Circuit Court: CC00-166).

## ORDER

The appellant's motion to hear jurisdictional and appellate ineffective assistance of counsel issues raised in Rule 32 post conviction petition on direct appeal is denied.

Done this the 29th day of April, 2004.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Hon. Ray D. Martin, Circuit Judge
Hon. Charles W. Story, Circuit Clerk
Frances Roark, Court Reporter
Joseph D. Ficquette, Attorney
Charles R. Gillenwaters, Attorney
Andy Scott Poole, Asst. Atty. Gen.

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA



H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## CR-04-1401

Ex parte Jason Lee Holloway   (In re: State of Alabama vs. Jason Lee Holloway)
(Chambers  Circuit Court: CC00-166.60)

## ORDER

Upon consideration of the above referenced Petition for Writ of Mandamus, the Court of Criminal Appeals ORDERS that said petition be and the same is hereby DISMISSED.

Done this the 16th day of May, 2005.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Hon. Charles W. Story, Circuit Clerk
    Jason Lee Holloway, Pro Se
    Hon. Ray D. Martin, Circuit Judge
    Hon. Troy King, Attorney General
    Andy Scott Poole, Asst. Atty. Gen.
    Hon. E. Paul Jones, District Attorney
    Hon. Randy Helms, Director, AOC

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA                    )
                                    )
VS.                                 )        CASE NO. CC-00-166
                                    )
JASON LEE HOLLOWAY                  )

### ORDER

The defendant in the above styled cause as filed a Petition requesting relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. This case is currently pending appeal before the Alabama Court of Criminal Appeals. To the knowledge of this Court, no opinion has been filed in the same. Accordingly, this Petition is DISMISSED as untimely filed. It is interesting to note that this defendant is basically requesting to plead guilty to two intentional murders with a twenty year sentence on each case running concurrently. The defendant's petition is a sham and a mockery.

Let a copy of this Order issue to the defendant, counsel, and the District Attorneys Office.

Signed this the 28th day of June, 2004.



RAY D. MARTIN
CIRCUIT JUDGE

FILED IN OFFICE THIS

JUN 2 8 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

22

NOTICE OF APPEAL TO THE
ALABAMA COURT OF CRIMINAL APPEALS
BY THE TRIAL COURT CLERK

**JASON LEE HOLLOWAY**

APPELLANT (As Appears on Indictment)

v.

STATE OF ALABAMA
APPELLEE

CIRCUIT COURT OF **CHAMBERS** COUNTY, ALABAMA

CIRCUIT COURT NUMBER **CC 2000 166**

CIRCUIT JUDGE **Hon. RAY D. MARTIN**

CONVICTION OR ORDER APPEALED FROM: **RULE 32 PETITION**

DATE OF JUDGMENT OR CONVICTION: _____

SENTENCE: _____

DATE OF SENTENCING: _____

DATE OF NOTICE OF APPEAL: **07-08-2004**

(Notice of Appeal must be given within 42 days from date of sentencing or from order overruling a post conviction motion).

DATE MOTION FOR NEW TRIAL FILED: _____

DATE MOTION FOR NEW TRIAL DENIED: _____

INDIGENT: ☑ YES   ☐ NO

NAME AND COMPLETE ADDRESS OF:

1. COURT REPORTER:

_____

(Address)              (City)              (State)              (Zip Code)

2. APPELLANT'S COUNSEL ON APPEAL:

_____                          (Telephone No.)

(Address)              (City)              (State)              (Zip Code)

3. APPELLANT, IF PRO SE APPEAL:

                                          AIS No: _____

(Address)              (City)              (State)              (Zip Code)

4. APPELLEE, IF CITY APPEAL:

_____

(Address)              (City)              (State)              (Zip Code)

I certify that I have served a copy of this
Notice of Appeal on all parties to this
action of this **9** day of
**July**, 20 **04**

CIRCUIT COURT CLERK

23

IN THE CIRCUIT COURT OF CHAMBERS CO., ALABAMA

JASON LEE HOLLOWAY,
Petitioner, PRO se,

v.

State of Alabama
Respondent.

CC-00-166

# NOTICE OF APPEAL

Comes Now petitioner Holloway And gives notice
of Appeal to the Court of Criminal Appears from
the trial Courts ORDER dismissing his Rule 32
petition on 6-28-04

## Certificate of service

I do hereby certify on 7-7-04 served a copy of
the forgoing upon All parties by properly Addressing
And placing the same first Class postage prepaid in
the U.S. mail via institutional mail clerk.

Attached=
Reporters transcript order
Docketing statement,

Respectfully Submitted,
Jason Lee Holloway
1000 St. Clair Rd. # 230296
Springville, Alabama
35146-5582

FILED IN OFFICE THIS

JUL - 8 2004

CHARLES W. STORY

| State of Alabama Unified Judicial System Form ARAP-1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF _Chambers_ COUNTY

_JASON LEE Holloway_

V.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____, Appellant

Case Number _CC-00-166_    Date of Judgment/Sentence/Order _____

Date of Notice of Appeal
Oral: ____  Written: _7-7-04_   Indigent Status Granted: ☒ Yes  ☐ No

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT A STIPULATION OF FACTS WILL BE INCLUDED STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 2B(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975.

_Jason Lee Holloway_    Date _7-7-04_    _JASON LEE Holloway_
Signature                                                        Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)).

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)

A. ☐ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.    _N/A_

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)    _N/A_

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)    _N/A_

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED    DATE    COURT REPORTER(S)

D. _____

E. _____

F. _____    _N/A_    _N/A_

G. _____

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

FILED IN OFFICE THIS

JUL - 8 2004

_____ Date _____ Print or Type Name
Signature

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, Alabama

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)   8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>_____-_____ |

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _____ *Chambers* _____ COUNTY

*JASON LEE HOLLOWAY*, Appellant

V.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number<br>CC-00-166 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order<br>6-28-04 |
| Number of Days of Trial/Hearing          Days | Date of Notice of Appeal<br>Oral: | Written: 7-7-04 |

Indigent Status Requested: ☒ Yes ☐ No          Indigent Status Granted: ☒ Yes ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☐ Appointed  ☐ Retained.    If no attorney, will appellant represent self? ☒ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br>*JASON LEE HOLLOWAY* | Telephone Number |
| Address<br>1000 St. Clair Rd. | City<br>SPRINGVILLE | State<br>ALA | Zip Code<br>35146 |

CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
| Codefendant    *N/A* | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☐ State Conviction
2 ☒ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify)

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☐ Homicide - § _____
3 ☐ Assault - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☐ Theft - § _____
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☐ Miscellaneous (Specify): _____

FILED IN OFFICE THIS

JUL - 8 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS CO., ALABAMA
_____
(Date)

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?  ☐ Yes  ☒ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _____
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☒ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions? ☒ Yes  ☐ No

THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-03-1671

Jason Lee Holloway, Appellant

vs.

State of Alabama, Appellee

Appeal from Chambers Circuit Court No. CC00-166

## ORDER

On July 12, 2004, this Court received the Circuit Clerk's transmittal of the notice of appeal in the above cause. This is an appeal from the trial court's dismissal of a Rule 32 petition that was filed in connection with Chambers Circuit Court Case Number CC00-166.

This Court notes that Chambers Circuit Court Case Number CC00-166 is presently pending before this Court on direct appeal in CR-02-2115. Because this Court had not transferred jurisdiction back to the circuit court after the direct appeal was initiated pursuant to the procedure prescribed in Barnes v. State, 621 So. 2d 329 (Ala. Cr. App. 1992), the circuit court lacked jurisdiction to act on the appellant's Rule 32 petition, and absent jurisdiction, the order dismissing the appellant's Rule 32 petition is void. See also Ex parte Hargett, 772 So.2d 481 (Ala.Crim.App. 1999).

Upon consideration of the above, the Court of Criminal Appeals hereby ORDERS that this appeal be, and the same is hereby, DISMISSED and that the certificate of judgment should issue forthwith.

Because the trial court lacked jurisdiction to dismiss the appellant's petition, the circuit court should set aside its June 28, 2004, judgment and hold the appellant's Rule 32 petition in abeyance until the certificate of judgment issues on the direct appeal in CR-02-2115, after which, jurisdiction will revert to the circuit court to dispose of the petition.

)
)                                                          )
)                                                          )

If in the future a Rule 32 petition is filed during the pendency of a direct appeal, the circuit clerk, in accordance with Rule 32.6(c), Alabama Rules of Criminal Procedure, should promptly send a copy of the petition to this Court. After receipt of such notice, this Court will either direct that the Rule 32 be held in abeyance or remand jurisdiction to the circuit court to dispose of the Rule 32 petition thus staying the direct appeal.

Done this 14th day of July, 2004.

H. W. "BUCKY" McMILLAN, PRESIDING JUDGE

cca/di

cc:     Hon. Ray D. Martin, Judge
        Hon. Charles W. Story, Clerk
        Jason Lee Holloway, Appellant, Pro Se
        Joseph D. Fiquette, Esq.
        Charles R. Gillenwaters, Esq.
        Office of the Attorney General

2

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
## THE ALABAMA COURT OF CRIMINAL APPEALS

CR-03-1671

Jason Lee Holloway v. State of Alabama  (Appeal from Chambers  Circuit Court: CC00-166).

# CERTIFICATE OF JUDGMENT

To the Clerk of the above noted Trial Court, Greetings:

WHEREAS, the appeal in the above-referenced cause has been considered by the Court of Criminal Appeals; and

WHEREAS, an order was issued this date in said cause containing the judgment indicated below:

## Appeal Dismissed

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure and the order of dismissal, it is hereby certified that the aforesaid judgment is final.

Witness. Lane W. Mann, Clerk
Court of Criminal Appeals, on this
the 14th day of July, 2004.

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. Ray D. Martin, Circuit Judge
   Hon. Charles W. Story, Circuit Clerk
   Joseph D. Ficquette, Attorney
   Charles R. Gillenwaters, Attorney
   Jason Lee Holloway, Pro Se
   Office of Attorney General

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA          )
                          )
VS.                       )          CASE NO. CC-00-166
                          )
JASON LEE HOLLOWAY        )

### ORDER

Pursuant to the Order of the Alabama Court of Criminal Appeals, the Order of June 28, 2004 dismissing Defendant's Rule 32 Petition is hereby SET ASIDE. The Petition was filed during the pendency of a direct appeal of the criminal case and this Court had no jurisdiction to enter the dismissal.

Let a copy of this Order issue to the defendant, counsel, the District Attorneys Office, and the Court of Criminal Appeals.

Signed this the 16th day of July, 2004.

RAY D. MARTIN
CIRCUIT JUDGE

FILED IN OFFICE THIS

JUL 1 9 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
P. O. Box 301555
Montgomery, AL 36130-1555



RELEASED

AUG 13 2004

CLERK
ALA COURT CRIMINAL APPEALS

H.W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

MEMORANDUM

CR-02-2115                    Chambers Circuit Court CC-00-166

Jason Lee Holloway v. State

McMILLAN, Presiding Judge.

The appellant appeals from his convictions on Count II of the indictment charging him with capital murder, committed during the course of a burglary, a violation of § 13A-5-40(a)(4), Ala. Code 1975, wherein the jury convicted him of the lesser-included offense of the intentional murder of Rodney Brown, a violation of § 13A-6-2, Ala. Code 1975, and Count III, charging him the capital murder of Angela Brown, committed during the course of a burglary, a violation of § 13A-5-40(a)(4), Ala. Code 1975. The appellant does not appeal his convictions listed in Count I, which charged him with the intentional murder of two persons, Rodney Brown and Angela Brown, violations of § 13A-5-40(a)(4), Ala. Code 1975. He was sentenced to life imprisonment with parole on Counts I and III of the indictment, and life imprisonment on Count II of the indictment, the murder conviction.

1

## I.

The appellant argues that the trial court erred in denying his motion for a judgment of acquittal on grounds that there was insufficient evidence to support his conviction for murder committed during the course of a burglary. More particularly, he contends that the State did not prove the necessary element of the underlying burglary charge that he "knowingly and unlawfully entered or remained unlawfully" in the victims' home, pursuant to § 13A-7-5, Ala. Code 1975.

Although the appellant's motion for a judgment of acquittal was directed toward his original indicted charge for the capital murder of Rodney Brown, during the course of a burglary, the jury convicted him of the lesser-included offense of murder. Because the appellant was convicted of the lesser-included offense, he was, in effect, acquitted of the greater offense. Because the elements constituting the offense of murder do not require proof that the appellant unlawfully entered or unlawfully remained in the victims' home, it is irrelevant whether the State proved that he "unlawfully entered or unlawfully remained" in the victims' home. Assuming that the appellant's motion for a judgment of acquittal should have been granted, there was no error due to the jury's verdict of guilt on the lesser charge. See <u>Samuels v. State</u>, 584 So. 2d 958 (Ala. Crim. App. 1991); <u>Wysinger v. State</u>, 448 So. 2d 435 (Ala. Crim. App. 1983).

Additionally, the appellant argues that the trial court erred in denying his motion on Count III for the capital murder of Angela Brown, committed during the course of a burglary. The trial court found that, based upon the facts, there was no basis to support a judgment of acquittal. The trial court noted that the evidence presented by the State tended to show that the appellant left the Browns' home after shooting Angela twice and leaving her to die on the sofa. Evidence was presented that when he left, the victim was breathing. The appellant went to his home, watched television and then decided to return to the Browns' home to make sure Angela was dead. He then struck her with a baseball bat and stabbed her to ensure that she was dead. Because the State presented evidence that the appellant's second entry was an unlawful entry that supported the capital murder charge, there was sufficient evidence presented to the jury which, if

2

believed, would justify the verdict of guilt.

## II.

The appellant argues that the trial court erred in allowing the State to cross-examine the appellant about an earlier incident of violence.

The record reveals that the appellant took the stand in his defense and testified that he had "never even made any threat of violence in [his] life." In response to the appellant's testimony concerning his good character, the State was allowed to rebut the evidence pursuant to Rule 404 (a)(1), Ala. R. Evid. The record reveals that the trial court allowed a limited examination, wherein the State was allowed to inquire about an earlier incident in which the appellant cut the screen off a door in an effort to enter the home when a woman refused to let him in. The trial court found that the testimony fell within the scope of cross-examination on a matter "affecting the credibility of the witness." Rule 611(b), Ala. R. Evid. See also Ex parte Woodall, 730 So. 2d 652 (Ala. 1988). The record indicates that the trial court gave a limiting instruction to the jury on the use of the cross-examination by the jury. Because there was no abuse of the trial court's discretion, no error occurred here. Ex parte Loggins, 771 So. 2d 1093 (Ala. 2000).

The judgment of the trial court is affirmed.

AFFIRMED.

Cobb, Shaw, and Wise, JJ., concur. Baschab, J., concurs in the result.

3

# THE STATE OF ALABAMA -- JUDICIAL DEPARTMENT
## THE ALABAMA COURT OF CRIMINAL APPEALS

CR-02-2115

Jason Lee Holloway v. State of Alabama  (Appeal from Chambers  Circuit Court: CC00-166)

# CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on August 13th 2004:

## Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

Witness. Lane W. Mann, Clerk
Court of Criminal Appeals, on this
the 1st day of September, 2004.

Clerk
Court of Criminal Appeals
State of Alabama

cc: Hon. Ray D. Martin, Circuit Judge
Hon. Charles W. Story, Circuit Clerk
Joseph D. Ficquette, Attorney
Charles R. Gillenwaters, Attorney
Andy Scott Poole, Asst. Atty. Gen.

34

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

Jason Lee Holloway,
Defendant/Petitioner, Pro Se,                    )
                                                 )    TO: Judge Howard F. Bryan
VS.                                              )
                                                 )    Case No. CC-00-166
                                                 )
                                                 )    For: Rule 32 Petition
State of Alabama,
Plaintiff/ Respondent     /

## RULE 32.7 (b) A.R.Cr.P. AMENDMENT TO PETITION.

### GROUND

Rule 32.1(b) A.R.Cr.P., THE COURT WAS WITHOUT JURISDICTION TO IMPOSE SENTENCE

### CLAIM

The Court did not afford Holloway an opportunity to make a statement in his own behalf before imposing sentence. See Rule 26.9 (b)(1) A.R.Cr.P.:

> "All defendant's are entitled to an allocution, regardless of the gravity of the sentenced imposed."
> "The failure to afford a defendant an allocution renders his sentence erroneous." Shelton v. State, 851 So.2d 83 (Ala.Crim.App. 1998).

### SUPPORTING FACTS

It is a fact, the record in toto is devoid of the Court asking Holloway in the presence of counsel if he had anything to say before the Court imposed sentence. See R. 1766-1769.

### RELIEF SOUGHT

Holloway wants a new sentencing hearing and to have Court appointed counsel raise each claim in his Rule 32 petition on motion for new trial and on direct appeal.

> "Remand was required for trial court to determine if defendant was afforded allocution, and if he was not, to conduct new sentencing hearing and allow for proper allocution." See Shelton, supra.

CERTIFICATE OF SERVICE

I do hereby certify on this 20th day of December, 2004, served a copy of the foregoing by properly addressing and placing the same first class mail, postage prepaid in the U.S. Mail on the following:

Respectfully submitted,

*Jason Lee Holloway,*
Jason Lee Holloway #230290
1000 St. Clair Rd. G4-A-204
Springville, Alabama
35146-5582

District Attorney
Rea S. Clark
P.O. Box 609
Lafayett, Alabama
36862-0609

Certified Mail Number: 7002-0510-0000-0207-2160

2 of 2

36

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

| | | |
|---|---|---|
| JASON LEE HOLLOWAY | ) | |
| Petitioner | ) | CC 00-166 |
| | ) | |
| VS. | ) | |
| | ) | |
| STATE OF ALABAMA, | ) | |
| Respondent | ) | |

## RESPONSE OF THE RESPONDENT

Comes now the State of Alabama, Respondent in the above styled cause, and in response to the petition in said cause shows as follows, separately and severely:

The petition should be denied because the Petitioner's claim is barred by the statute of limitations, as more particularly appears below.

I.

## STATEMENT OF THE PETITIONER'S CLAIM
## AS UNDERSTOOD BY THE RESPONDENT

The Petitioner's claim, as understood by the Respondent, is as follows:

A.   The court was without jurisdiction to impose the sentence because the Petitioner was not given the opportunity to give an allocution prior to sentencing.

If the Petitioner's claim be other than as stated, the Respondent demands a more definite statement.

II.

## SPECIAL DEFENSES

1.   The Petitioner's conviction became final on September 4, 2003, said date being 42 days after sentencing. Since this petition is filed more than one year after said date, this petition is barred by the statute of limitations.

2.   As to Claim A, the petition should be denied because the same were or could have been raised at trial or on appeal. Therefore, the claim is precluded.

<u>Claim A</u>

1. Although Rule 26.9 of the Alabama Rules of Criminal Procedure states that a defendant shall be given the opportunity to make a statement as to why the rule of law shall not be imposed on him, there are no magic words the judge is required to utter for this statement to be made. Section 26.9 A.R.C.P.

2. Petitioner was represented by Honorable Charles Gillenwaters when the sentence was imposed. Therefore, Claim A has no merit.

Wherefore the premises considered, the Respondent respectfully requests this Honorable Court to deny this petition without a hearing.

Respectfully submitted this 30th day of March , 2005.

Derek L. Taunton
Assistant District Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing response was served upon the petitioner, Jason Lee Holloway, at St. Clair Correctional Facility, by mail, this 30th day of March , 2005.

Derek L. Taunton
Assistant District Attorney

FILED IN OFFICE THIS

APR 4 2005

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

38

IN THE ALABAMA COURT OF CRIMINAL APPEALS

Ex Parte: Jason Lee Holloway,

IN RE:    Jason Lee Holloway,

Petitioner, Pro Se,                 )

VERSUS                              )
                                    )
                                    )    Case No. _____
                                    )
                                    )    CC-00-166.60
                                    )

STATE OF ALABAMA,
_____Respondent._____/

## PETITION FOR WRIT OF MANDAMUS

Comes now Holloway and petitions the above named Court for a Writ of Mandamus to Judge Martin of Chambers County Circuit Court and shows the following in support of this petition.

## STATEMENT OF THE FACTS

1.   On or about April 12, 2004, Holloway prosecuted a pro se Rule 32 Post Conviction petition certified mail return receipt number 7002-0510-0000-0709-5589.  On or about December 20, 2004, Holloway filed an Amended claim to his petition certified mail return receipt number 7002-0510-0000-0707-2160.  The petition was filed pursuant to Rule 32.6 (c) A.R.Cr.P.

2.   Holloway raised two grounds:  One, the Court was without jurisdiction to render judgment or to impose sentence.  Two, the Constitution of the United States or of the State of Alabama requires a New Trial, a new sentence proceeding, or other relief for denial of effective assistance of Counsel. Holloway raised eleven claims under ground one and four claims under ground two.

3.   The District Attorney has . responded to the petition since the filing date .on 3-30-05

4.  On August 13, 2004, the Court of Criminal Appeals released its opinion by Memorandum affirming Holloway's conviction on Direct Appeal Case No. CR-02-2115. No application for Rehearing was filed. A Certificate of Judgment was issued on September 01, 2004.

5.  It should be noted, on June 28, 2004, Judge Martin dismissed the petition as untimely filed but on July 14, 2004, the Court of Criminal Appeals dismissed Holloway's appeal, issued a Certificate of Judgment and ordered the Circuit Court to set aside it's judgment and hold the petition in abeyance until the Certificate of Judgment issued on direct appeal in CR-02-2115. See Case No. CR-03-1671.

6.  Holloway asks this Court to take Judicial Notice of its own records since it should all ready have copies of the pertinent records aforesaid.

## ISSUE PRESENTED FOR REVIEW

7.  Whether or not Holloway's Rule 32 petition is due to be timely addressed?

## RELIEF SOUGHT

8.  Holloway wants this Court to issue an order to the Trial Court to address the petition timely.

## REASONS WHY THE PETITION SHOULD BE GRANTED

9.  Since the filing of the petition to the present date the District Attorney has knowingly and intentionally failed to address the petitions merit in law and fact when the D.A. could have but has not.

10.  Approximately eight (8) months has passed since the Certificate of Judgment on direct appeal has been issued. Wherefore, Holloway believes

-2-

he has a right to have his petition timely addressed and the Court has a duty to address his petition but has refused to timely do so. Thus, this Court has jurisdiction over the Trial Judge under this extraordinary remedy when the Court has declined to address the petition timely without any excuse offered for the unnecessary delay. See Ex parte Gonzalez, 686 So.2d 204 (Ala. 1996).

CONCLUSION

WHEREFORE, the premises considered, Petitioner prays that the Court grant the petition and order that an answer to the petition be filed by the Respondents.

CERTIFICATE OF SERVICE

On the below date, I do hereby certify I served two copies upon the Appellate Court Clerk for him to place a copy of the foregoing into the Attorney Generals Mailbox, and served a copy of the forgoing upon Judge Martin by properly addressing and placing the same first class postage pre-paid in the U.S. Mail via institutional mail clerk.

Dated: 4-15-05

_____
Notary Public

MY COMMISSION EXPIRES:

Respectfully submitted,

_____
Jason Lee Holloway
AIS #230296; G4-A-207
1000 St. Clair Road
Springville, Alabama
USA 35146-5582

-3-

04-2424

FILED

AUG 3 1 2005

Rec'd  9-2-05
CLERK
ALA COURT CRIMINAL APPEALS

## IN THE ALABAMA COURT OF CRIMINAL APPEALS

Ex parte: Jason Lee Holloway.                    )
In Re: Jason Lee Holloway.                       )
    . . Petitioner, Pro Se.                      )
                                                 )
                                                 )
        —v—                                      )        CC-00-166.60
                                                 )
                                                 )
State of Alabama,                                )
        Respondent. /                            )

## PETITION FOR WRIT OF MANDAMUS

Comes now Holloway and petitions the above named Court for a writ of mandamus to Judge Martin of Chambers County Circuit Court and shows the following in support of the petition.

## STATEMENT OF FACTS

On or about April 12, 2004, on April 4th 2005, the District Attorney responded to the petition.

Holloway moves this court to take judicial notice of the previous mandamus Petition. filed CR-04-1401.

## ISSUE PRESENTED FOR REVIEW

Whether or not Holloway's Rule 32 petition is due to be timely addressed?

## RELIEF SOUGHT

Holloway wants Judge Martin to  timely address the petition.

## REASONS WHY THE PETITION SHOULD BE GRANTED

More than sixteen (16) months has passed and Judge Martin has not addressed the petition. Holloway believes his petition is due to be timely addressed to prevent gross disrution of administration of criminal justice. Sixteen (16) months without addressing a Rule 32 petition is entirely unreasonable.

"Mandamus is not to be used as a substitute for appeal; however, mandamus can be used to prevent gross disruption of administration of criminal justice."

Ex parte Jackson, 614 So.2d 405.

## CONCLUSION

Wherefore, the premises considered, petitioner pray's the court grant the petition and order that an answer to the petition be filed by the pespondents.

## CERTIFICATE OF SERVICE

I do hereby certify I served copies of the foregoing upon the trial court judge, attorney general and court of criminal appeals by properly addressing and placing the same in the U.S. mail first class postage pre-paid.

Respectfully Submitted

_Jason Holloway_

Jason Lee Holloway
AIS# 230296 (G-4-A207)
1000 St.Clair Road
Springville, Alabama
U.S.A.  35146-5582

Signed before me in person, a Notary Public,
on this 31 day of August , 20 05 .
_____
Notary Public

8-31-05
DATED
_Odes Wickins_
NOTARY

8/9/05 - Response requested within 21 days.
HW. McMillan, PJ

43

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA           )
                           )
VS.                        )
                           )       CASE NO. CC-00-166
                           )
JASON LEE HOLLOWAY         )

## ORDER

The Court has fully reviewed Holloway's Petition For Relief From Conviction Or Sentence pursuant to Rule 32, Alabama Rules of Criminal Procedure. On June 28, 2004, this Court had dismissed Holloway's Petition during the pendency of his direct appeal to the Alabama Court of Criminal Appeals. The same was set aside pursuant to the Order of the Alabama Court of Criminal Appeals on July 16, 2004.

The issues raised in Holloway's Petition was either addressed on direct appeal, or should have been raised on said direct appeal. Accordingly, his Petition is hereby DENIED.

Let a copy of this Order issue to the defendant, counsel, the District Attorneys Office, and the Alabama Court of Criminal Appeals.

Signed this the 12th day of October, 2005.

RAY D. MARTIN
CIRCUIT JUDGE

FILED IN OFFICE THIS

OCT 1 3 2005

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

In the Circuit court of _Chambers_

County, Alabama

_JASON LEE Holloway_

Petitioner, Pro Se,

vs.

Case No. _CC-00-166_

State of Alabama,

Respondent,

<u>Notice of Appeal to the Court of Criminal Appeals</u>

<u>of Alabama</u>

Notice is hereby given that _JASON LEE Holloway_, petitioner pro se, appeals to the above named court from the judgment entered in this case on the _12th_ day of _October_, 200**5**, denying his Rule 32 post conviction petition.

Respectfully Submitted,

_Jason Lee Holloway_

Petitioner, Pro Se

FILED IN OFFICE THIS

OCT 2 4 2005

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

45

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this *12ᵗʰ* day of *October*, 200*5*

served a copy of the foregoing, upon the following, by placing a copy of the

same in the U.S. mail, postage prepaid and properly addressed:

*Court of Criminal appeals*

_____

_____

_____

*Attorney General*

_____

_____

_____

Respectfully Submitted,

*Jason Lee Holloway*

*1000 St. Clair Rd #230296*

*Springville, Alabama*

*35146-5382*

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C         8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF _Chambers_____ COUNTY

_JASON LEE Holloway_____, Appellant

v. ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number<br>CC-00-166 | Date of Judgment/Sentence/Order<br>October 12, 2005 |
|---|---|
| Date of Notice of Appeal<br>Oral:                    Written: 10-17-05 | Indigent Status Granted:<br>☒ Yes      ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT;**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

_Jason Lee Holloway_____    10-17-05          JASON LEE Holloway
Signature                                Date              Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                                    COURT REPORTER(S)

☐ A. TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence
proceedings, a transcript of the organization of the jury and arguments of counsel must
be designated separately.

☐ B. ORGANIZATION OF THE JURY - This designation will include voir dire examination and
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

☐ C. ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIFIC REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED                    DATE                    COURT REPORTER(S)

D. _____

E. _____

F. _____

G. _____

*[Stamp: IN OFFICE THIS 24 2005 CIRCUIT CLERK CHAMBERS HISTORY ALABAMA]*

*[Handwritten: N/A]*

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2); A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT;**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_____        _____        _____
Signature                        Date              Print or Type Name

DISTRIBUTION: Original filed with Clerk of Trial C...

State of Alabama
Unified Judicial System

m ARAP- 26 (front)    8/91

## COURT OF CRIMINAL APPEALS
## DOCKETING STATEMENT

Criminal Appeal Number

_____

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF    *Chambers*    COUNTY

*JASON LEE HOLLOWAY*    , Appellant

V.  ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number *CC-00-166* | Date of Complaint or Indictment | Date of Judgment/Sentence/Order *10-12-05* |
|---|---|---|
| Number of Days of Trial/Hearing _____ Days | Date of Notice of Appeal Oral: | Written: |

Indigent Status Requested: ☒ Yes ☐ No    Indigent Status Granted: ☒ Yes ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☐ Appointed  ☐ Retained.    If no attorney, will appellant represent self?  ☐ Yes  ☐ No

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)    Telephone Number

*JASON LEE HOLLOWAY*    *N/A*

Address *1000 St. Clair Rd.*    City *Springville*    State *ALA*    Zip Code *35146-5382*

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

Codefendant

Codefendant    *N/A*

Codefendant

FILED IN OFFICE THIS

Case Number

Case Number    OCT 2 4 2005

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☐ State Conviction    4 ☐ Pretrial Order    7 ☐ Juvenile Transfer Order
2 ☐ Post-Conviction Remedy    5 ☐ Contempt Adjudication    8 ☐ Juvenile Delinquency
3 ☐ Probation Revocation    6 ☐ Municipal Conviction    9 ☐ Habeas Corpus Petition    10 ☐ Other (Specify)

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☒ Capital Offense - § _____    6 ☐ Trafficking in Drugs - § _____    11 ☐ Fraudulent Practices - § _____
2 ☐ Homicide - § _____    7 ☐ Theft - § _____    12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____    8 ☐ Damage or Intrusion to Property - § _____    13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____    9 ☐ Escape - § _____    14 ☐ Traffic - Other - § _____
5 ☐ Drug Possession - § _____    10 ☐ Weapons/Firearms - § _____    15 ☐ Miscellaneous (Specify): _____ - § _____

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

**TRANSCRIPT:**

Will the record on appeal have a reporter's transcript?  ☐ Yes  ☒ No

2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed.  *October 17, 2005*
(Date)

3. If the answer to question "1" is "No":

(a)  Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☒ No
(b)  Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☒ Yes  ☐ No

48

| Form ARAP- 26 (back)   8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |
|---|---|

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | *N/A* | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Holloway filed a Rule 32 petition without a response from the state the court denied the petition

**J. ISSUE(S) ON APPEAL;** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

whether or not the trial court abused its discretion when it denied the petition?

**K. SIGNATURE:**

october 17, 2005                      Daron Lee Holloway

```
ACRO370                ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: CC 2000 000166.60
OPER: CHS                     CASE ACTION SUMMARY
PAGE:  1                        CIRCUIT  CRIMINAL                  RUN DATE: 10/26/2005
J  THE CIRCUIT COURT OF  CHAMBERS
                                                                        JUDGE: RDM
STATE  OF  ALABAMA                        VS      HOLLOWAY JASON LEE
                                                  1000 ST. CLAIR ROAD
CASE: CC 2000 000166.60                           6-4-A-206
                                                  SPRINGVILLE, AL  35146 5582
DOB: 01/21/1973          SEX: M  RACE: B  HT: 5 05  WT: 135   HR: BLK EYES: BRO
SSN: 419987561  ALIAS NAMES: BABY FOOD
============================================================================
CHARGE01: MURDER CAPITAL-TWO O CODE01: CM10  LIT: MURDER CAPITAL TYP: F #: 001
CHARGE02: MURDER CAPITAL-BURGL CODE02: CM04                      TYP: F #: 001
CHARGE03: MURDER CAPITAL-BURGL CODE03: CM04                      TYP: F #: 001
OFFENSE DATE:
                                         AGENCY/OFFICER: 0120000 BLACKST
DATE WAR/CAP ISS:
DATE    INDICTED: 08/23/2000             DATE ARRESTED: 01/12/2000
DATE    RELEASED:                        DATE    FILED: 08/24/2000
        BOND AMOUNT:          $.00       DATE  HEARING:
                                              SURETIES:
DATE 1: 07/23/2003  DESC: SENT
DATE 2:             DESC:                      TIME: 0900 A
                                               TIME: 0000
TRACKING NOS: GJ 2000 000088 00  /  GJ 2000 000089 00  /  GJ 2000 000090 00

   DEF/ATY: GILLENWATERS CHARLES R      TYPE: A
           P.O. BOX 2129                                              TYPE:

        ALEXANDER CITY AL 35011
                                                         00000
PROSECUTOR:
============================================================================
   SE: GJ200000008800 CHK/TICKET NO:
   REPORTER:                   SID NO:                    GRAND JURY: 39,40,41
E  STATUS: JAIL                DEMAND:         000000000
                                                                  OPER: CHS
 TRANS DATE       ACTIONS, JUDGEMENTS, AND NOTES
============================================================================
                                                                        OPE
04/15/2004 | ASSIGNED TO: (RDM) RAY D. MARTIN                           CHS |
           |                                           (AR01)
04/15/2004 | FILED ON: 08/24/2000                                       CHS |
           |                                           (AR01)
04/15/2004 | INITIAL STATUS SET TO: "J" - JAIL                          CHS |
           |                                           (AR01)
04/15/2004 | DEFENDANT ARRESTED ON: 01/12/2000                          CHS |
           |                                           (AR01)
04/15/2004 | DEFENDANT INDICTED ON: 08/23/2000                          CHS |
           |                                           (AR01)
04/15/2004 | ATTORNEY FOR DEFENDANT: GILLENWATERS CHARLES (AR01)         CHS |
04/15/2004 | SET FOR:   SENTENCING DKT/HE ON 07/23/2003 AT (AR01)        CHS |
04/15/2004 | CHARGE 01: MURDER CAPITAL-TWO O/#CNTS: 001  (AR01)          CHS |
04/15/2004 | CHARGE 02: MURDER CAPITAL-BURGL/#CNTS: 001  (AR01)          CHS |
04/15/2004 | CHARGE 03: MURDER CAPITAL-BURGL/#CNTS: 001  (AR01)          CHS |
04/15/2004 | RULE 32 FILED COPY TO D.A.                                  CHS |
04/29/2004 | ORDER CRIMINAL APPEALS                                      CHS |
05/16/2004 | ORDER CRIMINAL APPEALS                                      CHS |
06/28/2004 | ORDER--PETITION IS DISMISSED.                               CHS |
07/09/2004 | NOTICE OF APPEAL TO CRIMINAL APPEALS PRO-SE                 RHM |
           |                                                            CHS |
   /2004   | CASE APPEALED ON: 07/09/2004                               CHS |
           |                                           (AR10)
```

```
ACRO37                    ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: CC 2000 000166.60
OPER: CHS                          CASE ACTION SUMMARY
PAGE:    2                            CIRCUIT   CRIMINAL
                                                                    RUN DATE: 10/26/2005
IN THE CIRCUIT COURT OF   CHAMBERS
                                                                         JUDGE: RDM
STATE  OF  ALABAMA                    VS          HOLLOWAY JASON LEE
                                                  1000 ST. CLAIR ROAD
C‾  ‾: CC 2000 000166.60                           6-4-A-206
                                                  SPRINGVILLE, AL  35146 5582

DOB: 01/21/1973            SEX: M  RACE: B  HT: 5 05  WT: 135
SSN: 419987561  ALIAS NAMES: BABY FOOD                      HR: BLK EYES: BRO
```

| TRANS DATE | ACTIONS, JUDGEMENTS, AND NOTES | |
|---|---|---|
| | | OPE |
| 07/09/2004 | APPEAL "TO" TYPE: "R" | |
| | (AR10) | CHS |
| 07/14/2004 | ORDER CRIMINAL APPEALS | |
| | | CHS |
| 07/14/2004 | CERTIFICATE OF JUDGMENT ORDER CRIMINAL APPEALS | |
| | | CHS |
| 07/19/2004 | ORDER--ORDER OF JUNE 29 DISMISSING DEF'S RULE 32 | |
| | | RHM |
| 07/19/2004 | IS SET ASIDE. | |
| | | RHM |
| 08/13/2004 | CRIMINAL APPEALS MEMORANDUM | |
| | | CHS |
| 09/01/2004 | CERTIFICATE OF JUDGMENT ORDER CRIMINAL APPEALS | |
| | | CHS |
| 12/23/2004 | AMENDMENT RULE 32 | |
| | | CHS |
| 04/04/2005 | RESPONSE OF THE RESPONDENT. | |
| | | RHM |
| 06/02/2005 | PETITION FOR WRIT OF MANAMUS FILED W/ CRIM. APPEAL | |
| | | CHS |
| 09/02/2005 | COPY OF PETITON FOR WRIT OF MANDAMUS FILED | |
| | | CHS |
| 10/13/2005 | ORDER--PETITION IS DENIED. | |
| | | CHS |
| 10/24/2005 | NOTICE OF APPEAL TO CRIMINAL APPEALS FILED | |
| | | CHS |
| 10/24/2005 | DATE ON DEF. APPEAL WAS 10-12-2005 BUT I DID NOT | |
| | | CHS |
| '24/2005 | RECEIVE IT TIL 10-24-2005 | |
| | | CHS |
| 1〇/24/2005 | REPORTER'S TRANSCRIPT ORDER & DOCKETING STATEMENT | |
| | | CHS |
| 10/24/2005 | FILED. | |
| | | CHS |
| 10/25/2005 | ADDR1 CHANGED FROM: 1011 COUNTY RD 250 | |
| | (AR01) | CHS |
| 10/25/2005 | HOME CITY CHANGED FROM: ROANOKE | |
| | (AR01) | CHS |
| 10/26/2005 | CASE ACTION SUMMARY PRINTED | |
| | (AR08) | CHS |

51

ACR371                    ALABAMA JUDICIAL DATA CENTER
            NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                          BY THE TRIAL COURT CLERK
                    IN THE CIRCUIT COURT  OF  CHAMBERS COUNTY
)TATE OF ALABAMA VS HOLLOWAY JASON LEE            JUDGE: RAY D. MARTIN

APPEAL DATE: 10/24/2005

INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:    __X__ YES    _____ NO
    INDIGENT STATUS REVOKED ON APPEAL:               __X__ YES    __X__ NO
    INDIGENT STATUS GRANTED ON APPEAL:               __X__ YES    __X__ NO

DEATH PENALTY: NO

APPEAL TYPE: RULE 32 PETITION

THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION,
WRIT OF HABEAS CORPUS, ETC) OR FROM ANY OTHER ISSUED BY THE TRIAL JUDGE.

CO/CASE NUMBER: 12/CC 2000 000166.60

ORDER ENTERED(DATE): 10132005 PETITION: __DISMISSED  X DENIED  __GRANTED

POST-JUDGMENT MOTIONS FILED:    DT FILED        DT DENIED      CON BY AGREE
___ MOTION FOR NEW TRIAL
___ MOTION FOR JUDG. OF ACQUIT   _____     _____     _____
___ MOTION TO W/D GUILTY PLEA    _____     _____     _____
___ MOTION FOR ATTY TO W/DRAW    _____     _____     _____
___ OTHER                        _____     _____     _____

COURT REPORTER(S):
ADDRESS:

APPELLATE COUNSEL #1:
ADDRESS:                          ~~WATERS CHARLES R~~
                                  ~~P.O. BOX 1114~~

PHONE NUMBER:                     ~~ALEXANDER CITY, AL  35011~~
                                  ~~256-234-5018~~

APPELLATE COUNSEL #2:
ADDRESS:

PHONE NUMBER:

APPELLANT (PRO SE):
ADDRESS:                          HOLLOWAY JASON LEE
                                  1000 ST. CLAIR ROAD
AIS #:                            SPRINGVILLE   ,  AL   351465582
                                  230296

APPELLEE (IF CITY APPEAL):
ADDRESS:

I CERTIFY THAT THE INFORMATION PROVIDED                      OPERATOR: CHS
ABOVE IS ACCURATE TO THE BEST OF MY                   PREPARED: 10/26/2005
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS 26 DAY OF OCTOBER 2005      _____
                                                  CIRCUIT COURT CLERK

| State of Alabama<br>Unified Judicial System<br>From ARAP - 14  Rev. 11 / 91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

TO: THE CLERK OF
    THE COURT OF CRIMINAL APPEALS OF ALABAMA

APPELLANT

DATE OF
NOTICE OF APPEAL:  October 24, 2005

JASON LEE HOLLOWAY

v. STATE OF ALABAMA

    I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of ___53___ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

    I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this____26____ day of ___OCTOBER____, __2005__.


CHARLES W. STORY - CHAMBERS COUNTY
Circuit Clerk

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
  Clerk
Sonja McKnight
  Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

November 7, 2005

## CR-05-0185

Jason Lee Holloway v. State of Alabama   (Appeal from Chambers  Circuit Court: CC00-166.60)

## NOTICE

You are hereby notified of the following action in the above cause:

The Appellant's pro se brief was filed on November 7, 2005.  Because the Appellant utilized the alternative means of service to serve the Attorney General with a copy of his/her brief, the Appellee's brief is due to be filed and served by December 1, 2005.

Lane W. Mann, Clerk
Court of Criminal Appeals

cc: Jason Lee Holloway, Pro Se
    Office of Attorney General

FILED

NOV – 7 2005

CLERK
ALA COURT CRIMINAL APPEALS

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA
NO: CR-05-0185

JASON LEE HOLLOWAY,
Petitioner/Appellate, Pro-Se,

vs.

STATE OF ALABAMA,
Respondent/Appellee.

*Attoreny General's Copy*

ON APPEAL FROM THE CIRCUIT COURT OF
CHAMBERS COUNTY, ALABAMA
( CC-00-166.60 )

## BRIEF OF THE PETITIONER

ORAL ARGUMENT NOT REQUESTED

Jason Lee Holloway #230296
G4A-206
1000 St. Clair Road
Springville, AL.
35146-5582

TABLE OF CONTENTS

TABLE OF CONTENTS                                      i

TABLE OF AUTHORITIES                                   ii

STATEMENT OF THE CASE                                  1.

ISSUE PRESENTED FOR REVIEW                             1.

STATEMENT OF THE FACTS                                 1.

STATEMENT OF THE STANDARD OF REVIEW                    2.

SUMMARY OF THE ARGUMENT                                3.

ARGUMENT                                               4.

CONCLUSION                                             5.

CERTIFICATE OF SERVICE                                 6.

i

TABLE OF AUTHORITIES

<u>Lanier v State</u>, 733 So.2d 931 (Ala.Crim.App.1998)          3.

<u>Costillo v State</u>, __So.2d__[CR-04-824](Ala.Crim.App.2005)     3.

Rule 13.5 (a), A.R.Crim.P.                                 3.
*Summleor v. state, 582 So 2d 606 (Ala. Crim. App. 1991*     4.
<u>U.S. Constitution Sixth Amendment</u>                     5.

## STATEMENT OF THE CASE

Petitioner Holloway filed a pro-se Rule 32 post-conviction petition challenging the trial courts jurisdiction to render judgment and raising ineffective asiistance of counsel. CR 1-16. The Respondent answered the petition CR 37-38. The trial court denied the petition. CR 44.

## ISSUE PRESENTED FOR REVIEW

Whether or not the trial court abused its discretion when it denied Petitioner Holloway's claims based upon the fact that they were addressed on direct appeal or they should have been raised on direct appeal?

## STATEMENT OF FACTS

Petitioner Holloway moves this court to take judicial notice of its own records. Holloway was charged tried and convicted for capital murder of two persons pursuant to one course of conduct and two counts of capital murder during a burglary in which one count was reduced to intentional murder.

Petitioner Holloway was sentenced to life without parole for each capital count and to life for intentional murder.

1.

STATEMENT OF THE STANDARD OF REVIEW

The denial of a Rule 32 petition is reviewed under the abuse of discretion standard and if the circuit courts decision is correct for any reason, even if not stated, this court will not reverse the lower court. Ex parte Heaton, 542 So.2d 932, 933 (Ala.1989); Grady v State, 831 So.2d 646,647 (Ala.Crim.App.2001); Strickland v State, 771 So.2d 1123,1125 (Ala.Crim.App.1999),cert. denied, 771 So.2d 1129 (Ala.1999).

An abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law or if there is no evidence in the record to rationally support the decision. State v Jude, 686 So.2d 528,530 (Ala.Crim.App.1996),cert. quashed, 686 So.2d 536 (Ala.1996).

When the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 petition is de novo. Ex parte White, 792 So.2d 1097,1098 (Ala.2001).

2.

SUMMARY OF THE ARGUMENT

The trial court abused its discretion when it denied Petitioner Holloway's Jurisdictional and supporting claims of ineffective assistance of counsel upon finding the issues raised was either addressed on direct appeal or should have been raised on direct appeal because precedent law warrants unconditional relief of conviction and sentence.

ARGUMENT

Petitioner Holloway argues with respect to his indictments for capital murder during a burglary failing to charge an offense (i.e., claims 9 and 10 @ CR 10) are due to be vacated under the authority of Lanier v State, 733 So.2d 931 (Ala.Crim.App.1998) because Holloway's indictment counts fail to state the crime intended to be committed.

In the alternative, that the indictments are insufficient and these convictions are due to be vacated under the authority of Costillo v State, So. 2d__[Cr-04-824](Ala.Crim.App.2005).

Holloway argues with respect to his convictions for capital murder of Angela Brown and Rodney Brown of two persons pursuant to one course of conduct that these convictions are due to be vacated pursuant to Rule 13.5 (a), A.R.Cr.P. because the trial court did, without Petitioner Holloway's consent, amend the indictment in its oral instructions to the petit jury by omitting to instruct the grand jury found Holloway intentionally caused the death of the victims "by one act or pursuant to one scheme or course of conduct", CR 10, for the petit jury to

3.

consider all the material elements for convicting Holloway of capital murder.
Wherefore, Petitioner Holloway's substantial rights was prejudiced because
he was not convicted upon what was charged and tried upon and this relieved
the prosecution of proving each material element of the indicted offenses.

Petitioner Holloway argues the court was without jurisdiction to impose
sentence upon any of his convictions when the court deprived him of the right to
an allocution. Therefore, based on the authority of Ex parte Anderson, 434
So.2d 737 (Ala.1983) Holloway is due a new sentencing hearing. CR 35-36.

Petitioner Holloway's counsel was ineffective when they failed to move to
dismiss his indictments for failing to charge a material element to constitute
burglary and charge capital murder during a burglary. Thus prejudice must be
presumed per se from this gross error on the face of the record because intent
to commit a specific crime is an essential element to charge any burglary
offense. See Lanier v State, supra.

Petitioner Holloway's counsel was ineffective for failing to object to the
trial court omitting to instruct the statutory elements to constitute capital
murder wherein two persons are murdered by the defendant by one act or pursuant
to one scheme or course of conduct. Thus prejudice per se must be presumed
because the court failed to instruct the jury had to find the defendant killed
the victims by one act or pursuant to one scheme or course of conduct.

Holloway's counsel was ineffective for failing to object to the trial court
amending the indictment in its jury instrctions. Thus prejudice must be
presumed because the grand jury did not find what the trial court instructed
to the petit jury. See Summlcor v. State, 582 So.2d 606 (Ala. Crim. App. 1991)

4.

Holloway's appellate counsel was ineffective because they failed to adequately review the record of these errors complained of and raised them in a motion to arrest judgment or directly to the appellate court since all jurisdictional issues can be raised at any time . Thus prejudice must be presumed when these fundamental errors are on the face of the record.

Petitioner Holloway's U.S. Sixth Amendment Right to effective assistance of counsel has been violated.

## CONCLUSION

WHEREFORE, based on the above and the record of the case, Holloway prays this court stand on stare decisis of the laws presented to each of Holloway's and grant him relief of conviction or sentence. The failure to entertain these errors of law will result in a miscarriage of justice.

Respectfully Submitted,

*Jason Lee Holloway*

Jason Lee Holloway,
Petitioner, Pro-Se.

5.

CERTIFICATE OF SERVICE

On this 7th day of __November__, 2005, Holloway certifies that he served two copies of the foregoing upon the Appellate Court Clerk for him to place a copy of the same into the Attorney General's Mailbox.

Jason Lee Holloway

Jason L. Holloway #230296
G4A-206
1000 St. Clair Road
Springville, AL.
35146-5582

6.

No. CR-05-0185

In the COURT of CRIMINAL APPEALS
*of ALABAMA*

◆

JASON LEE HOLLOWAY,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

◆

*On Appeal From the Circuit Court of
Chambers County
(CC-00-166.60)*

**BRIEF OF APPELLEE**

Troy King
*Attorney General*

Andy S. Poole *
*Assistant Attorney General*

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama   36130
(334) 242-7300*

December 8, 2005          Counsel of Record*

## STATEMENT REGARDING ORAL ARGUMENT

The State does not request oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT........................ i

TABLE OF CONTENTS....................................... ii

TABLE OF AUTHORITIES................................... iii

STATEMENT OF THE CASE AND FACTS......................... 1

STATEMENT OF THE ISSUE.................................. 9

STATEMENT OF THE STANDARD OF REVIEW..................... 9

SUMMARY OF THE ARGUMENT................................. 9

ARGUMENT............................................... 11

  The Trial Court Properly Denied And Dismissed Holloway's
  Rule 32 Petition As He Failed To Meet His Initial
  Burden Of Pleading Grounds That, If True, Entitled
  Him To Relief. ...................................... 11

    1.   Jurisdiction ................................... 12

    2.   Ineffective assistance of counsel ............... 21

CONCLUSION............................................. 26

CERTIFICATE OF SERVICE................................. 27

## TABLE OF AUTHORITIES

**Cases**

Arthur v. State, 711 So. 2d 1031 (Ala. Crim. App. 1996).. 15

Bell v. State, 845 So. 2d 856 (Ala. Crim. App. 2002)..... 24

Brown v. State, 663 So. 2d 1028 (Ala. Crim. App. 1995)... 22

Burnett v. State, 651 So. 2d 57 (Ala. Crim. App. 1994)... 22

Carruth v. State, CR-03-0327, 2005 WL 2046334 (Ala.
  Crim. App. Aug. 26, 2005) ............................. 16

Chandler v. United States, 218 F. 3d 1305 (11th Cir.
  2000) ................................................. 23

Ex parte Baldwin, 456 So. 2d 129 (Ala. 1984)............ 22

Ex parte Peraita, 897 So. 2d 1227 (Ala. 2004)........... 15

Fortenberry v. State, 659 So. 2d 194 (Ala. Crim. App.
  1994) ................................................ 11

Grady v. State, 831 So. 2d 646 (Ala. Crim. App. 2001).... 12

Hope v. State, 521 So. 2d 1383 (Ala. Crim. App. 1988).... 23

Howard v. State, 551 So. 2d 1155 (Ala. Crim. App. 1989).. 22

Johnson v. State, 835 So. 2d 1077 (Ala. Crim. App.
  2001) ................................................ 11

Jones v. State, 555 So. 2d 333 (Ala. Crim. App. 1989).... 19

Jones v. State, 816 So. 2d 1067 (Ala. Crim. App. 2000)... 23

Kimmelman v. Morrison, 477 U.S. 365 (1986).............. 22

Little v. State, 676 So. 2d 959 (Ala. Crim. App. 1996)... 13

Lockhart v. Fretwell, 506 U.S. 364 (1993)............... 22

Moore v. State, 709 So. 2d 1324 (Ala. Crim. App. 1997)... 13

Patrick v. State, 680 So. 2d 959 (Ala. Crim. App. 1996).. 23

Strickland v. Washington, 466 U.S. 668 (1984)........... 21

Waters v. Thomas, 46 F. 3d 1506 (11th Cir. 1995)......... 23

Yeomans v. State, 898 So. 2d 878 (Ala. Crim. App. 2004).. 18

**Other Authorities**

Alabama Code (1975)

§ 13A-5-40 ......................................... 14

**Rules**

ARCrP,

Rule 21.3 ......................................... 17

Rule 26.9(b)(1) ..................................... 19

Rule 32.3 ......................................... 11

## STATEMENT OF THE CASE AND FACTS

This appeal arises from the denial of Jason Holloway's nonmeritorious Rule 32 petition. Holloway contends that the trial court committed reversible error by summarily denying and dismissing his petition. The State avers that, contrary to Holloway's contentions, the trial court ruled correctly because Holloway's petition failed to meet its initial burden of pleading grounds that, if true, would entitle him to relief. The trial court's order was correct and should be affirmed.

On January 12, 2000, Holloway went into the home of his neighbors, Rodney and Angela Brown, and murdered them both. On August 23, 2000, the Chambers County Grand Jury returned a three-count indictment against Holloway. Count I charged him with the intentional capital murders of Rodney and Angela Brown pursuant to one scheme or course of conduct, in violation of Alabama Code Section 13A-5-40(a)(10). Count II charged him with the capital murder of Rodney Brown during the course of a burglary, in violation of Alabama Code Section 13A-5-40(a)(4). Count III charged him with the capital murder of Angela Brown during the course of a burglary, in violation of Alabama Code Section 13A-5-

40(a)(4).  Beginning on June 3, 2003, Holloway was tried by a jury, Judge Ray D. Martin presiding.  The jury found Holloway guilty of capital murder of Rodney and Angela Brown on Count I of the indictment; guilty of the lesser included offense of intentional murder of Rodney Brown on Count II of the indictment; and, guilty of the capital murder of Angela Brown during the course of a burglary on Count III of the indictment.  At the conclusion of the sentencing phase of the capital trial, the jury returned a verdict recommending punishment by life in prison without parole by a vote of four for death and eight for life without parole.

The court held a sentencing hearing on July 23, 2003. After conducting a weighing of the aggravating and mitigating circumstances in Holloway's case, the court sentenced Holloway to life in prison without parole for the capital murder convictions contained in Counts I and III of the indictment.  The court sentenced Holloway to life imprisonment for the conviction of intentional murder under Count II of the indictment.

Holloway appealed his convictions to the Alabama Court of Criminal Appeals, raising two issues.  He first argued

that the trial court had improperly denied his motions for judgment of acquittal on Counts II and II of the indictment because there was insufficient evidence to prove he committed the murders during the course of a burglary. He also argued the trial court improperly admitted into evidence testimony concerning an incident he was involved in in 1989 involving a threat to another person, contending that the incident occurred when he was a juvenile; that the incident was too prejudicial to be admitted into evidence; and, that the incident was too remote to be admitted into evidence.

On August 13, 2004, the Alabama Court of Criminal Appeals affirmed Holloway's convictions and sentences by memorandum opinion in case number CR-02-2115. (R. 31-33) The Court found that Holloway did not challenge the sufficiency of the evidence for his conviction under Count I of the capital murder of two or more persons; that he was convicted under Count II of the lesser included offense of intentional murder of Rodney Brown and therefore proof that he committed a burglary was irrelevant to this count; and, that there was evidence relevant to the murder of Angela Brown supporting a finding that he committed intentional

3

murder of her during the course of committing a burglary. The Court of Criminal Appeals further concluded that the evidence of the earlier act was properly admitted within the trial court's discretion in response to Holloway's direct testimony asserting that he had never threatened violence in his life. Holloway filed no further pleadings on direct appeal and, on September 1, 2004, the Alabama Court of Criminal Appeals issued Certificate of Judgment.[1] (R. 34)

On April 12, 2004, while his direct appeal was still pending with the Alabama Court of Criminal Appeals, Holloway filed a Rule 32 petition. (R. 1-7) Holloway asserted several allegations that the trial court lacked jurisdiction to render judgment or to impose sentence, as well as several allegations of ineffective representation by counsel. (R. 5) As understood by the State, Holloway's jurisdictional allegations were as follows:

1. Holloway's conviction for the capital murder of Angela Brown during a burglary should be set aside because it was inconsistent with the

---

[1] This Court may take judicial notice of its own records on direct appeal when reviewing a post-conviction petition. State v. Gagliardi, 747 So. 2d 366, 366 (Ala. Crim. App. 1999); Riddle v. State, 669 So. 2d 1014, 1016 (Ala. Crim. App. 1995).

4

jury verdict acquitting him of the capital murder of Rodney Brown during a burglary;

2.  Holloway's conviction for the intentional murder of Rodney Brown should be set aside because it was part of the conviction for intentional murder of two persons by one course of conduct;

3.  Holloway's conviction for the capital murder of Angela Brown during a burglary should be set aside because the intentional murder part of this offense was a part of the separate conviction for the capital murder of two persons;

4.  Holloway's conviction for the capital murder of two persons should be set aside and found to be two convictions for intentional murder;

5.  Holloway's conviction for the intentional murder of Rodney Brown should be set aside because the indictment charging capital murder during a burglary did not specify what crime Holloway intended to commit, but this was added by the trial court in its jury's instruction;

6.  Holloway's conviction for the capital murder of Angela Brown similarly should be set aside because the indictment lacked a specific named crime Holloway intended to commit;

7.  Holloway's conviction for the capital murder of two persons by one course of conduct should be set aside because the trial court failed to instruct the jury that they must find the crime was committed pursuant to one scheme or one course of conduct;

8.  All of Holloway's convictions were due to be set aside based on the cumulative effect of the alleged errors;

9.   Holloway's conviction for the "capital murder"
     (sic) of Rodney Brown should be dismissed
     because the indictment failed to state an
     offense because it did not specify what crime
     he intended to commit by the burglary; and,

10.  Holloway's conviction for the capital murder
     of Angela Brown should be dismissed because
     the indictment failed to state an offense
     because it did not specify what crime he
     intended to commit by the burglary.

(R. 8-10)

The allegations of ineffective representation by

counsel asserted in Holloway's petition, as understood by

the State, were as follows:

1.   Trial counsel was ineffective for not moving
     to dismiss the two capital murder charges
     because the indictments failed to specify what
     crime Holloway intended to commit (R. 11);

2.   Trial counsel was constitutionally ineffective
     for not objecting to the trial court
     constructively amending the indictment when
     the court gave jury instructions adding a
     specific crime Holloway intended to commit (R.
     12);

3.   Trial counsel was ineffective for not
     objecting to the trial court failing to
     instruct the jury on the charge of the capital
     murder of two persons that the murders must be
     by one act or pursuant to one scheme or course
     of conduct (R. 12-13); and,

4.   Trial counsel was ineffective for failing to
     raise the jurisdictional claims asserted by
     Holloway in his petition.  (R. 13-14)

6

Holloway concluded his petition by stating that he was willing to plead guilty to two charges of intentional murder and be sentenced to concurrent terms of twenty years.  (R. 14)

Judge Ray D. Martin issued an order dismissing the petition as untimely filed.  (R. 22)  The court noted that Holloway's case was still pending on direct appeal, and further noted that what Holloway actually desired was to receive twenty year sentences for intentional murder rather than the findings of the trial jury.  The court concluded that Holloway's "petition [was] a sham and a mockery."  (R. 22)  Holloway appealed the denial of his petition (R. 24); the Alabama Court of Criminal Appeals, noting that the case was still pending before them on direct appeal, dismissed the appeal and found that the circuit court did not have jurisdiction to dismiss the petition because it was still pending on appeal.  The Court of Criminal Appeals directed the trial court to set aside the order of dismissal, and hold Holloway's petition in abeyance until the direct appeal was concluded.  (R. 27)  Judge Martin issued an order setting aside the earlier order of dismissal on July 16, 2004.  (R. 30)  As noted earlier, Certificate of

7

Judgment issued on direct appeal on September 1, 2004. (R. 34)

On December 20, 2004, Holloway filed an amendment to his petition. In the amendment, he averred that he was not allowed an opportunity to make a statement at sentencing as set out in Rule 26.9, Alabama Rules of Criminal Procedure. (R. 35-36) The State filed a Response on April 4, 2005, asserting that the allegation should have been raised at trial or on appeal. The State further averred that, while a defendant was entitled the opportunity to make a statement, there were "no magic words" required by the judge to satisfy this requirement, noting that Holloway was represented by counsel at the sentencing hearing and, therefore, his allegation was without merit.

On October 13, 2005, Judge Martin issued an order denying Holloway's petition. (R. 44) The court noted that the allegations were either addressed on direct appeal or should have been raised on direct appeal. Holloway filed written Notice of Appeal on October 24, 2005. (R. 45-46)

8

## STATEMENT OF THE ISSUE

Did the trial court properly deny and dismiss Holloway's Rule 32 petition because he failed to meet his initial burden of pleading facts that, if true, entitled him to relief?

## STATEMENT OF THE STANDARD OF REVIEW

The applicable standard of review is whether the trial court abused its discretion in denying Holloway's Rule 32 petition.  If the trial court's decision is correct for any reason, the decision is due to be affirmed.  Grady v. State, 831 So. 2d 646, 648 (Ala. Crim. App. 2001); Reed v. State, 748 So. 2d 231, 233 (Ala. Crim. App. 1999).  Pure questions of law, if presented, are reviewed de novo.  Ex parte White, 792 So. 2d 1097, 1098 (Ala. 2001).

## SUMMARY OF THE ARGUMENT

To obtain a reversal of the trial court's denial of a Rule 32 petition, the petitioner must show the trial court abused its discretion.  If the trial court's decision is

correct for any reason, the decision is due to be affirmed.
Grady v. State, 831 So. 2d 646, 648 (Ala. Crim. App. 2001).
It is not an abuse of discretion to deny a Rule 32 petition
when the petitioner failed to meet his burden of pleading
grounds that, if true, showed he was entitled to relief.
Rule 32.3; Fortenberry v. State, 659 So. 2d 194, 197, 200
(Ala. Crim. App. 1994).  The trial court properly denied
Holloway's petition because his allegations lacked legal
and factual support.  His purported jurisdictional claims
failed to show that the trial court did not have
jurisdiction to render judgment and impose sentence.  The
indictments against Holloway were not void, and there were
no inconsistencies in the verdicts returned by the jury
that implicated the jurisdictional authority of the trial
court.  Similarly, Holloway's claims of ineffective
assistance of counsel failed to assert matters that, if
true, entitled him to relief.  Holloway's pleading failed
to show the requirements of Strickland v. Washington, 466
U. S. 668 (1984).  His allegations were based on assertions
that were legally unsound, or that were belied by the
transcript of trial proceedings.  Because Holloway failed
to meet his initial burden of pleading grounds showing he

10

was entitled to relief, the trial court acted properly in summarily denying his petition.

<div align="center">

**ARGUMENT**

</div>

**The Trial Court Properly Denied And Dismissed Holloway's Rule 32 Petition As He Failed To Meet His Initial Burden Of Pleading Grounds That, If True, Entitled Him To Relief.**

In a Rule 32 proceeding, the petitioner has "the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, <u>Alabama Rules of Criminal Procedure</u>.  The petitioner's burden of pleading is to clearly and specifically allege grounds that, if true, would entitle him to relief.  <u>Johnson v. State</u>, 835 So. 2d 1077, 1079-1080 (Ala. Crim. App. 2001).  His burden initially is to convince the trial court that he has alleged grounds entitling him, if true, to the relief sought of setting aside a conviction and sentence.  A Rule 32 petition is properly denied when a petitioner fails to meet his burden of pleading and proof.  <u>Fortenberry v. State</u>, 659 So. 2d 194, 197, 200 (Ala. Crim. App. 1994).  A trial court's order denying a Rule 32 petition should only be reversed

11

where it is shown to be an abuse of discretion; if the order is correct for any reason, it should be affirmed. Grady v. State, 831 So. 2d 646, 648 (Ala. Crim. App. 2001). Contrary to Holloway's assertions, he failed to plead grounds that, even if true, entitled him to relief.  The trial court properly denied Holloway's petition because he failed to meet his initial burden of proof, and the trial court's order is due to be affirmed.

## 1.    Jurisdiction

Holloway contends that he raised several valid jurisdictional challenges to his convictions.  In fact, he did not, when his claims are reviewed under the appropriate legal guidelines.

Holloway's first four allegations of jurisdictional error all seem to arise as variations of a theory that the jury returned inconsistent verdicts in his case.  Holloway was charged with the intentional murder of two or more persons, pursuant to one scheme or course of conduct, of both Rodney and Angela Brown under Alabama Code Section 13A-5-40(a)(10).  He was separately charged for the capital murder of both his victims as intentional murder during the

12

course of a burglary under Alabama Code Section 13A-5-40(a)(4). The jury returned verdicts finding him guilty of the intentional murder of two or more persons pursuant to one scheme or course of conduct; guilty of the capital murder during the course of a burglary of Angela Brown; but not guilty of capital murder, although guilty of the intentional murder, of Rodney Brown. (R. 31)

Holloway first contended that his conviction for the capital murder of Angela Brown must be set aside because it was inconsistent with the acquittal on the charge of capital murder of Rodney Brown. The State first notes that there was no inconsistency in these verdicts under the facts of this case. (See part I of this Court's Memorandum Opinion on direct appeal, R. 32) Dispositive of this claim, to the extent that it alleges inconsistent verdicts, is that such an allegation is not a jurisdictional issue and must be raised during the trial proceedings and on direct appeal to be addressed. See Moore v. State, 709 So. 2d 1324, 1326 (Ala. Crim. App. 1997); Little v. State, 676 So. 2d 959, 964 (Ala. Crim. App. 1996). This claim was properly rejected as a matter that should have been raised at trial or on direct appeal.

13

Holloway's next three jurisdictional claims appear to be allegations of a violation of the prohibition against double jeopardy. He argued that he could not be convicted of both the intentional murder of Rodney Brown and the capital murder of two persons because the intentional murder was part of the capital conviction; that he could not be convicted of the capital murder of Angela Brown during a burglary and for the capital murder of two of more persons because the intentional murder contained within the burglary-murder conviction was part of the capital offense of the murder of two or more persons. Claim 4 appears to be a restatement of the assertions in Claims 2 and 3. (R. 8-9)

Holloway presents a confusing assertion that his conviction for the capital murder of two or more persons pursuant to one scheme or course of conduct consumes all other potential charges arising from the murder of his victims. The Alabama courts, however, have clearly held to the contrary. The various subsections of the capital murder statute, Alabama Code § 13A-5-40, are separate offenses and a defendant may properly be convicted of committing separate offenses of capital murder of the same

14

victim.  See Ex parte Peraita, 897 So. 2d 1227, 1236 (Ala.
2004).  As long as the different offenses contain separate
elements, there is no jurisdictional defect.  Id; Arthur v.
State, 711 So. 2d 1031, 1074-1075 (Ala. Crim. App. 1996).

Here, the jury convicted Holloway of the intentional
murder of two persons pursuant to one scheme or course of
conduct under 13A-5-40(a)(10).  They separately convicted
him of the capital murder during the course of a burglary
of Angela Brown under 13A-5-40(a)(4).  Under a separate
charge under this same subsection, the jury convicted
Holloway of the intentional murder of Rodney Brown,
apparently finding there were insufficient facts to show
this intentional murder was committed during the course of
a burglary.  The fact that the convictions all involved
intentional murders does not create a jurisdictional defect
to the convictions.  Holloway's assertions of
jurisdictional defect in Claims 1-4 has no legal support.

The alleged jurisdictional Claims 5, 6, 9, and 10 of
Holloway's petition were assertions of an improper
indictment charging him with capital murder during the
course of a burglary.  Holloway contended that the charge
of capital murder was insufficient because the indictments

15

failed to specify what crime he intended to commit when he unlawfully entered or remained in the Brown's home; he further contended that the trial court improperly amended the indictment and added additional facts and elements when the court specifically instructed the jury that they had to find that Holloway unlawfully entered the home with the intent to commit the crimes of assault or harassment or menacing.  (R. 9, 10)

This alleged jurisdictional claim is belied by existing case law.  Holloway correctly notes that an indictment for burglary should specify the offense intended to be committed by the unlawful entry; however, this is not a jurisdictional defect that renders an indictment void. This Court has held that the specific shortcoming of an indictment alleged by Holloway may be corrected by the trial court, as was done in Holloway's case, by adding the charge during jury instructions.  See Carruth v. State, CR-03-0327, 2005 WL 2046334, at *10, fn. 6 (Ala. Crim. App. Aug. 26, 2005), citing, Ash v. State, 843 So. 2d 213 (Ala. 2002), and Hampton v. State, 815 So. 2d 571 (Ala. Crim. App. 2001).  Thus, these alleged jurisdictional defects had

16

no legal basis and were properly rejected by the trial
court.[2]

In Claim 7, Holloway alleged that his capital murder
conviction for both Angela and Rodney Brown for the
intentional murder of two persons under one course of
conduct was invalid because the trial court constructively
amended the indictment by its omission in its jury charge
that the jury must find the intentional murders were
committed by one act or pursuant to one scheme or course of
conduct.  The State first notes that this complaint is not
a jurisdictional claim, but is an allegation of an improper
jury charge, a matter that must be properly preserved or it
is waived from appellate review.  See Rule 21.3, Alabama
Rules of Criminal Procedure.  On its face, this claim did
not assert a jurisdictional ground.  Further, a brief
review of the record on direct appeal shows the claim to be
without factual support.

---

[2] The State also notes that Claim 9 of Holloway's petition
attacked a conviction for the "capital murder" of Rodney
Brown during the course of a burglary; as noted previously,
Holloway was acquitted of this charge and convicted of the
lesser included offense of intentional murder.
Nevertheless, the indictment was not void for failure to
charge an offense as alleged by Holloway.

17

A trial court's jury instructions are reviewed in whole and not in isolation. See Yeomans v. State, 898 So. 2d 878, 898 (Ala. Crim. App. 2004). In instructing the jury on the definition of the capital offense of the intentional murder of two or more persons, the court initially instructed the jury that they must find that Holloway intentionally murdered Rodney and Angela Brown. The court, however, specifically referred to the offense as "the murder of two or more persons by a single act." The court concluded this portion of the charge by stating that the offense charged in Count I "covers the murder of two or more persons by one act or one scheme of conduct." (See Transcript in CR-02-2115 at R. 1335) Contrary to Holloway's assertion, the trial court's definition of the capital offense of the intentional murder of two persons by a single act, when read as a whole, did not omit the requirement that the murders be done by one act or one scheme of conduct. Again, however, this is not a jurisdictional claim and therefore it was properly summarily denied by the trial court.

Holloway's remaining claim in his original petition was an allegation of "cumulative" error caused by all of the

18

alleged jurisdictional errors. Holloway contended this was due to the court not requiring the State to elect what capital offense it chose to present. Because there were no jurisdictional errors, there can be no cumulative juror error. Further, there is no requirement that the State elect charges when they are separate offenses, even if they arise out of the same act.

In an amendment to his petition, Holloway argued that the trial court did not have jurisdiction to sentence him because he was not offered an opportunity to make a statement before sentence was imposed. He correctly notes that the courts of this State have held that such an opportunity must be provided under Rule 26.9(b)(1), Alabama Rules of Criminal Procedure. The requirement, however, is that the court give the defendant an opportunity for allocution; there are, however, "no magic words" that must be stated. Rather, what is required is that the trial court give an opportunity. Jones v. State, 555 So. 2d 333, 335-336 (Ala. Crim. App. 1989).

In Jones, this Court stated:

Although the appellant was not specifically asked by the trial judge whether he had anything to say before sentence was imposed on him, the trial judge asked if anybody had anything to say before

19

> he took a recess and then he allowed the appellant
> to make a lengthy statement. There are no magic
> words that a trial judge must recite before a
> defendant is afforded a proper allocution. All
> that is required is that the defendant be given an
> opportunity to make a statement.

Jones, 555 So. 2d at 335-336. Even though there was no

formal offer of allocution, if the record indicates the

defendant was afforded such an opportunity, the requirement

is met. In Holloway's case, the State avers the record

shows just such a fact.

At the sentencing hearing on the capital convictions,

the trial court allowed Holloway, through his attorney, a

lengthy amount of time to argue his position on appropriate

sentencing. The court then took a recess, following which,

before imposing sentence, the court inquired, "Is there

anything else to be submitted by State or Defense?"

Holloway's attorney replied in the negative. (See

Transcript in CR-02-2115 at R. 1765) The court then

imposed sentence. The State avers that the record

indicates that Holloway was given the opportunity to

allocute; through counsel he declined. Accordingly, his

claim was properly rejected by the trial court. Holloway's

petition presented no jurisdictional challenges to the

court's authority to render judgment and impose sentence.
Accordingly, it was proper for the trial court to summarily
deny the petition.

## 2.   Ineffective assistance of counsel

Holloway's petition next asserted several grounds of
constitutionally ineffective representation by trial
counsel.  The claims raised by Holloway, however, failed to
assert grounds that, even if true, entitled him to relief.
Accordingly, these grounds were also properly denied by the
trial court.

To meet the burden under Rule 32 on a claim of
ineffective representation by counsel, the petitioner must
meet the standard set out by the United States Supreme
Court in Strickland v. Washington, 466 U.S. 668 (1984).
The party claiming constitutional error in the
representation provided by counsel must show that counsel's
actions or omissions were deficient *and* that these
deficiencies resulted in actual prejudice to the defendant
to such extent that the validity of the verdict is called
into question.  This requires a showing that, "but for"
counsel's deficient performance, the results of the

21

proceeding would have been different.  Howard v. State, 551 So. 2d 1155, 1158 (Ala. Crim. App. 1989).  Prejudice is only proved where there

> exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  [citations omitted]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial.

Burnett v. State, 651 So. 2d 57, 58 (Ala. Crim. App. 1994); citing Strickland, 466 U.S. at 694.  To prove the necessary prong of prejudice, the alleged errors of counsel must "so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  Kimmelman v. Morrison, 477 U.S. 365, 374 (1986), cited in Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

The party claiming ineffective assistance of counsel bears the burden of satisfactorily proving the claim. Brown v. State, 663 So. 2d 1028, 1032 (Ala. Crim. App. 1995); Ex parte Baldwin, 456 So. 2d 129, 134 (Ala. 1984). An evaluation of an allegation of ineffective assistance of counsel should be made by "considering all the circumstances".  Strickland, 466 U.S. at 688.  The burden of proof is not satisfied by showing some evidence of

22

either of the two prongs of the Strickland test.  Both
prongs must be sufficiently pleaded and proved.

Simply because Holloway thinks something should have
been done does not meet his burden of proof.  "The law does
not require a useless act."  Patrick v. State, 680 So. 2d
959, 963 (Ala. Crim. App. 1996); Jones v. State, 816 So. 2d
1067, 1071 (Ala. Crim. App. 2000).  Counsel may not be held
ineffective for not performing an action for which there is
"no legal basis."  Hope v. State, 521 So. 2d 1383, 1386
(Ala. Crim. App. 1988), quoting United States v. Caputo,
808 F. 2d 963, 967 (2nd Cir. 1997).

In Chandler v. United States, 218 F. 3d 1305 (11th Cir.
2000), the Eleventh Circuit Court of Appeals reiterated the
principles and presumptions that have developed, based upon
decisions of the United States Supreme Court, governing the
evaluation of representation by counsel.  Because of these
principles and presumptions, successful challenges based on
constitutionally deficient representation "are few and far
between."  Chandler, 218 F. 3d at 1313, quoting, Waters v.
Thomas, 46 F. 3d 1506, 1511 (11th Cir. 1995).

Among these governing principles and presumptions is
the requirement that the petitioner must actually prove the

23

unreasonableness of counsel's challenged actions.    In evaluating these actions, the reviewing court must avoid second guessing and "the distorting effects of hindsight." A strong presumption exists that counsel's actions were reasonable.    Bell v. State, 845 So. 2d 856, 859-860 (Ala. Crim. App. 2002).    In applying these principles and presumptions, it is evident that Holloway's allegations of constitutional ineffectiveness are without merit.

Holloway's first claim was that trial counsel should have moved to dismiss the charges of burglary-murder because the indictments did not specify the underlying crime Holloway sought to commit when he unlawfully entered or remained at the Brown's home.    As noted in the jurisdictional portion of this brief, the omission cited by Holloway is not fatal to an indictment, and the underlying crime may be added by the trial court's jury instructions, as was done in this case.    Carruth, 2005 WL 2046334 at *10, fn. 6.    This claim does not support a finding of ineffective assistance of counsel.

Holloway next complained that trial counsel should have objected to the trial court's jury instructions on the capital murder during a burglary indictment.    Again, there

24

is no legal support for such objections and trial counsel cannot be found ineffective for not raising them.

Holloway next argued that trial counsel should have objected to the trial court's omission of language that the intentional murder of two or more persons must be committed by one act or pursuant to one scheme or course of conduct. As noted earlier in the jurisdiction section of this brief, a review of the transcript shows that the court's charge, considered in the whole, contained the necessary language informing the jury that the intentional murders must be "by one act or one scheme of conduct." (See Transcript in CR-02-2115 at R. 1335)

Finally, Holloway argued that trial counsel was constitutionally ineffective for not raising any of the jurisdictional claims in his petition. As noted earlier in this brief, Holloway's assertions were neither jurisdictional nor had any legal or factual merit; accordingly, trial counsel cannot be found to be ineffective for not raising claims with no basis.

25

## CONCLUSION

Based on the foregoing, the State avers that Jason Holloway failed to meet his initial burden of pleading grounds that, even if true, would entitle him to relief under Rule 32.  Accordingly, the trial court acted properly in summarily denying the petition.  The trial court's order is correct and should be affirmed.

Respectfully submitted,

Troy King
*Attorney General*
By:

Andy S. Poole
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>8th</u> day of December, 2005, I served a copy of the foregoing on Holloway, by placing the same in the United States mail, first class, postage prepaid and addressed as follows:

        Jason Lee Holloway
        AIS #230296
        St. Clair Correctional Facility
        1000 St. Clair Road
        Springville, AL  35146


                        Andy S. Poole
                        Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300
231595/87128-001

27

RELEASED

SEP 2 9 2006

CLERK
ALA COURT CRIMINAL APPEALS

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# ALABAMA COURT OF CRIMINAL APPEALS

## OCTOBER TERM, 2005-2006

---

### CR-05-0185

---

### Jason Lee Holloway

### v.

### State of Alabama

### Appeal from Chambers Circuit Court
### (CC-2000-0166.60)

COBB, Judge.

        Jason Lee Holloway appeals the circuit court's denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R. Crim. P.  The petition sought relief from his July 2003 convictions for the capital murder of Rodney and

CR-05-0185

Angela Brown (count I), the intentional murder of Rodney Brown

(count II), and the capital murder of Angela Brown during the

course of a burglary (count III).[1]  Holloway was sentenced to

life imprisonment without the possibility of parole for the

convictions on counts I and III and was sentenced to life

imprisonment for his conviction on count II.    This Court

affirmed Holloway's convictions in an unpublished memorandum.

Holloway v. State, 920 So. 2d 608 (Ala. Crim. App. 2004)

(table).

Holloway initially filed his Rule 32 petition for

postconviction relief while his direct appeal was pending

before this Court.    The Chambers Circuit Court dismissed

Holloway's petition as untimely filed.    (C. 22.)    Holloway

appealed the dismissal to this Court. Noting that the trial

court lacked jurisdiction over the case because the direct

---

[1]Holloway was indicted on three counts.  Count I charged
Holloway with the murder of Angela and Rodney Brown made
capital because it was committed "pursuant to one scheme or
course of conduct,"§ 13A-5-40(a)(10), Ala. Code 1975.  Count
II charged Holloway with the murder of Rodney Brown made
capital because it was committed during a burglary, § 13A-5-
40(a)(4).   Count III charged Holloway with the murder of
Angela Brown made capital because it was committed during a
burglary,§ 13A-5-40(a)(4).  The jury found Holloway guilty of
counts I and III and of the lesser-included offense of
intentional murder as to count II.

2

CR-05-0185

appeal was currently pending before this Court, this Court dismissed Holloway's appeal of the dismissal of his Rule 32 petition and directed the trial court to set aside its dismissal and hold Holloway's petition in abatement until this Court issued its certificate of judgment on the direct appeal. (C. 27.) This Court issued a certificate of judgment on the direct appeal on September 1, 2004. (C. 29.) On or about December 20, 2004, Holloway amended his Rule 32 petition alleging that the trial court failed to grant him an allocution during the sentencing hearing. (C. 35-36.) The trial court dismissed Holloway's petition on October 12, 2005, stating that all the issues raised in Holloway's petition were either raised and addressed on direct appeal or should have been raised in that appeal. (C. 44.)

On appeal, Holloway does not present all of the allegations stated in his petition regarding the trial court's lack of jurisdiction to render judgment or to impose a sentence and ineffective assistance of counsel. Thus, we will address only those issues presented in his brief; the other issues are deemed abandoned. See Brownlee v. State, 666 So. 2d 91 (Ala. Crim. App. 1995).

3

CR-05-0185

## I. Jurisdictional Claims

In his brief to this Court, Holloway argues that the trial court lacked jurisdiction to render judgment or to impose a sentence because the indictment charging Holloway with capital murder of Rodney Brown and Angela Brown during the course of a crime (count II) did not state specifically what crime Holloway intended to commit in the dwelling when the murders occurred and because the trial court allegedly amended the indictment by its oral instructions to the jury. Although a defective indictment that did not allege all the elements of a crime formerly divested a court of jurisdiction, that is no longer the case. In Ex parte Seymour, [Ms. 1050597, June 30, 2006] ___ So. 2d ___, ___ (Ala. 2006), the Alabama Supreme Court held that "a circuit court has subject-matter jurisdiction over a felony prosecution, even if that prosecution is based on a defective indictment."

Holloway also argues that the trial court lacked jurisdiction to impose a sentence upon him because, he says, he was deprived of the right to allocution. Assuming, for the sake of argument, that Holloway was deprived of the right to allocution, that omission does not deprive the trial court of

4

CR-05-0185

jurisdiction. As this Court recently held: "A claim that a defendant was not afforded the opportunity to address the court before the sentence is imposed is not a jurisdictional claim." Shaw v. State, [MS CR-04-2145, March 24, 2006] ___ So. 2d ___, ___ (Ala. Crim. App. 2006). Thus, Holloway is not entitled to any relief as to his alleged jurisdictional claims.

II.  Ineffective-Assistance-of-Counsel-Claims

Holloway argues that he received ineffective assistance from his trial counsel because trial counsel (1) failed to move to dismiss the capital-murder indictments that failed to specify the crime Holloway had committed contemporaneous to the murders, (2) failed to object to the trial court's omission of a jury instruction on the statutory elements of capital murder as defined in § 13A-5-40(a)(10), and (3) failed to object to the amendment of the indictment by the trial court's jury instructions. He also alleges that he received ineffective assistance of appellate counsel because, he says, appellate counsel did not raise the issue of trial counsel's ineffectiveness on direct appeal.

5

CR-05-0185

In order to prevail on an ineffective-assistance-of-counsel-claim, Holloway must satisfy the two-pronged test set forth by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Holloway must show not only that counsel's performance was deficient, but must also show that the deficiency prejudiced him. <u>Strickland</u>, <u>supra</u>. "This Court indulges the presumption that trial counsel's representation was sufficient and that counsel's assistance was effective." <u>Bowen v. State</u>, 899 So. 2d 310, 312 (Ala. Crim. App. 2004).

Holloway's claims of ineffective assistance of counsel are without merit because he is unable to show that he was prejudiced by his counsel's performance. Holloway argues that trial counsel should have moved the trial court to dismiss the capital-murder indictments because the indictments failed to specify the crime Holloway committed contemporaneous to the murders. Even if his trial counsel had moved to dismiss the indictments, however, the trial court could have, as it actually did during the jury charges, amended the indictment. In <u>Carruth v. State</u>, 927 So. 2d 866 (Ala. Crim. App. 2005), we noted:

6

CR-05-0185

>"Although the indictment did not allege the
>specific crime Carruth intended to commit inside the
>dwelling, see, e.g., Lanier v. State, 733 So. 2d
>931, 936 (Ala. Crim. App. 1998), and Popwell v.
>State, 480 So. 2d 41, 45 (Ala. Crim. App. 1985)
>(both holding that a burglary indictment must allege
>the specific crime the accused intended to commit in
>the dwelling), the trial court amended the
>indictment during its jury instructions when it
>instructed the jury that to find Carruth guilty of
>capital murder during a burglary it had to find that
>Carruth intended to commit the crime of theft inside
>the dwelling. See, e.g., Ash v. State, 843 So. 2d
>213 (Ala. 2002) (a trial court can amend an
>indictment through its jury instructions), and
>Hampton v. State, 815 So. 2d 571 (Ala. Crim. App.
>2001) (holding that an indictment that fails to
>charge a mens rea element but otherwise validly
>charges a crime may be amended to add the mens rea
>element)."

927 So. 2d at 878-79, n. 6.  Such amendment may be made over

the objection of a defendant.  Rule 13.5(a), Ala. R. Crim. P.,

states:

>"A charge may be amended by order of the court with
>the consent of the defendant in all cases, except to
>change the offense or to charge new offenses not
>contemplated by the original indictment. The court
>may permit a charge to be amended without the
>defendant's consent, at any time before verdict or
>finding, if no additional or different offense is
>charged and if the substantial rights of the
>defendant are not prejudiced."

(Emphasis added.)    Thus, Holloway could not have been

prejudiced by his attorney's failure to move to dismiss the

indictment.

7

CR-05-0185

Likewise, Holloway's claim that trial counsel was ineffective for not objecting to the trial court's failure to instruct the jury as to the statutory elements of capital murder as defined in § 13A-5-40(a)(10) is without merit. When considering a trial court's jury instructions, this Court must review the instructions as a whole, and not in isolation. See, e.g., Yeomans v. State, 898 So. 2d 878, 898 (Ala. Crim. App. 2004). The trial court's instructions to the jury as to count I were as follows:

> "Ladies and Gentlemen, that concludes some general principles of law that applies to any criminal case. Now, I will go over with you specific law pertaining to this case. And, I'm going to begin with count one.
>
> "The defendant is charged with capital murder. The law states that the intentional murder of two or more persons is capital murder. A person commits an intentional murder of two or more persons, if he causes the death of two or more persons and in performing the act that causes the death of those persons, he intends to kill each of those people.
>
> "To convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder of two or more persons.
>
> "One, that Rodney Brown is dead.
>
> "Two, that Angela Brown is dead.
>
> "Three, that the defendant Jason Holloway caused the deaths of Rodney Brown and Angela Brown by

8

CR-05-0185

shooting Rodney Brown with a pistol or gun and by shooting Angela Brown with a pistol or gun and/or stabbing her with a knife, or knife-like object, and/or beating her with a bat or stick-like object.

"Four, that in committing the act which caused the deaths of both Rodney and Angela Brown, the defendant intended to kill the deceased persons.

"A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific.

"If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of intentionally [sic] murder of two or more persons as charged then you shall find the defendant guilty of capital murder.

"If you find the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of intentional murder of two or more persons, then you cannot find the defendant guilty of capital murder.

"Ladies and Gentleman, I'm going straight through this charge as I said with the counts as they are found in the indictment. And then I'm going to explain to you what, if any, lesser-included offenses may apply to each of the three counts of the indictment.

"<u>In further connection with the charge that I have just given you on the law as it pertains to the murder of two or more persons by a single act</u>, I charge you that a knife, when used to cut or stab a person, is a deadly weapon.

"Because the element of intent being a state of mind or mental purpose is usually incapable of direct proof, it may be inferred from the character of the assault, the use of a deadly weapon, and other attendant circumstances.

9

CR-05-0185

"<u>Now count one covers the murder of two or more</u>
<u>persons by one act or one scheme of conduct</u>."

(Direct appeal R. 1333-35.)    Although not the model of

clarity, the instructions did inform the jury that to

constitute a capital offense the two murders must have arisen

out of the same scheme or conduct.    Thus, Holloway's claim is

without merit.

Similarly, Holloway's claim that trial counsel failed to

object to the amendment of the indictment by the trial court's

jury instructions is without merit.    As stated previously, a

trial court may amend an indictment by giving a jury

instruction and such an amendment may take place over the

objection of the defendant.    <u>See</u>, <u>e.g.</u>, <u>Carruth v. State</u>, 927

So. 2d 866 (Ala. Crim. App. 2005), and Rule 13.5(a), Ala. R.

Crim. P.

Because the aforementioned claims of ineffective

assistance of trial counsel are without merit, it logically

follows that appellate counsel did not err by not raising

these issues on appeal.    Thus, Holloway's claim of ineffective

assistance of appellate counsel are likewise without merit.

10

CR-05-0185

Therefore, Holloway is not entitled to relief as to his claims of ineffective assistance of counsel.

### III.  Double-Jeopardy Concerns

Additionally, we find it necessary to address Holloway's convictions and sentence ex mero motu.  See Thompson v. Board of Pardons & Paroles, 806 So. 2d 374, 375 (Ala. 2001). ("'[I]t is the duty of an appellate court to consider lack of subject matter jurisdiction ex mero motu.'" (quoting Ex parte Smith, 438 So. 2d 766, 768 (Ala. 1983))).  According to the briefs of the parties as well as the record on direct appeal, Holloway was convicted of (1) capital murder of Rodney Brown and Angela Brown, (2) intentional murder of Rodney Brown, and (3) capital murder of Angela Brown during the course of a burglary.  He was sentenced to life imprisonment without the possibility of parole as to the two capital-murder convictions and to life imprisonment as to the intentional murder conviction.  The conviction and sentence for both intentional murder and capital murder as to one victim violate the principles of double jeopardy.

11

CR-05-0185

This Court addressed a similar situation recently in Cooper v. State, 912 So. 2d 1150 (Ala. Crim. App. 2005), in which we stated:

> "'Section 13A-1-8(b), Ala. Code 1975, provides, in pertinent part, as follows:
>
>> "'"(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
>>
>>> "'"(1) One offense is included in the other, as defined in Section 13A-1-9."
>
> "'Intentional murder, as defined in § 13A-6-2(a)(1), Ala. Code 1975, is a statutory element of the capital offense of murder committed during first-degree robbery, as that offense is defined in § 13A-5-40(a)(2), Ala. Code 1975; therefore, the State must prove the element of intentional murder to support a conviction for the capital offense of murder committed during a first-degree robbery. See, e.g., Mangione v. State, 740 So. 2d 444, 449 (Ala. Crim. App. 1998).'
>
> "Watson v. State, 875 So. 2d 330, 333 (Ala. Crim. App. 2003).
>
> "Thus, in Cooper's case, as in Watson, intentional murder is a lesser offense to the offense of capital murder. Because the intentional murder of Herman Daniels as charged in count I of

12

CR-05-0185

the indictment was an element of the capital offense of the murder of Daniels during the course of a burglary, as charged in count II of that same indictment, Cooper could not be convicted of both counts.

"'As we noted in <u>Borden v. State</u>, 711 So. 2d 498, 503 (Ala. Crim. App. 1997), aff'd, 711 So. 2d 506 (Ala. 1998):

"'"We recognize that the trial court may, and indeed should, properly submit to the jury all counts of an indictment and lesser included offenses reasonably supported by the evidence, notwithstanding the fact that some of the lesser included offenses constitute the 'same offense' for double jeopardy purposes. <u>Rolling [v. State</u>], 673 So. 2d [812] at 815 n. 1 [(Ala. Crim. App. 1995)], citing <u>Ball v. United States</u>, 470 U.S. 856, 865, 105 S. Ct. 1668, 1673-74, 84 L. Ed. 2d 740 (1985), and <u>King v. State</u>, 574 So. 2d 921, 935-36 (Ala. Cr. App. 1990) (Bowen, J., concurring specially). See § 13A-1-8(b). However, where, as here, the jury returns guilty verdicts for both a capital offense alleged in one count of the indictment and the lesser included offense of intentional murder ... [as] alleged in another count of the indictment, and the same murder was an element of the capital offense and the intentional murder conviction, the trial court should enter a judgment on

13

CR-05-0185

> only one of the offenses. See
> Coral [v. State], 628 So. 2d
> [954] at 958 [(Ala. Crim. App.
> 1992)]."

> "'(Footnote omitted.) See also Simmons v.
> State, 797 So. 2d 1134, 1184 (Ala. Crim.
> App. 1999); Ingram v. State, 779 So. 2d
> 1225, 1241 (Ala. Crim. App. 1999), aff'd,
> 779 So. 2d 1283 (Ala. 2000).'

> "Watson v. State, 875 So. 2d at 333."

912 So. 2d at 1152-53.

We therefore remand this cause for the trial court to vacate Holloway's conviction and sentence based on count II of the indictment, i.e., intentional murder of Rodney Brown, which is a lesser-included offense of the capital murder of two or more people pursuant to the same scheme or cause of action. We note, however, that Holloway's convictions under counts I and III of the indictment for capital murder were proper, "and thus [they] stand." Coral v. State, 628 So. 2d 954, 958 (Ala. Crim. App. 1992)).

For the foregoing reasons, the trial court's denial of Jason Lee Holloway's Rule 32 petition is affirmed. However, we remand this cause so the trial court may enter a new order vacating Holloway's conviction for intentional murder. The

14

CR-05-0185

return to remand shall be filed within 28 days of this opinion.   The convictions for capital murder stand.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

McMillan, P.J., and Baschab, Shaw, and Wise, JJ., concur.

Rel 03/09/2007 Holloway
Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P.  Rule 54(d),
states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or
briefs and shall not be used by any court within this state, except for the purpose of establishing the application
of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

| | |
|---|---|
| **PAMELA W. BASCHAB** | **Lane W. Mann** |
| **Presiding Judge** | **Clerk** |
| **H.W."BUCKY" McMILLAN** | **Gerri Robinson** |
| **GREG SHAW** | **Assistant Clerk** |
| **A. KELLI WISE** | **(334) 242-4590** |
| **SAMUEL HENRY WELCH** | **Fax (334) 242-4689** |
| **Judges** | |

## MEMORANDUM

CR-05-0185                    Chambers Circuit Court CC00-166.60

<u>Jason Lee Holloway v. State</u>

On Second Return to Remand

WELCH, Judge.

Jason Lee Holloway was convicted in July 2003 for the capital murder of Rodney and Angela Brown (Count I), the intentional murder of Rodney Brown (Count II), and the capital murder of Angela Brown during the course of a burglary (Count III). Holloway was sentenced to life imprisonment without the possibility of parole for his conviction on Counts I and III and was sentenced to life imprisonment for his conviction on Count II. This Court affirmed those convictions in an unpublished memorandum. <u>Holloway v. State</u>, 920 So. 2d 608 (Ala. Crim. App. 2004) (table).

1

Holloway filed a petition for postconviction relief pursuant to Rule 32, Ala. R. Crim. P. On September 29, 2006, this Court unanimously affirmed the capital murder convictions and sentence. However, we held that Holloway's conviction and sentence on Count II, the intentional murder of Rodney Brown, violated principles of double jeopardy because the intentional murder of Rodney Brown is a lesser offense to the offense named in Count I, the capital murder of Rodney and Angela Brown; all the judges concurred. Therefore, we remanded this cause, instructing the Chambers Circuit Court to enter a new order vacating Jason Lee Holloway's conviction and sentence based on Count II of the indictment, the intentional murder.

On January 10, 2007, the trial court entered an order dismissing Count II of the indictment. The order did not vacate Holloway's conviction and sentence on Count II, however. Accordingly, we once again remanded this cause for the trial court to vacate Holloway's conviction and sentence based on Count II of the indictment, the intentional murder of Rodney Brown.

On the second return to remand, the circuit court has entered an order vacating Holloway's conviction for the intentional murder of Rodney Brown and the sentence of life imprisonment he received for that conviction. Because the circuit court has followed our instructions on remand, the judgment of the circuit court is affirmed.

AFFIRMED.

Baschab, P.J., and McMillan, Shaw, and Wise, JJ., concur.

2

## IN THE ALABAMA SUPREME COURT

| | | |
|---|---|---|
| Jason Lee Holloway | § | Supreme Court Number: |
| Petitioner/Appellant, Pro-Se, | § | _____ |
| | § | |
| Versus | § | Appellate Court No.: |
| | § | CR-05-0185. |
| | § | |
| State of Alabama, | § | Circuit Court No. |
| Respondent/Appellee. | § | CC-2000-0166.60 |

Approved Bennett's (General Copy)

---

### PETITION FOR WRIT OF CERTIORARI

Comes your Petitioner/Appellant, and petitions this court for a writ of certiorari to issue to the Court of Criminal Appeals in the above styled cause under Rule 39 A.R.A.P., and shows the following:

1.  Petitioner filed a Rule 32 post conviction petition and suffered a Judgment in the Circuit Court of Chambers County, Alabama on October 12, 2005. The Court of Criminal Appeals affirmed the judgment on March 09, 2007. An application for re-hearing was filed on March 12, 2007, and overruled on March 23, 2007.

2.  A copy of the opinion and motion to enlarge the statement of facts is attached to this petition which shows the Court of Criminal Appeals.

3.  Petitioner alleges as grounds for the issuance of the writ the following:

A.  The basis of this petition for the writ is that a material question requiring decision was one of first impression in the appellate courts of Alabama and was incorrectly decided. The issue is whether the appellate court erred in holding that Ex Parte Seymour, [Ms. 105097, June 30, 2006] _____ So. 2d _____, _____ (Ala. 2006) applies retroactively to the time Holloway raised his jurisdictional indictment issues and his issues of the trial court amending the indictment to charge the offense by its oral instruction to the jury.

B.  The basis of this petition for the writ is that a material question requiring decision was one of first impression in the appellate courts of Alabama and was incorrectly decided. The issue is whether the appellate court erred in holding that Shaw v. State, [Ms CR-04-2145, March 24, 2006] _____ So. 2d _____, _____ (Ala.

Crim.App. 2006) applies retroactively to the time Holloway raised his issue of being deprived of the right to an allocution.

C.    The basis of this petition for the writ is that a material question requiring decision was one of first impression in the appellate courts of Alabama and was incorrectly decided. The issue is whether the appellate court erred in holding that Holloway's claims of ineffective assistance of counsel are without merit because he is unable to show that he was prejudiced by his counsel's performance to move the trial court to dismiss the indictment because the Capital Murder indictment failed to specify the crime Holloway committed contemporaneous to the murders when Carruth v. State, 927 So. 2d 856 (Ala.Crim.App. 2005) was not precedent case law at the time of Holloway's trial.

D.    The basis of this petition for the writ is that a material question requiring decision was one of first impression in the appellate courts of Alabama and was incorrectly decided. The issue is whether the appellate court erred in holding that Holloway's claim that trial counsel was ineffective for not objecting to the trial

3

courts failure to instruct the jury as to the statutory elements of Capital murder as defined in §13A-5-40 (a) (10) is without merit when the court omitted the essential elements of "murder of two or more persons by a single act" in its elements to convict beyond a reasonable doubt.

E.  The basis of this petition for the writ is that a material question requiring decision was one of first impression in the appellate courts of Alabama and was incorrectly decided. The issue is whether the appellate court erred in holding that appellate counsel did not err by not raising (1) trial counsel failed to move to dismiss the Capital murder indictment that failed to specify the crime Holloway had committed contemporaneous to the murders (2) failed to object to the trial courts omission of a jury instruction on the statutory elements of Capital murder as defined in §13A-5-40 (a) (10), and (3) failed to object to the amendment to the indictment by the trial courts jury instructions when Carruth v. State, 927 So. 2d 856 (Ala.Crim.App. 2005) was not decided, and therefore, it

must have been impossible for the appellate counsel to have known this case law.

F.  The basis of this petition for the writ is that the decision is in conflict with a prior decision of the Supreme Court on the same point of law. In its opinion, the appellate court held that Holloway's conviction under count three of the indictment for Capital murder during a Burglary was proper but count two of the indictment for Capital murder during a Burglary, that occurred at the same time and in the same dwelling, and the petit jury acquitted Holloway of this Burglary in this count but vacated the remaining murder because it was a lesser included offense of count one.

In the case of Ex Parte Robey, 920 So. 2d 1069 (Ala. 2004) the Supreme Court held that multiple convictions in a single proceeding for the same offense implicates the jurisdiction of the trial court. Thus Holloway's count three is due to be dismissed and vacated because the petit jury acquitted him of the same Burglary in count two. Therefore, these statements of the law or the substance of the opinion are in conflict and the

appellate court erred in failing to follow the decision of the Supreme Court on the same point of law.

### CONCLUSION

Petitioner respectfully requests that after preliminary examination, the writ of certiorari be granted and that this court proceed under its Rules to review the matters complained of, and to reverse the judgment of the Court of Criminal Appeals, and for other such relief Petitioner may be entitled.

### CERTIFICATE OF SERVICE

On the below date Petitioner does hereby certify that he has duly served a copy of the foregoing upon the attorney general, 11 South Union Street, Montgomery Alabama 36130-0152 and the Court of Criminal Appeals, 300 Dexter Avenue, Montgomery, Alabama 36130-1555 by placing a copy of the same in the U.S. Mail first class postage prepaid.

Dated: April 4, 2007.                     Respectfully Submitted,

                                          X _Jason Lee Holloway_

                                          Jason Lee Holloway
                                          230296   {K2-29-2A}
                                          1000 St. Clair Rd.
                                          Springville, Alabama 35146-5582

6

# IN THE SUPREME COURT OF ALABAMA




May 11, 2007

**1060972**

Ex parte Jason Lee Holloway. PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS (In re: Jason Lee Holloway v. State of Alabama) (Chambers Circuit Court: CC00-166.60; Criminal Appeals : CR-05-0185).

## CERTIFICATE OF JUDGMENT

## Writ Denied

The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.

WOODALL, J. - See, Smith, Parker, and Murdock, JJ., concur. Cobb, C.J., recuses herself.

**I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.**

**Witness my hand this** *11th* **day of** *May,* *2007*

Robert G Esdale, Sr

**Clerk, Supreme Court of Alabama**

/bb

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-05-0185**

Jason Lee Holloway v. State of Alabama  (Appeal from Chambers  Circuit Court: CC00-166.60)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on March 9th 2007:

### Affirmed by Memorandum on Second Return to Remand.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 11th day of May, 2007.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

**cc:** Hon. Ray D. Martin, Circuit Judge
Hon. Charles W. Story, Circuit Clerk
Jason Lee Holloway, Pro Se
Andy Scott Poole, Asst. Atty. Gen.